# Exhibit 1

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| United States Patent No: 9,001,985 | § | |
| Inventors: Patrick M. Cox, Richard J. | § | Attorney Docket No.: |
| Greene, Joseph H. Bockelman, Shreyas | § | 103378-0029 |
| Saitawdekar | § | |
| Formerly Application No.: 13/567,592 | § | Petitioner: Next Caller Inc. |
| Issue Date: Apr. 7, 2015 | § | |
| Filing Date: Aug. 6, 2012 | § | |
| Former Group Art Unit: 2656 | § | |
| Former Examiner: Binh Kien Tieu | § | |
| Patent Owner: TrustID, Inc. | § | |

For: METHOD OF AND SYSTEM FOR DISCOVERING AND REPORTING TRUSTWORTHINESS AND CREDIBILITY OF CALLING PART NUMBER INFORMATION

MAIL STOP PATENT BOARD
Patent Trial and Appeal Board
United States Patent and Trademark Office
Post Office Box 1450
Alexandria, Virginia 22313-1450

## PETITION FOR *INTER PARTES* REVIEW OF UNITED STATES PATENT NO. 9,001,985

*Inter Partes* Review
United States Patent No. 9,001,985

# TABLE OF CONTENTS

I.      INTRODUCTION ............................................................................1

II.     MANDATORY NOTICES UNDER § 42.8 ..................................4

III.    PETITIONER HAS STANDING....................................................5

IV.    '985 Patent .....................................................................................6

     A.      Overview ..............................................................................6

     B.      Prosecution History .............................................................8

V.      THERE IS A REASONABLE LIKELIHOOD PETITIONER WILL
        PREVAIL WITH RESPECT TO AT LEAST ONE CLAIM ........................9

     A.      Claim Construction Under § 42.104(b)(3) ............................9

     B.      Level of Ordinary Skill in the Art.......................................11

     C.      <u>Ground 1</u>: Claims 1-7, 12-14, 16-18, 21, and 22 are obvious
            over Martin; <u>Ground 2</u>: Claims 1-7, 12-18, 21, and 22 are
            obvious over Martin and Abramson; <u>Ground 3</u>: Claims 8-11,
            and 19-20 are obvious over Martin and Kealy; and <u>Ground 4</u>:
            Claims 8-11, and 19-20 are obvious over Martin, Abramson,
            and Kealy..............................................................................11

        1.      Martin......................................................................11

        2.      Abramson .................................................................16

        3.      Motivation to Combine Martin and Abramson .........18

        4.      Kealy .......................................................................19

        5.      Motivation to Combine Martin and Kealy................20

        6.      Motivation to Combine Martin, Abramson, and Kealy............22

        7.      Claim Charts (Grounds 1-4)....................................23

VI.    CONCLUSION.............................................................................60

*Inter Partes* Review
United States Patent No. 9,001,985

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*In re Am. Acad. of Sci. Tech Ctr.*,
  367 F.3d 1359 (Fed. Cir. 2004) ............................................................................9

**STATUTES**

35 U.S.C. §102 ...............................................................................................11, 16, 19

35 U.S.C. §103 .................................................................................................1, 4, 5

35 U.S.C. §§311-319 ...............................................................................................1

35 U.S.C. §325 .........................................................................................................5

37 C.F.R. §1.33 ......................................................................................................61

37 C.F.R. §42.1 ........................................................................................................1

37 C.F.R. §42.8 ........................................................................................................4

37 C.F.R. §42.22 ......................................................................................................5

37 C.F.R. §42.100 ..............................................................................................9, 61

37 C.F.R. §42.104 ................................................................................................5, 9

37 C.F.R. §42.105 ..................................................................................................61

**OTHER AUTHORITIES**

MPEP §2111 .............................................................................................................9

*Cisco Sys., Inc. v. Crossroads Sys., Inc.*, IPR2014-01544........................................6

*L-3 Commc'ns. Hold., Inc. v. Power Survey, LLC*, IPR2014-00839.........................6

*Praxair Dist., Inc. v. Ino Therapeutics, LLC*, IPR2015-00889 ............................5, 6

*Inter Partes* Review
United States Patent No. 9,001,985

*Vibrant Media, Inc. v. Gen. Elec. Co.*, IPR2013-00170 ...........................................9

*Inter Partes* Review
United States Patent No. 9,001,985

## LIST OF EXHIBITS

| Exhibit | Description |
| --- | --- |
| Ex. 1001 | U.S. Patent No. 9,001,985 |
| Ex. 1002 | U.S. Patent No. 9,001,985 File History |
| Ex. 1003 | Declaration of James T. Geier In Support of the Petition for an *Inter Partes* Review of United States Patent No. 9,001,985 |
| Ex. 1004 | U.S. Patent Application Publication No. 2007/0201625 to Martin *et al.* ("Martin") |
| Ex. 1005 | U.S. Patent Application Publication No. 2007/0081648 to Abramson *et al.* ("Abramson") |
| Ex. 1006 | U.S. Patent No. 7,912,192 to Kealy *et al.* ("Kealy") |
| Ex. 1007 | Declaration of Ian B. Brooks In Support of the Petition for an *Inter Partes* Review of United States Patent No. 9,001,985 |

*Inter Partes* Review
United States Patent No. 9,001,985

Pursuant to §§311-319 and §42.1,[1] Next Caller Inc. ("Petitioner") hereby petitions for IPR of claims 1-22 ("Challenged Claims") of U.S. Patent No. 9,001,985 ("the '985 Patent"), issued to TrustID, Inc. ("TrustID" or "Patent Owner"). Petitioner asserts there is a reasonable likelihood at least one of the Challenged Claims is unpatentable and respectfully requests review of, and judgment against, claims 1-22 as unpatentable under §103.

## I.      INTRODUCTION

The applicants for the '985 Patent tried to claim, as their exclusive property, a basic method of determining the trustworthiness of a calling party by using an electronic system to (1) receive a calling party number; (2) after receipt of the calling party number, but before answering the call, gathering information associated with the calling party number; and (3) determining a trustworthiness metric or indicator for the calling party number.  Well before the earliest priority date of the '985 Patent, May 19, 2009, such methods to filter incoming calls and prevent spoofing of calling party origin were well known.  Indeed, the prior art presented here demonstrates the methods of determining trustworthiness as claimed, were known.

For example, U.S. Patent Application Publication No. 2007/0201625

---

[1]      Section cites are to 35 U.S.C. or 37 C.F.R. as the context indicates, and all emphasis and annotations are added unless noted.

-1-

("Martin") (Ex. 1004) teaches a method for processing an incoming telephone call to an alarm system central monitoring station using caller identification ("caller ID") and status information related to the caller ID.  Using the caller ID and status information, when an incoming call arrives, the alarm system central monitoring station determines whether the incoming call should be disconnected, transferred, or connected. Ex. 1004 at Abstract. As illustrated in Figure 5, annotated below, Martin's system reads the caller ID information (in green) and status information (in red) prior to permitting the connection of the call to Martin's receiver (in blue).



Using the caller ID and status information, Martin determines whether the incoming call is a valid (i.e., trustworthy) alarm call and, if so, connects the call to

the appropriate receiver.

Similarly, U.S. Patent Application Publication No. 2007/0081648 ("Abramson") (Ex. 1005) teaches a method of detecting whether an incoming call telephone number has been spoofed. Abramson's method includes receiving the incoming caller's telephone number and additional information related to the caller, assessing whether certain characteristics (e.g., telephone type, signaling protocol, identifiers) relating to the caller's terminal are satisfied, and if so, granting access to the caller. Abramson's assessment of characteristics is performed at tasks 501-503 as illustrated (annotated) below.



In the event any of 501-503 results in a "no," the call is deemed illegitimate and ended. But if all are a "yes," then the call is deemed legitimate and allowed.

As demonstrated, each and every element of the Challenged Claims is disclosed in the prior art and the Challenged Claims are at best nothing more than a

routine and predictable combination of these well-known elements. Thus, Petitioner respectfully requests the Board institute trial and find each of the Challenged Claims unpatentable under §103.

## II.   MANDATORY NOTICES UNDER §42.8

**Real Party in Interest Under §42.8(b)(1).** The real party-in-interest is Petitioner Next Caller, Inc.

**Related Matter Under Rule §42.8(b)(2).** The '985 patent is the subject of Civil Action No. 1:18-cv-00172-LPS, which is pending in the U.S. District Court for the District of Delaware and filed January 30, 2018. Petitioner is unaware of any other pending matter that would affect, or be affected by, a decision in this proceeding.

**Lead counsel, backup counsel, and service information.** Lead counsel, backup counsel, and service information for Petitioner are: Nicole M. Jantzi (Lead Counsel), Reg. No. 50,364, njantzi@mwe.com, P: 202-756-8213 / F: 202-756-8087; Ian B. Brooks (Backup Counsel), Reg. No. 66,709, ibrooks@mwe.com, P:202-756-8075 / F: 202-756-8087. Mailing address for all PTAB correspondence: McDermott Will & Emery LLP, The McDermott Building, 500 North Capitol Street, N.W., Washington, DC 20001.  Petitioner consents to electronic service.

## III.   PETITIONER HAS STANDING

**Grounds for Standing Under Rule §42.104(a):** Petitioner certifies, pursuant to §42.104(a), the '985 Patent is eligible for IPR and Petitioner is not barred or estopped from requesting IPR.  Neither Petitioner nor any real party-in-interest has filed a civil action challenging the validity of a claim of the '985 Patent, or been served with a complaint alleging infringement of the '985 Patent more than a year before this filing.

**Statutory Grounds Under Rules §§42.22, 42.104(b):** Petitioner requests IPR of claims 1-22 and asserts these claims are unpatentable based on one or more grounds: **<u>Ground 1</u>**: Claims 1-7, 12-14, 16-18, 21, and 22 are obvious over Martin under §103(a); **<u>Ground 2</u>**: Claims 1-7, 12-18, 21, and 22 are obvious over Martin in view of Abramson under §103(a); **<u>Ground 3:</u>** Claims 8-11, and 19-20 are obvious over Martin in view of Kealy under §103(a); and **<u>Ground 4:</u>** Claims 8-11, and 19-20 are obvious over Martin in view of Abramson in view of Kealy under §103(a).  These grounds have not been previously before the Office, and any art relied upon here by Petitioner that was previously before the Office, e.g., Kealy, is presented here in a new light.

While the Board "may take into account" the fact Kealy was previously presented to the Office in determining whether to institute, that is only one factor the Board considers. *See* §325(d); *Praxair Dist. v. Ino Therapeutics*, IPR2015-

00889, Paper 14 at 10 (Sept. 22, 2015); *Cisco Sys. v. Crossroads Sys.*, IPR2014-01544, Paper 9 at 13-14 (Apr. 3, 2015); *L-3 Commc'ns. Hold. v. Power Survey*, IPR2014-00839, Paper 9 at 15-16 (Nov. 26, 2014). Like the petition in *Praxair Dist.*, the Petition here does ***not*** present substantially the same arguments as were previously before the Office. *See Praxair Dist.*, IPR2015-00889 at 9-10. Each of the asserted grounds is new, including the combinations of Martin and Kealy, and Martin, Abramson, and Kealy. Indeed, Martin and Abramson were not presented during prosecution. And Kealy is only asserted for Grounds 3 and 4. Moreover, all grounds are supported by the testimony of Petitioner's expert, who, *inter alia*, explains why these combinations render obvious each and every limitation of the Challenged Claims. *See* Ex. 1003.

Section V.C.7 below provides claim charts specifying how the relied upon prior art renders obvious the challenged claims. In further support of the proposed grounds of rejection, the Declaration of technical expert James T. Geier is attached (Ex. 1003).

## IV.   '985 PATENT

### A.   Overview

The '985 Patent is generally directed to a "method of and system for discovering and reporting the trustworthiness and credibility of calling party number information, such as Automatic Number Identification (ANI) or Calling

Number Identification (Caller ID) information, or for inbound telephone calls." Ex. 1001 at Abstract. The '985 Patent has 22 method claims. In independent claim 1, a generic "electronic system" performs three steps.  First, it receives a "calling party number or billing number." Ex. 1001 at 15:6-9.  Second, it gathers "operational status information," and does so "before the incoming call is answered." *Id.* at 15:11-15.  Finally, it determines a "source origin confidence metric." *Id.* at 15:16-19. Ex. 1003 ¶¶29-31.

The '985 Patent admits virtually every aspect of this method was well known. For instance, the patent concedes "the method can be implemented into ***existing*** enterprise, telecommunications, and information service infrastructures," *id.* at 4:5-7.  The patent also admits the "calling party number," "billing number," and "operational status information" have been known for "25 years" before the '985 Patent. *Id.* at 2:10-12, 1:32-37, 1:37-40.  The patent further admits "transmission before the call is answered . . . may be performed through ***any conventional data transmitting technique***" (*id.* at 6:60-67), thus conceding there was nothing new about transmitting information "before the incoming call is answered." Ex. 1003 ¶32.

That leaves only the broad step of "determining" "a source origin confidence metric for the calling party number or billing number." But the claims impose no requirement on how the "determining" step is carried out, and the specification

admits this step may be as simple as "a singular determination such as 'valid' or 'invalid.'" *Id.* at 11:4-5.  According to the specification, the source origin metric is used to determine the validity of the incoming caller information.  *Id.* at 4:59-63; Ex. 1003 ¶¶33-34. The relied-upon prior art taught this claim element and every other element of the Challenged Claims.

### B.    Prosecution History

The application leading to the '985 Patent is a continuation of application 12/783,405, filed May 19, 2010.  The '985 Patent claims priority to a provisional patent application, filed May 19, 2009. The Examiner rejected all claims as either anticipated over U.S. Patent No. 5,963,625 ("Kawecki"), obvious over Kawecki in view of U.S. Patent No. 6,947,532, or obvious over Kawecki in view of Kealy.  Ex. 1002 at 73-77 (01/10/2013 OA at 4-8). As to Kealy, the Examiner determined Kealy

> teaches trust rating embedded in certificates of calling device[s], and a method of managing trust ratings based on fraud and risk factors such as accumulated complains, etc. When a quantity of accumulated complains exceeded a given threshold or no complaints in a given time, a trust rate of a given calling device is adjusted such as reduced or increased (col. 14, line 24 through col. 15, line 16).

*Id.* at 76-77.  The applicants never disputed the Examiner's findings as to Kealy. *See generally* Ex. 1002; Ex. 1003 ¶¶36-38.

## V.   THERE IS A REASONABLE LIKELIHOOD PETITIONER WILL PREVAIL WITH RESPECT TO AT LEAST ONE CLAIM

### A.   Claim Construction Under §42.104(b)(3)

For purposes of this review, the claim language is "given its broadest reasonable construction in light of the specification of the patent in which it appears." §42.100(b). Under this standard, while an inventor may rebut that presumption by providing a definition of the term in the specification with reasonable clarity, deliberateness, and precision, claim terms are presumed to be given their ordinary and customary meaning as would be understood by one of ordinary skill in the art at the time of the invention. *E.g.*, *Vibrant Media v. Gen. Elec.*, IPR2013-00170, Paper 14 at 5 (July 29, 2013). For terms not construed below, Petitioner interprets them for purposes of this review in accordance with their plain and ordinary meaning under the required broadest reasonable interpretation consistent with the specification. Because the standard for claim construction at the PTO is different than used in litigation, *see In re Am. Acad. of Sci. Tech Ctr.*, 367 F.3d 1359, 1364, 1369 (Fed. Cir. 2004); MPEP §2111, Petitioner expressly reserves the right to argue in litigation constructions for any term, as appropriate to that proceeding.[2]  If the Board determines the Challenged

---

[2]    Petitioner further reserves the right to assert in litigation that any term is indefinite.

Claims should be construed under the same standard used by district courts, Petitioner submits the constructions below are still appropriate and the prior art renders obvious the Challenged Claims for the same reasons presented.

The term "**call**" (all claims) means "any connection over a telecommunications or an information service network and includes, but is not limited to, landline, wireless, modem, facsimile, Session Initiation Protocol (SIP), and Voice over Internet Protocol (VoIP) transmissions." This is defined in the specification. *See* Ex. 1001 at 6:22-27.

The term "**source origin confidence metric**" (claims 1, 8, 13-19) means "a determination of the trustworthiness for the entity from which the call originated." This is consistent with the claims. *See* Ex. 1001 at cls. 16, 17, 18.  For example, dependent claim 17 requires "the source origin confidence metric indicates either the calling party number or the billing number *is valid or invalid*." This construction is further consistent with the specification, which describes many forms of the source origin metric, including "a singular determination such as 'valid' or 'invalid'." *Id.* at 11:2-6 ("these and other attributes or elements may be used to generate a score or metric of the validity of an ANI or, alternatively, as a singular determination such as 'valid' or 'invalid' or as a tiered system such as 'red,' 'yellow,' 'green.'").  The metric is disclosed as representing the trustworthiness or credibility of the calling party number.  *Id.* at 12:43-47 ("could

use the disclosed method taught here to achieve the same trustworthiness and validity metric"), 13:61-63 ("[t]he results obtained include a calculated confidence metric representing the credibility of the calling party number").

### B.   Level of Ordinary Skill in the Art

The applicable person of ordinary skill in the art ("POSITA") would have had a bachelor's degree in electrical engineering, computer science, or a related field, plus 1-2 years of experience with telecommunications. Ex. 1003 ¶16. A POSITA is presumed to have knowledge of all relevant prior art, and would thus have been familiar with each of the references cited herein, as well as the background knowledge in the art discussed in §I *supra*, and the full range of teachings they contain.

### C.   Ground 1: Claims 1-7, 12-14, 16-18, 21, and 22 are obvious over Martin; Ground 2: Claims 1-7, 12-18, 21, and 22 are obvious over Martin and Abramson; Ground 3: Claims 8-11, and 19-20 are obvious over Martin and Kealy; and Ground 4: Claims 8-11, and 19-20 are obvious over Martin, Abramson, and Kealy.

#### 1.   Martin

Martin, titled "Central Monitoring Station with Method To Process Call Based On Call Source Identification Information," published Aug. 30, 2007, making it prior art under at least §102(b). Martin discloses "a method for processing an incoming telephone call to an alarm system central monitoring station using call source identification information (such as caller ID, DNIS, or ANI)." Ex. 1004 at [0006]. "The central monitoring station uses the call source

identification information transmitted by the telephone system . . . to make decisions as to how to process the call prior to the receiver answering the call." *Id.* "The central monitoring station will process the call by checking if the call source identification information matches call source identification information stored in memory, and it will check status data that may be associated with the call source identification information, also stored in memory, to determine if the call should be disconnected, transferred, or connected to the receiver." *Id.* "Since the receiver only processes valid (legitimate) local alarm system reports, the lines are less likely to be tied up by invalid alarm calls and the efficiency of the alarm answering process is increased." *Id.*; Ex. 1003 ¶¶46-47.

In Martin's Figure 1, provided below, alarm panels 10-50 are connected to a public telephone system 60 (labeled "PSTN"), which is connected to a central monitoring station 100. *Id.* at [0018].

*Inter Partes* Review
United States Patent No. 9,001,985



FIGURE 1

The receiving circuits 110 read caller ID information 75 from telephone line 70. *Id.* at [0019]. The processing circuits 130 use the caller ID information 75 to determine the status of an alarm system (for example, burglary alarm panel 10) from status information 145 stored in memory 140. *Id.* Based on this status information 145, the processing circuits 130 may cause the switching circuits 120 to connect the call to one of the receiver 150 input lines or to an invalid alarm call station 195. *Id.*; Ex. 1003 ¶¶48-49.

Martin's Figure 2 shows how the status information 145 may be stored in the memory 140. *Id.* at [0022].

-13-



Shown is a list of caller ID information 200 and the status bits (or bytes) 210-330 associated with each caller ID information 200. *Id.* The status information 145 may be updated manually by the monitoring operator 180 or business operator 190, or the status information 145 may be updated automatically by the processing circuits 130. *Id.* at [0021]. Martin discloses "the status information 145 may comprise different information or may be programmed differently in memory." *Id.* at [0028]. Martin explicitly provides an "additional information 330" field and states "[o]ther additional information 330 that may be useful to the monitoring operator 180 or the business operator 190 may also be stored." *Id.* at [0023]; Ex. 1003 ¶¶50-51.

Martin discloses several embodiments for processing an incoming telephone

call. One embodiment is in Martin's Figure 5, annotated[3] below.



"[T]he central monitoring station 100 receives a telephone call, which is detected

by receiving circuits 110 [block 502]." *Id.* at [0027]. "The receiving circuits 110

read the caller ID information 75 [block 504] and the processing circuits 130 look

for a match between the received caller ID information 75 and the caller ID

information 200 stored in memory 140 [block 506]." *Id.* "If a match is not found,

the processing circuits 130 cause the switching circuits 120 to connect the call to

the invalid alarm call station 195 [blocks 508, 510, 512]." *Id.* "If there is a match,

---

[3]     For the Board's convenience, Petitioner added numerals, which are not in

Martin's Figure 5.

the processing circuits 120 read the status bits 210-330 associated with the caller ID information 200 [block 514]." *Id.* "If the processing circuits [130] determine the call is a valid alarm call [block 516], the processing circuits 130 cause the switching circuits 120 to connect the call to the receiver 150 [block 518] and transmit the status information 145 [block 520]." *Id.* "The status information 145 is also updated if necessary [block 522]." *Id.*; Ex. 1003 ¶¶52-53.

### 2. Abramson

Abramson, titled "Detection of Telephone Number Spoofing," published Apr. 12, 2007, making it prior art under at least §102(b). Abramson is directed to "[a]n apparatus and method . . . that enables detecting the spoofing of a telephone number." Ex. 1005 at Abstract. Abramson detects spoofing "by assessing characteristics other than the calling terminal's telephone number, such as the telephone type and the signaling protocol." Abramson utilizes an Enhanced Private Branch Exchange ("PBX") 205 to perform various tasks to grant or deny access to callers. *See id.* at [0040]-[0056], Figs. 2, 3. The tasks performed by Abramson's Enhanced PBX 205 are illustrated in Figures 4 and 5 (below).





Ex. 1003 ¶¶54-55. As shown in Figure 5, "exchange 205 grants a privilege to the

first telephone based on one or more criteria that exchange 205 uses to verify the

-17-

identity of the first telephone" *Id.* at [0064]. For example, "[a]t task 504, exchange 205 grants one or more privileges to the calling telephone, having validated the identity of the calling telephone in tasks 501 through 503." *Id.* at [0072]; Ex. 1003 ¶56.

### 3.   Motivation to Combine Martin and Abramson

It would have been obvious to a POSITA to combine the teachings of Martin and Abramson. In particular, it would have been obvious to modify Martin's processing circuits 130 to perform Abramson's tasks 501-504 so as to protect against spoofing of the incoming caller's caller ID.  Both Martin and Abramson are directed towards validating callers, and in particular to using an automated system that assesses incoming call information to determine how to route a call. *See* Ex. 1004 at [0006], Figs. 1, 2, 5; Ex. 1005 at [0021], [0022], Figs. 2-5. In addition, Martin and Abramson disclose using common elements, e.g., processor, memory, and switching circuits to implement their solutions.  Ex. 1004 at Fig. 1; Ex. 1005 at Fig. 3.   Indeed, a POSITA would have understood Martin's central monitoring station includes a PBX (e.g., the components within the dotted line of Figure 1) that could beneficially implement Abramson's Enhanced PBX. Given the similarities of their teachings, a POSITA would have been motivated to combine Martin and Abramson. Ex. 1003 ¶63.

A POSITA would have been motivated to combine the teachings of Martin

and Abramson because modifying Martin's processing circuits 130 to perform Abramson's tasks 501-504 would have the advantageous benefit of providing additional benefit of avoiding spoofing of the caller ID that Martin relies upon. Absent this modification, Martin is at risk of relying on caller ID information that is inaccurate. As advantageously taught by Abramson, Abramson's additional checks of telephone type, signaling protocol, and identifiers in the call attempt message, make it more difficult to spoof a legitimate telephone number.  Ex. 1005 at [0022], [0023]. This combination would therefore add further efficiency to Martin's system.   Ex. 1003 ¶64.

A POSITA would have found it obvious and straightforward to implement this combination because a POSITA would have understood that Abramson's teachings could be applied through modification of Martin's program performed by Martin's processing circuits, which are analogous to Abramson's processor. Such a modification would have been routine and predictable as both Martin and Abramson utilize call systems with similar components that are connected to the PSTN for assessing the validity of a call. Ex. 1003 ¶65.

### 4.    Kealy

Kealy, titled "Arrangement for Managing Voice Over IP (VoIP) Telephone Calls, Especially Unsolicited or Unwanted Calls," filed Feb. 15, 2005, and issued Mar. 22, 2011, making it prior art under at least §102(e). Kealy teaches assigning a

*Inter Partes* Review
United States Patent No. 9,001,985

trust rating to callers, based on complaints received, to combat spam.  Ex. 1006 at

Abstract.  The trust ratings may be used according to the following rules:

| Trust Rating | Category | Call Management Operation |
|---|---|---|
| 1-4 | Untrusted | (FIG. 4 block 418) Reject calls unless consumer has "opted-in" for such calls with the service provider when establishing service, or in block 332 (FIG. 3). |
| 5, 6 | Suspect | (FIG. 4 block 422) Present caller with "challenge/response" scenario, in which the caller is either requested to provide a spoken reason for the call, type his number or identity to allow the call recipient to decide whether or not to accept the call, etc.. Tell recipient the calling device's trust rating. |
| 7-9 | Suspect | (FIG. 4 block 422) Ring as normal, but present subscriber with a "reject call" option like conventional GSM cell phones, but also showing the caller's trust rating. If subscriber rejects call, turn caller away with a recorded message explaining that his call was rejected. Alternatively, send call to voicemail (FIG. 1 block 115) (automatically or manually) for subscriber to deal with at his leisure. |
| 10-14 | Trusted | (FIG. 4 block 420) Accept call. |
| 15 | Special trusted | (FIG. 4 block 420) Always accept call. |

*Id.* at 9:38-64. Kealy teaches communicating a call using "the Internet or other

communications medium." *Id.* at 3:56-59. Ex. 1003 ¶¶57-58.

## 5.     Motivation to Combine Martin and Kealy

It would have been obvious to a POSITA to combine the teachings of Martin

and Kealy, and in particular to utilize Kealy's trust ratings to further bolster

Martin's incoming call processing system. Both Martin and Kealy are directed

towards assessing the legitimacy of an incoming call. *See* Ex. 1004 at [0006]; Ex.

1006 at 9:39-64, 14:13-20. In addition, both Martin and Kealy use information

about the incoming caller, including caller ID, to determine whether to accept or reject the call. *See* Ex. 1004 at Fig. 5; Ex. 1006 at 8:18-55, 9:39-64. Both operate on known general-purpose hardware using appropriate software. See Ex. 1004 at [0018], [0019], Fig. 1; Ex. 1006 at 11:21-44. A POSITA would have understood Kealy's solution would have been particularly beneficial to Martin's assessment of VoIP calls, which could have been used alongside, or in place of Martin's, telephone lines as it was a well-known trend to transition from conventional telephone lines to internet telephony. *See* Ex. 1006 at 12:1-13. Indeed, a POSITA would have been motivated to use VoIP solutions due to the reduced costs associated therewith. *Id.* at 1:18-20. Moreover, Kealy teaches using trust ratings "for emergency service VoIP devices." *Id.* at 5:3-5. A POSITA would thus have been motivated to combine the teachings of Martin and Kealy by the similarities in their solutions presented and the improvements that Kealy could provide to Martin's system. Ex. 1003 ¶66.

A POSITA would have found it obvious and straightforward to use Kealy's advantageous teachings of trust ratings to further assess the legitimacy of an alarm call in Martin's system. A POSITA would have understood how to make the modification to Martin's program, and such a modification would have been routine and predictable. Indeed, Martin's status information is readily adaptable and could maintain trust ratings as part of its "additional information." Ex. 1004 at

[0023], Fig. 2. Ex. 1003 ¶67.

### 6. Motivation to Combine Martin, Abramson, and Kealy

For similar reasons as expressed above, it would have been obvious to a POSITA to combine the teachings of Martin, Abramson, and Kealy, and in particular to utilize Kealy's trust ratings to further bolster Martin's incoming call processing system with Abramson's spoofing detection. All three references teach methods of combating unwanted calls. *See* Ex. 1004 at [0006]; Ex. 1005 at Abstract; Ex. 1006 at 9:39-64, 14:13-20. Abramson and Kealy both teach the use of call terminals capable of VoIP calls. Ex. 1005 at [0015], Fig. 2; Ex. 1006 at Abstract. These calls, like all others, are taught in Abramson to be routed through the PSTN, which Martin also teaches as the path through which calls reach its system. *See* Ex. 1005 at Fig. 2; Ex. 1004 at Fig. 1. Given the similarities of the goals of each and their methods of implementation, a POSITA would thus have been motivated to combine the teachings of Martin, Abramson, and Kealy. Indeed, incorporating Kealy's teachings would strengthen the Martin/Abramson systems capabilities to reject spam callers, particularly those arriving over the VoIP system. Ex. 1003 ¶68.

As explained above, a POSITA would have found it obvious and straightforward to use Kealy's advantageous teachings of trust ratings to further assess the legitimacy of an alarm call in the combined Martin/Abramson system.

A POSITA would have understood how to make the modification to Martin/Abramson's program, and such a modification would have been routine and predictable. Ex. 1003 ¶69.

### 7. Claim Charts (Grounds 1-4)

| Claim 1 | Martin; Martin in view of Abramson |
|---|---|
| **[1.pre]**[4] A method of determining a source origin confidence metric of a calling party number or billing number associated with an incoming call to a called party telephonic device from a calling party telephonic device, comprising: | **Martin discloses a method (e.g., "method") of determining a source origin confidence metric (e.g., "determine the call is a valid alarm call") of a calling party number or billing number associated with an incoming call (e.g., "call source identification information (such as caller ID, DNIS, or ANI)") to a called party (e.g., "central monitoring station 100") telephonic device (e.g., "receiving circuits 110," "switching circuits 120," "receiver(s) 150," and/or "invalid alarm call station")[5] from a calling party telephonic device (e.g., "burglary alarm panel 10")** at, *e.g.,* Ex. 1004 at **[0006]** ("a *method for processing an incoming telephone call to an alarm system central monitoring station using call source identification information (such as caller ID, DNIS, or ANI). . . . The central monitoring station will process the call by checking if the call source identification information matches call source identification information stored in memory, and it will check status data that may be associated with the call source identification information, also stored in* |

---

[4]     To the extent they are considered limitations, the preambles of the Challenged Claims are also disclosed.

[5]     A POSITA would have understood Martin's receiving circuits 110, switching circuits 120, receiver(s) 150, and/or invalid alarm call station in varying combinations to be telephonic devices.  Ex. 1003 ¶74.

*memory, to determine if the call should be disconnected, transferred, or connected to the receiver.* Since the receiver *only processes valid (legitimate)* local alarm system reports, the lines are less likely to be tied up by invalid alarm calls and the efficiency of the alarm answering process is increased."), **[0018]** ("FIG. 1 shows a central monitoring station 100 with an input telephone line 70 from the public telephone system 60. Also shown are alarm panels 10-50 . . . . When a burglary, for instance, is taking place, the burglary alarm system would detect the intruder and *the burglary alarm panel 10, connected to the public telephone system 60, would dial the central monitoring station 100. The public telephone system 60 would connect the call from the burglary alarm panel 10 to the central monitoring station 100 through telephone input line 70.* As the public telephone system 60 makes the connection it transmits call source identification (caller ID) information 75 . . . . *The receiving circuits 110 detect the call from telephone input line 70 and read the caller ID information 75.* The interface protocol to the burglary alarm panel 10 is determined and the connection is made between the receiver 150 and the burglary alarm panel 10 through the switching circuits 120. *This operation is controlled by the processing circuits 130 with inputs from memory 140. The receiver 150 converts the data transmitted from the burglary alarm panel 10 and transmits it to the automation computer 160 along with the caller ID information 75.*"), **[0027]** ("the *central monitoring station 100 receives a telephone call which is detected by receiving circuits 110. The receiving circuits 110 read the caller ID information 75 and the processing circuits 130 look for a match between the received caller ID information 75 and the caller ID information 200 stored in memory 140.* If a match is not found, the processing circuits 130 cause the switching circuits 120 to connect the call to the invalid alarm call station 195. The business operator 190 will determine if the status information 145 should be programmed into memory 140. If there is a match, the processing circuits 120 read the status bits 210-330 associ-

ated with the caller ID information 200. *If the processing circuits 120 determine the call is a valid alarm call, the processing circuits 130 cause the switching circuits 120 to connect the call to the receiver 150 and transmit the status information 145.*"),



Fig. 1,



Fig. 2; Ex. 1003 ¶¶71-73.

|  | **Abramson[6] discloses a source origin confidence metric (e.g., "validat[ing] the identity of the calling telephone in tasks 501 through 503" so as to "determine[], with a higher level of confidence than with some techniques in the prior art, whether the calling telephone is genuine or is spoofing another tele-** |
|---|---|

---

[6]      To the extent it is argued that determining a source origin confidence metric would not have been obvious in view of Martin's teachings alone, Abramson teaches validating the identity of a caller, so as to determine a higher confidence level that the call is genuine, through a series of checks at tasks 501-503—each check providing a higher confidence level. Ex. 1003 ¶75.  As explained above, a POSITA would have been motivated to modify Martin's central monitoring station to perform the validation tasks in Abramson.  Indeed, such a modification would have been obvious and straightforward.  Abramson's enhanced PBX utilizes standard processor and memory components, Ex. 1005 at [0058], [0059], Fig. 3, which a POSITA would have understood to be equivalent to Martin's processing circuits 130 and memory 140 and capable of processing the same information as Abramson's Enhanced PBX.  A POSITA would have recognized that performing tasks 501-503 as taught by Abramson in Martin's alarm system central monitoring station would have advantageously provided a higher level of confidence that the calling telephone was genuine.  Such a modification would have been straightforward in light of Abramson's teachings, and yielded predictable results. Ex. 1003 ¶83.

**phone")** at, *e.g.*, Ex. 1005 at **[0023]** ("the system checks the order of the identifiers present in the call attempt message to see if the order agrees with what is expected. *By checking the results, the data-processing system determines, with a higher level of confidence than with some techniques in the prior art, whether the calling telephone is genuine or is spoofing another telephone*."), **[0066]** ("At task 501, exchange 205 determines whether the received telephone type agrees with what is expected for the received telephone number. *If the telephone type agrees with what is expected, task execution proceeds to task 502*; otherwise, task execution proceeds to task 505."), **[0067]** ("Exchange 205 has expected information for each affiliated telephone number stored in memory 303. . . . For example, for the telephone number "908-555-3381", exchange 205 expects a telephone type of "GSM Cellular". If the calling telephone's telephone type is "GSM Cellular", then task execution proceeds to task 502. If the calling telephone's telephone type is something else, such as "Landline", then task execution proceeds to task 505."), **[0068]** ("At task 502, exchange 205 determines whether the received signaling protocol agrees with what is expected for the received telephone number. *If the signaling protocol agrees with what is expected, then task execution proceeds to task 503*; otherwise, task execution proceeds to task 505."), **[0069]** ("For example, for the telephone number "908-555-3381" as shown in Table 2, exchange 205 expects the calling telephone to be using a signaling protocol of "ISDN". If the calling telephone is using a signaling protocol of "ISDN", then task execution proceeds to task 503; otherwise, task execution proceeds to task 505."), **[0070]** ("At task 503, exchange 205 determines whether the ordering of the identifiers within the received plurality of identifiers agrees with what is expected for the received telephone number. *If the ordering of the identifiers agrees with what is expected, then task execution proceeds to task 504*; otherwise, task execution proceeds to task 505."), **[0071]** ("suppose exchange 205 expects four identifiers A through D in the order "A-B-C-D" in

the signaling message. If exchange 205 receives the four identifiers, but in the order "A-B-D-C" (i.e., not in the order expected), then task execution proceeds to task 505."), **[0072]** ("*At task 504, exchange 205 grants one or more privileges to the calling telephone, having validated the identity of the calling telephone in tasks 501 through 503*. . . . After task 504, task execution ends.").



**Fig. 5; Ex. 1003 ¶¶76-82.**[7]

---

[7]     To the extent it is argued that further disclosure of a "source origin confidence metric" is required, this limitation would have been obvious. As explained above, the source origin confidence metric is used to determine the validity of incoming caller information, resulting in a binary outcome—valid or invalid. *See* Ex. 1001 at 4:59-63. As explained above, Martin and Abramson perform similar determinations, consistent with the claimed metric—yielding valid/invalid determinations. If "source origin confidence metric" is determined to be something other than binary, it would have been obvious to modify Martin and Abramson to use a non-binary metric. For example, it would have been obvious to a POSITA to

| **[1.1(a)]** receiving by an | **Martin discloses receiving (e.g., "receiv[ing]") by an** |
|---|---|

modify Martin to use Martin's status information to calculate a score using statistical analysis of the status bits to make a validity determination.  Doing so would permit Martin's call center to assess certain boundary situations where, e.g., a caller may not yet have runaway dialer status, but the COUNT DATA continues to rise.  Once a threshold has been passed, the caller is then determined to be a runaway dialer.  Similarly, a POSITA would have found obvious to modify Abramson to assess each characteristic and assign a probabilistic score—if, e.g., only two of three tasks resulted in a "yes."  Under such circumstances, Abramson could advantageously gain greater flexibility in evaluating callers—assigning weight to certain characteristics and determining validity based on a surpassed threshold.  These modifications would have been straightforward to a POSITA, as they would require minor changes to the programming of Martin's and Abramson's processors, and would have yielded predictable results.  Ex. 1003 ¶¶84-86.

| electronic system associated with the called party telephonic device the calling party number or billing number, | **electronic system (e.g., "processing circuits 130")[8] associated with the telephonic device (e.g., "receiving circuits 110," "switching circuits 120," "receiver(s) 150," and/or "invalid alarm call station") the calling party number or billing number (e.g., "call source identification information (such as caller ID, DNIS, or ANI)")** at, *e.g.,* Ex. 1004 at **[0006]** ("a system and a method for processing an incoming telephone call to an alarm system central monitoring station using *call source identification information (such as caller ID, DNIS, or ANI)*. The central monitoring station uses the call source identification information transmitted by *the telephone system* (typically between the first and second ring of a call) to make decisions as to how to process the call prior to the receiver answering the call. *The central monitoring station will process the call by checking if the call source identification information matches call source identification information stored in memory, and it will check status data that may be associated with the call source identification information, also stored in memory, to determine if the call should be disconnected, transferred, or connected to the receiver.*"), **[0027]** ("In this embodiment *the central monitoring station 100 re-* |

---

[8]    A POSITA would have understood that Martin's processing circuits 130 necessarily (and thus inherently) receive the caller ID information. For example, in order for the processing circuits 130 to "look for a match between the received caller ID information 75 and the caller ID information 200 stored in memory 140" (Ex. 1004 at [0027]), they would have to first receive the caller ID information. *See also id.* at Fig. 1.  To the extent it is argued that further disclosure is necessary, it would have been obvious in view of Martin's teachings for the processing circuits 130 to receive the caller ID information. Ex. 1003 ¶89.

| | |
|---|---|
| | *ceives a telephone call which is detected by receiving circuits 110. The receiving circuits 110 read the caller ID information 75 and the processing circuits 130 look for a match between the received caller ID information 75 and the caller ID information 200 stored in memory 140. . . .”*); **Ex. 1003 ¶¶87-88**. |
| **[1.1(b)]** wherein the electronic system receives the calling party number or billing number from the called party telephonic device; | **Martin discloses the electronic system (e.g., "processing circuits 130") receives the calling party number or billing number (e.g., "call source identification information (such as caller ID, DNIS, or ANI)") from the called party telephonic device (e.g., "receiving circuits 110")**[9] at, *e.g.,* Ex. 1004 at **[0027]** ("In this embodiment *the central monitoring station 100 receives a telephone call which is detected by receiving circuits 110. The receiving circuits 110 read the caller ID information 75 and the processing circuits 130 look for a match between the received caller ID information 75 and the caller ID information 200 stored in memory 140. . . .”*),<br><br><br><br>**Fig. 1; Ex. 1003 ¶90-91**. |
| **[1.2]** after receiving the | **Martin discloses after receiving the calling party** |

___

[9]     *See supra* FN5.  As shown in Figure 1 of Martin, the processing circuits 130 receive information from the receiving circuits 110.

| | |
|---|---|
| calling party number or billing number and before the incoming call is answered, gathering by the electronic system associated with the called party telephonic device operational status information associated with the calling party number or billing number, and | **number or billing number and before the incoming call is answered (after "the central monitoring station 100 receives a telephone call" and "read[s] the caller ID," but before the call is "connected to receiver 150"), gathering (e.g., "read[ing]") by the electronic system (e.g., "processing circuits 130") associated with the called party telephonic device (e.g., "receiving circuits 110," "switching circuits 120," "receiver(s) 150," and/or "invalid alarm call station") operational status information[10] associated with the calling party number or billing number (e.g., "read the status bits 210-330 associated with the caller ID information 200")** at, *e.g.,* Ex. 1004 at **Abstract** ("The alarm system central monitoring station can *use the caller ID information transmitted by the telephone company to make decisions as to how to process a call prior to the central monitoring station receiver answering the call*. The central monitoring station will process the call by checking if the caller ID information matches caller ID |

---

[10]     A POSITA would have understood that Martin's status information is composed of "operational status information," as claimed.  For example, the '985 Patent provides an example of operational status as "checking for faults in ANI processing" (Ex. 1001 at 13:28-30). Martin's MISMATCHED CALLER ID STATUS 250 would fall within the scope of this example.  Moreover, the claim broadly covers any "operational status information," which Martin discloses at least by its status information 145.  To the extent additional disclosure is required, it would have been obvious to include operational status information as part of Martin's status information.  Doing so would have improved Martin's processing of alarm calls—utilizing Martin's additional information bits. Ex. 1003 ¶98.

information stored in memory and *it will check status information associated with the caller ID information to determine if the call should be disconnected, transferred, or connected.*"), **[0006]** ("The central monitoring station uses the call source identification information transmitted by the telephone system (*typically between the first and second ring of a call*) to make decisions as to how to process the call prior to the receiver answering the call. *The central monitoring station will process the call by checking if the call source identification information matches call source identification information stored in memory, and it will check status data that may be associated with the call source identification information, also stored in memory, to determine if the call should be disconnected, transferred, or connected to the receiver.*"), **[0027]** ("In this embodiment *the central monitoring station 100 receives a telephone call which is detected by receiving circuits 110. The receiving circuits 110 read the caller ID information 75 and the processing circuits 130 look for a match between the received caller ID information 75 and the caller ID information 200 stored in memory 140*. If a match is not found, the processing circuits 130 cause the switching circuits 120 to connect the call to the invalid alarm call station 195. The business operator 190 will determine if the status information 145 should be programmed into memory 140. *If there is a match, the processing circuits 120 read the status bits 210-330 associated with the caller ID information 200*. If the processing circuits 120 determine the call is a valid alarm call, the processing circuits 130 cause the switching circuits 120 to connect the call to the receiver 150 and transmit the status information 145. The status information 145 is also updated if necessary. If the processing circuits 130 determine the call is to be transferred, the processing circuits 130 cause the switching circuits 120 to transfer the call based on the status information 145. *The status information 145 may also be transmitted by the processing circuits 130 to the location where the call is transferred and is updated if necessary*. If the call is not connected to the re-

ceiver 150 or transferred, the processing circuits 130 cause the receiving circuits 110 to disconnect the call. The status information 145 may also be updated if necessary."), **Fig. 1**, **Fig. 2**,



Fig. 5; Ex. 1003 ¶¶92-97.

| [1.3] determining by the electronic system associated with the called party telephonic device the source origin confidence metric for the calling party number or billing number. | **Martin discloses determining (e.g., "determin[ing]") by the electronic system (e.g., "processing circuits 130") associated with the called party telephonic device (e.g., "receiving circuits 110," "switching circuits 120," "receiver(s) 150," and/or "invalid alarm call station") the source origin confidence metric (e.g., "determine the call is a valid alarm call") for the calling party number or billing number (e.g., "call source identification information (such as caller ID, DNIS, or ANI)") at,** *e.g.,* Ex. 1004 at **[0006]** (*"The central monitoring station will process the call by checking if the call source identification information matches call* |

| | |
|---|---|
| | *source identification information stored in memory, and it will check status data that may be associated with the call source identification information, also stored in memory, to determine if the call should be disconnected, transferred, or connected to the receiver.* Since the receiver *only processes valid (legitimate) local alarm system reports*, the lines are less likely to be tied up by invalid alarm calls and the efficiency of the alarm answering process is increased."), **[0027]** ("In this embodiment the central monitoring station 100 receives a telephone call which is detected by receiving circuits 110. *The receiving circuits 110 read the caller ID information 75 and the processing circuits 130 look for a match between the received caller ID information 75 and the caller ID information 200 stored in memory 140.* If a match is not found, the processing circuits 130 cause the switching circuits 120 to connect the call to the invalid alarm call station 195. . . . If there is a match, the processing circuits 120 read the status bits 210-330 associated with the caller ID information 200. *If the processing circuits 120 determine the call is a valid alarm call, the processing circuits 130 cause the switching circuits 120 to connect the call to the receiver 150 and transmit the status information 145. . . .*"); **Ex. 1003 ¶¶99-100**. |
| | **Abramson[11] discloses determining the source origin confidence metric** at, *e.g.*, Ex. 1005 at **[0023]**, **[0066]**, **[0067]**, **[0068]**, **[0069]**, **[0071]**; **Ex. 1003 ¶¶101-106**.[12] *See* **Claim 1.pre.** |

| Claim 2 | Martin; Martin in view of Abramson |
|---|---|
| The method of claim 1, further comprising | *See* **claim 1.** |
| receiving by the electron- | **Martin discloses receiving (e.g., "receiv[ing]") by the** |

---

[11]     *See supra* FN6.

[12]     *See supra* FN7.

| | |
|---|---|
| ic system associated with the called party telephonic device characteristics of the incoming call. | **electronic system (e.g., "processing circuits 130") associated with the called party telephonic device (e.g., "receiving circuits 110," "switching circuits 120," "receiver(s) 150," and/or "invalid alarm call station") characteristics (e.g., "interface protocol," "ANI," "DNIS"**[13]**) of the incoming call (e.g., "call")** at, *e.g.*, Ex. 1004 at **[0006]**, **[0018]** ("The operation of the public telephone system 60 is well known to one skilled in the art and will not be discussed in detail. The receiving circuits 110 *detect the call* from telephone input line 70 and read the caller ID information 75. *The interface protocol to the burglar alarm panel 10 is determined* and the connection is made between the receiver 150 and the burglar alarm panel 10 through the switching circuits 120."), **[0027], Fig. 1; Ex. 1003 ¶¶107-108.** |
| | **Abramson**[14] **discloses receiving (e.g., "receiv[ing]") by the electronic system associated with the called party telephonic device (e.g., "exchange 205") characteristics of the incoming call (e.g., "characteristics for each off-premises telephone number")** at, *e.g.*, Ex. 1004 at **[0062]** ("At task 402, exchange 205 *receives a telephone number for the first telephone. The telephone number is a caller identifier*, as is known in the art. In some alternative embodiments, *exchange 205 receives some other type of identifier that identifies the calling (originating) party*."), **[0067]** ("Exchange 205 has expected information for each affiliated telephone number stored in memory 303.  Table 2 depicts an example of the type of information stored. |

---

[13]   A POSITA would have understood "DNIS" refers to "Dialed Number Identification Service," which provides device characteristics of the incoming call. Ex. 1003 ¶108.

[14]   *See supra* FN6.

TABLE 2

Telephone Characteristics Database

| Off-Premises Telephone | Telecommunications Network Number | Telephone Type | Signaling Protocol |
|---|---|---|---|
| 103 | 201-555-1236 | Landline | ISDN |
| 112 | 908-555-3381 | GSM Cellular | ISDN |
| . . . | . . . | . . . | . . . |

For example, for the telephone number "908-555-3381", exchange 205 expects a telephone type of "GSM Cellular". If the calling telephone's telephone type is "GSM Cellular", then task execution proceeds to task 502. If the calling telephone's telephone type is something else, such as "Landline", then task execution proceeds to task 505."), **[0074]** ("Furthermore, in some other alternative embodiments, *exchange 205 might not check the three characteristics of telephone type, signaling protocol, and the ordering of the identifiers*; instead, it might check only one or two of those characteristics."); **Ex. 1003 ¶¶109-112.**

| Claim 3 | Marin; Martin in view of Abramson |
|---|---|
| The method of claim 2, | *See claim 2.* |
| wherein characteristics of the incoming call include one or more of time of day, trunk number, ANI II digits, dialed number information, an identifier | **Martin discloses the characteristics of the incoming call (e.g., "interface protocol," "ANI," "DNIS") include one or more of time of day, trunk number, ANI II digits (e.g., "ANI")[15], dialed number information (e.g., "DNIS"[16]), an identifier of an originating switch, SIP Header information, SIP routing infor-** |

---

[15] A POSITA would have understood from Martin's disclosure of "ANI" Martin necessarily (and thus inherently) discloses ANI II digits. To the extent it is argued additional disclosure is required, this limitation would have been obvious in view of Martin's teachings. *See* Ex. 1001 at 6:11-22. Ex. 1003 ¶117.

[16] *See supra* FN15.

| of an originating switch, SIP Header information, SIP routing information, transaction number, call frequency indicator, SS7 data or a unique call identifier. | **mation, transaction number, call frequency indicator, call frequency indicator, SS7 data or a unique call identifier** at, *e.g.,* Ex. 1004 at **[0006]; Ex. 1003 ¶¶114-117.** *See* **claim 1.pre.** |

| Claim 4 | Martin; Martin in view of Abramson |
|---|---|
| The method of claim 1, further comprising | *See* claim 1. |
| determining by the electronic system associated with the called party telephonic device whether the format of the calling party number or billing number is valid. | **Martin discloses determining (e.g., "determin[ing]") by the electronic system (e.g., "processing circuits 130") associated with the called party telephonic device (e.g., "receiving circuits 110," "switching circuits 120," "receiver(s) 150," and/or "invalid alarm call station") whether the format of the calling party number or billing number (e.g., "call source identification information (such as caller ID, DNIS, or ANI)") is valid (e.g., "matches," "valid (legitimate)")** at, *e.g.,* Ex. 1004 at **[0006]** ("a *method for processing an incoming telephone call to an alarm system central monitoring station using call source identification information (such as caller ID, DNIS, or ANI)*. The central monitoring station uses the call source identification information transmitted by the telephone system (typically between the first and second ring of a call) to make decisions as to how to process the call prior to the receiver answering the call. *The central monitoring station will process the call by checking if the call source identification information matches call source identification information stored in memory, and it will check status data that may be associated with the call source identification information, also stored in memory, to determine if the call should be disconnected, transferred, or connected to the receiver*. Since the receiver only processes *valid (legitimate)* local alarm system reports, the lines are less likely to be tied up by invalid alarm calls and the efficiency of the alarm answering process is in- |

| | |
|---|---|
| | creased."), **[0027]** ("In this embodiment the *central monitoring station 100 receives a telephone call which is detected by receiving circuits 110. The receiving circuits 110 read the caller ID information 75 and the processing circuits 130 look for a match between the received caller ID information 75 and the caller ID information 200 stored in memory 140.* If a match is not found, the processing circuits 130 cause the switching circuits 120 to connect the call to the invalid alarm call station 195. The business operator 190 will determine if the status information 145 should be programmed into memory 140. If there is a match, the processing circuits 120 read the status bits 210-330 associated with the caller ID information 200. *If the processing circuits 120 determine the call is a valid alarm call, the processing circuits 130 cause the switching circuits 120 to connect the call to the receiver 150 and transmit the status information 145.*"), **Fig. 2; Ex. 1003 ¶¶119-123**.[17] |

| Claim 5 | Martin; Martin in view of Abramson |
|---|---|
| The method of claim 4, further comprising | *See* **claim 4.** |
| upon determining that the format of the calling party number or billing number is invalid, generating a message by the system associated with the called party telephonic device that indicates | **Martin discloses upon determining that the format of the calling party number or billing number is invalid (e.g., "[i]f a match is not found"), generating a message (e.g., "the call is identified as an unknown call source identification call") by the system (e.g., "processing circuits 130") associated with the called party telephonic device that indicates the calling party number or billing number is invalid (e.g., "status in-** |

---

[17]     To the extent it is argued that additional disclosure is necessary, a POSITA would have found it obvious to determine whether the format of the calling party number or billing number was valid.  Indeed, doing so would be a straightforward check on the whether the caller was legitimate. Ex. 1003 ¶124.

| | |
|---|---|
| the calling party number or billing number is invalid. | **formation 145 may also be transmitted by the processing circuits 130 to the location where the call is transferred")** at, *e.g.,* Ex. 1004 at **[0010]** ("If the call source identification does not match any programmed call source identification information, then the call will be transferred to a business operator and *the call is identified as an unknown call source identification call*. In the case of an unknown call source identification call, *the memory may be revised to include the unknown caller status information*."), **[0027]** ("In this embodiment the central monitoring station 100 receives a telephone call which is detected by receiving circuits 110. The receiving circuits 110 read the caller ID information 75 and the processing circuits 130 look for a match between the received caller ID information 75 and the caller ID information 200 stored in memory 140. *If a match is not found, the processing circuits 130 cause the switching circuits 120 to connect the call to the invalid alarm call station 195. The business operator 190 will determine if the status information 145 should be programmed into memory 140*. If there is a match, the processing circuits 120 read the status bits 210-330 associated with the caller ID information 200. If the processing circuits 120 determine the call is a valid alarm call, the processing circuits 130 cause the switching circuits 120 to connect the call to the receiver 150 and transmit the status information 145. The status information 145 is also updated if necessary. If the processing circuits 130 determine the call is to be transferred, the processing circuits 130 cause the switching circuits 120 to transfer the call based on the status information 145. *The status information 145 may also be transmitted by the processing circuits 130 to the location where the call is transferred and is updated if necessary*. If the call is not connected to the receiver 150 or transferred, the processing circuits 130 cause the receiving circuits 110 to disconnect the call. The status infor-* |

| | |
|---|---|
| | mation 145 may also be updated if necessary."); **Ex. 1003 ¶126-129.**[18] |

| Claim 6 | Martin; Martin in view of Abramson |
|---|---|
| The method of claim 1, further comprising | *See* **claim 1.** |
| obtaining a number of calls within a given timeframe that have been originated from the calling party number or billing number. | **Martin discloses obtaining a number of calls within a given timeframe (e.g., "runaway dialer" that "call[s] the central monitoring station every 30 seconds", or "non-subscriber that frequently calls") that have been originated from the calling party number or billing number (e.g., "runaway dialer", or "non-subscriber that frequently calls")** at, *e.g.,* Ex. 1004 at **[0003]** ("An alarm system panel may have a bug in it or a component failure, such as a dead battery, that causes *the alarm system panel to call the central monitoring station every 30 seconds, known as a "runaway dialer"*. This constant calling continues until someone from the alarm system company goes to the site and fixes the alarm system."), **[0023]** ("In the second embodiment of the present invention the *caller ID information 200 and some of the status bits 210-330 will be stored in memory 140 when it has been determined that a particular alarm system has a problem*. In this embodiment the call may be disconnected by the receiving circuits 110 or may be transferred by the switching circuits 120 depending on the stored status information 145. *The memory 140 may be programmed with the caller ID information 200, the runaway dialer status bit 210 set and disconnect call bit 300 set*. In this case a call by the alarm system with this |

---

[18]     To the extent it is argued that additional disclosure is necessary, it would have been obvious to determine that the format of the calling party number is invalid and generate a message.  Doing so would have been an obvious and straightforward means of verifying the legitimacy of the calling party. Ex. 1003 ¶130.

caller ID information 200 will be disconnected by the receiving circuits 110. . . . *Additionally the memory 140 may be programmed with the caller ID information 200 of a non-subscriber that frequently calls, such as a fax machine*. The monitoring operator 180 would set the non-alarm call status bit 230 associated with this caller ID information 200 and possibly the disconnect call status bit 300. Also in this embodiment, *the status information 145 may include time data bytes 280 or count data bytes 290 which may keep track of the actual time or the number of times a call is being disconnected or transferred*. Other additional information 330 that may be useful to the monitoring operator 180 or the business operator 190 may also be stored."),



Fig. 2; Ex. 1003 ¶¶132-136.

| Claim 7 | Martin; Martin in view of Abramson |
|---|---|
| The method of claim 6, further comprising | *See* claim 6. |
| determining by the system associated with the called party telephonic device whether the number of calls within a giv- | **Martin discloses determining by the system (e.g., "processing circuits 130") associated with the called party telephonic device (e.g., "receiving circuits 110," "switching circuits 120," "receiver(s) 150," and/or "invalid alarm call station") whether the number of** |

| en timeframe that have been originated from the calling party number or billing number exceeds a threshold. | **calls within a given timeframe that have been originated from the calling party number or billing number exceeds a threshold (e.g., whether "the alarm system panel" should be labeled "a runaway dialer") at, *e.g.,* Ex. 1004 at [0003], [0023]; Ex. 1003 ¶¶138-140.**[19] ***See* claim 6.** |

| Claim 8 | **Martin in view of Kealy; Martin in view of Abramson further in view of Kealy** |
|---|---|
| The method of claim 1, further comprising: | ***See* claim 1.** |
| adjusting by the system associated with the called party telephonic device the source origin confidence metric based on personal risk factors of an entity associated with the calling party number or billing number. | **Martin discloses the system (e.g., "processing circuits 130") associated with the called party telephonic device (e.g., "receiving circuits 110," "switching circuits 120," "receiver(s) 150," and/or "invalid alarm call station") determining a source origin confidence metric (e.g., "determine the call is a valid alarm call") at, e.g., Ex. 1004 at [0006], [0027]; Ex. 1003 ¶¶143-144.  *See* Claim 1.pre, Claim 1.3.**<br><br>**Abramson**[20] **discloses determining the source origin confidence metric at, *e.g.,* Ex. 1005 at [0023], [0066],** |

---

[19]  To the extent it is argued that additional disclosure is required, a POSITA would have found it obvious in light of Martin's teachings to establish a threshold for determining whether to label a calling party as a runaway dialer.  Indeed, in the event of a bug, the system could be programmed to automatically label a caller as a runaway dialer after a set number of repeat calls received during the thirty-second interval identified by Martin.  *See* EX. 1004 at [0003]. Ex. 1003 ¶141.

[20]  *See supra* FN6.

-43-

| | |
|---|---|
| | [0067], [0068], [0069], [0071]; Ex. 1003 ¶145. *See* Claim 1.pre, Claim 1.3. [21]<br><br>Kealy[22] discloses adjusting (e.g., "reducing") the source origin confidence metric (e.g., "a trust rating") based on personal risk factors (e.g., "complaints") of an entity associated with the calling party number or billing number (e.g., "associated with each calling device") at, *e.g.*, Ex. 1006 at **14:13-20** ("call management rules may include (418) associating call requests in a first category of lowest trust ratings with an operation of conditionally rejecting the VoIP call; (422) associating call requests in a second category of intermediate trust ratings with an operation of conditionally completing the VoIP call; and (420) associating call requests in a third category of highest trust ratings with an operation of unconditionally completing the |

---

[21]     *See supra* FN7.

[22]     To the extent it is argued that adjusting the source origin confidence metric based on personal risk factors would not have been obvious in view of Martin's teachings alone or Martin in view of Abramson, Kealy teaches reducing a trust rating of a calling party based on the number of complaints received. Ex. 1003 ¶146. Kealy teaches a method of combating spam calls. Ex. 1006 at Abstract, 3:28-36. As explained above, a POSITA would have been motivated to modify Martin and Abramson to utilize Kealy's trust rating system, which uses "a metric-related threshold" (*id.* at 15:25), as an additional factor for validating callers. As explained above, the applicants never disputed that Kealy teaches the limitations of this claim. Ex. 1003 ¶¶150-151.

| | |
|---|---|
| | VoIP call."), **14:58-15:6** ("a method (FIG. 2) of managing trust ratings that are embedded in certificates of calling devices in a Voice over Internet Protocol (VoIP) communications system. *The method may involve automatically accumulating complaints concerning VoIP calls initiated from calling devices, and (208) comparing respective quantities of accumulated complaints associated with each calling device. When a quantity of accumulated complaints associated with a given calling device exceeds a given threshold, the method may involve (220) reducing a trust rating of the given calling device*; and in call requests of subsequent VoIP calls that the given calling device attempts to place, the method may further involve *including the reduced trust rating so that the subsequent calls are subject to more austere call screening operations than calls having the unreduced trust rating before the reducing step.*"); **Ex. 1003 ¶¶147-149.** |

| Claim 9 | Martin in view of Kealy; Martin in view of Abramson further in view of Kealy |
|---|---|
| The method of claim 8, | *See* claim 8. |
| wherein the personal risk factors include one or more of fraud score, risk score, credit score, mar- | **Kealy discloses the personal risk factors (e.g., "complaints") include one or more of fraud score, risk score, credit score, marketing score (e.g., "trust rating"), affinity score (e.g., "trust rating")[23], expansion** |

---

[23]     A POSITA would have understood that Kealy's "trust rating" as used to identify spammers is a form of a "marketing score" or "affinity score" as claimed. Specifically, a POSITA would have understood a marketing score to relate to the quality of the service provided. Similarly, the affinity score would have been understood to relate to the called party's relation or interest in receiving calls from the calling party. For example, in Martin the affinity score would have related to

| | |
|---|---|
| keting score, affinity score, expansion score, or warning indicators for bankruptcy, or whether a person associated with the calling party number or billing number is deceased. | **score, or warning indicators for bankruptcy, or whether a person associated with the calling party number or billing number is deceased** at, *e.g.*, Ex. 1006 at **Abstract** ("A method of managing trust ratings involves automatically accumulating complaints concerning VoIP calls initiated from calling devices, and comparing respective quantities of accumulated complaints associated with each calling device. *When a quantity of accumulated complaints associated with a given calling device exceeds a given threshold, a trust rating of the given calling device is reduced*. In subsequent VoIP calls the given calling device attempts to place, the reduced trust rating is included in the call request so that the subsequent calls are subject to more austere call screening operations than calls having the unreduced trust rating. Call recipients thus affect the calling device's trust rating simply by entering complaints associated with received calls. *The method effectively combats spam over Internet telephony (SPIT) through participation of called parties*."); **Ex. 1003 ¶¶153-155.** |

| Claim 10 | Martin in view of Kealy; Martin in view of Abramson further in view of Kealy |
|---|---|
| The method of claim 8, further comprising: | *See* claim 8. |
| retrieving consortium information by the system associated with the called party telephonic device | **Martin discloses retrieving (e.g., "read[ing]") consortium information (e.g., "CALLER ID INFORMATION," "ACCEPTABLE ACCOUNT STATUS," "SERVICE TIER STATUS," "COUNT DATA" in** |

the likelihood that the calling party is a subscriber. Kealy's trust rating serves both

purposes. To the extent it is argued that additional disclosure is required, it would

have been obvious to a POSITA use one or more of the claimed "scores" in as-

sessing the risk of the caller. Ex. 1003 ¶156.

| | |
|---|---|
| from an external database. | **Fig. 2)[24] by the system (e.g., "processing circuits 130") associated with the called party telephonic device (e.g., "receiving circuits 110," "switching circuits 120," "receiver(s) 150," and/or "invalid alarm call station") from an external database (e.g., "status information 145" in "memory 140")[25]** at, *e.g.*, Ex. 1004 at **[0024]** ("the status information 145, which includes *the caller ID information 200 and the status bits 210-330, is stored for every subscriber*, not just for subscribers with problem alarm systems as in the first two embodiments. Also *non-subscriber caller ID information 200 may be stored for frequent non-alarm calls*. In addition to the status information 145 described in the second embodiment an *acceptable account status bit 260 and a service tier status byte 270 may be stored. The service tier status byte 270 may signal to the monitoring operator 180 that additional services may be needed for that subscriber*."), |

---

[24]  The '985 Patent describes "information from a consortium database such as calling velocity to multiple locations within a specified time period."  Ex. 1001 at 11:42-44.  Accordingly, at minimum "COUNT DATA" is "consortium information" as claimed. *See* chart for **Claim 11**. Ex. 1003 ¶159.

[25]  A POSITA would have understood the "external database," as claimed, to be a data source external to the system for establishing the call connection with the receiver. Martin's memory 140 is external to the processing circuits 130 and therefore satisfied this limitation. To the extent it is argued additional disclosure is required, it would have been obvious to use a database external or remote from Martin's central station. Ex. 1003 ¶160.

-47-



Fig. 1,

Fig. 2; Ex. 1003 ¶159.

| Claim 11 | Martin in view of Kealy; Martin in view of Abramson further in view of Kealy |
|---|---|
| The method of claim 10, | *See* claim 10. |
| wherein the external database includes data for calling velocity to multiple locations within a | **Martin discloses the external database (e.g., "status information 145" in "memory 140") includes data for calling velocity (e.g., "COUNT DATA") to multiple locations (e.g., "multiple receivers that each have 36** |

*Inter Partes* Review
United States Patent No. 9,001,985

| | |
|---|---|
| specified time period for the calling party number or billing number, or known fraudulent calling party numbers or billing numbers. | **telephone lines")[26] within a specified time period for the calling party number or billing number (e.g., "keep track of the actual time or the number of times a call is being disconnected or transferred," such as determining "a runaway dialer"), or known fraudulent calling party numbers or billing numbers** at, e.g., Ex. 1004 at **[0002]** ("central monitoring stations generally have multiple receivers that each have 36 telephone lines"), **[0003]** ("An alarm system panel may have a bug in it or a component failure, such as a dead battery, that causes *the alarm system panel to call the central monitoring station every 30 seconds, known as a "runaway dialer"*. This constant calling continues until someone from the alarm system company goes to the site and fixes the alarm system. This may take days, causing the |

[26]     To the extent it is argued additional disclosure is necessary, it would have been at minimum obvious and straightforward to a POSITA to maintain Martin's COUNT DATA for multiple locations.  For example, a POSITA would have understood that an alarm system central monitoring station could have multiple locations and, accordingly, multiple contact numbers.  Ex. 1004 at [0002] ("central monitoring stations generally have multiple receivers that each have 36 telephone lines").  Maintaining COUNT DATA for each of the contact numbers/locations would have enabled better tracking of the received call data and thus better enabled responding to the call data.  Indeed, Martin teaches varying types of alarm panels 10-50, Ex. 1004 at [0018], Fig. 1, which could all be at the same location but may reach out to different numbers depending on the type of alert triggered. Multiple locations also add redundancy to the system.  Ex. 1003 ¶165.

|  | runaway dialer to tie up receiving lines for days."), **[0023]** ("the caller ID information 200 and some of the status bits 210-330 will be stored in memory 140 when it has been determined that a particular alarm system has a problem. In this embodiment the call may be disconnected by the receiving circuits 110 or may be transferred by the switching circuits 120 depending on the stored status information 145. *The memory 140 may be programmed with the caller ID information 200, the runaway dialer status bit 210 set and disconnect call bit 300 set.* In this case a call by the alarm system with this caller ID information 200 will be disconnected by the receiving circuits 110. . . . *Additionally the memory 140 may be programmed with the caller ID information 200 of a non-subscriber that frequently calls, such as a fax machine.* The monitoring operator 180 would set the non-alarm call status bit 230 associated with this caller ID information 200 and possibly the disconnect call status bit 300. Also in this embodiment, *the status information 145 may include time data bytes 280 or count data bytes 290 which may keep track of the actual time or the number of times a call is being disconnected or transferred.* Other additional information 330 that may be useful to the monitoring operator 180 or the business operator 190 may also be stored."), **Fig. 2; Ex. 1003 ¶¶162-164**. *See* **Claims, 7, 10**. |
|---|---|

| Claim 12 | Martin; Martin in view of Abramson |
|---|---|
| The method of claim 1, | *See* **claim 1.** |
| wherein the operational status information associated with the calling party number or billing number includes telephone line status information associated with the calling party number or billing number. | **Martin discloses the operational status information associated with the calling party number or billing number (e.g., "read the status bits 210-330 associated with the caller ID information 200") includes telephone line status information associated with the calling party number or billing number (e.g., "runaway dialer status," "mismatched caller ID status") at,** *e.g.*, Ex. 1004 at **[0011]** ("Other status information may include whether the call source identification information is mismatched or alarm system information pre- |

*Inter Partes* Review
United States Patent No. 9,001,985

| | |
|---|---|
| | viously transmitted is mismatched."), **[0023], [0027], Fig. 2; Ex. 1003 ¶¶167-168. *See* Claims 1.2, 6.** [27]<br><br>**Abramson** [28] **discloses telephone line status information (e.g., "Telephone Type," "Signaling Protocol") associated with the calling party number or billing number (e.g., "telephone number")** at *e.g.*, Ex. 1005 at **[0067] ; Ex. 1003 ¶¶170-171. *See* Claim 2.** |

| Claim 13 | Martin; Martin in view of Abramson |
|---|---|
| **[13.pre]** [29] **A method for authenticating a calling** | **Martin discloses a method (e.g., "method") for authenticating a calling party (e.g., "determin[ing] the** |

---

[27]   To the extent it is argued that additional disclosure is necessary, it would have been obvious to a POSITA to maintain telephone line status information for a particular caller, e.g., alarm panel.  For example, maintaining telephone line status information in Martin's alarm system would enable Martin to ensure that subscriber alarm calls to the central monitoring station would be properly received.  In the event that telephone line status information indicates that the line is busy or not functioning properly, that status could be recorded and an operator could be notified so that the issue could be resolved.  Such information could be, e.g., stored as part of Martin's additional information 330.  *See* Ex. 1004 at [0023] ("Other additional information 330 that may be useful to the monitoring operator 180 or the business operator 190 may also be stored."). Ex. 1003 ¶169.

[28]   *See supra* FN6.

[29]   *See supra* FN4.

| party, comprising: | call is a valid alarm call") at, *e.g.*, Ex. 1004 at **[0006], [0018], [0027]; Ex. 1003 ¶¶174-178.** *See* claim 1.pre. |
|---|---|
| **[13.1]** receiving an incoming call from a telephonic device at a call center telephonic device; | **Martin discloses receiving (e.g., "receiv[ing]") an incoming call (e.g., "call") from a telephonic device (e.g., "burglary alarm panel 10") at a call center (e.g., "central monitoring station 100") telephonic device (e.g., "receiving circuits 110," "switching circuits 120," "receiver(s) 150," and/or "invalid alarm call station")[30]** at, *e.g.*, Ex. 1004 at **[0006], [0018], [0027], Fig. 1; Ex. 1003 ¶179.** *See* claims 1.pre, 1.1(b). |
| **[13.2(a)]** receiving a calling party number or billing number associated with the received incoming call by the call center telephonic device; | **Martin discloses receiving (e.g., "receiv[ing]") a calling party number or billing number associated with the received incoming call (e.g., "call source identification information (such as caller ID, DNIS, or ANI)") by the call center (e.g., "central monitoring station 100") telephonic device (e.g., "receiving circuits 110," "switching circuits 120," "receiver(s) 150," and/or "invalid alarm call station")** at, *e.g.*, Ex. 1004 at **[0006], [0027]; Ex. 1003 ¶180.** *See* claims 1.1(a), 1.1(b). |
| **[13.2(b)]** prior to answering the incoming call, requesting by the call cen- | **Martin disclose prior to answering the incoming call (before the call is "connected to receiver 150"), requesting[31] by the call center (e.g., "central monitor-** |

---

[30]    *See supra* FN5.

[31]    To the extent that it is argued that further disclosure is necessary, it would have been obvious in view of Martin's teachings for one or more of Martin's "receiving circuits 110," "switching circuits 120," "receiver(s) 150," and "invalid alarm call station" to request from the processing circuits 130 a source origin confidence metric. A POSITA would have found it obvious and straightforward to request the source origin metric, because doing so would have enabled the "receiving circuits 110," "switching circuits 120," "receiver(s) 150," and "invalid alarm call

| | |
|---|---|
| ter telephonic device a source origin confidence metric for the calling party number or billing number from an electronic system associated with the call center telephonic device, | ing station 100") telephonic device (e.g., "receiving circuits 110," "switching circuits 120," "receiver(s) 150," and/or "invalid alarm call station") a source origin confidence metric for the calling party number or billing number (e.g., "determine the call is a valid alarm call") from an electronic system (e.g., "processing circuits 130") associated with the call center telephonic device** at, *e.g.*, Ex. 1004 at **Abstract**, **[0006]**, **[0027]**, **Fig. 5; Ex. 1003 ¶181.** *See* **claims 1.2, 1.3.**<br><br>**Abramson[32] discloses a source origin confidence metric (e.g., "validat[ing] the identity of the calling telephone in tasks 501 through 503" so as to "determine[], with a higher level of confidence than with some techniques in the prior art, whether the calling telephone is genuine or is spoofing another telephone")** at, *e.g.*, Ex. 1005 at **[0023], [0066], [0067], [0068], [0069], [0071]; Ex. 1003 ¶¶183-191.[33]** *See* **Claim 1.pre.** |
| **[13.2(c)]** wherein the confidence metric is determined based on operational status information of the calling party number or billing number; | **Martin discloses the confidence metric (e.g., "determin[ing] the call is a valid alarm call") is determined (e.g., "determine[d]") based on operational status information of the calling party number or billing number (e.g., "read the status bits 210-330 associated with the caller ID information 200")** at, *e.g.*, Ex. 1004 at **[0006], [0027], Fig. 5; Ex. 1003 ¶¶192-193.** *See* **claims 1.2, 1.3.** |
| **[13.3]** receiving by the | **Martin discloses receiving by the call center (e.g.,** |

station" to determine how to route the call.  This is further consistent with Martin's

teachings that the caller ID and status information are transferred to with the call.

Ex. 1004 at [0027]; Ex. 1003 ¶182.

[32]    *See supra* FN6.

[33]    *See supra* FN7.

| | |
|---|---|
| call center telephonic device the confidence metric for the calling party number or billing number; and | **"central monitoring station 100") telephonic device (e.g., "receiving circuits 110," "switching circuits 120," "receiver(s) 150," and/or "invalid alarm call station") the confidence metric for the calling party number or billing number (e.g., "determine the call is a valid alarm call")** at, *e.g.*, Ex. 1004 at **[0006], [0027], Fig. 5; Ex. 1003 ¶¶194-195.**[34] *See* **claims 1.2, 1.3.** |
| **[13.4]** answering the incoming call following receipt of the source origin confidence metric. | **Martin discloses answering the incoming call (e.g., "answering the call" or "connect the call") following receipt of the source origin confidence metric (e.g., "determine the call is a valid alarm call")** at, *e.g.*, Ex. 1004 at **[0006], [0027], Fig. 5; Ex. 1003 ¶¶196-197.** *See* **claim 1.3.** <br><br> **Abramson**[35] **discloses answering the incoming call (e.g., "[g]rant a privilege to the first telephone") following receipt of the source origin confidence metric (e.g., "validat[ing] the identity of the calling telephone in tasks 501 through 503" so as to "determine[], with a higher level of confidence than with some techniques in the prior art, whether the calling telephone is genuine or is spoofing another telephone")** at, *e.g.*, Ex. 1005 at **[0023], [0066], [0067], [0068], [0069], [0071] ; Ex. 1003 ¶198.**[36] *See* **Claim 1.pre.** |

| Claim 14 | Martin; Martin in view of Abramson |
|---|---|
| The method of claim 13, further comprising: | *See* **claim 13.** |

---

34      *See supra* FN31.

35      *See supra* FN6.

36      *See supra* FN7.

| determining a script for the incoming call based on the received source origin confidence metric. | **Martin discloses determining a script for the incoming call (e.g., the rules to "cause the switching circuits 120 to connect the call to the receiver 150 and transmit the status information 145" as in Fig. 5) based on the received source origin confidence metric (e.g., "[i]f the processing circuits 130 determine the call is a valid alarm call")** at, *e.g.*, Ex. 1004 at **Abstract** ("The central monitoring station may *process the call by 1) transferring the call to an invalid alarm call station, 2) connecting the call to a central monitoring station receiver, a second central monitoring station receiver, or a second line of a central monitoring station receiver, or 3) disconnecting the call.*"), **[0006], [0027], Fig. 5; Ex. 1003 ¶¶200-203.[37]** *See claim 1.3.* |
|---|---|

| **Claim 15** | **Martin in view of Abramson** |
|---|---|
| The method of claim 13, further comprising: | *See claim 13.* |
| providing an additional call center metric to the electronic system associated with the call center telephonic device, wherein the additional call center metric is used to adjust the source origin confidence metric. | **Abramson[38] discloses providing an additional call center metric (e.g., "validat[ing] the identity of the calling telephone in tasks 501 through 503" so as to "determine[], with a higher level of confidence than with some techniques in the prior art, whether the calling telephone is genuine or is spoofing another telephone"), wherein the additional call center metric is used to adjust the source origin confidence metric (if "tasks 501 through 503" yields "at least one unexpected value for the received telephone number, ends the call attempt from the first telephone")** at, *e.g.*, Ex. 1005 at **[0023], [0066], [0067], [0068], [0069], [0071], [0073]** ("At task 505, exchange 205, having received at least one unexpected value for the received telephone |

---

[37]    *See supra* FN7.

[38]    *See supra* FN6.

*Inter Partes* Review
United States Patent No. 9,001,985

|  | number, ends the call attempt from the first telephone. Task execution then ends.")[39]; **Ex. 1003 ¶¶205-206.**[40] ***See* Claim 1.pre.** |
|--|--|

| Claim 16 | Martin; Martin in view of Abramson |
|--|--|
| The method of claim 13, | *See* claim 13. |
| wherein the source origin confidence metric is a probability that the calling party number or the billing number is valid. | **Martin discloses the source origin confidence metric (e.g., "determine the call is a valid alarm call") is a probability (e.g., "YES" or "NO")[41] that the calling party number or the billing number (e.g., "call source identification information (such as caller ID, DNIS, or ANI)") is valid (e.g., "valid")** at, *e.g.,* Ex. |

---

[39]     A POSITA would have understood each of Abramson's tasks 501-503 yields a call center metric, as claimed.  As explained above, "source origin confidence metric" is a determination of the trustworthiness for the entity from which the call originated.  Accordingly, after task 501, each task provides a determination of the trustworthiness for the call. For example, if tasks 502 or 503 results in a "no," then this yields an adjustment to the source origin confidence metric indicating the caller is not trustworthy so as to cause the system to end the call.  Ex. 1003 ¶207.

[40]     *See supra* FN7.

[41]     A POSITA would have understood YES or NO is a probability of 100% or 0%, respectively.  To the extent additional disclosure is required, it would have been obvious to use a probability as the source origin confidence metric.  *See supra* FN7.  Ex. 1003 ¶¶210, 212.

| | |
|---|---|
| | 1004 at **Abstract**, **[0006]**, **[0027]**, **Fig. 5; Ex. 1003 ¶209-211.**[42] *See* **claims 1.3, 14.** |

| Claim 17 | Martin; Martin in view of Abramson |
|---|---|
| The method of claim 13, | *See* **claim 13.** |
| wherein the source origin confidence metric indicates either the calling party number or the billing number is valid or invalid. | **Martin discloses the source origin confidence metric (e.g., "determine the call is a valid alarm call") indicates either the calling party number or the billing number is valid (e.g., "valid") or invalid (e.g., "invalid")** at, *e.g.*, Ex. 1004 at **Abstract**, **[0006]**, **[0027]**, **Fig. 5; Ex. 1003 ¶¶214-216.** *See* **claims 1.3, 14.** |

| Claim 18 | Martin; Martin in view of Abramson |
|---|---|
| The method of claim 13, | *See* **claim 13.** |
| wherein the source origin confidence metric indicates a calling party number or billing number validity indicator, wherein the validity indicators comprise a static set of predetermined indicators. | **Martin discloses the source origin confidence metric (e.g., "determine the call is a valid alarm call") indicates a calling party number or billing number validity indicator (e.g., "valid" or "invalid"), wherein the validity indicators comprise a static set of predetermined indicators (e.g., "valid" or "invalid")** at, *e.g.*, Ex. 1004 at **Abstract**, **[0006]**, **[0027]**, **Fig. 5; Ex. 1003 ¶¶218-219.** *See* **claims 1.3, 14.**<br><br>**Abramson**[43] **discloses the source origin confidence metric (e.g., "validat[ing] the identity of the calling telephone in tasks 501 through 503" so as to "determine[], with a higher level of confidence than with some techniques in the prior art, whether the calling telephone is genuine or is spoofing another telephone") indicates a calling party number or billing number validity indicator (e.g., "valid[]"), wherein the validity indicators comprise a static set of predetermined indicators (e.g., all "yes[es]" for "tasks 501** |

---

[42]     *See supra* FN7.

[43]     *See supra* FN6.

| | |
|---|---|
| | **through 503")** at, *e.g.*, Ex. 1005 at **[0023]**, **[0066]**, **[0067]**, **[0068]**, **[0069]**, **[0071]**, **[0072]** ("At task 504, exchange 205 grants one or more privileges to the calling telephone, having *validated* the identity of the calling telephone in tasks 501 through 503."), **Fig. 5; Ex. 1003 ¶220-221.** *See* **Claim 1.pre.** |

| Claim 19 | Martin in view of Kealy; Martin in view of Abramson further in view of Kealy |
|---|---|
| The method of claim 13, further comprising: | *See* **claim 13.** |
| adjusting by the electronic system associated with the call center telephonic device the source origin confidence metric based on personal risk factors of an entity associated with the calling party number or billing number. | *See* **claim 8. Ex. 1003 ¶223.** |

| Claim 20 | Martin in view of Kealy; Martin in view of Abramson further in view of Kealy |
|---|---|
| The method of claim 13, | *See* **claim 13.** |
| wherein the personal risk factors include one or more of fraud score, risk score, credit score, marketing score, affinity score, expansion score, or warning indicators for bankruptcy, or whether a person associated with the calling party number or billing number is deceased. | *See* **claim 9. Ex. 1003 ¶225.** |

| Claim 21 | Martin; Martin in view of Abramson |
|---|---|
| The method of claim 13, | *See claim 13.* |
| wherein the operational status information of the calling party number or billing number is based on call progress information gathered by placing an outgoing call to the calling party number or billing number and re- | **Martin discloses the operational status information of the calling party number or billing number (e.g., "read the status bits 210-330 associated with the caller ID information 200") is based on call progress information (e.g., "non-alarm call status") gathered by placing an outgoing call to the calling party number or billing number and receiving call progress messages associated with the outgoing call (e.g., "fax machine" call)[44]** at, *e.g.*, Ex. 1004 at **[0023]** ("*Additionally* |

---

[44]    A POSITA would have understood from Martin's disclosure that Martin desires to disconnect calls from non-subscribers, such as from fax machines.  *See* Ex. 1004 at [0023]. One well-known and straightforward manner of eliminating such callers would have been to place outgoing calls to suspicious numbers, *i.e.*, those believed to be fax machines, and receive call progress messages (e.g., fax machine tones) associated with the outgoing call. These calls could, e.g., be placed by Martin's "monitoring operator 180." *Id.* at [0012] ("status information may be updated manually"), [0021] ("updating of status information 145 may be accomplished in many ways and is well known to one skilled in the art"), [0023]. Based on the determination that the number is answered by a fax machine, as taught by Martin the monitoring operator could easily have updated the status bits for the fax machine's telephone number—thereby reducing the efficiency of handling calls. Accordingly, to the extent it is argued additional disclosure is necessary, this limitation would have been obvious in view of the knowledge of a POSITA. Ex. 1003 ¶230.

| ceiving call progress messages associated with the outgoing call. | *the memory 140 may be programmed with the caller ID information 200 of a non-subscriber that frequently calls, such as a fax machine. The monitoring operator 180 would set the non-alarm call status bit 230 associated with this caller ID information 200 and possibly the disconnect call status bit 300.*"),<br><br><br><br>**Fig. 2; Ex. 1003 ¶¶227-229.** |

| Claim 22 | Martin; Martin in view of Abramson |
|---|---|
| The method of claim 13, | ***See* claim 13.** |
| wherein the operational status information associated with the calling party number or billing number includes telephone line status information associated with the calling party number or billing number. | ***See* claim 12. Ex. 1003 ¶232.** |

## VI.   CONCLUSION

Because this Petition, if unrebutted, shows that there is a reasonable

likelihood that these claims are unpatentable, Petitioner requests this Petition be

instituted and the Challenged Claims be found unpatentable. Per §§1.33(c), 42.105,

and 42.100, a copy of the present Request, in its entirety, is being served on the

Patent Owner at the address of record in the PAIR system. The Director is hereby

authorized to charge any deficiency in the fees filed, asserted to be filed or which

should have been filed herewith (or with any paper hereafter filed in this

proceeding by this firm) to Deposit Account 50-0417, under Order No. 103378-

0029.

Respectfully submitted,                          October 5, 2018


By: /Nicole M. Jantzi/
_____

Nicole M. Jantzi (Lead Counsel)

*Attorneys for Petitioner Next Caller, Inc.*

*Inter Partes* Review
United States Patent No. 9,001,985

# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| United States Patent No: 9,001,985 | § | |
| Inventors: Patrick M. Cox, Richard J. | § | Attorney Docket No.: |
| Greene, Joseph H. Bockelman, Shreyas | § | 103378-0029 |
| Saitawdekar | § | |
| Formerly Application No.: 13/567,592 | § | Petitioner: Next Caller Inc. |
| Issue Date: Apr. 7, 2015 | § | |
| Filing Date: Aug. 6, 2012 | § | |
| Former Group Art Unit: 2656 | § | |
| Former Examiner: Binh Kien Tieu | § | |
| Patent Owner: TrustID, Inc. | § | |

For: METHOD OF AND SYSTEM FOR DISCOVERING AND REPORTING TRUSTWORTHINESS AND CREDIBILITY OF CALLING PART NUMBER INFORMATION

MAIL STOP PATENT BOARD
Patent Trial and Appeal Board
United States Patent and Trademark Office
Post Office Box 1450
Alexandria, Virginia 22313-1450

## CERTIFICATE OF WORD COUNT

It is certified that the number of words, not including the table of contents, table of authorities, mandatory notices under §42.8, certificate of service, appendix of exhibits and claim listing, is 13,904, which is less than 14,000.

Dated:　　　　October 5, 2018　　　　　　Respectfully submitted,

By:　　　/Ian B. Brooks/_____
　　　　Name:  Ian B. Brooks (Back-up
　　　　Counsel)

*Inter Partes* Review
United States Patent No. 9,001,985

**McDERMOTT WILL & EMERY LLP**

*Inter Partes* Review
United States Patent No. 9,001,985

# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| United States Patent No: 9,001,985 | § | |
| Inventors: Patrick M. Cox, Richard J. | § | Attorney Docket No.: |
| Greene, Joseph H. Bockelman, Shreyas | § | 103378-0029 |
| Saitawdekar | § | |
| Formerly Application No.: 13/567,592 | § | Petitioner: Next Caller Inc. |
| Issue Date: Apr. 7, 2015 | § | |
| Filing Date: Aug. 6, 2012 | § | |
| Former Group Art Unit: 2656 | § | |
| Former Examiner: Binh Kien Tieu | § | |
| Patent Owner: TrustID, Inc. | § | |

For: METHOD OF AND SYSTEM FOR DISCOVERING AND REPORTING
TRUSTWORTHINESS AND CREDIBILITY OF CALLING PART NUMBER
INFORMATION

MAIL STOP PATENT BOARD
Patent Trial and Appeal Board
United States Patent and Trademark Office
Post Office Box 1450
Alexandria, Virginia 22313-1450

## CERTIFICATE OF SERVICE

It is certified that copies of the following documents have been served in

their entirety on the patent owner as provided in 37 CFR §42.105:

Petition for *Inter Partes* Review of United States Patent No. 9,001,985.

| Exhibit | Description |
|---|---|
| Ex. 1001 | U.S. Patent No. 9,001,985 |
| Ex. 1002 | U.S. Patent No. 9,001,985 File History |
| Ex. 1003 | Declaration of James T. Geier In Support of the Petition for an *Inter Partes* Review of United States Patent No. 9,001,985 |

*Inter Partes* Review
United States Patent No. 9,001,985

| Ex. 1004 | U.S. Patent Application Publication No. 2007/0201625 to Martin *et al.* ("Martin") |
|---|---|
| Ex. 1005 | U.S. Patent Application Publication No. 2007/0081648 to Abramson *et al.* ("Abramson") |
| Ex. 1006 | U.S. Patent No. 7,912,192 to Kealy *et al.* ("Kealy") |
| Ex. 1007 | Declaration of Ian B. Brooks In Support of the Petition for an *Inter Partes* Review of United States Patent No. 9,001,985 |

The copy has been served on October 5, 2018 by causing the aforementioned document to be deposited in the United States Postal Service as Express Mail (Label No. EL 869312251) postage pre-paid in an envelope addressed to:

TRUSTID, INC.
STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.
1100 NEW YORK AVENUE, N.W.
WASHINGTON, D.C. 20005

Dated:        October 5, 2018              Respectfully submitted,

By:      /Michael Nemith/
        Name:  Michael Nemith

**McDERMOTT WILL & EMERY LLP**

-2-

# Exhibit 2

Trials@uspto.gov                                  Paper No. 11
571-272-7822                        Date Entered:  February 25, 2019

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

NEXT CALLER INC.,
Petitioner,

v.

TRUSTID, INC.,
Patent Owner.

_____

Case IPR2019-00039
Patent 9,001,985 B2

_____

Before:  JEAN R. HOMERE, BARBARA A. PARVIS, and
STACEY G. WHITE, *Administrative Patent Judges*.

PARVIS, *Administrative Patent Judge*.

DECISION TO INSTITUTE
*35 U.S.C. § 314(a)*

IPR2019-00039
Patent 9,001,985 B2

# I.   INTRODUCTION

Next Caller Inc., ("Petitioner") filed a Petition pursuant to 35 U.S.C. §§ 311–319 to institute an *inter partes* review of claims 1–22 of U.S. Patent No. 9,001,985 B2 (Ex. 1001, "the '985 Patent").  Paper 1 ("Pet.").  TRUSTID, Inc. ("Patent Owner") filed a Preliminary Response.  Paper 10 ("Prelim. Resp.").

We apply the standard set forth in 35 U.S.C. § 314(a), which requires demonstration of "a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition."[1]  Upon consideration of the parties' contentions and the evidence of record, we conclude Petitioner demonstrates a reasonable likelihood of prevailing in demonstrating the unpatentability of claims 1–7, 12–18, 21, and 22 of the '985 Patent.  Accordingly, we grant Petitioner's request and institute an *inter partes* review of all challenged claims and with respect to all grounds set forth in the Petition.  *See SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1359–60 (2018).

# II.   BACKGROUND

## A.   *Real Parties-in-Interest*

Petitioner names itself as the real party-in-interest.  Pet. 4.  Patent Owner names itself as the real party-in-interest.  Paper 3, 1.

---

[1] We have authority under 35 U.S.C. § 314 to determine whether to institute an *inter partes* review.  *See* 37 C.F.R. § 42.4(a).

IPR2019-00039
Patent 9,001,985 B2

### B.     Related Matters

As required by 37 C.F.R. § 42.8(b)(2), each party identifies a judicial matter that would affect, or be affected by, a decision in this proceeding.  In particular, the parties inform us that the '985 Patent is asserted in *TRUSTID, Inc. v. Next Caller Inc.*, Case No. 1:18-cv-000172 (D. Del.) filed January 30, 2018.  Pet. 4; Paper 3, 1.

### C.     The '985 Patent

The '985 Patent is directed to establishing the credibility of incoming calls placed in telecommunication and information service networks. Ex. 1001, 1:23–28.  Figure 1 of the '985 Patent is reproduced below.

IPR2019-00039
Patent 9,001,985 B2



FIG. 1

Figure 1 of the '985 Patent, above, illustrates a flow diagram for determining trustworthiness and credibility of calling number information relating to calls placed in a telecommunication network.  *Id.* at 5:63–67.

IPR2019-00039
Patent 9,001,985 B2

The process begins with an event in which an incoming telephone call is received. *Id.* at 6:50–52. Automatic Number Identification (ANI) information, which typically is ten digits long in North America, is delivered. *Id.* at 6:52–54. The ANI is used to perform checks represented, for example, by calling party compliance block 7, representing a validity check, carrier discovery 8 block representing a determination of the carrier that owns the ANI, and geo-spatial location block 12 representing a determination of the geographic information about the ANI. *Id.* at 7:26–8:16. Network condition, line-status, call progress information, and call progress messages and their associated timing information are collected in Network Condition 14. *Id.* at 8:49–51. Examples of network conditions of the telephone number include busy, ring then answer, call forward then answer, and ringing no answer. *Id.* at 8:51–54.

Storage 16 represents sorting and formatting data obtained, for example, in carrier discovery 8, geo-spatial location block 12, and network condition 14. *Id.* at 9:40–49. Real-time patterns database 17 stores data from storage 16. *Id.* at 9:51–53. Compare 18 compares data in real-time patterns database 17 against expected pattern results in expected patterns database 19. *Id.* at 10:7–10.

In determine block 20, the results from compare 18 are analyzed for normalcy deviation and statistical match to patterns and their timing or duration between messages or conditions. *Id.* at 10:63–65. Real time patterns and other attributes are used to generate a score or metric of the validity of an ANI or, alternatively, a single determination of "valid" or "invalid." *Id.* at 10:66–11:5.

IPR2019-00039
Patent 9,001,985 B2

### D.    Illustrative Claim

Petitioner challenges claims 1–22 of the '985 Patent.  Pet. 1.  Claims 1 and 13 are independent claims.  Claims 2–12 and 14–22 depend, directly or indirectly, from claim 1 or 13.  Independent claim 1, reproduced below, is illustrative of the claimed subject matter:

> 1.  A method of determining a source origin confidence metric of a calling party number or billing number associated with an incoming call to a called party telephonic device from a calling party telephonic device, comprising:
>
> receiving by an electronic system associated with the called party telephonic device the calling party number or billing number, wherein the electronic system receives the calling party number or billing number from the called party telephonic device;
>
> after receiving the calling party number or billing number and before the incoming call is answered, gathering by the electronic system associated with the called party telephonic device operational status information associated with the calling party number or billing number, and
>
> determining by the electronic system associated with the called party telephonic device the source origin confidence metric for the calling party number or billing number.

Ex. 1001, 15:2–19.

### E.    Evidence Relied Upon

Petitioner relies on the following references:

U.S. Patent Publication No. 2007/0201625 A1, filed February 28, 2006, published August 30, 2007 (Ex. 1004, "Martin");

U.S. Patent Publication No. 2007/0081648 A1, filed September 28, 2005, published April 12, 2007 (Ex. 1005, "Abramson"); and

IPR2019-00039
Patent 9,001,985 B2

U.S. Patent No. 7,912,192 B2, filed February 15, 2005, issued March 22, 2011 (Ex. 1006, "Kealy").

Additionally, Petitioner relies on the Declaration of Mr. James T. Geier. (Ex. 1003).

### F.    Grounds Asserted

Petitioner asserts the following grounds of unpatentability (Pet. 5):

| Reference(s) | Basis | Claims Challenged |
|---|---|---|
| Martin | § 103(a) | 1–7, 12–14, 16–18, 21, and 22 |
| Martin and Abramson | § 103(a) | 1–7, 12–18, 21, and 22 |
| Martin and Kealy | § 103(a) | 8–11, 19, and 20 |
| Martin, Abramson, and Kealy | § 103(a) | 8–11, 19, and 20 |

## III.    DISCUSSION

### A.    Principles of Law Relating to Obviousness

A patent claim is unpatentable if the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. 35 U.S.C. § 103(a).  The question of obviousness is resolved on the basis of underlying factual determinations, including:  (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) objective evidence of nonobviousness, i.e., secondary considerations.  *See Graham v. John Deere*

*Co.*, 383 U.S. 1, 17–18 (1966).  When evaluating a combination of teachings, we also "determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007) (citing *In re Kahn*, 441, F.3d 977, 988 (Fed. Cir. 2006)).  We analyze the ground based on obviousness in accordance with the above-stated principles.

> B.      *Level of Ordinary Skill and Mr. Geier's Declaration*

Petitioner contends, relying on the testimony of Mr. Geier that a person having ordinary skill in the art would have had a bachelor's degree in electrical engineering, computer science, or a related field, plus 1–2 years of experience with telecommunications.  Pet. 11 (citing Ex. 1003 ¶ 16).  Mr. Geier testifies:

> Based on these factors, on or before May 19, 2009, a POSITA relating to the technology of the '985 Patent would have had a minimum of a bachelor's degree in electrical engineering, computer science, or a related field, plus 1–2 years of experience with telecommunications.  In lieu of a degree, a POSITA could be one whose equivalent accumulated knowledge and experience in the field of telecommunications makes him or her a POSITA.  Additional graduate education could substitute for professional experience, or significant experience in the field could substitute for formal education.  A POSITA is presumed to have knowledge of all relevant prior art, and therefore would have been familiar with each of the references cited in this declaration and the full range of teachings they contain.

Ex. 1003 ¶ 16.

Patent Owner contends that absent from Petitioner's definition of level of skill is experience with spoofing and fraudulent calling technologies. Prelim. Resp. 15.  Patent Owner further contends, as a result, we should give

IPR2019-00039
Patent 9,001,985 B2

little or no weight to Mr. Geier's Declaration because Petitioner has not
established that Mr. Geier is qualified in the prior art. *Id.* at 18–22. Patent
Owner points to paragraph 17 of Mr. Geier's Declaration indicating a
"background in chemical engineering and material science." *Id.* at 19 (citing
Ex. 1003 ¶ 17). Patent Owner characterizes paragraph 17 of Mr. Geier's
Declaration as a "mistake" that was "leftover from a previous declaration
used by Next Caller's counsel." *Id.*

Consistent with Petitioner's definition of level of skill in the art, the
'985 Patent pertains to calls placed in telecommunication and information
service networks. Ex. 1001, 1:23–24. The '985 Patent describes as
background in this field using ANI information and a problem arising from
such use, i.e., falsification of ANI. *Id.* at 1:42–46 (describing that
"[b]usiness such as banks, call centers, and government entities such as 911
service centers have relied on ANI information as a factor in identity
determination), 2:5–7 ("ANI fabrication or spoofing is a low cost, powerful
penetration tool used to impersonate identity and location").

Mr. Geier testifies that he has a "a B.S. in Electrical Engineering from
California State University in 1985, an M.S. in Electrical Engineering from
the Air Force Institute of Technology in 1990, and an M.B.A. from the
University of Phoenix in 2001." Ex. 1003 ¶ 3; *see also id.* at Appendix A.
Mr. Geier further testifies that he is a practicing engineer with over 30 years
of experience in the field of communications systems and he provides details
regarding his experience. *Id.* ¶¶ 4–12.

At this juncture, we determine Petitioner's definition of level of skill
is sufficient for purposes of this Decision. Additionally, we are persuaded
that Petitioner has shown sufficiently for purposes of this Decision that Mr.

IPR2019-00039
Patent 9,001,985 B2

Geier is qualified in the prior art. The parties will have the opportunity to develop the evidentiary record regarding the definition of level of skill and Mr. Geier's qualifications during the trial.

### C.   Claim Construction

In this *inter partes* review, we construe claim terms according to their broadest reasonable construction in light of the specification of the patent in which they appear. 37 C.F.R. § 42.100(b) (2016).[2] Petitioner provides proposed constructions for "call" and "source origin confidence metric." Pet. 10. Patent Owner's disputes pertain to the broadest reasonable interpretation of only "source origin confidence metric." *See generally* Prelim. Resp. Accordingly, we need only determine an express construction for that term. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (noting that "we need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy'") (citing *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999)).

### 1.   The Parties' Contentions

Petitioner proposes that "source origin confidence metric" recited in independent claims 1 and 13 means "a determination of the trustworthiness for the entity from which the call originated." Pet. 10–11 (citing, *e.g.*, Ex.

---

[2] The claim construction standard to be employed in an *inter partes* review recently changed. *See Changes to the Claim Construction Standard for Interpreting Claims in Trial Proceedings Before the Patent Trial and Appeal Board*, 83 Fed. Reg. 51340 (Oct. 11, 2018). At the time of the filing of the Petition in this proceeding, however, the applicable claim construction standard was set forth in 37 C.F.R. § 42.100(b) (2016).

IPR2019-00039
Patent 9,001,985 B2

1001, 11:2–6, 12:43–47, 13:61–63).  Petitioner further contends, based on
the '985 Patent Specification, that the "source origin confidence metric"
encompasses "a singular determination such as 'valid' or 'invalid.'"  *Id.*
(citing Ex. 1001, 11:2–6).

Patent Owner does not dispute Petitioner's proposed construction that
"source origin confidence metric" means "a determination of the
trustworthiness for the entity from which the call originated."  Prelim. Resp.
26.  Patent Owner, however, disputes that the "source origin confidence
metric" encompasses a binary (valid or invalid) determination.  *See, e.g.*, *id.*
at 28.

## 2.  Discussion—"source origin confidence metric"

Regarding whether a "source origin confidence metric" encompasses
a binary (valid or invalid) determination, based on the record before us, we
agree with Patent Owner.  Starting with the language of the claim, claim 1
recites "determining by the electronic system associated with the called
party telephonic device the *source origin confidence metric* for the calling
party number or the billing number."  Ex. 1001, 15:16–19 (emphasis added).
Claim 13 recites:

> prior to answering the incoming call, requesting by the call
>     center telephonic device *a source origin confidence metric*
>     for the calling party number or billing number from an
>     electronic system associated with the call center telephonic
>     device, wherein the *confidence metric* is determined based
>     on operational status information of the calling party number
>     or billing number

*Id.* at 16:11–17 (emphasis added).

In applying a broadest reasonable construction, claim terms generally
are given their ordinary and customary meaning, as would be understood by

11

one of ordinary skill in the art in the context of the entire disclosure. *See In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007). Additionally, we must be careful not to read a particular embodiment appearing in the written description into the claim if the claim language is broader than the embodiment. *See In re Van Geuns*, 988 F.2d 1181, 1184 (Fed. Cir. 1993). "Metric" means a measurement or benchmark. *See, e.g.*, HARRY NEWTON, NEWTON'S TELECOM DICTIONARY 501 (CMP Books 19th ed. 2003) (Ex. 3001).

Petitioner points to claim 17, which depends directly from claim 13 and further requires "wherein the source origin confidence metric indicates either the calling party number or the billing number is valid or invalid." *Id.* at 16:36–38. "[T]he presence of a dependent claim that adds a particular limitation raises a presumption that the limitation in question is not found in the independent claim." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004). Claim differentiation, however, only creates a presumption; it is not a hard and fast rule of construction and cannot broaden claims beyond their correct scope determined in light of the specification, prosecution history, and relevant extrinsic evidence. *Seachange Int'l, Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1369 (Fed. Cir. 2005).

Turning to the '985 Patent Specification, we are persuaded that the presumption is overcome. Consistent with the ordinary and customary meaning of "metric," the '985 Patent Specification describes:

> [T]hese and other attributes or elements may be used to generate a score or metric of the validity of an ANI or, alternatively, as a singular determination such as "valid" or "invalid" or as a tiered system such as "red," "yellow," "green." Each additional attribute or element such as carrier, line type, geo-location, time of day, match of real time pattern to expected

> pattern is assigned a weighted value as factors of a confidence
> metric. *A confidence metric is produced using statistical
> methods to indicate the probability* that the ANI is correct.

Ex. 1001, 11:2–11 (emphasis added). Additionally, with respect to another
embodiment, the '985 Patent describes achieving "the same trustworthiness
and validity metric." *Id.* at 12:43–47. The '985 Patent further describes that
processing by system 50 results in "a calculated confidence metric
representing the credibility of the calling party number (FIG. 1, process
block 20)." *Id.* at 13:61–63.

The '985 Patent Specification's description of "metric" is consistent
with its ordinary and customary meaning. Accordingly, at this juncture, we
are not persuaded by Petitioner that "source origin confidence metric"
encompasses a binary (valid or invalid) determination. Instead, we apply the
ordinary and customary meaning, namely that "metric" means a
measurement or benchmark.

### D.    *Claims 1–7, 12–18, 21, and 22*

Petitioner contends each of claims 1–7, 12–14, 16–18, 21, and 22 of
the '985 Patent is unpatentable, under 35 U.S.C. § 103, as obvious over
Martin. Pet. 5, 11–19, 23–43, 50–60. Petitioner also contends each of
claims 1–7, 12–18, 21, and 22 of the '985 Patent is unpatentable, under
35 U.S.C. § 103, as obvious over Martin and Abramson. *Id.* Patent Owner
opposes. *See generally* Prelim. Resp. In our discussion below, we first
provide a brief overview of the prior art, and then we address the parties'
contentions in turn.

IPR2019-00039
Patent 9,001,985 B2

### *1. Overview of Martin*

Martin is directed to an alarm system central monitoring station that processes an incoming telephone call based on the call source identification information.  Ex. 1004 ¶ 1.  Figure 1 of Martin is reproduced below.



Figure 1 illustrates central monitoring station 100, which includes receiving circuits 110 that detect a call from one of alarm panels 10–50.  *Id.* ¶ 18. Processing circuits 130 use caller identifier (ID) information 75 to determine the status of an alarm system from status information 145 stored in memory 140.  *Id.* ¶ 19.

Figure 5 of Martin provides more detail regarding determining the status of an alarm and is reproduced below.

14

IPR2019-00039
Patent 9,001,985 B2



Figure 5 of Martin is a flowchart that illustrates processing by central monitoring system 100 when a telephone call is detected by receiving circuits 110. *Id.* ¶ 27.

Processing circuits 130 determine if caller ID information 75 received by receiving circuits 110 matches information 200 stored in memory. *Id.* If

IPR2019-00039
Patent 9,001,985 B2

no match is found, the call is connected to invalid alarm call station 195.  *Id.*
If a match is found, processing circuits 130 read status bits 210–330.  *Id.*  If
the call is a valid alarm call, the call is connected to receiver 150 and status
information 145 is transmitted.  *Id.*  Otherwise, the call is transferred to a
business operator based on status information 145 or disconnected.  *Id.* ¶¶ 9,
27.

### 2. *Overview of Abramson*

Abramson is directed to detecting spoofing of a telephone number.
Ex. 1005 ¶ 1.  Figure 5 of Abramson is reproduced below.



Figure 5 of Abramson, above, illustrates, a flowchart of tasks relating to
granting a privilege to a call from a telephone based on criteria used to
verify the telephone.  *Id.* ¶¶ 64–65.

16

IPR2019-00039
Patent 9,001,985 B2

At task 501, exchange 205 determines whether a received telephone type agrees with what is expected based on information stored in memory 303 and, if so, execution proceeds to task 502. *Id.* ¶¶ 66–67. Otherwise, the call attempt ends in task 505. *Id.* ¶ 67. Exemplary telephone types include "GSM Cellular" and "Landline." *Id.*

At task 502, exchange 205 determines whether a received signaling protocol agrees with what is expected and, if so, execution proceeds to task 503; otherwise task execution proceeds to task 505. *Id.* ¶ 68. An exemplary signaling protocol is "ISDN." *Id.* ¶ 69.

At task 503, exchange 205 determines whether the ordering of identifiers agrees with what is expected and, if so, execution proceeds to task 504; otherwise task execution proceeds to task 505. *Id.* ¶ 70. At task 504, exchange 205 grants one or more privileges to the telephone. *Id.* ¶ 72.

### 3. Discussion of Claim 1

We begin our analysis with independent claim 1. Petitioner asserts that claim 1 is obvious over Martin alone and, alternatively, over the combination of Martin and Abramson. Pet. 5, 11–19, 23–35. Patent Owner counters that (1) Petitioner has not shown that the asserted art teaches "source origin confidence metric" (Prelim. Resp. 25–30); (2) Petitioner has not shown that the asserted art teaches "operational status information" (*id.*

IPR2019-00039
Patent 9,001,985 B2

at 30–35); and (3) Petitioner's obviousness analysis does not apply the *Graham* framework (*id.* at 12–17).[3]

Upon review of the evidence in the current record at this preliminary stage in the proceeding, we find that Petitioner has shown sufficiently for purposes of this Decision how Martin alone and the combination of Martin and Abramson teach each limitation of claim 1. At this juncture, we do not find Patent Owner's arguments undermine Petitioner's showing.

We start with the preamble of claim 1, which recites "[a] method of determining a source origin confidence metric of a calling party number or billing number associated with an incoming call to a called party telephonic device from a calling party telephonic device." Ex. 1001, 15:2–5. Petitioner points to Martin's teaching of processing a call to determine if it is a valid, legitimate alarm system report. Pet. 23–25 (citing, *e.g.*, Ex. 1004 ¶¶ 6, 18, 27, Figs. 1, 2). With respect to the combination of Martin and Abramson, Petitioner contends one having ordinary skill in the art would have had reason to modify Martin's central monitoring station to perform Abramson's validation checks (i.e., tasks 501–503) to determine with a higher confidence level that the call is genuine. *Id.* at 26–29 (citing Ex. 1005 ¶¶ 23, 58–59, 66–72, Figs. 3, 5; Ex. 1003 ¶¶ 75–83). Regarding the "source origin confidence metric," citing Mr. Geier's testimony as support, Petitioner

─────────────────

[3] Patent Owner, additionally, contends that Petitioner's claim charts improperly include explanations and arguments. *Id.* at 7–12 (citing *Int'l Bus. Mach. Corp. v. Elecs. and Telecomm. Research Inst.*, IPR2014-00949, Paper 7 at 2 (PTAB July 14, 2014)). At the time of the filing of the Petition in this proceeding, however, the word count limit for petitions was 14,000 words, set forth in 37 C.F.R. § 42.24(a)(1)(i) (2016). Patent Owner does not assert that Petitioner exceeded the word count limit.

18

IPR2019-00039
Patent 9,001,985 B2

contends one having ordinary skill in the art would have had reason to modify Martin's status information to calculate a score to permit Martin's call center to assess boundary situations. *Id.* at 28–29 n.7 (citing, *e.g.*, Ex. 1003 ¶¶ 84–86). Petitioner additionally contends one having ordinary skill in the art would have had reason to modify Abramson to assign a probabilistic score to gain greater flexibility in evaluating callers. *Id.*

> Martin teaches:

> The central monitoring station will process the call by checking if the call source identification information matches call source identification information stored in memory, and it will check status data that may be associated with the call source identification information, also stored in memory, to determine if the call should be disconnected, transferred, or connected to the receiver.

Ex. 1004 ¶ 6; *see also id.* ¶ 27 (describing determining using caller ID information 75 and status bits 210–330 if an incoming call is a valid alarm call); *supra* § III.D.1 (with reproductions of Figures 1 and 5 of Martin illustrating central monitoring station 100 and processing by central monitoring system 100, respectively).

> Regarding modifying Martin's status information to calculate a score, Mr. Geier testifies:

> For example, it would have been obvious to a POSITA to modify Martin to use Martin's status information to calculate a score using statistical analysis of the status bits to make a validity determination. Doing so would permit Martin's call center to assess certain boundary situations where, e.g., a caller may not yet have runaway dialer status, but the COUNT DATA continues to rise. Once a threshold has been passed, the caller is then determined to be a runaway dialer.

Ex. 1003 ¶ 85.

19

IPR2019-00039
Patent 9,001,985 B2

Patent Owner contends that Mr. Geier's testimony cannot be used to substitute for a missing element.  Prelim. Resp. 28–30.  Petitioner points to Martin's disclosure of making a validity or invalidity determination.  Pet. 23–25 (citing, *e.g.*, Ex. 1004 ¶¶ 6, 18, 27, Figs. 1, 2).  Based on the record before us at this preliminary stage, we find that Petitioner makes a sufficient showing based on Martin's suggestion and Mr. Geier's testimony (Ex. 1003 ¶¶ 84–85).  At this juncture, because Petitioner makes the requisite showing that Martin teaches the subject matter recited in the preamble, we need not reach whether the preamble is limiting for purposes of this Decision.[4]

We turn to the first element in claim 1, which is "receiving by an electronic system associated with the called party telephonic device the calling party number or billing number, wherein the electronic system receives the calling party number or billing number from the called party telephonic device."  Ex. 1001, 15:6–10.[5]  Petitioner points to Martin's teaching of central monitoring station using call source identification information, such as caller ID, Dialed Number Identification Service

---

[4] Patent Owner additionally contends we should give Mr. Geier's Declaration little or no weight because it repeats the Petition.  *See*, *e.g.*, *id.* at 20.  At this juncture, we are not convinced that similarities in the Petition and Mr. Geier's Declaration necessarily indicate that the Declaration is a copy of an attorney-prepared Petition.  Instead, the Petition may be a copy of the Declaration or Mr. Geier may have worked with the attorneys to prepare both the Petition and Declaration simultaneously.  The parties are free to explore this issue further during the trial.

[5] Petitioner discusses the first and second portions separately and designates these portions as "1.1(a)" and "1.1(b)," respectively.  Pet. 29–31.  We use Petitioner's designations or, consistent with Petitioner's designations, refer to the portions collectively as "element 1.1."

IPR2019-00039
Patent 9,001,985 B2

(DNIS), or ANI.  Pet. 30 (citing Ex. 1004 ¶¶ 6, 27, Fig. 1; Ex. 1003 ¶ 87–91).  Martin teaches "[t]he receiving circuits 110 read the caller ID information 75 and the processing circuits 130 look for a match between the received caller ID information 75 and the caller ID information 200 stored in memory 140."  Ex. 1004 ¶ 27.  Martin teaches exemplary call source information includes "caller ID, DNIS, or ANI."  *Id.* ¶ 6.

Patent Owner does not dispute Petitioner's showing with respect to element 1.1.  Accordingly, upon consideration of the Petition, the Preliminary Response, and the evidence of record, we find that Petitioner makes sufficient showing, at this stage in the proceeding, that Martin teaches claim element 1.1, i.e., "receiving by an electronic system associated with the called party telephonic device the calling party number or billing number, wherein the electronic system receives the calling party number or billing number from the called party telephonic device."  Ex. 1001, 15:6–10.

We next turn to the second element in claim 1, which is "after receiving the calling party number or billing number and before the incoming call is answered, gathering by the electronic system associated with the called party telephonic device operational status information associated with the calling party number or billing number."  Ex. 1001, 15:11–15.[6]  Petitioner points to Martin's teaching of central monitoring station 100 processing status bits 210–330 if the aforementioned match is found between the received caller ID information 75 and information 200.  Pet. 31–34 (citing, *e.g.*, Ex. 1004 ¶¶ 6, 27, Figs. 1, 2, 5; Ex. 1003 ¶¶ 92–97).

_____

[6] Petitioner designates the second element in claim 1 as "1.2."  Pet. 31–32. We use Petitioner's designation herein.

IPR2019-00039
Patent 9,001,985 B2

Petitioner also points to Martin's teaching of exemplary status bits 210–330, including, for example, Martin's "MISMATCHED CALLER ID STATUS 250." Pet. 13–14, 32 n.10 (citing, *e.g.*, Ex. 1004 ¶¶ 21–23, 28; Ex. 1003 ¶¶ 50–51, 98).

Martin teaches if a match is found, processing circuits 130 read status bits 210–330. Ex. 1004 ¶¶ 6, 27, Fig. 5. Martin's status bits are illustrated in Figure 2, reproduced below:



FIGURE 2

Figure 2 of Martin illustrates a diagram of caller ID information 200 and status information stored in memory 140. *Id.* ¶ 22. Martin teaches if the MISMATCHED CALLER ID STATUS bit 250 is set, the call will be transmitted to invalid alarm call station 195. *Id.* ¶ 23. If after reading status bits 210–330 the call is determined to be a valid alarm call, the call is connected to receiver 150 and status information 145 is transmitted. *Id.* ¶ 27.

IPR2019-00039
Patent 9,001,985 B2

Patent Owner contends Petitioner relies on an "incorrect reading" that claim 1 "broadly covers any 'operational status information.'" Prelim. Resp. 34 (citing Pet. 32 n.10). Patent Owner further contends that Martin's MISMATCHED CALLER ID STATUS bit 250 is not the claimed "operational status information." *Id.* at 33–34. Consistent with "operational status information *associated with the calling party number or billing number*" recited in claim 1 (Ex. 1001, 15:14–15 (emphasis added)), Martin teaches that processing circuits 130 look for a *match between received caller ID information 75* and caller ID information 200 stored in memory 140. Ex. 1004 ¶ 27, Fig. 5. As shown in Figure 2 of Martin, MISMATCHED CALLER ID STATUS bit 250 is associated with caller ID information 75. *Id.* ¶ 22, Fig. 2 ("Shown is a list of caller ID information 200 and the status bits (or bytes) 210–330 *associated with each caller ID information 200*") (emphasis added). At this juncture, we are persuaded by Petitioner's showing. The parties will the opportunity to develop the record further regarding claim scope during the *inter partes* review

Accordingly, upon consideration of the Petition, the Preliminary Response, and the evidence of record, we find that Petitioner makes sufficient showing, at this stage in the proceeding, that Martin teaches claim element 1.2, i.e., "after receiving the calling party number or billing number and before the incoming call is answered, gathering by the electronic system associated with the called party telephonic device operational status information associated with the calling party number or billing number." Ex. 1001, 15:11–15.

We turn to the third element in claim 1, which is "determining by the electronic system associated with the called party telephonic device the

IPR2019-00039
Patent 9,001,985 B2

source origin confidence metric for the calling party number or billing number." Ex. 1001, 15:16–18.[7]  Petitioner, for example, points to its prior contentions regarding the preamble and the same teachings discussed herein. Pet. 34–35 (citing, *e.g.*, Ex. 1004 ¶¶ 6, 27; Ex. 1005 ¶¶ 23, 66–71; Ex. 1003 ¶¶ 99–106).  Patent Owner relies on the same contentions discussed with respect to the preamble.  Prelim. Resp. 28–30.  For the reasons discussed above in this section with respect to the preamble, upon consideration of the Petition, the Preliminary Response, and the evidence of record, we find that Petitioner makes sufficient showing, at this stage in the proceeding, that Martin teaches claim element 1.3 and we do not find Patent Owner's arguments undermine Petitioner's showing.

Regarding claim 1, Patent Owner also contends that Petitioner's obviousness analysis does not apply the *Graham* framework.  *Id.* at 12–14. In particular, Patent Owner contends that Petitioner does not identify differences between the claimed subject matter and Martin because Petitioner asserts claim 1 is obvious over Martin alone.  *Id.* at 13.

Petitioner, as an alternative, points to the combined teachings of Martin and Abramson with respect to "source origin *confidence* metric" recited in claim 1.  Ex. 1001, 15:2–3 (emphasis added).  In particular, Petitioner contends one having ordinary skill in the art would have had reason to modify Martin's central monitoring station to perform Abramson's validation checks to determine with a "higher confidence level" that the call is genuine.  Pet. 26–29, 35 (citing Ex. 1005 ¶¶ 23, 58–59, 66–72, Figs. 3, 5;

_____

[7] Petitioner designates the third element in claim 1 as "1.3."  Pet. 34.  We use Petitioner's designation herein.

24

IPR2019-00039
Patent 9,001,985 B2

Ex. 1003 ¶¶ 75–83, 101–106).  We determine that Petitioner's identification of an alternative ground does not undermine Petitioner's showing.  At this juncture, we are persuaded that Petitioner has offered articulated reasoning with a rational underpinning as to why one of ordinary skill in the art would have combined the teachings of Abramson and Martin.  Pet. 23–28 (citing, *e.g.*, Ex. 1004 ¶¶ 6, 27, Figs. 1, 2; Ex. 1005 ¶¶ 23, 58–59, 66–72, Figs. 3, 5; Ex. 1003 ¶¶ 71–73, 75–83).

In summary, upon consideration of the contentions and evidence presented by both parties at this stage in the proceeding and the evidence of record, we find that Petitioner makes sufficient showing that all recitations in claim 1 are taught by each of Martin alone and the combination of Martin and Abramson.  Additionally, at this juncture, we are persuaded that Petitioner has offered articulated reasoning with a rational underpinning as to why one of ordinary skill in the art would have modified and combined the teachings of the asserted art in the manner proposed by Petitioner.  Accordingly, on this record, we determine that Petitioner has shown a reasonable likelihood that it would prevail in establishing that claim 1 is obvious over (1) Martin alone and (2) the combination of Martin and Abramson.

### 4.   *Discussion of Independent Claim 13*

Independent claim 13 is similar to independent claim 1.  Claim 13 recites "[a] method for authenticating a calling party" that comprises steps similar to the steps recited in method claim 1.  *Compare* Ex. 1001, 16:3–23 *with id.* at 15:2–19.

IPR2019-00039
Patent 9,001,985 B2

Petitioner's showing with respect to claim 13 is similar to its showing with respect to claim 1 and, indeed, Petitioner references its contentions for claim 1. *See*, *e.g.*, Pet. 51–54. Petitioner accounts sufficiently for all differences in the claims. For instance, regarding "*requesting* by the call center telephonic device a source origin confidence metric" recited in claim 13 (Ex. 1001, 16:11–13 (emphasis added)), Petitioner points to Martin's teaching of transferring caller ID and status information with the incoming call and relies on the testimony of Mr. Geier that a person having ordinary skill in the art would have had reason to modify Martin *to request* the source origin confidence metric. Pet. 52–53 (citing, *e.g.*, Ex. 1004 ¶¶ 6, 27, Fig. 5; Ex. 1003 ¶¶ 181–182).

Martin teaches, "[t]he central monitoring station uses the call source identification information *transmitted by the telephone system* (*typically between the first and second ring of a call*) to make decisions as to how to process the call prior to the receiver answering the call." Ex. 1004 ¶ 6 (emphasis added). Mr. Geier testifies "[a] POSITA would have found it obvious and straightforward to request the source origin confidence metric, because doing so would have enabled the 'receiving circuits 110,' 'switching circuits 120,' 'receiver(s) 150,' and 'invalid alarm call station' to determine how to route the call." Ex. 1003 ¶ 182.

Regarding "wherein the confidence metric is determined based on operational status information of the calling party number or billing number" recited in claim 13, Petitioner points to Martin's teaching of determining whether the call is a valid alarm call based on status bits 210–330. *Id.* at 53–54 (citing, *e.g.*, Ex. 1004 ¶¶ 6, 27, Fig. 5; Ex. 1003 ¶¶ 194–195). Martin teaches:

26

IPR2019-00039
Patent 9,001,985 B2

> If there is a match, the processing circuits 120 read the status
> bits 210–330 associated with the caller ID information 200.  If
> the processing circuits 120 determine the call is a valid alarm
> call, the processing circuits 130 cause the switching circuits 120
> to connect the call to the receiver 150 and transmit the status
> information 145.

Ex. 1004 ¶ 27.  As shown in Figure 2 of Martin, MISMATCHED CALLER

ID STATUS bit 250 is associated with caller ID information 75.  *Id.* ¶ 22,

Fig. 2 ("Shown is a list of caller ID information 200 and the status bits (or

bytes) 210–330 *associated with each caller ID information 200*") (emphasis

added).

For independent claim 13, Patent Owner relies on the same arguments

discussed above in Section III.D.3 with respect to claim 1.  *See generally*

Prelim. Resp.  For the reasons discussed above in Section III.D.3 with

respect to claim 1 based on the record before us, we find that Petitioner

makes sufficient showing that all recitations in claim 13 are taught by each

of Martin alone and the combination of Martin and Abramson.  Also, we are

persuaded that Petitioner has offered articulated reasoning with a rational

underpinning as to why one of ordinary skill in the art would have modified

and combined the teachings of the asserted art in the manner proposed by

Petitioner.

For the reasons given and on the record before us at this juncture, we

determine that Petitioner has shown a reasonable likelihood that it would

prevail in establishing that claim 13 is obvious over (1) Martin alone and

(2) the combination of Martin and Abramson.

IPR2019-00039
Patent 9,001,985 B2

>    5.    *Discussion of Dependent Claims 2–7, 12, 14–18, 21, and 22*

Claim 2 depends directly from claim 1 and further recites "receiving by the electronic system associated with the called party telephonic device characteristics of the incoming call." Ex. 1001, 15:20–22. Claim 3 depends directly from claim 2 and further recites "wherein characteristics of the incoming call include one or more of time of day, trunk number, ANI II digits, dialed number information, an identifier of an originating switch, SIP Header information, SIP routing information, transaction number, call frequency indicator, SS7 data or a unique call identifier." *Id.* at 1001, 15:23–28.

We turn to the "characteristics of the incoming call" recited in claim 2 (*id.* at 15:20–22) and the further requirements recited in claim 3. Petitioner points to Martin's teaching of detecting the "interface protocol," "ANI," and "DNIS" of incoming calls. Pet. 35–38 (citing Ex. 1004 ¶¶ 6, 18, 27, Fig. 1; Ex. 1003 ¶¶ 107–108). Petitioner also points to Abramson's teaching of telephone type, signaling protocol, and expected information depicted in the "Telephone Characteristics Database." *Id.* at 36–37 (citing Ex. 1005 ¶¶ 62, 67, 74; Ex. 1003 ¶¶ 109–112).

Martin teaches, "using call source identification information (such as caller ID, DNIS, or ANI)" (Ex. 1004 ¶ 6) and determining the "interface protocol to the burglary alarm panel 10" (*id.* ¶ 18). Abramson teaches, "possible values for telephone type might represent 'GSM,' 'CDMA,' 'Landline'" and "the signaling protocol might have possible values that represent 'ISDN,' 'SIP' (for 'Session Initiation Protocol')." Ex. 1005 ¶ 62. Abramson also provides examples of expected information, which are set forth in Table 2 reproduced below.

28

IPR2019-00039
Patent 9,001,985 B2

## TABLE 2

Telephone Characteristics Database

| Off-Premises Telephone | Telecommunications Network Number | Telephone Type | Signaling Protocol |
|---|---|---|---|
| 103 | 201-555-1236 | Landline | ISDN |
| 112 | 908-555-3381 | GSM Cellular | ISDN |
| . . . | . . . | . . . | . . . |

Table 2 of Abramson depicts an example of information stored for each affiliated telephone number stored in memory 303. *Id.* ¶ 67.

Patent Owner does not argue separately Petitioner's contentions for claims 2 and 3. Based on the record before us, we determine that Petitioner has shown a reasonable likelihood that it would prevail in establishing that each of claims 2 and 3 is obvious over (1) Martin alone and (2) the combination of Martin and Abramson.

Claim 4 depends directly from claim 1 and further recites "determining by the electronic system associated with the called party telephonic device whether the format of the calling party number or billing number is valid." Ex. 1001, 15:29–32. Claim 5 depends directly from claim 4 and further recites "upon determining that the format of the calling party number or billing number is invalid, generating a message by the system associated with the called party telephonic device that indicates the calling party number or billing number is invalid." *Id.* at 15:33–37.

For claim 4, Petitioner points to Martin's teaching of checking validity of the incoming call, as well as Martin's teaching of processing only valid calls. Pet. 38–39 (Ex. 1004 ¶¶ 6, 27; Ex. 1003 ¶¶ 119–124). For claim

IPR2019-00039
Patent 9,001,985 B2

5, Petitioner refers to its contentions for claim 4 and further points to
Martin's teaching of determining if status information should be
programmed into memory. *Id.* at 39–41 (citing Ex. 1004 ¶¶ 10, 27; Ex.
1003 ¶¶ 126–129).

> Martin, for example, teaches:
>
> If the status information shows an acceptable account status,
> then the call is processed as a valid alarm call. If the status
> information shows a problem (such as a runaway dialer), then
> the call is an invalid alarm call and may be disconnected or
> transferred. If the call source identification does not match any
> programmed call source identification information, then the call
> will be transferred to a business operator and the call is
> identified as an unknown call source identification call. In the
> case of an unknown call source identification call, the memory
> may be revised to include the unknown caller status
> information. This may be the case for a new subscriber, or a
> subscriber with a new telephone number. The status
> information also may include information as to why the call is
> being transferred, a time period for how long the disconnecting
> or transferring should take place, a count of valid and/or invalid
> alarm calls, call source identification information, and/or
> information as to where the call should be transferred.

Ex. 1004 ¶ 10.

Patent Owner does not argue separately Petitioner's contentions for
claims 4 and 5. Based on the record before us, we determine that Petitioner
has shown a reasonable likelihood that it would prevail in establishing that
each of claims 4 and 5 is obvious over (1) Martin alone and (2) the
combination of Martin and Abramson.

Claim 6 depends directly from claim 1 and further recites "obtaining a
number of calls within a given timeframe that have been originated from the
calling party number or billing number." Ex. 1001, 15:38–40. Claim 7
depends directly from claim 6 and further recites "determining by the system

30

IPR2019-00039
Patent 9,001,985 B2

associated with the called party telephonic device whether the number of calls within a given timeframe that have been originated from the calling party number or billing number exceeds a threshold." *Id.* at 15:41–45. Petitioner points to Martin's teaching of storing runaway dialer status bits 210, time data bytes 280, and count data bytes 290, as well as storing the caller IDs of fax machines.  Pet. 41–43 (citing Ex. 1004 ¶¶ 3, 23, Fig. 2; Ex. 1003 ¶¶ 132–140).

> Martin's teachings are set forth below:
>
> In the second embodiment of the present invention the caller ID information 200 and some of the status bits 210–330 will be stored in memory 140 when it has been determined that a particular alarm system has a problem. . . . The memory 140 may be programmed with the caller ID information 200, the *runaway dialer status bit 210 set* and disconnect call bit 300 set. . . . Additionally the *memory 140 may be programmed with the caller ID information 200 of a non-subscriber that frequently calls, such as a fax machine*.  The monitoring operator 180 would set the non-alarm call status bit 230 associated with this caller ID information 200 and possibly the disconnect call status bit 300.  Also in this embodiment, the status information 145 may include *time data bytes 280 or count data bytes 290 which may keep track of the actual time or the number of times a call is being disconnected or transferred*.

Ex. 1004 ¶ 23 (emphases added); *see also id.* ¶ 24 (describing in the third embodiment "status information 145, which includes the caller ID information 200 and the status bits 210–330, is stored for every subscriber, not just for subscribers with problem alarm systems as in the first two embodiments.")

Patent Owner does not argue separately Petitioner's contentions for claims 6 and 7.  Based on the record before us, we determine that Petitioner has shown a reasonable likelihood that it would prevail in establishing that

31

IPR2019-00039
Patent 9,001,985 B2

each of claims 6 and 7 is obvious over (1) Martin alone and (2) the combination of Martin and Abramson.

Claim 12 depends directly from claim 1 and claim 22 depends directly from claim 13.  Each of claim 12 and claim 22 further recites "wherein the operational status information associated with the calling party number or billing number includes telephone line status information associated with the calling party number or billing number."  Ex. 1001, 15:65–16; 16:61–64. Petitioner again points to Martin's teaching of runaway dialer status and mismatched caller ID status, as well as Abramson's teaching of telephone type and signaling type.  Pet. 50–51, 60 (Ex. 1004 ¶¶ 11, 23, 27, Fig. 2; Ex. 1005 ¶ 67; Ex. 1003 ¶¶ 167–171, 232).  Patent Owner does not argue separately Petitioner's contentions for claims 12 and 22.  Based on the record before us, we determine that Petitioner has shown a reasonable likelihood that it would prevail in establishing that each of claims 12 and 22 is obvious over (1) Martin alone and (2) the combination of Martin and Abramson.

Claim 14 depends directly from claim 13 and further recites "*determining a script* for the incoming call based on the received source origin confidence metric."  Ex. 1001, 16:24–26 (emphasis added).  Petitioner points to Martin's teaching that:

> [t]he central monitoring station may *process the call by 1) transferring the call to an invalid alarm call station, 2) connecting the call to a central monitoring station receiver, a second central monitoring station receiver, or a second line of a central monitoring station receiver, or 3) disconnecting the call*.

Pet. 54–55 (citing Ex. 1004, (57) ¶¶ 6, 27, Fig. 5; Ex. 1003 ¶¶ 200–203).

IPR2019-00039
Patent 9,001,985 B2

Patent Owner does not argue separately Petitioner's contentions for claim 14.  Based on the record before us, we determine that Petitioner has shown a reasonable likelihood that it would prevail in establishing that claim 14 is obvious over (1) Martin alone and (2) the combination of Martin and Abramson.

Claim 15 depends directly from claim 13 and further recites "providing an additional call center metric to the electronic system associated with the call center telephonic device, wherein *the additional call center metric is used to adjust* the source origin confidence metric."  Ex. 1001, 16:27–31 (emphasis added).  Petitioner points to Abramson's teaching that a call attempt ends if *tasks 501 through 503* yield at least one expected value and references back to its contentions for claim 1.  Pet. 55–56 (citing, *e.g.*, Ex. 1005 ¶¶ 23, 66–69, 71, 73).  Abramson teaches processing tasks 501 through 503 and "[a]t task 505, exchange 205, having received *at least one unexpected value* for the received telephone number, *ends the call attempt* from the first telephone."  Ex. 1005 ¶¶ 66–73, Fig. 2.  Patent Owner does not argue separately Petitioner's contentions for claim 15.  Based on the record before us, we determine that Petitioner has shown a reasonable likelihood that it would prevail in establishing that claim 15 is obvious over the combination of Martin and Abramson.

Claim 16 depends directly from claim 13 and further recites "wherein the source origin confidence metric is a probability that the calling party number or the billing number is valid."  Ex. 1001, 16:32–34.  Claim 17 depends directly from claim 13 and further recites "wherein the source origin confidence metric indicates either the calling party number or the billing number is valid or invalid."  *Id.* at 16:36–38.  Petitioner points to its

33

IPR2019-00039
Patent 9,001,985 B2

contentions for claims 1, 13, and 14.  Pet. 56–57.  Patent Owner does not
argue separately Petitioner's contentions for claims 16 and 17.  Based on the
record before us, for the reasons stated above in this section and in Sections
III.D.3 and III.D.4, we determine that Petitioner has shown a reasonable
likelihood that it would prevail in establishing that each of claims 16 and 17
is obvious over (1) Martin alone and (2) the combination of Martin and
Abramson.

Claim 18 depends directly from claim 13 and further recites "wherein
the source origin confidence metric indicates a calling party number or
billing number validity indicator, wherein the validity indicators comprise a
static set of predetermined indicators."  Ex. 1001, 16:39–42.  Regarding the
"validity indicator" recited in claim 18, Petitioner, for example, points to
Abramson's teaching of "'yes[es]' for 'tasks 501 through 503'" and "[a]t
task 504, exchange 205 grants one or more privileges to the calling
telephone, having *validated* the identity of the calling telephone in tasks 501
and 503."  Pet. 57–58 (citing, *e.g.*, Ex. 1005 ¶¶ 23, 66–69, 71–72, Fig. 5).
Patent Owner does not argue separately Petitioner's contentions for claim
18.  Based on the record before us, we determine that Petitioner has shown a
reasonable likelihood that it would prevail in establishing that claim 18 is
obvious over (1) Martin alone and (2) the combination of Martin and
Abramson.

Claim 21 depends directly from claim 13 and further recites "wherein
the operational status information of the calling party number or billing
number is based on call progress information gathered by placing an
outgoing call to the calling party number or billing number and receiving
call progress messages associated with the outgoing call."  Ex. 1001, 16:55–

34

IPR2019-00039
Patent 9,001,985 B2

60.  For "based on call progress information" recited in claim 21, Petitioner points to Martin's teaching of "non-alarm call status" for "fax machine" calls.  Pet. 59–60 (citing Ex. 1004 ¶¶ 12, 21, 23; Ex. 1003 ¶ 230).

> Martin's teaching is reproduced below.

> Additionally the memory 140 may be programmed with the caller ID information 200 of a non-subscriber that frequently calls, such as a fax machine. The monitoring operator 180 would set the non-alarm call status bit 230 associated with this caller ID information 200 and possibly the disconnect call status bit 300.

Ex. 1004 ¶ 23.  Patent Owner does not argue separately Petitioner's contentions for claim 21.  Based on the record before us, we determine that Petitioner has shown a reasonable likelihood that it would prevail in establishing that claim 21 is obvious over (1) Martin alone and (2) the combination of Martin and Abramson.

In summary, for the reasons given and on the record before us at this juncture, we determine that Petitioner has shown a reasonable likelihood that it would prevail in establishing that dependent claims 2–7, 12, 14, 16–18, 21, and 22 are obvious over Martin alone and dependent claims 2–7, 12, 14–18, 21, and 22 are obvious over Martin and Abramson.

### E.     Claims 8–11, 19, and 20

Petitioner contends each of claims 8–11, 19, and 20 of the '985 Patent is unpatentable, under 35 U.S.C. § 103, as obvious over (1) Martin and Kealy, and (2) Martin, Kealy, and Abramson.  Pet. 5, 43–50, 58.  In our discussion below, we first provide a brief overview of Kealy, and then we address the Petitioner's contentions.

IPR2019-00039
Patent 9,001,985 B2

*1. Overview of Kealy*

Kealy is directed to managing telephone calls carried by Voice over Internet Protocol (VoIP) technology. Ex. 1006, 1:10–12. Figure 4 of Kealy is reproduced below.



***FIG. 4***

36

IPR2019-00039
Patent 9,001,985 B2

Figure 4 of Kealy illustrates a flowchart for managing an incoming VoIP
call. *Id.* at 7:51–52.

Blocks 402, 404, and 406 illustrate the following steps: recognizing
the call, checking the call request for presence of a trust rating in a certificate
associated with the incoming call, and determining whether a trust rating is
present or absent. *Id.* at 7:53–54, 8:1–3, 8:15–17. Block 410 illustrates the
step of assigning a trust rating, if absent, and then passing control to block
414. *Id.* at 8:18–19, 8:56–57.

Block 414 illustrates the step of analyzing the trust rating and block
416 illustrates deciding how to respond to an incoming call. *Id.* at Fig. 4.
Kealy describes exemplary trust rules in the table set forth below.

| Trust Rating | Category | Call Management Operation |
|---|---|---|
| 1-4 | Untrusted | (FIG. 4 block 418) Reject calls unless consumer has "opted-in" for such calls with the service provider when establishing service, or in block 332 (FIG. 3). |
| 5, 6 | Suspect | (FIG. 4 block 422) Present caller with "challenge/response" scenario, in which the caller is either requested to provide a spoken reason for the call, type his number or identity to allow the call recipient to decide whether or not to accept the call, etc.. Tell recipient the calling device's trust rating. |
| 7-9 | Suspect | (FIG. 4 block 422) Ring as normal, but present subscriber with a "reject call" option like conventional GSM cell phones, but also showing the caller's trust rating. If subscriber rejects call, turn caller away with a recorded message explaining that his call was rejected. Alternatively, send call to voicemail (FIG. 1 block 115) (automatically or manually) for subscriber to deal with at his leisure. |
| 10-14 | Trusted | (FIG. 4 block 420) Accept call. |
| 15 | Special trusted | (FIG. 4 block 420) Always accept call. |

37

IPR2019-00039
Patent 9,001,985 B2

In Kealy's table above, exemplary trust ratings are provided with associated call management operations. *Id.* at 9:38–64. As reflected in blocks 416, 418, 420, and 422 and the table above, low trust ratings, e.g., trust ratings 1 through 4 are "Untrusted" reflecting that calls are blocked. *Id.* at 7:23–27, 9:38–64. Trust ratings 5 through 9 are "Suspect" and additional processing is performed, trust ratings 10 through 14 are "Trusted" and the call is accepted, and trust rating 15 is "Special Trusted" reflecting that the calls always are accepted. *Id.*

## 2. *Discussion of Dependent Claims 8–11, 19, and 20*

Claim 8 depends directly from claim 1 and claim 19 depends directly from claim 13. Claim 8 further recites "adjusting by the system associated with the called party telephonic device the source origin confidence metric based on personal risk factors of an entity associated with the calling party number or billing number." Ex. 1001, 15:47–50. Claim 19 similarly recites "adjusting . . . the source origin confidence metric based on personal risk factors of an entity associated with the calling party number or billing number." *Id.* at 16:45–48. Claim 9 depends directly from claim 8 and claim 20 depends directly from claim 13. Each of claim 9 and claim 20 further recites "wherein the personal risk factors include one or more of fraud score, risk score, credit score, marketing score, affinity score, expansion score, or warning indicators for bankruptcy, or whether a person associated with the calling party number or billing number is deceased." *Id.* at 15:51–55, 16:49–54.

For adjusting the source origin confidence metric based on *personal risk factors*, Petitioner points to Kealy's teaching of reducing the trust rating

38

IPR2019-00039
Patent 9,001,985 B2

based on complaints.  *See*, *e.g.*, Pet. 44–45, 58 (citing Ex. 1006, 14:13–20, 14:58–15:6; Ex. 1003 ¶¶ 147–151).  For the further limitations specified in claims 9 and 20, Petitioner points to Kealy's teaching of accumulating complaints by called parties.  *Id.* at 45–46, 58 (citing Ex. 1006, (57); Ex. 1003 ¶¶ 153–155).

> Kealy teaches:
>
> The method [of managing trust ratings] may involve automatically accumulating complaints concerning VoIP calls initiated from calling devices, and (208) comparing respective *quantities of accumulated complaints* associated with each calling device.  When a *quantity of accumulated complaints associated with a given calling device exceeds a given threshold, the method may involve (220) reducing a trust rating* of the given calling device; and in call requests of subsequent VoIP calls that the given calling device attempts to place, the method may further involve including the reduced trust rating so that the subsequent calls are subject to more austere call screening operations than calls having the unreduced trust rating before the reducing step.

Ex. 1006, 14:58–15:6 (emphases added).

Patent Owner does not argue separately Petitioner's contentions for claims 8, 9, 19, and 20.  The parties will have the opportunity to develop the evidentiary record regarding claims 8, 9, 19, and 20.  We look forward to hearing from the parties regarding whether Kealy teaches "adjusting . . . the source origin confidence metric based on personal risk factors" recited in claims 8 and 19, as well as the personal risk factors recited in claims 9 and 20.

Claim 10 depends from claim 8 and claim 11 depends from claim 10. Petitioner does not provide further contentions for claims 10 and 11 relating

IPR2019-00039
Patent 9,001,985 B2

to "adjusting . . . the source origin confidence metric based on personal risk factors" recited in claim 8.  Pet. 46–50.

On this record, for the reasons provided herein, we are persuaded that Petitioner has shown a reasonable likelihood of prevailing on its assertion that claims 1–7, 12–18, 21, and 22 are unpatentable.  Given our determination, we institute trial on all challenged claims and all grounds raised in the Petition, including grounds relating to claims 8–11, 19, and 20. *See SAS Inst.*, 138 S. Ct. at 1359–60.

IV.   CONCLUSION

Upon consideration of the parties' contentions and the evidence of record, we determine that Petitioner has shown a reasonable likelihood that it would prevail in establishing the unpatentability of claims 1–7, 12–18, 21, and 22 of the '985 Patent.  Given our determination, we institute trial on all challenged claims and all grounds raised in the Petition.  *See SAS Inst.*, 138 S. Ct. at 1359–60.  At this preliminary stage, no final determination has yet been made with regard to the patentability of any challenged claim or any underlying factual or legal issues.  The final determination will be based on the record as developed during the *inter partes* review.

IPR2019-00039
Patent 9,001,985 B2

## V.   ORDER

In consideration of the foregoing, it is hereby:

ORDERED that, pursuant to 35 U.S.C. § 314(a), an *inter partes* review of claims 1–22 of the '985 Patent is instituted with respect to all grounds set forth in the Petition; and

FURTHER ORDERED that pursuant to 35 U.S.C. § 314(c) and 37 C.F.R. § 42.4(b), *inter partes* review of the '985 Patent shall commence on the entry date of this Order, and notice is hereby given of the institution of a trial.


PETITIONER:

Nicole M. Jantzi
Ian B. Brooks
Paul Schoenhard
MCDERMOTT WILL & EMERY LLP
njantzi@mwe.com
ibrooks@mwe.com
pschoenhard@mwe.com


PATENT OWNER:

Michael D. Specht
Richard M. Bemben
STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.
mspecht-ptab@sternekessler.com
rbemben-ptab@sternekessler.com

## <u>CERTIFICATE OF SERVICE</u>

I, Pilar G. Kraman, Esquire, hereby certify that on April 17, 2019, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to registered participants.

I further certify that on April 17, 2019, I caused the foregoing document to be served by e-mail upon the following counsel:

| | |
|---|---|
| Kristen Healey Cramer | Paul M. Schoenhard |
| Dana K. Severance | Nicole M. Jantzi |
| WOMBLE BOND DICKINSON (US) LLP | Ian B. Brooks |
| 1313 North Market Street | MCDERMOTT WILL & EMERY LLP |
| Suite 1200 | 500 North Capitol Streeet NW |
| Wilmington, DE 19801 | Washington DC 20001 |
| (302) 252-4348 | (202) 756-8000 |
| kristen.cramer@wbd-us.com | pschoenhard@mwe.com |
| dana.severance@wbd-us.com | njantzi@mwe.com |
| | ibrooks@mwe.com |

*Attorneys for Next Caller Inc.*

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Pilar G. Kraman*
Pilar G. Kraman (No. 5199)
Rodney Square
1000 North King Street
Wilmington, Delaware  19801
(302) 571-6600
pkraman@ycst.com

Dated: April 17, 2019                    *Attorneys for TRUSTID, Inc.*

01:23028924.1