## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| TRUSTID, Inc., | |
| *Plaintiff,* | |
| v. | Civil Action No. 18-cv-00172-LPS |
| Next Caller, Inc., | |
| *Defendant.* | |

### DECLARATION OF JAMES R. BRESS IN SUPPORT OF
### PLAINTIFF TRUSTID, INC'S OPENING CLAIM CONSTRUCTION BRIEF

I, James R. Bress, declare:

1.     I am over the age of 18. Except where stated otherwise, I have personal knowledge of the facts set forth herein, which are known by me to be true and correct. If called as a witness, I could and would competently testify to these statements.

2.     This declaration is submitted in support of Plaintiff TRUSTID, Inc.'s ("TRUSTID") Opening Claim Construction Brief.

3.     I have been retained by TRUSTID in the above-captioned matter, and have been asked to offer my opinion as to the meaning of certain claim terms recited in U.S. Patent No. 9,001,985 ("the '985 Patent") and U.S. Patent No. 8,238,532 ("the '532 Patent") (collectively, "the Patents" or "the patents-in-suit"). Specifically, I have been asked to offer my opinion on the meaning of the following terms: (1) "source origin confidence metric" / "source origin confidence metric of a calling party number or billing number" / "source origin confidence metric for the calling party number or billing number" (recited in various claims of the '985 and

'532 Patents); and (2) "consortium information" (recited in claim 10 of the '985 Patent and in claim 27 of the '532 Patent).

4.      In forming my opinions, I have reviewed and considered, at least, the following documents: the '985 Patent and the '985 Patent's prosecution history, the '532 Patent and the '532 Patent's prosecution history; and the other documents referenced herein.

5.      I am being compensated for my time at a rate of $350/hour. My opinions stated herein in no way depend on my compensation.

## I.      QUALIFICATIONS AND BACKGROUND

6.      I am a former Bellcore engineer and author of Bellcore network features requirements with over 35 years of experience in communication systems and equipment testing, hardware and software design, and network signaling services. I am currently President and Chief Technical Officer of AST Technology Labs, Inc., a company that focuses on communication product performance testing and design consulting services.

7.      I have experience with the technologies described in the patents-in-suit, including telecommunications network architectures, protocols, standards, Public Switched Telephone Networks (PSTN), Advanced Intelligent Network (AIN), Voice-over-IP (VoIP) telephony and networks, mobile networks, interworking between PSTN, VoIP, and mobile networks, the Session Initiation Protocol (SIP), the H.323 Protocol, the Transmission Control Protocol (TCP), the Internet Protocol (IP), call processing for both PSTN, VoIP, and mobile networks, network interfacing, network interconnection, gateways, call controllers, soft switches, etc. Below, I provide a brief summary of my education and qualifications.

8.      I received a Bachelor of Science degree in electrical engineering from the University of North Carolina at Charlotte in 1985, and a Master of Science degree in electrical

engineering from the California Institute of Technology in 1987, where I had a grade point average of 4.0 out of a possible 4.0. From 1982 to 1984, while still attending the University of North Carolina, I was an engineering technician at Process Systems, Inc., located in Charlotte, NC. My duties there included technical writing for energy management field-located equipment and host system software and user manuals, as well as developing test equipment for field-located equipment and host systems.

9.      In addition to my educational background, I have over 35 years of experience in the telecommunications industry. In 1985, after graduating from the University of North Carolina, I was employed by Bell Communications Research, Inc. (also known as Bellcore), located in Piscataway, NJ. I was a member of the Technical Staff at Bellcore with responsibility for numerous telecommunications systems operations and development projects. For these systems-related projects, I was responsible for development and integration including computers, network hardware, network interconnections, network signaling, network protocols, database technologies, software, user interfaces, client-server operations, and telephony features. I also authored numerous system requirement publications and recommendations for Bellcore.

10.      In 1995 I founded AST Technology Labs, Inc., located in Melbourne, FL, where I am the President and Chief Technical Officer. My responsibilities at AST include the development of detailed specifications, architectures, hardware, and software for custom telecommunications and telephony test systems including analog, digital, VoIP, and wireless.

11.      I have served on numerous standards setting committees of the Telecommunications Industry Association ("TIA") and have been a prime contributor to many published ANSI (American National Standards Institute) / TIA telecommunications standards. I served continuously from 2000 to 2017 as chairman or vice chairman of the TIA TR41.3

3

subcommittee for Communications Products Performance and Accessibility. From 2017 to the present I have served as the chairman of the TIA TR41 engineering committee for Communications Products Performance and Accessibility. In relation to my work within the TIA, I received the HLAA (Hearing Loss Association of America) 2018 National Access Award for my development work and leadership in standards that have impacted telecommunications accessibility on a national level. Additionally, in 2018, I received an ANSI (American National Standards Institute) Meritorious Service Award in recognition of my 20+ years of leadership and contributions to the U.S. voluntary standardization system.

12.     Starting in 2017 and to the present, I am the chairman of the Bluetooth SIG High Quality Audio study group. This project is focused on developing a new Bluetooth specification for Bluetooth audio device conformance as an indication of meeting high quality audio performance standards.

13.     My first assignment during my employment at Bellcore was in the software operations area. This area was focused on operations system software including PREMIS (PREMise Information System), SOAC (Service Order Analysis & Control), and LFACS (Loop Facility Assignment and Control System). These software systems integrated hardware (network switching equipment and computers) and software (database, reporting, network control and management, and user interface) used for the operations systems used by Bellcore's owners (the Bell Companies or "Baby Bells"). My experiences during this assignment included software installation and testing, network management and control, database configuration and schema development, troubleshooting network connectivity issues, and software documentation.

14.     My next assignment at Bellcore was on a development team for the "Information Gateway" project. My responsibilities included data network design, network connectivity

implementation, configurations, and troubleshooting for the connectivity of computer systems located in multiple USA states. These computer systems provided access to databases and terminal interface software from distributed network connected workstations. In addition to networking, I was also responsible for database system design and distributed network access to compressed image files located on network connected servers.

15.     My work in Bellcore's "New Services Development" area included designing and prototyping new services that were focused on the use of the Advanced Intelligent Network (AIN) system features and components. These projects required an understanding of telephone system network architectures, signaling, protocols, and features operations. One of my projects in this area included interfacing to AIN components including Service Control Points (SCP) and Signaling Transfer Points (STP) to implement a telephone network control feature. I am the first named inventor on a patent for one of the systems developed which was integrated with the AIN (U.S. Patent No. 5,570,420, "Customer premise equipment network integrator").

16.     Another one of my assignments at Bellcore involving network signaling and features was for the development of the Analog Display Services Interface (ADSI) and the Caller ID on Call Waiting (CIDCW) feature that is now well known to telephone users. My responsibilities included developing prototype systems, including hardware and software, for network signaling. I was also responsible for developing Bellcore's Customer Premises Equipment (CPE) test lab (including hardware, software, and reporting) to support the development of new telephony devices used with the ADSI and CIDCW features. These projects provided experience in the details of the network signaling and protocols germane to PSTN/AIN provided Caller-ID services. This included the signaling and database interactions required to support Calling Name (CNAM) services along with traditional Caller-ID (calling number)

5

services. The ADSI projects provided experience with call progress tones and the related

PSTN/AIN network signaling that is related to a Central Office switch generating call progress

signaling.

17.     While at Bellcore, I designed and implemented network signal detection systems

as a troubleshooting assignment for the Bell Companies. At this time in the late 1980s, most

prison systems used primarily coin telephones, which were owned and operated by the Bell

Companies, to provide telephony services to inmates. Inmates had discovered that they could

defraud the telephone system by playing certain music into the telephone transmitter

(microphone), which would cause the Bell Company Central Office (CO) to errantly record

sometimes hundreds of dollars of credit due to falsely detecting coin-drop-confirmation tones.

During this troubleshooting assignment, I gained experience in the issues related to security and

fraud detection.

18.     I am the first named inventor on U.S. Patent No. 7,076,031, "System and Method

for Telephone Signal Collection and Analysis." The impetus for this patent was the development

of the TSA-6000® telephone signal recording and analysis system. This project culminated into

the manufacture and sale of TSA-6000® systems starting at least by 2003. I was the chief

architect for the design of this system, and I continue to serve as the technical lead for this

project and product. The TSA-6000® system was designed using the concept of functional units

that can be combined in any physical implementation including the functions of 1) signal data

capture and recording; 2) analysis of the captured signaling data to identify pre-defined

telephone signals and events occurring in the recorded signals, as well as identifying the modes

of the telephone line; and 3) a user-friendly graphical interface for viewing signals and analysis

data, and also for system configurations such as changing the parameters used during the

6

analysis operations. The software of the TSA-6000® was developed using "C" language and runs on a Windows®-based computer. The software has been revised over the years for multiple reasons including to add new pre-defined signal types or classifications, and to modify and enhance the signal analysis algorithms.

19.     While employed at AST Technology Labs (AST), I have been responsible for the development of a "Call Generator" system for Telcordia Systems (formerly Bellcore). The Call Generator system included network interfaces integrated with a network-based controller system. My development responsibilities for the controller system included hardware integration, software development including network control, remote configuration, database, and user interfaces. The system was designed to demonstrate Telcordia's larger system goal of handling "one million calls per minute" for emergency management. The system was installed at Telcordia and used for demonstrations by Telcordia management and sales teams.

20.     In my position as chairman of the TIA-TR41.3 subcommittee and chairman of the TIA-TR41 committee for Communications Products Performance and Accessibility, I have been responsible for contributions to, and the development and publication of, several VoIP and mobile telephony performance standards for telephony and gateway equipment. In addition to my roles as chairman of the TIA-TR41.3 subcommittee and TIA-TR41 committee, I include as part of my responsibilities to be informed, and to maintain a level of expertise, regarding other standards bodies' VoIP and mobile telephony related standards including those published by the IEEE (Institute of Electrical and Electronics Engineers), the ETSI (European Telecommunications Standards Institute), 3GPP (3rd Generation Partnership Project), the ITU (International Telecommunication Union), the IETF (Internet Engineering Task Force), and others.

7

21.    Starting in 2007, I led a project at AST for Microsoft for the development of detailed performance and testing specifications, and the development of custom testing capabilities, for Microsoft's "Response Point" IP-PBX system. The detailed specifications covered each of the Response Point IP-PBX system components including telephony devices (handset, headset, and speakerphone), voice gateways (FXO/PSTN and FXS/ATA-Analog), and the system base controller (including SIP server, proxy, registrar, and voicemail server). In addition to developing the detailed performance and testing requirements, and performing testing on the Response Point systems, I also visited Microsoft's customer's installations for troubleshooting and consulting.

22.    I am the chief architect and design engineer for the development of one of AST's in-house test systems used for evaluating the performance of VoIP endpoints and gateway products. These endpoint products, and the test systems developed, employ the SIP (Session Initiation Protocol) and the SDP (Session Description Protocol) for establishing call connections, and the RTP (Real Time Protocol) for the transmission of media (e.g., packets of digitized voice) after session establishment. During the on-going development of these systems, I have gained experience in the operation and implementation of the stack of protocols that are used to implement VoIP features and services. This includes developing software enabled features for controlling and manipulating SIP signaling parameters, SDP session and device related parameters, and RTP parameters. In addition to controlling the content of the messages used by these protocols, the test systems I have developed control the timing of offer/answer negotiations, which is the primary method used to establish sessions between endpoints (e.g., a call between two VoIP telephones), or between endpoints and servers (e.g., a voicemail server) using SIP, SDP, and RTP protocols. I was responsible for implementing these systems which

required the development of user interfaces, configuration/provisioning features, custom IP protocol level control software, and the integration of network-based servers including SIP proxies and registrars.

23.    I am a named inventor on U.S. Patent No. 9,020,621, "Network Based Media Enhancement Function Based on an Identifier," which was based on the systems and concepts developed for a start-up company for whom I was a consultant. My responsibilities included research and development of system designs and architectures for IP-based IMS (Internet-protocol Multimedia Subsystem) servers and services. The systems developed provided services to users connecting to an IMS network via SIP/SDP enabled devices to access application servers located within an IMS network. The application servers provided the ability to enhance the audio of a VoIP telephone call by being inserted in the media path and modifying the audio to match a user's needs based on the user's hearing impairment parameters. As such, the application server performed the role of a media gateway with added features to provide the audio enhancements.

24.    The many PSTN, VoIP (SIP, SDP, RTP, etc.), and IMS related projects that I have worked on have provided me with experience with call related signaling (including call progress and control signaling) in both the VoIP and the PSTN domains. Likewise, these projects have provided me with experience in the network signaling and protocols employed for services such as Caller-ID (number) and Calling Name (CNAM) in both the VoIP and PSTN domains. This includes the signaling generated by network servers and switches that access databases for looking up and retrieving parameters related to call signaling for service implementation, verifications, and authorizations.

25.     My *Curriculum Vitae* (Exhibit A) outlines my duties at Bellcore, AST, and as a consultant, includes further details about my education and professional career, and lists my patents and publications.

## II.     SUMMARY OF OPINIONS

26.     I offer my opinions regarding the meaning of certain claim terms from the point of view of a person of ordinary skill in the art at the time of the invention ("POSITA"), which I define below.

27.     In my opinion, a POSTIA would have understood the terms "source origin confidence metric," "source origin confidence metric of a calling party number or billing number," and "source origin confidence metric for the calling party number or billing number" (recited in various claims of the '985 and '532 Patents) to mean: "measure representing the credibility of the calling party number or the calling party billing number."

28.     In my opinion, a POSITA would have understood the term "consortium information" ('985 Patent at claim 10 and '532 Patent at claim 27) to mean: "commercially available, aggregated data."

## III.     LEGAL UNDERSTANDING

29.     I understand from my discussions with TRUSTID's counsel that the claims and specification of a patent are addressed to, and are intended to be read, by a POSITA to which the patent pertains, at the time of the filing of the patent application. I understand that the words of a claim are generally given their plain and ordinary meaning, which is the meaning that the term would have to a POSITA at the time of the invention (i.e., the effective filing date of the patent application). I understand that a patent's specification is always highly relevant when construing a term and is the single best guide to the meaning of a claim term.

30.     I also understand that patent claims must be understood as a POSITA would understand them unless the patent, or the patent prosecution history, provides a different explicit definition. I have accordingly applied what I understand the plain and ordinary meaning of various claim limitations to be in my review of the '985 and '532 Patents and the patent prosecution histories of these patents.

## IV.     THE '985 AND '532 PATENTS

31.     The '985 and '532 Patents involve technology that cover a broad range of call-trustworthiness, caller authentication, and anti-spoofing features, including methods of evaluating incoming telephone calls. I have extensive experience with the underlying technologies employed to implement the features described in the '985 and '532 Patents. The call-trustworthiness, caller authentication, and anti-spoofing features described in the Patents start by receiving information via Caller-ID or Automatic Number Identification (ANI), or other related features, which the Patents describe as being one of several features or methods for in general, receiving calling party identification information. *See* '985 Patent at 6:10-22. The '985 and '532 Patent specifications describe in detail using a variety of network-based features and capabilities to authenticate the calling party identification information. These authentication techniques provide the basis for evaluating the trustworthiness of the calling party identification information. Using the techniques disclosed, evaluating the trustworthiness of the received calling party identification information can lead to a source origin confidence metric, which is a measure representing the credibility of the received calling party identification information. The techniques described in the Patents to implement the disclosed methods and systems employ PSTN/AIN (Public Switched Telephone Network / Advanced Intelligent Network) and VoIP signaling, protocols, and features.

32.     As summarized above and in my CV, my 35+ year career in telecommunications has included multiple projects working with PSTN/AIN and VoIP network signaling, protocols, and feature implementations. I have extensive experience with PSTN/AIN signaling used for call setup and control including call progress signaling and the signaling features that are used to carry calling party identification information. Likewise, I have extensive experience with VoIP call setup and control including call progress signaling and the signaling features that are used to carry calling party identification information. Additionally, I have extensive experience with PSTN/AIN and VoIP based network features that perform database lookups during call setup. For example, in the PSTN/AIN, a Calling Name database is queried to populate the name field in a call setup message sent from an originating caller's central office switch. The PSTN/AIN also performs database queries to databases controlled by Service Control Points (SCP) for subscriber service control and authorization. VoIP signaling uses database queries during call setup, for example, to locate the IP address of a called number or URL and to control billing.

33.     I understand that the parties agreed that the specifications of the '985 Patent and the '532 Patent are substantially identical. After reviewing the specifications, I also agree that the specifications of the '985 and '532 Patents are substantially identical. Therefore, below I describe the technical background of the '985 and '532 Patents together, and cite only to the '985 Patent as a matter of convenience (unless otherwise indicated). But citations to the specification of the '985 Patent apply with equal force to the specification of the '532 Patent.

34.     The '985 and '532 Patents describe anti-spoofing technology that "discover[s] and report[s] the trustworthiness and credibility of calling party number information . . . [using] real time telephone network status and forensics, network data, locally stored data, and predictive analytics." '985 Patent at 3:64-4:3.

12

35.     The concept of spoofed telephone calls—a displayed Caller ID number that is not the actual number the caller is calling from—is a problem of recent vintage. Even though Automatic Number Identification (ANI) and calling-number identification (Caller ID) have been available for decades (*id*. at 1:32-42), the ability to falsify or spoof these types of caller-identification information only became prevalent in the early 2000s, with the confluence of several different technologies, including VoiceXML applications, software-based private branch exchanges (PBX), and voice-over-IP (VoIP) telephony (*id*. at 3:7-33). One conventional approach to address spoofing is to require a caller to verify their identity by providing personally identifiable information (such as, a social security number or date of birth). *Id.* at 5:14-20. But using personally identifiable information has its own challenges and risks, and is thus not an optimal way to verify a caller.

36.     The '985 and '532 Patents take a different approach. They disclose methods and systems for discovering and reporting the trustworthiness and credibility of the caller identification information associated with an incoming call. *Id*. at Title.

37.     For example, the claimed inventions of the '985 Patent includes at least three steps. First, an electronic system receives caller-identification information associated with an incoming call. *See, e.g., id*. at 15:6-10 (first step of claim 1); *see also id*. at 6:10-7:34 (describing various types of caller-identification information). Second, in the short time interval after the caller-identification information is received and before the call is answered (which is typically only a few seconds), the electronic system gathers information about the status of the telephone line or service associated with the caller identification information. *See, e.g., id*. at 15:11-15 (second step of claim 1); *see also id*. at 8:35-9:39. The information that is gathered pre-answer may include, for example, "line-status, call progress information, and call progress messages and

13

their associated timing information" (*id*. at 8:49-51), "the current network condition of the telephone number" (*id*. at 8:53-54), and "the type of answer condition and line type" (*id*. at 8:61-62). Third, the collected information is then analyzed and compared to expected patterns to develop a "source origin confidence metric" for the caller-identification information received with the incoming call. *See, e.g., id*. at 15:16-19 (third step of claim 1); *see also id*. at 9:51-11:22. This confidence metric represents "the credibility of the calling party number." *Id*. at 13:61-63. In other words, the confidence metric is used to mitigate the problems associated with spoofing. *Id*. at 5:40-55, 14:41-61.

38.    FIG. 1, reproduced below, is a hybrid block diagram/flow chart of embodiments of the invention depicting certain aspects of the systems and methods of the '985 Patent. *Id*. at 5:63-67. The figure highlights that System 50 conducts significant analysis as depicted in Blocks 10-20 to determine a "confidence metric." System 50 then transmits the "confidence metric" to User 56 in Block 22 allowing User 56 to apply business rules based on the "confidence metric" as to how to handle the incoming call, as shown in Blocks 24A and B. The figure also further highlights that a "confidence metric" is a measure of the credibility of calling party number information associated with the incoming call as described in Block 20.



**FIG. 1**

'985 Patent at FIG. 1.

15

## V.      CLAIM CONSTRUCTION

### A.  Person of Ordinary Skill in the Art at the time of the Invention (POSITA)

39.      I understand that there is a concept in patent law known as a person of ordinary skill in the art at the time of the invention, which I abbreviate "POSITA." I understand that this concept refers to a person who is trained in the relevant technical field of a patent without possessing extraordinary or otherwise exceptional skill. I further understand that factors such as the education level of those working in the field, the sophistication of the technology, the types of problems encountered in the art, prior art solutions to those problems, and the speed at which innovations are made may help establish the level of ordinary skill in the art.

40.      Taking these factors into consideration, it is my opinion that one of ordinary skill in the art relevant to the '985 and '532 Patents would have a bachelor's degree in electrical engineering, computer engineering, computer science, or a related engineering field and at least two years of experience with telecommunications signaling and protocols used for call processing.

### B.  The "source origin" terms recited in the '985 and '532 Patents.

41.      Counsel for TRUSTID has asked me to opine on how a POSITA would have understood the terms "source origin confidence metric" / "source origin confidence metric of a calling party number or billing number" / "source origin confidence metric for the calling party number or billing number" that are recited in claims 1, 8, 13-19 of the '985 Patent and in claims 1, 19, 21-23, 25, 30, 32, 43, and 46-50 of the '532 Patent. For convenience, I refer to these variants as the "source origin" terms. In my opinion, a POSITA would have understood these

terms to mean a "measure representing the credibility of the calling party number or the calling

party billing number."

42.     I understand that the parties dispute the proper construction of the "source origin"

terms. In particular, I understand that the parties dispute two issues with respect to these terms:

First, the parties disagree whether the claimed "metric" is an assessment of the credibility of the

*number* associated with the call being placed or whether it is an assessment of the

trustworthiness for the *entity itself* from which the call originated.[1] Second, the parties disagree

on whether "metric" encompasses a binary determination, such as "valid" or "invalid." Here are

the parties proposed constructions provided to me by counsel for TRUSTID:

| Terms | Claims | TRUSTID's Construction | Next Caller's Construction |
|---|---|---|---|
| "source origin confidence metric" / "source origin confidence metric of a calling party number or billing number" / "source origin confidence metric for the calling party number or billing number" | '985 Patent, claims 1, 8, and 13-19; '532 Patent, claims 1, 19, 21-23, 25, 30, 32, 43, and 46-50 | "measure representing the credibility of the calling party number or the calling party billing number" | "a determination of the trustworthiness for the entity from which the call originated" |

43.     Regarding the first disputed issue (number vs. entity), it is readily apparent from

the claims and the specification that the recited metric is an assessment of the credibility of the

*number* associated with the call being placed, not of the trustworthiness for the *entity* from which

the call originated. Independent claims 1 and 13 of the '985 Patent and independent claim 1 of

the '532 Patent recite that the "source origin confidence metric" is "for the calling party *number*

---

[1] I have added all emphasis, such as italicizing, unless I state otherwise.

or billing *number*." And independent claim 32 of the '532 Patent recites assigning "a source origin confidence metric to the calling party *number*" using "operational status information," where the "operational status information" is "associated with the calling party *number* information." None of the independent claims refer to the entity who is placing the call. Accordingly, the plain language of the independent claims would have informed a POSITA that the recited metric is an assessment of the credibility of the *number* associated with the call being placed, not of the trustworthiness for the *entity* from which the call originated.

44.     The dependent claims would have further informed and confirmed to a POSITA that the recited metric is an assessment of the credibility of the *number* associated with the call being placed, not of the trustworthiness for the *entity* from which the call originated. Claim 16 of the '985 Patent and claim 21 of the '532 Patent recite that "the source origin confidence metric is a probability that the calling party *number* or the billing *number* is valid." Claim 17 of the '985 Patent and claim 22 of the '532 Patent recite that "the source origin confidence metric indicates either the calling party *number* or the billing *number* is valid or invalid." And claim 18 of the '985 Patent and claim 23 of the '532 Patent recite that "the source origin confidence metric indicates a calling party *number* or billing *number* validity indicator, wherein the validity indicators comprise a static set of predetermined indicators." Each of these claims associate the recited metric with the *number*, not the *entity* that originated the call.

45.     A POSITA would have also looked to claim 8 of the '985 Patent and claim 25 of the '532 Patent to confirm that the recited metric is an assessment of the credibility of the *number* associated with the call being placed, not of the trustworthiness for the *entity* from which the call originated. These claims recite adjusting "the source origin confidence metric based on personal risk factors of an entity associated with the calling party number or billing number."

The independent claims determine a source origin confidence metric, which is associated with the *number*. Then, in these dependent claims, the source origin confidence metric is adjusted based on additional information, which is "based on personal risk factors of an entity associated with the *calling party number or billing number*." It would have been clear to a POSITA that for these dependent claims the source origin confidence metric is a measure of the credibility of the *number* and not of the trustworthiness for the entity from which the call originated because there is no way to actually know who originated the call. The only information available is the *number* received from the ANI or Caller-ID and information (personal risk factors) associated with the entity that is associated with that number. The personal risk factors would, for example, be based on a database lookup or query. *See* '985 Patent at 11:33-45. In the example of a database query, the ANI / Caller-ID information would be sent as the primary key and the database would return the personal risk factors that were found to be associated with the received primary key (ANI / Caller-ID). Thus, in these dependent claims, the credibility assessment still focuses on the *number*, not the *entity* that originated the call.

46.     The specification is replete with disclosures confirming that the recited metric is an assessment of the credibility of the *number* associated with the call being placed, not of the trustworthiness for the *entity* from which the call originated. For example, the specification discloses that the patent is generally directed to "[a] method of and system for discovering and reporting the trustworthiness and credibility of *calling party number information*, such as Automatic Number Identification (ANI) or Calling Number Identification (Caller ID) information . . . ." *Id.* at 3:64-4:3. It further states, "[i]f a specified one or number of such attributes suggest an anomalous or suspicious *calling party number*, the disclosed System determines noncompliance of the *calling party number*, and the System can terminate the

19

procedure and indicate to the User that a *calling party number* is of low credibility." *Id*. at 4:35-39. The specification also unequivocally states that "[t]he confidence metric is used by one or both of the User and the System *to determine the validity of the ANI*. Once the ANI is validated, the recipient can have a higher degree of confidence in the validity of *the calling party number* and place more trust in it." '985 Patent at 4:59-65; *see also id*. at 11:9-11 ("A confidence metric is produced using statistical methods to indicate the probability that *the ANI is correct*."); *id.* at 11:46-49 ("A Metric Received 22 block represents receipt from API 6 of a confidence metric developed, scored, and created in Determine 20, indicating the probability *that the ANI from Incoming Call 2 is valid*."); *id.* at 13:61-63 ("The results obtained include a calculated confidence metric representing the credibility of *the calling party number* (FIG. 1, process block 20).").

47.     After reviewing the disclosure, I could not find a single instance in the claims or in the specification that would support determining the credibility or trustworthiness of the *entity* from which the call originated (e.g., the person that made the call). To the contrary, the patent discloses that because of the spoofing problem, banks have resorted to authenticating the identity of the entity making the call using, for example, personal identifying information such as a mother's maiden name. *Id.* at 5:14-45. But the patent points out the major drawback of such authentication techniques and states that the purpose of the inventions was to "restore the value lost to spoofing . . . by again using and trusting validated ANI as a factor in authentication." *Id*. at 5:40-45. That is, a POSITA would have understood that the purpose of the inventions was to restore the ability to reliably use information about the calling party *number* or billing *number* for authentication, not to authenticate the actual entity that originated the call.

48.     Regarding the second disputed issue related to "metric" (measure vs. binary determination), a POSITA would have understood that a "metric" is a measure of something, not a binary valid/invalid or yes/no determination. The specification supports this understanding. It explains that a metric is calculated using statistics and probabilities and indicates a probability. Specifically, the specification discloses:

- "Based on the closeness of patterns and the degree of match, a confidence *metric* is *calculated using statistical probabilities*." *Id.* at 4:59-61.

- "Each additional attribute or element such as carrier, line type, geo-location, time of day, match of real time pattern to expected pattern is assigned a *weighted value as factors of a confidence metric. A confidence metric is produced using statistical methods to indicate the probability that the ANI is correct.*" *Id.* at 11:6-11.

- "A Metric Received 22 block represents receipt from API 6 of a confidence metric *developed, scored, and created* in Determine 20, *indicating the probability that the ANI from Incoming Call 2 is valid.*" *Id.* at 11:46-49.

49.     Based on these disclosures, a POSITA would have understood the recited metric to be more than a mere binary determination of validity or invalidity.

50.     The specification also provides the following examples of metrics that would have further informed a POSITA's understanding of this term: "metrics such as a fraud *score*, risk *score*, credit *score*, marketing *score*, affinity *score*, [or] expansion *score*." *Id.* at 11:40-41. A POSITA would have understood that the various scores described in these examples represent more than a simple binary "valid" or "invalid" determination. For example, it was well known to POSITAs, as well as lay persons, that a "credit score" is a numerical expression of a person's

creditworthiness that is typically computed using a rather complex formula that weighs the

person's past financial health and activities. POSITAs, as well as lay persons, would have further

known that while a credit score may indicate to, or be used by, a lender to determine whether a

given person is creditworthy or not (i.e., binary "yes" or "no"), the score itself is not a binary

determination.

      51.    Newton's Telecom Dictionary provides the following definition of "metric":



**metric** A measurement. A benchmark. You might measure your marketing program by applying the metric of how many mailing pieces you send out each day. You might measure the value of your web advertising by how many "click throughs" you get each day. You need metrics to see if you're succeeding. Metrics originally meant the application of mathematical analysis to a field of study – for example, econometrics. In its current voguish sense, it is a hifalutin word for measurement. See also Service Level Agreement.

Exhibit B, Newton's Telecom Dictionary, at 716 (annotated).

      52.    A POSITA would have been familiar with and would have looked to Newton's

Telecom Dictionary if there was any doubt as to the meaning of "metric" in the '985 and '532

Patents. Newton's definition of metric—"A measurement. A benchmark."—is consistent with

the specification's description of the recited metric, and thus confirms my opinion that a metric is

a measure of something, not a binary determination.

      53.    I understand that Next Caller believes that the following disclosure supports its

position that the recited metric is a determination of trustworthiness that includes a binary

valid/invalid determination:

> In Determine 20, the results from Compare 18 are analyzed for
> normalcy deviation and statistical match to patterns and their
> timing or duration between messages or conditions. This analysis
> entails comparing the real time patterns to previously expected call
> patterns of valid and invalid calling party decomposing processes

to make a degree of match interpretation. *In turn, these and other attributes or elements may be used to generate a score or metric of the validity of an ANI or, alternatively, as a singular determination such as "valid" or "invalid" or as a tiered system such as "red," "yellow," "green."*

'985 Patent at 10:63-11:6.

54.     I disagree with Next Caller. A POSITA would have understood that this disclosure presents three alternatives: "In turn, these and other attributes or elements may be used to [1] generate a score or metric of the validity of an ANI *or, alternatively*, [2] as a singular determination such as 'valid' or 'invalid' *or* [3] as a tiered system such as 'red,' 'yellow,' 'green.'" This sentence uses the conjunction "or" to present three alternatives; it does not equate "a score or metric" to "a singular determination such as 'valid' or 'invalid.'"

55.     I also understand that Next Caller points to dependent claim 17 of the '985 Patent and to dependent claims 22 and 47 of the '532 Patent to support its position. These claims recite that "the source origin confidence metric indicates either the calling party number or the billing number is valid or invalid." I disagree with Next Caller. As I discussed above with respect to the "credit score" example from the specification, a metric or score may *indicate* a valid/invalid or yes/no result, but that does not mean that the metric itself is merely a binary determination.

### C.  The term "consortium information" recited in claim 10 of the '985 Patent

56.     Counsel for TRUSTID has asked me to opine on how a POSITA would have understood the term "consortium information" that is recited in claim 10 of the '985 Patent and in claim 27 of the '532 Patent. For example, claim 10 of the '985 Patent recites, "retrieving *consortium information* by the system associated with the called party telephonic device from an external database." In my opinion, a POSITA would have understood "consortium information" to mean "commercially available, aggregated data."

23

57.     The term "consortium information" would have been a well understood term in the telecommunications industry at the time of the inventions, namely *commercially available, aggregated data*. POSITAs would have known that telecommunication carriers often provided data to third parties—such as North American Number Plan Administration (NANPA), NetNumber, TNS, Targusinfo and InfoUSA ('985 Patent at 7:35-65)—who aggregate call-related data from the telecommunications carriers into databases. These databases were known as consortium databases because the stored data was aggregated from multiple sources. This aggregated data was then made available for a subscription fee. The parties that had access to the databases then used the aggregated data for evaluating call-trustworthiness, authenticating callers, anti-spoofing, and evaluating incoming telephone calls. Thus, in the telecommunications industry, the plain meaning of "consortium information" at the time of the invention is properly limited to *commercially available, aggregated data*.

58.     The specification supports this meaning. To start, it uses the term "consortium" only one time to describe retrieving information from a "consortium database": "or *information from a consortium database* such as calling velocity to multiple locations within a specified time period." *Id.* at 11:42-45. This description would have informed a POSITA that consortium information is information retrieved from a consortium database, which is not a particularly helpful definition. But the specification also describes several databases that a POSITA would have understood to be consortium databases, such as the Local Number Portability (LNP) database (*id* at 7:35-44, 12:65-13:6, 13:67-14:10), which would have further informed a POSITA as to the meaning of "consortium *information*."

59.     The Federal Communications Commission (FCC) issued its first report and order (R&O) and further notice of proposed rulemaking mandating implementation of telephone

number portability on July 2, 1996. Exhibit C, FCC 96-286, at 4. Paragraph 5 from that R&O is copied below to provide context for the mandated implementation:

> 5. We conclude that a system of regional databases that are managed by an independent administrator will serve the public interest. We direct the North American Numbering Council (NANC) to provide initial oversight of this regional database system. We direct the NANC to determine the number and location of the regional databases and to select one or more administrators responsible for deploying the database system.

*Id.*

60.    In the late 1990's and early 2000's, the regional bell operating companies along with Bellcore, implemented the systems and databases necessary to implement the mandated number portability. Eventually, access to the LNP databases became available to all service providers and others willing to pay the associated access fees. As stated above, the '985 Patent describes accessing the LNP databases:

> A Carrier Discovery 8 block represents a query of available network-accessible *Local Number Portability (LNP) databases, such as the ones maintained by North American Numbering Plan Administration (NANPA), NetNumber, or TNS*, to determine the current telecommunication carrier that services and owns the ANI number delivered in Transmission 4 from the incoming call placed to the called party in Incoming Call 2. This query could be performed via the Internet using a secure TCP/IP protocol or other methods, such as Signaling System 7 (SS7), ATM, ITU-T, SIGTRAN, or Enum.

'985 Patent at 7:35-44.

The '985 Patent also describes using the data provided by the LNP database:

> Services layer 52 interfaces with telecommunications network 58 (FIG. 1, process block 14) through gateway external server 96, firewall 98 and a virtual switch 100, and gateway firewall 102 to place a test call to the supposed calling party number of the incoming call to User 56. Services layer 52 interfaces with *LNP*

> *carrier service provider 60 (FIG. 1, process block 8)* to access
> (sometimes by purchase) call information data and to return
> accessed data to message queue server 64 through application
> server 66, to virtual switch 78 and firewall 98, through virtual
> switch 106 and gateway firewall 102.

*Id.* at 13:67-14:10.

61.     The data stored in the LNP databases is aggregated from numerous service

providers, and is made commercially available to the service providers as well as others that need

to retrieve and use this information. Accordingly, a POSITA would have understood that the

information retrieved from a consortium database had two necessary characteristics. First, it was

collected or aggregated from multiple sources. And second, the information was made

commercially available such that third parties could access and use the information, such as how

service providers access and use the data in the LNP database.

62.     Another consortium database that a POSITA would have been familiar with was

the Line Information Database (LIDB). LIDBs contain a plethora of information:

> 14.5 Line Information Database Capabilities
>
> Another set of services based on data received via CCS are those
> services that depend upon data contained in Line Information
> Databases (LIDBs)[3]. LIDBs contain data about line numbers,
> including billing validation information and line characteristic
> information. A line's data can be accessed by a network node
> needing information about that line when it is the originating or the
> billing number for a particular call. Each LIDB is accessed by
> Query Originators (QOs) owned by the same company that owns
> the LIDB, as well as by QOs owned by other companies. …
>
> LIDBs also contain other information about individual line
> numbers, such as the type of service/equipment (e.g., person,
> public, POTS) and the name associated with each line number.
>
> [3] LIDBs are currently accessed by Query Originators (QOs) only
> via CCS SS7. However, due to industry interest in accessing

> LIDBs to retrieve data for use by various networks' services (e.g., NGNs, IP Networks), generic requirements work is occurring in 2000 to support LIDB access via TCP/IP using LDAP (see Section 14.5.8).

Exhibit D, Telcordia Notes on the Networks (Telcordia Technologies Special Report, SR-2275, Issue 4, October 2000), at 14-31. POSITAs would understand "consortium information" as stated in claim 10 of the '985 Patent and in claim 27 of the '532 Patent, informed by the specification, to be the type of commercially available, aggregated data that is provided in LNP and LIDB and other similar databases. Accordingly, such consortium databases were common in the telecom industry at the time of the inventions, and a POSITA would have understood that the information retrieved from such databases, i.e., consortium information, was both commercially available and aggregated.

## VI.     CONCLUSION

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct to the best of my knowledge.

Executed this 17th day of April 2019 in Melbourne FL, USA.

James R. Bress