## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

TRUSTID, INC.,

        Plaintiff,

        v.

NEXT CALLER INC.,

        Defendant.

Civil Action No. 18-172-LPS

**JURY TRIAL DEMANDED**

## DEFENDANT NEXT CALLER INC.'S
## <u>OPENING CLAIM CONSTRUCTION BRIEF</u>

WOMBLE BOND DICKINSON (US) LLP
Kristen Healey Cramer (#4512)
Dana Kathryn Severance (#4869)
1313 North Market Street, Suite 1200
Wilmington, DE  19801
(302) 252-4320
kristen.cramer@wbd-us.com
dana.severance@wbd-us.com

MCDERMOTT WILL & EMERY LLP
Paul M. Schoenhard
Nicole M. Jantzi
Ian B. Brooks
500 North Capitol Street, N.W.
Washington, D.C.  20001
(202) 758-8000

*Attorneys for Defendant Next Caller Inc.*

## TABLE OF CONTENTS

I.    Introduction ....................................................................................................... 1

II.   The Asserted Patents ......................................................................................... 1

III.  Relevant Law ..................................................................................................... 5

IV.   The Level of Ordinary Skill In the Art ............................................................ 7

V.    Construction of Disputed Terms ...................................................................... 7

    A.   "source origin confidence metric" / "source origin confidence metric of a calling party number or billing number" / "source origin confidence metric for the calling party number or billing number" ('985 Patent claims 1, 8, 13-19; '532 Patent claims 1, 19, 21-23, 25, 30, 32, 43, 46-50) ........................................................................ 7

    B.   "consortium information" ('985 Patent claim 10; '532 Patent claim 27) ........................... 9

    C.   Whether the preamble of Claim 32 of the '532 Patent is limiting? (Next Caller understands that TRUSTID now agrees the preamble is limiting) ................................... 11

VI.   Conclusion ....................................................................................................... 16

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
  314 F.3d 1313 (Fed. Cir. 2003)............................................................................................5

*Applied Materials, Inc. v. Advanced Semiconductor Materials Am., Inc.*,
  98 F.3d 1563 (Fed. Cir. 1996)............................................................................................11

*ArcelorMittal France v. AK Steel Corp.*,
  700 F.3d 1314 (Fed. Cir. 2012)............................................................................................6

*Bell Commc'ns. Research, Inc. v. Vitalink Commc'ns. Corp.*,
  55 F.3d 615 (Fed. Cir. 1995)..............................................................................................12

*Bristol–Myers Squibb Co. v. Ben Venue Labs., Inc.*,
  246 F.3d 1368 (Fed. Cir. 2001)..........................................................................................12

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*,
  289 F.3d 801 (Fed. Cir. 2002)......................................................................................11, 12

*Corning Glass Works v. Sumitomo Electric U.S.A., Inc.*,
  868 F.2d 1251 (Fed. Cir. 1989)....................................................................................12, 16

*Johnson Worldwide Assocs., Inc. v. Zebco Corp.*,
  175 F.3d 985 (Fed. Cir. 1999)..............................................................................................6

*Karlin Tech. Inc. v. Surgical Dynamics, Inc.*,
  177 F.3d 968 (Fed. Cir. 1999)..............................................................................................6

*Markman v. Westview Instruments, Inc.*,
  52 F.3d 967 (Fed. Cir. 1995) (*en banc*) ........................................................................6, 10

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ...........................................................1, 5, 6, 10

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*,
  182 F.3d 1298 (Fed. Cir. 1999)..........................................................................................12

*Poly-America, L.P. v. GSE Lining Tech., Inc.*,
  383 F.3d 1303 (Fed. Cir. 2004)..........................................................................................11

*Seachange Int'l, Inc. v. C-COR Inc.*,
  413 F.3d 1361 (Fed. Cir. 2005)............................................................................................5

*Vitronics Corp. v. Conceptronic, Inc.*,
  90 F. 3d 1576 (Fed. Cir. 1996)............................................................................................6

*Vizio, Inc. v. Int'l Trade Comm'n*,
    605 F.3d 1330 (Fed. Cir. 2010 ................................................................................................11

**TABLE OF EXHIBITS**

| Exhibit | Description |
|---|---|
| D.I. 75-1, Exhibit C | U.S. Patent No. 9,001,985 ("the '985 Patent") |
| D.I. 75-1, Exhibit D | U.S. Patent No. 8,238,532 ("the '532 Patent") |
| D.I. 75-1, Exhibit E | U.S. Patent No. 9,871,913 ("the '913 Patent") |
| D.I. 75-1, Exhibit I | IPR2019-00039, Patent Owner's Preliminary Response |

Pursuant to the Court's Scheduling Order (D.I. 41), Defendant Next Caller Inc. ("Next Caller") hereby submits its opening claim construction brief.[1]

## I.    INTRODUCTION

Claim construction proceedings in this case should be straightforward. Indeed, the claim language is readily understood. For the two terms in dispute, Next Caller proposes that the words be ascribed their ordinary and customary meanings, consistent with the teachings in the specifications. This is what the Federal Circuit requires. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*) ("Because the patentee is required to define precisely what his invention is . . . it is unjust to the public, as well as an evasion of the law, to construe it in a manner different from the plain import of its terms." (citations and internal quotation marks omitted)). And as to the third term, there is no dispute as to what it means; only as to whether it has legal significance—it does.[2] Accordingly, and for the reasons explained below, Next Caller's proposed constructions should be adopted by the Court.[3]

## II.    THE ASSERTED PATENTS

The Asserted Patents[4] relate, in general, to methods and systems for determining the trustworthiness of calling party information, such as Automatic Number Identification (ANI) or

---

[1]    All emphasis added unless otherwise indicated.

[2]    As of April 17, 2019—the date of the filing of this brief—Next Caller understands from TRUSTID that TRUSTID no longer disputes that the preamble of Claim 32 of the '532 Patent is a limitation.

[3]    The Court should also adopt the parties' agreed-to constructions, which are presented in D.I. 79, Ex. A.

[4]    The Asserted Patents are U.S. Patent Nos. 9,001,985 (the '985 Patent") (D.I. 75-1, Exhibit C), 8,238,532 ("the '532 Patent") (D.I. 75-1, Exhibit D), and 9,871,913 ("the '913 Patent") (D.I. 75-1, Exhibit E). The '985 Patent is a continuation of the '532 Patent. The '985 Patent and the '532 Patent share substantially similar specifications. As a matter of convenience,

Calling Number Identification (Caller ID). ('532 Patent at Abstract, 1:23-28; '913 Patent at Abstract). According to the patents, there was a need to determine the accuracy and truthfulness of calling party information. ('532 Patent at 3:59-60; '913 Patent at 4:8-11). Specifically, the ability to falsify ANI and Caller ID, *i.e.*, spoofing, purportedly undermined using this information to identify incoming callers. ('532 Patent at 1:47-3:58; '913 Patent at 1:57-4:7). Thus, the patents purport to disclose a way to analyze this information "in a transitional state between an actual or a virtual on-hook condition and an answered condition" to "help restore[] the value lost to spoofing and fraudulent ANI transmissions." ('532 Patent at 4:8-5:45; '913 Patent at 4:15-37, Fig. 3).[5]

Figure 1 of the '985 and '532 Patents purports to illustrate "the disclosed method of and system for determining trustworthiness and credibility of calling number information relating to calls placed in a telecommunications network." ('532 Patent at 5:63-67).

---

Next Caller cites only to the '532 Patent specification, unless otherwise indicated. Citations to the specification of the '532 Patent apply with equal force to the specification of the '985 Patent.

[5]     The patents concede that ANI and Caller ID were well-known long before the patents' filing dates. (*See, e.g.*, '532 Patent at 1:32-54, 2:10-17; '913 Patent at 1:39-57, 2:24-31). Moreover, the patents admit that businesses and government agencies have long had access to this information to use "as a factor in identity determination; as an element in location discovery; and for call routing assistance, workflow efficiency, and fraud mitigation." (*Id.*)



FIG. 1

As addressed in Next Caller's motion to dismiss and discussed during the November 20, 2018 hearing, however, the claims are even broader.  For example, the '985 and '532 Patent claims are directed to methods and systems that involve receiving a "calling party number or billing number" ('985 Patent at 15:6-9); before the call is answered, gathering "operational status information associated with the calling party number or billing number" (*Id.* at 15:11-15); and determining or assigning a "source origin confidence metric" (*Id.* at 15:16-19).  The claims do not specify how the "source origin confidence metric" is determined or how it is used.  Moreover, "the method can be implemented into existing enterprise, information services, and telecommunications infrastructures."  *Id.* at 4:5-7.

Similarly, the '913 Patent broadly claims a method including the step of first receiving a call request by a "discrepancy detector," where the "discrepancy detector determines

discrepancies in calling party information." ('913 Patent at 10:36-44). This could be, for example, as simple as checking to see whether caller ID information in the call request matches known caller ID information. (*Id.* at 7:32-35). Second, accessing a "monitored called party database" and determining "whether the call request to the called telephone number is to be verified." (*Id.* at 10:45-50). Third, determining "whether a discrepancy exists between the calling party information contained within the call request and stored calling party information." (*Id.* at 10:51-55). And if "a discrepancy exists between the calling party information contained within the call request and stored calling party information," suspending the call request. (*Id.* at 10:56-59). The '913 Patent specification describes performing the disclosed methods using a generic computer system (*id.* at 9:15-10:3), which is illustrated in Figure 4 (below).



TRUSTID currently asserts all ninety-four claims from the Asserted Patents:

| U.S. Patent Number | Asserted Claims |
| --- | --- |
| 9,001,985 | 1 (independent), 2-12 (dependent), 13 (independent), 14-22 (dependent) |
| 8,238,532 | 1 (independent), 2-31 (dependent), 32 (independent), 33-52 (dependent) |
| 9,871,913 | 1 (independent), 2-14 (dependent), 15 (independent), 16-20 (dependent) |

## III.    RELEVANT LAW

The Federal Circuit set forth the principles that govern claim construction in its *en banc* decision in *Phillips*.  In *Phillips*, the Federal Circuit confirmed that claim terms should be given "their ordinary and customary meaning," *i.e.*, each term should be presumed to carry "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention."  415 F.3d at 1312-13 (citation omitted).  To determine how a "person of ordinary skill in the art" (POSITA) would understand a claim term, a court should look to "those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean."  *Id*. at 1314 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004)).  Such sources include "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art."  *Id*. (quoting *Innova/Pure Water*, 381 F.3d at 1116).

A "bedrock principle" of patent law is that "the claims of a patent define the invention."  *Id*. at 1312 (quotation marks omitted).  Accordingly, "a claim construction analysis must begin and remain centered on the claim language itself, for that is the language the patentee has chosen to particularly point out and distinctly claim the subject matter which the patentee regards as his invention."  *Innova/Pure Water*, 381 F.3d at 1116 (citations and internal quotation marks omitted).  Under the doctrine of claim differentiation, "[t]here is a rebuttable presumption that different claims are of different scope."  *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1326 (Fed. Cir. 2003) (citations omitted).  The doctrine "stems from 'the common sense notion that different words or phrases used in separate claims are presumed to indicate that the claims have different meanings and scope.'"  *Seachange Int'l, Inc. v. C-COR Inc.*, 413 F.3d

5

1361, 1368 (Fed. Cir. 2005) (quoting *Karlin Tech. Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968, 971-72 (Fed. Cir. 1999)).

In addition to the clams, other intrinsic evidence—the specification and prosecution history—is highly relevant. A POSITA "is deemed to read [a] claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips*, 415 F.3d at 1313. For this reason, the words of the claim must be interpreted "in view of the specification, of which they are a part." *Id.* at 1315 (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996)). While the specification is "the single best guide to the meaning of a disputed term," *Vitronics Corp. v. Conceptronic, Inc.*, 90 F. 3d 1576, 1582 (Fed. Cir. 1996), the file history also can provide important evidence of how both the U.S. Patent & Trademark Office ("PTO") and the inventor understood the terms of the patent. *Phillips*, 415 F.3d at 1317. Despite the invitation to consider the intrinsic record as a whole, "claim terms cannot be narrowed by reference to the written description or prosecution history unless the language of the claims invites reference to those sources." *Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 989-90 (Fed. Cir. 1999) (citation omitted).

The Federal Circuit has "also authorized district courts to rely on extrinsic evidence, which consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317 (citations and internal quotation marks omitted). Extrinsic evidence should not be considered, however, divorced from the context of the intrinsic evidence. *Id.* at 1319; *ArcelorMittal France v. AK Steel Corp.*, 700 F.3d 1314, 1320 (Fed. Cir. 2012).

## IV.    THE LEVEL OF ORDINARY SKILL IN THE ART

The Asserted Patents describe the technical field as relating generally to calls placed in telecommunications and information service networks and, in particular, to establishing the credibility of incoming calls by identifying and reporting on the credibility of ANI information and caller ID information.  ('532 Patent at 1:21-28; '913 Patent at 1:28-35).  A person of ordinary skill in the art would have had a bachelor's degree in electrical engineering, computer science, or a related field, plus 1-2 years of experience with telecommunications.

## V.    CONSTRUCTION OF DISPUTED TERMS

### A.    "source origin confidence metric" / "source origin confidence metric of a calling party number or billing number" / "source origin confidence metric for the calling party number or billing number" ('985 Patent claims 1, 8, 13-19; '532 Patent claims 1, 19, 21-23, 25, 30, 32, 43, 46-50)

| TRUSTID's Proposed Construction | Next Caller's Proposed Construction |
| --- | --- |
| "measure representing the credibility of the calling party number or the calling party billing number" | "a determination of the trustworthiness for the entity from which the call originated" |

The terms "source origin confidence metric," "source origin confidence metric of a calling party number or billing number," and "source origin confidence metric for the calling party number or billing number"[6] appear variously in claims 1, 8, and 13-19 of the '985 Patent and claims 1, 19, 21-23, 25, 30, 32, 43, and 46-50 of the '532 Patent.  A variant of the term "source origin confidence metric" is thus a limitation of all asserted claims.  The parties generally agree that the claimed metric relates to trustworthiness or credibility of something.  But the parties dispute what meaning is imparted by the language "source origin."

"Source origin confidence metric" is not an established term of art.  Nor did the patentee offer a definition for the term, *or even use the term*, in the specification of the patents.  The

---

[6]    For the convenience of the court and to avoid duplicative arguments, the parties proposed construing the stated terms together.

parties and the Court are thus left to rely on the plain English meanings of the words and the context in which they are used.

As the phrase "source origin confidence metric of a calling party number or billing number" suggests, the phrase encompasses a confidence metric relating to the origin of a calling party number or billing number. In other words, it is a determination of the trustworthiness ("confidence metric") for the entity from which the call originated ("source origin"). This is further supported by the surrounding language in the claims, which requires "determining" or "assign[ing]" the metric. (*See, e.g.*, '985 Patent cl. 1 at 15:16-19; '532 Patent cl. 1 at 15:14-15, cl. 19 at 16:13-16, cl. 25 at 16:35-38, cl. 32 at 17:6-9). Next Caller's proposed construction captures the phrase's plain meaning in the context of the claims.

Turning to the specification, the '985 Patent and the '532 Patent purport to be directed to "[a] method of and system for discovering and reporting the trustworthiness and credibility of calling party information . . . ." ('532 Patent at Abstract). As explained above, such a method was desirable, according to the patentees, to minimize the problems associated with persons spoofing their ANI or caller ID, and thus causing those that rely on this information, including financial institutions, to no longer trust ANI or caller ID to verify the identity of the person on the other end of the phone. (*Id.* at 1:47-3:4). According to the patents, "[t]he disclosed method helps restore the value lost to spoofing and fraudulent ANI transmissions, ***providing a powerful new tool to banks to authenticate their customers*** by again using and trusting validated ANI as a factor in authentication for the telephone channel." (*Id.* at 5:40-45). Although the specification does not use the term "source origin confidence metric," it does disclose that trust is regained through use of a "confidence metric" or "trustworthiness metric." Such a "metric" may be "generate[d]" as "a singular determination such as 'valid' or 'invalid' or as a tiered system such

8

as 'red,' 'yellow,' 'green.'" (*Id.* at 11:2-6). Thus, the specification supports that "source origin confidence metric" is "a determination of the trustworthiness for the entity from which the call originated."

TRUSTID's proposed construction, "measure representing the credibility of the calling party number or the calling party billing number," either imparts no meaning to the words "source origin" or, in certain variations, renders the express claim language "of the calling party number" and/or "of the calling party billing number" redundant. The "source origin" must thus be something different—as Next Caller proposes, the entity from which the call originated.

Accordingly, this Court should adopt Next Caller's proposed construction: "a determination of the trustworthiness for the entity from which the call originated."

**B.      "consortium information" ('985 Patent claim 10; '532 Patent claim 27)**

| TRUSTID's Proposed Construction | Next Caller's Proposed Construction |
|---|---|
| "commercially available, aggregated data" | "aggregated information" |

The term "consortium information" appears in dependent claim 10 of the '985 Patent and dependent claim 27 of the '532 Patent. The parties agree that this is aggregated information or data. The parties disagree whether "consortium" should be further limited only to information that is commercially available. As explained below, the Court should adhere to the plain and ordinary meaning of the term.

Claim 10 of the '985 Patent is dependent to claim 8, which is dependent to claim 1. Claim 8 provides the method of claim 1 further comprises "adjusting . . . the source origin confidence metric based on personal risk factors of an entity associated with the calling party number or billing number." ('985 Patent cl. 8 at 15:46-50). In turn, claim 10 provides the method of claim 8, further comprising "retrieving *consortium information* . . . from an external

database." (*Id.* cl. 10 at 15:56-59).[7] The claims do not suggest a meaning for "consortium information" other than its plain and ordinary meaning—aggregated information. Indeed, nothing in the claims themselves even suggests "consortium information" must be commercially available.

Nor does the specification disclose a special meaning. *See Phillips*, 415 F.3d at 1315 (quoting *Markman*, 52 F.3d at 979) (providing the words of the claim must be interpreted "in view of the specification, of which they are a part"). For example, the specification discloses "the System may gather additional information that may be useful to the User from additional systems, vendors, processes, or metadata from one or more of the steps taught in this application, such as . . . ***information from a consortium database*** such as calling velocity to multiple locations within a specified time period, or known frauds, and then passed to API 6 along with the ANI validity metric." (*Id.* at 11:33-45). This does not limit "consortium information" to only that information that is commercially available.

Elsewhere, the specification refers at times to "commercially available" components, such as "commercially available database" (*id.* at 7:55-64), "commercially available system" (*id.* at 11:59-12:2), and "commercially accessible telecommunications carrier" (*id.* at 13:31-37). But these references do not limit "consortium information" to being only commercially available.

Accordingly, this Court should not read sa commercial limitation into the term "consortium information." Instead, this Court should construe "consortium information" consistent with its plain and ordinary meaning: "aggregate information."

---

[7]      Claim 27 of the '532 Patent includes the same language and claim dependency.

C.    **Whether the preamble of Claim 32 of the '532 Patent is limiting? (Next Caller understands that TRUSTID now agrees the preamble is limiting)**

| TRUSTID's Proposed Construction | Next Caller's Proposed Construction |
|---|---|
| The preamble is non-limiting.[8] | The preamble is a limitation. |

The parties dispute whether the preamble of claim 32 of the '532 Patent is limiting. The preamble of claim 32 provides: "A system for performing forensic analysis on calling party number information associated with an incoming call from a telephonic device, ***before the incoming call is answered***, comprising:" ('913 Patent at 16:62-65). Construing the preamble to be non-limiting, as TRUSTID seeks, is contrary to the teaching of the patent and TRUSTID's own representations to this Court regarding the scope of the its purported inventions. Accordingly, the Court should find the preamble of claim 32 is a limitation.

A term or phrase found in the introductory words of the claim—the preamble—should be construed as a limitation if it "recites essential structure or steps, or is necessary to give life, meaning, and vitality to the claim." *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002); *Vizio, Inc. v. Int'l Trade Comm'n*, 605 F.3d 1330, 1340 (Fed. Cir. 2010). Conversely, a preamble term or phrase is not limiting "where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention." *Vizio*, 605 F.3d at 1340. (internal quotation marks omitted).

In making this distinction, a court should "review . . . the entire patent to gain an understanding of what the inventors actually invented and intended to encompass by the claim." *Catalina Mktg.*, 289 F.3d at 808 (internal quotation marks omitted). *See also Poly-America, L.P. v. GSE Lining Tech., Inc.*, 383 F.3d 1303, 1309 (Fed. Cir. 2004); *Applied Materials, Inc. v. Advanced Semiconductor Materials Am., Inc.*, 98 F.3d 1563, 1572-73 (Fed. Cir. 1996) ("Whether

---

[8]    Next Caller understands that TRUSTID no longer disputes that the preamble of Claim 32 of the '532 Patent is a limitation.

a preamble stating the purpose and context of the invention constitutes a limitation of the claimed process is determined on the facts of each case in light of the overall form of the claim, and the invention as described in the specification and illuminated in the prosecution history." (citations omitted)).

The Federal Circuit has provided "[s]ome guideposts" to assist in determining whether language in the preamble limits claim scope. *Catalina Mktg.*, 289 F.3d at 808. For example, if reference to the preamble is necessary "to understand limitations or terms in the claim body, the preamble limits claim scope." *Id.* (citing *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1306 (Fed. Cir. 1999)). The preamble may also be limiting if it recites additional structure or steps that the specification identifies as important. *Id.* (citing *Corning Glass Works v. Sumitomo Electric U.S.A., Inc.*, 868 F.2d 1251, 1257 (Fed. Cir. 1989)). Dependence on a "preamble phrase for antecedent basis may limit claim scope because it indicates a reliance on both the preamble and claim body to define the claimed invention." *Id.* (citing *Bell Commc'ns. Research, Inc. v. Vitalink Commc'ns. Corp.*, 55 F.3d 615, 620 (Fed. Cir. 1995)). Moreover, "clear reliance on the preamble during prosecution to distinguish the claimed invention from the prior art transforms the preamble into a claim limitation because such reliance indicates use of the preamble to define, in part, the claimed invention." *Id.* at 808-09 (citing *Bristol–Myers Squibb Co. v. Ben Venue Labs., Inc.*, 246 F.3d 1368, 1375 (Fed. Cir. 2001)).

Here, the specification repeatedly and consistently describes the alleged inventive functions occurring ***before*** an incoming call is answered. For example, in the summary of the disclosure, the specification first provides "the disclosed method performs ANI analysis with the calling party's telephone or telephonic device in a transitional state ***between an actual or a virtual on-hook condition and an answered condition*** . . . ." ('532 Patent at 4:8-11). Later in

the specification, the patent elaborates that in Figure 1, "Transmission 4 block represents a User (such as a bank-card activation center or a 911 emergency call center) transmitting the ANI to the System ***before the call is answered*** and while the calling party hears one or more ringing tones." (*Id.* at 6:56-59). Indeed, Figure 1 depicts the System API 6 is called and returns a confidence metric before "Call is answered by USER." (*See id.* at Fig. 1).



The specification further provides that performing the alleged invention before the incoming call is answered is advantageous, because "[t]his transmission ***before the call is answered*** (goes off-hook) by the User enables the calling party's telephone to be in a ***more***

13

*predictable and detectable transitional state*." (*Id.* at 6:60-63; *see also id.* at 8:35-43). As a result, the alleged invention can better collect ANI information, as well as other information, such as "time of day, trunk number, ANI II digits, dialed number information (DNIS), SIP header routing information . . . or other information or data that may be helpful to the System . . . ." (*Id.* at 6:63-7:8).

It is surprising that TRUSTID would now contend that the '532 Patent does not require the claimed operations, such as gathering operational status information, to occur before the incoming call is answered. Since the beginning of this litigation, TRUSTID has repeatedly proclaimed as the purported benefit of its patents that the claimed operations occur *before* the incoming call is answered. For example, in its First Amended Complaint, TRUSTID alleged:

> TRUSTID's patented anti-spoofing technology works differently. ***This technology performs a real-time telephone forensic analysis before a call is answered***. In this way, TRUSTID's technology allows call centers to quickly identify callers that should enter trusted work flows for better, faster service. TRUSTID's approach is more robust and reliable than conventional knowledge-based techniques and saves clients time and money.

(D.I. 16 ¶ 11).

Similarly, in TRUSTID's Response in Opposition to Defendant Next Caller's Motion to Dismiss, TRUSTID relied specifically on the preamble of Claim 32 of the '913 Patent to describe the claim to the Court:

> Claim 32 of the '532 patent recites a "system for performing forensic analysis on calling party number information associated with an incoming call from a telephonic device." D.I. 16, Ex. 7, '532 patent, 16:62-64. ***"[B]efore the incoming call is answered," the "one or more processors" gathers "operational status information associated with the calling party number."*** *Id.* at 16:62-17:9. It then assigns a "source origin confidence metric to the calling party number." *Id.* The confidence metric is determined by comparing the "operational status information" with "an expected call pattern," which is among one of many call patterns stored on the memory of the device. *Id.* This confidence metric represents "the credibility of the calling party number," *id.* at 13:61-63, and mitigates the fraudulent and costly spoofing practices.

14

(D.I. 29 at 13).  TRUSTID went on to proclaim "the claims here are directed to a technological improvement: an enhanced anti-spoofing telephonic system.  The claims here focus on a 'specific asserted improvement in computer capabilities' (e.g., the use of operational status information *obtained pre-answer* to solve the problem of 'spoofed' calls).  (*Id.* at 14). TRUSTID further elaborated that this feature was a purported basis of patentability: "[t]he '985 and *'532 patents require* an electronic system that (i) receives the calling party number or billing number associated with an incoming call from a calling device and (ii) *before the call is answered*, determines a confidence metric for the validity of the calling party number or billing number received with the incoming call."  (*Id.* at 15).  Indeed, TRUSTID further explained: "The *claimed invention* determines—*before a call is even answered*—whether the caller-identification information received with the call is likely valid or not. In this way, the claimed inventions solve the problems of 'spoofing' and 'phishing' that have become prevalent in the past few years."  (*Id.* (citing '532 Patent at 1:55-2:67, 5:15-55, 14:41-61)); *see also id.* at 17.[9]

Moreover, at the hearing on the Motion to Dismiss, TRUSTID again relied on this feature as an alleged basis for patentability.  For instance, TRUSTID's counsel stated "[t]here are things that we do in these patents, for example, the placing of an outgoing call when you have an incoming call, *all in realtime pre-answer*."  (D.I. 53 at 80:22-23).  TRUSTID further alleged that performing these operations in the "pre-answer" phase (i.e., before the incoming call is answered) helps show its invention is patentable and not an abstract concept.  (*Id.* at 81:3-15).

---

[9]    TRUSTID has made similar arguments to the USPTO in its Patent Owner's Preliminary Response relating to the '985 Patent.  For example, TRUSTID argued: "The claimed invention includes at least three sets. . . .  *Second*, in the short time interval *after* the caller-identification information is received and *before* the call is answered (which is typically only a few seconds), the electronic system gathers information about the status of the telephone line associated with the caller-identification information."  D.I. 75-1, Exhibit I at 4 (citing '985 Patent at 8:35-9:39) (emphasis original).

Notably, TRUSTID argued that its claims do not preempt an entire field, because TRUSTID claims only "pre-answer." (*Id.* at 88:19-23). Overall, TRUSTID reiterated at least six times during oral argument its patents claim operations ***before*** the incoming call is answered. (*See id.* at 80-82, 88). Accordingly, TRUSTID should not be permitted now to contend that its patent claims do not require performing the claimed functions before the call is answered.

For the reasons explained above, the claim, the specification, and TRUSTID's own statements make clear that claim 32 of the '532 Patent requires the claimed functions, including gathering operational status information, to be performed before the incoming call is answered. As such, to avoid being "divorced from reality," this Court should find the preamble of claim 32 of the '532 patent is limiting. *See Corning Glass Works*, 868 F.2d at 1257.

## VI.    CONCLUSION

For the foregoing reasons, the claims of the Asserted Patents should be construed as agreed to by the parties (*see* D.I. 79, Ex. A), and as presented by Next Caller herein and summarized below.

| Term/Dispute | Construction |
|---|---|
| "**source origin confidence metric**" / "**source origin confidence metric of a calling party number or billing number**" / "**source origin confidence metric for the calling party number or billing number**"<br><br>('985 Patent claims 1, 8, 13-19; '532 Patent claims 1, 19, 21-23, 25, 30, 32, 43, 46-50) | "a determination of the trustworthiness for the entity from which the call originated" |
| "**consortium information**"<br><br>('985 Patent claim 10; '532 Patent claim 27) | "aggregated information" |

| Term/Dispute | Construction |
|---|---|
| **Whether the preamble of Claim 32 of the '532 Patent is limiting?**<br><br>('532 Patent claim 32) | The preamble is a limitation.[10] |

Dated: April 17, 2019                    Respectfully submitted,

*/s/ Kristen Healey Cramer*

Kristen Healey Cramer (#4512)
Dana Kathryn Severance (#4869)
WOMBLE BOND DICKINSON (US) LLP
1313 North Market Street, Suite 1200
Wilmington, DE  19801
(302) 252-4320
kristen.cramer@wbd-us.com
dana.severance@wbd-us.com

Paul M. Schoenhard
Nicole M. Jantzi
Ian B. Brooks
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street, N.W.
Washington, D.C.  20001
(202) 758-8000

*Attorneys for Defendant Next Caller Inc.*

---

[10]      As explained above, Next Caller understands that TRUSTID no longer disputes that the preamble is a limitation.

17