# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

TRUSTID, INC.,

    Plaintiff,

v.

NEXT CALLER, INC.,

    Defendant.

C.A. No. 18-172-LPS

Adam W. Poff and Pilar G. Kraman, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, DE

Jonathan Tuminaro, Michael D. Specht, Byron L. Pickard, Richard M. Bemben, and Daniel S. Block, STERNE, KESSLER, GOLDSTEIN & FOX, PLLC, Washington, DC

    Attorneys for Plaintiff

Kirsten Healey Cramer and Dana Kathryn Severance, WOMBLE BOND DICKINSON (US) LLP, Wilmington, DE

Paul M. Schoenhard, Nicole M. Jantzi, and Ian B. Brooks, MCDERMOTT WILL & EMERY LLP, Washington, DC

    Attorneys for Defendant

## MEMORANDUM OPINION

August 2, 2019
Wilmington, Delaware

[signature]

**STARK, U.S District Judge:**

Plaintiff TRUSTID, Inc. ("TRUSTID" or "Plaintiff") sued Defendant Next Caller, Inc. ("Next Caller" or "Defendant"), alleging infringement of U.S. Patent Nos. 9,001,985 ("the '985 patent"), 8,238,532 ("the '532 patent"), and 9,871,913 ("the '913 patent") (collectively, "patents-in-suit"). (D.I. 83 at 3) The patents-in-suit relate to methods and systems "for discovering and reporting the credibility of calling party number information." ('985 patent, Abstract)

Presently before the Court is the issue of claim construction. The parties submitted technology tutorials (D.I. 67, 68), objections to the other party's tutorial (D.I. 96, 97), and claim construction briefs (D.I. 82, 84, 95, 99). In addition, the parties submitted letters relating to Next Caller's motion (D.I. 87) to strike TRUSTID's expert declaration.[1] (D.I. 88, 92, 93) The Court held a claim construction hearing on June 3, 2019. (*See* D.I. 110) ("Tr.")

## I. LEGAL STANDARDS

The ultimate question of the proper construction of a patent is a question of law. *See Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 837 (2015) (citing *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 388-91 (1996)). "It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (citation and internal quotation marks omitted). "[T]here is no magic formula or catechism for conducting claim construction." *Id.* at 1324. Instead, the court is free to attach the appropriate weight to appropriate sources "in light of the statutes and policies that inform patent law." *Id.*

---

[1] For the reasons stated during the claim construction hearing, the Court denied Next Caller's motion to strike. (Tr. at 4; *see also* D.I. 105)

1

"[T]he words of a claim are generally given their ordinary and customary meaning. . . . [which is] the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1312-13 (internal citations and quotation marks omitted). "[T]he ordinary meaning of a claim term is its meaning to the ordinary artisan after reading the entire patent." *Id.* at 1321 (internal quotation marks omitted). The patent "specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

While "the claims themselves provide substantial guidance as to the meaning of particular claim terms," the context of the surrounding words of the claim also must be considered. *Phillips*, 415 F.3d at 1314. Furthermore, "[o]ther claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment . . . . [b]ecause claim terms are normally used consistently throughout the patent." *Id.* (internal citation omitted).

It is likewise true that "[d]ifferences among claims can also be a useful guide . . . . For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Id.* at 1314-15 (internal citation omitted). This "presumption is especially strong when the limitation in dispute is the only meaningful difference between an independent and dependent claim, and one party is urging that the limitation in the dependent claim should be read into the independent claim." *SunRace Roots Enter. Co., Ltd. v. SRAM Corp.*, 336 F.3d 1298, 1303 (Fed. Cir. 2003).

It is also possible that "the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316. It bears emphasis that "[e]ven

2

when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1372 (Fed. Cir. 2014) (quoting *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004)) (alteration in original) (internal quotation marks omitted).

In addition to the specification, a court "should also consider the patent's prosecution history, if it is in evidence." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996). The prosecution history, which is "intrinsic evidence," "consists of the complete record of the proceedings before the [Patent and Trademark Office] and includes the prior art cited during the examination of the patent." *Phillips*, 415 F.3d at 1317. "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.*

"In some cases, . . . the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *Teva*, 135 S. Ct. at 841. "Extrinsic evidence consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980. For instance, technical dictionaries can assist the court in determining the meaning of a term to those of skill in the relevant art because such dictionaries "endeavor to collect the accepted meanings of terms used in various fields of science and technology." *Phillips*, 415 F.3d at 1318. In addition, expert testimony can be useful "to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in

3

the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Id.* Nonetheless, courts must not lose sight of the fact that "expert reports and testimony [are] generated at the time of and for the purpose of litigation and thus can suffer from bias that is not present in intrinsic evidence." *Id.* Overall, while extrinsic evidence "may be useful to the court," it is "less reliable" than intrinsic evidence, and its consideration "is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1318-19. Where the intrinsic record unambiguously describes the scope of the patented invention, reliance on any extrinsic evidence is improper. *See Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1308 (Fed. Cir. 1999) (citing *Vitronics*, 90 F.3d at 1583).

Finally, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998). It follows that "a claim interpretation that would exclude the inventor's device is rarely the correct interpretation." *Osram GmbH v. Int'l Trade Comm'n*, 505 F.3d 1351, 1358 (Fed. Cir. 2007) (quoting *Modine Mfg. Co. v. U.S. Int'l Trade Comm'n*, 75 F.3d 1545, 1550 (Fed. Cir. 1996)).

## II. CONSTRUCTION OF DISPUTED TERMS[2]

### A. "source origin confidence metric" limitations[3]

| **TRUSTID** |
|---|
| "measure representing the credibility of the calling party number or the calling party billing number" |
| **Next Caller** |
| "a determination of the trustworthiness for the entity from which the call originated" |
| **Court** |
| "a number in a range that represents the credibility of the calling party number or the calling party billing number" |

The parties dispute two aspects of the claimed "source origin confidence metric." First, the parties dispute whether the metric relates to the credibility[4] of the *number* associated with the call being placed, as TRUSTID contends, or whether the metric relates to the credibility of the *entity itself* which is placing the call, as Next Caller contends. (*See* D.I. 82 at 7; D.I. 84 at 7-9) Second, the parties dispute whether the metric is limited to *a number in a range* (such as a percentage probability), as TRUSTID contends, or whether the metric can more broadly encompass *any type of determination* (such as a binary valid/invalid determination), as Next Caller contends. (*See* D.I. 82 at 10-13; D.I. 99 at 5-6)

For the reasons below, the Court agrees with TRUSTID with respect to both disputes. The Court's construction reflects these conclusions.

---

[2] In their briefing, the parties dispute the level of ordinary skill in the art. (D.I. 84 at 7; D.I. 95 at 8 n.4) However, at the hearing, the parties agreed that no the claim construction dispute turns on the difference between the parties' definitions of a person of ordinary skill. (Tr. at 16-17) The Court, in any event, finds that both definitions lead to the same constructions.

[3] The term "source origin confidence metric" appears in claims 1, 8, and 13-19 of the '985 patent, and claims 1, 19, 21-23, 25, 30, 32, 43, and 46-50 of the '532 patent.

[4] The Court agrees with TRUSTID's contention that any difference between "credibility" (as used in TRUSTID's proposed construction) and "trustworthiness" (as used in Next Caller's proposed construction) is immaterial for the purposes of resolving the parties' claim construction disputes. (*See* D.I. 82 at 7 n.4)

5

First, the Court agrees with TRUSTID that the claimed "source origin confidence metric" relates to a phone number, not to the entity making the call. The specification does not define "source origin confidence metric," and the parties do not contend that the term has an accepted meaning in the art. However, the intrinsic evidence as a whole compels TRUSTID's proposed construction. The abstract characterizes the invention as "[a] method and system for discovering and reporting the trustworthiness and credibility of calling party number information, such as Automatic Number Identification (ANI) or Calling Number Identification (Caller ID) information, or for inbound telephone calls." ('985 patent,[5] Abstract) Similarly, the detailed description notes that the "confidence metric represent[s] the credibility of the calling party number." ('985 patent, 13:61-63) That the specification describes the credibility determination as of "calling party *number information*" or "the calling party *number*," and not of the calling *party* itself, also supports TRUSTID's position that the result of the inventive method – the source origin confidence metric – relates to a number, and not to the entity making the call. *See Wi-Fi One, LLC v. Broadcom Corp.*, 887 F.3d 1329, 1346 (Fed. Cir. 2018) (noting that claim construction must be "faithful to the invention disclosed in the specification").

The independent claims' use of "source origin confidence metric" further supports the TRUSTID's construction. For example, multiple independent claims recite "a source origin confidence metric of a calling party number or a billing number." (*E.g.*, '985 patent, cls. 1, 13; '532 patent, cl. 1) That the metric is "*of* a calling party *number* or billing *number*" suggests that the metric is associated with a number; if the patentee instead wished for the metric to be associated with an entity, the patentee could have claimed a source origin confidence metric *of a*

---

[5] The '532 patent is a continuation of the '985 patent, so the specifications of the two patents are substantially identical.

*calling party*. *See Phillips*, 415 F.3d at 1314 (Fed. Cir. 2005) (noting that usage of term in claims often illuminates term's meaning).

TRUSTID's construction is further supported by the patents' dependent claims. For example, the '985 patent's claim 16 recites "wherein the source origin confidence metric is a probability that the calling party *number* or the billing *number* is valid," and claim 17 recites "wherein the source origin confidence metric indicates either the calling party *number* or the billing *number* is valid or invalid" (emphasis added). That the source origin confidence metric is claimed with reference to a number is consistent with TRUSTID's construction, but inconsistent with Next Caller's construction. *See Wright Med. Tech., Inc. v. Osteonics Corp.*, 122 F.3d 1440, 1445 (Fed. Cir. 1997) (noting that independent claim must be interpreted consistently with its dependent claims).

Next Caller's contention that the phrase "source origin" supports its construction lacks merit. Next Caller argues that the phrase "source origin" means "the entity from which the call originated," and that TRUSTID's construction improperly reads out "source origin" from the term "source origin confidence metric." (D.I. 99 at 3-5) (relying on principle that "claims are interpreted with an eye toward giving effect to all terms in the claim") The Court disagrees; a "source origin" is better read to refer to a *number*, not an *entity*. For the reasons explained at length above, a "source origin confidence metric" is a metric associated with a phone number. It follows that a "source origin" is not an entity making a phone call but instead the phone number that the calling party represents to be the original source of the call.

Next Caller's reliance on certain dependent claims of the '985 and '532 patents is also unavailing. In particular, Next Caller relies on dependent claims 8 and 19 of the '985 patent and dependent claims 25 and 50 of the '532 patent, each of which recites "adjust[ing] . . . the source

7

origin confidence metric based on personal risk factors of an entity associated with the calling party number or billing number." (D.I. 9 at 4-5) Next Caller contends that these claims confirm its position that the "source origin" is the entity making the call and not simply a number. (*Id.*) The Court disagrees. The recited "entity associated with the calling party number" is not necessarily the entity making the call. Indeed, a primary purpose of the invention is to detect spoofed calls – calls in which the entity making the call *is not* the lawful owner of the number being used for the call. (*See, e.g.,* '985 patent, 5:46-52) Thus, as TRUSTID points out, "in these dependent claims, the credibility assessment still focuses on the *number*, not the *entity* that originated the call." (D.I. 82 at 9) (emphasis in original)

Turning to the parties' second dispute, whether the "source origin confidence metric" is limited to a number in a range (such as a probability), as TRUSTID contends, or whether the metric can more broadly encompass any type of determination (such as a binary valid/invalid determination), as Next Caller contends, the Court again agrees with TRUSTID. (*See* D.I. 82 at 10-13; D.I. 99 at 5-6)

The claimed "source origin confidence metric" relates to a number in a range and does not include binary valid/invalid determinations. The specification does not define "source origin confidence metric," and the parties do not contend that the term has an accepted meaning in the art. However, the intrinsic evidence as a whole supports TRUSTID's proposed construction. For instance, in discussing attributes (e.g., the timing and duration between calls) that are used to generate the metric, the specification states:

> [T]hese and other attributes or elements may be used to generate a score or *metric* of the validity of an ANI *or, alternatively*, as a *singular determination* such as "valid" or "invalid" or as a tiered system such as "red," "yellow," "green."

('985 patent, 11:2-6) (emphasis added) As TRUSTID notes, this passage "distinguishes a 'metric' from a 'singular determination' – illustrating that a metric and a determination are two different things."[6] (D.I. 95 at 5; *see also* D.I. 82 at 12) The '532 patent claims support this reading: whereas claim 21 of recites "wherein the source origin confidence metric *is* a probability," claim 22 recites "wherein the source origin confidence metric ***indicates*** either the calling party number or billing number is valid or invalid." That the patentee chose to use "is" in claim 21 but "indicates" in claim 22 supports the conclusion that the "source origin confidence metric" is a number in a range, but is not, in itself, a binary valid/invalid determination (i.e., it may only be an "indication" of validity).

Next Caller's reliance on a dictionary definition of "metric" is unavailing. (*See* D.I. 82 at 12-13) Next Caller notes that Newton's Telecom Dictionary defines "metric" as "[a] benchmark," and points out that "[a] benchmark is either met or it is not." (D.I. 99 at 5-6) Thus, to Next Caller, the dictionary definition of "metric" supports the position that a "source origin confidence metric" could be a binary valid/invalid determination. (*Id.*) But the dictionary definition relied upon by Next Caller is for "metric," not "source origin confidence metric," which is the term being construed. *See Phillips*, 415 F.3d at 1321 (warning that "general-usage" dictionary definitions, which are "divorced from the context" of specification, may conflict with proper construction). Moreover, where, as here, the intrinsic evidence is unambiguous, reliance on extrinsic evidence such as dictionaries is improper. *See Vitronics*, 90 F.3d at 1583.

---

[6] The PTAB, in its Institution Decision, concluded on the basis of this passage that a "source origin confidence metric" does not "encompass[] a binary (valid or invalid) determination." (D.I. 82-1 Ex. 2 at 11) The Court agrees with the PTAB's conclusion.

## B. "consortium information"[7]

The parties originally disputed the construction of the term "consortium information," but now agree that the term should be construed as "aggregated data from multiple external sources." (D.I. 103) The Court will adopt the parties' construction.[8]

## III. CONCLUSION

An appropriate Order follows.

---

[7] The term "consortium information" appears in claim 10 of the '985 patent and claim 27 of the '532 patent.

[8] The Court will also adopt the parties' other agreed-upon constructions. (*See* D.I. 75-1 Ex. A)

10