13:12:40

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


TRUSTID, INC.,                    )
                                  )
              Plaintiff,          )
                                  ) C.A. No. 18-172(MN)
v.                                )
                                  )
NEXT CALLER, INC.,                )
                                  )
              Defendant.          )



              Monday, June 28, 2021
              10:00 a.m.
              Pretrial Conference


              844 King Street
              Wilmington, Delaware



BEFORE:   THE HONORABLE MARYELLEN NOREIKA
          United States District Court Judge



APPEARANCES:


              YOUNG CONAWAY STARGATT & TAYLOR
              BY:  ADAM POFF, ESQ.

              -and-

              STERNE KESSLER GOLDSTEIN & FOX
              BY:  JONATHAN TUMINARO, PhD., ESQ.
              BY:  MICHAEL D. SPECHT, ESQ.
              BY:  BYRON PICKARD, ESQ.
              BY:  DANIEL BLOCK, ESQ.
              BY:  DEIDRE WELLS, ESQ.

                        Counsel for the Plaintiff

1

APPEARANCES CONTINUED:

2

3              MORRIS NICHOLS ARSHT & TUNNELL LLP
               BY:  JACK B. BLUMENFELD, ESQ.
4              BY:  MEGAN DELLINGER, ESQ.
               BY:  CAMERON CLARK, ESQ.
5
               -and-
6
               McDERMOTT WILL & EMERY
7              BY:  SARAH CHAPIN COLUMBIA, ESQ.
               BY:  IAN B. BROOKS, ESQ.
8
                         Counsel for the Defendant
9

10                   _ _ _ _ _ _ _ _ _

11

09:53:49  12

09:53:49  13          THE COURT:  Good morning, everyone.  Please be

10:04:22  14  seated.

10:04:32  15          Let's start with some introductions.

10:04:36  16          MR. POFF:  Good morning, Your Honor.  Adam Poff

10:04:40  17  from Young, Conaway on behalf of TRUSTID.  And with me from

10:04:44  18  Sterne Kessler, Mike Specht, John Tuminaro, Byron Pickard,

10:04:49  19  Daniel Block and Deidre Wells.

10:04:52  20          THE COURT:  Good morning.

10:04:55  21          MR. BLUMENFELD:  Good morning, Your Honor.  Jack

10:04:55  22  Blumenfeld from Morris Nichols for Next Caller.  With me is

10:04:55  23  Sarah Columbia from McDermott Will & Emory and her partner,

10:05:00  24  Mr. Ian Brooks.  Megan Dellinger from Morris Nichols.

10:05:00  25  Behind Ms. Dellinger is Cameron Clark from Morris Nichols.

10:05:11 1    And next to Ms. Clark is Nikki Capitano who is a paralegal

10:05:16 2    at McDermott.

10:05:16 3            THE COURT:  Good morning.  By the way, anyone

10:05:18 4    who is vaccinated if you wish to take off your mask, you

10:05:22 5    may, but you do not have to.

10:05:25 6            All right.  So I just need a minute or two to

10:05:32 7    get my list of issues that we had written.  But let me start

10:05:37 8    with saying in the pretrial order, there were it looked like

10:05:41 9    eighteen claims asserted.  How many are you really planning

10:05:45 10   to go to trial on?

10:05:46 11           MR. TUMINARO:  Your Honor, we have limited that

10:05:48 12   to nine, nine claims.

10:05:50 13           THE COURT:  And does the limitation address any

10:05:55 14   of the issues in any of the motions in limine, the patent

10:06:00 15   that was killed in the PTAB, the claims that were

10:06:04 16   invalidated in the PTAB, are you still asserted those?

10:06:10 17           MR. TUMINARO:  We still are for the '985 Patent,

10:06:13 18   the one that was subject to the PTAB, we're still asserting

10:06:16 19   claim 1 and claim 4, and we can address that if Your Honor

10:06:18 20   would like us to.

10:06:19 21           THE COURT:  No, that's okay.

10:06:21 22           Of your nine claims, you're still asserting two

10:06:23 23   that the Federal Circuit may say are invalid?

10:06:27 24           MR. TUMINARO:  That is correct, Your Honor.

10:06:28 25           THE COURT:  If the Federal Circuit affirms that,

10:06:33  1    what is the effect of that on me?

10:06:35  2            MR. TUMINARO:  If the Federal Circuit were to

10:06:37  3    affirm it would be judicially efficient to move forward on

10:06:41  4    the claim.

10:06:42  5            THE COURT:  That's not my question.  If the

10:06:44  6    Federal Circuit affirms, are those claims dead?

10:06:47  7            MR. TUMINARO:  Those claims would be dead, Your

10:06:49  8    Honor.

10:06:49  9            THE COURT:  All right.  There was a motion to

10:06:50 10    amend the pretrial order.  Does the Defendant really want to

10:06:55 11    push that?

10:06:56 12            MR. BLUMENFELD:  Your Honor, we spoke in the

10:06:57 13    hall and we reached an agreement that we would not oppose

10:07:02 14    them removing paragraph 48 and they would not oppose our

10:07:06 15    removing footnote 2 which had to do with allowing two

10:07:11 16    attorneys to cross-examine a certain witness.  So I think we

10:07:14 17    have resolved both of those issues.

10:07:16 18            THE COURT:  Great.  Okay.  So I'll just deny

10:07:21 19    that motion as moot subject to the agreement that the

10:07:25 20    parties have made.

10:07:30 21            Okay.  Motions in limine.  First one motion to

10:07:37 22    preclude Defendant -- we're going to go Plaintiffs first.

10:07:41 23    Motion to preclude Defendants from raising prior art

10:07:44 24    invalidity defenses from to the '985 Patent.

10:07:51 25            MR. TUMINARO:  Do you want to hear about that,

10:07:53 1     Your Honor?

10:07:53 2                 THE COURT:  Yes.  I don't care about -- there

10:07:55 3     are three references that I understand that the Defendants

10:07:58 4     don't challenge.  Right, Defendant?

10:08:04 5                 MR. BROOKS:  Yes, that's correct, Your Honor.

10:08:06 6                 THE COURT:  All right.  So we're down to three

10:08:09 7     references, two of which were on the face of the patent.

10:08:11 8     Are you all really contending that you couldn't have found

10:08:15 9     those?

10:08:15 10                MR. BROOKS:  No, Your Honor.

10:08:16 11                THE COURT:  Okay.  So really is the only issue

10:08:18 12    here the Goldman reference?

10:08:21 13                MR. BROOKS:  With respect to the prior art, yes,

10:08:23 14    the Goldman reference would be the only issue.

10:08:25 15                THE COURT:  With respect to the prior art, what

10:08:28 16    do you mean?

10:08:28 17                MR. BROOKS:  We also note, Your Honor, it would

10:08:30 18    be fundamentally unfair to allow them to assert claims that

10:08:34 19    they found invalid while also estopping us from --

10:08:38 20                THE COURT:  Yeah, I know that seems weird to me,

10:08:41 21    but we'll get to that.

10:08:42 22                MR. BROOKS:  Okay.

10:08:42 23                THE COURT:  So you're saying than the only issue

10:08:46 24    here on the estoppel, the PTAB estoppel is the Goldman

10:08:51 25    reference?

10:08:56 1                    MR. BROOKS:  Correct, Your Honor.

10:08:56 2                    THE COURT:  All right.  So it's your burden and

10:08:59 3      normally folks put in like a declaration, it doesn't seem

10:09:03 4      like a high burden, but they do something and you guys

10:09:06 5      didn't really do anything, so what's the --

10:09:09 6                    MR. TUMINARO:  With respect to Goldman, Your

10:09:10 7      Honor, we understand that Next Caller has removed that

10:09:14 8      reference as a reference that we're relying on for prior

10:09:17 9      art, we understand that to be moot for Goldman.

10:09:19 10                   THE COURT:  You're moot.

10:09:20 11                   MR. BROOKS:  Your Honor, we have been working

10:09:22 12     with Plaintiffs to try to reach an agreement on the reduced

10:09:24 13     set of prior art.  We have tentatively identified Goldman as

10:09:28 14     one of those references, but we have not entered the

10:09:31 15     agreement.

10:09:31 16                   THE COURT:  I'm going to hold off on dealing

10:09:33 17     with that motion in limine until you guys talk a little bit

10:09:36 18     more and see if this is even really worth me addressing.

10:09:40 19                   Okay.  Next we have motion in limine number 2,

10:09:42 20     to preclude Defendant from calling Tanner Ezell as a witness

10:09:51 21     at trial on the grounds of untimely disclosure.  Okay.  And

10:09:56 22     to exclude statements and information provided by him to

10:10:01 23     Defendant's expert.  All right.

10:10:02 24                   MR. BLOCK:  Yes, Your Honor, good morning.

10:10:07 25                   THE COURT:  Good morning.

10:10:09 1           MR. BLOCK:  My name is Daniel Block.

10:10:12 2           THE COURT:  Mr. Block, go ahead.

10:10:15 3           MR. BLOCK:  With Mr. Ezell there are the three

10:10:17 4   issues you mentioned, first of all his live testimony, if

10:10:20 5   Defendants are not going to call him as a live witness, I

10:10:22 6   think that moots that issue, but with respect to the live

10:10:25 7   testimony, he was not on their Rule 26 disclosures, in fact

10:10:29 8   we never learned about Mr. Ezell until after close of fact

10:10:35 9   discovery.  It was only in the expert reply report that his

10:10:39 10  name came up.  And the declaration that we're talking about

10:10:41 11  here was not served until summary judgment.

10:10:43 12          So with respect to live testimony, I think it

10:10:45 13  would be improper for Next Caller to rely on that because he

10:10:49 14  was never on the disclosure list.  We never had the ability

10:10:52 15  to cross-examine Mr. Ezell, either.  And when we asked for a

10:10:56 16  deposition, they declined.

10:10:57 17          THE COURT:  Okay.

10:10:59 18          MS. COLUMBIA:  Your Honor, in terms of

10:11:01 19  efficiency -- Sarah Columbia for Next Caller.

10:11:04 20          I think the Plaintiffs are aware from our

10:11:06 21  updated witness list we do not intend to call Dr. Ezell at

10:11:12 22  trial.  The only issue is whether Dr. Brody, our experts do,

10:11:16 23  can rely on the information that he gathered from Mr. Ezell.

10:11:20 24          THE COURT:  I guess the question I have is how

10:11:21 25  are they supposed to effectively -- you can sit down.

10:11:25 1  Anybody can sit down when you're talking, just because there

10:11:28 2  is no podium, whatever you're comfortable doing is fine.

10:11:31 3          How are they supposedly cross-examine Dr. Brody

10:11:37 4  with what was said when they don't know -- I mean, if

10:11:41 5  Mr. Ezell came and said the sky is blue or the sky is green,

10:11:46 6  how are they supposed to cross-examine Dr. Brody if they

10:11:50 7  don't -- if they have no access to the underlying facts?

10:11:56 8          MS. COLUMBIA:  So I think there is two answers

10:11:59 9  to that.  Answer one which is spelled out in our short brief

10:12:02 10 is they did have an opportunity --

10:12:04 11         THE COURT:  I know, they had an opportunity to

10:12:05 12 talk with Dr. Brody, but that's not my issue.

10:12:09 13         MS. COLUMBIA:  I apologize, Your Honor.  They

10:12:11 14 had an opportunity, they had the same documents we had.

10:12:13 15         THE COURT:  That one is a loser for you.  Go

10:12:15 16 ahead, what's the second part?

10:12:17 17         MS. COLUMBIA:  They had an opportunity to --

10:12:18 18         THE COURT:  I don't think they really did, but

10:12:20 19 anyway, go ahead.

10:12:21 20         MS. COLUMBIA:  Okay.  And in terms of Dr. Brody,

10:12:24 21 they took his deposition, they asked him questions about

10:12:27 22 what Mr. Ezell, what information he relied on for Mr. Ezell.

10:12:31 23 Their own expert put in a reply report addressing those

10:12:34 24 arguments so there is no prejudice, there is nothing

10:12:37 25 limiting their ability to --

10:12:39 1          THE COURT:  Tell me specifically what it is that

10:12:43 2 Dr. Brody is relying on that Mr. Ezell said that you want to

10:12:49 3 put in so I can understand the whole issue of can they

10:12:53 4 effectively cross-examine Dr. Brody.

10:12:55 5          MS. COLUMBIA:  Understood, Your Honor.

10:12:57 6 Specifically, first of all, I want to be clear, we don't

10:13:00 7 intend for Dr. Brody to essentially republish hearsay so we

10:13:04 8 don't intend for him to say Mr. Ezell told me these things,

10:13:08 9 that would be wrong.  What he did learn from Mr. Ezell,

10:13:11 10 which I think now everybody essentially acknowledges if

10:13:14 11 we're all being honest is that the Dish implementation which

10:13:20 12 is the one that TRUSTID chose to make its representative

10:13:24 13 implementation notwithstanding the fuzzy testimony from the

10:13:28 14 Dish corporate representative was, in fact, implemented in

10:13:33 15 the same general manner as the other customers, that is that

10:13:36 16 the VeriCall system is called after the call is first

10:13:44 17 engaged by the Dish computer system.  I'm trying not to use

10:13:52 18 claim words and so forth.  But I don't think there is any

10:13:55 19 actual dispute about that.  The corporate representative

10:13:59 20 that TRUSTID took the deposition of was unsure.  I know you

10:14:04 21 don't like this argument, but they chose not to press on

10:14:08 22 that.  We chose to find somebody who could answer those

10:14:12 23 questions.  That person did for Dr. Brody --

10:14:16 24          THE COURT:  Why didn't you just make him

10:14:18 25 available for deposition when they asked you to?  Wouldn't

10:14:21 1    that just make things so much easier?  They asked give us a

10:14:25 2    deposition of this guy and you said no.

10:14:28 3                MS. COLUMBIA:  I guess the answer, Your Honor,

10:14:30 4    which you're not going to like is he's not our guy.  There

10:14:34 5    is these things called subpoenas which --

10:14:38 6                THE COURT:  So he's not an employee.

10:14:40 7                MS. COLUMBIA:  He is not an employee, Your

10:14:43 8    Honor.  And one of this reasons he's not coming to testify

10:14:46 9    is because he's not an employee and we determined that his

10:14:49 10   testimony is a very small piece of the pie.  But I

10:14:54 11   understand your position about our -- the history here, but

10:14:58 12   he is not our employee.  There was the opportunity for

10:15:02 13   TRUSTID either to press harder on Dish who didn't provide a

10:15:06 14   corporate representative with adequate knowledge, or to

10:15:11 15   subpoena Mr. Ezell if they wanted to learn more about what

10:15:14 16   he was going to say.

10:15:16 17               THE COURT:  Mr. Block.

10:15:17 18               MR. BLOCK:  Your Honor, first of all, I think

10:15:19 19   just on the outset, I think there is plenty of dispute as

10:15:22 20   you might imagine on these issues on a factual nature --

10:15:26 21               THE COURT:  Yes, but my question is, what is it

10:15:31 22   -- do you want Dr. Brody not to be able to testify about how

10:15:36 23   the system works?

10:15:37 24               MR. BLOCK:  The issue, Your Honor, is that

10:15:41 25   Mr. Ezell testifying I think it cuts to the core of what

10:15:45 1    their non-infringement defense is.  So basically what

10:15:48 2    Dr. Brody's position is going to be effectively is we don't

10:15:52 3    infringe because of what I learned from Mr. Ezell, that's

10:15:56 4    fundamentally what's going on.

10:15:57 5              THE COURT:  Is that right?

10:15:58 6              MS. COLUMBIA:  Not quite, Your Honor, for two

10:16:00 7    reasons.  Reason one is we don't have the burden to prove

10:16:04 8    non-infringement.  They have the burden to prove it.  They

10:16:07 9    chose to take the deposition of Dish, they got someone who

10:16:10 10   didn't know how the Dish system worked, they haven't met

10:16:13 11   their burden of proof.

10:16:14 12             THE COURT:  What I'm trying to figure out is if

10:16:18 13   the testimony, you're saying it was confusing or unclear or

10:16:21 14   he wasn't prepared, but if he testified as to something that

10:16:25 15   is wrong such that if we don't have his testimony we're just

10:16:30 16   going to be dealing with infringement on a misunderstanding

10:16:32 17   of how the system worked, or was he actually really just

10:16:36 18   vague about it?

10:16:37 19             MS. COLUMBIA:  Do you mind if I consult, Your

10:16:39 20   Honor?

10:16:40 21             THE COURT:  No, please, go ahead.

10:16:42 22             MS. COLUMBIA:  So I just wanted to confirm, Your

10:16:48 23   Honor, so I don't make a misstatement to the Court.  I don't

10:16:51 24   think it would be fair to say it's wrong, what he said is,

10:16:55 25   you know, I don't really know, it could be 50/50, maybe it

10:16:58 1   works this way, maybe it works that way.  And so that's why

10:17:03 2   we think in terms of getting to the right results here

10:17:07 3   actually trying this case on how the Dish system does work

10:17:11 4   makes more sense.

10:17:12 5          THE COURT:  So Dr. Brody is going to come in and

10:17:14 6   say look, my understanding of how it works is that you place

10:17:17 7   a call, or whatever, I know there is an issue of when the

10:17:22 8   call is placed.  Okay.  So he's going on to say I understand

10:17:25 9   from this, is he going to rely on anything to support that

10:17:28 10  other than this conversation that he had?

10:17:31 11         MS. COLUMBIA:  It's going to be combined with

10:17:34 12  the documents that we both were provided by Dish and

10:17:37 13  Dr. Brody's expertise having learned from Mr. Ezell how it

10:17:42 14  was implemented at Dish, so it's a combination of

10:17:47 15  Dr. Brody's expertise, the schematics that we have from Dish

10:17:50 16  and learning from Mr. Ezell where in that call flow the Dish

10:17:54 17  system is implemented.

10:17:56 18         THE COURT:  So if you don't have the testimony,

10:18:00 19  or not testimony, if you don't have the conversation with

10:18:02 20  Dr. Ezell, do the documents -- are they not definitive

10:18:12 21  between Dr. Brody's testimony and the documents?

10:18:17 22         MS. COLUMBIA:  I think Dr. Brody would still

10:18:20 23  read those documents the same way.

10:18:22 24         THE COURT:  Like did he get confirmation from

10:18:26 25  Mr. Ezell or can --

10:18:27 1          MS. COLUMBIA:  It would be more in the nature of

10:18:29 2   confirmation, Your Honor, because the Dish witness waffled

10:18:33 3   and said, you know, not sure, Dr. Brody's -- the reliance on

10:18:39 4   Ezell would be more in the nature of confirmation.

10:18:45 5          MR. BLOCK:  Your Honor, I think that for the

10:18:47 6   most part answers the question, right, this is just

10:18:51 7   superfluous in terms of what the diagrams Dr. Brody would

10:18:54 8   point to and have an opinion.  We're dealing with two

10:18:57 9   separate issues here, one is the declaration which is

10:18:59 10  testimonial, which we certainly, we certainly think would be

10:19:03 11  unfair for that to be introduced as evidence that Dr. Brody

10:19:06 12  would point to.

10:19:07 13         MS. COLUMBIA:  We had no intention of trying to

10:19:09 14  introduced an uncross-examined declaration into the record.

10:19:14 15         MR. BLOCK:  That solves that.

10:19:16 16         THE COURT:  That's one of the reasons --

10:19:19 17         MR. BLOCK:  That's one which is good in terms of

10:19:22 18  the conversation, but again I think because of the technical

10:19:24 19  nature of this --

10:19:25 20         THE COURT:  Why didn't you follow-up if the Dish

10:19:28 21  witness said maybe it works this way, maybe it works that

10:19:31 22  way?

10:19:33 23         MR. BLOCK:  Because with all due respect to my

10:19:35 24  colleagues, I think that's a mischaracterization of what the

10:19:38 25  Dish Network person testified to.  Yes, during

10:19:41 1    cross-examination he said something like 50/50, but on

10:19:44 2    redirect when he was asked the question again, he said

10:19:46 3    something like actually I'm a lot more certain about how

10:19:49 4    that operates.  So I disagree with this idea that he was

10:19:53 5    wishy washy if you will in terms of how this works because

10:19:56 6    he clarified on redirect on what his certainty level was.

10:20:00 7         THE COURT:  What if I were to ask you,

10:20:02 8    Ms. Columbia, if Mr. Ezell could be made available for

10:20:05 9    deposition, a short one?

10:20:07 10        MS. COLUMBIA:  I have an e-mail address for

10:20:10 11   Mr. Ezell and I could certainly attempt to reach him to make

10:20:15 12   him available.  I don't want to make representations to the

10:20:19 13   Court because I don't have any information to tell me

10:20:23 14   whether he would make himself available.  And I don't

10:20:28 15   believe he's within this Court's subpoena power.

10:20:31 16        THE COURT:  Okay.  I think what I am going to do

10:20:35 17   is if he can be made available for a deposition this week,

10:20:47 18   then I will deny the motion.  If he can't, I will reconsider

10:20:53 19   and I may grant the motion with respect to Dr. Brody.  I

10:20:57 20   just think that if it's not entirely clear from the document

10:21:00 21   how it works and we have one person who is testifying it's

10:21:04 22   one way and another person who gave an off-the-record

10:21:06 23   conversation that it worked a different way, and that person

10:21:12 24   was not made available for a deposition, I think that it may

10:21:16 25   be that that is inappropriate and comes too late.  But why

10:21:23 1   don't you see if Mr. Ezell will be made available for a

10:21:27 2   deposition.  I would limit that deposition to two hours, and

10:21:31 3   it may be done remotely, whatever is convenient to him.

10:21:36 4          MS. COLUMBIA:  Thank you, Your Honor.

10:21:37 5          MR. BLOCK:  Thank you, Your Honor.

10:21:41 6          THE COURT:  Motion in limine number 3, to

10:21:43 7   exclude Next Caller's referencing prior litigation during

10:21:49 8   trial.

10:21:49 9          MR. TUMINARO:  Thank you, Your Honor.  John

10:21:51 10  Tuminaro.  We're seeking to exclude two very specific

10:21:54 11  things.  First, a reference to the outcome or decisions from

10:21:58 12  that Colorado trial, and number two, any suggestion that the

10:22:02 13  jury verdict there would support findings here.  And we

10:22:06 14  believe that decision should be made now and not deferred

10:22:11 15  until trial because any mention of that Colorado action

10:22:14 16  would be prejudicial and that prejudice couldn't be cured.

10:22:18 17  We note that there are some overlapping documents, we

10:22:23 18  believe like documents and potential testimony from that

10:22:28 19  jury trial would be relevant here, so using those documents

10:22:32 20  or admitting them here would not necessarily open the door

10:22:36 21  to allow Next Caller to reference the jury's verdict in the

10:22:40 22  Colorado case.  This jury's verdict here, in this Delaware

10:22:45 23  case needs to be decided based on the facts here.

10:22:50 24          THE COURT:  Who has this one?

10:22:51 25          MR. BLUMENFELD:  Your Honor, I do.  And we're

10:22:53 1    not asking you to rule that the verdict from Colorado can

10:22:57 2    come in, we're not intending to put the verdict from

10:22:59 3    Colorado in.  All we're asking is that you leave this issue

10:23:04 4    open until we see how the trial develops.  And we have a

10:23:09 5    concern here and the concern I think is very real, which is

10:23:13 6    they're going to try to take, if we're reading things

10:23:17 7    correctly, a patent false advertising case and turn it into

10:23:22 8    a mud slinging as we said in our paper case and start

10:23:25 9    accusing people of lying, cheating, stealing, whatever.

10:23:29 10   When we said that in our response brief I was surprised they

10:23:33 11   didn't come back in their reply and say no, we're not going

10:23:36 12   to do that.  All we're asking you to do is to see how the

10:23:39 13   evidence develops.  We don't have any intention to do this,

10:23:43 14   but if they open the door, we want to be free to do it and

10:23:47 15   not have a ruling that no, I already told you you can't do

10:23:51 16   that.

10:23:51 17          THE COURT:  So what happens -- I think what

10:23:54 18   they're afraid of and what concerns me a little bit is

10:23:57 19   someone is being cross-examined and someone decides well,

10:24:02 20   they made it relevant so you're going to ask in front of the

10:24:06 21   jury, you already lost that case, is that going to happen or

10:24:10 22   can I get an agreement that before that is done, that will

10:24:14 23   be raised with the Court so we can make -- I can make that

10:24:14 24   determination?

10:24:19 25          MR. BLUMENFELD:  Absolutely, Your Honor.  They

10:24:21 1    only have one fact witness, Mr. Cox.  If Mr. Cox opens, in

10:24:26 2    our view opens that up and I want to ask or we want to ask

10:24:31 3    on cross-examination about something that happened in

10:24:34 4    Colorado, we absolutely will ask for a side-bar and raise

10:24:38 5    that with you before we do that.

10:24:39 6            THE COURT:  All right.  And that's the same if

10:24:42 7    anyone wanted to ask an expert that, too.

10:24:44 8            MR. BLUMENFELD:  An expert or one of our

10:24:47 9    witnesses.

10:24:47 10           THE COURT:  Or a reference to it in openings or

10:24:49 11   closing, anything like that.

10:24:51 12           MR. BLUMENFELD:  Correct, Your Honor, we will

10:24:52 13   not do that without raising it with you.

10:24:54 14           MR. TUMINARO:  Your Honor, we think they could

10:24:56 15   certainly use the trial testimony for impeachment purposes

10:25:00 16   but not reference the Colorado action itself.

10:25:03 17           THE COURT:  Your concern is that they will let

10:25:06 18   the, I don't even know what it is, horse out of the barn,

10:25:13 19   cat out of the bag, whatever it is, in front of the jury,

10:25:16 20   right, and we just had a representation that they will not

10:25:18 21   do so prior to if they think that you guys have opened the

10:25:22 22   door, they won't do so until confirming that.  Doesn't that

10:25:26 23   alleviate your concern?

10:25:31 24           MR. TUMINARO:  I think that does alleviate, as

10:25:34 25   long as they don't raise it before confirming with Your

10:25:37 1    Honor.

10:25:37 2              THE COURT:  Okay.  So I think we have that

10:25:39 3    agreement and with that I will deny the motion because I do

10:25:43 4    think it could come in, but as I said, it should not come in

10:25:47 5    until I have made a ruling on specific questions or issues.

10:25:51 6    Okay.

10:25:53 7              Now we get to Defendant's motion in limine

10:25:56 8    number 1 to preclude assertion of claims 1, 3 and 4, and I

10:26:04 9    guess now it's just 1 and 4.

10:26:07 10             MR. BROOKS:  That's correct, Your Honor.

10:26:09 11             MR. TUMINARO:  That's correct, Your Honor, just

10:26:10 12    1 and 4.

10:26:11 13             THE COURT:  Of the '985 Patent because they have

10:26:14 14    been deemed unpatentable by the PTAB.  All right.  So as I

10:26:21 15    understand it, I'm just trying to understand the ins and

10:26:25 16    outs of this before I get into the law on collateral

10:26:28 17    estoppel.

10:26:30 18             For the Plaintiff, if I deny the motion and

10:26:32 19    allow trial to proceed on these two claims and the jury

10:26:36 20    finds they're invalid, and the jury finds they are valid and

10:26:40 21    infringed, and Federal Circuit affirms the IPR, what

10:26:44 22    happens, those claims are invalid?

10:26:47 23             MR. TUMINARO:  The verdict couldn't stand on

10:26:49 24    those claims, but it could potentially -- you know, we could

10:26:52 25    have a verdict on other claims as well, the verdict could

10:26:55  1    stand on those other claims.

10:27:10  2               THE COURT:  What about damages, how would we

10:27:12  3    separate out damages if as you say the verdict could stand

10:27:16  4    on other claims but not these?

10:27:18  5               MR. TUMINARO:  Damages are not necessarily based

10:27:21  6    on a claim-by-claim analysis of infringement.  It's based on

10:27:24  7    the case being the number of infringing calls, so the calls

10:27:28  8    were found to be infringing those patents, the damages would

10:27:31  9    stand based on --

10:27:33 10               THE COURT:  So your expert is going to testify

10:27:35 11    that the damages are the same whether one or nine claims are

10:27:39 12    infringed and valid?

10:27:41 13               MR. TUMINARO:  That's correct, Your Honor, based

10:27:42 14    on the -- the damages base are the number of infringing

10:27:47 15    claims, infringing calls.

10:27:52 16               THE COURT:  Okay.  For you, that's enough for

10:27:54 17    right now.

10:27:55 18               Now over here to the Defendant, what happens if

10:27:58 19    I grant the motion, the claims are not asserted in the trial

10:28:02 20    and the Federal Circuit reverses, do I get to have a second

10:28:02 21    trial?

10:28:11 22               MR. BROOKS:  Yes, Your Honor.

10:28:11 23               THE COURT:  I heard the whisper, so thank you

10:28:17 24    for confirming that one.

10:28:20 25               Okay.  So if I don't -- if I grant the motion

10:28:28 1   and we get a verdict here, does that mean that we don't have

10:28:31 2   a final judgment until that second trial concludes?

10:28:39 3              MR. BROOKS:  I believe that that's correct, Your

10:28:42 4   Honor.

10:28:43 5              THE COURT:  Okay.  And then I guess in getting

10:28:46 6   to the collateral estoppel point, you all are finding over

10:28:52 7   whether it's a final -- whether we have a final decision,

10:28:59 8   but is it the same issue if I have different legal standards

10:29:05 9   that were used before the PTAB and that will be used here?

10:29:09 10             MR. BROOKS:  So the legal standard issue does

10:29:13 11  not apply here because of the statutory scheme of an IPR

10:29:17 12  which was intended to be in place of district court

10:29:21 13  litigation.  This issue was discussed by the *Intellectual*

10:29:27 14  *Ventures v. Lenovo*, Mass 256.  And the fact of the matter is

10:29:32 15  once the claims have been found unpatentable at the PTAB,

10:29:35 16  the Patent Office is to issue a certificate cancelling the

10:29:40 17  claims, so therefore the difference in the standard does not

10:29:45 18  apply here as it would in other cases.

10:29:52 19             THE COURT:  All right.  Tell me, then, about the

10:29:57 20  issue with respect to Third Circuit versus the Federal

10:30:01 21  Circuit law.

10:30:02 22             MR. BROOKS:  So I think it's quite clear, Your

10:30:04 23  Honor, that the Federal Circuit issues that are exclusive to

10:30:08 24  patent law are to be decided based upon the regional circuit

10:30:12 25  law.  And the number of cases we have cited, the *Pharmacia*

10:30:15 1      case stated that that's a Federal Circuit case stated that

10:30:20 2      the finality of judgment is not within the exclusive

10:30:23 3      jurisdiction of the Federal Circuit.  Similarly *Intellectual*

10:30:31 4      *Ventures v. Lenovo* talk about the same thing.  We're not

10:30:32 5      talking about a substantive issue of patent law talking

10:30:37 6      about whether the judgment is final at the PTAB, therefore

10:30:39 7      the Third Circuit would apply.

10:30:41 8              THE COURT:  What if the Federal Circuit law

10:30:44 9      applies or I determine that Federal Circuit law applies,

10:30:46 10     what's your argument then?

10:30:48 11             MR. BROOKS:  I believe that this would still be

10:30:50 12     a final judgment based upon the cases that we've referred

10:30:55 13     to.

10:30:57 14             THE COURT:  Do you want to give me a little bit

10:31:00 15     more than that?

10:31:02 16             MR. BROOKS:  I don't want to take too much time

10:31:05 17     on that, but the *Pabst Licensing* case, and I think that

10:31:13 18     there is also *Pabst Licensing* case, Your Honor.

10:31:46 19             THE COURT:  What about, so tell me what in the

10:31:50 20     Federal Circuit case law suggest that the PTAB's final

10:32:01 21     written decision is a final judgment.

10:32:13 22             MR. BROOKS:  So in instances where a district

10:32:17 23     court or an administration agency such as the PTAB finds a

10:32:22 24     patent invalid.

10:32:23 25             THE COURT:  District Court I know, but the PTAB

10:32:26 1    is where I'm having trouble because there are cases in the

10:32:29 2    Federal Circuit that suggest that it's the affirmance of the

10:32:34 3    invalidity finding that has a collateral estoppel effect.

10:32:41 4            MR. BROOKS:  There are certainly a number of

10:32:42 5    cases suggesting that upon affirmance that finding is final.

10:32:48 6    I would submit that those cases do not directly address the

10:32:52 7    question of finality absent the appeal.

10:33:00 8            THE COURT:  All right.  And let me understand

10:33:03 9    from the Plaintiff's point of view, so you have claims that

10:33:06 10   have been found to be invalid on a final written decision.

10:33:11 11   There is an appeal where the Federal Circuit has heard

10:33:15 12   argument so those claims could be -- that decision can come

10:33:18 13   out at any point.  Right?

10:33:20 14           MR. TUMINARO:  Yes, Your Honor.

10:33:21 15           THE COURT:  And for those claims you want to

10:33:23 16   preclude them from raising prior art defenses so we have

10:33:28 17   invalid claims that you want to say they can't come in here

10:33:31 18   and challenge in front of the jury based on prior art that

10:33:34 19   we all know has invalidated those claims, right?

10:33:37 20           MR. TUMINARO:  The reason for that is the

10:33:39 21   statute, 315(e) --

10:33:41 22           THE COURT:  Totally understand, totally

10:33:43 23   understand that that's what the statute says, and I don't

10:33:46 24   think that the statute actually contemplated that we would

10:33:49 25   be in the situation that we're in here where you're having

10:33:52 1   the trial on invalid claims.  Because I think they assumed

10:33:57 2   that litigation would stay in the district court, but that's

10:34:02 3   not where we are.  I mean, is there any case that you can

10:34:05 4   tell me where this has happened and the court has gone

10:34:11 5   forward with the claims where essentially we have invalid

10:34:17 6   claims, yet you are precluding the defendant from defending

10:34:23 7   itself?

10:34:24 8            MR. TUMINARO:  I believe the *Sanofi-Aventis* case

10:34:28 9   that we cited out of the District of New Jersey, I believe

10:34:31 10   that is an example of a case that they are talking about,

10:34:34 11   that's 2019 --

10:34:36 12            THE COURT:  Did that go in front of a jury?

10:34:39 13            MR. TUMINARO:  As I stand here right now, I

10:34:40 14   don't know the answer to that, Your Honor.  But I will say

10:34:43 15   in terms of claim 1, the claim that was confirmed by the

10:34:49 16   PTAB is claim 10, that's a dependent claim.  So the jury

10:34:52 17   will have to hear about claim 1 because claim 10 depends

10:34:56 18   from claim 1 so just as a matter of judicial efficiency it

10:35:00 19   would be efficient for us to be able to also present claim 1

10:35:05 20   to the jury, really the main difference there would be

10:35:08 21   whether claim 1 appears on the verdict form or not because

10:35:10 22   the jury is going to have to hear about it anyway and claim

10:35:12 23   4 is also the dependent claim and the amount of time it

10:35:12 24   would take to present that claim would be a matter of

10:35:12 25   minutes --

10:35:19 1                THE COURT:  I'm sorry.  I get it, you're saying

10:35:22 2     judicial efficiency.  I don't think it's necessarily

10:35:26 3     efficient to confuse a jury.  Do you?

10:35:27 4                MR. TUMINARO:  I don't think it's efficient to

10:35:29 5     confuse the jury, that's not our intent to confuse the jury,

10:35:33 6     Your Honor.  The PTAB was set up as an alternative venue, an

10:35:39 7     alternative place for defendants to have the validity of a

10:35:43 8     patent adjudicated and that's what Next Caller chose to do

10:35:47 9     here.  And now they should be bound by the choices that they

10:35:51 10    made.

10:35:51 11               THE COURT:  Yes, but you don't want to be bound

10:35:53 12    by the decision from that choice, right?

10:35:56 13               MR. TUMINARO:  We didn't make that choice to go

10:35:58 14    to the PTAB, we came here to have our claim adjudicated

10:36:03 15    here.  They chose to raise the PTAB challenge.  And again,

10:36:10 16    the difference between the finality, the finality here, the

10:36:14 17    PTAB's decision is not final because the differing

10:36:19 18    standards, that's the B & B Hardware case out of the Supreme

10:36:23 19    Court that we cited, and Federal Circuit law does apply

10:36:27 20    here.  And every case that we're aware of, we haven't found

10:36:30 21    a Federal Circuit case where collateral estoppel was applied

10:36:34 22    without having an affirmance, where there were appeal rights

10:36:38 23    that were not exhausted from the PTAB, we haven't found a

10:36:42 24    single case where the Federal Circuit has found collateral

10:36:47 25    estoppel and Next Caller has not cited any, either.

10:36:49  1          THE COURT:  I mean, why do you need to assert

10:36:54  2   these claims that are just going to confuse the jury because

10:36:58  3   they don't have a defense of invalidity even though we're

10:37:01  4   all sitting here knowing that those claims have been found

10:37:04  5   to be invalid?  I don't understand why you're doing that.

10:37:09  6          MR. TUMINARO:  Claim 1 the jury will hear about.

10:37:11  7          THE COURT:  I get it, but you don't have to have

10:37:14  8   claim 1 on the verdict form, you don't have to have the jury

10:37:17  9   being asked have they proved that claim 1 is invalid.

10:37:21 10          MR. TUMINARO:  You're right, but simply as a

10:37:24 11   matter of judicial efficiency, as you mentioned, the Federal

10:37:27 12   Circuit can come back sometime a week after trial and say

10:37:30 13   reverse those claims and find those claims to be valid, so

10:37:34 14   as a matter of judicial efficiency it makes sense just to go

10:37:38 15   forward with those claims to the jury.

10:37:41 16          THE COURT:  And if the Federal Circuit comes

10:37:43 17   back today or tomorrow and affirms, you're not going to go

10:37:48 18   back and increase the number of claims, you're going to be

10:37:51 19   stuck with seven then, right?

10:37:52 20          MR. TUMINARO:  That's correct, Your Honor.

10:37:52 21          THE COURT:  I'm going to reserve on this one

10:37:56 22   while we go back and look at some more of the case law.

10:38:02 23          Okay.  Defendant's motion in limine number 2,

10:38:07 24   precluding testimony or argument suggesting the Defendants

10:38:08 25   have a policy of lying.  Who has that one?  Two documents

10:38:16 1  and you have a policy.

10:38:17 2              MR. BLUMENFELD:  Right.  That really is the

10:38:18 3  issue.  I think there are two issues, Your Honor.  One is

10:38:21 4  with Data Peddler's handbook which is attached to our

10:38:25 5  motion.  It's a twenty-page document with all kinds of --

10:38:30 6              THE COURT:  Is that a sales document?

10:38:32 7              MR. BLUMENFELD:  It's a document which is given

10:38:34 8  to sales development, they're SDR sales development

10:38:40 9  something.  They are people who make cold calls, they sit

10:38:43 10 and they try to get other people appointments.  They don't

10:38:47 11 talk about our product.  They don't talk about IVR

10:38:51 12 containment.  They don't talk about when calls are answered.

10:38:56 13 They try to get in the door.  One line at the end I think on

10:38:59 14 page 20 or 21, that says "lie within reason" and then it's

10:39:03 15 talking about things if you read the whole thing, tell them

10:39:05 16 you're a Boston Red Socks fan if their LinkedIn page shows

10:39:11 17 that they live in Boston and things like that.  There is one

10:39:15 18 e-mail in addition to that.  The Data Peddler handbook --

10:39:19 19             THE COURT:  The e-mail one is really, come on,

10:39:21 20 that's actually the issue that's the subject of the false

10:39:25 21 advertising claim; right?

10:39:27 22             MR. BLUMENFELD:  It actually goes to the IVR

10:39:30 23 containment issue, so it's different, but is it a basis to

10:39:34 24 say they have a policy of lying, they have a culture of

10:39:36 25 lying?  That's the big concern here.  So they're trying to

10:39:39 1    take these two documents and say culture of lying.  And the

10:39:43 2    Data Peddler's handbook really is pretty peripheral.  It has

10:39:47 3    nothing to do with the patent issues, it has nothing do with

10:39:50 4    the false advertising issues.  And they're trying to play it

10:39:53 5    into something that it isn't.  We think that's a real 403

10:39:57 6    issue.  And we don't think it should get into evidence, but

10:40:01 7    if it does get into evidence, we certainly don't think they

10:40:03 8    should be able to stand there and point to it and say look

10:40:06 9    at that, ladies and gentlemen, they have a culture of lying,

10:40:09 10   they have a policy of lying, because that document just

10:40:11 11   doesn't say that.  And they're really taking one line and

10:40:14 12   making it into something that it isn't.

10:40:22 13              MR. PICKARD:  This is Mr. Pickard.  I guess I'll

10:40:26 14   focus on the Data Peddler's handbook just to reorient the

10:40:31 15   Court.

10:40:31 16              THE COURT:  Are you really going to say they

10:40:33 17   have a policy of lying based on those?

10:40:36 18              MR. PICKARD:  I'm not sure how we're going to

10:40:38 19   argue about the evidence.

10:40:39 20              THE COURT:  I'm going to take that as a yes, you

10:40:41 21   want to argue that that is a policy of lying.

10:40:44 22              MR. PICKARD:  The reason I say that,

10:40:45 23   Mr. Roncoroni, the president of the company testified at the

10:40:50 24   Colorado trial about the handbook and first learned about

10:40:52 25   that statement when we deposed him in one of the two cases.

10:40:55 1    He immediately ran back and thought it was a terrible thing

10:40:58 2    and get it off the books.  And I believe the reason it was

10:41:02 3    not a good thing for the company to have done that is that

10:41:05 4    handbook is the tool they used to train their people on how

10:41:07 5    to sell their product.

10:41:09 6         THE COURT:  What does that have to do with this

10:41:11 7    case?

10:41:11 8         MR. PICKARD:  I think it tends to show

10:41:13 9    willfulness or deliberateness in false advertising.

10:41:16 10        THE COURT:  This statement doesn't have anything

10:41:18 11   to do with the particular false advertising claims you're

10:41:22 12   making?

10:41:22 13        MR. PICKARD:  Respectfully it shows that they do

10:41:25 14   have a policy to lie and that they are -- they are not

10:41:29 15   concerned about being truthful with their customer.  And if

10:41:32 16   we can show the jury that they're willful and deliberate

10:41:36 17   that gives rise under the Lanham Act with respect to

10:41:40 18   causation and confusion of the consuming public.  With

10:41:44 19   respect to the argument, we need to see how the evidence

10:41:48 20   comes in.  We think it's directly relevant to the false

10:41:52 21   advertising claims in this case.

10:41:54 22        THE COURT:  All right.  So Defendant moves to

10:41:57 23   preclude two pieces of evidence, Exhibit 1 which is the Data

10:42:00 24   Peddler's handbook, and Exhibit 2, an e-mail exchange

10:42:02 25   between Next Caller employees.  I'm going to grant the

10:42:12 1  motion as to Exhibit 1 and deny it as to Exhibit 2.  I do

10:42:17 2  not find Exhibit 1 to be particularly relevant to the case.

10:42:21 3  The handbook suggest that Next Caller employees may have

10:42:24 4  lied in claiming personal connections with prospective

10:42:30 5  customers, the connection being between that and the false

10:42:33 6  advertising claims in this case which is tenuous and I do

10:42:37 7  not think that these two exhibits even taken together amount

10:42:40 8  to a policy of lying.  To the extent that the document is

10:42:43 9  relevant, the probative value is substantially outweighed by

10:42:47 10  the risk of unfair prejudice and confusing the issues for

10:42:51 11  the jury, so I will grant the motion as to that document.

10:42:54 12          Exhibit 2, however, is directly relative to

10:42:57 13  Plaintiff's false advertising claim in that it makes it more

10:43:00 14  likely that the Defendant fabricated the ten percent IVR

10:43:04 15  containment rate number at issue in the false advertising

10:43:08 16  claims.  I do not think that the risk of prejudice

10:43:10 17  substantially outweighs the substantive probative value of

10:43:14 18  Exhibit 2, so I am going to deny the motion as to that

10:43:18 19  document.

10:43:18 20          But again, I do not think that this is

10:43:20 21  sufficient to claim a policy of lying without more.  So

10:43:22 22  unless Plaintiff has other evidence which it may obtain at

10:43:22 23  trial I suppose suggesting an ongoing policy of lying, I

10:43:30 24  will allow you to put Exhibit 2 into evidence, but I'm not

10:43:32 25  going to allow you to argue that there is a policy of lying

10:43:42 1    without more than Exhibit 2.

10:43:45 2            Motion in limine number three, to preclude

10:43:49 3    Plaintiff from presenting untimely infringement contentions.

10:43:57 4            MR. BROOKS:   Ian Brooks.   There is really two

10:44:00 5    issues here, the agent answer and then the second call

10:44:02 6    theory.   I'll take the first one.   The issue with the agent

10:44:05 7    answer is that it's really contrary to the Court's claim

10:44:08 8    construction of is answered, both of the patents, the

10:44:12 9    remaining asserted dependent claims use the phrase before

10:44:16 10   the incoming call is answered, the Court has construed is

10:44:20 11   answered to mean actually or virtually goes off hook.   In

10:44:24 12   each instance, when an agent would answer the call, the

10:44:28 13   incoming call has already gone off hook.   And so pointing

10:44:35 14   to -- as TRUSTID admits in their brief, they're pointing to

10:44:38 15   a separate call, not the call that I make as a consumer

10:44:42 16   trying to reach a business, that would be incoming call,

10:44:45 17   that call as has been referred to earlier, it goes off hook

10:44:49 18   by a computer system as it calls each of the customers and

10:44:54 19   the subsequent call, the call may subsequently go to an

10:44:57 20   agent or not.   So that's the issue with the agent answer

10:45:00 21   theory.

10:45:01 22           With respect to the second call theory, this is

10:45:03 23   a theory that Mr. Bress presented at his deposition the last

10:45:08 24   day of expert discovery.   If you look at his expert reports,

10:45:11 25   there is no mention of a second call or the fact that there

10:45:16  1    are two calls and he's analyzing the second one which is

10:45:20  2    not, again, the incoming call, but a subsequent call after a

10:45:24  3    call has been made to the business and then it is in some

10:45:28  4    instances optionally transferred to the agent.

10:45:31  5              THE COURT:  Let's take those in reverse order

10:45:34  6    over here.  Second call theory, where was it disclosed prior

10:45:43  7    to the deposition at the last day of discovery?

10:45:46  8              MR. PICKARD:  It's in our final infringement

10:45:50  9    contentions, Your Honor.

10:45:50 10              THE COURT:  Where was it disclosed by your

10:45:52 11    expert?

10:45:52 12              MR. PICKARD:  As well as in his expert report.

10:45:55 13              THE COURT:  Show me a reference.

10:45:59 14              MR. PICKARD:  Thank you for the Court's

10:48:17 15    indulgence there.

10:48:18 16              THE COURT:  I would have thought you would have

10:48:20 17    it handy if you were going to make that statement.

10:48:22 18              MR. PICKARD:  Your Honor, first of all we submit

10:48:25 19    that there is one and only one theory about the agent

10:48:28 20    answering the call, but to answer Your Honor's question --

10:48:30 21              THE COURT:  Does that mean that the second call

10:48:32 22    theory is not one that you're going to be presenting to the

10:48:35 23    jury?

10:48:36 24              MR. PICKARD:  Our point is they're the same

10:48:38 25    theory.   The theory is there is one call, the connection and

10:48:40 1    that's between the calling party and the connection to the

10:48:44 2    agent.   And the agent goes off hook the moment he or she

10:48:50 3    takes the phone off the hook or does it virtually with the

10:48:53 4    computer system.   That's the agent answer theory and that's

10:48:56 5    what they're calling, not what we're calling the two-call

10:49:00 6    theory.

10:49:01 7            THE COURT:   I still need you to show me where

10:49:03 8    this is disclosed and tell these folks where it's disclosed

10:49:08 9    so that someone can make an argument to me because right now

10:49:12 10   you're saying he talked about it, and they're saying he

10:49:16 11   didn't talk about it, so I need a little proof.

10:49:19 12           MR. PICKARD:   We cited in our brief at

10:49:21 13   paragraph 203 --

10:49:23 14           THE COURT:   I need the report.   I need the

10:49:25 15   expert report.   Give me a copy, show me where it is.   I

10:49:57 16   think it's 73, tell me where it is.

10:50:03 17           MR. PICKARD:   Paragraph 203, Your Honor.

10:50:15 18           THE COURT:   What I have here goes from

10:50:17 19   paragraph 192 to paragraph 260.

10:50:27 20           MR. PICKARD:   It looks like we cited two or

10:50:22 21   three, but somehow that portion --

10:50:31 22           THE COURT:   Then you got to give me a copy of

10:50:33 23   it.

10:50:33 24           MR. TUMINARO:   Your Honor, I have a copy on my

10:50:42 25   iPad I can provide to you.   I don't have a complete copy

10:50:45 1    with me right now.

10:50:46 2                    THE COURT:  Does anyone have copies?

10:50:48 3                    MR. BROOKS:  We do not, Your Honor.

10:50:51 4                    THE COURT:  Someone want to read me

10:50:56 5    paragraph 203.

10:51:01 6                    MR. PICKARD:  Your Honor, the relevant portion

10:51:03 7    of 203, it's, "Furthermore, Next Caller --

10:51:06 8                    THE COURT:  You got to read slowly because I'm

10:51:09 9    not reading along.  Go ahead.

10:51:12 10                   MR. PICKARD:  "Furthermore, Next Caller's

10:51:14 11   customers IVR systems gather 'operational status

10:51:21 12   information' before a call is answered because the IVR

10:51:25 13   cannot answer a call (e.g. send a 200 okay message) without

10:51:35 14   versus receiving an invite request containing 'operational

10:51:40 15   status information."

10:51:42 16                   And what Mr. Bress is saying there it's not the

10:51:46 17   IVR answering, it's the agent answering, is the relevant

10:51:51 18   connection for that infringement theory.

10:51:52 19                   THE COURT:  Mr. Brooks.

10:51:52 20                   MR. BROOKS:  Respectfully, Your Honor, I don't

10:51:52 21   believe that provides any indication that he's identifying a

10:51:58 22   second call saying there is one call from the caller to this

10:52:02 23   IVR and then a subsequent call from the caller to the agent.

10:52:06 24                   THE COURT:  Do you agree that he can say what

10:52:06 25   was just read to me at trial?

10:52:13 1          MR. BROOKS:  He can say what was just read to

10:52:15 2      you, yes.

10:52:16 3          THE COURT:  So the reason I'm asking, let's say

10:52:18 4      I agree with you that whatever the second -- whatever he

10:52:23 5      said at the deposition that you say you're calling a second

10:52:26 6      caller is out, it doesn't seem like I can -- they're saying

10:52:31 7      no, our theory is what he just read to me as disclosed.  Am

10:52:37 8      I going to be getting arguments from you saying whoa, whoa,

10:52:41 9      you said second caller now and they're saying no, no, no,

10:52:44 10     you're just calling it a second caller, but we always mean

10:52:48 11     the same thing.

10:52:48 12         MR. BROOKS:  With respect to that issue, no,

10:52:50 13     there is still the concern about his agent answer theory as

10:52:55 14     if they're articulating it as the same as the second call

10:52:58 15     theory, it's inconsistent with the Court's claim

10:53:03 16     construction of is answered because you're not talking about

10:53:06 17     the incoming call at that point, it's another call.

10:53:10 18         MR. PICKARD:  Your Honor, if I may, Exhibit 4 on

10:53:13 19     to the motion has a portion --

10:53:15 20         THE COURT:  Yeah, I know, but it doesn't have

10:53:17 21     203.

10:53:18 22         MR. PICKARD:  It does have 85 which I think more

10:53:21 23     clearly states the theory.  And I'm looking about three

10:53:27 24     sentencing down Mr. Bress says, When an agent answers an

10:53:31 25     incoming call using a telephonic device, the call goes off

the hook as discussed in more detail below.  And confirming

Next Caller's customers corporate representative, VeriCall

confidence board is always calculated in return prior to the

agent answering the call.  That is our infringement theory,

one and only one, they give the same theory two names in

their briefing.

          THE COURT:  What are you saying about the

argument that that's inconsistent with my claim

construction, why is that an infringement issue and not a

claim construction issue?

          MR. PICKARD:  Well, I think I understand Your

Honor's question.  The way --

          THE COURT:  That's their argument, I think, that

they're saying your argument is inconsistent.

          MR. PICKARD:  They don't explain why in the

brief.  I don't know what they're getting at, but our theory

is consistent with Your Honor's claim construction, a call

according to the agreed construction is connection, and here

is the connection between the calling party and the agent,

there is a connection made there.  Mr. Bress' deposition

explained why that's the case as well as his reports.  And

then the call is answered when it goes off hook actually

virtually and that's what happens when the agent actually or

virtually picks up the phone to engage with the calling

party.

10:54:58 1            MR. BROOKS:  Your Honor, the definition of call

10:55:01 2    as in connection is unhelpful because the claim language is

10:55:05 3    the incoming call, and what is required is that the incoming

10:55:10 4    call goes off hook, when an agent answers the call as

10:55:15 5    expressed by Mr. Bress, that incoming call has already gone

10:55:20 6    off hook.

10:55:22 7            THE COURT:  Why isn't that just a factual issue?

10:55:26 8            MR. BROOKS:  Because the claim requires that the

10:55:31 9    analysis be formed before the incoming call actually or

10:55:36 10   virtually goes off hook, and by reading the claim to cover

10:55:40 11   an agent answering, we are ignoring that the claim requires

10:55:44 12   before the incoming actual actually or virtually goes off

10:55:52 13   hook.

10:55:53 14           THE COURT:  All right.  Defendant seeks to

10:55:55 15   preclude Plaintiff from presenting two infringement

10:55:58 16   theories, the agent answer theory and the second call

10:56:01 17   theory, arguing that they are inconsistent with the

10:56:03 18   construction of answer and would confuse the jury that they

10:56:09 19   were untimely disclosed and prejudicial.

10:56:12 20           As to the agent answer theory, it seems

10:56:15 21   undisputed that this theory was timely disclosed.  Plaintiff

10:56:20 22   included the theory in its final infringement contentions

10:56:24 23   served before the close of fact discovery and Defendant had

10:56:26 24   the opportunity to respond to this theory in its expert

10:56:29 25   report.  Defendant argues that the theory is inconsistent

10:56:32 1   with the Court's claim construction of answer because there

10:56:35 2   is a mismatch between the relevant claims and the accused

10:56:38 3   implementations.  This seems to be a non-infringement issue

10:56:42 4   rather than claim construction and is not a reason to

10:56:45 5   preclude Plaintiff from representing an infringement theory

10:56:49 6   which was untimely disclosed.  I'm going to deny the motion

10:56:53 7   as to agent answer theory.

10:56:56 8          On the second call theory I understand that

10:56:59 9   Plaintiff says that is the same theory that it's always

10:57:02 10  disclosed and Defendant is calling it something different,

10:57:05 11  but to the extent it was not fairly disclosed, Mr. Bress'

10:57:10 12  expert reports do suggest that there is only one call, for

10:57:14 13  example, in paragraph 271 of the opening report which states

10:57:19 14  that Next Caller's own documentation and witness

10:57:22 15  acknowledged that the call is not answered until proceeding

10:57:25 16  beyond the IVR to the agent.  And even in paragraph 85 that

10:57:32 17  the Plaintiff just pointed me to, it doesn't seem to

10:57:37 18  reference two calls.  At Mr. Bress' deposition, however, he

10:57:43 19  proposed that there are two distinct calls such as at

10:57:47 20  page 65, lines 20 to 24 where he suggested that a call will

10:57:51 21  be received at the call center at the IVR and then depending

10:57:55 22  on the processing in the IVR, a new call is launched to go

10:57:59 23  from the calling party to the agent.  So to the extent that

10:58:02 24  he is going to explicitly talk about two calls when he did

10:58:05 25  not do so in his disclosure or in his expert report, that is

10:58:10 1   new and untimely and not a restatement of the agent answer

10:58:16 2   theory, so I will preclude that.  It is untimely governed by

10:58:26 3   the *Pennypack* factors, prejudice, the ability of Defendant

10:58:29 4   to cure the prejudice, the extent to which the theory would

10:58:32 5   disrupt at trial, and bad faith or willfulness.  Here I

10:58:37 6   think Defendant would be prejudiced by the late disclosure

10:58:40 7   of the theory and could not cure that prejudice because

10:58:43 8   Mr. Bress' deposition took place on the last day of expert

10:58:46 9   discovery and Defendant could not develop a record to

10:58:49 10  respond to that theory.  And timely fulsome disclosures are

10:58:55 11  integral to orderly and efficient trials.

10:58:58 12       Finally, if this theory is merely a restatement

10:59:01 13  of the agent answer theory as Plaintiff contends, then they

10:59:07 14  would have been required to more accurately describe that

10:59:11 15  theory in their infringement contentions.  Therefore, I find

10:59:14 16  that these factors are not finding bad faith, but the

10:59:19 17  factors weigh in favor of excluding the second call theory

10:59:22 18  and I will grant the motion as to that.

10:59:26 19       Now I want to talk about some issues from the

10:59:29 20  pretrial order that were raised and then give you all a

10:59:33 21  chance to raise any additional issues with me.  So I will

10:59:36 22  amend Chief Judge Stark's order on claim construction to

10:59:40 23  reflect the parties' agreement on the term "ancillary" to as

10:59:44 24  used in claims 1 and 15 of the '913 Patent to mean "coupled

10:59:51 25  as an adjunct to."

10:59:55 1          I see in the pretrial order that Plaintiff

10:59:58 2   objects to any attempt by Next Caller to adduce testimony

11:00:04 3   from Dr. Brody on the topic of invalidity under 101 or 112

11:00:09 4   as beyond the scope of his expert report.  So where are we

11:00:15 5   on that?

11:00:15 6          MR. TUMINARO:  On that issue, Your Honor,

11:00:17 7   Dr. Brody had not said anything about 101 invalidity in his

11:00:22 8   expert report so any testimony from Dr. Brody on that point

11:00:26 9   about abstract idea or conventionality would be beyond the

11:00:32 10  scope of what he said in his report.

11:00:33 11         THE COURT:  Have you talked to Defendant about

11:00:36 12  whether they intend to offer that?

11:00:38 13         MR. TUMINARO:  We did talk to them earlier and

11:00:40 14  it's our understanding that they do intend to raise that.

11:00:43 15         MS. COLUMBIA:  Your Honor, Dr. Brody will not

11:00:47 16  render an opinion under 101 or 112.  There are factual

11:00:53 17  issues that underpin the 101 decision that are currently in

11:00:57 18  the verdict form, and Dr. Brody's testimony may go to those

11:01:01 19  factual issues, but he didn't opine on his report on 101 or

11:01:06 20  112 and we're not going to ask him --

11:01:08 21         THE COURT:  I'm sorry, I haven't looked at the

11:01:10 22  verdict form, and they were filed a year ago.

11:01:12 23         MS. COLUMBIA:  Understood.  Yes.

11:01:14 24         THE COURT:  Can you give me some specifics?

11:01:16 25         MS. COLUMBIA:  Currently, Your Honor, the agreed

| | |
|---|---|
| 11:01:19 | 1 |

upon -- well, let me make sure it's agreed upon before I say

that.  In the verdict form that was submitted, it's document

number 243, there are questions, number 8, 9 and 10, I can

hand this up, Your Honor.

THE COURT:  I have it here.  Just give me a

second.  Okay.

MS. COLUMBIA:  So for each of the three patents,

there is intended to be a question to the jury that

essentially mimics the *Berkheimer* factual considerations for

101 asking for each, whether Next Caller has proven that

those patents involve activities that were well understood,

routine and conventional as of the priority date, so we

don't intend to ask Dr. Brody to offer an opinion on 101,

but in the course of his testimony he will be describing the

prior art, describing the state of the art, so there will be

facts in his testimony that I would expect would support a

jury finding that those patents were well understood,

routine and conventional supporting ultimately what we would

ask Your Honor for which would be a finding under 101 that

the patents are not patent eligible.

MR. TUMINARO:  Two points in response, Your

Honor.  First, Dr. Brody has not said anything in his report

about what was well understood, routine or conventional.

And number two, about the prior art that they -- Next Caller

intends to rely on, at this point it's still unclear.  The

parties have an agreement about narrowing the case.  We
narrowed our asserted claims.  They said they were going to
narrow the references that they intended to rely on, but
they have reserved the right to rely on some other
references that they alluded to that Dr. Brody made
reference or talked about and we're not sure what those are.

            MS. COLUMBIA:  Your Honor, we did have an
agreement, we did reduce the number of prior art references.
We told them that the primary references that Dr. Brody
intends to rely on for anticipation and obviousness are
narrowed down to six references from a larger group that I
think was nine or ten.  But we do expect Dr. Brody as is
appropriate both for the 102 and 103 issues and for an
ultimate finding of fact that might support Your Honor's
findings on 101 to talk about the state of the art and the
prior art more generally.

            THE COURT:  Does everybody agree that there are
no factual issues underlying Step 1 of *Alice*, because I got
to tell you, I'm not sure anymore.  You seem to be asking,
you seem to be saying look, if you do Step 2, Judge, you can
just make a legal determination at Step 1.  I don't know if
that's possible.  So where does that leave us if I'm not
sure about that?

            MS. COLUMBIA:  I think it leaves us where most
of the bar is right now which is pretty darn confused about

11:04:45 1    what the standards are under 101.  I noted that Judge Burke

11:04:49 2    on the motion to dismiss sort of assumed Step 1 of the 101

11:04:54 3    analysis for purposes of the motion to dismiss.  I think

11:04:57 4    Your Honor --

11:04:57 5              THE COURT:  I can't do that.

11:05:01 6              MS. COLUMBIA:  I think we would have to come

11:05:03 7    back to Your Honor after you have heard the case and make a

11:05:06 8    post-trial motion on 101 which I can tell already has you

11:05:10 9    very --

11:05:10 10             THE COURT:  On nine claims, is that what I am

11:05:14 11   going to get?

11:05:16 12             MS. COLUMBIA:  Your Honor --

11:05:17 13             THE COURT:  Nine claims and no expert, right?

11:05:19 14   It's just going to be attorney argument and the patents?

11:05:22 15             MS. COLUMBIA:  And the underlying factual

11:05:24 16   evidence, Your Honor.  Because I am always the optimist, I'm

11:05:31 17   hopeful that the claims will be invalidated on other

11:05:35 18   grounds, but I think they're highly susceptible on 101

11:05:39 19   grounds and I don't think there is anything in the record

11:05:41 20   that precludes us from laying the factual underpinnings and

11:05:45 21   making a motion to the Court to review them for patent

11:05:48 22   eligibility.

11:05:50 23             THE COURT:  Well, I guess we'll take that up

11:05:52 24   when we have to, but Dr. Brody may not testify about 101 or

11:05:57 25   112 issues.  He may not give an ultimate opinion on those

11:06:03 1 and he may not testify to anything outside of his expert

11:06:06 2 report.  Whether I allow you to follow up on 101 or even

11:06:12 3 include those questions in the verdict form I guess we'll

11:06:17 4 take up at a later time because I don't know that that was

11:06:21 5 an issue here, and I don't know if I am going to be able to

11:06:25 6 do what you're asking me to do on 101.

11:06:28 7          MS. COLUMBIA:  Understood, Your Honor.

11:06:30 8          THE COURT:  Okay.  Defendant objects to -- by

11:06:32 9 the way, these seem like motions in limine which are extra

11:06:36 10 motions in limine that I don't usually allow, but I guess I

11:06:40 11 have to deal with them.

11:06:42 12          Defendant objects to any intent by TRUSTID to

11:06:46 13 produce testimony from any TRUSTID expert on TRUSTID's

11:06:48 14 entitlement to damages for false advertising or the amount

11:06:50 15 of such damages as beyond the scope of the expert report.

11:06:54 16 The pretrial order does seem to suggest that Plaintiffs will

11:06:57 17 offer expert testimony on that.  Is that your intention?

11:07:02 18          MR. PICKARD:  Your Honor, we are not going to

11:07:03 19 offer expert testimony on the ultimate amount, false

11:07:07 20 advertising damages.  That said, there may be evidence that

11:07:10 21 comes in through the expert that is nevertheless relevant on

11:07:12 22 that issue.  In particular I'm talking about the gross

11:07:16 23 revenues of Next Caller which would be the starting point

11:07:20 24 for damages under the Lanham Act.

11:07:22 25          MS. COLUMBIA:  Your Honor, we're not sure what

11:07:25 1    they're going to do, they have -- their damages expert has

11:07:29 2    two very patent driven sets of analyses.  One is lost

11:07:34 3    profits, the other is reasonable royalty under the patent

11:07:37 4    statute; neither would be appropriate for false advertising.

11:07:41 5            THE COURT:  So they just said they're not going

11:07:44 6    -- he's not going to give an opinion on the amount of

11:07:47 7    damages for false advertising, but he may give testimony on

11:07:51 8    things that are relevant like the gross revenue.  Do you

11:07:55 9    have a problem with that?

11:07:57 10           MS. COLUMBIA:  I think the gross revenues would

11:07:59 11   come in through the patent analysis.  If I could highlight

11:08:02 12   what I'm concern about and I think this is probably better

11:08:04 13   reserved for trial is the jury --

11:08:05 14           THE COURT:  We're not going to do side-bars and

11:08:08 15   I don't want to keep having to leave the jury, I get it

11:08:11 16   everyone wants to wait until trial.

11:08:13 17           MS. COLUMBIA:  My concern, Your Honor, is that

11:08:16 18   the jury is going to have nothing in the record on what the

11:08:20 19   damages ought to be for false advertising, and damage --

11:08:24 20           THE COURT:  Isn't that their problem?

11:08:26 21           MS. COLUMBIA:  It is.  And damages is an element

11:08:28 22   of the claim.  So if they're not going to put in it, I guess

11:08:32 23   I'll sit down and shut up and I'll raise it when it comes up

11:08:34 24   before the closing, because I don't think there is going to

11:08:36 25   be any evidence to support a damages verdict.

11:08:42  1                THE COURT:  Okay.  All right.  We know that

11:08:46  2    there was a request made about seating arrangements for one

11:08:49  3    of the witnesses.  Did you guys talk about that?

11:08:53  4                MR. TUMINARO:  We talked about it, we're trying

11:08:54  5    to figure out whether we could come up with some other

11:08:58  6    accomodation.  We had made a proposal of maybe a table on

11:09:01  7    the side or a table on this side for the witness.  I don't

11:09:04  8    think the witness would fit in that chair, Your Honor.

11:09:07  9                THE COURT:  Okay.  Well, did you talk about it

11:09:10 10    and come up with something?

11:09:11 11                MR. TUMINARO:  We talked about it and did not

11:09:13 12    come to a complete proposal.

11:09:16 13                MR. BLUMENFELD:  Your Honor, we don't have any

11:09:21 14    opposition to him either testifying remotely or testifying

11:09:24 15    on this side of the courtroom if it works for Your Honor.

11:09:28 16    In fact, a related concern is I'm not sure that we can see

11:09:32 17    the witness box if we're doing witness examinations from

11:09:36 18    here.

11:09:36 19                THE COURT:  I think you can see it well enough.

11:09:39 20    We might have an issue with the podium because of the

11:09:42 21    electronics, but I'm not bringing it in just because of that

11:09:47 22    because I think we can figure that out.

11:09:49 23                MR. BLUMENFELD:  Maybe we can turn back to that

11:09:51 24    later, because I know we discussed that.  We don't have a

11:09:55 25    problem with this witness sitting on this side of the

11:09:58 1    courtroom facing the jury.  That is fine with us.

11:10:02 2              MR. TUMINARO:  If we could have a monitor for

11:10:05 3    the witness so that he could see the document.

11:10:07 4              THE COURT:  Are you guys going to set it up?

11:10:10 5              MR. TUMINARO:  Yes, Your Honor.

11:10:10 6              THE COURT:  Okay.  I just do not want this

11:10:13 7    person too close to my folks up here or to the jury, and the

11:10:19 8    person has to be sitting in a place where everybody can see

11:10:23 9    him or her.  But any arrangements that you want to make, you

11:10:27 10   just have to make sure that it's set up.

11:10:30 11             MR. TUMINARO:  Understood.  Thank you, Your

11:10:33 12   Honor.

11:10:33 13             THE COURT:  Okay.  Trial time.  So we need to

11:10:42 14   finish this trial by Friday.  Each side I am going to give

11:10:49 15   eleven hours for opening and presenting case, and an

11:10:53 16   additional one hour for closing arguments.  Neither side

11:10:57 17   will be charged for voir dire unless the questions asked

11:11:01 18   become excessive.  Other than jury selection and my reading

11:11:05 19   of jury instructions, if we are in the courtroom we are on

11:11:02 20   the clock and someone will be charged for the time.  Trial

11:11:12 21   days generally run from 9:00 a.m. to 4:30 p.m. with a

11:11:17 22   fifteen-minute break in the morning, a lunch break, and a

11:11:21 23   fifteen-minute break in the afternoon.  During the pandemic,

11:11:24 24   I was thinking that it would be helpful to have lunches

11:11:29 25   brought in and take shorter breaks so that we get more

11:11:34 1    during the trial.  I know that Judge Robinson used to have

11:11:37 2    shorter lunch breaks with folks taking turns bringing in

11:11:42 3    lunches for the jury.  Perhaps that is something that you

11:11:47 4    can consider if you want to agree upon and let us know later

11:11:51 5    this week.

11:11:54 6            Voir dire and jury issues.  So we've looked

11:12:02 7    briefly at the voir dire.  I'll just ask, did you guys

11:12:06 8    update it with the names of attorneys and witnesses?

11:12:09 9            MR. BLUMENFELD:  Your Honor, we haven't yet.  We

11:12:12 10   recognize I think on both sides that we have to do that,

11:12:14 11   more with attorneys than witnesses.

11:12:17 12           THE COURT:  Yes.  There is a reference to an

11:12:19 13   updated witness list that I heard earlier.

11:12:23 14           MR. TUMINARO:  We could update, in terms of voir

11:12:27 15   dire, will the attorneys get any chance to question the

11:12:30 16   witnesses -- I mean to question --

11:12:32 17           THE COURT:  We'll cover that in a second.  I

11:12:34 18   just want to know whether we can have an updated --

11:12:37 19           MR. BLUMENFELD:  We will get that in.  The other

11:12:39 20   thing that I think should be added to it is that since this

11:12:42 21   litigation has started, TRUSTID has been acquired by

11:12:48 22   NewStar, Next Caller has been acquired by Pindrop.  I think

11:12:51 23   somewhere in the questions they ought to be listed.

11:12:54 24           THE COURT:  Why don't you guys go back and talk

11:12:55 25   and submit a revised voir dire and we will then give that to

11:13:04 1    -- we will use that to edit and send out to you all.

11:13:09 2                Now with respect to some of the other issues, so

11:13:16 3    we had sent out questionnaires to respective jurors, COVID

11:13:20 4    questionnaires asking about COVID hardships, underlying

11:13:24 5    health condition hardships due to work and vaccine status.

11:13:30 6    You will not get a copy of those.  The response date is not

11:13:33 7    until later this week, so I don't know what our response

11:13:36 8    rate will be.  Usually we get about forty to fifty percent

11:13:40 9    back that include people who have not stated any COVID

11:13:45 10   concerns, either they're fully vaccinated or they're not,

11:13:49 11   but they don't raise a concern.

11:13:51 12               So the current plan is to bring in those who

11:13:54 13   have not indicated concerns and those who do not return a

11:13:57 14   questionnaire to us, and to excuse the rest.  Hopefully that

11:14:02 15   will give us a sufficient number to pull from.  If it

11:14:06 16   doesn't, I suppose we're going to have to change tactics and

11:14:09 17   I will let you know what we do with respect to those

11:14:14 18   questionnaires.

11:14:15 19               Now, we're doing the voir dire, we're going to

11:14:19 20   do it a little differently than we have done it in the past.

11:14:22 21   It used to be that we would call everybody in, they would

11:14:26 22   sit by their juror numbers and we would randomly pick

11:14:29 23   numbers out of a bingo thing.  We're going to do it a little

11:14:34 24   differently now.  We're going to randomize the jurors and

11:14:41 25   assign them a number.  So it used to be you would get a jury

11:14:45 1    list that had Abbott as number one and Beta as number 26,

11:14:51 2    now we're going to randomize the jurors as numbers.  We will

11:14:55 3    have juror numbers 1 through 14 sit over in the pews in the

11:15:01 4    back.  When they come in, we will 15 to 28 sit on this side,

11:15:07 5    and anyone if we are able to get more than 28 folks to come

11:15:12 6    in will sit in the jury box or in front of the jury box.

11:15:17 7    Each juror will wear a number and each juror would be

11:15:21 8    provided a sheet that includes the voir dire questions and a

11:15:24 9    pencil so that he or she may keep track of yes answers when

11:15:27 10   I read the voir dire questions aloud.  After that is done,

11:15:31 11   the attorneys will move to the conference room where we will

11:15:34 12   conduct voir dire.

11:15:36 13            We're going to instead of using the jury room,

11:15:39 14   we're going to use the clerk's conference room which is on

11:15:42 15   the other side of the hall.  I think it's sort of across

11:15:48 16   from the men's restroom, and that's where the jurors will

11:15:51 17   also deliberate.

11:15:55 18            The parties can have two attorneys come into

11:15:58 19   that conference room.  I will then ask the folks over here

11:16:02 20   in the back who have -- who are juror numbers 1 through 14,

11:16:10 21   I will ask them did you answer yes to any of the voir dire

11:16:12 22   questions.  Anyone who answered yes to a voir dire question

11:16:17 23   will be taken out into the hall for further questioning by

11:16:21 24   the parties in the conference room.  If they answered no,

11:16:24 25   they will remain seated over here and you will not get an

opportunity to talk to them before exercises preemptory

strikes.  Prospective jurors who are questioned and excused

for cause will be allowed to leave and not have to come back

into the courtroom.  Perspective jurors who are questioned

but not excused for cause will return and sit again over

here in the pews.  We will continue going and if we excuse a

juror, we will then come to juror number 15, we will say to

juror number 15, did you answer yes to any questions, juror

number 15 says no, that person will sit over here.  If that

person says yes, the person will be brought out into the

hall and we will question him or her.

Once we get to fourteen people sitting over

there, we will come back into the courtroom and exercise

preemptory strikes.

As I said, we have our proposed voir dire

questions.  If you could get us a revised set of those later

this week, we will get you a revised draft as soon as we

can.  Prospective jurors will be provided a sheet, as I told

you, that includes the voir dire questions.  That means that

Plaintiff needs to provide us with enough hard copies of the

questions and enough pens or pencils for up to forty people

and you need those delivered to the clerk's office by

3:00 p.m. on July 8th.

Jurors will wear a mask at all times during voir

dire and they will also wear masks at all times during

11:18:09 1    trials unless they unanimously agree not to.

11:18:13 2            The pretrial order says the jurors will be given

11:18:17 3    binders containing the patents-in-suit, a glossary of terms

11:18:20 4    agreed upon by the parties, claim construction and a

11:18:23 5    notepad.  If the parties still agree on that set of

11:18:27 6    documents, you may give the jury the binders.  If you want

11:18:32 7    to do that, you must bring eight copies of the juror

11:18:35 8    notebooks to court on the first day of trial and if you

11:18:38 9    can't agree on the content, then we will skip jury binders.

11:18:43 10            With regard to paragraph 118, there is something

11:18:51 11    about a request that the jury binders be collected each day.

11:18:55 12    We will not do that.  Jury notes will not be collected, but

11:18:59 13    will be left in the conference room that will serve as the

11:19:02 14    jury room and they will be collected by the courtroom deputy

11:19:07 15    after the trial is complete.

11:19:11 16            Now for the COVID procedures.  As I mentioned,

11:19:14 17    the jurors must wear face masks unless they unanimously

11:19:19 18    agree not to.  Lawyers must wear face masks covering mouth

11:19:24 19    and nose if they are not talking.  If you have been

11:19:29 20    vaccinated you may take off your mask when examining a

11:19:32 21    witness or making an argument to me.  Now if it turns out

11:19:36 22    that we have eight jurors that are comfortable being in a

11:19:39 23    room without masks, then I may reconsider that, but for now

11:19:42 24    that will be the rule.

11:19:45 25            There are limits to the number of people for

11:19:48 1    each side in the courtroom at one time.  You may have up to

11:19:52 2    four people in here at any given time, up to three people at

11:19:56 3    counsel table and one sitting behind the bar.  You won't be

11:20:01 4    socially distanced if you do that, but if you chose to do

11:20:06 5    that, I leave it up to you.

11:20:09 6          Now as I mentioned during the voir dire and the

11:20:12 7    jury selection, we're going to be using those benches in the

11:20:16 8    back so you can't plan to have anyone sitting on those

11:20:19 9    benches in the back during jury selection.

11:20:21 10          We are going to limit the movement around the

11:20:25 11    courtroom.  As I had said, lawyers will speak from the

11:20:27 12    counsel table.

11:20:28 13          Now, there was a concern about the podium.  What

11:20:34 14    is the concern?

11:20:35 15          MR. BLUMENFELD:  It's partly the concern that I

11:20:39 16    mentioned, but you know, about being able to see, but I

11:20:43 17    guess the question we had and we talked to the other side a

11:20:46 18    little bit is whether it would be possible to either set up

11:20:52 19    two podiums or to agree to share a podium notwithstanding

11:20:58 20    the concerns about the COVID issues.  I think it is easier,

11:21:02 21    it's kind of hard to do an opening from here, and it's hard

11:21:08 22    to talk to the witness and the jury from here, also.  So I

11:21:12 23    don't know if there is any accommodation we could get to

11:21:14 24    have separate podiums or to agree to share a podium.

11:21:19 25    Everyone on both sides has been vaccinated so we're feeling

11:21:25 1  between ourselves pretty comfortable.

11:21:27 2          THE COURT:  I'll think about that.

11:21:29 3          MS. COLUMBIA:  Your Honor, just a question about

11:21:31 4  that.  The other concern I had, you mentioned the technology

11:21:35 5  concern, that without the podium, I don't know how we would

11:21:38 6  have an Elmo and the other things that are normal --

11:21:41 7          THE COURT:  You would have to bring them in.

11:21:44 8          MS. COLUMBIA:  Can we do that, can we bring a

11:21:47 9  podium type thing in?

11:21:48 10         THE COURT:  No, you have to bring in the

11:21:50 11 equipment that you're talking about if you don't have our

11:21:53 12 podium here.  I don't know.  I'm having a jury trial this

11:21:57 13 week.  I will see how it works.  If I want to let you have a

11:22:01 14 podium, I will let you know.

11:22:02 15         MS. COLUMBIA:  Thank you.

11:22:03 16         THE COURT:  Okay.  We will not have side-bars

11:22:06 17 during the trial.  I will talk to you in a minute about how

11:22:11 18 we're going to deal with objections to exhibits, but if

11:22:19 19 there is a need for a side-bar and I have to let the jury

11:22:22 20 recess to decide the objections during trial time, I am

11:22:28 21 going to assign the time that we use to one or both parties.

11:22:30 22 I'm reserving the right to assign it to the loser of the

11:22:40 23 issue that's being raised, but I may do it differently if

11:22:42 24 something else seems more fair.  We're going to have to just

11:22:45 25 play this by ear.  I think we should try and reduce the need

11:22:53  1    for side-bars because I don't think it's a good look for us

11:22:59  2    while we're communicating over here while we are bringing in

11:23:02  3    juries and making them wear masks, so we are going to be

11:23:06  4    pretty restrictive about what you do.  If we have to let the

11:23:10  5    jury go for these side-bars, as you know, they have to walk

11:23:15  6    across there, come back, it's going to waste a lot of time,

11:23:18  7    and I'm going to keep everyone on the clock during that

11:23:22  8    time.  So you want to keep that in mind.

11:23:26  9           Will the parties be broadcasting the trial to

11:23:29 10    folks who will not be in the courtroom?

11:23:31 11           MR. TUMINARO:  We would like to, Your Honor.

11:23:34 12           MR. BLUMENFELD:  We would like to, also, either

11:23:37 13    by Zoom or at least by telephone, but we would -- especially

11:23:41 14    with the limitation of the number of people who can be in

11:23:43 15    the courtroom, if we could arrange between the parties to do

11:23:47 16    that, that would be great.

11:23:49 17           THE COURT:  Did you have a vendor or someone who

11:23:51 18    can help with that?

11:23:52 19           MR. BLUMENFELD:  We haven't talked to anyone

11:23:54 20    yet.  I don't know whether Mr. Tuminaro has.

11:23:57 21           MR. TUMINARO:  We haven't talked.  We can work

11:23:58 22    that out.

11:23:59 23           THE COURT:  And I know that we have had some

11:24:02 24    venders who have been more successful than others, so if you

11:24:05 25    want to talk with Ms. Walker about that, that would be

helpful.

And you know, with the witness, if you're going to be doing that with a witness who is going to have an issue coming into trial, if you want to bring that witness remotely because there are other concerns that witness may have with COVID or something, it's fine to do that witness remotely.

The parties have suggested expert witnesses not be sequestered, that's fine, we'll sequester witnesses other than one -- fact witnesses other than one representative for each party who may be here, but who will count in two total number of folks you're allowed to have in the courtroom as will anyone who is doing the trial graphics.

MS. COLUMBIA:  Your Honor, may I ask a question about that?  After the jury is seated, will it be possible to have a lawyer in the --

THE COURT:  Yes.  So you can have four total people, one of whom can sit in the back or two can sit in the back, I don't care, so but still four.

MS. COLUMBIA:  Still four altogether.

MR. TUMINARO:  And that includes the hot seat person?

THE COURT:  It's a person, so yes.

MR. TUMINARO:  Okay.  Can I ask one other clarifying question?  You mentioned that two people can go

11:25:29  1    back for voir dire.  Could we substitute an attorney for a

11:25:33  2    jury consultant?

11:25:36  3                    THE COURT:  Yes.

11:25:37  4                    MR. TUMINARO:  Thank you.

11:25:37  5                    THE COURT:  On these things I'm more concerned

11:25:40  6    with bodies, so that's why I'm saying any person is

11:25:44  7    included.

11:25:52  8                    With regard to paragraph 122 and request to seal

11:25:57  9    the courtroom, do we really think that's going to be an

11:26:00 10    issue in this case?

11:26:01 11                    MR. TUMINARO:  It may be, Your Honor, especially

11:26:03 12    with respect to someone's financial information that may

11:26:06 13    come up and some of the customer names that has already been

11:26:10 14    an issue that we had to approach the Court about.

11:26:13 15                    MS. COLUMBIA:  Your Honor, I don't expect on the

11:26:18 16    financial side for us to need to ask you to seal the

11:26:22 17    courtroom.  I did hear for the first time this morning, I

11:26:25 18    don't have any details, that Plaintiffs may want to publish

11:26:31 19    our source code.  So I need to know more about that, but I

11:26:36 20    -- if that's something they intend to do, that would raise

11:26:41 21    an issue in terms of public access.

11:26:42 22                    MR. TUMINARO:  We may, we may need to display

11:26:47 23    that source code depending on how things transpire.

11:26:51 24                    THE COURT:  All right.  So I am generally

11:26:55 25    disinclined to close the courtroom, but if anyone

anticipates needing to do so, you must keep it to an

absolute minimum and you must provide sufficient advance to

the other side and to the Court.  I can't guarantee that I

will seal the courtroom, but if you don't follow those

rules, either the request to seal will be denied or you will

be precluded from publishing -- if it's the other side's

material, you will be precluded from publishing that in a

way that would make it something that people could see up

there.  You would have to just, you know, use it with the

witness and not be able to publish it.

MR. TUMINARO:  Just one clarifying question.  If

a witness goes up, and we anticipate that there may be a

confidential portion of that, would it be sufficient timing

to let you know at the time of the witness --

THE COURT:  No.

MR. TUMINARO:  How much advanced notice would

you want?

THE COURT:  I would want to know when the day

that that witness is going to testify, you need to tell me.

MR. TUMINARO:  Thank you.

THE COURT:  And as I said, you need to keep it

to a minimum, and everything that's going to be done under

seal must be done in a short period of time.  So you have to

put it all together, whatever is under seal even if it

doesn't seem to make sense.  How exactly do you plan to do

11:28:14  1    that if we have it remotely?

11:28:16  2              MR. TUMINARO:  If it was published, if there

11:28:20  3    were people on the line that could not hear that.

11:28:22  4              THE COURT:  If it's a Zoom call, anybody could

11:28:24  5    be on the line; right?

11:28:26  6              MR. TUMINARO:  Then we would close that for the

11:28:28  7    sealed portion, we would close that line for the sealed

11:28:31  8    portion.

11:28:31  9              THE COURT:  Okay.  All right.  Witnesses, the

11:28:36 10    parties have provided the will call and may call witness

11:28:40 11    list.  The pretrial order was filed over a year ago, and

11:28:46 12    there was discussions about people appearing on video rather

11:28:50 13    than live.  So what is your current thinking on number of

11:28:55 14    witnesses?

11:28:55 15              MR. TUMINARO:  Number of witnesses would be four

11:28:58 16    or our side, Your Honor, I believe.

11:29:02 17              MS. COLUMBIA:  And it's four for our side, Your

11:29:07 18    Honor.  And they haven't -- we have -- we mentioned earlier

11:29:13 19    that there was an agreement on an updated list for the

11:29:16 20    Court.  I think the only issue on witnesses is Mr. Roncoroni

11:29:21 21    who is our CEO and will be our table rep who TRUSTID has on

11:29:26 22    their will call list and says they intend to call in our

11:29:32 23    case.

11:29:32 24              THE COURT:  He's one of your four?

11:29:37 25              MR. TUMINARO:  He's one of our four that we

11:29:39 1    intend to call in our case in chief.

11:29:42 2         MS. COLUMBIA:  We prefer that we call him in our

11:29:45 3    case so it makes more sense to the jury.  If not, I just

11:29:49 4    want to make clear he's only going to testify once and it

11:29:53 5    will have to do with Mr. Roncoroni, when he's on the stand

11:29:57 6    all that we would do with him if we call him in our case.

11:30:00 7         MR. TUMINARO:  We ask that we be able to present

11:30:02 8    the case we want to present and present it in the way we

11:30:05 9    want to present it since it's our burden.  And depending on

11:30:09 10   what Mr. Roncoroni says on the stand it may impact some

11:30:13 11   other witnesses that we may call or may not need to call or

11:30:16 12   documents, so we would propose, we request that we be able

11:30:19 13   to call him in our case in chief.

11:30:21 14        THE COURT:  So I'll let you call him in your

11:30:24 15   case in chief, but you may in cross-examination do whatever

11:30:28 16   you want to do as if you were calling him.

11:30:32 17        MS. COLUMBIA:  Thank you, Your Honor.  Just to

11:30:34 18   be clear, Your Honor, we did offer to leave their case open

11:30:36 19   if they wanted to do that.

11:30:38 20        THE COURT:  And I was thinking about that, my

11:30:40 21   only issue is it seems like Mr. Tuminaro is saying there may

11:30:45 22   be documents or other evidence that they know that they need

11:30:51 23   to get in through another witness or not based on what he

11:30:55 24   says.  So it seems like they would be leaving a bunch of

11:31:00 25   their case open and that might just get more confusing.

11:31:03  1                    MS. COLUMBIA:  That's fine, Your Honor.

11:31:19  2                    THE COURT:  And the four witnesses, is it

11:31:25  3    Roncoroni?

11:31:25  4                    MS. COLUMBIA:  Yes, Your Honor.

11:31:26  5                    THE COURT:  Is he the only overlapping witness?

11:31:30  6    When you say four and you say four, are there really seven

11:31:33  7    people?

11:31:33  8                    MS. COLUMBIA:  Yes.

11:31:34  9                    MR. TUMINARO:  We have on our may call list a

11:31:37 10    few individuals and again, depending on what Mr. Roncoroni

11:31:41 11    says on the stand, we may need to call someone else, it just

11:31:44 12    depends.  We can't know that as we stand here right now.

11:31:47 13                    THE COURT:  Okay.  But are those people people

11:31:50 14    that -- I'm just trying to figure out numbers here.  Are

11:31:53 15    those people people that are not already on the Defendant's

11:31:58 16    list?

11:31:58 17                    MR. TUMINARO:  They are on Defendant's list.

11:32:00 18                    THE COURT:  So you're not going to call every

11:32:02 19    one of their witnesses in your case, are you?  Is that

11:32:04 20    really what you're trying to ask me to do?

11:32:07 21                    MR. TUMINARO:  No, we do not intend to call all

11:32:09 22    of their witnesses in our case, we have on our may call

11:32:12 23    list, for example, Mr. Espinosa, he's on their will call

11:32:18 24    list.  Depending on what Mr. Roncoroni says, we may need to

11:32:21 25    call Mr. Espinosa.

11:32:23  1                    THE COURT:  This is going to be fun for you just

11:32:26  2       mucking up their case.

11:32:27  3                    MS. COLUMBIA:  There is a part of me that says

11:32:29  4       go for it, but on the other hand, Mr. Espinosa is on our

11:32:34  5       will call list.  I would need some notice if he isn't

11:32:38  6       allowed to be in the courtroom, I haven't planned for him to

11:32:38  7       be just standing by for them on the off chance they want to

11:32:41  8       call him.

11:32:41  9                    THE COURT:  We are going to have to take that

11:32:43 10       one, with Mr. Roncoroni, yes.  With the other ones, we're

11:32:47 11       going to have to figure out what makes sense at the time so

11:32:50 12       that we do this in a way that makes sense to the jury and

11:32:53 13       that is fair to the witnesses so they have some idea of when

11:32:56 14       they will be called.

11:32:59 15                    MS. COLUMBIA:  Your Honor, just as a heads up,

11:33:01 16       there is more than the usual amount of deposition testimony

11:33:05 17       in this case.  I'm sure --

11:33:07 18                    THE COURT:  You didn't think you would say

11:33:09 19       anything that would make me happier.  What are we talking

11:33:12 20       about?  You're limited, you got eleven hours.  We call them

11:33:12 21       bedtime stories.  So what have you got?

11:33:22 22                    MS. COLUMBIA:  And we'll -- obviously we'll

11:33:25 23       choose our time.  There are only four live, seven total live

11:33:27 24       witnesses.  There are probably more than that witnesses by

11:33:34 25       deposition.  And one or two of them are at least as

11:33:39 1    currently cut lengthy, not my fault, Your Honor, I didn't do

11:33:43 2    it, but so I just wanted you to be aware of that.  There is

11:33:49 3    -- we have proposed and I think it's consistent with Your

11:33:52 4    Honor's practices that whichever side calls a witness by

11:33:56 5    designation, that's the time to play that witness in its

11:33:59 6    entirety, designations, counters, et cetera.  Plaintiffs

11:34:05 7    don't seem to agree with that, but I think that's something

11:34:09 8    we should sort out before trial.  I think it will go faster

11:34:12 9    and easier for the jury if the deposition witnesses are only

11:34:17 10   called once.

11:34:19 11            MR. TUMINARO:  We don't agree with that, Your

11:34:21 12   Honor.  To the extent that we wouldn't want to use depo

11:34:25 13   designations, it would be short, and we don't want --

11:34:28 14            THE COURT:  What part did you agree on?  Is it

11:34:31 15   the multiple calling or the time assignment?

11:34:34 16            MR. TUMINARO:  We don't agree with calling a

11:34:37 17   depo designation one time, so if we wanted to call a depo

11:34:42 18   designation, we could put it in our case, if they have some

11:34:46 19   counters to that, they could put in their counters at that

11:34:49 20   time, but if they have affirmative designations for that

11:34:52 21   depo designation, we think it should go in their case in

11:34:56 22   chief.

11:34:57 23            THE COURT:  Why?

11:34:57 24            MR. TUMINARO:  Because if we have a short

11:34:59 25   progression of some, some short depo designation, we don't

11:35:03  1    want it to be clouded up with a bunch of other things that

11:35:07  2    are irrelevant to our case.

11:35:09  3              THE COURT:  All right.  I am not going to agree

11:35:14  4    on that.  But I am going to need more specifics at trial

11:35:20  5    before I can tell you whether that's okay.  So you should be

11:35:23  6    prepared to go forward either way.  What I don't want to

11:35:26  7    have is the jury sitting over there and Mr. Smith comes up

11:35:29  8    and plays for five minutes and then we go on to something

11:35:33  9    else and then Mr. Smith comes up and plays for three minutes

11:35:36 10    and then we go on to something else and then Mr. Smith pops

11:35:39 11    up, they're never going to feel like they're making any

11:35:41 12    progress because Mr. Smith keeps appearing on the stand and

11:35:45 13    doesn't get finished.  So I need specifics.  If you're going

11:35:49 14    to say that, I need to know how many times these folks are

11:35:52 15    going to be coming up and how many times -- and how long

11:35:55 16    these things are.

11:35:56 17              MR. TUMINARO:  We can work on the specifics.  We

11:35:58 18    would say if we were going to call a witness, we would call

11:36:01 19    that witness one time.  We won't present that witness

11:36:02 20    multiple times.  But if Next Caller wants to present that

11:36:02 21    witness via depo designation, they should do it in their

11:36:14 22    case in chief, not ours.

11:36:14 23              THE COURT:  You guys have to give me specifics

11:36:14 24    and I'll let you know whether what you want is okay or not.

11:36:21 25              MR. TUMINARO:  Thank you, Your Honor.

THE COURT:  Are you planning to call anyone by deposition who is also going to be here live?

MR. TUMINARO:  We do not intend to do that, Your Honor.

MS. COLUMBIA:  No, Your Honor.

THE COURT:  Witnesses should be given a binder of documents for direct and a binder of documents for cross to eliminate the back and forth of giving them exhibits.  So when the witness goes up to the stand, they should be given a binder with the direct.  For cross I will allow you to one time come up and give them a binder of exhibits for cross, but we're not going to keep going back and forth walking in front of a jury.  I don't want to make them feel uncomfortable.  You can leave a notebook for the court reporter if the court reporter wants, but you will not give a notebook to me or my clerk.  For us, you will need to submit all of the exhibits to us electronically by noon on Thursday, July 8th, and then the morning a witness testified you will need to send us a folder for that witness with the exhibits and demonstratives to be used on direct and a folder with the exhibits and any demonstratives to be used on cross.  You can do that via e-mail or a secured link, it doesn't matter, just work with Ms. Walker to get those to us.

The exhibits in the electronic file should be

11:38:14 1    named according to their exhibit numbers.  So JTX 1 through

11:38:20 2    whatever, PTX 1 through whatever, DTX 1 through whatever,

11:38:25 3    and you can work with Ms. Walker on that.  And when you do

11:38:29 4    send the exhibits, I want you to send them to Ms. Walker and

11:38:33 5    also copy my judicial administrator, Diana Welham on your

11:38:39 6    e-mail.

11:38:41 7                MS. COLUMBIA:  Your Honor, may I raise an issue

11:38:44 8    with respect to exhibits?  We were trying to work together

11:38:47 9    to reduce the exhibit lists.  And on Friday the Plaintiffs

11:38:53 10   did reduce their list from I think 800 something to 500

11:38:58 11   something.  So we may need a little help from the Court on

11:39:01 12   that, although they said they're going to further reduce it.

11:39:05 13   The bigger issue is they on Friday included in their list 48

11:39:10 14   exhibits that had not been on their exhibit list, you know,

11:39:15 15   from the pretrial order, which we just think is out of

11:39:22 16   bounds.  We all agreed to live with the exhibits we listed

11:39:24 17   in the pretrial order.

11:39:26 18               MR. TUMINARO:  This is an atypical case, Your

11:39:29 19   Honor.  We submitted the pretrial order over a year ago and

11:39:32 20   since that time many things have happened.

11:39:34 21               THE COURT:  What happened that's made you change

11:39:36 22   what is in the pretrial order?

11:39:40 23               MR. TUMINARO:  For one thing, updated financial

11:39:42 24   information for the exhibit list.

11:39:45 25               MS. COLUMBIA:  I have no -- the updated

11:39:47 1    financials isn't my objection, Your Honor.  What I'm
11:39:49 2    objecting to are the exhibits that are documents that were
11:39:52 3    produced well before the pretrial order that have now just
11:39:56 4    hopped on to exhibit list.
11:39:58 5              THE COURT:  Is that the 48 or does the 48
11:40:01 6    include that?
11:40:02 7              MR. BROOKS:  Of the 48 there may be eight or so
11:40:05 8    that are the updated financial.
11:40:07 9              MR. TUMINARO:  In addition to that, Next Caller
11:40:10 10   was acquired by Pindrop.  We also had a case, a trial in
11:40:13 11   Colorado.
11:40:14 12             THE COURT:  You don't want anything about that
11:40:16 13   trial in this case?
11:40:18 14             MR. TUMINARO:  To be fair, we don't want the
11:40:20 15   result of that case here, but there are facts from that case
11:40:23 16   and evidence from that case that were certainly relevant,
11:40:27 17   like the Data Peddler handbook was admitted in that case as
11:40:31 18   evidence, so there are facts from that case that are
11:40:33 19   relevant here, Your Honor.
11:40:35 20             MS. COLUMBIA:  The data --
11:40:35 21             THE COURT:  You guys, I need specifics, because
11:40:35 22   when you just say 48 exhibits, it sounds bad, then
11:40:42 23   Mr. Tuminaro says yeah, but it's updated financials, that
11:40:46 24   sounds less bad.  Then I come over here -- can I get a list.
11:40:52 25             MS. COLUMBIA:  You can have a book of them, if

11:40:55 1   you would like them.  To be clear, this came in late on

11:41:00 2   Friday.

11:41:03 3               THE COURT:  So you haven't had a chance to talk

11:41:05 4   about them?

11:41:05 5               MS. COLUMBIA:  We have not had much chance to

11:41:07 6   talk about it.  If it's updated financials because we

11:41:11 7   updated our financial and they did, that's fine.  What I saw

11:41:14 8   was document after document of Bates numbered documents that

11:41:17 9   were produced in 2019 and 2020 that could very easily have

11:41:22 10  been put on their exhibit list when we did the pretrial

11:41:25 11  order.

11:41:25 12              THE COURT:  Okay.  So I thought this was going

11:41:29 13  to be a list.  Is this all 48 of the documents?

11:41:31 14              MS. COLUMBIA:  That's all 48, Your Honor.

11:41:33 15              THE COURT:  I'm going to keep this.  Is that

11:41:35 16  okay?

11:41:36 17              MS. COLUMBIA:  Yes, I don't think I have written

11:41:38 18  on any of them.

11:41:38 19              THE COURT:  In case there is an issue that comes

11:41:40 20  up.  What I will do is I will say go back and talk about it,

11:41:42 21  if it's updated financials, if it's updated information

11:41:47 22  because the parties have been acquired by someone in the

11:41:51 23  interim, that sounds okay.  If it's document that were

11:41:54 24  produced in 2019 or 2020 that should have and could have

11:41:59 25  been in the original pretrial order, I will not allow them.

11:42:03 1   So I'll let you guys go back and figure that out and to the

11:42:06 2   extent there is still a controversy, just send me a letter

11:42:11 3   with the exhibit numbers, when they were produced, and we'll

11:42:15 4   take a look and try and get you a decision.

11:42:19 5          MS. COLUMBIA:  Thank you.

11:42:22 6          THE COURT:  All right.  Witnesses.  The witness

11:42:26 7   when over here will be separated from the attorneys and the

11:42:30 8   jury behind this plexiglaslish screen.  We should also have

11:42:37 9   face shields for live witnesses.  The witness can either use

11:42:40 10  a mask or a face shield when testifying, but as I said

11:42:43 11  before, if the jurors all want to -- don't all agree not to

11:42:48 12  wear a mask, then I will ask that the witnesses also wear

11:42:54 13  some kind of face covering when testifying.

11:42:57 14          Exhibits.  I know we have -- now Mr. Tuminaro

11:43:00 15  mentioned these 48 exhibits.  You don't have any witness, or

11:43:10 16  any exhibit list that has those on them; right?

11:43:14 17          MR. TUMINARO:  No, Your Honor.

11:43:14 18          THE COURT:  When are you planning to get that?

11:43:16 19          MR. TUMINARO:  We had just exchanged some

11:43:18 20  updated list.  We could work with the other side about when

11:43:22 21  we provide the updated list.  We just exchanged updated

11:43:26 22  lists between the parties on Friday.

11:43:27 23          THE COURT:  So I need you guys to like, pretrial

11:43:31 24  conference, I like to make those decisions because anything

11:43:35 25  we do at trial is going to come out of your trial time.

11:43:37 1    This was your free shot when you're not being on the clock,

11:43:41 2    so when are you planning to get me an updated exhibit list?

11:43:45 3              MR. TUMINARO:  I can work with other side.  I

11:43:47 4    think by Wednesday would be fine.

11:43:48 5              MS. COLUMBIA:  Your Honor, we've reduced our

11:43:51 6    exhibits down to 60 some odd exhibits, there is nothing

11:43:54 7    that's going to change on our side.

11:43:57 8              THE COURT:  But I see --

11:43:59 9              MR. BLUMENFELD:  That's not quite right.  The

11:44:01 10   reason -- I'm sorry, Your Honor, because in addition --

11:44:04 11             THE COURT:  You guys can't agree with each

11:44:07 12   other, you can't agree with yourself.

11:44:10 13             MR. BLUMENFELD:  I'm not sure Ms. Columbia

11:44:12 14   knows, the one thing they did on Friday night, they took a

11:44:15 15   bunch of exhibits off what had been a joint exhibit, we need

11:44:19 16   to look at those and see if we need to put those on the

11:44:23 17   Defendant's exhibit list.  I think we probably will.  If

11:44:26 18   we're moving things from joint to defense, that's going to

11:44:29 19   change our list.

11:44:30 20             THE COURT:  I would like you guys to submit to

11:44:33 21   me your revised exhibit lists, can you do it by Wednesday or

11:44:37 22   do you need until Friday?

11:44:39 23             MR. BLUMENFELD:  We also need to do objections

11:44:48 24   to the new exhibits, so I think having until Friday would be

11:44:51 25   a good thing.

11:44:52  1          THE COURT:  Okay.  That's fine.

11:44:55  2          So usually I give my speech that says the

11:44:59  3  exhibits on the pretrial order is the sum total of exhibits

11:45:05  4  that may be offered for admission, so that will be the case

11:45:09  5  on whatever the final lists are and my decision, if any, on

11:45:15  6  these 48.  But whatever we finalize those exhibit lists, if

11:45:21  7  it's not on an exhibit list, it does not come into evidence.

11:45:25  8  So documents used solely for impeachment or rebuttal that

11:45:29  9  are not on any exhibit list will not be received into

11:45:31 10  evidence.

11:45:32 11          Demonstratives will not be received into

11:45:34 12  evidence.  No exhibits will be admitted unless offered into

11:45:40 13  evidence through a witness, and no exhibit will be published

11:45:44 14  into the jury until it is admitted into evidence.  So the

11:45:46 15  parties must move to admit each exhibit individually prior

11:45:50 16  to showing it to the jury.

11:45:55 17          The pretrial order provides the rights for the

11:45:58 18  parties to add any exhibits used in any deposition yet to

11:46:03 19  occur in this case or any additional documents subsequently

11:46:06 20  produced.  I think that we addressed that issue with respect

11:46:12 21  to exhibits.  What about, is there more deposition testimony

11:46:12 22  that you're planning to add?

11:46:22 23          MR. TUMINARO:  Only to the extent if Mr. Ezell

11:46:25 24  were to appear for deposition.

11:46:28 25          MS. COLUMBIA:  I think that's the only thing,

11:46:30 1    Your Honor.

11:46:30 2              THE COURT:  Okay.  In the pretrial order the

11:46:34 3    procedures for disclosing exhibits, witnesses,

11:46:37 4    demonstratives, deposition designations, et cetera, do not

11:46:40 5    indicate a specific time by which the parties must raise

11:46:45 6    unresolved issues with me, so we're going to use my default

11:46:50 7    procedure which is if the parties are unable to reach

11:46:53 8    agreement after meeting and conferring about objections,

11:46:55 9    they must e-mail my judicial administrator by 7:00 a.m. on

11:47:00 10   the day the witness is to testify, the exhibit is to be

11:47:05 11   offered, the demonstrative will be used or the deposition

11:47:07 12   will be played.

11:47:10 13             The deposition issue I want to talk to you about

11:47:14 14   the depositions, but at least for the demonstratives, the

11:47:18 15   exhibits and the witnesses testifying, you should tell me

11:47:21 16   when you expect a witness will testify either before lunch

11:47:25 17   or after lunch and I will hear the objection either in the

11:47:27 18   morning before the jury is brought in or during lunch, and

11:47:32 19   the time will be charged to the parties.

11:47:35 20             Consistent with my procedures, the parties shall

11:47:41 21   provide a completed AO Form 187 exhibit list to my courtroom

11:47:45 22   deputy on the first day of trial.  Let me just take a look

11:47:51 23   at something.  So you already have the procedure that I

11:48:01 24   would use in here for deposition testimony, it's just we

11:48:12 25   need to get that to me before, right -- you know, before, a

11:48:18  1    day or two before so that we can look at it rather than just

11:48:22  2    make a call on a fly.

11:48:24  3             Other logistics.  The parties may access the

11:48:30  4    courtroom before trial to set things up, just coordinate

11:48:34  5    with Ms. Walker on that.  I'm guessing we can do that on

11:48:38  6    Thursday or Friday before, but I don't know what we have on

11:48:41  7    our calendar, so Ms. Walker can help you.  If you get us the

11:48:48  8    updated voir dire, I don't think there is going to be any

11:48:52  9    updates to the preliminary jury instructions.  What I have

11:48:56 10    just seen seemed okay, but we would like updated versions of

11:49:04 11    voir dire, preliminary instructions, final instructions and

11:49:08 12    a verdict sheet to the extent that changes, so you can send

11:49:13 13    us the revised voir dire and say there is no changes to what

11:49:17 14    we already proposed on the preliminary instructions or the

11:49:21 15    final instructions or the verdict sheet, but just let us

11:49:24 16    know whether there are any changes that are necessary.

11:49:27 17             And lastly, after trial, we're going to ask you

11:49:34 18    to take a look at the trial transcript within two weeks and

11:49:37 19    get any errata back to the court reporter within that period

11:49:42 20    of time.  If you need more time, you can let us know, but

11:49:45 21    we've run into issues with briefing not being easy to follow

11:49:49 22    because the transcripts change after that so we just want to

11:49:57 23    have corrected transcripts in relatively short order to make

11:50:00 24    post-trial issues easier.

11:50:02 25             All right.  So then anything else that you guys

11:50:06 1    want to discuss?

11:50:08 2              MR. BLUMENFELD:  Your Honor, this is not a

11:50:12 3    controversial issue, but we have a witness who has a hearing

11:50:16 4    issue and we can deal with Ms. Walker to try to get whatever

11:50:21 5    hearing device we need, but it is Mr. Roncoroni who is

11:50:28 6    mentioned so he'll need it both when he is a witness and

11:50:34 7    other time in the courtroom.  I assume the Court has

11:50:36 8    devices.  I know it used to.  I don't know the current

11:50:40 9    situation.

11:50:41 10             THE COURT:  I'll check, but work with Ms. Walker

11:50:43 11   on that.  I know that at some point we had something, I

11:50:47 12   don't know the status of anything at this time.

11:50:49 13             Anything else?

11:50:50 14             MR. TUMINARO:  Nothing further from us, Your

11:50:54 15   Honor.

11:50:56 16             MS. COLUMBIA:  Nothing else, Your Honor.

11:50:58 17             THE COURT:  Okay.  Thank you, everyone.

18                      (Pretrial conference concluded at 11:50 a.m.)

19

20             I hereby certify the foregoing is a true and
        accurate transcript from my stenographic notes in the proceeding.

21

22                            /s/ Dale C. Hawkins
                              Official Court Reporter
23                            U.S. District Court

24

25