08:28:14 1          IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF DELAWARE

3

4    TRUSTID, INC.,          )
                          ) VOLUME 1
5           Plaintiff,   )
                          ) C.A. No. 18-172(MN)
6    v.                   )
                          )
7    NEXT CALLER, INC.,     )
                          )
8           Defendant.   )

9

10             Monday, July 12, 2021
                9:51 a.m.
11             Jury Trial

12             844 King Street
                Wilmington, Delaware
13

14

15    BEFORE:  THE HONORABLE MARYELLEN NOREIKA
               United States District Court Judge

16

17

18    APPEARANCES:

19             YOUNG CONAWAY STARGATT & TAYLOR
               BY:  ADAM POFF, ESQ.
20
               -and-
21
             STERNE KESSLER GOLDSTEIN & FOX
22           BY:  JONATHAN TUMINARO, PhD., ESQ.
               BY:  MICHAEL D. SPECHT, ESQ.
23

24                  Counsel for the Plaintiff

25

1    APPEARANCES CONTINUED:

2

         MORRIS NICHOLS ARSHT & TUNNELL LLP
3        BY:   JACK B. BLUMENFELD, ESQ.

4        -and-

5        McDERMOTT WILL & EMERY
         BY:   SARAH CHAPIN COLUMBIA, ESQ.
6        BY:   IAN B. BROOKS, ESQ.

7               Counsel for the Defendant

8

08:44:23  9              — — — — — — — — —

08:55:51 10              THE COURT:  Good morning.  Please be seated.

09:51:32 11    All right.  So good morning, ladies and gentlemen.  My name

09:51:55 12    is Maryellen Noreika and I am the judge who will be

09:51:59 13    presiding over the trial in this civil case for which a jury

09:52:03 14    is about to be selected.  I am going to ask you some

09:52:06 15    questions, the purpose of which is to enable us to determine

09:52:10 16    whether or not any prospective jurors should be excused for

09:52:16 17    cause, and two, to enable counsel for the parties to

09:52:19 18    exercise their individual judgment with respect to what are

09:52:22 19    called preemptory challenges that are challenges counsel can

09:52:26 20    make to a potential juror without giving any reason.

09:52:30 21              Before I ask any questions I'm going to ask my

09:52:32 22    deputy, Ms. Walker, to swear in the jury panel to answer all

09:52:36 23    of the questions truthfully.

09:52:37 24              Ms. Walker.

09:52:39 25              COURTROOM DEPUTY:  Members of the jury panel,

09:52:41 1    will you please rise and raise your right hand.

09:52:43 2              Do each of you solemnly swear, those of you who

09:52:47 3    swear, and affirm, those of you who affirm, that you will

09:52:50 4    answer truthfully any questions you are asked pertaining to

09:52:53 5    the matter now before the Court?

09:52:55 6              The appropriate response is I do.

09:52:57 7              THE JURORS:  I do.

09:52:58 8              THE COURT:  All right.  Please be seated.

09:53:00 9              Now you each have a list of the questions that I

09:53:02 10   am going to read aloud.  If you answer yes to any of the

09:53:06 11   questions that I ask, please make a note on the list.  And

09:53:09 12   at the end of the questions I'm going to ask some of you

09:53:13 13   whether you answered yes to any questions and if you did,

09:53:16 14   take you out into the hall where you will wait to talk with

09:53:20 15   the lawyers and me about your answers.

09:53:22 16             We are having jury selection for a case that

09:53:25 17   will begin today and last up to five days until Friday of

09:53:28 18   this week.  The trial will be timed, so the attorneys must

09:53:33 19   complete their trial presentations within the five days.  It

09:53:37 20   is possible, however, the jury deliberation also may require

09:53:40 21   you to be here longer than the scheduled five days.  Our

09:53:42 22   trials will run approximately from 9:00 a.m. to 4:30 p.m.

09:53:47 23   each day.  My questions.

09:53:49 24             Number 1.  Does the schedule that I have just

09:53:51 25   mentioned present a special problem for any of you?

Number 2.  In this case, the plaintiff is TRUSTID, Inc. which has brought a lawsuit against the defendant, Next Caller, Inc., for patent infringement and false advertising related to Next Caller's product, VeriCall.  Defendant denies the allegations.  Have you heard anything about this case prior to today?

3.  Have you or has anyone in your immediate family or close friends had any dealings with, owned stock in, or been employed by TRUSTID or Next Caller?

4.  Have you or has anyone in your immediate family or close friends had any dealings with, owned stock in, or been employed by Neustar or Pindrop?

5.  Do you have any opinions about TRUSTID, Neustar, Pindrop or Next Caller or their products and services that might make it difficult for you to be a fair and impartial juror in this case?

6.  Have you or has anyone in your immediate family or close friends had any experience, good or bad, with TRUSTID, Neustar, Pindrop or Next Caller or their products or services that might keep you from being a fair and impartial juror in this case?

7.  The lawyers and law firms involved in this case are listed here.  I am going to ask you to please carefully review the list.

Now my question.  Do you or your immediate

family members or close friends know of or have dealings with or been employed by any of these attorneys or law firms?

        8.  The potential witnesses in this case are listed here.  Please carefully review the list.  Are you or is anyone in your immediate family or your close friends related to or personally acquainted with any of these individuals?

        9.  Have you or has anyone in your immediate family or close friends had any experience with patents, patent law, patented technology or the United States Patent and Trademark Office?

        10.  Have you or any member of your immediate family or close friends ever applied for or obtained a United States patent or foreign patent?

        11.  Do you have any opinions about patents that might make it difficult for you to be a fair and impartial juror in this case?

        12.  Have you or any member of your immediate family, your close friends or your employer ever been involved in a dispute about patents or false advertising?

        13.  Have you or any member of your immediate family or close friends ever worked at a call center?

        14.  Do you have any formal education or training or have you worked in any of the following fields:

Law, electrical engineering, computer engineering, computer science or telecommunications?

       15.  Have you ever been a plaintiff, a defendant, or a witness in a lawsuit?

       16.  Have you ever served as a juror in a civil lawsuit?

       17.  This is the last question.

Do you know of any other matter that you believe should be called to the Court's attention as having some bearing upon your qualifications or your ability to sit as a juror or that you think may prevent you from rendering a fair and impartial verdict based solely upon the evidence and my instructions as to the law?

All right.  So that is the end of my questions. And now what I am going to do is ask that the lawyers for the parties who are going to be involved in the voir dire go to the conference room.

Okay.  Let's start with the jurors who are over here who are jurors number 1 through 14.  Can you just show me by raising of the hands how many of you answered yes to one or more questions?  Okay.  So anyone who answered yes to a question, I'm going to ask you to stand up and we're going to proceed out into the hall.

Okay.  Now, let me just ask, for the folks who are still sitting there, could you give me your juror

numbers.

                Sir.

                A JUROR:  5.

                THE COURT:  You're 5.

                A JUROR:  I'm 5.

                A JUROR:  4.

                THE COURT:  4.

                3.

                A JUROR:  3.

                THE COURT:  Okay.  Ma'am, in the back.

                A JUROR:  9.

                THE COURT:  9.

                A JUROR:  12.

                THE COURT:  12.

                A JUROR:  14.

                THE COURT:  14.

        All right.  Thank you so much.  So what we are going to do now is we're going to slip out the back and go talk with the folks who are waiting in the hall and we will try and do this as expeditiously as possible and get back, but in the meantime I'm just going to ask you all to sit here and give us a few minutes.

            (A brief recess was taken.)

        THE COURT:  So we have six people who did not answer yes to any of the questions.  So these will be part

of the panel.  Those are juror numbers 3, 4, 5, 9, 12, and 14.

COURTROOM DEPUTY:  Juror number 1 answered 13 and 15.

THE COURT:  Good morning.  Come on in.  You can stand, you can sit down, whatever is more comfortable to you.  So you answered yes to one or more questions?

A JUROR:  Yes.

THE COURT:  Do you want to let me know, which one?

A JUROR:  13 and 15.

THE COURT:  Okay.  At a call center and the plaintiff, defendant, witnesses in the lawsuit.  Let's start with the first one.  Tell me about the answer about the call center.

A JUROR:  My husband worked at a phone solicitors.  I deem that as a call center.  And he worked for one, been over ten years ago.

THE COURT:  Okay.  That's just a job he had, that was not something you were ever involved in?

A JUROR:  No.

THE COURT:  Do you have any feelings about that call center based on that?

A JUROR:  No.

THE COURT:  Okay.  And what about number 15?

A JUROR:  I was a witness in a malpractice suit, a couple of them, about a year or so ago.

THE COURT:  When you say you were a witness?

A JUROR:  I mean for the employer, just indicating what the employee exhibited as far as symptoms when he came to work with his injury.

THE COURT:  Okay.  All right.  And is there anything about that experience that you think impacts your ability to be a juror in the case?

A JUROR:  No.

THE COURT:  Any questions?

MR. TUMINARO:  No.

THE COURT:  Anything?

MR. BLUMENFELD:  Just one thing.  Do you know what the name of the call center was that your husband worked at?

A JUROR:  It was for the Wilmington Fire Fighters for their -- for donations.

MR. BLUMENFELD:  Okay.

A JUROR:  One of those.

MR. BLUMENFELD:  Thank you.

A JUROR:  And I think they did police as well, but I know it was Wilmington Fire Fighters.

THE COURT:  Great.  All right.  Thank you so much.  And you can go back and have a seat in the jury room.

10:49:36 1          A JUROR:  Okay.

10:49:36 2                (Juror leaving the room.)

10:49:36 3                (Juror entering the room.)

10:49:36 4          COURTROOM DEPUTY:  Juror number 2 answered

10:49:36 5   number 14.

10:49:36 6          THE COURT:  Good morning.  Mr. Speights?

10:49:36 7          A JUROR:  Yes.

10:49:36 8          THE COURT:  Thanks for coming in this morning.

10:49:36 9   I'm sorry, which number did you answer yes to?  You can have

10:49:36 10  a seat or stand, whatever is more comfortable.

10:49:36 11         A JUROR:  Thank you.

10:49:36 12         THE COURT:  Which number?

10:49:36 13         A JUROR:  14.

10:49:36 14         THE COURT:  14.  Education.  All right.  Tell us

10:49:36 15  about that.

10:49:36 16         A JUROR:  I have some knowledge.  I have

10:49:36 17  knowledge in electrical engineering.  I didn't finish my

10:49:36 18  degree yet, but I am -- I am almost finished with my degree

10:49:36 19  and I'm --

10:49:36 20         THE COURT:  Are you currently studying now?

10:49:36 21         A JUROR:  Yes.

10:49:36 22         THE COURT:  Where did you go to school?

10:49:36 23         A JUROR:  Dover, Del-Tech.

10:49:36 24         THE COURT:  You said you're almost finished.

10:49:37 25  How long have you been in school?

10:49:37 1          A JUROR:  I registered since '09, 2009, but

10:49:37 2   yeah.

10:49:37 3          THE COURT:  You're doing it slowly over time?

10:49:37 4          A JUROR:  Yeah.  Yeah.

10:49:37 5          THE COURT:  And what specifically is your degree

10:49:37 6   that you're studying?

10:49:37 7          A JUROR:  Associates.

10:49:37 8          THE COURT:  Associates degree.  In electrical

10:49:37 9   engineering or in some subdivision?

10:49:37 10         A JUROR:  It's electrical engineering.

10:49:37 11         THE COURT:  Electrical engineering.

10:49:37 12         A JUROR:  Yeah.

10:49:37 13         THE COURT:  Is it --

10:49:37 14         A JUROR:  It's like electronics engineering,

10:49:37 15  it's like computers, different kinds of stuff.

10:49:37 16         THE COURT:  Okay.  All right.  Is there anything

10:49:37 17  about your knowledge in that that you think would keep you

10:49:37 18  from being fair and impartial to just listen to what the

10:49:37 19  evidence in this case is?

10:49:37 20         A JUROR:  I don't think so, no.

10:49:37 21         THE COURT:  Okay.

10:49:37 22         MR. TUMINARO:  What kind of system do you work

10:49:37 23  on in your electrical engineering training?

10:49:37 24         A JUROR:  Most of the projects we have done was

10:49:37 25  remote -- it might have been like robots, like small robots,

even like robotic arms, programing, circuit boards, circuit

boards and the projects were mostly centered on theory of

circuits in print boards, circuit boards.

MR. TUMINARO:  Is it more hardware or software?

THE COURT:  Or both.

MR. TUMINARO:  Or both.

A JUROR:  Probably both.  More hardware, I would

say hardware.

MR. TUMINARO:  Anything telephone related?

A JUROR:  No.

MR. BLUMENFELD:  Nothing, Your Honor.

THE COURT:  All right.  Thank you very much.

You can go and have a seat back in the jury box, or in the

courtroom and we'll be with as soon as we can.

A JUROR:  One question.

THE COURT:  Sure.

A JUROR:  I may have said yes to 14, but I'm

pretty sure, number one, I mean, I shouldn't have a problem

other than, of course, with work and stuff like that.

THE COURT:  I guess that is a question.  So when

you say work, is that going to be an issue?  Are you not

going to get paid?  Is there an issue with that?

A JUROR:  Just the schedule with work, nothing

to do with the case.

THE COURT:  So the trial is going to be every

day this week from let's say 9:00 to 4:30.  Are you going to

be able to work that schedule out?

               A JUROR:  Will I be working?

               THE COURT:  Like you need to be here from 9:00

to 4:30.  Is that going to be a problem?

               A JUROR:  It shouldn't be.  I can let my

supervisor know.

               THE COURT:  All right.  Thanks for letting us

know that.  You can go back into the courtroom and we'll be

in there in a few minutes.

               A JUROR:  Thank you, Your Honor.

               (Juror leaving the room.)

               THE COURT:  I assume there is no objections to

number 1 or number 2?

               MR. TUMINARO:  Nothing from us.

               THE COURT:  Okay.  Next is going to be juror

number 6.  Do you want to go bring the next person in?

               COURTROOM DEPUTY:  Juror number 6.

               THE COURT:  Good morning.  You can stand, sit,

whatever makes you comfortable.

               A JUROR:  Okay.

               THE COURT:  So you answered yes to a question

number four.

               A JUROR:  Yeah, 1.  3 is a question mark.  And

12 and 15.  12 and 15 are kind of the same.

10:49:38 1     THE COURT:  Okay.  Let's start with 1, the

10:49:38 2  scheduling issue.

10:49:38 3     A JUROR:  I received an excuse letter for next

10:49:38 4  week.  I know you mentioned that this is going to be going

10:49:38 5  this week.

10:49:38 6     THE COURT:  Until Friday.

10:49:38 7     A JUROR:  But this is for Monday through Friday

10:49:38 8  the following week in case things go over.

10:49:38 9     THE COURT:  So you would have a problem being

10:49:38 10  here on Monday if things ran over?

10:49:38 11     A JUROR:  Yes.

10:49:38 12     THE COURT:  Okay.

10:49:38 13     A JUROR:  And then on question 3, Fidelity

10:49:38 14  manages my money, so I honestly don't know if --

10:49:38 15     THE COURT:  Have any stock?

10:49:38 16     A JUROR:  You know what I mean, and they

10:49:38 17  probably don't.

10:49:38 18     On 12 and 15, my employer was involved in a

10:49:38 19  patent infringement case and I was deposed, so I was kind of

10:49:38 20  looking at 15.  And that was Thermatrue versus Peachtree

10:49:38 21  which was an infringement case.

10:49:38 22     THE COURT:  And which of those companies was

10:49:38 23  your employer?

10:49:38 24     A JUROR:  I was on the Peachtree side of things.

10:49:38 25  I was the vice-president of tax.  Why they deposed me, I

10:49:38 1    still don't know to this day.

10:49:38 2              THE COURT:  You must have had something

10:49:38 3    interesting for them.  Is there anything about your

10:49:38 4    experience with that patent litigation that makes you

10:49:38 5    question whether you could be fair and impartial?

10:49:38 6              A JUROR:  No.

10:49:38 7              THE COURT:  All right.  Do you remember what the

10:49:38 8    subject matter of that was?  You said doors.

10:49:38 9              A JUROR:  It was on doors, yeah, infringement on

10:49:38 10   some layering on them.

10:49:38 11             THE COURT:  Questions?

10:49:38 12             MR. TUMINARO:  Were you the defendant in that

10:49:38 13   case?

10:49:38 14             A JUROR:  Yes.

10:49:38 15             THE COURT:  He wasn't.

10:49:38 16             MR. TUMINARO:  Peachtree.

10:49:38 17             A JUROR:  Peachtree would have been the

10:49:38 18   defendant and Thermatrue was the --

10:49:38 19             THE COURT:  Plaintiff.

10:49:38 20             A JUROR:  Yeah.

10:49:38 21             MR. TUMINARO:  Did you attend trial?

10:49:38 22             A JUROR:  No.  I was just deposed in the

10:49:38 23   corporate offices.  The attorney came in, deposed me for,

10:49:38 24   you know, an hour or so.

10:49:38 25             MR. TUMINARO:  What was your role at Peachtree?

A JUROR:  I was vice-president of taxes for the parent company Peachtree.

MR. TUMINARO:  You said taxes.

A JUROR:  Vice-president of taxes for the parent, Peachtree.

THE COURT:  Okay.  Anything?

MR. BLUMENFELD:  Do you know how that case came out?

A JUROR:  Yeah, we lost.

MR. BLUMENFELD:  Anything about that affects your opinion about patent cases?

A JUROR:  No.

THE COURT:  Okay.  Anything else?

Just give us one second.  Okay?  Just wait in the hall for one minute.  Thank you.

(Juror leaving the room.)

THE COURT:  All right.  My guess is that the schedule isn't going to be an issue, but I suppose it could be if he's been excused.  I don't plan to have folks staying here until next Monday.  That's the only issue I can see.  Thoughts?

MR. TUMINARO:  That would be the only issue, Your Honor.

MR. BLUMENFELD:  Yeah, I agree with Your Honor that we're likely to be done by Friday the way things are

10:49:39 1  looking, so I don't see it as a problem.

10:49:39 2  　　　　　　THE COURT:  I suppose we'll just have to deal

10:49:39 3  with it if it becomes an issue.

10:49:39 4  　　　　　　MR. TUMINARO:  Well, Your Honor, if it were to

10:49:39 5  spill over into Monday.

10:49:39 6  　　　　　　THE COURT:  We're not going to do that right

10:49:39 7  now.  I understand, if it spills over into Monday and we

10:49:39 8  lose a juror, that is I suppose an issue, but we can go down

10:49:39 9  to six.

10:49:39 10 　　　　　　MR. TUMINARO:  I guess our concern would be that

10:49:39 11 they would rush to a verdict and we don't want to do that.

10:49:39 12 　　　　　　THE COURT:  Your objection is noted and it's

10:49:39 13 overruled.

10:49:39 14 　　　　　　So he can go back to the box, you know, the 14.

10:49:39 15 　　　　　　COURTROOM DEPUTY:  Number 3 just came up and

10:49:39 16 said that he answered questions.

10:49:39 17 　　　　　　THE COURT:  Why don't you bring in number 3.

10:49:39 18 　　　　　　COURTROOM DEPUTY:  Okay.

10:49:39 19 　　　　　　THE COURT:  He stood up and sort of sat down and

10:49:39 20 then stood up.

10:49:39 21 　　　　　　COURTROOM DEPUTY:  Yes.

10:49:39 22 　　　　　　(Juror entering the room.)

10:49:39 23 　　　　　　COURTROOM DEPUTY:  Juror number 3.

10:49:39 24 　　　　　　THE COURT:  Good morning.

10:49:39 25 　　　　　　A JUROR:  Good morning.

```
10:49:39  1            THE COURT:  You stood up, you sat down, so I
10:49:39  2   guess you decided you wanted to talk to us.
10:49:39  3            A JUROR:  I don't think --
10:49:39  4            THE COURT:  No problem.  What did you want to
10:49:39  5   talk to us about?
10:49:39  6            A JUROR:  I have work to do.
10:49:39  7            THE COURT:  You have work?
10:49:39  8            A JUROR:  Yeah.
10:49:39  9            THE COURT:  Tell us what your job is.
10:49:39 10            A JUROR:  Amazon.
10:49:39 11            THE COURT:  At Amazon?  And if you don't go to
10:49:39 12   work, are you -- do you get paid or do they give you --
10:49:39 13            A JUROR:  I have no idea.
10:49:39 14            THE COURT:  You don't know?
10:49:39 15            A JUROR:  No.
10:49:39 16            THE COURT:  Are you scheduled?
10:49:39 17            A JUROR:  This is my first time missing work.
10:49:39 18            THE COURT:  Your first what?
10:49:39 19            A JUROR:  I come in here and don't go to work
10:49:39 20   first time.
10:49:39 21            THE COURT:  But you mean for jury duty?
10:49:39 22            A JUROR:  Yeah.
10:49:39 23            THE COURT:  So do you understand English or do
10:49:39 24   you feel uncomfortable?
10:49:39 25            A JUROR:  Uncomfortable.
```

10:49:39 1      THE COURT:  You feel uncomfortable with English.

10:49:39 2      How about we excuse Mr. Patel.  It is Mr. Patel?

10:49:39 3      A JUROR:  Yes.

10:49:39 4      THE COURT:  Mr. Patel, we're going to excuse you

10:49:39 5  and you can actually get your belongings and go and leave if

10:49:39 6  you choose.  Thank you so much for coming in.  We appreciate

10:49:39 7  it.

10:49:39 8      A JUROR:  Thank you.

10:49:39 9      THE COURT:  Have a good day.

10:49:39 10     (Juror leaving the room.)

10:49:40 11     COURTROOM DEPUTY:  Juror number 7.

10:49:40 12     THE COURT:  Good morning.

10:49:40 13     A JUROR:  Good morning.

10:49:40 14     THE COURT:  Ms. Moore?

10:49:40 15     A JUROR:  Yes.

10:49:40 16     THE COURT:  You can stand, sit, whatever is more

10:49:40 17  comfortable for you.

10:49:40 18     You answered yes to questions.

10:49:40 19     A JUROR:  Yes.  Question 13 and 16.

10:49:40 20     THE COURT:  Okay.  Call center and serving as a

10:49:40 21  juror.

10:49:40 22     A JUROR:  Uh-huh.

10:49:40 23     THE COURT:  Okay.  So tell us about the call

10:49:40 24  center.

10:49:40 25     A JUROR:  I worked for Coventry, myself and both

my daughters, we both worked in the call center there for
the insurance company.

        THE COURT:  What kind of things did you do?

        A JUROR:  Answer incoming calls from providers
and members.

        THE COURT:  How long did you do that?

        A JUROR:  I did that for, myself personally I
did that for a year.

        THE COURT:  What about your daughters?

        A JUROR:  One did it for two years, the other
one for I think four.

        THE COURT:  Is anyone currently there now?

        A JUROR:  No.

        THE COURT:  And how long ago did you work there?

        A JUROR:  Seven years ago.

        THE COURT:  All right.

        A JUROR:  I mean, I do -- not the position now,
but I was at the call center.  I had incoming and outgoing
calls from providers as a case manager.

        THE COURT:  Also on the insurance issues?

        A JUROR:  Uh-huh.  Yeah.

        THE COURT:  Is there anything about that
experience that makes you think that you couldn't be fair
and impartial in the case?

        A JUROR:  No, not really.

THE COURT:  Okay.  Now, what about serving as a juror?

A JUROR:  I was a juror, I was the foreman.  It was a slip and fall case.

THE COURT:  Do you remember what court, was that here in Wilmington or a different court?

A JUROR:  Yes.

THE COURT:  Was it in state court?

A JUROR:  State court.

THE COURT:  How long ago was that?

A JUROR:  That was about five years ago.

THE COURT:  And you were the forewoman, foreperson?

A JUROR:  Foreperson.

THE COURT:  And do you know what the outcome of that trial was?

A JUROR:  We found for the company and against the defendant.

THE COURT:  It was a company against --

A JUROR:  It was a slip and fall in a store, so we found that the company was not negligent.

THE COURT:  Okay.  All right.  Any questions?

MR. TUMINARO:  You mentioned that you answered incoming calls.  What do you understand the incoming calls to be?

10:49:40 1                    A JUROR:  I'm sorry?

10:49:40 2                    MR. TUMINARO:  What were the incoming calls,

10:49:40 3     with can you describe the incoming calls that you answered?

10:49:40 4                    A JUROR:  Like I say, they were from members,

10:49:40 5     doctors, provider offices, they would call for benefits,

10:49:40 6     authorizations, various things.

10:49:40 7                    MR. TUMINARO:  Did your call center have an

10:49:40 8     interactive voice response system?

10:49:41 9                    A JUROR:  Yes, towards the end.  When I first

10:49:41 10    started they didn't, but they implemented that.  And the

10:49:41 11    last position I had as case manager, they did have the

10:49:41 12    interactive system.

10:49:41 13                   MR. TUMINARO:  Was there any special technology

10:49:41 14    running on that interactive voice response system that

10:49:41 15    you're aware of?

10:49:41 16                   A JUROR:  I'm not a technical person so I can't

10:49:41 17    really tell you.  I did voiceover internet protocol the last

10:49:41 18    position I did, IP, because I worked at home.  Other than

10:49:41 19    that, that's all I can tell you.  The previous position

10:49:41 20    before that was actually in an office.

10:49:41 21                   MR. TUMINARO:  Thank you.

10:49:41 22                   MR. BLUMENFELD:  No questions.

10:49:41 23                   THE COURT:  All right.  Thank you very much.

10:49:41 24                   (Juror leaving the room.)

10:49:41 25                   THE COURT:  All right.  Any objections?

MR. BLUMENFELD:  No, Your Honor.

MR. TUMINARO:  No, Your Honor.

(Juror entered the room.)

COURTROOM DEPUTY:  Number 8.

THE COURT:  Good morning.

A JUROR:  Good morning.

THE COURT:  Have a seat.  So you answered yes to --

A JUROR:  Number 9.

THE COURT:  -- number 9.

A JUROR:  My husband is a chemist and I think he has testified before the United States Patent and Trademark Office for -- it was a case against a Chinese company that undersold them on a patented product, I believe.

THE COURT:  Where does your husband work?

A JUROR:  He works for Nemours.  I think it's while he's been with Nemours.  He was with DuPont before that, so I don't really remember which.

THE COURT:  It gets confusing.  All right.  Do you know anything about the subject matter of your husband's patents or just --

A JUROR:  No, it's way beyond me.

THE COURT:  And is there anything in your experience that makes you feel like you could or couldn't be fair and impartial on a case looking at whether a company

10:49:41 1    infringed a patent or whether a patent was valid?

10:49:41 2              A JUROR:  No.

10:49:41 3              THE COURT:  All right.

10:49:41 4              A JUROR:  I also answered yes to another

10:49:41 5    question.

10:49:41 6              THE COURT:  Okay.

10:49:41 7              A JUROR:  Number 14.  I do have a degree in law.

10:49:41 8    I have not been practicing for ever since we moved here

10:49:41 9    sixteen years ago.  General civil law.  I specialized in

10:49:41 10   appeals of denials of Social Security disability claims.

10:49:41 11             THE COURT:  You see a lot of those.

10:49:41 12             A JUROR:  Uh-huh.

10:49:41 13             THE COURT:  And where were you -- where did you

10:49:41 14   practice?

10:49:41 15             A JUROR:  I did that work in Ohio.  I also

10:49:41 16   practiced in New Hampshire.

10:49:41 17             THE COURT:  And you haven't practiced law since?

10:49:41 18             A JUROR:  Since 2005.

10:49:41 19             THE COURT:  All right.  I always have the need

10:49:41 20   for those good lawyers to do those things in case you ever

10:49:41 21   want to start up again.

10:49:41 22             Okay.  Any questions?

10:49:41 23             MR. TUMINARO:  I don't know if I heard.  How

10:49:41 24   long were you practicing law?

10:49:41 25             A JUROR:  I practiced for a little less than

five years in Ohio, then I took a break when we had a family
and we moved a lot.  And then in New Hampshire I took the
bar exam and just practiced on my own doing general civil
stuff for another five or ten years.

        MR. TUMINARO:  You mentioned also that your
husband is a chemist.  Did his experience have any impact on
your ability to be fair and impartial?

        A JUROR:  No.

        MR. BLUMENFELD:  I think you said that one of
your husband's patents was asserted against a Chinese
company?

        A JUROR:  Yes.

        MR. BLUMENFELD:  Do you know how that came out?

        A JUROR:  No, I don't.

        MR. BLUMENFELD:  Does the fact that one of his
patents had been asserted, does that have any affect on your
view or the patents --

        A JUROR:  No, it was a patent with the company,
it wasn't something he personally held, so no.

        MR. BLUMENFELD:  Thank you.

        THE COURT:  All right.  Thank you very much.

        A JUROR:  Sure.

        (Juror leaving the room.)

        THE COURT:  Any objections?

        MR. TUMINARO:  No.

10:49:42 1       MR. BLUMENFELD:  No.

10:49:42 2       THE COURT:  Okay.

10:49:42 3       Juror number 10.  Mr. Mentzel.

10:49:42 4       A JUROR:  Yes.

10:49:42 5       THE COURT:  Good morning.  Thank you for coming

10:49:42 6 in.  You can sit down, stand up, whatever is more

10:49:42 7 comfortable.

10:49:42 8       A JUROR:  Sure.

10:49:42 9       THE COURT:  So you answered yes.

10:49:42 10       A JUROR:  To number 14.

10:49:42 11       THE COURT:  Number 14.  Form education, what's

10:49:42 12 your training or work experience?

10:49:42 13       A JUROR:  Computer science, and I am right now

10:49:42 14 an associate director of systems administration at Galtrip

10:49:42 15 College.

10:49:42 16       THE COURT:  Okay.  And can you just give us an

10:49:42 17 idea of what kind of things you do?

10:49:42 18       A JUROR:  I keep all the servers that run the

10:49:42 19 college running.

10:49:42 20       THE COURT:  Okay.  And how long have you had

10:49:42 21 that position?

10:49:42 22       A JUROR:  Twenty-four years.

10:49:42 23       THE COURT:  And have you worked in computer

10:49:42 24 science for other places even before that?

10:49:42 25       A JUROR:  Yes.

THE COURT:  How long have you been working in computer science, your whole career?

A JUROR:  Yes, since I was eighteen.

THE COURT:  Okay.  Why don't I just open it up because I don't know really what the specific relevance of that is.

MR. TUMINARO:  In your computer science background, can you describe a little bit more about your systems administration experience?

A JUROR:  Sure.  I have to, like I said, I have to maintain and keep all -- over a hundred servers up and running.  On those servers there are many applications that I have to know, knowledge of, and keep running, also.

MR. TUMINARO:  That system, does it include any telecommunications interfaces or telecommunications systems?

A JUROR:  Yes.  Yes.

MR. TUMINARO:  Given your experience, would it be difficult for you to base your decision on what you hear in the courtroom and not just based on your past experience and knowledge?

A JUROR:  Would I use that?

MR. TUMINARO:  Would it be difficult for you to just rely on what you hear in the courtroom and on your past experience and knowledge?

A JUROR:  Common sense would tell me what I

10:49:42 1   would use, what I know, sure.

10:49:42 2         MR. TUMINARO:  Would it be hard for you to base

10:49:42 3   your decision on only the evidence that's presented in the

10:49:42 4   courtroom?

10:49:42 5         A JUROR:  Sure.

10:49:42 6         MR. TUMINARO:  It would be hard, that's what you

10:49:42 7   said?

10:49:42 8         A JUROR:  No, it would not be hard.

10:49:43 9         MR. TUMINARO:  Do you have dealings with IVR

10:49:43 10   systems in your systems administrations?

10:49:43 11         A JUROR:  That acronym doesn't ring a bell.

10:49:43 12         THE COURT:  All right.  Wrap it up so we don't

10:49:43 13   have on to put you on the clock.  Anything?

10:49:43 14         MR. TUMINARO:  We're done.

10:49:43 15         THE COURT:  Mr. Blumenfeld?

10:49:43 16         MR. BLUMENFELD:  Do you have any patents or

10:49:43 17   experience with patents?

10:49:43 18         A JUROR:  No.

10:49:43 19         MR. BLUMENFELD:  Thank you.

10:49:42 20         THE COURT:  All right.  Thank you very much.

10:49:42 21   You can go.  Thank you.

10:49:42 22         (Juror leaving the room.)

10:49:42 23         THE COURT:  Any objections?

10:49:42 24         MR. BLUMENFELD:  No.

10:49:42 25         MR. TUMINARO:  (Nodded head.)

THE COURT:  Can we speak on the record just so we have it on the record.

MR. TUMINARO:  No objections, Your Honor.

THE COURT:  Thank you.

Mr. Nuegebauer.

A JUROR:  Nuegebauer.

THE COURT:  Thank you for coming in.  You can stand sit, whatever makes you comfortable.

A JUROR:  Okay.

THE COURT:  You answered yes.

A JUROR:  Yes, to numbers 10 and 13.

THE COURT:  Okay.  Patents and call centers.

A JUROR:  Yes.

THE COURT:  Tell us about the patents.

A JUROR:  About three or four years ago I applied for but never obtain a patent for a short sleeve packable rain jacket for runners to wear, so I didn't proceed with it.  I decided from a business perspective not to pursue it any further.  And then for 13, my first job out of college was at Juniper Bank which is now owned by Barclays and I worked in the call center for the credit card.

THE COURT:  What kind of things did you do there?

A JUROR:  People would call in -- basically no

one ever calls you to tell you you're doing a great job in that business, they call to complain about interest rates, late fees.

THE COURT:  I was going to say, the interest rate is what?

A JUROR:  That's why they called.  Occasionally you have people applying for things, new credit cards over the phone.  That was seventeen or eighteen years ago since that point.  It's been a while since I got out of college.

THE COURT:  How long did you do that job?

A JUROR:  I was there for twelve to fourteen months.

THE COURT:  All right.  Questions?

MR. TUMINARO:  So what was your experience with the patent prosecution, your own patent?

A JUROR:  I did it all through Legal Zoom, so I put everything through there.  I think they responded with some questions specifically about the jacket.  And to be honest, at that point I had already dumped like 5,000 bucks into it, and I didn't want to do it anymore.  I left it abandoned.  I still get e-mails from time to time asking me if I want to continue to work on the abandoned patent.

MR. TUMINARO:  Did you have any interactions back and forth with a patent examiner?

A JUROR:  No, I did not, no.

10:49:44 1          MR. BLUMENFELD:  No questions, Your Honor.

10:49:44 2          THE COURT:  All right.  Thank you very much.

10:49:44 3          A JUROR:  Okay.

10:49:44 4          (Juror leaving the room.)

10:49:44 5          THE COURT:  Any objections?

10:49:44 6          MR. TUMINARO:  No objections, Your Honor.

10:49:44 7          MR. BLUMENFELD:  No objections.

10:49:44 8          THE COURT:  Okay.  Number 13.

10:49:44 9          (Juror entering the room.)

10:49:44 10         THE COURT:  Ms. Biggs, thank you for coming in.
You can have a seat.  You answered yes.

10:49:44 12         A JUROR:  Yes, to the call center one.

10:49:44 13         THE COURT:  13?

10:49:44 14         A JUROR:  Yes.  Did you need to know about it?

10:49:44 15         THE COURT:  Just tell us about your familiarity.

10:49:44 16         A JUROR:  I worked at two call centers.  The
first one was -- do you need the name?

10:49:44 18         THE COURT:  That would help.

10:49:44 19         A JUROR:  The first one called ARC Services.  I
don't know if they are still around.  It was a scam where if
someone went on a website it would ultimately send their
information over so we would call them and it was in regards
to signing up for our services to better their credit score
and you got two weeks free and after that we charged their
account $75.  If they looked at their bank statements, if

they had any stop payments on their account we weren't allowed to go through with it for them. It was a scam. Obviously I wasn't there that long.

The second one was Free Rate Update, another one where you click on the website and could go to Rocket Mortgage and their information would get sent over to us, we look at it on the screen, it's in regard to refinancing VA loans and stuff like that, then you would pop up on the screen, call them, it's like hi, so and so from Free Rate Update. We saw you were interested. We make it sound like you are going to be the loan officer. And then we say we'll put our loan officer on the line with you. And we would send them over to one of fifty loan officer companies. It was another scam.

THE COURT: Well, look at you. How long did you do the first job?

A JUROR: The first job, I would say like six months. The second one was probably a year.

THE COURT: And when was that?

A JUROR: The one for --

THE COURT: The most recent.

A JUROR: The most recent one, Free Rate Update, I was there last year. And then ARC Services, I want to say 2016.

THE COURT: All right. I'll let the lawyers ask

10:49:45 1    you, they might have more specific questions about the

10:49:45 2    technology used there.

10:49:45 3                    A JUROR:  Okay.

10:49:45 4                    MR. TUMINARO:  At either call center, did you

10:49:45 5    answer incoming calls?

10:49:45 6                    A JUROR:  Yes, at both of them.

10:49:45 7                    MR. TUMINARO:  Can you describe what calls you

10:49:45 8    answered.

10:49:45 9                    A JUROR:  So somebody would think they were --

10:49:45 10   like for the second one, the Rate Update for the mortgage

10:49:45 11   company, they would think that they were calling in to

10:49:45 12   Rocket Mortgage Company, but they're not actually calling in

10:49:45 13   to them, they got directed over to us and then you direct

10:49:45 14   them over to somebody else.

10:49:45 15                   The first one, no, you -- we got all their

10:49:45 16   information because they clicked on a website and they put

10:49:45 17   their phone number in, it would automatically generate a

10:49:45 18   call back.

10:49:45 19                   MR. TUMINARO:  So at either call center, did you

10:49:42 20   have something called an interactive voice response system?

10:49:42 21                   A JUROR:  Explain that.

10:49:42 22                   MR. TUMINARO:  If you have --

10:49:42 23                   A JUROR:  I don't think so.  It sounds a little

10:49:42 24   bit familiar.

10:49:42 25                   MR. TUMINARO:  Who or what directed the calls to

10:49:45 1   you?

10:49:45 2         A JUROR:  It was some kind of lead system.

10:49:45 3         MR. TUMINARO:  Do you have any knowledge about

10:49:45 4   that?

10:49:45 5         A JUROR:  I don't know what it was now.  They

10:49:45 6   just called them leads.  We're getting leads in, that's what

10:49:45 7   they called it.

10:49:45 8         MR. TUMINARO:  Anything about your experience

10:49:45 9   there that would make it difficult for you to be impartial

10:49:45 10   on this jury?

10:49:45 11         A JUROR:  No.  I mean, I don't think it's right

10:49:45 12   to lie to people.

10:49:45 13         THE COURT:  The particular ones that you worked

10:49:45 14   at you're saying, or all call centers?

10:49:45 15         A JUROR:  I mean, if you're working for Chase

10:49:45 16   Bank, if somebody is calling about Chase Bank, but this one,

10:49:45 17   they thought they were calling into another company and you

10:49:45 18   send them over.  I frequently had people yell at me for it,

10:49:45 19   so I didn't think it was right.  I would be really mad, too,

10:49:45 20   if somebody did that to me.

10:49:42 21         THE COURT:  Anything?

10:49:42 22         MR. BLUMENFELD:  No questions, Your Honor.

10:49:42 23         THE COURT:  Thank you very much.

10:49:42 24        (Juror leaving the room.)

10:49:42 25         MR. TUMINARO:  No objections.

10:49:45 1          MR. BLUMENFELD:  No objections.

10:49:45 2          THE COURT:  All right.  You're number 15.

10:49:45 3          COURTROOM DEPUTY:  Number 15.

10:49:45 4          THE COURT:  Ms. Deaton.

10:49:45 5          A JUROR:  Yes.

10:49:45 6          THE COURT:  How are you?  Thanks for coming in.

10:49:45 7          A JUROR:  Sure.

10:49:45 8          THE COURT:  You answered yes to a question or

10:49:45 9  two.

10:49:45 10          A JUROR:  Yeah.  Number 1, I would have to

10:49:45 11  rearrange, my 92-year-old mother-in-law.

10:49:45 12          THE COURT:  Did she have something scheduled

10:49:45 13  this week?

10:49:45 14          A JUROR:  Yes.

10:49:45 15          THE COURT:  Would it be possible for you to

10:49:45 16  reschedule?

10:49:45 17          A JUROR:  Yes.  She's getting cataract surgery,

10:49:45 18  so we just have a pre-opt visit.

10:49:45 19          THE COURT:  Do you think it's possible for you

10:49:42 20  to do that?

10:49:42 21          A JUROR:  Yes.  I can probably do that.

10:49:42 22          THE COURT:  Okay.

10:49:42 23          A JUROR:  The other one, question 2, do you or

10:49:42 24  your immediate family or close friends had business dealings

10:49:42 25  with any of these firms, and my husband owns a boutique

10:49:46 1    commercial real estate company and has been advised by

10:49:46 2    people from Young, Conaway, Stargatt & Taylor and has also

10:49:46 3    used them because they manage -- he managed properties in

10:49:46 4    his past.

10:49:46 5         THE COURT:  So I'm sorry, so which side of the

10:49:46 6    coin is -- he both has used them as attorneys and they have

10:49:46 7    sued him?

10:49:46 8         A JUROR:  Yes, as property manager, it wasn't

10:49:46 9    him personally.

10:49:46 10        THE COURT:  I see.  I see.  As property manager.

10:49:46 11        A JUROR:  Yeah, but there has been -- I hear

10:49:46 12    that around the dinner table.

10:49:46 13        THE COURT:  All right.

10:49:46 14        A JUROR:  And then have you ever served as a

10:49:46 15    juror in a civil suit?  And I have.

10:49:46 16        THE COURT:  Tell us about that.

10:49:46 17        A JUROR:  It was a civil suit that a woman was

10:49:46 18    claiming disabilities due to her accident and was suing for

10:49:46 19    benefits from the insurance company, and the insurance

10:49:46 20    company said it was not liable.

10:49:46 21        THE COURT:  Was that in state court?

10:49:46 22        A JUROR:  Yes.

10:49:46 23        THE COURT:  About how long ago was that?

10:49:46 24        A JUROR:  Probably four years ago.

10:49:46 25        THE COURT:  Four years.  Do you remember what

10:49:46 1    the result was?

10:49:46 2                    A JUROR:  Yes.  We did pay a few medical bills,

10:49:46 3    but not many.

10:49:46 4                    THE COURT:  So it was sort of split that the

10:49:46 5    person who was claiming disability paid, but not all that

10:49:46 6    they were seeking?

10:49:46 7                    A JUROR:  Correct.  Yes.

10:49:46 8                    THE COURT:  All right.  Questions?

10:49:46 9                    MR. TUMINARO:  I think you mentioned that you

10:49:4 10    had dealings with Young Conaway attorneys?

10:49:4 11                    A JUROR:  I have not, my husband's business has

10:49:4 12    been at times.

10:49:4 13                    MR. TUMINARO:  When was that?

10:49:4 14                    A JUROR:  I'm not sure.  I mean, I just heard

10:49:4 15    the name around the dinner table because he owns a small

10:49:4 16    boutique commercial real estate company and they managed

10:49:4 17    properties in the past, so I would hear that name.  And he

10:49:4 18    also developed properties in downstate.  So that name has

10:49:4 19    come up.

10:49:4 20                    MR. TUMINARO:  What was your husband's role?

10:49:4 21                    A JUROR:  He owned the commercial real estate

10:49:4 22    company so he has an attorney and they would work for that

10:49:4 23    firm.

10:49:4 24                    MR. TUMINARO:  Was he deposed at all in that

10:49:4 25    matter?

A JUROR:  He has been.  Many times it's settled before they go to court.

MR. TUMINARO:  At Young Conaway, I'm sure there has been settlements.  Does that impact your ability to be impartial at all?

A JUROR:  Not really, he does not have a favorable view of, you know, injury type things.  I guess if you were asking me do I have a slight bias about personal injury, probably.

MR. TUMINARO:  And --

THE COURT:  I think he's asking more about the firm specifically rather than personally.

A JUROR:  No, I'm not talking about the firm. My husband's dealings have been -- I'm just talking about his dealings.

MR. TUMINARO:  Has your husband expressed any negative opinions toward Young Conaway?

A JUROR:  No.

THE COURT:  Just so I understand it, your husband has actually used Young Conaway as his attorney?

A JUROR:  I believe so, but I think it's been primarily on the other type, that he has an attorney that is working for him.

MR. TUMINARO:  Okay.

MR. BLUMENFELD:  Would anything about your

husband's relationship with Young, Conaway over the years

affect your ability to decide this case fairly based on the

evidence?

    A JUROR:  No.

    MR. BLUMENFELD:  Thank you.

    THE COURT:  Thanks very much.  Just give us one

second.

    A JUROR:  Okay.

    (Juror leaving the room.)

    MR. TUMINARO:  Rule for cause, bias against

Young Conaway.

    THE COURT:  You got to be more specific than

that.  She said no, but she's been on both sides so give me

something more.

    MR. TUMINARO:  She's had negative settlements

through Young, Conaway.  She's had conversations with her

husband about what happened at Young, Conaway.  So we move

for implicit bias with Young Conaway for having negative

settlements against her husband in the past.

    MR. BLUMENFELD:  I didn't hear anything about

Young, Conaway to have a reasonable basis that it would

affect her ability to decide the case fairly.

    THE COURT:  I'm just going to sustain the

objection because we have so many people in the pool to

choose from.  And to the extent she might have negative

10:49:47 1   feelings, I will sustain that objection.  She can go home.

10:49:47 2                    Can you check with number 16.

10:49:47 3                     (Juror entering the room.)

10:49:47 4                    THE COURT:  Good morning.

10:49:47 5                    COURTROOM DEPUTY:  Juror number 16.

10:49:47 6                    THE COURT:  Good morning, Mr. Riethmuller.

10:49:47 7   Thanks for coming in this morning.  Sir, you answered yes to

10:49:47 8   a question.

10:49:47 9                    A JUROR:  The first one.

10:49:47 10                   THE COURT:  Just tell us about that.

10:49:47 11                   A JUROR:  I have medical issues.

10:49:47 12                   THE COURT:  Okay.

10:49:47 13                   A JUROR:  I got a doctor's appointment next

10:49:47 14  Monday.  I have something very recently I want to get

10:49:47 15  attended to this week.  I have a growth in my elbow.

10:49:47 16                   THE COURT:  I actually see that, sir.  I can

10:49:47 17  see.

10:49:47 18                   A JUROR:  And I get tired easily.

10:49:47 19                   THE COURT:  Do you think it would be difficult

10:49:47 20  for you to sit through a whole day's worth of trial day

10:49:47 21  after day?

10:49:47 22                   A JUROR:  Yes.

10:49:47 23                   THE COURT:  Does anyone object to me excusing

10:49:47 24  Mr. Riethmuller?

10:49:47 25                   MR. TUMINARO:  No, Your Honor.

10:49:47 1          MR. BLUMENFELD:  No, Your Honor.

10:49:47 2          THE COURT:  Thank you very much for coming in,

10:49:47 3     sir.  I do appreciate it.  And good luck with your elbow.

10:49:47 4              (Juror leaving the room.)

10:49:47 5          COURTROOM DEPUTY:  Juror number 17.

10:49:47 6          THE COURT:  Ms. Williams.

10:49:47 7          A JUROR:  Hi.

10:49:47 8          THE COURT:  Good morning.  Thanks for coming in.

10:49:47 9     Come on over.  You can stand, sit, whatever you're more

10:49:48 10    comfortable with.

10:49:48 11             So you answered yes.

10:49:48 12         A JUROR:  Yes.  I answered yes to call center

10:49:48 13    questions.

10:49:48 14         THE COURT:  13, I think.

10:49:48 15         A JUROR:  Yes.

10:49:48 16         THE COURT:  Is that the only one?

10:49:48 17         A JUROR:  And number 5.

10:49:48 18         THE COURT:  Opinions about TRUSTID, Neustar,

10:49:48 19    Pindrop, or Next Caller.

10:49:48 20         A JUROR:  Yes.

10:49:48 21         THE COURT:  Tell us about that.

10:49:48 22         A JUROR:  I have heard about TRUSTID, and it

10:49:48 23    wasn't a positive feedback about them.

10:49:48 24         THE COURT:  Can you tell me in what context you

10:49:48 25    heard that?

10:49:48 1    A JUROR:  I heard they're like a scam company.

10:49:48 2    THE COURT:  Okay.

10:49:48 3    A JUROR:  And that it was a person that I knew,

10:49:48 4 they dealt with them and don't go through TRUSTID.  I just

10:49:48 5 heard the company name and I remember that name.

10:49:48 6    THE COURT:  And you think that that might make

10:49:48 7 it difficult for you to be impartial in the case?

10:49:48 8    A JUROR:  I try to be a fair person, so I don't

10:49:48 9 know.  I just said yep because I did hear about it, so --

10:49:48 10    THE COURT:  Okay.  Do you remember in what

10:49:48 11 context, just so we know it's the same company, was it about

10:49:48 12 calls or something like that?

10:49:48 13    A JUROR:  Yeah, it was about those robotic --

10:49:48 14    THE COURT:  Robo calls.

10:49:48 15    A JUROR:  That's what I heard.

10:49:48 16    MR. TUMINARO:  We all try to be fair, but you

10:49:48 17 have heard negative things about TRUSTID.  Would that make

10:49:48 18 it difficult for you to be fair in this case?

10:49:48 19    A JUROR:  No.

10:49:48 20    MR. TUMINARO:  What were the negative things

10:49:48 21 that you heard about TRUSTID?

10:49:48 22    A JUROR:  It was more in the context to the robo

10:49:48 23 calls, and do you ever get these calls from TRUSTID all the

10:49:48 24 time.  And I'm like no.  And they were like, oh, they're

10:49:48 25 horrible.  And that's how the conversation went.

10:49:48 1          MR. TUMINARO:  When was that conversation,

10:49:48 2    roughly?

10:49:48 3          A JUROR:  Months, during the pandemic, when

10:49:48 4    everybody else was getting all these robo calls.

10:49:48 5          THE COURT:  Everyone was home to get them.

10:49:48 6          A JUROR:  Yeah, so it was during the pandemic.

10:49:48 7          MR. TUMINARO:  And who did you hear that from?

10:49:48 8          A JUROR:  Colleagues of mine.

10:49:48 9          MR. TUMINARO:  At the call center?

10:49:48 10         A JUROR:  No, it actually previous colleagues to

10:49:48 11   be honest with you.  Just touching base with other people

10:49:48 12   during the pandemic.  I had a lot more time to reach out to

10:49:48 13   people.  And they were just like do you always get these

10:49:48 14   calls and just random general conversation, but I know the

10:49:48 15   name was TRUSTID.  I'm just being honest about it.

10:49:48 16         MR. TUMINARO:  Okay.

10:49:48 17         MR. BLUMENFELD:  No questions, Your Honor.

10:49:48 18         THE COURT:  You also said you worked for a call

10:49:48 19   center.

10:49:48 20         A JUROR:  Chase Bank call center.

10:49:48 21         THE COURT:  And what was your position there?

10:49:48 22         A JUROR:  Customer service.

10:49:48 23         THE COURT:  All right.  And in that context you

10:49:48 24   didn't have any experience with any of the --

10:49:48 25         A JUROR:  No.

THE COURT:  -- companies?

A JUROR:  No.

THE COURT:  Just give us one minute.

Thank you.

(Juror leaving the room.)

THE COURT:  I assume it's your motion?

MR. TUMINARO:  We move to strike, actual bias.

MR. BLUMENFELD:  I thought she sounded perfect, but I won't oppose that.

THE COURT:  We will excuse Ms. Williams for cause.

18.

COURTROOM DEPUTY:  Juror number 18.

(Juror entering the room.)

THE COURT:  Good morning, Mr. Roman.

A JUROR:  Good morning.

THE COURT:  How are you?

A JUROR:  Good.  How are you?

THE COURT:  Good.  Thank you.  Thanks for coming in this morning.  So you answered yes to a question.

A JUROR:  I did not.

THE COURT:  You didn't?

A JUROR:  No.

THE COURT:  You could have asked him that before you came.  At least you got a nice walk.  You can take a

chair.  Thank you.

I think we have 14.  So I think we have 14, so just so we're all on the same page, we have jurors numbers 1, 2, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, and 18.

All right.  So we can go back and we will do our preemptories.  So everyone is going to be sitting in the seats of 1 through 14, so that's where you're going to be looking at people for the panel.

MR. TUMINARO:  Thank you.

THE COURT:  All right.  Everyone, please be seated.  Okay.  Just a few more minutes.  We're going to let the jury -- what happens now is we're going to go back and forth between the parties to get down from our panel of fourteen to eight potential jurors.

(Pause)

All right.

COURTROOM DEPUTY:  When I call your number, please have a seat in the first row of the jury box.

Number 2.

Number 18.

Number 4.

Number 5.

Number 9.

Number 11.

Number 12.

10:58:30 1          And number 14.

10:58:50 2          THE COURT:  All right.  So we have our jury

10:59:07 3   here.  I am going to ask Ms. Walker to swear in the --

10:59:15 4   apparently I had that wrong.  I am going to now dismiss

10:59:19 5   everyone who is in the back who has not been picked for the

10:59:24 6   jury.  And I thank you all for coming in today and for your

10:59:28 7   patience with us this morning.

10:59:44 8          All right.  Thank you.

11:00:11 9          COURTROOM DEPUTY:  Members of the jury panel,

11:00:13 10  will you please rise and raise your right hand.

11:00:16 11          You and each of you do swear, those of you who

11:00:21 12  swear, and you and each of you do affirm, those of you who

11:00:24 13  affirm, that you will try and true wherein TRUSTID is the

11:00:29 14  plaintiff and Next Caller is the defendant, and that you

11:00:32 15  will a true verdict render according to the evidence so help

11:00:36 16  you God, those of you who swear, and those of you who do

11:00:41 17  affirm, the appropriate response is I do.

11:00:45 18          JURY:  I do.

11:00:45 19          THE COURT:  Thank you all very much.  Take your

11:00:48 20  seat.  What you're going to do now, I know some of you might

11:00:51 21  need to make some telephone calls.  We're going to also give

11:00:55 22  you a moment to put down some of your belongings if you want

11:00:58 23  to in the jury room.  What we're going to do is take about a

11:01:02 24  twenty-minute break for you to go get done anything that you

11:01:05 25  need to do, and then we'll come back in, I'm going to read

11:01:08 1  you some preliminary instructions just to give you an idea

11:01:11 2  of what you need to do as a juror with a little bit of

11:01:15 3  background on this case and then you will hear the opening

11:01:18 4  statements in this case.

11:01:19 5  And then probably, I don't know, it depends on

11:01:22 6  how long the opening statements go, we'll either break in

11:01:25 7  the middle or after the last of the opening statements,

11:01:28 8  we'll take a break for lunch.

11:01:31 9  So with that, we're going to recess you.  And

11:01:35 10  Ms. Walker, do you want to take them back to the jury room.

11:01:39 11  COURTROOM DEPUTY:  All rise.  Court is in

11:01:43 12  recess.

11:01:43 13  (Jury leaving the courtroom at 11:01 a.m.)

11:02:04 14  THE COURT:  All right.  So before the jury comes

11:02:08 15  back, I wanted to talk about these objections.  You're on

11:02:14 16  the clock, so objections to plaintiff's opening slides 7 and

11:02:21 17  8.

11:02:25 18  MS. COLUMBIA:  Yes, Your Honor.  Sarah Columbia

11:02:29 19  on behalf of Next Caller.  May I remove the mask, Your

11:02:32 20  Honor?

11:02:32 21  THE COURT:  We do have at least one juror who is

11:02:35 22  not vaccinated, so they may not remove their masks, but you

11:02:40 23  may when you are speaking.  And when the jury is not in

11:02:44 24  here, you may remove your masks if vaccinated.

11:02:48 25  MS. COLUMBIA:  Understood, Your Honor.  Thank

you.

Your Honor, the issue with slide number 7 is that the first point under TRUSTID's patented technology is contrary to the Court's claim construction. I believe the Court has the slides, and I can hand it up.

THE COURT: I do. I guess the way I was looking at this is, this is a claim construction that Judge Stark did, so I don't exactly know what was in his head, but they are using the words of the construction. To the extent that there is a factual issue as to whether, whatever they're picturing here is what virtually goes -- I don't know --

MS. COLUMBIA: Actually, Your Honor, with all due respect, the first bullet point does not use the word the good construction, it talks about proof before answered by the agent. The claim limitation is that the analysis is before the incoming call is answered which is what Judge Stark construed.

MR. TUMINARO: Your Honor, he construed the term answer. We simply applied the Court's construction. I think Ms. Columbia was talking about slide 7 where it says determines whether a call is spoofed before it's answered by an agent. That's been on our infringement theory all throughout this case based on Judge Stark's claim construction. It was something that was raised in Next Caller's motions in limine, summary judgment, and they were

11:04:21 1   denied there.

11:04:21 2           THE COURT:  All right.  And on slide 8, as long

11:04:24 3   as -- you're not going to say that the Court has somehow

11:04:29 4   agreed that what you say virtually goes off hook means is

11:04:33 5   correct; right?

11:04:34 6           MR. TUMINARO:  No.

11:04:34 7           THE COURT:  That's just an issue of facts for

11:04:36 8   the jury.

11:04:38 9           MR. TUMINARO:  That's exactly correct, Your

11:04:39 10  Honor.

11:04:39 11          THE COURT:  I'm going to overrule the

11:04:41 12  objections.

11:04:41 13          PTX-396, slide 38, PTX-339, slide 39, PTX-125,

11:04:52 14  slide 40.

11:04:54 15          MR. BLUMENFELD:  Thank you, Your Honor.  These

11:04:56 16  three slides, they all fall in the same category.  They say

11:05:00 17  that they're using them for willfulness and direct

11:05:03 18  infringement.  The problem is these slides have nothing do

11:05:05 19  with the patents-in-suit.  And the three patents-in-suit

11:05:09 20  issued in 2012, '15, and '18, the conversation here is in

11:05:12 21  The Slack from February of 2016 couldn't involve these

11:05:22 22  patents, there is no patent involved.  And 40 also has

11:05:27 23  nothing to do with these patents, it's also 2016.  And it

11:05:31 24  has to do with a discussion when these two parties were in

11:05:35 25  negotiations that led to the Colorado lawsuit, that's what

that is about.

Two weeks ago I think I suggested that we were going to hear some mud slinging and personalizing, and I think that's all we're getting.

THE COURT: They both seem to have that going on. You all have a few exhibits yourselves, juvenile language that's used by these companies.

MR. BLUMENFELD: That may be, Your Honor, but there is no relevance to these, so just putting them in so they can put steal their shit or the F word or whatever they want to put in with it has no relevance to anything.

THE COURT: Mr. Tuminaro, why is this relevant? I get it this might be relevant. If there is willfulness found, it may be relevant to enhancement and egregiousness. How is it relevant to what the jury has to decide, knowledge of the patents we're talking about here and knowledge of the infringement.

MR. TUMINARO: If we can take them in reverse order. PTX-125, during that time period, TRUSTID had only two patent families --

THE COURT: Did they have the patents that are at issue here?

MR. TUMINARO: Yes, it did, Your Honor, one patent family included the '985 Patent and the '532.

THE COURT: The '985 and the '532 had been

1 issued by this date.

2 MR. TUMINARO: By 2016, yes, July. And the

3 other slack messages refer to the parent of the '913 Patent.

4 Those slack messages are referring to the '536 Patent, that

5 is the parent includes the exact same specification as the

6 '913 Patent. And so the totality of these circumstances

7 show knowledge of our patents --

8 THE COURT: Could I ask that phones be put down

9 at counsel table while people are talking and while I am in

10 the room. Thanks.

11 Go ahead.

12 MR. TUMINARO: So the patent at issue in slides

13 38 and 39, again, that is the parent patent. The day that

14 that parent patent issued, Next Caller was aware of it, and

15 that is the parent of the '913 Patent. It includes the

16 exact same specification as the '913 Patent. And post *Halo*,

17 the inquiries for willfulness is about the totality of the

18 circumstances for the jury.

19 THE COURT: Yes. But the egregiousness,

20 whatever, as I understand it, the issue is knowledge of the

21 patent and knowledge of infringement for the jury and the

22 rest of it is the egregiousness and acting like a pirate.

23 MR. TUMINARO: Your Honor, if I may, it's two

24 Federal Circuit cases, *WCM v. IBCS Corp.*, 721 F appendix 959

25 Federal Circuit 2018, in that what the Federal Circuit --

THE COURT:  Any of these after *Eko*?

MR. TUMINARO:  This was after --

THE COURT:  *Eko* was the question I asked.  Any of them after *Eko*?

MR. TUMINARO:  I don't know the date of *Eko*, this is after *Halo* 2016.

THE COURT:  I understand they're after *Halo*. I'm asking if they're after *Eko*.  When the Federal Circuit said when the instruction that was in the Federal Circuit Bar Association Jury Instructions wasn't quite right and egregiousness and like a pirate actually applied to the enhancement and not the issue of willfulness.

MR. TUMINARO:  As I stand here right now, I don't know the date of that *Eko*, but 2018 --

THE COURT:  Tell me why slide 14 is different from slides 38 and 39.

MR. TUMINARO:  Slide 40 reference, Mr. Roncoroni is stating that their tool is patented, referring to TRUSTID's tool being patented.  Again, this is in July of 2016.  At that point TRUSTID had only two patent families, one including the '985 --

THE COURT:  I'm just asking, did any of the patents that are at issue here, they existed as you are talking at that time.

MR. TUMINARO:  That is correct, Your Honor,

11:09:53 1  those existed.

11:09:53 2           THE COURT:  Mr. Blumenfeld, why isn't that fair

11:09:57 3  game if they say it's patented, hey, patented can include

11:10:00 4  the patent at issue here?

11:10:02 5           MR. BLUMENFELD:  Because they have other

11:10:04 6  patents, also.  And there has to be a direct connection

11:10:08 7  between the patents and the activities for both willfulness

11:10:14 8  and for indirect infringement.  And it can't be that for

11:10:20 9  2016 that we had knowledge of a patent that issued in 2018

11:10:24 10 because the parent had issued.

11:10:26 11          THE COURT:  But that's why I keep asking,

11:10:29 12 though.  Mr. Tuminaro I thought was telling me the patents

11:10:31 13 at issue, at least one of them had already issued.  And he

11:10:37 14 is saying 2018 and he is saying 2016.

11:10:41 15          MR. BLUMENFELD:  Two of the patents had issued,

11:10:43 16 the one that's in the two Slacks is not in suit, the 2016.

11:10:47 17 That's in slide 38 and 39, that's not a patent-in-suit.

11:10:51 18          THE COURT:  38 and 39 I get.  I'm focusing on

11:10:56 19 40.

11:10:56 20          MR. BLUMENFELD:  And on 40, we just don't see

11:10:58 21 the relevance of someone saying their tool was patented and

11:11:02 22 even if we have a one percent chance of infringing that

11:11:07 23 somehow that goes to willfulness without any analysis of the

11:11:11 24 patent.  There isn't any question that they brought the

11:11:14 25 patents to our attention before they sued us, so it's not --

11:11:19 1    these are brought in for another reason.

11:11:22 2              THE COURT:  So what I am going to do is I agree

11:11:24 3    with the defendants that slides 38 and 39 and the

11:11:28 4    corresponding PTXs are not admissible.  They don't go to

11:11:35 5    whether knowledge of the patents that are actually at issue

11:11:38 6    here or the knowledge of infringement of those patents.  For

11:11:46 7    slide 40, I think that it's possible that it's referring to

11:11:50 8    these.  It's tangental, but I think the relevance is the

11:11:55 9    objection, that there is some relevance to it, and the jury

11:11:59 10   can give it whatever weight it wants.

11:12:01 11             Next.  229, PTX-229, PTX-411, PTX-413 and

11:12:11 12   PTX-418.

11:12:16 13             MR. BROOKS:  Good morning, Your Honor.  Ian

11:12:17 14   Brooks on behalf of Next Caller.  With respect to these four

11:12:20 15   exhibits, they all go to the relationship --

11:12:23 16             THE COURT:  I'm sorry.  I can't hear you.  Step

11:12:25 17   closer to the microphone.  Can you take that down?  That's

11:12:33 18   just distracting.

11:12:35 19             MR. BROOKS:  Thank you.  So these four go to the

11:12:41 20   relationship of the patents surrounding the referral

11:12:44 21   agreement, that was an issue, the primary issue in Colorado.

11:12:48 22   That's not an issue here, we don't believe it's relevant to

11:12:51 23   patent infringement, false advertising or damages.  If

11:12:54 24   anything, these only speak to -- they mention TRUSTID, but

11:12:57 25   they go to any specific issue that would be relevant here.

11:13:02 1    MR. TUMINARO:  It's relevant to damages, Your

11:13:04 2  Honor.  One of the issues in damages is lost profits that we

11:13:08 3  are seeking and that relate to the amount of competition

11:13:10 4  between the two parties and all of these documents speak to

11:13:13 5  the competition between TRUSTID and Next Caller at the time.

11:13:16 6    THE COURT:  All right.  I am going to overrule

11:13:18 7  the objections, but I will give a warning to plaintiff, you

11:13:21 8  wanted to keep out the stuff from the Colorado action.  If

11:13:25 9  by using these documents in any way you open that door, I am

11:13:28 10  going to rethink the motion in limine.  So I want you to

11:13:32 11  have fair warning.  I'm not saying you will, I'm sure you

11:13:36 12  will tell me you won't, but if you do, I want you to know

11:13:39 13  that I have given you warning.

11:13:41 14    Okay.  Plaintiff's opening slide 44.

11:13:45 15    MR. BROOKS:  So, Your Honor, here we have a

11:13:48 16  timeline showing when the patents issued and in particular

11:13:51 17  here for some reason there is, on the '985 Patent a checkbox

11:13:55 18  or a checkmark.

11:13:56 19    THE COURT:  Let me ask, Mr. Tuminaro, just so we

11:13:59 20  can move this along and get the jurors back here, I mean,

11:14:02 21  this one caught my attention a little.  We know some of

11:14:02 22  those claims are dead.  They're not allowed to challenge

11:14:02 23  them.  It seems wrong.

11:14:10 24    MR. TUMINARO:  We have already taken off the

11:14:12 25  green checkmark, Your Honor.

11:14:13 1          THE COURT:  So now what's the issue?

11:14:15 2          MR. BROOKS:  That's it, Your Honor.

11:14:16 3          THE COURT:  Okay.  Sustained.

11:14:19 4          Next, plaintiff's opening slide 50.

11:14:21 5          MR. BROOKS:  Your Honor, the issue here --

11:14:23 6          THE COURT:  The Stub system.

11:14:24 7          MR. BROOKS:  The Stub system, unclear what any

11:14:27 8 evidence those relate to.

11:14:28 9          MR. TUMINARO:  Our witness will testify about

11:14:30 10 what the evidence is, and we're simply saying what the

11:14:33 11 evidence will show.

11:14:34 12          THE COURT:  All right.  If they don't, then I

11:14:36 13 suppose you can tell the jury that they were lied to in the

11:14:39 14 openings.  Overruled.

11:14:41 15          Now we have plaintiff's objections to JTX-99,

11:14:48 16 DDX-1-8.

11:14:52 17          MR. TUMINARO:  For JTX-99, Your Honor, we are

11:15:00 18 not at all clear what that is relevant to.  It doesn't

11:15:03 19 appear to be relevant to any of the issues in dispute in

11:15:06 20 this case.  And for DTX-58, that appears to be hearsay.  And

11:15:11 21 we received a letter from counsel during the course of this

11:15:14 22 litigation where they said they would not rely on an opinion

11:15:18 23 of counsel and that DTX-58 is tantamount to an opinion of

11:15:21 24 counsel.  It's an uncross-examined out-of-court statement.

11:15:26 25 It's hearsay.

11:15:30 1          THE COURT:  All right.

11:15:35 2          MR. BLUMENFELD:  Your Honor, I got a little

11:15:37 3  confused about -- we're on DDX-1-8.

11:15:41 4          THE COURT:  I think I did them both together

11:15:44 5  just trying to save a little time.  I can't fault him for

11:15:47 6  that.

11:15:47 7          MR. BLUMENFELD:  No, that's fine.  I need to put

11:15:51 8  -- I'm only doing the first one, 1-8.  And on that, to put

11:15:56 9  it in context, the plaintiff is seeking lost profits here

11:16:01 10  and it is putting on evidence of what's going on in the

11:16:04 11  market, what was going on in the market in 2017 between

11:16:08 12  these two parties.  And we thought -- can I hand up, Your

11:16:12 13  Honor, a slide they're going to use with Mr. Cox today and

11:16:15 14  also the document we're talking about, because I don't think

11:16:18 15  you have those.

11:16:20 16          THE COURT:  Okay.

11:16:21 17          MR. BLUMENFELD:  Thank you.

11:16:21 18          THE COURT:  I have the DTX-1-8.

11:16:24 19          MR. BLUMENFELD:  You have the DDX, but you don't

11:16:26 20  have the underlying document, JTX-99.

11:16:29 21          THE COURT:  I think I do because we have all the

11:16:31 22  exhibits.

11:16:32 23          MR. BLUMENFELD:  You have JTX-99.  Just to hand

11:16:36 24  up a slide that they're going to use with Mr. Cox today,

11:16:40 25  what they are arguing is that as of some time in 2017, that

this was a two-player market, something they're calling for the first time a caller-ID authentication market, and what we have here in the document is exactly the right time, it's in August of 2017. It's not a one-line document. It's a chain that starts at the bottom of page or the top of page 2 from Mr. O'Leary saying, "We've heard what's going on with Next Caller. It seems like we need to address that in our conversations."

And then Mr. Cox is going to testify, says, "I agree, Chris. Next Caller is now a full competitor. We need to kill them in the market. We need to start talking about why detecting fraud is not authorization."

And then Mr. O'Leary at the top of page 1, he responds and he says "Sounds good. I don't think the argument will be as simple as explaining why fraud detection is not authentication. They're going to claim that technology can be used for authentication as well as fraud. And it's just as good for authentication. We need to beat that down with an argument that shoots holes in their approach versus our approach for authentication."

So what they're going to do with the jury is say both of these are authentication, they're the only two caller-ID authentication solutions in the market and then they're trying to keep out a document where at the time they're taking an opposite position and saying we're

1 authentication, they're not authentication.  This goes to

2 lost profit.  We need to be able to get this document in,

3 and it can't be that Mr. Cox can testify about whatever he

4 wants about what was going on between these two parties in

5 2017, and then exclude the evidence of what was actually

6 going on.

7          THE COURT:  I mean, if it is a lost profits

8 case, then both sides -- fears competition, isn't it

9 relevant that both side are saying that?

10          MR. TUMINARO:  To the extent this document comes

11 in, Your Honor, we would want to say they opened the door

12 and we would want to put in additional documents about

13 competition between the parties that Next Caller has

14 objected to.

15          THE COURT:  Yes, I guess we're going to have to

16 take that at the time if you guys open the door.  I can't

17 decide that in the abstract, so I don't know what the answer

18 to that is.  But I take your point.

19          MR. TUMINARO:  Thank you, Your Honor.

20          THE COURT:  Okay.  So that objection is

21 overruled.  And DTX-058, the position I saw was that it's

22 not -- the objection I got was it's hearsay, and I don't

23 think it's hearsay.  But let me hear about the opinion of

24 counsel aspect of it.

25          MR. BROOKS:  Would you like to hear from me

first?

THE COURT:  Mr. Tuminaro already made his argument.

MR. BROOKS:  I don't believe, Your Honor, I don't believe it's an opinion of counsel.  It's a response to a demand letter --

THE COURT:  Isn't it a kind of a backdoor way of putting in an opinion of counsel without actually having counsel testify?

MR. BROOKS:  No, it's not.  It's a demonstration of a good faith showing of the basis of non-infringement which was presented before this case was filed and we intend to present the same argument with respect to two of the patents which were presented in that letter.  And it is -- just because Next Caller retained counsel for purposes of responding to the letter does not turn that representation into an opinion of counsel.

MR. TUMINARO:  I think what I heard there is they intend to rely on this document as sort of to rebut a willfulness that is the state of mind of the intent which is essentially relying on an opinion of counsel.  I want to pass up to Your Honor the letter that we received from Mr. Brooks stating that Next Caller has not identified any non-privileged legal opinions on which it intends to rely.  So we received this in July 25th, 2019.  After receiving

11:21:12 1    that communication we relied on it and had no opportunity to

11:21:16 2    then go cross-examine the attorney who wrote this letter,

11:21:21 3    which they're essentially relying on this as an opinion of

11:21:24 4    counsel.

11:21:27 5              MR. BROOKS:  Your Honor, respectfully this is

11:21:29 6    not a privileged communication.

11:21:31 7              THE COURT:  Yes, it says you're not relying on

11:21:33 8    non-privileged.  He understands you're not relying on

11:21:37 9    privilege, but that letter as it was read to me says we're

11:21:40 10   not relying on anything that's not privileged either that

11:21:43 11   came from a lawyer.

11:21:45 12              MR. BROOKS:  Also, this letter came from

11:21:47 13   Mr. Specht.

11:21:48 14              THE COURT:  That just goes to whether he's

11:21:50 15   privileged.  You are in effect saying look, our lawyer said

11:21:53 16   we didn't infringe.  How are you going to use this?  How are

11:21:59 17   you going to use this?

11:22:00 18              MR. BROOKS:  To demonstrate --

11:22:01 19              THE COURT:  How are you going to use it?  A

11:22:02 20   witness?  What are you going to ask?  How are you going to

11:22:02 21   use this?

11:22:02 22              MR. BROOKS:  Yes, we would present it through a

11:22:02 23   witness who would talk to --

11:22:12 24              THE COURT:  Who?  Let's get specifics so I

11:22:12 25   understand what is going to happen here.

11:22:15 1     MR. BROOKS: Mr. Roncoroni.

11:22:18 2     THE COURT: He's doing well, Ms. Columbia.

11:22:23 3     MS. COLUMBIA: It's just Mr. Roncoroni is my

11:22:25 4 witness.

11:22:26 5     THE COURT: When is he going to testify?

11:22:29 6     MR. BROOKS: I suspect he's going to testify

11:22:32 7 today.

11:22:32 8     THE COURT: And so what's going to be asked,

11:22:35 9 Ms. Columbia? So he's your witness. How much are we going

11:22:39 10 to talk about this document?

11:22:40 11     MS. COLUMBIA: Your Honor, the intent is if he's

11:22:43 12 asked on his adverse direct knowledge of the specific

11:22:46 13 patents that are in suit and when he became aware of them, I

11:22:52 14 would ask him on my examination what did you do in response.

11:22:58 15 They got a cease and desist letter from TRUSTID, what did

11:23:02 16 you do in response? I expect that he will testify that he

11:23:06 17 had his engineers look at it, he retained attorneys, and

11:23:09 18 they formed a collective opinion that they did not infringe.

11:23:13 19     THE COURT: Right. Once you get that, that his

11:23:16 20 attorneys gave an opinion they didn't infringe, isn't that

11:23:20 21 really giving an opinion of counsel? If he said I let my

11:23:22 22 attorney -- I had my attorneys look at it, and -- I just

11:23:28 23 don't understand how that's not relying on the opinion of

11:23:31 24 counsel. He says my attorneys formed an opinion that we

11:23:38 25 didn't infringe, that's what he wants to tell the jury.

11:23:41 1    That seems like an opinion of counsel.

11:23:43 2            MS. COLUMBIA:  I don't want to testify for

11:23:45 3    Mr. Roncoroni, but I believe his testimony will be that his

11:23:51 4    engineers looked at the patent and he hired counsel and as a

11:23:54 5    result of the input from his engineers and his counsel, he

11:23:57 6    determined that the product doesn't infringe.

11:23:59 7            THE COURT:  Okay.  That I understand, but why do

11:24:02 8    you need the letter from counsel?

11:24:05 9            MS. COLUMBIA:  Your Honor, it's just

11:24:07 10   contemporaneous evidence.  If Mr. Roncoroni is permitted to

11:24:12 11   testify along the lines of what I just described, we can

11:24:15 12   live without the letter.

11:24:16 13           THE COURT:  I'm going to sustain the objection

11:24:19 14   for now just because it sounds to me like a backdoor opinion

11:24:23 15   of counsel, but if it turns out that something is asked of

11:24:26 16   him that you need to use it, I'll just ask that you ask

11:24:29 17   permission before you use it.

11:24:31 18           MS. COLUMBIA:  Understood, Your Honor.  Thank

11:24:32 19   you.

11:24:32 20           THE COURT:  So I think, look, it's been

11:24:35 21   twenty minutes, twenty-five minutes, I don't want to keep

11:24:37 22   the jury waiting.

11:24:39 23           MR. TUMINARO:  Your Honor, if I can just ask one

11:24:41 24   clarifying question about --

11:24:42 25           THE COURT:  We have a juror who has a problem

with being on the jury.  So I guess I should go talk to her,
so I'll give you all a couple of minutes, but ask you to be
back here prepared to proceed.

          (A brief recess was taken.)

          THE COURT:  All right.  One second before we
bring the jury in.  We had a little bit of an anxiety issue.
But the juror is going to try to see how things go.

          For planning purposes, what are we thinking in
terms of how long openings are going to be?

          MR. TUMINARO:  About forty-five minutes for
plaintiff.

          MS. COLUMBIA:  Probably a little less than that
for the defendants.

          THE COURT:  So should we -- what do you think
about breaking in the middle of the openings or not?

          MS. COLUMBIA:  That's fine with me, Your Honor.

          MR. TUMINARO:  That's fine with us, Your Honor.

          THE COURT:  Okay.

          (Jury entering the courtroom at 11:43 a.m.)

          THE COURT:  All right.  Go ahead and be seated.
Everyone is standing for you, so you don't have to keep
standing when you come in.

          All right.  Thanks everyone.  So I am going to
start this by giving some instructions.  And you have the
instructions there.  You can read along or just listen.

Members of the jury, now that you have been sworn I have the following preliminary instructions for guidance on your role as jurors in this case. These instructions are intended to assist you in discharging your duties as jurors and to introduce you to the case and the law that you will apply to the evidence that you will hear. Also, because this case involves patents, I will give you some preliminary instructions regarding patents. I will give you more detailed instructions on the law at the end of the trial. You will hear the evidence, decide what the facts are, and then apply those facts to the law that I will give you. You, and only you, will be the judges of the facts. You will have to decide what happened. I play no part in judging the facts. My role is to be the judge of the law. I make whatever legal decisions have to be made during the course of trial and I will explain to you the legal principles that must guide you in your decisions. You must follow the law whether you agree with it or not. It is important that you perform your duties fairly. Do not let any bias, sympathy, or prejudice influence your decision in any way. Nothing I may say or do during the course of the trial is intended to indicate what I think your verdict should be.

As you heard during the voir dire process, the plaintiff in this case is TRUSTID, Inc., which I will refer

11:45:32  1    to as TRUSTID.  The defendant is Next Caller, Inc., which I

11:45:37  2    will refer to as Next Caller.  TRUSTID owns three patents

11:45:42  3    that are at issue in this case; U.S. Patent Numbers

11:45:47  4    9,001,985; 8,238,532; and 9,871,913.  I will refer to these

11:45:52  5    patents the '985, '532, and '913 patents, respectively.

11:45:56  6    During trial the parties will offer testimony and evidence

11:45:59  7    to familiarize you with technology involved in the patents.

11:46:04  8            TRUSTID contends that Next Caller has infringed

11:46:06  9    the '985, '532 and '913 patents.  TRUSTID also contends that

11:46:12 10    Next Caller falsely advertised its products.  Next Caller

11:46:17 11    contends that it does not infringe TRUSTID's patents and

11:46:19 12    that the patents are invalid and that it has not engaged in

11:46:23 13    false advertising.

11:46:23 14            As I just mentioned, this is a case about

11:46:26 15    patents which is an area unfamiliar to many people.  To help

11:46:30 16    you understand what patents are and how they are made, you

11:46:34 17    will now be shown a video produced by the Federal Judicial

11:46:38 18    Center.  The video will run for approximately

11:46:41 19    seventeen minutes and at the conclusion of the video, I will

11:46:44 20    provide you with additional instructions.

11:46:46 21            So let's start the video.

11:46:49 22            (Federal Judicial Center videotape was played.)

12:03:01 23            THE COURT:  All right.  That one hasn't made it

12:03:07 24    to Netflix yet.

12:03:09 25            The evidence from which you will find the facts

will consist of the testimony of witnesses and the documents
and other things admitted into evidence as exhibits.  In
addition, the evidence may include certain facts as agreed
to by the parties or as I instruct you.  Certain things are
not evidence.  They include statements, arguments and
questions by lawyers.  Objections to questions are not
evidence.  Lawyers have an obligation to their clients to
make objections when they believe testimony or exhibits
being offered into evidence are not proper under the rules
of evidence.  You should not be influenced by a lawyer's
objection or by ruling on the objection.  If I sustained or
uphold the objection, you should ignore the question or
document in question.  By overruling an objection and
allowing the matter into evidence, treat the testimony or
document like any other evidence.  If I instruct you that
some item of evidence is admitted for a limited purpose, you
must follow that instruction and consider that evidence for
that purpose only.  If this occurs during trial, I will try
to clarify this for you at the time.

          Exhibits that are identified by a party but not
offered or received into evidence are not evidence.
Testimony and exhibits that I exclude or strike from the
record, or tell you to disregard, are not evidence.  They
must not be considered.  Anything you see or hear outside
the courtroom is not evidence and must be disregarded.  You

are to decide this case solely on the evidence presented here in the courtroom.

There are two kinds of evidence, direct and circumstantial. Direct evidence is direct proof of a fact such as testimony of an eye witness. Circumstantial evidence is proof of a fact or facts from which you may infer or conclude that other facts do or do not exist. For example, the fact that it snowed overnight could be proven directly ("I saw it snow last night") or circumstantially ("When I went to sleep the grass was green, when I woke up there was a foot of snow on the ground".) Do not be concerned about whether evidence is direct or circumstantial evidence. You should consider and weigh all the evidence that is presented to you. If your experience tells you that certain evidence reasonably leads to a conclusion, you are free to reach that conclusion.

It will be up to you to decide which witnesses to believe, which witnesses not to believe, and how much any witness's testimony to accept or reject. You should consider each witness's means of knowledge, strength of memory, opportunity to observe, how reasonable or unreasonable the testimony is, whether it is consistent or inconsistent, whether it has been contradicted, the witness's biases, prejudices or interest, the witness's manner or demeanor on the witness stand and all

circumstances that according to the evidence could affect

the credibility of testimony.  The weight of the evidence to

prove a fact does not necessarily depend on the number of

witnesses who testify.  What is more important is how

believable the witnesses were and how much weight you think

their testimony deserves.

If you find the testimony to be contradictory,

you must try to reconcile it if reasonably possible to make

one harmonious story of it all.  But if you can't do this,

it is your duty and privilege to believe the testimony that,

in your judgment, is most believable and disregard any

testimony that, in your judgment, is not believable.  This

instruction applies to testimony of all witnesses, including

expert witnesses.  I will give you some additional

guidelines for determining the credibility of the witnesses

at the end of the case.

Expert testimony is testimony from a person who

has a special skill or knowledge in some science,

profession, or business.  This skill or knowledge is not

common to the average person but has been acquired by the

expert through special study or experience.  In weighing

expert testimony, you may consider the expert's

qualifications, the reasons for the expert's opinions, and

the reliable of the information supporting the expert's

opinions, as well as the factors I have previously mentioned

12:07:20  1    for weighing testimony of any other witness.  Expert

12:07:23  2    testimony should receive whatever weight and credit you

12:07:25  3    think appropriate, given all the other evidence in the case.

12:07:29  4    You are free to accept or reject the testimony of experts,

12:07:33  5    just as with any other witness.

12:07:35  6          You may hear witnesses testify through

12:07:38  7    deposition testimony.  A deposition is the sworn testimony

12:07:41  8    of a witness taken before trial.  The witness is placed

12:07:45  9    under oath and swears to tell the truth and lawyers for each

12:07:48 10    party may ask questions.  A court reporter is present and

12:07:51 11    records the questions and answers.  The deposition may also

12:07:55 12    be recorded on videotape.  Deposition testimony is entitled

12:07:59 13    to the same consideration and is to be judged, insofar as

12:08:02 14    possible, in the same way as if the witness had been present

12:08:07 15    to testify.

12:08:11 16          In any legal action, facts must proven by the

12:08:15 17    required weight of the evidence, known as the burden of

12:08:18 18    proof.  In this civil case, two burdens of proof are used.

12:08:20 19    The first is called proof by a preponderance of the

12:08:22 20    evidence.  The second is called proof by clear and

12:08:25 21    convincing evidence.

12:08:27 22          TRUSTID contends that Next Caller has infringed

12:08:29 23    TRUSTID's patents and that Next Caller falsely advertised

12:08:32 24    its products.  TRUSTID has the burden of proving patent

12:08:36 25    infringement and false advertising by what is called the

preponderance of the evidence.  That means TRUSTID has to produced evidence which, when considered in the light of all facts, leads you to believe that what TRUSTID claims is more likely true than not.  To put it differently, if you were to put the evidence in support of TRUSTID's claims and the evidence weighing against TRUSTID's claims and the evidence weighing against TRUSTID's claims on opposite sides of a scale, the evidence supporting TRUSTID's claims would have to make the scales tip in TRUSTID's favor in each instance. If TRUSTID fails to meet this burden, your verdict must be for Next Caller.

Next Caller contends that the claims of the patents are invalid.  On this issue, Next Caller has the burden of proof.  Next Caller has the burden of proving the patents are not valid by clear and convincing evidence. Proof by clear and convincing evidence is evidence that produces an abiding conviction that the truth of a factual contention is highly probable.  Proof by clear and convincing evidence is, thus, a higher burden than proof by a preponderance of the evidence.  If Next Caller fails to meet this burden on invalidity, your verdict must be for TRUSTID.

I will discuss with you later in more detail the specific elements that TRUSTID must prove with respect to alleged infringement and false advertising, as well as what

Next Caller must prove regarding alleged invalidity of the patents.

You may have heard the term "proof beyond a reasonable doubt." That requirement applies only to criminal cases and does not apply to a civil case. You should therefore put it out of your mind and you should not use the standard when considering whether the parties have met their respective burdens of proof on the various issues.

Now, a few words about your conduct as jurors.

First, I instruct you that during the trial and until you have heard all of the evidence and retired to the jury room to deliberate, you are not to discuss the case with anyone, not even among yourselves. If any lawyer, party, or witness does not speak to you when you pass in the hall, ride the elevator, or the like, remember it is because they are not supposed to talk with you, nor you with them. If anyone should try to talk to you about the case, bring it to my attention promptly.

Second, do not read or listen to anything touching on this case that is not admitted into evidence. By that I mean, if there is a newspaper or internet article or radio or television report relating to this case, do not read the article or watch or listen to the report.

Third, do not try to do any research or investigate the case on your own. Let me elaborate. During

the course of the trial, you must not conduct any

independent research about the case, the matters in the

case, or the individuals or entities involved in the case.

In other words, you should not consult dictionaries or

reference materials (in print, electronic, or other format)

or search websites or blogs on the internet.  Also, again,

should there happen to be a newspaper article, internet

article, or television or radio report relating to this

case, do not read the article or watch or listen to the

report.  It is important that you decide this case based

solely on the evidence presented in the courtroom.  Please

do not try to find out information from any other source.

I know that many of you use cell phones, iPhones

and other smartphones, iPads and other tablets, the

internet, and other forms of technology.  You must not talk

to anyone about this case or use these tools to communicate

electronically with anyone about the case.  This includes

your family and friends.  You may not communicate with

anyone about the case on our cell phone or smartphone,

through e-mail, your tablet, text messaging, on Twitter,

through any blog or website, through any internet chat room,

or by way of any other social networking web sites,

including but not limited to Facebook, Twitter, Instagram,

LinkedIn, and YouTube.

Finally, do not reach any conclusion as to the

12:12:30  1    claim until all of the evidence is in.  Keep an open mind

12:12:33  2    until you start your deliberations at the end of the case.

12:12:35  3            You have each been provided with a notebook that

12:12:40  4    contains the following:

12:12:41  5            Copies of the three Patents-in-Suit;

12:12:44  6            A glossary of terms agreed upon by the parties;

12:12:48  7            The Court's claim constructions; and

12:12:49  8            A notepad for notes.

12:12:51  9            These materials have been jointly submitted by

12:12:53  10   the parties.  Please refer to these materials to assist you

12:12:57  11   during the trial.

12:12:57  12            If you wish, you may take notes in your juror

12:13:00  13   notebooks.  If you do take notes, leave them in the jury

12:13:05  14   room when you leave at night.  Remember that these notebooks

12:13:08  15   are for your own personal use - they are not to be given or

12:13:12  16   read to anyone else.  No one else will read your notes but

12:13:15  17   you.  Your notes will be destroyed after the trial is over.

12:13:18  18   A word of caution is in order.  There is generally a

12:13:22  19   tendency to attach undue importance to matters which one has

12:13:25  20   written down.  Some testimony that is considered unimportant

12:13:27  21   at the time presented, and thus not written down, takes on

12:13:30  22   greater importance later in the trial in light of all the

12:13:33  23   evidence presented.  Therefore, you are instructed that your

12:13:35  24   notes are only a tool to aid your own individual memory and

12:13:40  25   you should not compare your notes with other jurors in

determining the content of any testimony or in evaluating the importance of any evidence. Your notes are not evidence and are by no means a complete outline of the proceedings or a list of the highlights of the trial.

At the end of trial, you must make your decision based on what you recall of the evidence. You will not have a written transcript to consult, and it may not be practical for the court reporter to read back lengthy testimony. Therefore, you should pay close attention to the testimony as it is given. I do not suggest that you look to your note taking as a substitute for that written transcript. Instead, as you listen to the testimony, keep in mind that you will be relying on your recollection of the testimony during your deliberations.

During the trial, it may be necessary for me to talk with the lawyers out of your hearing by having a conference - this may mean that I excuse you or that some of the lawyers and I go back into my Chambers for a few minutes so that we can talk. If that happens, please be patient.

We are not trying to keep important information from you. These conferences are necessary for me to fulfill my responsibility to be sure that the evidence is presented to you correctly under the law.

We will, of course, do what we can to keep the number and length of these conferences to a minimum. If you

would like to stand or stretch or walk around the jury box while we are conferring, you should feel free to do so.

I may not always grant an attorney's request for a conference. Do not consider my granting or denying a request for a conference as an indication of my opinion of the case or of what your verdict should be.

And I will also mention that even if we leave the room while you're in here with one of these conferences, the clock will be running, so you're getting credit for that time.

The trial will begin shortly. First each side may make an opening statement. An opening statement is neither evidence nor argument. It is an outline of what that party intends to prove, and it is present to help you follow the evidence as it is offered. After the opening statements, TRUSTID will present its witnesses, and Next Caller may cross-examine them. Then Next Caller will present its witnesses, and TRUSTID may cross-examine them. After that, I will give you instructions on the law and the attorneys will make their closing arguments to summarize and interpret the evidence for you. You will then retire to deliberate on your verdict.

Though you have heard this before, I want to again outline the schedule I will maintain during the course of this trial.

12:16:16 1          As mentioned previously, once trial begins, this

12:16:19 2 case is expected to take up to five business days to try,

12:16:23 3 between now and Friday, July 16, 2021.

12:16:26 4          The trial will normally begin each day at

12:16:29 5 9:00 a.m., will go to 12:30 p.m., when there will be a

12:16:33 6 forty-five-minute break for lunch before continuing until

12:16:35 7 4:30 or 4:45 p.m.  There will be a fifteen-minute break in

12:16:39 8 the morning and another fifteen-minute break in the

12:16:42 9 afternoon.

12:16:42 10          What I have just outlined is the general

12:16:45 11 schedule.  It is possible that there will be some

12:16:48 12 interruptions if I need to attend to other matters.

12:16:51 13          The only significant exception to this schedule

12:16:54 14 may occur when the case is submitted to you for your

12:16:56 15 deliberations.  At that point, you will be permitted to

12:16:59 16 deliberate as late as you wish.

12:17:01 17          As I have mentioned, this is a timed trial.

12:17:03 18 That means that I have allocated each party a maximum number

12:17:08 19 of hours in which to present all portions of its case.  This

12:17:11 20 allows me to assure you that the case is expected to be

12:17:14 21 completed by Friday.

12:17:15 22          Of course, you can help us to stay on schedule

12:17:17 23 by meeting here promptly each morning and being ready to

12:17:20 24 proceed at the end of each break.

12:17:24 25          That is the end of my preliminary instructions.

It's now about 12:15. What we were thinking of doing is having the opening statement from the plaintiff, then you can take a break and have your lunch probably around 1:00, maybe a little before then, a little after, and then you'll come back, we'll have defendant's opening statement, and then start with the first witness.

Okay. All right. Mr. Tuminaro.

MR. TUMINARO: Your Honor, may I remove my mask for the opening?

THE COURT: You may.

MR. TUMINARO: Good afternoon. My name is Jonathan Tuminaro. I'm an attorney for the plaintiff, TRUSTID. With me is my colleague, Mike Specht, at counsel table, and Mr. Pat Cox, he is the founder, co-founder and the inventor of the patents at suit. We thank you very much for your time today, especially given COVID. This is a very important matter for my client. Thank you very much.

So there are three issues in this case. Number one, TRUSTID's patented technology. Number two, Next Caller's infringement and false advertising. And number three, that's damages. That's what we're asking for in terms of compensation for the infringement. We'll get to that at the end.

As the patent video mentioned, every invention is really just a solution to a problem. And the problem

that we're addressing here is the problem of spoofing. You may not have heard that term before, but the concept of spoofing is probably familiar to you. So we've all had the experience of looking at our cell phone and we can see the incoming number, caller-ID. And caller-ID was great before this problem of spoofing.

What happens with spoofing is the caller-ID that's coming in to your phone has been changed. So you may have this experience where you're looking at your phone, it looks like within your area code, when you pick it up, it's actually a robo call or something like that. What has happened there is the number has been spoofed. It can be a big problem for you in that it can lead to fraud or scams, it could be annoying and a nuisance.

What TRUSTID has done is focused on solving the problem in the context of a call center. And what a call center is, it's just a collection of individuals who answer telephones for large companies. So if you have a cell phone provider or a bank, they may have hundreds of, thousands of customers, and so if you call in to the -- you want to get your problem solved, you may have to call the company, they have a call center to answer those incoming calls. The problem of spoofing becomes multiplied in the context of a call center. There is potential for fraud because these call centers could receive millions of calls a day. So it's

difficult to determine which are the bad calls from the good calls. And it could also impact you when you're calling in leading to longer wait times because the agents who answer telephone calls can't trust the caller-ID coming in, so they have to ask a bunch of questions of you. You probably had this experience. What's your date of birth? What's your mother's maiden name? What are the last four digits of your Social Security number?

The agents ask you those questions in order to identify you. You may hear the term through this trial called knowledge-based authentication. That's what this is about. It takes time for the call centers to ask all these questions and it's annoying to callers to have to answer so many questions.

And the problem of spoofing really started in the early 2000s with the advent of using telephone calls with internet technologies. And around 2004, there began these things called spoofing services where you could simply go and buy an ap in order to spoof your own telephone number. So spoofing became such a big problem in the early 2000s that by 2006, the FCC began an investigation, the Federal Communications Commission. And in 2007, the senate introduced a bill called Truth In Caller-ID to try to stop this spoofing problem. And that's where TRUSTID enters into this story.

In 2007, Mr. Cox began investigating a technical solution to the spoofing problem. And by 2009, he had confirmed after two years of research with his colleagues that he had an invention, and he filed for his first patent application.

So let's talk a little bit more about what TRUSTID does. TRUSTID invented caller-ID authentication technology that's now used by some of the world's biggest companies. These are household names. For example, Bank of America. What TRUSTID's technology does is it determines whether a call is spoofed before it's answered by that agent. So it determines whether the incoming caller-ID is credible or not. Can that agent trust that caller-ID? If it's spoof, the agent can't trust it, if it's not -- if it's not spoofed the agent can trust it. If it's spoofed the agent can't trust it. And that improves customer experience because if the agent could just pick up the phone and say how may I help you rather than who are you. By asking you all these questions, like what's your mother's maiden name, what's your date of birth, it improves the customer's experience.

And TRUSTID's technology also helps the call centers by reducing the potential for fraud by being able to catch which are the good calls in all of the millions of calls that may come in to a call center each day.

Let's focus in on a call center.  Some of you

12:23:51  2    may be familiar with this, but I would like to focus on one

12:23:56  3    of these call center agents, for example.  This woman right

12:23:59  4    here.  What she has in front of her is a computer, she has a

12:24:03  5    telephone, she has a headset.  And with that computer, she

12:24:08  6    may get some information about the incoming call.

12:24:12  7                    When an incoming call comes in, the agent can

12:24:14  8    answer that call in one of two ways.  The agent can pick up

12:24:20  9    the phone and you'll hear these terms throughout this trial,

12:24:24 10    that would be the phone going actually off hook.  That's one

12:24:30 11    way that the agent can answer the phone.  You may be

12:24:32 12    familiar with the old rotary phones that you had in your

12:24:36 13    house.  When you picked those up, that would be going

12:24:38 14    actually off hook.

12:24:40 15                    The agent can answer the call in another way.

12:24:43 16    The agent could press a button and that would cause the call

12:24:47 17    to go virtually off hook.  That's kind of the way you use

12:24:50 18    your cell phone when you slide it, it causes the phone to go

12:24:54 19    virtually off hook.  The agent can answer the incoming calls

12:24:57 20    in one of two ways.

12:24:58 21                    Now, it may seem relatively simple that an agent

12:25:02 22    can answer these incoming calls, but there is actually a lot

12:25:05 23    of technology that goes on before the call actually arrives

12:25:10 24    at the agent.  Let me give you a little bit of background

12:25:14 25    about what happens with an incoming call.

What we have here is sort of a cartoon.  We have
a calling party, someone who is going to place a call and we
have the call center agent, the person who is going to
receive that call.  And how does the call get to the agent?
Well, the calling party will have something called a
caller-ID.  There is also these letters up there, ANI, that
will be pronounced ANI, that stands for something called
Automatic Number Identification, it's like the caller-ID.
So that caller-ID will go along with the telephone -- with
the call.  It goes through the public telephone network,
gets to the call center telephone network and ultimately
will arrive at the agent.  In this example, everything is
perfect because the calling party's number matches up with
the number that the agent receives.  This is not a spoofed
call.  This is good.

But what happens with spoofing is the spoofer
will have a caller-ID or an ANI that's associated with their
phone, but the spoofer can change that number to whatever
number that spoofer wants and that will be sent through the
public telephone network, the call center telephone network,
and ultimately on to the agent.

And the problem here is that the spoofer's
actual caller-ID is different than the caller-ID that the
agent receives.  And again, that's why the agent asks you so
many questions, what's your mother's maiden name, what's

your date of birth.  They ask these questions because before TRUSTID's technology they couldn't trust the caller-ID associated with the incoming call.

And that's where our patent, TRUSTID's patent technology comes in.  There are three patents at issue here as you have heard.  There is the '532 Patent, the '985 Patent, and the '913 Patent.  Let me try -- you'll hear from the experts, we brought in one of the leading experts to explain this technology to you, and you'll hear from Mr. Cox as well who will talk about his technology.

Let me give a high level overview of the investments that were involved in arriving at this technology.  As I mentioned earlier, Mr. Cox founded with some co-founders TRUSTID in 2007.  It took them seven years, from 2007 to 2014, to obtain their first major customer, that was Bank of America.  During those seven years, Mr. Cox and his team were involved in research, in development, they spent nights and weekends trying to solve this problem.  They developed the product, continued to develop and tweak the product.  And they actually had to create the market to educate these contact centers and call centers about how this technology worked.

During this same -- and they invested $15 million to get to that point before they got their first customer.  To protect that investment, they filed for their

12:28:23 1    patent applications, the patents that are at issue here.

12:28:26 2            It wasn't until 2016 that TRUSTID was able to

12:28:31 3    earn its first profit.  That was the first year that TRUSTID

12:28:35 4    received a profit.  In even getting that profit as the

12:28:40 5    evidence will show, that profit did not make up for the $15

12:28:43 6    million investment that TRUSTID had to invest to get to its

12:28:47 7    first customer.

12:28:48 8            So as I mentioned, we'll talk a little bit about

12:28:54 9    what TRUSTID's technology does here.  There are really two

12:28:57 10   types of calls.  You might hear this referred to as green

12:29:00 11   lighting.  That's a good call.  Let me show you what happens

12:29:03 12   with green lighting and TRUSTID's technology.  This is very

12:29:06 13   much like the original cartoon that I showed you, but here

12:29:10 14   we have this authentication system, that's where TRUSTID's

12:29:14 15   patented technology will operate.  And what does this

12:29:18 16   technology do at a high level?  Let's look at what it does

12:29:21 17   for a green lighting call.

12:29:23 18           We have the calling party with the caller-ID,

12:29:26 19   and then there is something a little bit more technical.

12:29:29 20   You'll hear from the technical experts about something

12:29:32 21   called a SIP invite.  SIP stands for Session Initiation

12:29:36 22   Protocol.  What that stands for really doesn't matter, but

12:29:40 23   there is a lot of information that will travel with the

12:29:42 24   call.  So that information will travel with the call, get to

12:29:46 25   the call center telecom network and this is where TRUSTID's

patented technology kicks in.

It extracts information from that incoming call, the caller-ID, and something called operational status information that you'll hear about later. And what the technology does is generates a metric, a score, a measure, is this a good call or not. So for green lighting, what happens is it's determined that that call is valid, and then the agent can answer the call. Importantly all of this technology occurs before the agent answers the call.

Now what happens with red lighting or spoofing? Here we have a spoofer. Again, the spoofer will send his number but change the caller-ID. And when it goes through a telephone network and gets to the call center, TRUSTID's technology will -- patented technology will look at the incoming information and determine that with this score this, in fact, is a spoofed call. So before the agent even answers the call, TRUSTID's technology will determine that this is a spoofed call. And that may be referred to throughout this trial as something referred to as red lighting.

So that leads into two issues here, the false advertising -- I mean, Next Caller's infringement and then false advertising.

So again, going back to the timeline that I showed you earlier, for many years TRUSTID was the only one

12:31:20 1  on the market.  They created this market for pre-answer

12:31:25 2  caller-ID authentication.  Next Caller as founded in 2012,

12:31:30 3  the evidence will show that for several years they focused

12:31:34 4  on a product that was not at issue here, but eventually they

12:31:38 5  focused on something called VeriCall.  VeriCall is the

12:31:41 6  product that's accused of infringement here.  And VeriCall

12:31:45 7  was first given to -- the evidence will show was given to

12:31:50 8  Capital One in March of 2016 for free.  For an entire year,

12:31:55 9  Capital One used VeriCall for free without paying Next

12:32:00 10  Caller any money and the first time that Next Caller

12:32:02 11  received money for its VeriCall product from Capital One was

12:32:07 12  in March 2017.  And it was after that that -- after that

12:32:11 13  sale that TRUSTID learned of the infringement and filed this

12:32:15 14  lawsuit.

12:32:15 15        Now, that leads into the claims.  You heard from

12:32:20 16  the patent video about what -- the property, the legal

12:32:24 17  property of a patent is really defined by the claims, the

12:32:28 18  things that come at the end.  We have listed up the claims

12:32:30 19  here for each of the asserted patents, but a claim as

12:32:32 20  mentioned in the patent video is kind of like a deed, it

12:32:37 21  defines the boundary or the scope of what is the patented

12:32:41 22  technology.

12:32:41 23        And let's just take a look at one of the claims.

12:32:44 24  This is claim 32 of the '532 Patent.  It's one of the claims

12:32:47 25  that are asserted here.  There is a lot of words here so

12:32:50 1  let's try to break it down.  What this claim includes, it

12:32:56 2  recites a system, and there are several elements that you

12:33:01 3  see in this claim.  And this claim in particular is directed

12:33:06 4  to a system for performing an analysis on a calling party

12:33:10 5  number information.  And you're going to hear from our

12:33:14 6  experts about how -- he's going to walk through the details

12:33:17 7  of these claim limitations.  But for infringement, in order

12:33:20 8  to show infringement, it's our burden to show that each of

12:33:24 9  these claim elements will be met by the VeriCall product.

12:33:28 10  We'd also -- just to show you quickly, the claim

12:33:33 11  1 of the '985 Patent, this is a method claim.  It's very

12:33:37 12  similar to the system claim of claim 32.  You'll hear more

12:33:41 13  about that.  We also have claim 15 of the '913 Patent.

12:33:45 14  You'll hear more from the experts about the patent claims.

12:33:48 15  But for now what I want to preview is that in

12:33:52 16  the '532 Patent and the '985 Patent, both of those patents

12:33:56 17  have claims that have language that certain activities have

12:34:00 18  to occur before the incoming call is answered.  And this is

12:34:06 19  going to become an issue in this case and I want to preview

12:34:09 20  what that issue is.  But it's important to note that before

12:34:12 21  the incoming call is answered, language appears only in the

12:34:15 22  claims of the '532 and the '985 Patent.  That language does

12:34:20 23  not appear in the '913 Patent.  So this before the call is

12:34:24 24  answered issue is not an issue for the '913 Patent.

12:34:28 25  So I'll preview, though, what the evidence will

show with respect to the before the call is answered for the '532 and the '985 Patent.  First of all, let's look at what Next Caller said to each one of its customers before this lawsuit.  Next Caller had four customers before this lawsuit, Capital One, BBVA, which is a large bank headquartered out of Alabama, Dish and Comcast.  Let's walk through what Next Caller said to these customers.  For Capital One, Next Caller told Capital One that the Next Caller solution is real-time.  It can be used ahead of the call before the call is answered.

Next Caller told BBVA, a second customer, the bank out of Alabama, the Next Caller solution is considered a first line of defense since our analysis occurs before the call is answered.

In that same communication to BBVA, Next Caller again said our real-time offering allows our tool to be used in the IVR.  And I'll pause there for a second.  The IVR, that stand for interactive voice response system.  That term may not be familiar to you, but the concept probably is. You probably called in to a call center and you heard this computer that you talked to and it said listen carefully as the options have changed.  Press 1 for service.  Press 2 for sales.  That thing you talked to, that's called an IVR, or interactive voice response system.  What Next Caller is saying here to BBVA, our real-time offering allows our tool

to be used in the IVR for decision making before the call is answered.

Next Caller went on -- BBVA went on to ask for clarification on certain things.  The evidence will show that Next Caller again told BBVA, this is a real-time solution which can be used to make decisions in the IVR before the call is answered.

Next Caller's third customer is Dish.  What Next Caller said to Dish is that Next Caller solution is a pre-answer analysis, calls are flagged pre-answer to enable strategic routing.

And then finally what did Next Caller say to Comcast?  Next Caller said that its solution, its API, you'll hear that acronym later, the response delivers analysis in the IVR during the first ring.  If the phone is ringing, it hasn't been answered yet, so again, before the call is answered.  This is what Next Caller told each one of its customers before this lawsuit.

But then in January 2018, TRUSTID brought this lawsuit and Next Caller sent a memo to Capital One.  The evidence will show that after the lawsuit, Next Caller said to Capital One that Next Caller's solution performs the relevant analysis after the call is answered.  But remember, before this litigation, the evidence will show that Next Caller told that very same customer that Next Caller's

solution was before the call is answered. So the evidence will show that Next Caller said two different things to the same exact customer before and after this litigation.

But Next Caller when it was important, the evidence will show that, in fact, Next Caller again said that its solution was before the call was answered, even after this litigation. Next Caller talked to a company called Pindrop. Pindrop was a large company that Next Caller was looking to become acquired by and, in fact, Next Caller did become acquired by Pindrop. During the discussions to become acquired, Next Caller told Pindrop, our tool works in the absence of voice before the call is answered. So the evidence will show that when it was important for business reasons for Next Caller to characterize its product as being before the call is answered, that's exactly what it did.

And that characterization was effective because Pindrop ultimately made an offer to acquire Next Caller and as I mentioned, Pindrop did acquire Next Caller.

Now, in those communications that Next Caller will likely say that what it was talking about was being before the call was answered by the agent, and that's exactly what our expert will explain. You'll hear from Mr. Bress who is a leading technologist in this area and he'll explain how the VeriCall product meets all the

12:39:18 1  limitations of claim 32 of the '532 Patent and, in fact, all

12:39:22 2  the other claims.  But I'll just preview what the evidence

12:39:25 3  will show with respect to claim 32 of the '532 Patent.

12:39:29 4  So this claim requires a system for performing a

12:39:33 5  forensic analysis.  And that system that Mr. Bress will

12:39:37 6  point to is the VeriCall product from Next Caller, the

12:39:40 7  infringing product.  And what claim 32 requires is this

12:39:45 8  incoming call from a telephonic device.  And what Mr. Bress

12:39:50 9  will explain the incoming call that he's talking about is

12:39:52 10  the call from the calling party to the agent.  And all of

12:39:56 11  the analysis has to happen before the incoming call is

12:40:00 12  answered.  And what Mr. Bress will explain is that all of

12:40:05 13  VeriCall's analysis is performed before the incoming call is

12:40:10 14  answered by the agent.

12:40:11 15  Mr. Bress will explain that to you throughout

12:40:15 16  this trial.  But, in fact, the evidence will show you don't

12:40:18 17  even need to rely on what Mr. Bress says, because Next

12:40:24 18  Caller's own head of sales said the same thing.  You'll hear

12:40:26 19  from Mr. Kirchick.  He's the head of sales for Next Caller.

12:40:30 20  And he'll testify via video.  He was asked these questions:

12:40:35 21  "QUESTION:  So the analysis from Next Caller is

12:40:38 22  always performed before the agent picks up; fair?

12:40:42 23  "ANSWER:  Yeah.  That was the intention, yes.

12:40:46 24  "QUESTION:  And that's still the intention and

12:40:50 25  how it works today?

12:40:51 1          "ANSWER:  Yes."

12:40:53 2          That leads into willful infringement.  You'll be

12:41:00 3  instructed from the Judge about what willful infringement

12:41:03 4  means, but this is essentially meaning intentional

12:41:06 5  infringement.  And it will be your job to decide whether

12:41:10 6  there is willful infringement.

12:41:11 7          What the evidence will show is that Next Caller

12:41:16 8  knew how to find patents, knew how to find its competitor's

12:41:21 9  patents.  It told Capital One to game our competitor's

12:41:25 10 system, you only have to Google their patents and you'll

12:41:28 11 learn exactly how they work.  The evidence will show that's

12:41:32 12 exactly what Next Caller was doing, it was googling

12:41:35 13 TRUSTID's patents and monitoring what patents TRUSTID had.

12:41:38 14          In fact, during this litigation, we had

12:41:42 15 communications, documents that were produced by Next Caller

12:41:45 16 to us.  And we have an e-mail from Mr. Roncoroni to his

12:41:52 17 co-founder, his head of marketing and his head of sales.

12:41:55 18 And in this e-mail, he is talking about TRUSTID and he

12:41:59 19 states, The evidence will show that TRUSTID, their tool is

12:42:02 20 patented.  And even goes on, the evidence will show that he

12:42:02 21 knew that there was a possibility there could be

12:42:02 22 infringement.  He goes on to say "even if we infringe one

12:42:12 23 percent, we could be liable for that."

12:42:12 24          But the evidence will show they did infringe and

12:42:12 25 they didn't even care because he goes on to say, "We don't

have to play nice in the sandbox."

I apologize, these are not my words, what he said is, "We could put fuck you TRUSTID on our website, and it won't mean dick."

That leads into their false advertising claim. So one of the things you'll hear about is something called IVR containment. I told you about what an IVR is. That's a computer you may talk to. This notion of IVR containment is calls are sort of serviced in that IVR. For example, if you called up your bank and you wanted to know what your account balance is and it said press 3 for account balance, so you press 3 and you get your account balance. Well, then maybe that's all you wanted and you can hang up. That call would have been contained in the IVR.

So what TRUSTID has advertised based on analyzing millions of calls and actual customer implementations, TRUSTID advertised that its solution resulted in ten percent increase IVR containment. This is very valuable to the contact centers because the call doesn't have to go to the agent. You don't have to pay for agent time which is very expensive.

The evidence will show that Next Caller was again monitoring what TRUSTID was doing. We have an e-mail from Mr. Kirchick, he's the head of sales for Next Caller and he sent an e-mail and he says TRUSTID says IVR

containment goes up five to ten percent with their solution.

What did Mr. Kirchick say.  I would like to jack that stat

or make up a number like eight percent and the evidence will

show that the number that Next Caller chose was the exact

same number as TRUSTID's, ten percent increase IVR

containment.

You heard in the patent video about this notion

of validity, and i will touch on this briefly.  So first of

all, we have three patents in this case.  First, the '532.

All three patents were thoroughly examined by the United

States Patent and Trademark Office.  And after this thorough

examination, you see here, they're filed -- the '532 Patent

was initially filed in May 2009, and it doesn't issue until

August 2012.  What happened during that time period, that

long time period?  The examiner as you heard in that patent

video who is trained in this type of technology did

something called prior art searching, looking for

references, anything that's close to the technology that

TRUSTID does.  What the examiner determined is that the '532

Patent was new, nonobvious, useful, and worthy of a United

States patent.

The same is true of the '985 Patent and the '913

Patent.  Now, I'll just point out that the validity of the

'532 and the '913 Patent will be the only patents that you

need to consider the validity of with respect to the thing

12:45:44 1   called prior art.  The prior art, validity will not be an

12:45:48 2   issue for the '985 Patent.

12:45:51 3          Now you'll hear from Next Caller's expert and

12:45:56 4   they'll bring up certain references and they'll try to say

12:45:59 5   that our patent is invalid.  But the evidence will show, and

12:46:04 6   as I mentioned earlier, what TRUSTID's patented technology

12:46:07 7   is directed to is this caller-ID, can you trust that

12:46:11 8   caller-ID?  Is that valid or not?  And the way that we --

12:46:15 9   that this patented technology works to determine whether the

12:46:18 10  caller-ID is valid or not is by generating that source

12:46:24 11  origin confidence metric, you'll hear that term, I show the

12:46:28 12  cartoon with the metric to determine whether the call is

12:46:31 13  spoofed or not.  That's what TRUSTID's patented technology

12:46:35 14  is directed to doing, to solving, to determine whether the

12:46:37 15  caller-ID is valid or not.

12:46:38 16         The references that you'll hear from Next Caller

12:46:41 17  are not directed to determining whether the caller-ID is

12:46:45 18  valid or not.  They're directed to alarm systems and whether

12:46:50 19  you want to take a call or not, this call screening or

12:46:54 20  whether it's spam from a telemarketer, the evidence will

12:46:56 21  show and it shouldn't be surprising that none of these

12:47:00 22  references will have a source origin confidence metric like

12:47:02 23  TRUSTID's patents.  So it's really just an issue of apples

12:47:04 24  and oranges here.

12:47:10 25         That leads into the last thing that I'll talk to

you about which is damages.  So again you saw this timeline before, and I mentioned that TRUSTID learned of Next Caller's infringement after Next Caller sold to Capital One. One of the reasons we knew that is that Capital -- TRUSTID and Next Caller both went head to head and were tested by Capital One to see which company Capital One wanted to choose.  And you'll hear from Capital One's witness.  He will testify, Mr. Burgess by video, he explained that the reason that Capital One chose Next Caller over TRUSTID was price.  He was asked and he'll testify:

"QUESTION:  And it appears to be that the reason that Capital One was proposing Next Caller over TRUSTID was price; is that right?

"ANSWER:  It was a primary consideration, yes.

"QUESTION:  That was the primary consideration?

"ANSWER:  Yes."

And the evidence will show that the reason that Next Caller could undercut TRUSTID on price is because Next Caller didn't need to recoup its R & D investment.  As I mentioned earlier, TRUSTID invested over seven years of its time and nearly $15 million to come up with its patented technology to create this market and to get its first major customer.  Next Caller didn't have to do any of that, so it was able to undercut on price and use TRUSTID's patented technology without any permission.

12:48:53 1          Now, you may hear about the testing that TRUSTID

12:48:58 2    did with Capital One.  And what the evidence will show is

12:49:02 3    there was simply a mixup, a communication mixup about the

12:49:07 4    test setup that TRUSTID ran with Capital One.  The evidence

12:49:10 5    will show that TRUSTID had two different systems running

12:49:13 6    there.  There was the authentication system, which is

12:49:16 7    running TRUSTID's patented technology.  It is the thing that

12:49:19 8    was designed, patented to catch these spoof calls.  But in

12:49:24 9    addition, during that test, TRUSTID had something that is

12:49:28 10   called a Stub system that was really just designed there to

12:49:33 11   test the interface.  It was not running TRUSTID's patented

12:49:37 12   technology.  And unfortunately spoof calls were sent there

12:49:41 13   and TRUSTID didn't catch them because it wasn't running

12:49:45 14   TRUSTID's patented technology on this Stub system.  And you

12:49:49 15   will hear from Mr. Cox, he'll explain that.

12:49:52 16          So that leads into this concept of damages.  The

12:49:56 17   law provides for two different ways to receive damages.

12:49:59 18   First, lost profit and a reasonable royalty.  Let me try to

12:50:03 19   explain the lost profits.  What lost profits are doing is

12:50:07 20   trying to imagine a world in which Next Caller doesn't

12:50:10 21   infringe, what are the profits that TRUSTID would have

12:50:13 22   obtained.  So we have created a graphic of this.  So if

12:50:18 23   there is no infringement from Next Caller, there is a

12:50:21 24   certain revenue stream that TRUSTID could turn into profit.

12:50:25 25   Because of the infringing activity by Next Caller, that

infringement siphons off some of the revenue and the difference, the lost profit that TRUSTID lost based on that siphoned off revenue, that's the lost profits that we're looking for.

You'll hear from our expert, Mr. Steve Holzen about these lost profits, but I'll just preview what the evidence will show. The evidence will show that TRUSTID's profits on a per call basis were about a little more than a penny, 1.23 cents. But from January 2018 to July 2021, Next Caller invoiced almost 2 billion infringing calls. Each one of those almost 2 billion calls is an infringement. And when you multiply those almost 2 billion calls by the profit that TRUSTID would have made, it works out to be almost $24 million. So we'll be asking for lost profits of almost $24 million. And you'll hear from Mr. Holzen on that.

But the law provides that at a minimum we be entitled to a reasonable royalty if you were to find infringement. Let me try to explain what a reasonable royalty is. Again, you have this concept of rent when you have real property. So with real property you have a property owner, a house, and the owner of that property and the tenant will get together, they'll come up with some agreement. I'll pay you so much for the property. And they sign a lease agreement. And then the tenant will pay rent. That's how it works with real property. It works similarly

with intellectual property or patents.  With patents or

intellectual property, you have a patent owner like TRUSTID,

and they could have gotten together with Next Caller, Next

Caller could have before they infringed, they could have

negotiated with TRUSTID about what is the price that we

would pay you for using this patented technology, they could

have signed a license agreement and arrived at some royalty.

Well, we refer to that as -- you'll hear

Mr. Holzen refer to that as a hypothetical negotiation.

What would have happened if the parties got together to talk

about a license before the infringement occurred?  And what

Mr. Holzen will explain is that the evidence will show that

the parties would have agreed to a royalty rate of just

under half a penny per call.  When you multiply that half a

penny times the almost 2 billion calls, that results in

about nine-and-a-half million dollars.  So an alternative,

as an alternative, we ask for a reasonable royalty.

So at this point, I'll sit down and Next

Caller's counsel will be able to get up and give their

closing argument -- I mean their opening statement, I

apologize, their opening statement, and then as the Judge

mentioned, you'll hear the evidence.  The witnesses will go

up, they'll be examined and then cross-examined.  At the end

of the case, we'll be able to speak with you again in our

closing arguments.  You'll hear from my colleague,

Mr. Specht will give you the closing argument.  We ask that you pay attention and we really thank you for your time here today.

Thank you.

THE COURT:  All right.  Thank you.

So we are going to let the jury go and take a break for lunch.  I believe that we are providing you lunch. But you can eat it in the jury room, take it outside, whatever you want.  We mentioned in the instructions, I read that the jurors had a notebook, but I'm told you all didn't give them a notebook.  Are you planning to or not?

MR. TUMINARO:  I believe we are.  I need to confer with my team, Your Honor.

THE COURT:  Well, if you want to do that, you should have that ready for when we get back after break.

All right.  So with that, I will say thank you and let's take about forty-five minutes, which will get us to about 1:40.

(Jury leaving the courtroom at 12:54 p.m.)

THE COURT:  Anything that we need to discuss?

MR. TUMINARO:  Nothing from us, Your Honor.

MS. COLUMBIA:  No, Your Honor.

THE COURT:  All right.  Thank you.

(A lunch recess was taken.)

THE COURT:  All right.  Anything we need to do

13:47:10 1    before the jury comes in?  All right.  Let's bring them in.

13:47:22 2                    (Jury entering the courtroom at 1:47 p.m.)

13:47:33 3                    THE COURT:  All right.  You may be seated.

13:47:49 4                    Ms. Columbia.

13:47:51 5                    MS. COLUMBIA:  Thank you, Your Honor.  May I

13:47:54 6    take off my mask, Your Honor?

13:47:56 7                    THE COURT:  You may.  Any time you're speaking,

13:47:58 8    you may.

13:48:00 9                    MS. COLUMBIA:  Thank you.

13:48:01 10                   Good afternoon, members of the jury.  My name is

13:48:07 11   Sarah Columbia and I'm one of the attorneys for the

13:48:11 12   defendant in this case, Next Caller.  With me here at

13:48:14 13   counsel table are Jack Blumenfeld.  He'll be helping to

13:48:17 14   present the case to you.  And also Ian Roncoroni who is the

13:48:22 15   CEO of Next Caller.  You may see some of our other attorneys

13:48:26 16   as well, but we're limited with how many can be in the

13:48:29 17   courtroom at one time.  And I'm sure they'll introduce

13:48:32 18   themselves as we go along.

13:48:33 19                   You'll also hear me call out occasionally

13:48:36 20   somebody named Mr. Rosenberg.  He's like the man behind the

13:48:40 21   curtain who is going to help to make sure when we're

13:48:42 22   presenting you with documents and slides, they show up on

13:48:47 23   your screen when they're supposed to.  So if you wonder why

13:48:51 24   I keep talking to somebody named Mr. Rosenberg, that's why.

13:48:54 25                   Thank you very much for being here today and

being willing to serve.  Next Caller very much appreciates your service and your attention.  As you've already probably gleaned, this is an important case among some real competitors, and we appreciate your coming and doing the work.

I want to start with a little bit of an apology for what you started to see this morning and you may see some more of.  You were shown an e-mail message this morning with some pretty foul language.  You'll probably see some more of that.  Next Caller uses an internal text messaging program called Slack.  I'm too old to know what that is, I think, but I'm told it's an internal text messaging tool. And it's very informal.  And I will say that there are some words and language in the text messages and e-mails that I'm not very proud of.  And I know that can be hard for some people to see, but I also want to say that's not what this case is about.  This case is not about did somebody use a swear word in an e-mail.  So I apologize for them in advance.  I'm sure when Mr. Roncoroni is on the stand, he will express his apologies as well, but that's not what this case is about.

So let's talk about what it really is about. What it really is about is competition, and TRUSTID trying to prevent Next Caller from competing fairly in the marketplace.

13:50:32 1          We'll talk more about that, but you'll see

13:50:36 2     evidence that TRUSTID was the established company.  I think

13:50:39 3     you saw that already in the TRUSTID opening.  It offered a

13:50:42 4     solution for call authentication.  It turned out to be a

13:50:47 5     very expensive solution for call authentication.

13:50:53 6          Next Caller is something of the new kid on the

13:50:55 7     block.  You'll see evidence that Ian Roncoroni and others

13:51:00 8     formed the company in 2012 and after lots of hard work over

13:51:04 9     many, many years and lots of investment, and customer input

13:51:08 10    developed a better, faster, and less expensive solution.

13:51:13 11    That solution is called VeriCall.  And VeriCall as you'll

13:51:18 12    learn from the witnesses in the case, and as you'll see in

13:51:21 13    the evidence, works differently and perhaps more importantly

13:51:26 14    could be offered at much lower pricing because of the way it

13:51:30 15    works.

13:51:30 16         Now, not surprisingly TRUSTID wasn't happy when

13:51:35 17    it learned it had a young, hungry, entrepreneurial

13:51:42 18    competitor with a faster, better, less expensive solution to

13:51:45 19    the authentication problem.  So TRUSTID sued Next Caller

13:51:52 20    right here for patent infringement and false advertising.

13:51:52 21    And why did they do that?  To slow them down in the

13:52:02 22    marketplace.  And the evidence will show that's exactly

13:52:02 23    what's happened.

13:52:06 24         Now, on its face this is a case about technology

13:52:11 25    and its patents.  So let's talk about that.  On the

13:52:14 1    **technology, you just heard from TRUSTID's lawyer, the**

13:52:17 2    **technology here involves helping companies, big companies**

13:52:20 3    **like banks and financial institutions who are receiving**

13:52:24 4    **large volumes of incoming calls to identify calls as either**

13:52:29 5    **being authentic on the one hand, hopefully like you and me,**

13:52:33 6    **or spoofed or fraudulent on the other hand.  And doing that**

13:52:39 7    **helps all of us, helps you and me because we spend less time**

13:52:44 8    **waiting for the call centers, we spend less time answering**

13:52:48 9    **questions like what's your mother's maiden name, what's your**

13:52:52 10    **favorite pizza topping, and so forth.  But it also -- so it**

13:52:57 11    **saves us time and hassle.  It also saves the banks or the**

13:53:01 12    **big call centers money because it means of their customers,**

13:53:07 13    **their consumers' problems and issues can be resolved without**

13:53:11 14    **extensive time by an agent.**

13:53:15 15    **The good thing about this case for patent cases,**

13:53:18 16    **we all have experience in calling call centers.  Either our**

13:53:23 17    **bank, our cable company, our utility company, we have all**

13:53:29 18    **heard that familiar welcome to Acme Bank, please, you know,**

13:53:34 19    **press 1 for service.  What you may not know is that when you**

13:53:39 20    **call into a bank like that and you begin to get that**

13:53:42 21    **recording, the bank's computers have answered your incoming**

13:53:46 22    **call.**

13:53:50 23    **Now, that's important in this case because the**

13:53:52 24    **claims here are only to analysis that's done before the call**

13:53:57 25    **is answered.  The call is answered, the incoming call is**

answered at a call center when it first goes off hook.
That's part of the claim construction in this case which
we'll look at later. And if you think about when those --
those times when you have called into a call center and you
get that recording, that familiar recording and you have
looked down at your iPhone and the little timer has started,
that's because that call, your incoming call has been
answered, has been taken virtually off hook by the call
center's computers. We'll look at that more closely, but
you can think about it because you have actually called call
centers and have had that experience.

Now, typically when you get to the call center,
you may get a recorded message, thank you for calling. You
may be offered options like press or say 1 for account
balance information, that kind of thing. All of that is
happening in the call center computers. It's happening in a
part of the call center computers that Mr. Tuminaro
mentioned earlier called the IVR. That's an interactive
voice system that interacts with you and your voice commands
and your pressing of the buttons all in the computer of the
call centers. And that IVR is the thing that determines
whether you'll ever get to an agent. And when you do get to
an agent, will provide that agent with the authentication
information that Next Caller has provided.

Now, eventually when you get to an agent, you

13:55:45 1 may get asked what's your mother's maiden name, or what is

13:55:50 2 your Social Security number, but hopefully if the customer

13:55:54 3 has a Next Caller system, much of that authentication has

13:55:58 4 been done before your call is transferred to an agent.

13:56:01 5 TRUSTID and Next Caller both have technology for

13:56:07 6 authentication. TRUSTID's technology and Next Caller's

13:56:12 7 technology work very differently. TRUSTID works the way

13:56:17 8 their patent describes. Next Caller's does not.

13:56:22 9 And what you'll learn and you'll see from the

13:56:28 10 evidence is that Next Caller's technology which they

13:56:32 11 developed independently works inside the IVR. I agree with

13:56:39 12 Mr. Tuminaro, it works before the call is answered by the

13:56:43 13 agent, but it works after the call has been answered and

13:56:47 14 virtually off hook by the call center. And by working

13:56:52 15 inside the IVR and working much faster than the TRUSTID

13:56:57 16 system, Next Caller is able to perform better and faster and

13:57:03 17 offer lower pricing.

13:57:05 18 And that's what's resulted in Next Caller being

13:57:09 19 the preferred provider for some of the nation's biggest call

13:57:12 20 center users, including companies like Capital One and

13:57:12 21 Comcast.

13:57:21 22 So who is Next Caller? Next Caller was founded

13:57:25 23 in 2012 by two young men, Mr. Roncoroni, who is not as young

13:57:32 24 today as he was in 2012, and a gentleman named Gianni

13:57:37 25 Martire. It's the brain child of Mr. Roncoroni. He'll tell

you about that when he takes the stand and testifies under oath. As he'll tell you, he had his own personal story which caused him to get interested in this issue. With the last name, Roncoroni, all one word, he had several experiences where he couldn't convince the call center to find his name. He was constantly being confused with a person whose name was Ron Coroni, and they couldn't find his accounts or couldn't find his reservation in the system. He said to himself, how could that be? My bank, for example, should know something about me, they should have all my data, my cell phone number, et cetera, et cetera. So he also had a long-time interest in starting a company.

Beginning in 2012 he started down the path which took many years and a lot of hard work to research and understand the call center industry, to find partners and talented people to work with him on potential solutions to this problem, to make our consumer experience better and to save call centers money.

Through that process, and Mr. Roncoroni will talk to you about it, he and his colleagues, including some very sophisticated software engineers who did this independent development, built a new solution that would offer better results at lower costs for call centers. And that new and better service is called VeriCall. Mr. Roncoroni spent five years, really three years dedicated

specifically to VeriCall, and over $5 million to develop VeriCall.

They also worked during the same time to develop relationships with banks and financial institutions. They knew that would be the kind of business that would need this high level authentication for incoming call center calls. And so they built relationships with call center leaders and in particular with large financial institutions, including Capital One Bank.

You'll hear a lot of evidence in this case about Capital One. It was Next Caller's first customer. And it took Next Caller more than eighteen months of working with Capital One to sign them as a customer. Mr. Tuminaro said we gave it to them for free. That's not going to be what the evidence shows. But it will show that because we were new, because we were hungry, we agreed to do pilot testing for Capital One to show them how much better our solution was than the other competitors in the industry. And in that pilot testing, Capital One tested Next Caller's VeriCall solution on more than 10 million calls to validate the performance that VeriCall could bring to its call centers for authentication.

Even though Next Caller didn't earn any money during that eighteen months that it was working with Capital One, it was a very valuable time. You'll hear from

Mr. Roncoroni that they learned from Capital One, from their customer, what their customer's needs were and how best their customer would integrate VeriCall into their customer's call center and into the overall authentication and security system at Capital One Bank. That enabled Next Caller to continue to develop VeriCall not just based on what they knew, but based on direct feedback from one of the largest banks in the country. Capital One signed up for Next Caller's service in mid 2017, and it did that, and you'll hear this directly, because VeriCall was a better and less expensive solution than the other competitors.

After Capital One signed on, Next Caller was able to sell its service to other big customers, including customers you'll probably recognize, Comcast, Dish Network, and BBVA, which is a big bank that used to be called Compass Bank. You may have seen that on TV commercials.

That's a little bit about Next Caller. Let's talk a little bit about TRUSTID. As you can imagine, TRUSTID was not happy to have a competitor. I think you heard this morning that TRUSTID thought it was the only solution, the only provider of this sort of authentication for call centers. And I'm sure they expected to be that way for a long time. And they were charging very high prices, and they were not happy to have a competitor with a high performing solution that could be priced at lower prices.

This came to a head in the Capital One account. TRUSTID didn't have a Capital One account. TRUSTID was trying to get the Capital One account as were we, as were Next Caller and as were other companies. You'll hear about those other companies who were also competing. In the end, Capital One ran its testing and selected VeriCall. And TRUSTID was not happy when it learned that. Not only did it have a competitor, but its competitor was a new kid on the block who had figured out a way to do the authentication differently and less expensively.

And you'll see TRUSTID's reaction in plain English directly from its CEO, Mr. Cox. This is August 2017, shortly after Mr. Cox and TRUSTID learned from Capital One that Capital One had selected Next Caller. And what does he say? He says "Next Caller is now a full competitor and we need to kill them in the market, period."

Six months later they filed this lawsuit for patent infringement. Why did they do that? As part of a competitive strategy.

Let's talk about the patent claim. TRUSTID asserts three patents. You heard that this morning. The two on the left, the '532 and the '985, are in the same family, so they have the same words with slight differences in the claims. And then the '913 is a separate patent.

We'll start with the '532 and the '985 and sort

14:04:58 1    of talk about them together.

14:04:59 2             You learned this morning through that

14:05:07 3    scintillating video from the Federal Judiciary Center that

14:05:10 4    the key part of the patents are the claims.  And the one

14:05:13 5    thing that the Judge will instruct you and you heard in the

14:05:16 6    video is in order to infringe a patent, the accused product,

14:05:20 7    or the accused service has to be proved to perform each and

14:05:25 8    every element of those claims.  Very important here, there

14:05:34 9    are a number of differences between our product and these

14:05:37 10   claims.  I'm going to focus on one for this afternoon, but

14:05:42 11   you'll hear about more from our expert.

14:05:44 12            Each of the claims requires that the analysis be

14:05:47 13   performed before the incoming call is answered.  And in your

14:05:58 14   juror notebooks which you have just been given, you'll have

14:06:02 15   the Court's claim construction with respect to the order "is

14:06:06 16   answered."  "Is answered" in this case means that the call

14:06:09 17   is actually or virtually off the hook.  That's what this

14:06:14 18   patent is about.  It's about performing the analysis before

14:06:20 19   it reaches the call center because when it reaches the call

14:06:25 20   center, it goes virtually off the hook.

14:06:30 21            This case is not about whether the analysis is

14:06:35 22   performed before the agent answers the call.  Let me say

14:06:42 23   that again.  This case is about whether the analysis is

14:06:46 24   performed before the incoming call, as you see in the

14:06:51 25   claims, is actually or virtually off the hook.  And the

14:06:57 1   evidence will show that the incoming call, the call that you

14:07:01 2   and I make to our bank is answered, goes virtually off the

14:07:10 3   hook when it reaches the computers at the call center and

14:07:14 4   you start to see that timer on your iPhone, or I don't want

14:07:18 5   -- iPhone, Samsung phone, Google phone.

14:07:24 6           The patent is specific to analysis that happened

14:07:31 7   before the call reaches the call center, so before it goes

14:07:36 8   virtually off the hook.  And you'll see evidence, that's

14:07:41 9   what TRUSTID's product does.  TRUSTID's product does its

14:07:48 10  analysis before the call is answered in the call center,

14:07:53 11  before it goes virtually off the hook.

14:07:58 12          And you don't have to take my word for it,

14:08:01 13  you'll hear from evidence directly from Mr. Cox and from

14:08:05 14  TRUSTID's expert.  To use the words of TRUSTID, the two

14:08:11 15  products are simply apples and oranges.  So outside of this

14:08:17 16  courtroom, that's what they say.

14:08:23 17          Let's take a look at it more graphically so that

14:08:28 18  you can get an appreciation of what I'm saying.  On the left

14:08:32 19  we have a caller.  That could be you or me.  In the middle

14:08:36 20  we have computers, that's the call center computers.

14:08:39 21  They're the ones who say thank you for calling Capital One,

14:08:42 22  your call may be monitored, et cetera.  TRUSTID's patent,

14:08:48 23  the evidence will show that TRUSTID's patent and TRUSTID's

14:08:52 24  product carry out their analysis in that orange area before

14:08:56 25  your incoming call goes virtually off hook at the call

center.

By contrast, VeriCall, Next Caller's product, just as you heard this morning, frankly, begins its work after the call has gone virtually off the hook. That is after the call has been answered by the call center's computer. You can think of it as after the little timer on your iPhone or Google phone starts to click. Because of that, VeriCall does not infringe because it does not meet that element of the claim that we just looked at.

Now, that's a fundamental difference and it's important in this courtroom because it means we don't infringe. Simple as that. But it's also a difference that makes VeriCall a better and faster system than TRUSTID's system. It makes it a much better experience for you and me when we call into a bank, and also for the call center because the TRUSTID system has to interrupt your call, has to prevent your call from being answered at the call center. You have to wait while your call rings, while TRUSTID's system, just like the patent talks about, processes and analyzes your call data. And you'll learn that you have to wait while your call rings for as much as two to three to four seconds, which may not sound like very long, but if you're impatient like I am and your call is still ringing, that could make a big difference.

TRUSTID's system, TRUSTID's patent are focused

14:11:18 1  on analyzing your call before it hits the call center

14:11:22 2  computer, better it goes virtually off hook and that's

14:11:27 3  important because TRUSTID's system only works while your

14:11:31 4  call is still ringing, so it works with its bank customers

14:11:35 5  to delay your call, leave it on a ring mode so that it can

14:11:41 6  do its analysis.

14:11:42 7          VeriCall doesn't need to do that.  VeriCall

14:11:53 8  allows your call to move forward, allows you to interact

14:11:56 9  with the computers at the call center and VeriCall does its

14:11:58 10  analysis while that's all going on.  And VeriCall's analysis

14:12:04 11  takes only about 200 milliseconds, so two seconds,

14:12:12 12  200 milliseconds, I don't do so well with those kind of

14:12:17 13  numbers, but it's a much, much, shorter amount of time, and

14:12:20 14  you don't even notice it because you're already in the call

14:12:24 15  center interacting with a computerized system, pushing

14:12:28 16  buttons or using your voice.

14:12:30 17          And it saves money because VeriCall's system,

14:12:35 18  you'll learn this from Mr. Roncoroni, is a software system

14:12:39 19  that operates in what we call the cloud.  It doesn't have a

14:12:42 20  high overhead, it doesn't have a lot of costs, so it can be

14:12:48 21  offered to customers, performs better, performs faster,

14:12:52 22  performs after the calls in the call center and because it's

14:12:56 23  software that sits in the cloud, they don't have to charge a

14:13:02 24  lot of money for it.  You'll see evidence in this case about

14:13:02 25  the pricing of these two competing products.  You'll hear

directly from both the witnesses for the parties and from customers that TRUSTID's prices are as much as ten times higher than Next Caller's prices.

Now, there are more differences between VeriCall and the patents and our experts will talk about that, but let me talk briefly about the '913 Patent.  The '913 Patent, TRUSTID admits that VeriCall does not infringe that patent directly because we don't perform, VeriCall does not perform all of these steps of the claims.  So what they are alleging here is that we induce or persuade our customers, the big banks, or Comcast, to infringe this patent.  I won't go into a lot of detail today, but basically the '913 Patent is directed at solving a completely different problem in a completely different way than what we have been talking about today.  The '913 Patent is focused on stopping the fraudulent call at the front end of the process, before it ever gets to the call center.  To do that, the '913 Patent claims require, and sorry, it's a lot of words, but they require that the thing that's detecting the discrepancy, the analysis, has to be ancillary to the calling side network switch.  Meaning if I'm the caller, in order to infringe this patent you have to be ancillary to, which the Court has defined as coupled as an adjunct to the caller's side network switch.  And as you'll see when we get the experts and so forth, that's just the opposite of what Next Caller

does.  Next Caller as you saw from the previous graphic works in a cloud-based software system, kind of like an ap if any of you use aps, and it works in the IVR at the call center side of that calling process.

Now, sticking with the patents, let me just say when we're done, as the Judge told you, TRUSTID gets to put on its case, they have the burden of proof, that's why they get to go first.  We'll come back, we'll show you evidence of how VeriCall was developed.  We'll show you evidence that it was done over more than three years independently of any information from TRUSTID, that Next Caller invested more than $5 million.  And we'll show you that VeriCall does not use the techniques in TRUSTID's patent.  We'll also have an opportunity at that time to show you why VeriCall's -- sorry, why TRUSTID's patents are not valid.

Now, as you heard in the Federal Judiciary video, it may seem odd that you would decide whether a patent that's been granted by the United States government is valid or not, but the constitution provides us that right and it provides us that right because as you saw in the video, the Patent Office doesn't always have the same information that you will have as a result of this trial.  And frankly, everyone recognizes that the Patent Office may make mistakes.  So when we come back, we'll put on our evidence of invalidity, and we will -- the evidence will

show you that the ideas in these patents were not new, were not novel, and are not patentable.

Let's talk about the false advertising claim. TRUSTID accuses us of false advertising because our marketing materials say that VeriCall can improve IVR containment by ten percent. That's the false advertising claim.

So what's IVR containment? It's one of many statistics that customers and companies in this competitive space pay attention to. Here is what it means in simple terms, at least I can understand, which is if I call into my bank and all I want to know is my current balance and I'm able to be served by the IVR, by the computers without needing to talk to an agent, that's IVR containment. It means my call was able to be resolved, hopefully to my satisfaction in the computer system that's called the IVR. So there is lots of industry research about IVR containment and you'll hear about that in this case. The customers, some of them track it, some of them care about it. For some of them, IVR containment is not their key metric. But we have a statement in our marketing materials that says that using VeriCall, a customer may achieve ten percent additional IVR containment, meaning ten percent more people, or more calls I should say, that are able to be resolved by the computer rather than going to an agent.

So here is the first thing about that. It's true. And you'll see that evidence. It's not false, it's true. And it's a statement that is well within the bounds of what VeriCall has achieved for its customers.

Maybe more importantly, you'll see absolutely no evidence that any customer relied on our advertising of a ten percent IVR containment in its decision to buy VeriCall. Now, you saw one line of an e-mail in this morning's presentation on this ten percent IVR containment issue. It was a pop out, sort of, you know, these ten words or so in which one of the Next Caller employees said TRUSTID advertises five to ten percent IVR containment. I would like to jack that stat or make up a number like ten percent, or like eight percent, I think it said. And from that, TRUSTID is presumably going to argue that we made up the ten percent IVR containment. You will be the judges of that. Mr. Roncoroni and we'll have Mr. Espinosa, our VP of marketing will be here testifying under oath, you'll be able to assess their credibility and their testimony. I'm here to tell you not only is the statistic solid, but there is no evidence that anyone at Next Caller made up that statistic.

And as I said, you won't see any evidence in this trial of any customer that relied on ten percent IVR containment advertising, or was misled. Think about it, our customers are companies like Capital One, Comcast, Dish

Network, you'll hear that each and every one of them ran
pilot tests on our system testing millions of calls,
sometimes as I said, Capital One, it was eighteen months of
on and off appointments.  Each of these other customers did
multiple pilot tests.  They don't buy like I would buy going
to Home Depot.  It's not like buying a light bulb off a
shelf because it says twenty percent brighter.  These are
sophisticated companies who test for themselves to see
whether VeriCall is going to improve the performance of
their call centers.

            And you'll hear directly from each of those
customers in this courtroom.  They'll be present by what the
Judge called deposition testimony, which is testimony under
oath, and they will tell you under oath that they chose
VeriCall because it met their performance needs and it was
less expensive.  They will not tell you that they purchased
VeriCall because of advertising about IVR containment.

            And we sometimes heard the phrase the proof of
the pudding is in the eating.  I think it's been in the news
lately.  In this case, all four of these customers who
signed on with VeriCall in the 2017-2018 time period
continue to be VeriCall customers today.

            Now, with that, ladies and gentlemen, let me
talk a little bit about damages.  You heard about damages
from TRUSTID's lawyer.  We don't think you have to get to

damages in this case. I don't think that -- the evidence will not show patent infringement, and the evidence will not show false advertising. But because it's been raised, we really have to respond and at least tell you what our side of that story is going to be. And the key part of our side of that story is that TRUSTID's damages theory is, the foundation of their damages theory is that had we not made the sale, had the customer not bought VeriCall, the customer automatically would have bought TRUSTID, and not only would that customer automatically have bought TRUSTID, but they would have paid TRUSTID's prices. This is an area where maybe unlike patent infringement, common sense can come to bear. I don't know of anybody that would automatically buy a different product that works differently and performs differently and pay up to ten times more for it, but that's the foundation of their lost profits damages theory.

Our side of that story will be to show you why they can't prove that, that that would not have happened, and that not a single Next Caller customer who bought VeriCall, there is no evidence any of those customers would have bought TRUSTID's system at TRUSTID's prices. Among other things the evidence will show these customers, very sophisticated customers, had lots of other options if for some reason they couldn't have bought VeriCall, they might have done their own solutions. All of these companies have

big in-house IT groups that could have done that, or they
may have gone to one of the many other competitors, and
you'll see evidence about that.  We'll have chance to get
into the details of it, but the evidence is going to show
you that the damages here are zero, both because there is no
infringement and no false advertising, and because TRUSTID
will not be able to meet its burden to prove lost profits.

Before I wrap up, let me just give you a brief
preview of the upcoming witnesses since we won't be putting
on our case for at least another day or so.  Our CEO, Ian
Roncoroni, is pleased to be here to testify.  He'll also be
with us either in the courtroom or in one of the watching
rooms outside the courtroom throughout the trial.  Sam
Espinosa is the VP, vice-president of marketing for Next
Caller, and he will be here.  Arthur Brody is a Ph.D. in
telecommunications and will help you to understand both the
intricacies of the patent and also the intricacies of how
these systems work.  And Gary Olsen is an expert in patent
valuation and forensic accounting, and he will address
TRUSTID's damages theory.

As I sit down after this opening statement,
TRUSTID will present its case, and they'll show you the
evidence that they have to prove patent infringement, false
advertising and damages.  That's the way it works.  They
have the burden of proof.  I know my mother taught me there

is always at least two sides to every story, and she always
told me to keep an open mind, there could be even more than
two sides to every story. So what we ask you on behalf of
Next Caller is to take in all the evidence, but keep my
mother's advice in mind, which is that there are always at
least two sides, sometimes more, to every story. And that
when we come back, we'll have an opportunity to put on our
evidence so that you have the full picture, the full story.
And we submit that once we do that, the evidence will show
that Next Caller doesn't infringe any patent, the patents
are invalid, and there has been no false advertising.

Thanks in advance for your time, your attention,
and your service. And I look forward to when we get to put
on our evidence.

THE COURT: All right. Mr. Tuminaro.

MR. TUMINARO: The first witness will be Mr. Pat
Cox.

COURTROOM DEPUTY: Please raise your right hand.
Please state your full name and spell your last name for the
record.

THE WITNESS: Patrick Michael Cox. C-O-X.

Patrick Michael Cox, having been duly sworn was
examined and testified as follows:

MR. TUMINARO: Your Honor, may I approach to
give --

THE COURT:  I would ask in the future that you give it to the witness before the witness takes the stand to minimize the back and forth, but yes, you may do that.

MR. TUMINARO:  Thank you.

THE COURT:  Please, go ahead.

MR. SPECHT:  Good afternoon.  Good afternoon, ladies and gentlemen of the jury.  I was introduced before, my name is Michael Specht, also here on behalf of TRUSTID. Also an attorney.  And I will be taking the testimony here of Mr. Cox.

DIRECT EXAMINATION

BY MR. SPECHT:

Q.    Mr. Cox, would you please state your full name.

A.    Patrick Michael Cox.

Q.    What is your relationship with TRUSTID?

A.    I was the co-founder, I ran the company from the day we started until Neustar bought the company.  I was a principal inventor and involved in the technology, sale of the marketing of the company.

Q.    You mentioned that you started the company.  What year did you start TRUSTID?

A.    1997 -- 20 -- I've got a problem with dates.  I apologize.  2017.

Q.    We'll come back to when you started -- I know you have a problem with dates.  When did you start the company?

14:30:38 1   A.      Thank you.  2017.  Am I still getting that wrong?

14:30:49 2   '17?  I'm sorry.

14:30:50 3   Q.      We'll turn back to that.  We have a timeline chart

14:30:53 4   for Mr. Cox given the issues that he has with dates.

14:30:57 5            Mr. Cox, are you currently involved in the

14:31:01 6   day-to-day operations of TRUSTID?

14:31:04 7   A.      I haven't been involved in any operational or

14:31:08 8   day-to-day role for about a year-and-a-half, but I still am

14:31:12 9   employed, an employee at TRUSTID.

14:31:14 10  Q.      So what is it that you do for TRUSTID currently?

14:31:17 11  A.      I work in a strategy area, I'm involved in selling.

14:31:22 12  I'm involved in technology issues as, you know, asked by the

14:31:26 13  folks who are doing the day-to-day work, but I'm not running

14:31:29 14  anything and have no operational responsibilities currently.

14:31:32 15  Q.      And just to confirm, I believe you mentioned this,

14:31:35 16  but you currently are an employee of TRUSTID; correct?

14:31:39 17  A.      I am.  Yes, I am.

14:31:41 18  Q.      And you mentioned that TRUSTID was acquired by

14:31:43 19  Neustar.  Who is Neustar?

14:31:45 20  A.      So Neustar is a big company, about 2,000 people.

14:31:48 21  They have been around for about twenty years.  They're a

14:31:52 22  really important big company in the telecommunications area.

14:31:56 23  They manage phone numbers and caller-ID.  They also have

14:32:01 24  analytic products and also a lot of fraud and securities

14:32:04 25  solutions as well.

14:32:05 1  Q.      Mr. Cox, is Neustar a large company?

14:32:09 2  A.      Yeah, I consider it a large company.

14:32:11 3  Q.      Focusing on TRUSTID, what is it that TRUSTID does?

14:32:14 4  A.      So TRUSTID has a technology that can analyze a call.

14:32:19 5  And what it does is it provides a metric or a measurement of

14:32:23 6  the trustworthiness or the authentication level of

14:32:28 7  caller-ID.  That is given to the agent before they answer

14:32:31 8  the call.  So we do our work before the agent engages in

14:32:35 9  interacting with the caller.

14:32:37 10 Q.      And who do you sell or who does TRUSTID sell their

14:32:40 11 services to?

14:32:41 12 A.      Primarily large financial institutions, insurance

14:32:45 13 companies, brokerage firms, those types of businesses with

14:32:51 14 contact centers.

14:32:51 15 Q.      Can you name a few of your customers?

14:32:53 16 A.      Bank of America would be an example we mentioned

14:32:56 17 earlier.  UBS would be an example.  There is about fifty

14:33:01 18 customers we service today.

14:33:02 19 Q.      And in describing TRUSTID, you mentioned call center

14:33:07 20 agent.  Can you tell us what a call center agent is?

14:33:10 21 A.      Sure.  It's that person that when you have a problem

14:33:12 22 and you're trying to reach out and solve it, I don't like

14:33:16 23 calling unless I have a problem, you finally get a human

14:33:19 24 being who can help you resolve the issue, that human being

14:33:22 25 is a call center agent.

14:33:24 1    Q.      And you mentioned you have a product that does

14:33:28 2    caller-ID authentication.  What is the name of that product?

14:33:30 3    A.      That product was called Authenticator.

14:33:34 4    Q.      Are there key features of Authenticator that you

14:33:39 5    market?

14:33:39 6    A.      Absolutely.  So from a feature point of view or

14:33:42 7    benefit point of view, our customers are going to buy it

14:33:46 8    primarily because they can make you happy, that's what --

14:33:49 9    that's what these big institutions care about is customer

14:33:52 10   service, so if they can start off by saying, hello, how can

14:33:56 11   I help you, versus hello, who are you, that's a real

14:34:00 12   positive for the customer experience they would call that.

14:34:02 13           The next benefit of course is because they can

14:34:04 14   now start off with hello, how can I help you, versus who are

14:34:08 15   you, that time spent figuring out who you are, right, that

14:34:11 16   is actually a cost savings for the bank or credit union or

14:34:15 17   anybody who would be having a contact center, so it saves

14:34:18 18   them money.

14:34:19 19           And then lastly there is a fraud component in

14:34:22 20   terms of how the service works.  We can reduce fraud by

14:34:22 21   containing it into those, as you heard earlier, red calls

14:34:22 22   right, they can really reduce fraud.

14:34:32 23   Q.      Thank you.

14:34:34 24           Knowing a little bit about TRUSTID, let's find

14:34:36 25   out about you.  And first of all, prior to founding TRUSTID,

14:34:40 1   did you have any experience in the telecom and

14:34:43 2   authentication industry?

14:34:44 3   A.      Yes.

14:34:44 4   Q.      And what was that experience?

14:34:46 5   A.      Forty, forty-five years.  I have been in telecom my

14:34:52 6   entire life.

14:34:52 7   Q.      And prior to starting TRUSTID, had you started any

14:34:56 8   other companies?

14:34:57 9   A.      So, I have.  I have had three companies I have

14:35:02 10  started and run three companies in the telecommunications

14:35:05 11  and authentication business over the last forty plus years.

14:35:08 12  Q.      Can you name those companies that you started?

14:35:11 13  A.      Sure.

14:35:12 14          So the first one was called Metro One Telecom.

14:35:16 15  And Metro One Telecom provided enhanced services to pretty

14:35:20 16  much every wireless carrier in the country.  It was 411.

14:35:26 17  411 is an old service that many of us don't remember.  You

14:35:30 18  dial it or 555-1212, they will get an operator, they would

14:35:35 19  help you look up the number, that's what that company did.

14:35:38 20  That company I started, just me.  We grew that company to

14:35:42 21  about 3,000 people and it was really an important part of

14:35:42 22  the telecommunication service infrastructure.

14:35:48 23          The second company was Qsent.  Qsent used

14:35:51 24  telephone company data feeds to power financial services

14:35:55 25  firms and others for their identity resolution around data.

14:36:00 1    We sold that company.  That reached about a hundred people,

14:36:03 2    so we're going from a bigger company down to a smaller

14:36:06 3    company.  We sold that one actually to TransUnion, the

14:36:10 4    credit bureau which almost all my employees that were there

14:36:14 5    are still working today.  And then, of course, there is

14:36:16 6    TRUSTID.

14:36:16 7    Q.    How did you originally get interested in

14:36:19 8    telecommunications?

14:36:20 9    A.    Since I was a kid, I would buy old TVs and fix them

14:36:25 10   and radios and I loved it.  I loved figuring out problems.

14:36:28 11   It was kind of what I did and who I was.  Who I am,

14:36:32 12   actually.  I guess telecommunications would be when I built

14:36:37 13   my first satellite dish.  I made the cover of the paper.  It

14:36:41 14   was pretty cool as a teenager.  I'm a tinkerer.  I love it.

14:36:46 15   I love the idea of solving problems and I have been doing

14:36:50 16   that my entire life.

14:36:51 17   Q.    Did you pursue a degree in engineering in college?

14:36:54 18   A.    No, I did not.  Actually I didn't -- I went to

14:36:58 19   community college for about a year.  That's the extent of my

14:37:00 20   formal college education.  And I never pursued a degree in

14:37:02 21   engineering.

14:37:02 22   Q.    And do you have any patents, Mr. Cox?

14:37:02 23   A.    I do have several patents, yes.

14:37:11 24   Q.    How many patents do you have?

14:37:12 25   A.    In total about thirty-five.

Cox - direct

14:37:15 1    Q.    And are you the sole inventor on those patents?

14:37:19 2    A.    I don't believe I'm the sole inventor on any of the

14:37:22 3    patents.  Maybe there is one or two.  I haven't reviewed

14:37:25 4    them recently.  Frankly I need to solve problems in a team

14:37:29 5    environment.  I got all my patents through a team.  I know

14:37:34 6    all the patents I have with TRUSTID are a team.  I think you

14:37:36 7    get better answers when you work as a team and collectively

14:37:39 8    bounce ideas.

14:37:40 9    Q.    Where do you currently reside?

14:37:41 10   A.    I live out in Oregon in a town about

14:37:44 11   forty-five minutes outside of Portland called Newberg.  It's

14:37:48 12   a small town; been there about twenty-five years or so.

14:37:50 13   Q.    Are you married?

14:37:51 14   A.    I am.  I have been married for it will be

14:37:55 15   thirty years in November.

14:37:56 16   Q.    Hopefully you got that number right.

14:37:58 17   A.    That's why I was laughing.

14:38:00 18   Q.    And any children?

14:38:01 19   A.    I do.  So I have got a 23-year old daughter who is

14:38:05 20   graduating from college this year, which is great.  And I

14:38:05 21   have got a 16-year old son.  And I also got three German

14:38:12 22   Shepards.

14:38:12 23   Q.    Turning back to the TRUSTID story, why did you start

14:38:16 24   TRUSTID, why did you found it?

14:38:20 25   A.    I solved a big problem in directory assistance.  I

14:38:25 1    solved the big problem in data and contact stuff.  And I run

14:38:30 2    cable companies and I have been involved in so much

14:38:32 3    technology.  I felt the biggest problem facing telecom when

14:38:36 4    I started this company was the spoofing problem.  It used to

14:38:39 5    be I could trust the telephone network.  When I would get a

14:38:42 6    call, there was like a pipe, a connection between me and the

14:38:45 7    phone company and I could see that caller-ID and know it was

14:38:48 8    trustworthy.  When that wasn't the case, when my phone said

14:38:52 9    the IRS was calling and it wasn't, I considered that a

14:38:57 10   threat to my profession, to my career, to the telephone

14:38:59 11   business and I felt that I was uniquely positioned to solve

14:39:02 12   the problem.  I became obsessed with solving it, frankly.

14:39:05 13   Q.    And did you think you could make some money solving

14:39:08 14   the problem?

14:39:09 15   A.    Yeah, I needed to -- to be able to solve a problem

14:39:11 16   like that where the phone companies hadn't been able to

14:39:14 17   solve it, I had to build a team.  And a team has to be good

14:39:18 18   people.  I can't go out and ask somebody, hey, I got this

14:39:21 19   job running technology in this really big company, come over

14:39:25 20   here and take a risk unless there is a hope and a chance

14:39:27 21   that you're going to build something of value, so

14:39:31 22   absolutely.

14:39:31 23   Q.    Mr. Cox, do you have a binder in front of you?

14:39:34 24   A.    I do.

14:39:35 25   Q.    Can you turn to PTX-459.

14:39:42 1   A.      Okay.

14:39:47 2   Q.      This will not be in the jury binders, so hopefully in

14:39:51 3   a moment you'll see it.

14:39:53 4           Do you recognize that document?

14:39:55 5   A.      I do, yes.

14:39:56 6   Q.      What is it, Mr. Cox, just generally?

14:39:59 7   A.      It's the cover slide of one of our seven promotional,

14:40:04 8   informative decks.

14:40:06 9           MR. SPECHT:  Your Honor, we would like to move

14:40:08 10  to admit PTX-459 into evidence.

14:40:12 11          MR. BLUMENFELD:  No objection.

14:40:12 12          THE COURT:  It's admitted.

14:40:14 13          (PTX Exhibit No. 459 was admitted into

14:40:15 14  evidence.)

14:40:15 15          MR. SPECHT:  May we publish?

14:40:16 16          THE COURT:  Yes, as soon as it's in evidence,

14:40:18 17  you don't have to ask.

14:40:20 18          MR. SPECHT:  Okay.  Thank you.

14:40:21 19  BY MR. SPECHT:

14:40:23 20  Q.      Mr. Cox, what was the purpose of this presentation?

14:40:26 21  A.      We would use a combination of slides, typically

14:40:29 22  around ten or so to tell a story and to answer questions for

14:40:32 23  prospects and customers.  We would have different slides of

14:40:35 24  course for different questions or technical people would

14:40:38 25  have one, business people would have another, this is

14:40:40 1  basically what it was for.  It was a way of keeping a story

14:40:43 2  consistent and well understood by the people we're talking

14:40:47 3  to.

14:40:47 4  Q.     Have you ever delivered this presentation?

14:40:49 5  A.     I have.

14:40:50 6  Q.     Have you delivered it many times?

14:40:52 7  A.     No, I have been doing this for years.

14:40:55 8  Q.     Mr. Passey, if we could move to slide 2.

14:41:02 9          Mr. Cox, what is this slide depicting?

14:41:06 10 A.     Sure.

14:41:07 11         So these are some key members of my management

14:41:11 12 team in the company.  There is me up there in the far

14:41:13 13 left-hand corner.  Rich Greene was our chief technology

14:41:17 14 officer.  When I think about trying to recruit talent,

14:41:20 15 that's who I'm thinking of.  Rich was the top guy, chief

14:41:24 16 technology officer at a multi-billion dollar company when I

14:41:27 17 convinced him to come over and join us.  Amazing

14:41:31 18 twenty years, probably twenty-five years now in telecom and

14:41:35 19 technology.

14:41:35 20 Q.     Mr. Passey, can you blow up Mr. Greene, the image.

14:41:42 21 Sorry.  I just wanted the jury members to be able to see

14:41:45 22 that.  Please, explain the others.  And Mr. Passey, if you

14:41:50 23 could blow up the other individuals when Mr. Cox speaks to

14:41:52 24 them.  You can reduce Mr. Greene now.

14:42:00 25         And Mr. Barger, can you explain his background?

14:42:05 1    A.      Sure.  So Art ran fraud for HSBC which is a very

14:42:10 2    large global bank.  He's been chair of the Master Card fraud

14:42:14 3    advisory committee globally.  He's run fraud for an

14:42:18 4    organizations called early warning, early warning is owned

14:42:21 5    by Chase, Wells Fargo, Bank of America, so on, probably one

14:42:25 6    of the leading fraud experts in the world.  Frankly we were

14:42:29 7    really fortunate to get him on our team.

14:42:33 8    Q.      And lastly, can you explain Mr. Godfrey's background?

14:42:37 9    A.      Sure.  Brent Godfrey had over twenty years in selling

14:42:42 10   of fraud authentication solutions, primarily focused on

14:42:46 11   selling to financial services firms.  He's a real

14:42:49 12   professional at dealing with large customers and large

14:42:53 13   accounts.

14:42:53 14   Q.      Mr. Cox, approximately what are the years of

14:42:57 15   experience of this team?

14:42:58 16   A.      If you add it up, it's over a hundred.

14:43:01 17   Q.      Thank you.

14:43:02 18           Mr. Passey, can you now turn to slide 11 of this

14:43:05 19   deck.  Thank you.

14:43:12 20           Mr. Cox, what does this slide depict?

14:43:17 21   A.      So this is a slide that tells the story of kind of

14:43:20 22   where we were and where we are now and how we got there in

14:43:26 23   the world of telephone authentication.

14:43:28 24   Q.      Mr. Passey, could you expand the left third of the

14:43:32 25   chart, please.

14:43:33 1     Mr. Cox, could you explain this portion of the

14:43:36 2 chart?

14:43:36 3 A.     Sure, I would be happy to.  The old telephone you see

14:43:39 4 sitting there, that rotary dial, that was the telephone

14:43:42 5 system I grew up with.  It was closed, trusted, that pipe I

14:43:46 6 talked about earlier existed where if I got a call, the call

14:43:50 7 could be trusted, nobody could get into it.  And back then I

14:43:54 8 did a credit card or debit card in the mail and it said to

14:43:58 9 activate this card call from your home phone, HOME, H-O-M-E

14:44:03 10 all caps, that's how trusted the phone system used to be.

14:44:06 11 Q.     And Mr. Passey, could you highlight the middle third

14:44:10 12 of the slide.

14:44:10 13     And Mr. Cox, can you explain this portion of the

14:44:14 14 slide?

14:44:14 15 A.     Sure.  So we get kind of in the flip phone era of the

14:44:19 16 phone.  This is when the internet connected with the phone

14:44:22 17 network and there were a lot of good things that came from

14:44:25 18 that, but one of the bad things that came from it is the

14:44:28 19 ability to spoof or alter these phone numbers.  That's when

14:44:31 20 the robo call problem started.  We still have it today.

14:44:35 21 This is where people are spoofing, taking numbers under

14:44:38 22 false pretense when they reached out.  That forced the banks

14:44:41 23 to abandoned the trust in the telephone network.

14:44:45 24 Q.     And finally, Mr. Passey, can you highlight the final

14:44:48 25 third of the slide.

14:44:49  1   And Mr. Cox, can you explain this portion?

14:44:52  2   A.   Sure.  So now we have a more modern looking phone to

14:44:55  3   indicate the current era.  Our job was to provide that level

14:45:00  4   of trust again so that all of a sudden now that phone number

14:45:04  5   had value.  Right?  It really allowed these banks to do the

14:45:09  6   thing they most wanted to do which was serve the customer,

14:45:12  7   serve them quickly and make them happy.  That's what TRUSTID

14:45:15  8   does, it was a fast visible cool technology that we brought

14:45:19  9   to bear to fix the problem and restore that trust.

14:45:23  10  Q.   Mr. Passey, can we return to the middle of the slide.

14:45:28  11  If we stay on that slide in the middle third of that.

14:45:36  12  Let me speak to you while he pulls that back.

14:45:39  13  There we go.  You mentioned this was when the problem with

14:45:42  14  spoofing emerged.  Did anyone try to solve this problem?

14:45:46  15  A.   Yeah.  So absolutely.  You think about these large

14:45:50  16  banks and others who were relying on that caller-ID, call

14:45:53  17  from your home phone, they had to change all that.  So the

14:45:57  18  first folks you called, I would do it and you did, I would

14:46:00  19  call the phone company and say fix this, you're giving me

14:46:04  20  information that's not right.  It's costing me a ton of

14:46:07  21  money and making my customers harmed.  The phone companies

14:46:10  22  were heavily involved.  Thirty states passed laws that said

14:46:14  23  this is not right, we got to make this illegal.  The federal

14:46:17  24  government got involved.  The FCC got involved, the Federal

14:46:22  25  Trade Commission got involved.  There was a lot of work put

14:46:24 1  into solving the problem and as all of us know, it's still a

14:46:28 2  tough problem.

14:46:28 3  Q.    Mr. Passey, can you move to slide 9 of the same deck,

14:46:33 4  please.

14:46:34 5        Mr. Cox, can you explain this slide?

14:46:50 6  A.    I can, yes.

14:46:52 7  Q.    At the top, you see it states "knowledge"?

14:46:56 8  A.    Yes, I do.

14:46:58 9  Q.    Let me ask generally.  What is this slide generally

14:47:03 10 depicting?

14:47:03 11 A.    Sure.  This slide talks about how you can

14:47:06 12 authenticate a person.  Right?  There is no five or ten ways

14:47:10 13 to do it.  Banks are really limited as to how many ways they

14:47:14 14 can actually authenticate us to be able to serve us.  There

14:47:17 15 is three, that's what's up there, knowledge, inherence,

14:47:22 16 ownership.

14:47:22 17 Q.    Can you explain briefly what knowledge authentication

14:47:25 18 is?

14:47:25 19 A.    I think we all know that drill, mother's maiden name,

14:47:28 20 date of birth, so forth, this is asking them do you have the

14:47:32 21 knowledge that is only available to you, and if you do,

14:47:35 22 thumbs up.

14:47:35 23 Q.    Mr. Cox, can you describe the inherence form of

14:47:35 24 authentication?

14:47:35 25 A.    Yeah.  So inherence is really interesting.  I think

14:47:43 1    we're probably familiar if you ever used a phone, held it up

14:47:46 2    to your face and it scans your face, that's something you

14:47:49 3    inherently are.  It's inherence authentication.  A

14:47:54 4    fingerprint, you put a fingerprint on a phone, that's

14:47:57 5    inherence.  In the world I live in, a call center, that

14:48:00 6    would be your voice, in listening to your voice and doing

14:48:03 7    voice biometrics, so inherently figuring out who a person is

14:48:08 8    by something they are.

14:48:09 9    Q.    Can you explain the third form of authentication?

14:48:11 10   A.    The third and final form is ownership.  This is

14:48:14 11   something you're probably familiar with.  If you have a key,

14:48:17 12   a key to a house, a car, a safety deposit box, any kind of a

14:48:21 13   key, if you have a credit card, debit card, a little chip on

14:48:25 14   it, that's an ownership, it's physical.  These are physical

14:48:28 15   devices that are really hard to duplicate.  They're not

14:48:31 16   available to everybody and you possess it, that means it's

14:48:34 17   authentication.  The phone, the cell phone really

14:48:37 18   specifically is probably the most used form of an identifier

14:48:42 19   called ownership today, because if you have your phone, you

14:48:46 20   have authenticated to it first Factor, that inherence thing,

14:48:50 21   or you type in a password, that would be knowledge, now that

14:48:52 22   phone can be proven to be engaged back to that pipe, back

14:48:57 23   where it connects.  If that's a real call you could use that

14:49:00 24   phone as an ownership token, that's where trust takes place.

14:49:05 25   Q.    Mr. Cox, I understand you prepared a timeline to go

through the history of TRUSTID. Do you have that in your binder?

A.      What's the number on that?

Q.      It should be in the front of your binder, Mr. Cox.

A.      I got it right here.

        MR. SPECHT:  Your Honor, permission to publish the timeline?

        MR. BLUMENFELD:  No objection.

        THE COURT:  Okay.

Q.      I'll ask you this while you were putting it up.  Why did you prepare this timeline, Mr. Cox?

A.      Sure.  Everyone knows I have dyslexia.  Yeah, my daughter has it worse.  I have a problem with dates, I really do.  It's a problem.  I apologize.  This is going to be very helpful.

Q.      Let's now walk through the timeline.  What is the event you were highlighting in 2007?

A.      So TRUSTID was started.  I was a co-founder.  That's when we began saying okay, we feel that we have to solve the problem, we haven't solved it, but we feel we can, let's commit time, energy and resources.

Q.      What is the event you're highlighting in 2014?

A.      It was the best event in the history of the company.  It's when a big bank finally said yes.  We all take risks, in my life at least many of them don't work out.  When you

14:50:19 1  get some validation from a really big institution that this

14:50:23 2  is good, that was a big deal for us.

14:50:27 3  Q.      And what is the event you're highlighting in 2016?

14:50:31 4  A.      The first year we actually brought some money in that

14:50:35 5  was a greater amount of profitability than what we had

14:50:39 6  spent.  We didn't makeup everything we had spent, but that

14:50:43 7  year, you know, it became positive.  That's a big event,

14:50:47 8  too.

14:50:47 9  Q.      And during the time period between 2007 when you

14:50:51 10 founded TRUSTID and 2014, what were the primary activities

14:50:56 11 of the company?

14:50:57 12 A.      So, if you look at the 2009, 2009 mark there, that

14:51:03 13 first two years, we were really just dedicated on trying to

14:51:07 14 understand the problem and find the solution.  I think when

14:51:10 15 I went into it, I thought I could nail it in six months.  It

14:51:15 16 ended up being two years.  Down below it says sweat equity.

14:51:20 17 No one was getting paid because we wanted to make sure we

14:51:23 18 could do it.  Why start a company, why interrupt people's

14:51:27 19 careers if you can't do it?  That's how it all started.

14:51:30 20          The rest of the time between that and the first

14:51:32 21 major customer had to do with how do we improve the

14:51:35 22 solution?  How do we complete the solution implemented in

14:51:38 23 the way that provided the best value to the bank and the

14:51:41 24 call center and its customers?  So a lot of development, a

14:51:42 25 lot of research a lot of time and energy and really a lot of

14:51:48 1    money to get to that point.

14:51:50 2    Q.    You mentioned, Mr. Cox, earlier that 2016 was your

14:51:54 3    first profitable year.  Did you have any accumulated losses

14:51:59 4    at that point?

14:52:00 5    A.    So we had spent a little bit more than 15 million

14:52:04 6    that we had raised from outside investors.  We ran out of

14:52:07 7    money.  It's not an uncommon story for startups, they spend

14:52:13 8    more than they have.  We borrowed money twice.  We borrowed

14:52:16 9    more than 4 million to get through it.  There was a lot of

14:52:19 10   money, a lot of time and effort put into it.

14:52:22 11   Q.    Just to be clear, you mentioned you borrowed 4

14:52:25 12   million.  Did you pay that money back?

14:52:27 13   A.    Yes, we did.

14:52:27 14   Q.    During that time period, did you ever feel like

14:52:30 15   quitting?

14:52:30 16   A.    Of course.

14:52:32 17   Q.    What kept you going?

14:52:34 18   A.    I thought I could solve the problem and commitment, I

14:52:37 19   had other people involved.  And it's heavy, it weighs heavy

14:52:41 20   on you.  You got to finish what you start.  And I did.  We

14:52:41 21   got lucky.

14:52:47 22   Q.    I would like to focus on the patent portion of your

14:52:49 23   timeline.  And again, what event occurred May 19th, 2009?

14:52:57 24   A.    We filed for our first patent on the technology that

14:53:02 25   we had invented.

14:53:03 1  Q.      And then what event occurred on August 7th, 2012?

14:53:08 2  A.      Our first patent was issued, the patent that we had

14:53:11 3  filed there eventually was issued by the Patent Office a

14:53:14 4  couple of years later.

14:53:15 5  Q.      And is that a patent in this case?

14:53:17 6  A.      Yes, it is.

14:53:18 7  Q.      And that's owned by TRUSTID; correct?

14:53:21 8  A.      It is.

14:53:22 9  Q.      What event occurred on April 7, 2015?

14:53:27 10  A.      So as we of course were developing, that's a big

14:53:31 11  window, 2007 to 2000 -- 2007 to 2014, we continued to refine

14:53:38 12  and improve.  So we had new inventions, so we filed for

14:53:42 13  those.  And there it was issued, the '985 Patent was issued.

14:53:46 14  Q.      Was the '985 Patent your second patent?

14:53:48 15  A.      I believe it was.

14:53:49 16  Q.      And is it a patent in this case?

14:53:52 17  A.      Yes, it is.

14:53:53 18  Q.      And is it owned by TRUSTID?

14:53:55 19  A.      It is.

14:53:56 20  Q.      What occurred on January 16th, 2018?

14:54:02 21  A.      So that would be our -- another patent, the '913 that

14:54:02 22  we had applied for earlier after prosecution with the

14:54:10 23  examiners, we had that patent issued as well.  It was

14:54:12 24  exciting but not quite as exciting as the first couple.  The

14:54:16 25  first couple I had hanging on our wall.  It was a real

14:54:21 1    motivator.  By the third patent it wasn't quite as exciting,

14:54:25 2    but nonetheless it was technology we had invented and we

14:54:28 3    were really proud of it.

14:54:29 4    Q.    You talked earlier about some of the investments.  I

14:54:32 5    just want to focus on the bottom portion where you have $15

14:54:36 6    million investments.  How much in total investments did it

14:54:38 7    take to get to your first profitable year?

14:54:41 8    A.    About 19 million.

14:54:43 9    Q.    And how did you raise that money?

14:54:45 10   A.    We went to professional investors and gave up a large

14:54:50 11   portion of the company in exchange for the equity, and then

14:54:54 12   there was also some debt as well which is just with interest

14:54:58 13   rate, interest payments.

14:54:59 14   Q.    And while we have the timeline up here, what was the

14:55:02 15   date that you filed this lawsuit?

14:55:04 16   A.    January 2018.

14:55:08 17   Q.    And who was responsible for filing the lawsuit at

14:55:11 18   TRUSTID?

14:55:11 19   A.    Our board.  As I mentioned, we raised money, we

14:55:12 20   raised a lot of money from professional people, and they

14:55:12 21   were on the board with me.  The board made the decision to

14:55:21 22   file the lawsuit.  I completely 100 percent supported that

14:55:25 23   decision.  And so we did.

14:55:27 24   Q.    And why did you support the decision to file this

14:55:28 25   lawsuit?

14:55:30 1   A.    When you invent something, when you create something

14:55:35 2   and then you interrupt people's careers to come join you and

14:55:39 3   then you ask people for money and they give it to you, that

14:55:42 4   comes with a heavy weight and a responsibility.  And so we

14:55:45 5   had created something.  I had to protect it.

14:55:49 6        Once we understood that our patents were being

14:55:52 7   infringed, everything in the marketing materials, everything

14:55:56 8   we saw became crystal clear to me.  I had no action other

14:56:01 9   than to file the lawsuit, the board had no action, we had a

14:56:05 10   fiduciary responsibility to all the stakeholders.

14:56:08 11   Q.    Let's focus a little bit more on the patents in a

14:56:12 12   little bit more detail.  First of all, you may have touched

14:56:15 13   on this briefly earlier, but why did you seek to protect

14:56:19 14   your inventions with the patents?

14:56:20 15   A.    I have thirty-five patents.  I'm a huge fan of the

14:56:24 16   patents.  They're hard to get.  A lot of work.  And the

14:56:27 17   reason you do it is because it gives you a chance to first

14:56:32 18   acknowledge the team that we have done something new, gives

14:56:36 19   you a chance to show investors and the team that you got

14:56:39 20   some protection for those property rights and it also adds

14:56:42 21   to the public knowledge.  Part of the downside, a lot of

14:56:45 22   people don't take the time and money to patent because you

14:56:48 23   tell the world your idea, and in exchange for telling the

14:56:52 24   world your idea, you get a little window or two to go out

14:56:55 25   and make hay.  It was important to me, really important to

14:56:59 1    my investors and really important to every single person in

14:57:03 2    my company.

14:57:03 3    Q.    Mr. Cox, in the binder in front of you, you have the

14:57:07 4    document JTX-002.

14:57:09 5    A.    Okay.

14:57:10 6    Q.    Do you recognize that?

14:57:11 7    A.    I do.

14:57:12 8    Q.    What is it?

14:57:13 9    A.    It's U.S. Patent 8,238,532.

14:57:20 10             MR. SPECHT:  Your Honor, we move to admit

14:57:23 11   JTX-002 into evidence.

14:57:25 12             MR. BLUMENFELD:  No objection.

14:57:26 13             THE COURT:  It's admitted.

14:57:28 14             (JTX Exhibit No. 002 was admitted into

14:57:30 15   evidence.)

14:57:30 16   BY MR. SPECHT:

14:57:31 17   Q.    Mr. Passey, can you highlight the middle portion of

14:57:35 18   this.  And this is the patent you just referred to; correct?

14:57:40 19   A.    Yes, it is.

14:57:40 20   Q.    Mr. Passey, please go to the second page.  And

14:57:42 21   highlight the inventor section.

14:57:42 22             And Mr. Cox, are you an inventor on this patent?

14:57:52 23   A.    Yes, I am.

14:57:52 24   Q.    And I believe earlier you talked about Mr. Greene.

14:57:58 25   Is that the same Mr. Greene you spoke about earlier?

14:58:01  1   A.      It is, yes.

14:58:02  2   Q.      Do you know who the other two inventors are?

14:58:04  3   A.      Yes, I do.

14:58:05  4   Q.      Can you briefly describe Mr. Bockelman's background?

14:58:09  5   A.      Sure.  So Joe Bockelman was a co-founder of the

14:58:14  6   company, an executive and brilliant technologist with big

14:58:19  7   credit bureaus and big data companies, a real expert in

14:58:23  8   authentication.  He contributed to the ideas, helped build

14:58:26  9   the patent, part of that team that worked so hard for those

14:58:30 10   two years to come up with the idea, document it and get it

14:58:33 11   submitted.

14:58:33 12   Q.      And Mr. Cox, can you describe briefly the background

14:58:37 13   of the other inventor?

14:58:38 14   A.      Absolutely.  Shreyas Saltawdekar was our chief

14:58:44 15   architect in the company, brilliant software person.  He's

14:58:47 16   still with the company today.  Very creative genius.  If

14:58:51 17   there is one genius up there, it's Shreyas.

14:58:56 18   Q.      In your binder, you have JTX-003.  Can you look in

14:59:00 19   your binder?

14:59:00 20   A.      Yes.

14:59:01 21   Q.      And do you recognize that document?

14:59:02 22   A.      I do.

14:59:03 23   Q.      What is it?

14:59:04 24   A.      It's U.S. Patent 9,001,985.

14:59:10 25           MR. SPECHT:  Your Honor, move to admit into

14:59:11 1   evidence JTX-003.

14:59:13 2              MR. BLUMENFELD:  No objection.

14:59:14 3              THE COURT:  It's admitted.

14:59:15 4              (JTX Exhibit No. 003 was admitted into

14:59:17 5   evidence.)

14:59:17 6   BY MR. SPECHT:

14:59:17 7   Q.      Mr. Passey, can you highlight the middle portion.

14:59:23 8   And this is the '985 Patent.  And this patent is in the

14:59:28 9   present case; correct?

14:59:29 10  A.      Yes, it is.

14:59:29 11  Q.      Mr. Passey, page 2, please.

14:59:32 12              And can you highlight the inventors.

14:59:38 13              And Mr. Cox, you're an inventor on this patent

14:59:43 14  also; correct?

14:59:43 15  A.      Yes, I am.

14:59:44 16  Q.      Turn back to your binder, JTX-004.  Are you familiar

14:59:49 17  with that?

14:59:49 18  A.      Yes.

14:59:50 19  Q.      And what is it?

14:59:51 20  A.      It's also a U.S. Patent 9,871,913.

14:59:56 21              MR. SPECHT:  Your Honor, we move to admit

15:00:00 22  JTX-004 into evidence.

15:00:02 23              MR. BLUMENFELD:  No objection.

15:00:02 24              THE COURT:  It's admitted.

15:00:05 25              (JTX Exhibit No. 004 was admitted into

15:00:06 1    evidence.)

15:00:06 2    BY MR. SPECHT:

15:00:07 3    Q.      Mr. Passey.  You can go to the second page,

15:00:09 4    Mr. Passey.  Skip this step.

15:00:11 5            Can you highlight the inventors.  And Mr. Cox,

15:00:17 6    are you an inventor on this patent?

15:00:19 7    A.      Yes, I am.

15:00:20 8    Q.      Thank you.

15:00:20 9            We have just gone through the three

15:00:23 10   patents-in-suit.  Are these the only TRUSTID patents?

15:00:27 11   A.      TRUSTID has eight patents in total.

15:00:30 12   Q.      And what do those patents focus on?

15:00:33 13   A.      Caller authentication, various aspects, different

15:00:37 14   technologies around that.

15:00:40 15   Q.      First of all, I would like to turn back to the

15:00:45 16   PTX-459 that was admitted earlier.  Can you put that slide

15:00:50 17   back up, Mr. Passey, slide number 11.  Actually slide 9,

15:01:08 18   please.  Sorry, Mr. Passey.

15:01:12 19           Do you recall going through this?

15:01:12 20   A.      I do.

15:01:14 21   Q.      Are these forms of authentication mutually exclusive,

15:01:18 22   that is would they not be used together?

15:01:20 23   A.      So if I understand the question, I'll just answer.

15:01:25 24   Knowledge is used along with ownership as is inherence.  For

15:01:30 25   example -- so, for example, even though we have

15:01:37  1  authenticated the call and proved it to be good, and that

15:01:40  2  would be ownership, a vendor would ask you questions,

15:01:43  3  commonly would.  Is that what you're asking?  They're

15:01:46  4  commonly used together, yes.

15:01:47  5  Q.     Thank you.  That was my question.  Thanks for

15:01:49  6  clarifying it.  Did you ever partner with another

15:01:53  7  authentication company, software services?

15:01:55  8  A.     Yes, over half our revenue comes with companies that

15:01:59  9  are providers of software authentication?

15:02:04  10  Q.     Can you give an example of partnering with other

15:02:08  11  authentication companies?

15:02:08  12  A.     There is a company called Nuance with technology

15:02:12  13  behind Siri, the Amazon aps and things like that.  They have

15:02:15  14  a great product that can protect your voice and understand

15:02:19  15  it's you.  A bank in many cases is required by law to have

15:02:22  16  two factors of authentication.  That's a fancy way of saying

15:02:25  17  you got to check two of those boxes.  So working with a

15:02:28  18  company like Nuance gives us the ability to have inherence,

15:02:32  19  check, we got the voice bio, ownership, TRUSTID, check, now

15:02:36  20  we got two factors or multifactor authentication.  We had

15:02:40  21  other partners as well.

15:02:41  22  Q.     When considering all of these forms of

15:02:42  23  authentication, do you have a sense of what the overall size

15:02:46  24  of the market is?

15:02:47  25  A.     For everything, probably it's a multi-billion dollar

15:02:52 1    expense.  A complete market, call centers alone spend

15:02:56 2    probably over a billion dollars in labor asking those

15:02:59 3    knowledge-based questions.  You have to include that.  So

15:03:02 4    overall it's a really big marketplace.

15:03:04 5    Q.     And where does TRUSTID fit into the overall market

15:03:08 6    for authentication services?

15:03:09 7    A.     We play in that ownership segment down there.  Today

15:03:14 8    that's a really small piece, probably I have to guess,

15:03:16 9    because I don't have perfect information, probably a market

15:03:19 10   of about 40, 40 million today being spent on ownership

15:03:24 11   authentication.

15:03:24 12   Q.     When you say ownership authentication, can you

15:03:30 13   elaborate on that as it relates to TRUSTID?

15:03:32 14   A.     It's validating, certifying and putting a measurement

15:03:36 15   in that metric on that caller-ID, putting the trust back in

15:03:39 16   that caller-ID, that's what works in the phone channel.

15:03:42 17   Q.     So that's the caller identify authentication market

15:03:49 18   you're playing in?

15:03:49 19   A.     Yes, it is, caller-ID authentication.

15:03:51 20   Q.     What is it that characterizes the caller-ID

15:03:54 21   authentication marketplace?

15:03:55 22   A.     So it really comes down to the idea that we can use

15:03:59 23   data that's only available pre-answer.  I'm going to have a

15:04:02 24   line, I'll try to do it quickly because I have a tendency to

15:04:02 25   go on and on, but there is signaling information, telephone

15:04:09 1    line setting up computers, talking and things like that,

15:04:13 2    once it becomes post answer, now we can talk.  So audio, and

15:04:17 3    inherence, right, those things are available to us, you

15:04:20 4    can't do that pre-answer, you also can't do knowledge, I

15:04:24 5    have to ask you a question, you have to hear the question,

15:04:26 6    you have to understand it and respond, so you're going to be

15:04:28 7    listening to, interacting.  So that's, that is -- I'm really

15:04:34 8    to me a big defining line.  So we're talking about

15:04:36 9    authentication that occurs around the caller-ID, that

15:04:40 10   incoming call, that's not using any of that audio.

15:04:44 11   Q.    And I understand that you also prepared a slide too

15:04:48 12   describe the caller-ID authentication market?

15:04:50 13   A.    I did.

15:04:51 14   Q.    I believe it's in the front of your binder.

15:04:54 15         MR. SPECHT:  Your Honor, permission to publish

15:04:56 16   that?

15:04:57 17         MR. BLUMENFELD:  No objection.

15:04:58 18         THE COURT:  Okay.

15:05:04 19   Q.    And is this the slide that you prepared on the

15:05:07 20   caller-ID authentication market?

15:05:08 21   A.    Yes, it is.

15:05:09 22   Q.    And what are you showing in the time period from 2011

15:05:12 23   to 2016?

15:05:14 24   A.    It's a pretty simple slide when it has dates on it.

15:05:18 25   TRUSTID, we invented the technology.  There was no solution

before us.  We made the market.  There was no market before

us.  Banks weren't relying on caller-ID before we came

along.  And during that period of time, we were it.  We were

a hundred percent of the market.  In 2017 going forward,

Next Caller and us were a hundred percent of the market.

Q.    Mr. Cox, you have also in your binder before you an

exhibit JTX-099.

A.    Okay.

Q.    And are you familiar with that exhibit?

A.    I am.

Q.    What is that exhibit?

A.    This is an e-mail that actually had about -- it was

one that I sent.

        MR. SPECHT:  We would like to move to admit

JTX-099 into evidence, Your Honor.

        MR. BLUMENFELD:  No objection.

        THE COURT:  It's admitted.

        (JTX Exhibit No. 099 was admitted into

evidence.)

BY MR. SPECHT:

Q.    And can you highlight that bottom portion of the

e-mail.

        Mr. Cox, do you see -- first of all, is this an

e-mail that you sent, this portion that's highlighted by

Mr. Passey?

15:06:45 1   A.      Yes.

15:06:45 2   Q.      And you see the, I guess the second line of this

15:06:48 3   e-mail.  And if Mr. Passey could highlight the portion that

15:06:52 4   says "Next Caller is now a full competitor and we need to

15:06:57 5   kill them in the market, period."

15:07:00 6   A.      I do.

15:07:00 7   Q.      And you wrote this e-mail?

15:07:01 8   A.      I did.

15:07:03 9   Q.      And what did you mean by this statement?

15:07:06 10   A.      If you read the rest of the e-mail and probably a

15:07:09 11   hundred e-mails around it, you would find there was a lot of

15:07:12 12   confusion.  We thought Next Caller was a fraud only product.

15:07:16 13   It basically said don't service the customer.  It turns out

15:07:19 14   we had just learned and were really understanding they were

15:07:22 15   infringing on our patents, they were getting the green

15:07:25 16   lights saying authentication, so we had a lot of debate

15:07:28 17   about that internally.  I was trying to be clear and I was

15:07:31 18   trying to rally the team around the notion that they are now

15:07:35 19   in my understanding a complete full 100 percent competitor,

15:07:40 20   and we need to win.  I said the word kill, that's probably

15:07:44 21   the controversial word, but we need to kill them in the

15:07:47 22   market, that's the important part, period, not to kill them

15:07:51 23   in some other way or win some other way, the market has to

15:07:55 24   decide, the customers.  We were really comfortable in our

15:07:58 25   product and I really wanted our product to win.  That's what

15:08:01 1 the message was about.

15:08:03 2 Q.    Mr. Passey, could you go back to the caller-ID

15:08:06 3 authentication slide for a moment.

15:08:15 4        One question here.  You mentioned earlier owing

15:08:18 5 a duty to your employees to keep going, and in the 2017 time

15:08:23 6 frame, about how many employees were working for you?

15:08:26 7 A.    2017, from memory, about fourteen full-time people.

15:08:31 8 We were a small company.  We had some contractors, probably

15:08:36 9 bringing the total involved head count from part-time folks

15:08:39 10 to maybe twenty-five.  But again, much smaller than any

15:08:43 11 company I had run for a long time.

15:08:45 12 Q.    And prior to the acquisition by Neustar, what was the

15:08:50 13 maximum number of employees TRUSTID had?

15:08:52 14 A.    In the twenty something range.  We were never bigger

15:08:55 15 than thirty people in our company.

15:08:58 16 Q.    And now turning back to the market, have you heard --

15:09:03 17 well, earlier, in terms of acquiring Next Caller, the

15:09:08 18 company Pindrop was mentioned.  Who is Pindrop?

15:09:11 19 A.    Pindrop is a big company that does post-answer

15:09:15 20 authentication.  The reason I say that to be clear, they

15:09:15 21 listen to audio on the phone, they actually listen to the

15:09:22 22 phone background noise, plus they listen to your voice for

15:09:26 23 voice biometrics.  They fight fraud and do authentication

15:09:30 24 using inherence method if you will.  Pindrop over the years

15:09:32 25 has announced products, one of which was of course called

15:09:38 1  Passport.  Passport claimed to be a pre-answer solution that

15:09:42 2  used phone data to authenticate earlier in the call than

15:09:47 3  using voice.

15:09:48 4          We actually never saw the market, we never lost

15:09:51 5  a customer to it, but there was a lot of confusion about

15:09:54 6  whether Pindrop is a competitor or not.  I would stand by

15:09:58 7  saying it's clear to me now they are.  They purchased Next

15:10:02 8  Caller, of course Pindrop is completely a competitor.

15:10:05 9  Q.      And have you heard of a company named Payfone?

15:10:09 10  A.      I have.

15:10:09 11  Q.      Who are they?

15:10:10 12  A.      Payfone is a company that did do caller-ID

15:10:14 13  authentication on about twenty percent of calls for a

15:10:19 14  contact center, and they're using a different technology.

15:10:22 15  They were partnered with them because they really -- a bank

15:10:27 16  or somebody else going to buy a solution, that's just a

15:10:32 17  little bit, they wanted a complete answer to the solution,

15:10:34 18  they were a partner of yours, we would do eighty percent of

15:10:37 19  the calls and they would do twenty.

15:10:39 20  Q.      Are you still a partner with Payfone?

15:10:41 21  A.      We are not.

15:10:42 22  Q.      Do you know who Payfone partners with?

15:10:42 23  A.      Next Caller.

15:10:46 24  Q.      Again, referring back to your binder, there is an

15:10:51 25  Exhibit PTX-507.  Can you take a look at that?

15:10:56 1    A.      Okay.

15:10:56 2    Q.      And are you familiar with that document?

15:10:58 3    A.      Yes, I am.

15:10:59 4    Q.      What is it?

15:11:00 5    A.      It's a white paper, a brochure if you will, a

15:11:04 6    marketing piece that speaks to our benefits.

15:11:08 7              MR. SPECHT:  Your Honor, we would like to move

15:11:09 8    to admit PTX-507 into evidence.

15:11:17 9              MR. BLUMENFELD:  No objection, Your Honor.

15:11:17 10             THE COURT:  It's admitted.

15:11:19 11              (PTX Exhibit No. 507 was admitted into

15:11:20 12   evidence.)

15:11:20 13   BY MR. SPECHT:

15:11:22 14   Q.      And Mr. Passey, if you could highlight that portion,

15:11:25 15   ten percent increase in IVR containment rate.

15:11:31 16             Mr. Cox, why do you feature IVR containment rate

15:11:34 17   in this marketing piece?

15:11:35 18   A.      IVR containment, I wouldn't mind explaining it

15:11:41 19   briefly again.  It's an automated system, that robot you

15:11:42 20   talk to, please listen carefully, that's the IVR.  Having a

15:11:48 21   call resolved when IVR is used is really important for every

15:11:52 22   institution that buys them because you get service faster

15:11:53 23   and they don't have to pay their agents to service you.  So

15:11:59 24   that is the single key metric for companies that use it.  A

15:12:02 25   credit union probably doesn't care because they have

15:12:07 1   operators, they don't really have IVRs in most cases.  They

15:12:12 2   go right to a live person for a small town feel.  But the

15:12:15 3   biggest part of the market, that's what they care about.

15:12:17 4   Q.      Did you do any testing or analysis to confirm your

15:12:21 5   IVR containment rates?

15:12:22 6   A.      Absolutely.

15:12:23 7   Q.      Can you describe that testing?

15:12:25 8   A.      So when we put this piece together, we couldn't make

15:12:30 9   this claim until we actually put it into production.  We

15:12:34 10  actually had to have a bank.  We were talking to Bank of

15:12:38 11  America, right, big bank, millions and millions and

15:12:42 12  millions, now billions of calls processed through Bank of

15:12:46 13  America.  We installed our product on the toughest line to

15:12:49 14  increase IVR containment and that's the fraud line.  This is

15:12:53 15  specifically if you call a number because your -- on the

15:12:56 16  back of your credit card, you're at dinner, they turned off

15:13:00 17  your card, you can't buy dinner, you're going to call the

15:13:03 18  bank to get it fixed so you can pay for dinner and get out

15:13:07 19  of there.  You want to speak to a live person and get it

15:13:10 20  resolved, but you don't want to send an e-mail and link,

15:13:12 21  that's the fraud.  In that case, tens of thousands of calls

15:13:16 22  coming in a day.  We even increased IVR containment on that

15:13:21 23  line twenty percent.  That's a huge -- a number they thought

15:13:24 24  was impossible.  We actually were blown away.  That's a

15:13:27 25  tough line.  There are easier lines to do that to.

15:13:30 1    Q.    Mr. Passey, could you reduce the ten percent increase

15:13:33 2    in IVR containment rate and then highlight the middle

15:13:37 3    portion of this piece where the arrow is.

15:13:44 4          Mr. Cox, does this quote relate to IVR

15:13:47 5    containment rates?

15:13:49 6    A.    Yes, it does.

15:13:50 7    Q.    Who was providing this company?

15:13:51 8    A.    This is Jen Pacholski from Bank of America.  She was

15:13:56 9    senior vice-president there.

15:13:57 10   Q.    What does this quote say about IVR containment rates?

15:14:00 11   A.    They saw ten percent, five to ten percent fewer calls

15:14:06 12   go to our agents when they put it in.  The important part

15:14:09 13   for me was time goes by, and they actually have an outage

15:14:13 14   and the containment rate dropped ten to fifteen percent on

15:14:16 15   their core business, the bank, this is your checking,

15:14:21 16   savings, so on, that was a huge, bigger increase actually

15:14:24 17   than we thought on those lines.  Six more credit agents.  It

15:14:29 18   again reinforced the value we were bringing.  Every one of

15:14:32 19   those calls is a call they don't have to spend five minutes

15:14:35 20   on.  That's big money.  It was a really big thing.  Also

15:14:39 21   every one of those calls is a call where you get service

15:14:42 22   right away, and that's actually job one for them.

15:14:45 23   Q.    I would like to change gears a bit.  You were here

15:14:49 24   during the opening statement of Next Caller and they talked

15:14:52 25   about Capital One.  Do you recall that?

15:14:54 1    A.        I do.

15:14:54 2    Q.        Have you ever tried to sell your services to Capital

15:14:57 3    One?

15:14:57 4    A.        We did.

15:14:58 5    Q.        Were you successful in securing that business?

15:15:01 6    A.        No, we were not.

15:15:03 7    Q.        And Capital One chose another provider; correct?

15:15:06 8    A.        Yes.

15:15:07 9    Q.        Was that provider Next Caller?

15:15:09 10   A.        It was Next Caller.

15:15:10 11   Q.        What was your understanding as to why Capital One did

15:15:13 12   not choose you?

15:15:14 13   A.        So when we got the notice from Capital One that we

15:15:19 14   haven't been selected as a proof of concept testing, they

15:15:23 15   gave us two reasons at the time, they said you have been

15:15:26 16   beat from a quality of product point of view and you have

15:15:29 17   been beat from a price point of view.

15:15:31 18   Q.        And what did you do at that point?

15:15:33 19   A.        We were confused completely how we could be beat in

15:15:37 20   quality, and we were actually confused that there was

15:15:41 21   somebody else that could provide the service we could

15:15:42 22   provide.  So we got engaged with them to understand that

15:15:47 23   deficiency.

15:15:48 24   Q.        And the quality measure was based on a proof of

15:15:51 25   concept test; is that correct?

15:15:52 1    A.      That's true.

15:15:53 2    Q.      Can you describe that proof of concept?

15:15:55 3    A.      Yeah.  So this was like a typical -- all proof of

15:16:00 4    concepts we do are very similar.  We set up a test line that

15:16:03 5    allows the programers to build a connection.  They sent

15:16:11 6    query, we sent a summons, okay it works, let's try to make

15:16:13 7    it try to crash.  We sent a query and not have it respond,

15:16:18 8    we wanted that, I think for the proof of concept fifty

15:16:23 9    transactions were sent to and from that, fifty, it was for

15:16:26 10   programing.  We set up a separate line for the proof of

15:16:30 11   concept, we turned on Authenticator.  We're going to now

15:16:33 12   analyze the calls and provide that metric back to the agent

15:16:36 13   before we answer the call.  We processed about two -- a

15:16:39 14   little over 200,000 calls.  We were flawless on the

15:16:45 15   Authenticator calls, but in that process, they had sent I

15:16:49 16   think a handful, maybe ten or twelve calls to the Stub and

15:16:53 17   we gave what we were supposed to give, random responses, and

15:16:57 18   they said well, you got some of the spoof calls right, but I

15:17:00 19   think you missed four of them.  We said well, that wasn't

15:17:02 20   the production system, and they were confused and we were

15:17:02 21   relieved they then, of course, ran the test again on the

15:17:02 22   production system.  Of course fine, right.  We couldn't

15:17:12 23   resolve the price point.

15:17:12 24   Q.      Just to be clear, on that line that you referred to

15:17:12 25   as a Stub line, was your Authenticator product running on

15:17:22 1  that line?

15:17:23 2  A.      No, it was not.

15:17:24 3  Q.      And so ultimately what was your understanding of why

15:17:27 4  you didn't get the contract with Capital One?

15:17:31 5  A.      Price.

15:17:33 6  Q.      Have you ever received any praise for your services?

15:17:36 7  A.      Certainly, yes.

15:17:38 8  Q.      Can you turn in your binder to PTX-582.

15:17:48 9  A.      Okay.

15:17:49 10  Q.      And what is that, Mr. Cox?

15:17:50 11  A.      This is a document that talks about a pay forward.

15:17:56 12          MR. SPECHT:  Your Honor, we would like to move

15:17:58 13  to admit PTX-582 into evidence.

15:18:01 14          MR. BLUMENFELD:  No objection.

15:18:02 15          THE COURT:  It's admitted.

15:18:02 16          (PTX Exhibit No. 582 was admitted into

15:18:02 17  evidence.)

15:18:02 18  BY MR. SPECHT:

15:18:05 19  Q.      What is PACE, Mr. Cox?

15:18:07 20  A.      It's a call center organization professional

15:18:11 21  association for customer engagement, if I got that right.

15:18:15 22  Q.      Mr. Passey, can reduce that again, or slide up.  That

15:18:20 23  would be fine, too, highlight the Technovation award portion

15:18:24 24  of that.

15:18:30 25          And Mr. Cox, what is the Technovation Award?

15:18:33  1    A.       So the PACE folks every year at their annual

15:18:36  2    convention, this is a big organization, they provide certain

15:18:40  3    awards for different things and the first one is the

15:18:43  4    Technovation, which basically means this is a technology

15:18:46  5    that really changes the contact center for the better.

15:18:49  6    Obviously it's a really big acknowledgment and we won that

15:18:54  7    year.

15:18:54  8    Q.       What did you win this award for?

15:18:56  9    A.       For the TRUSTID Authenticator service.

15:18:59 10    Q.       And do you pay a membership fee to be a member in

15:19:03 11    PACE?

15:19:03 12    A.       I don't know if we're a member in PACE.  We did go to

15:19:07 13    the conference, we did pay a fee to have a ten-by-ten booth

15:19:11 14    there.

15:19:11 15    Q.       Is this award in any way tied to your payment to

15:19:15 16    attend the conference?

15:19:16 17    A.       No.

15:19:18 18    Q.       Thank you.

15:19:18 19             In the binder in front of you, you have an

15:19:21 20    exhibit, PTX-522.

15:19:24 21    A.       Okay.

15:19:24 22    Q.       What is that document?

15:19:26 23    A.       This is a summary of an on-demand webinar we did with

15:19:31 24    Bank of America.

15:19:32 25    Q.       I'm sorry, PTX-522.

A.      Oh, 522.  Sorry about that.  Different one.  UBS.
Same thing.

          MR. SPECHT:  Your Honor, we like to move to
admit PTX-522 into evidence.

          MR. BLUMENFELD:  No objection.

          THE COURT:  It's admitted.

          (PTX Exhibit No. 522 was admitted into
evidence.)

Q.      What is PTX, or what is this document?

A.      Yeah.  So this is a document that talks about a
webinar we did with Bank of America, more specifically with
Jan -- I'm sorry, this is UBS.  This is Tom DeCarlo.  UBS is
a bank, a large international bank.  It's a Swiss bank.
They have offices all over the country.  And this kind of
advertises and promotes the fact that we had the contact
center webinar and it explains some of the highlights of it.

Q.      Mr. Cox, just to be clear, is the Authenticator your
patented technology?

A.      It uses our patented technology.  There is a product
which is different than a patent, but our Authenticator uses
our patented technology.

Q.      Okay.  And what is your understanding as to why UBS
would want to do such a webinar with you?

A.      Webinars like this are really important for banks to
show their customers they're investing in customer

15:20:57  1    satisfaction and security.  UBS wants to say we're doing

15:21:01  2    things for our customers, it's good for UBS.

15:21:03  3    Q.    And Mr. Passey, if we could now scroll to the last

15:21:09  4    paragraph of the summary.  And can you highlight the first

15:21:21  5    three sentences of that paragraph for members of the jury.

15:21:32  6          Mr. Cox, can you just read that first sentence?

15:21:34  7    A.    Sure.  It says, "I really like what we put in place

15:21:37  8    with TRUSTID as the initial layer of authentication.  Says

15:21:41  9    DeCarlo, it's spot on accurate, it filters out all of the

15:21:45  10   fraudster's ability to spoof us and most of all, it's

15:21:49  11   seamless to the client."

15:21:50  12   Q.    Who is Mr. DeCarlo?

15:21:52  13   A.    He was a senior executive at UBS in charge of the

15:21:57  14   contact center.

15:21:58  15   Q.    Remind me again, is UBS a large bank?

15:22:01  16   A.    They are.

15:22:02  17   Q.    In your binder, you have PTX-521.  And what is that

15:22:10  18   document?

15:22:10  19   A.    This is the Bank of America on-demand webinar.

15:22:12  20         MR. SPECHT:  Your Honor, we would like to move

15:22:17  21   to admit PTX-521 into evidence.

15:22:20  22         MR. BLUMENFELD:  No objection.

15:22:21  23         THE COURT:  It's admitted.

15:22:22  24         (PTX Exhibit No. 521 was admitted into

15:22:22  25   evidence.)

BY MR. SPECHT:

Q.      And again, what is this document?

A.      Similar in the fact that Bank of America wants to show its customers, doing things for its customers, they want to be able to say we're making investments in security and for your speed and service quality.

Q.      I believe you already indicated, but is Bank of America a customer?

A.      Yes.

Q.      And just to go back to the previous one just to confirm, UBS, is UBS a customer also of TRUSTID?

A.      Yes, it should be clear we never lost a customer or direct customer ever.

Q.      Did you have an understanding why Bank of America would want to do such a webinar with you?

A.      I do.  They're about trying to promote the fact they're spending money and effort to make it a better experience for you, their customer.

Q.      Mr. Passey, can you scroll to the third paragraph from the end of the summary.  I'm sorry, Mr. Passey, not that one.  The third one from the end, run under the big helps our fraud department.  And Mr. Cox, can you read the first two sentences?

A.      "We're loving the technology, to put it bluntly. Says Pacholski, not only has the pre-answer strategy helped

15:23:45 1    us create a very frictionless authentication experience for

15:23:49 2    our customers, we've tested it with our fraud-detection

15:23:52 3    partners and have found that it's a very secure method."

15:23:58 4    Q.    And what technology are you talking about there?

15:24:00 5    A.    The Authenticator product.

15:24:01 6    Q.    Who is Pacholski?

15:24:03 7    A.    She is a senior vice-president at Bank of America in

15:24:06 8    the contact center.

15:24:08 9    Q.    And Mr. Cox, how long has Bank of America been a

15:24:11 10   customer of TRUSTID?

15:24:12 11   A.    They were our first customer.  They're still a

15:24:15 12   customer.  They have been a great customer for over seven

15:24:19 13   years.

15:24:22 14              MR. SPECHT:  That is all the questions we have

15:24:23 15   for Mr. Cox.

15:24:25 16              THE COURT:  All right.  Cross-examine.

15:24:29 17              MR. BLUMENFELD:  Thank you, Your Honor.  May I

15:24:49 18   approach the witness and hand him a cross exhibit?

15:24:53 19              THE COURT:  You may.

15:24:54 20              MR. BLUMENFELD:  Thank you.

15:25:22 21                    CROSS-EXAMINATION

15:25:31 22   BY MR. BLUMENFELD:

15:25:32 23   Q.    Good afternoon, ladies and gentlemen.  My name is

15:25:42 24   Jack Blumenfeld.  I'm one of the attorneys for Next Caller.

15:25:46 25              And Mr. Cox, Jack Blumenfeld.  Very nice to meet

15:25:50 1  you.  We haven't met before.

15:25:51 2  A.     Right.

15:25:52 3  Q.     I have a few questions for you.

15:25:54 4          I would like to ask you a little bit about the

15:26:01 5  call authentication market.  You put a slide up, your second

15:26:06 6  slide and it showed 2011 to 2016 that TRUSTID was all alone

15:26:13 7  in the caller-ID authentication market.  Do you remember

15:26:16 8  that?

15:26:16 9  A.     Yes.

15:26:16 10 Q.     And then in 2017 on, you shared that space with Next

15:26:25 11 Caller; right?

15:26:26 12 A.     Yes.

15:26:26 13 Q.     You weren't very happy about sharing that, were you?

15:26:29 14 A.     Happy about sharing it?  Probably not.

15:26:32 15 Q.     Right.  That's why you wanted to kill them in the

15:26:35 16 market; correct?

15:26:36 17 A.     No.

15:26:37 18 Q.     Well, let me ask you a little bit about the market.

15:26:43 19 When you put that slide up, you weren't suggesting to the

15:26:47 20 jury, were you, that you and Next Caller don't compete with

15:26:54 21 others in the call authentication market; correct?

15:26:57 22 A.     Actually I was trying to clear that up.  That's a

15:27:00 23 great point.  In our team we had discussed it a lot, is Next

15:27:05 24 Caller a competitor or not, and that's what that e-mail is

15:27:08 25 about.  I was trying to make it clear that we had finally

15:27:11 1 figured out that indeed Next Caller was a call

15:27:14 2 authentication solution, using pre-answer data and providing

15:27:18 3 the answers back to prospects.

15:27:20 4 Q.    Do you remember what my question was, Mr. Cox?

15:27:25 5 A.    I think so.

15:27:26 6 Q.    I asked you, you weren't trying to tell the jury that

15:27:29 7 you and Next Caller didn't compete with other people, other

15:27:33 8 companies in the call authentication market?

15:27:36 9 A.    To be specific, I was trying to answer questions by

15:27:39 10 my attorney.  I'm not sure I understand the point you're

15:27:42 11 making.  Sorry.

15:27:43 12 Q.    Well, before 2017 and after 2017, TRUSTID has

15:27:51 13 competed with other companies than Next Caller; correct?

15:27:56 14 A.    That would be true broadly, yes, absolutely.

15:27:59 15 Q.    And you said it's a billion dollar plus market;

15:28:03 16 right?

15:28:03 17 A.    The authentication market is very large, yes.

15:28:06 18 Q.    And a big part of the call authentication market is

15:28:09 19 banks; correct?

15:28:12 20 A.    In the call authentication market, yes, banks and

15:28:12 21 other financial institutions.

15:28:17 22 Q.    And that's your central market for selling TRUSTID's

15:28:25 23 Authenticator product; right?

15:28:27 24 A.    Call authentication.

15:28:28 25 Q.    Call authentication to banks; right?

15:28:30 1   A.      **To anybody who needs it.**

15:28:32 2   Q.      **Right.  And so would you think there are thousands of**

15:28:37 3   **banks in the United States?**

15:28:38 4   A.      **Banks, credit unions, insurance companies, brokerage**

15:28:42 5   **firms, cable companies, so on, yeah, there are thousands of**

15:28:46 6   **contact centers, many of them require authentication.**

15:28:48 7   Q.      **Thousands of contact centers, and you have maybe**

15:28:52 8   **fifty customers; correct?**

15:28:53 9   A.      **We have about fifty direct customers.  We serve about**

15:28:57 10   **a hundred brands that most of us would know as household**

15:29:02 11   **names.**

15:29:02 12   Q.      **And the other contact centers -- a contact center is**

15:29:05 13   **the same thing as a call center; right?**

15:29:07 14   A.      **A contact center is slightly different but similar,**

15:29:10 15   **yes.**

15:29:10 16   Q.      **Now, the other contact centers or call centers,**

15:29:15 17   **companies that have call centers, some of them use**

15:29:19 18   **knowledge-based authentication; correct?**

15:29:22 19   A.      **Some of them do, yes.**

15:29:24 20   Q.      **And, in fact, that's still the dominant method of**

15:29:27 21   **call authentication for call centers; correct?**

15:29:31 22   A.      **Probably, so.**

15:29:33 23   Q.      **And you compete against knowledge-based**

15:29:36 24   **authentication solutions; correct?**

15:29:39 25   A.      **I don't think we have a solution for a**

15:29:43 1  knowledge-based authentication.  In fact, I know we don't.

15:29:46 2  You could say broadly we do, like Schwinn competes with Ford

15:29:53 3  Motor Company without walking, but they are very different.

15:29:56 4  We don't have a solution in knowledge-based authentication,

15:29:58 5  but broadly speaking, certainly they're different

15:30:01 6  competitors.

15:30:01 7  Q.    They sell their knowledge-based authentication

15:30:04 8  solutions, they sell to customers that you would like to

15:30:07 9  sell to; correct?

15:30:09 10  A.    Okay.  Yes.

15:30:10 11  Q.    And hundreds of millions of dollars; correct?

15:30:15 12  A.    Well, I would say most of the money is spent in

15:30:18 13  knowledge-based authentication is internally paying agents

15:30:22 14  and operators the time it takes to ask all those questions.

15:30:26 15  The banks already have the data.  They aren't really buying

15:30:29 16  it today --

15:30:30 17  Q.    Do you remember my question, Mr. Cox?  Do you think

15:30:32 18  you could answer my question?

15:30:33 19  A.    Could you repeat it for me.  I'm sorry.

15:30:35 20  Q.    I said, and the knowledge-based authentication is in

15:30:39 21  the hundreds of millions of dollars; correct?

15:30:42 22  A.    I would assume in total, not just spent by banks, but

15:30:47 23  in -- you know, internal costs as well.

15:30:50 24  Q.    And you would like to have a share of that, also;

15:30:52 25  correct?

15:30:54 1   A.      I don't really want a share of it.  We would like to

15:30:57 2   be an alternative solution that reduces the spend,

15:31:02 3   absolutely that's the whole benefit, it's all about agent.

15:31:06 4   Q.      And you compete with voice biometric solutions, also;

15:31:10 5   right?

15:31:10 6   A.      In the same extent, very broadly, they're a great

15:31:13 7   partner of ours, they're a great solution.  We don't offer

15:31:18 8   voice metrics.  It's very different.

15:31:20 9   Q.      But you compete with providers of voice-based

15:31:23 10  solutions; correct?

15:31:24 11  A.      Broadly speaking.

15:31:25 12  Q.      You have lost business to providers of voice-based

15:31:30 13  solutions; right?

15:31:30 14  A.      I bet we have lost business for a while, maybe

15:31:34 15  permanently, I don't know, but there are cases where a bank

15:31:38 16  goes in to look at something and says we want voice bio, we

15:31:43 17  don't want call authentication and we won't write that

15:31:46 18  business.

15:31:46 19  Q.      You have lost business to voice authentication

15:31:50 20  solutions; correct?

15:31:52 21  A.      Maybe I'm not getting it.  We've never lost a

15:31:52 22  customer.  Did I give the wrong answer for you?

15:31:56 23  Q.      You bid against Pindrop, for example, and they've

15:32:02 24  gotten the business; correct?

15:32:02 25  A.      Oh, we have yeah, yeah, we've been in RFP processes

15:32:10 1  where a bank will ask twenty companies to put in proposals,

15:32:13 2  maybe five would.  Pindrop would be one of those.

15:32:17 3  Q.      You have lost business to Pindrop, correct, yes or

15:32:20 4  no?

15:32:20 5  A.      I don't think we've lost business.  We may have lost

15:32:24 6  opportunity.  There is a difference, just to be clear.  I'm

15:32:26 7  trying to pay attention here as close as I can.  I

15:32:29 8  apologize.

15:32:31 9  Q.      We'll get back into the market a little bit later.  A

15:32:36 10  couple of other questions before we do.  You talk a little

15:32:41 11  bit about Capital One.  Do you remember that?

15:32:44 12  A.      Yes.

15:32:45 13  Q.      Now, you lost a bid for Capital One's business to

15:32:53 14  Next Caller; right?

15:32:54 15  A.      Yes, we did.

15:32:55 16  Q.      And that was the first bid that you had lost to Next

15:33:03 17  Caller?

15:33:03 18  A.      As far as I know.  I'm still learning things as of

15:33:07 19  today, but as far as I know, I don't have perfect

15:33:11 20  information on that.

15:33:12 21  Q.      And you understand that both Next Caller and TRUSTID

15:33:12 22  did proof of concept testing at Capital One; correct?

15:33:25 23  A.      I learned that today.

15:33:27 24  Q.      And doing proof of concept testing is typical for

15:33:34 25  banks and other financial institutions that are looking for

15:33:39 1    call authentication solutions; correct?

15:33:42 2    A.      It wouldn't be the majority.  I would say maybe a

15:33:45 3    third of our customers have done proof of concept and

15:33:50 4    two-thirds have not.

15:33:50 5    Q.      Capital One did proof of concept testing?

15:33:54 6    A.      Yes.

15:33:54 7    Q.      And you knew they were doing proof of concept testing

15:33:57 8    with other companies than you; correct?

15:33:59 9    A.      We actually knew -- I can tell you what Capital One

15:34:04 10   said.  They said they were looking at and working with, I

15:34:08 11   believe it was five companies in total, or it might have

15:34:11 12   been five others.  It's been a number of years.  We didn't

15:34:15 13   have any idea who the companies were.  We were trying to

15:34:19 14   guess for the most part.  There was one company I'm not sure

15:34:23 15   we even figured out.  We're weren't sure if they were proof

15:34:26 16   of concepts or not.  We made some assumptions, but again,

15:34:30 17   they're not going to tell us, Capital One, that's their

15:34:33 18   proprietary information.

15:34:43 19   Q.      Can you turn in your book to JTX-53.  It's in the

15:34:54 20   thinner book that I gave you.  I gave you two books.  One

15:34:56 21   had some transcripts and the other had some exhibits.

15:35:02 22   A.      Okay.

15:35:02 23   Q.      What is JTX-53, Mr. Cox?

15:35:12 24   A.      Let me look at it for a second here.  So it looks to

15:35:25 25   be an e-mail about Capital One telling us that they didn't

15:35:31 1    -- hang on a second.  So an e-mail that talks about Capital

15:35:39 2    One telling one of our team members that we had been

15:35:43 3    outperformed when compared to a competitor.

15:35:46 4    Q.    Right.

15:35:47 5         MR. BLUMENFELD:  Your Honor, we move JTX-53 into

15:35:50 6    evidence.

15:35:50 7         MR. SPECHT:  No objection, Your Honor.

15:35:52 8         THE COURT:  It's admitted.

15:35:53 9         (JTX Exhibit No. 53 was admitted into evidence.)

15:35:54 10   BY MR. BLUMENFELD:

15:35:56 11   Q.    Mr. Rosenberg, can you put up JTX-53, please.

15:36:01 12        This is an e-mail, you mentioned Mr. Greene,

15:36:03 13   from Mr. Greene to Mr. O'Leary.  Mr. O'Leary is another

15:36:09 14   executive at TRUSTID; correct?

15:36:10 15   A.    That's the first part of it, yes.  The second part

15:36:13 16   looks to be an e-mail from Chris O'Leary.  It's not clear

15:36:17 17   who that went to.

15:36:18 18   Q.    You were on this chain; right?

15:36:21 19   A.    Yes.

15:36:21 20   Q.    Right at the top, Patrick Cox, you got a carbon copy

15:36:27 21   recipient there.  And in the middle of the page,

15:36:33 22   Mr. Rosenberg, can we go to the middle of the page,

15:36:33 23   Mr. O'Leary's e-mail.  And what Mr. O'Leary was telling you

15:36:39 24   and Mr. Greene and others was "Will and I just got off the

15:36:41 25   phone with Capital One and the news is not good.  They have

15:36:48 1 completed their internal analysis and indicated we were

15:36:51 2 outperformed when compared to a competitor.  They indicated

15:36:56 3 that as part of the POC, they spoofed a number of test calls

15:37:02 4 and that we didn't catch any of those calls and the

15:37:05 5 competitor caught all of the calls.  We didn't get a lot

15:37:09 6 more information than that, as it was the project manager

15:37:13 7 conveying the news and she was not fluent in what was

15:37:20 8 tested."

15:37:20 9        And then it said, "I believe the competitor is

15:37:23 10 Next Caller."

15:37:24 11        Do you see that?

15:37:24 12 A.    I do see that.

15:37:26 13 Q.    What Capital One told you is that you were

15:37:29 14 outperformed when compared to Next Caller; correct?

15:37:32 15 A.    That's what the e-mail says.

15:37:34 16 Q.    Right.  So when you told the jury that it was based

15:37:38 17 on price, Capital One decided that it was based on

15:37:43 18 performance; correct?

15:37:44 19 A.    That's not true.

15:37:46 20 Q.    Capital One said to the people who work for you that

15:37:52 21 you were outperformed when compared to a competitor.

15:37:52 22 Correct?

15:37:57 23 A.    That's what Capital One informed us.  As you recall,

15:38:01 24 I said that earlier.

15:38:02 25 Q.    And what they found was that Next Caller had a better

15:38:07 1  product and a less expensive product; correct?

15:38:12 2  A.    I wouldn't put it in those words, but I see where

15:38:16 3  you're going with that.

15:38:17 4  Q.    Well, Capital One was a customer, they were deciding

15:38:22 5  what to buy and they told you that they had concluded that

15:38:28 6  Next Caller had outperformed you and was a lower price

15:38:34 7  solution; correct?

15:38:34 8  A.    Yeah, before they retested, yes.

15:38:37 9  Q.    That's the basis on which they made their decision;

15:38:40 10  right?

15:38:40 11  A.    The decision as far as I know.  Again, I don't have

15:38:43 12  perfect information, but I think the contract wasn't issued

15:38:46 13  for quite some time after that.

15:38:48 14  Q.    And as far as you know, Capital One is still a Next

15:38:53 15  Caller customer; correct?

15:38:54 16  A.    I learned that today.

15:38:55 17  Q.    And they've never come back to you and said we want

15:38:58 18  to switch from Next Caller to TRUSTID; right?

15:39:02 19  A.    About six times.

15:39:05 20  Q.    Okay.  And they haven't switched; correct?

15:39:08 21  A.    No.

15:39:08 22  Q.    Now, when you got this message, you weren't happy;

15:39:12 23  right?

15:39:12 24  A.    No, I was not at all.

15:39:16 25  Q.    And that was one of the reasons that you decided that

15:39:22 1  you had to kill Next Caller in the market; correct?

15:39:30 2  A.    No.  No, not at all.

15:39:33 3  Q.    When did you find out that Next Caller was a full

15:39:41 4  authentication competitor?

15:39:44 5  A.    I think it must have been about April, so about a

15:39:48 6  month or two after this that we started understanding, at

15:39:54 7  least we were about 90 percent certain it was Next Caller.

15:39:57 8  We didn't know.  Capital One wasn't going to tell us Next

15:40:02 9  Caller.  We believe at that time that Next Caller was

15:40:04 10 selling a fraud solution and they were saying don't hang up

15:40:07 11 on this call, versus what we sell which is an authentication

15:40:11 12 solution which is go ahead and treat this customer with the

15:40:14 13 respect they deserve.  It was in August roughly when that

15:40:19 14 e-mail with the word "kill" in it that it became clear

15:40:22 15 enough to me, again much clearer today than it was back then

15:40:26 16 that they were full competitors doing that.

15:40:28 17 Q.    So it was about the time you wrote the "kill them in

15:40:32 18 the market" e-mail that you had determined that Next Caller

15:40:35 19 was a true authentication competitor; correct?

15:40:39 20 A.    I don't believe that.  They were competitors in

15:40:41 21 caller authentication, but I didn't believe their quality

15:40:47 22 and their product was the same as ours.

15:40:49 23 Q.    Right.  In fact, you think that Next Caller's product

15:40:51 24 is very different than yours; correct?

15:40:55 25 A.    Very different, no.  They do a lot of the same things

15:41:00 1    we do.  We do more.  We have been doing this for a while.

15:41:08 2    Q.    Now, I want to go back to Capital One for just a

15:41:15 3    minute.  And at the time that Capital One was talking to

15:41:23 4    you, you knew that they were also talking to Next Caller,

15:41:33 5    Payfone, Pindrop, and perhaps someone else; correct?

15:41:37 6    A.    That sounds right.

15:41:40 7    Q.    And so the competitors for the Capital One business

15:41:44 8    were not just you and Next Caller, there were other

15:41:48 9    competitors as well; correct?

15:41:50 10   A.    Next Caller was talking about potentially putting in

15:41:54 11   fraud solutions and authentication solutions.  We weren't

15:41:59 12   completely clear as to which decision they were going to

15:42:01 13   make or make both.

15:42:02 14   Q.    That wasn't my point, Mr. Cox.  My point was when you

15:42:07 15   were talking to Capital One, you knew not only that Next

15:42:10 16   Caller, but that Pindrop, Payfone and perhaps another

15:42:14 17   competitor were also talking to Capital One; correct?

15:42:19 18   A.    Well, you're using the word competitor.  I didn't say

15:42:22 19   that.  I would say broadly, I'll agree with that broadly,

15:42:26 20   they were not direct competitors.

15:42:28 21   Q.    They were both trying, Payfone and Pindrop, they were

15:42:32 22   both trying to get Capital One's authentication business;

15:42:37 23   correct?

15:42:38 24   A.    Or a fraud product.  Again, we didn't and still don't

15:42:42 25   have perfect information about that.

15:42:44 1   Q.    So you don't think that you were competing for the

15:42:47 2   Capital One business against Payfone and Pindrop?

15:42:50 3   A.    We thought absolutely Capital One could decide to use

15:42:54 4   voice biometrics over us, that happens, right, and in many

15:42:58 5   cases we come back later as is quite common in our business,

15:43:02 6   so it's not the same thing.

15:43:05 7   Q.    But sometimes you lose business to voice biometrics

15:43:13 8   solutions; correct?

15:43:14 9   A.    Yes, we have had customers decide, or prospects, I'm

15:43:18 10   sorry, to be correct.

15:43:19 11   Q.    Prospects?

15:43:21 12   A.    Prospects decide to make investments in the voice

15:43:25 13   biometrics and not make investments in caller

15:43:29 14   authentication.

15:43:29 15   Q.    And in that sense, you're competing with those voice

15:43:34 16   biometrics companies for the same business at the same bank

15:43:39 17   or other financial institution; correct?

15:43:41 18   A.    No, not completely.

15:43:43 19   Q.    Well, you're trying to sell them your product and the

15:43:47 20   voice biometric company is trying to sell them their

15:43:52 21   product; correct?

15:43:52 22   A.    That I would agree with.

15:43:55 23   Q.    And sometimes the banks and financial institutions

15:43:57 24   elect to buy the voice biometric solution instead of buying

15:44:02 25   your solution; correct?

15:44:03 1    A.    That can happen.

15:44:05 2    Q.    And can you go back to where I was about your

15:44:19 3    relationship as a competitor with Next Caller.  You

15:44:27 4    determined sometime in 2017 that Next Caller was offering an

15:44:37 5    authentication solution; is that correct?

15:44:40 6    A.    We made the best guess we could.

15:44:46 7    Q.    In that same e-mail with killing the marketplace,

15:44:49 8    there was questions from your team asking I don't think this

15:44:52 9    is just a fraud product?

15:44:54 10   A.    I think Capital One bought an authentication product

15:44:57 11   from them.  Again, we didn't have perfect information.  It's

15:45:01 12   in that e-mail, but you got to go with the information you

15:45:06 13   have.

15:45:06 14   Q.    Right.  But at some point in 2017, you had sufficient

15:45:12 15   information to determine that Next Caller was offering an

15:45:17 16   authentication solution; correct?

15:45:19 17   A.    We made the decision, more specifically I did, they

15:45:24 18   were competing for caller authentication.

15:45:27 19   Q.    But nevertheless, you thought that they were offering

15:45:30 20   a very different solution than you were; correct?

15:45:34 21   A.    Very different solution.  I think we're splitting

15:45:40 22   hairs.  I don't think it's a very different solution if it

15:45:42 23   offers calling authentication.  I think they're infringing

15:45:46 24   on our technology.  I think they're using our patents

15:45:46 25   inappropriately without our permission.  And I think they do

15:45:52 1    things that we teach and disclose and have claims for in our

15:45:57 2    patent, I think, based on all the marketing material and

15:46:00 3    things I have read.

15:46:01 4    Q.      Do you remember the question I asked you, Mr. Cox?

15:46:03 5    A.      Please repeat it again.

15:46:08 6    Q.      You concluded that Next Caller was offering a very

15:46:13 7    different solution than you were offering; correct?

15:46:17 8    A.      We believed for years they were offering a different

15:46:20 9    solution than we offered.

15:46:22 10   Q.      Right.

15:46:23 11           And that was true in 2017 and 2018 and 2019 that

15:46:27 12   you believed they were offering a different solution;

15:46:30 13   correct?

15:46:31 14   A.      I mean, this is very hypothetical.  I got to tell you

15:46:35 15   it sounds like a simple question, it should have a simple

15:46:39 16   answer.  I think I need to know more about what you're

15:46:41 17   getting at to give you an answer that is going to be really,

15:46:44 18   really accurate, because I think you're starting with an

15:46:48 19   important question, I want to get it right.

15:46:50 20   Q.      You understood in 2017 when Next Caller -- when you

15:46:54 21   knew that Next Caller had an authentication solution that it

15:47:01 22   was very different than your solution; correct?

15:47:02 23   A.      No.

15:47:04 24   Q.      You didn't believe that?

15:47:05 25   A.      No, I didn't know that.

15:47:09 1  Q.      You didn't know that or you didn't believe that?

15:47:12 2  A.      I thought they had.  I didn't know.  You have to make

15:47:15 3  a guess.  There is a difference.

15:47:17 4  Q.      You know today that they have a very different

15:47:20 5  solution; right?

15:47:20 6  A.      I know today they have -- I have never seen their

15:47:23 7  source code.  I don't know for certain.

15:47:28 8  Q.      You have said that they have a very different

15:47:30 9  solution; correct?

15:47:31 10 A.      I view their solution as being inferior to what we do

15:47:36 11 because we do more.  So from that, if you're looking for

15:47:40 12 that as being different, yeah, there is some differences,

15:47:43 13 there are things we do, my guess there is things that Next

15:47:47 14 Caller does as well that we don't do as well.  I don't know

15:47:52 15 what those are.  I can't say the solutions are identical

15:47:55 16 because I don't know.

15:47:55 17 Q.      Can you take a look at DTX-6 in your book, please?

15:48:02 18 A.      DTX-6.

15:48:03 19 Q.      DTX-6.

15:48:05 20 A.      I got it here.

15:48:11 21 Q.      And what is DTX-6?

15:48:11 22 A.      DTX-6 is a TRUSTID board of directors meeting in July

15:48:25 23 of 2018.

15:48:27 24 Q.      So after the events with Capital One in 2017;

15:48:31 25 correct?

15:48:32 1  A.    After the events, yes -- I think -- I'm terrible with

15:48:38 2  dates.   I think this is before my e-mail, but yeah, it's in

15:48:42 3  the time frame.

15:48:43 4  Q.    Well, your e-mail --

15:48:44 5  A.    2018, I'm sorry, 2018, yes, you're correct.

15:48:48 6  Q.    Your e-mail was about a year earlier?

15:48:50 7  A.    Yes, I'm sorry.

15:48:51 8          MR. BLUMENFELD:  Your Honor, we move DTX-6 into

15:48:54 9  evidence.

15:48:55 10         MR. SPECHT:  No objection.

15:48:55 11         THE COURT:  It's admitted.

15:48:57 12         (DTX Exhibit No. 6 was admitted into evidence.)

15:48:58 13  BY MR. BLUMENFELD:

15:48:59 14  Q.    This is the board book for the board of directors

15:49:06 15  meeting for TRUSTID in July 19, 2018; correct?

15:49:09 16  A.    Yes.

15:49:10 17  Q.    And you were the chairman of the board at that time;

15:49:14 18  right?

15:49:14 19  A.    Yes.

15:49:15 20  Q.    And you chaired that meeting; correct?

15:49:17 21  A.    Let me look here.   Yes.

15:49:22 22  Q.    Now, if you turn to page 3.   I am just going to go

15:49:30 23  through a few things here.   You see on page 3 there is a

15:49:33 24  summary.   The whole page looks like a summary.

15:49:38 25  Mr. Rosenberg, can you highlight the line that says

15:49:41 1  competitive at the bottom of the summary.

15:49:50 2          And in there, you wrote "Competitive, Pindrop

15:49:55 3  re-announced a product, Passport Express, in June, a

15:50:02 4  signaling data audit and black list product."

15:50:05 5          Correct?

15:50:05 6  A.      I see that.

15:50:06 7  Q.      And you categorized that as a competitive product;

15:50:12 8  correct?

15:50:12 9  A.      It's a competitive update, which is different -- it's

15:50:15 10 a market update.  Competitive update is different.

15:50:18 11 Q.      The reason you used the word competitive is because

15:50:21 12 you were looking at that as a competitive product; right?

15:50:23 13 A.      Broadly speaking we had a section in every one of our

15:50:27 14 board meetings for anything market related.  Our investors

15:50:31 15 asked for this to be listed under competition or competitive

15:50:35 16 update.

15:50:35 17 Q.      If you turn to two pages later, page 5, you see at

15:50:40 18 the top there is a heading CitiGroup.  And you say, you see

15:50:47 19 in the paragraph below the three bullet points, "Citi just

15:50:52 20 told us there will be no new vendors implemented in 2018

15:50:58 21 pushing this opportunity into 2019, as well as increasing

15:51:01 22 the risk of closing this opportunity.  We have had multiple

15:51:05 23 phone conversations with the two new decision makers that

15:51:07 24 replaced our previous sponsor.  We suspect that the new Citi

15:51:11 25 bank leaders have political pressure to purchase Pindrop

15:51:18 1  over TRUSTID as the Citibank VC arm had invested $10 million

15:51:23 2  in Pindrop four years ago."

15:51:25 3          Did I read that correctly?

15:51:26 4  A.      Yes, you did.

15:51:27 5  Q.      And so this was a situation where you wanted to get

15:51:31 6  Citibank or CitiGroup's business and you didn't think that

15:51:35 7  you would be able to get it away from Pindrop; correct?

15:51:39 8  A.      I don't recall if Pindrop -- does it say if Pindrop

15:51:45 9  had it already?

15:51:47 10 Q.      You were trying to win Citibank over Pindrop;

15:51:51 11 correct?

15:51:52 12 A.      We were trying to get Citibank, absolutely, as a

15:51:56 13 customer.

15:51:56 14 Q.      And in that sense, you were competing with Pindrop;

15:52:00 15 correct?

15:52:00 16 A.      We still have many invitations today where Pindrop

15:52:06 17 and us work side-by-side.

15:52:09 18 Q.      Side-by-side and against each other; right?

15:52:12 19 A.      Their resources and Citibank couldn't implement new

15:52:17 20 vendors, that happens all the time with banks, you can only

15:52:20 21 do so many things at one time.

15:52:22 22 Q.      Can you turn in this document, page 24, please, there

15:52:28 23 is a section here on marketing.  Do you see that?  Can we

15:52:31 24 blow that up.

15:52:35 25          Now, in marketing, you see the heading,

15:52:40 1  competitive positioning?

15:52:43 2  A.      Yes.

15:52:44 3  Q.      And what it says is that, "As the market has become

15:52:47 4  hotter, we have also attracted more competition (Next Caller

15:52:51 5  and Pindrop both offer services based on use of phone data.)

15:52:58 6  We developed new messaging in May that better positions our

15:53:03 7  deterministic authentication solution based on network

15:53:08 8  forensics.  This messaging also makes clear that our

15:53:12 9  solution is very different from our phone data competitors."

15:53:15 10         That's what you wrote; correct?

15:53:17 11 A.      Yeah, I see that.  Is this the same document?

15:53:20 12 Q.      The same document.

15:53:21 13 A.      Great.  Yes.

15:53:23 14 Q.      And what you were saying among other things is that

15:53:27 15 your solution, TRUSTID's solution was very different from

15:53:32 16 the solutions of Pindrop and Next Caller; correct?

15:53:37 17 A.      In terms of competitive marketing positioning,

15:53:40 18 absolutely, we wanted to educate the differences, not the

15:53:43 19 similarities, you educate about the differences between

15:53:46 20 different companies and their approach.

15:53:49 21 Q.      And one of the things you do to try to differentiate

15:53:52 22 your solution from competitors' solutions is preparing

15:54:01 23 documents called battle cards; correct?

15:54:07 24 A.      I'm familiar with the battle card and they're usually

15:54:11 25 about the marketplace and other operations and direct and

15:54:15 1  indirect competitors, yes.

15:54:17 2  Q.      And the purpose of the battle cards is to assist your

15:54:24 3  salespeople and your marketing people with messages for

15:54:29 4  customers and prospective customers; correct?

15:54:33 5  A.      And our partners as well, yes.

15:54:35 6  Q.      And it's to market against competitors; right?

15:54:41 7  A.      Typically not.  It can be.  In many cases it's used

15:54:46 8  for selling which is different than marketing.

15:54:49 9  Q.      For selling as opposed to marketing?

15:54:51 10  A.      In some cases a battle card would be more appropriate

15:54:56 11  to handling objections.

15:54:58 12  Q.      So you give it to your sales representative so they

15:55:02 13  can handle objections that are made to them concerning

15:55:06 14  someone else's product; right?

15:55:08 15  A.      That would be usually part of a battle card.

15:55:12 16  Q.      And you get involved in preparing, or until a

15:55:16 17  year-and-a-half ago anyway, maybe you still do, you got

15:55:19 18  involved in preparing battle cards; correct?

15:55:22 19  A.      I haven't been involved in preparing them for quite

15:55:25 20  some time, but I absolutely have, as I should be involved

15:55:28 21  with preparing them.

15:55:30 22  Q.      And approving them; correct?

15:55:33 23  A.      I'm certain there are battle cards we created that I

15:55:37 24  haven't approved, but for the most part, I would say that's

15:55:41 25  probably accurate.

Cox- cross

Q.      And you want to make sure that they're accurate, that the battle cards are accurate so that your salespeople don't say things to prospective customers that isn't true; is that right?

A.      Yeah, we're not in the business of telling falsehoods.

Q.      And TRUSTID prepared a battle card for Next Caller's VeriCall service; correct?

A.      I think we prepared many over the years, based upon our current understanding of what we knew of the marketplace at the time.

Q.      And you prepared one in 2018; correct?

A.      I couldn't tell you, especially with the date.  I'm sorry.

Q.      You're not good at dates.  I forgot about that.  But whatever battle cards you prepared against Next Caller, you tried to make them as accurate as possible; correct?

A.      Actually a battle card by the nature is that, just that singular.  You try to put as much information as you can on the page of the card.  So it's a summary.  So it's not a complete document, it tries to give bullet points and high level ideas.  But we definitely don't want falsehoods and lies, that's just not how we operate.

Q.      You make them accurate, that was my question?

A.      As best as we can.  We have done things later to get

15:57:12 1     more accurate, but I'm with you.

15:57:15 2     Q.     Can you look at JTX-40.

15:57:18 3     A.     40?

15:57:19 4     Q.     40, JTX-40.

15:57:33 5     A.     Is there a year or a date or any other --

15:57:40 6     Q.     Maybe you can take a look at it and you could tell me

15:57:44 7     when you think it was prepared.

15:58:01 8     A.     I couldn't tell you when it was -- what that is.

15:58:05 9     It's a Next Caller battle card is what it says.  I haven't

15:58:08 10    read the whole thing.  This doesn't look really familiar to

15:58:12 11    me, but the format looks familiar.

15:58:14 12    Q.     And it's a TRUSTID document; correct?

15:58:16 13    A.     I would guess so, yes.  There is a chance actually to

15:58:20 14    be clear this could have been a Neustar document.  I don't

15:58:23 15    know.  You know, when TRUSTID was owned by Neustar, I don't

15:58:28 16    know the time frame.

15:58:29 17    Q.     But you see the TRUSTID number at the bottom of the

15:58:32 18    front page; correct?

15:58:33 19    A.     That's a number that would indicate evidence.  I'm

15:58:38 20    not sure --

15:58:39 21    Q.     Are you suggesting that this wasn't prepared by

15:58:42 22    TRUSTID, Mr. Cox?

15:58:43 23    A.     Well, there is two companies here, TRUSTID and then

15:58:47 24    the marketing firm, the marketing part of it at Neustar

15:58:51 25    since the acquisition has taken care of all the marketing.

15:58:54 1    So there is a slight difference.  These are the people that

15:58:59 2    reported to me and I worked with versus a marketing

15:59:02 3    department that had responsibility for thirty or fifty

15:59:05 4    products.  I don't know which this is.

15:59:08 5            MR. BLUMENFELD:  Your Honor, we move JTX-40 into

15:59:11 6    evidence.

15:59:13 7            MR. SPECHT:  No objection, Your Honor.

15:59:14 8            THE COURT:  It's admitted.

15:59:16 9            (JTX Exhibit No. 40 was admitted into evidence.)

15:59:17 10   BY MR. BLUMENFELD:

15:59:18 11   Q.    Mr. Rosenberg, can you please put this up.  Let's

15:59:22 12   start by taking a look at the top left part of the document,

15:59:26 13   the overview.  And you see under the overview it says, "Next

15:59:37 14   Caller provides a spoof detection service called VeriCall

15:59:40 15   that is based on analysis of enhanced call SIP header data.

15:59:47 16   This approach limits their coverage to mainly prospects that

15:59:50 17   use Verizon as their carrier (they are one of the few

15:59:55 18   carriers to provide enhanced SIP data) and makes it

16:00:00 19   impossible for them to detect risky virtualized calls (the

16:00:02 20   new tool of choice for criminals).  These limitations lead

16:00:10 21   Next Caller to position VeriCall as a verification service

16:00:13 22   rather than authentication."

16:00:16 23           Do you see that?

16:00:16 24   A.    I do see that.  It's a virtualized call.

16:00:20 25   Q.    Virtualized.  I'm sorry.  I misread that.  And what

16:00:30 1   this TRUSTID battle card was saying is that VeriCall is

16:00:36 2   really a verification service rather than authentication;

16:00:40 3   correct?

16:00:41 4   A.      In my way of thinking, that's true.

16:00:44 5   Q.      So in your way of thinking, VeriCall is not an

16:00:48 6   authentication solution?

16:00:50 7   A.      Yeah, there is a complex reason for it.  I would be

16:00:53 8   happy to answer, but I don't want to detract from what

16:00:56 9   you're doing.

16:00:57 10  Q.      No.  Thank you.  I'm sure you can do that when you

16:01:00 11  are on redirect.

16:01:01 12          And do you see if we go to the top right column,

16:01:10 13  there is a heading there, Field Guidance.  And the sentence

16:01:18 14  under Field Guidance says, "The following tactics are

16:01:22 15  suggested in competing against Next Caller."

16:01:25 16          Do you see that?

16:01:26 17  A.      I do.

16:01:27 18  Q.      And the first thing listed there is, "they are a risk

16:01:33 19  detection tool, not authentication."  Correct?

16:01:37 20  A.      I read that, yes.

16:01:39 21  Q.      And you agree with that; correct?

16:01:41 22  A.      I actually do agree with that.

16:01:43 23  Q.      So in your view, VeriCall is not a call

16:01:42 24  authentication?

16:01:42 25  A.      At that time I'm getting a better feel for when this

16:01:52 1   was roughly based on some of the stuff I have read, but

16:01:56 2   absolutely it would be my opinion because they didn't

16:01:59 3   actually inspect the call, they were just filing a claim.

16:02:03 4   Q.      So the timing of this as you read it, this was

16:02:07 5   written in 2018; correct?

16:02:09 6   A.      That sounds about right, yeah.

16:02:11 7   Q.      And so in 2018, you didn't think that VeriCall was an

16:02:19 8   authentication tool; correct?

16:02:19 9   A.      That's not what mattered.  Our prospects did.

16:02:24 10  Q.      But you didn't think it was an authentication tool?

16:02:26 11  A.      I did not.

16:02:28 12  Q.      If you go down to the last paragraph in this section,

16:02:33 13  company and product viability, do you see that?  And I'm

16:02:40 14  going to read that paragraph.  It says, "Ask prospects" --

16:02:45 15  by saying ask prospects, you're suggesting that your

16:02:49 16  salespeople ask prospects; correct?

16:02:52 17  A.      I'm actually -- I think this actually was prepared

16:02:55 18  for a partner of ours.  I could be wrong, but yes, it may

16:03:00 19  have gone to our salespeople as well, but I think this was

16:03:02 20  something -- I think this is something that was prepared by

16:03:08 21  a marketing person for Nice.  I could be wrong, but I'm

16:03:11 22  thinking this was based upon questions Nice had, things they

16:03:15 23  were hearing because I'm seeing this now, it makes more

16:03:18 24  sense.

16:03:18 25  Q.      This tactic suggested in competing against Next

16:03:23 1  Caller and then the bottom tactic there is, "Ask prospects

16:03:26 2  to look at Next Caller website."

16:03:30 3          You wouldn't be telling Nice to ask prospects to

16:03:34 4  do that, would you?

16:03:34 5  A.      Absolutely.

16:03:35 6  Q.      So you're telling people even outside the company to

16:03:38 7  do this; is that right?

16:03:40 8  A.      They're selling against Next Caller.

16:03:43 9  Q.      And so at the end of the second line it says, "Ask if

16:03:49 10 the prospect is aware that Next Caller is being sued for

16:03:54 11 patent infringement and trademark violations.  Does the

16:03:57 12 prospect really want to buy from a company that is so

16:04:01 13 shallow and troubled?"

16:04:05 14         Do you see that?

16:04:06 15 A.      I do.  I see a mistake in that sentence, but I do.

16:04:10 16 Q.      The mistake is they hadn't been sued, Next Caller

16:04:13 17 hadn't been sued for trademark violations; right?

16:04:15 18 A.      That's what I saw.

16:04:17 19 Q.      But nevertheless, whoever the recipients of this were

16:04:20 20 told to ask prospects if they were aware that Next Caller

16:04:22 21 had been sued for trademark violations; right?

16:04:26 22 A.      Yes.

16:04:27 23 Q.      And that was incorrect, Next Caller hasn't been sued

16:04:31 24 for trademark violations; right?

16:04:33 25 A.      No, that is false advertising.

16:04:36 1    Q.    And whoever the recipients were, they were being told

16:04:42 2    to market this patent infringement litigation case against

16:04:47 3    Next Caller in the market; correct?

16:04:50 4    A.    I wouldn't put it that way.

16:04:52 5    Q.    Well, you were telling people to ask prospects if

16:04:57 6    they were aware that Next Caller was being sued for patent

16:05:01 7    infringement; correct?

16:05:02 8    A.    Yes.

16:05:02 9    Q.    And TRUSTID was trying to use this patent litigation

16:05:07 10   against Next Caller in the market; correct?

16:05:10 11   A.    No.

16:05:12 12   Q.    Can we go down to the section below that called

16:05:20 13   Handling Objections.  And these are responses recommended in

16:05:26 14   responding to common points Next Caller makes to prospects;

16:05:30 15   correct?

16:05:31 16   A.    Yes, so these were the things Next Caller is

16:05:36 17   claiming.

16:05:37 18   Q.    And these are proposals?

16:05:39 19   A.    Their recommended responses, yes.

16:05:42 20   Q.    And the first one is "just as good but cheaper."  Do

16:05:47 21   you see that?

16:05:47 22   A.    I do.

16:05:47 23   Q.    And then I would like you to look at the one under --

16:05:55 24   and just on that, Next Caller is less expensive than

16:06:02 25   TRUSTID; correct?

16:06:03 1    A.       Yes.

16:06:04 2    Q.       No question about that?

16:06:05 3    A.       Again, I never had perfect knowledge, but I think

16:06:08 4    it's pretty clear now that that is absolutely the case and I

16:06:13 5    think we were guessing right.

16:06:14 6    Q.       So "Next Caller is faster" is the bottom one.  Can we

16:06:17 7    highlight that paragraph, Mr. Rosenberg, the whole

16:06:21 8    paragraph.

16:06:22 9         So it begins by saying, and this is responses to

16:06:28 10   points that Next Caller makes to prospects; right?

16:06:32 11   A.       Yeah, Next Caller claims, at least this is the

16:06:36 12   document I think it is, Nice said they're getting

16:06:40 13   objections, they talked to customers and prospects and they

16:06:43 14   say well, Next Caller keeps saying they're faster than us,

16:06:46 15   they were saying us because we were a partner.

16:06:48 16   Q.       What it says at the beginning is "Next Caller will

16:06:52 17   claim they can process calls in 200 milliseconds and try to

16:06:57 18   compare that to TRUSTID's pre-answer delay of approximately

16:07:00 19   three seconds."

16:07:02 20        Correct?

16:07:02 21   A.       I see that, yes.

16:07:04 22   Q.       And the reason for that difference in processing is

16:07:11 23   because TRUSTID does its processing while the phone is

16:07:14 24   ringing before it's answered; correct?

16:07:21 25   A.       The product can do it that way.  It can do it other

16:07:27 1  ways.  We have multiple products that can do it after the

16:07:30 2  call, too, but I don't think we're calling out a specific

16:07:36 3  product here.

16:07:36 4  Q.     Well, this is about VeriCall; right?

16:07:38 5  A.     This would be about VeriCall, you're right.

16:07:40 6  Q.     And it's about Authenticator, that's your product;

16:07:44 7  right?

16:07:44 8  A.     I don't know.  I would assume that.

16:07:46 9  Q.     Well, it says Authenticator two lines down; right?

16:07:50 10 A.     Okay.  Great.

16:07:51 11 Q.     I want to read you the next sentence.  It says, "This

16:07:54 12 is an apples and oranges comparison since Next Caller's

16:07:59 13 processing occurs after a call is answered while TRUSTID

16:08:05 14 Authenticator completes processing before the call is even

16:08:10 15 answered."

16:08:11 16        And that is correct, isn't it?

16:08:16 17 A.     It was what Next Caller was saying on their website

16:08:20 18 at that time, that's what we have to compete with, they were

16:08:23 19 saying just that, we felt that wasn't true.  We didn't think

16:08:28 20 it was accurate.  We think it was confusing, but they were

16:08:33 21 claiming that on their website.

16:08:35 22 Q.     Well, that statement is not attributed to Next

16:08:37 23 Caller, is it?  It says that Next Caller's claiming to be

16:08:41 24 faster, this is an apples and oranges comparison since Next

16:08:45 25 Caller's processing occurs after a call is answered while

16:08:49 1    TRUSTID Authenticator completes processing before the call

16:08:53 2    is even answered.  That was what you were suggesting that

16:08:57 3    your salespeople or Nice or whoever received this should

16:09:02 4    respond to prospects with; correct?

16:09:04 5    A.    These were the objections.  We didn't say Next

16:09:08 6    Caller's faster, Next Caller was saying they were faster.

16:09:11 7    Next Caller claimed 200 milliseconds, two-tenths of a

16:09:15 8    second.  We don't make those claims.  We're trying to

16:09:18 9    explain -- what we're trying to explain here, if you will,

16:09:21 10   is what the last sentence says.

16:09:23 11   Q.    And I want to focus on the apples and oranges

16:09:29 12   sentence, because the apples and oranges comparison was

16:09:34 13   TRUSTID's comparison, correct, TRUSTID was saying that

16:09:37 14   Authenticator and Next Caller VeriCall were apples and

16:09:42 15   oranges; correct?

16:09:43 16   A.    Not at all.

16:09:45 17   Q.    Well, those are the word they used; correct?

16:09:48 18   A.    I see the words, but that's not at all what this is.

16:09:52 19   Q.    And what TRUSTID said is that Next Caller's

16:09:54 20   processing occurs after a call is answered, while TRUSTID

16:09:56 21   Authenticator completes processing before the call is even

16:10:02 22   answered, that's what TRUSTID said back in 2018; correct?

16:10:08 23   A.    There was a lot in there.  We're into the weeds.

16:10:11 24   Could you repeat that one more time?  I apologize.

16:10:15 25   Q.    Back in 2018, TRUSTID was suggesting a response to

16:10:22 1    Next Caller's claim that it's faster by saying this is an

16:10:26 2    apples and oranges comparison since Next Caller's processing

16:10:30 3    occurs after a call is answered while TRUSTID Authenticator

16:10:36 4    completes processing before the call was even answered?

16:10:39 5    A.      I think I can agree with that.

16:10:41 6    Q.      And so that's what TRUSTID said back in 2018;

16:10:45 7    correct?

16:10:46 8    A.      Which was different than the last couple of

16:10:48 9    questions, that last one.  Thank you.

16:10:49 10   Q.      But we've agreed on that; correct?

16:10:51 11   A.      I believe so.  I'm doing the best I can here.

16:10:55 12   Q.      And TRUSTID wouldn't tell its people to say that if

16:11:04 13   it weren't true; correct?

16:11:08 14   A.      That would be correct.

16:11:10 15   Q.      Now, and this was the following year after you had

16:11:17 16   lost the Capital One account to Next Caller; correct?

16:11:22 17   A.      If this is 2018, then that would be correct.

16:11:25 18   Q.      And that was after Capital One had told you that it

16:11:29 19   had concluded that Next Caller was better and cheaper than

16:11:35 20   TRUSTID; correct?

16:11:36 21   A.      Capital One never told us it was Next Caller, still

16:11:39 22   to this day.

16:11:41 23   Q.      They told you whoever the competitor was was better

16:11:46 24   and cheaper; correct?

16:11:47 25   A.      That was their first communication to us, correct.

16:11:50 1   Q.      And you later found out that competitor was Next

16:11:53 2   Caller; correct?

16:11:54 3   A.      We learned that, I learned that today, but we've

16:11:58 4   suspected that.

16:12:01 5   Q.      Right.  I would like to turn back, Mr. Cox, to

16:12:11 6   marketing a little bit and the call authentication market.

16:12:18 7   I think we agreed earlier that there are thousands of call

16:12:21 8   centers in the United States?

16:12:23 9   A.      In the United States and globally, a lot of the

16:12:27 10  United States companies use overseas call centers as well.

16:12:30 11  Q.      Right.  And you testified on direct that you have

16:12:34 12  about fifty customers?

16:12:35 13  A.      We have about fifty customers.

16:12:38 14  Q.      And your revenues are of the billion or billions of

16:12:43 15  dollars, they're a very small portion of the call

16:12:48 16  authentication --

16:12:48 17  A.      I believe earlier I testified I believe the market

16:12:52 18  was around 40 million for caller authentication.

16:12:55 19  Q.      That's caller authentication that includes TRUSTID

16:13:00 20  and VeriCall; right?

16:13:01 21  A.      That's my best estimate.  I don't know VeriCall's

16:13:02 22  revenue.

16:13:02 23  Q.      But in any event, TRUSTID's revenues are something

16:13:02 24  less than $40 million out of the billion dollar addressable

16:13:12 25  call authentication market; correct?

16:13:16 1    A.    Well, addressable is -- addressable markets are a

16:13:21 2    desire, they weren't a market.  The market is what it is

16:13:29 3    today, so I would have to disagree.

16:13:32 4    Q.    Both of those are in the billions of dollars;

16:13:36 5    correct?

16:13:36 6    A.    The addressable market would be a billion dollars or

16:13:39 7    more potentially for the product, yes.

16:13:41 8    Q.    Could you turn in your book to JTX-52.

16:13:52 9    A.    Okay.

16:13:53 10   Q.    And this is something labeled Trust Management

16:13:58 11   Presentation Fall 2008.  Do you see that?

16:14:01 12   A.    I do see that, yes.

16:14:03 13   Q.    And if you -- I won't put it up yet, but if you turn

16:14:08 14   to the third page, it has your picture on it; correct?

16:14:11 15   A.    Yes.

16:14:12 16   Q.    This is a document, a presentation that was prepared

16:14:20 17   by a TRUSTID consultant; is that right?

16:14:23 18   A.    Yes, it looks like it was prepared by Raymond James.

16:14:27 19   Q.    And you paid Raymond James a fair amount of money for

16:14:30 20   this presentation; right?

16:14:31 21   A.    No.

16:14:33 22   Q.    You didn't pay anything for it?

16:14:33 23   A.    They were hired to raise money for us initially, or

16:14:37 24   potentially sell the company.  There was no fees until they

16:14:42 25   were successful.

16:14:44  1   Q.      So this was a presentation where you were trying to

16:14:47  2   find an acquirer; is that right?

16:14:50  3   A.      Either additional money to help fund the growth of

16:14:54  4   the company or a partner required, yes.

16:14:56  5   Q.      And Raymond James got information from TRUSTID to put

16:15:03  6   into the presentation; correct?

16:15:05  7   A.      That would be correct.

16:15:06  8   Q.      Including from you?

16:15:07  9   A.      Yes.

16:15:08 10   Q.      And you tried to give them accurate information;

16:15:10 11   correct?

16:15:11 12   A.      Yes.

16:15:11 13   Q.      And you've read this, haven't you?

16:15:14 14   A.      I don't know if it's this exact draft, but I have

16:15:20 15   absolutely read the presentation, the final version and

16:15:25 16   perhaps half a draft or so.

16:15:28 17   Q.      Why don't I move it into evidence first?

16:15:30 18          MR. BLUMENFELD:  Can we move JTX-52 into

16:15:32 19   evidence, please.

16:15:32 20          MR. SPECHT:  No objection.

16:15:32 21          THE COURT:  It's admitted.

16:15:32 22          (JTX Exhibit No. 52 was admitted into evidence.)

16:15:32 23          MR. BLUMENFELD:  Can we put up -- sorry,

16:15:42 24   Mr. Rosenberg, the cover page.

16:15:42 25   BY MR. BLUMENFELD:

16:15:48 1    Q.    And what I'm going to ask you to turn to, you can

16:15:52 2    look at any part of this you want to, but could you turn to

16:15:58 3    the section starting at page 15.  Maybe we could turn to

16:16:02 4    that.

16:16:05 5    A.    15?

16:16:07 6    Q.    15.  Are you at this page, Mr. Cox?

16:16:18 7    A.    Yes.

16:16:18 8    Q.    This is called market opportunity and competitive

16:16:21 9    landscape.  Do you see that?

16:16:22 10   A.    I do.

16:16:23 11   Q.    And it's a section that goes for several pages until

16:16:31 12   22.  Is that right?

16:16:35 13   A.    Yes.

16:16:36 14   Q.    And if you look at page 16, and I'm going to ask you,

16:16:51 15   the pie chart at the bottom, it refers to caller

16:16:54 16   authentication methods; correct?

16:16:57 17   A.    Yes.

16:16:58 18   Q.    And then to the right of that, maybe we could

16:17:02 19   highlight the first bullet point to the right of that.  And

16:17:12 20   what your consultant said here was despite the limitations

16:17:21 21   of KBA, it remains the most used authentication technique in

16:17:25 22   call centers.  Correct?

16:17:27 23   A.    I see that.

16:17:27 24   Q.    And KBA is knowledge-based authentication; correct?

16:17:32 25   A.    Right.

16:17:33 1  Q.      And that's correct, isn't it, that at this time in

16:17:37 2  2018, despite its limitations, knowledge-based

16:17:43 3  authentication remains the most used authentication

16:17:46 4  technique in call centers?

16:17:47 5  A.      Yeah, I believe that still is accurate as pretty much

16:17:51 6  every interaction involves some questioning and answering,

16:17:54 7  they also still use voice bio and caller-ID authentication.

16:17:59 8  Q.      Can we turn to the next page, please.  That's

16:18:05 9  page 17.  And highlight that left side, please.  There you

16:18:12 10 go.  Thank you, Mr. Rosenberg.

16:18:14 11          So this is a table of substantial Greenfield

16:18:19 12 opportunity.  Do you see that?

16:18:21 13 A.      Yes.

16:18:22 14 Q.      And Greenfield opportunity you understand refers to

16:18:26 15 an untapped market?

16:18:28 16 A.      Correct.

16:18:29 17 Q.      And it says right underneath that immediate

16:18:33 18 $1 billion addressable market, with significant headroom for

16:18:38 19 growth.  Part of that is cut off.  Significant headroom for

16:18:42 20 growth, that's what it says; right?

16:18:44 21 A.      Yes.

16:18:44 22 Q.      And what this report was saying is back in 2018,

16:18:48 23 TRUSTID had an addressable market opportunity of a billion

16:18:55 24 dollars; correct?

16:18:56 25 A.      I think all the competitive offerings would have

16:18:59 1    that, that's the market.

16:19:00 2    Q.    That's the market.  And at that time you had about

16:19:02 3    two percent of that billion dollars?

16:19:04 4    A.    Of the addressable, of the opportunity?

16:19:07 5    Q.    Yes.

16:19:09 6    A.    That sounds reasonable.  I'm not doing the math in my

16:19:15 7    mind right now.

16:19:16 8    Q.    Well, you were doing back in 2018 maybe $20 million

16:19:20 9    of business.

16:19:20 10   A.    Okay.

16:19:21 11   Q.    So that would be two percent; right?

16:19:23 12   A.    Great.

16:19:24 13   Q.    We're not arguing about that.

16:19:25 14   A.    I'm not doing the mental math.  Thank you.

16:19:29 15   Q.    Now, if we turn a couple of pages later to page 21,

16:19:36 16   there is a section there on voice biometrics.  And what it

16:19:43 17   says is while ubiquitous voice enrollment may be

16:19:49 18   unattainable over time, voice will become a more common

16:19:52 19   solution to replace the use of knowledge-based

16:19:55 20   authentication.

16:19:55 21        You agree with that, too?

16:19:57 22   A.    Yes, I do.

16:19:58 23   Q.    And the voice biometrics is a big part of that

16:20:04 24   potential billion dollar market; correct?

16:20:07 25   A.    No, I think we were talking about -- I would have to

go back and read it again.  I think we were talking about

caller authentication versus the overall authentication

market which I think in this document we said was about

$4 billion.  Is that right?

Q.      You think at this time the overall authentication

market was more like $4 billion?

A.      On page 17 if I'm reading that right, I think that's

what it says.

Q.      And in any event, it was more than a billion dollars;

right?

A.      We believe still to this day there is a big

opportunity.  We think asking these questions is terrible,

and there is a big opportunity for a replacement for that.

And we think that Authenticator could be absolutely the

potential to replace that all over time.

Q.      But so far that hadn't happened, right?

A.      No, unfortunately.

Q.      And the Authenticator has been on the market for

what, seven years, eight years?

A.      That sounds right.

Q.      Can we turn to page 22, the last page of this

section.  And on page 22, there is a couple that says

unmatched capabilities creates a massive competitive moat.

Do you see that?

A.      I do.

16:21:38 1    Q.    At the top it says authentication technique and then

16:21:41 2    it list a bunch of things there.  And it list TRUSTID on the

16:21:46 3    left; right?

16:21:47 4    A.    I see that.

16:21:48 5    Q.    And then next to it it list phone data, and it list

16:21:53 6    Next Caller and Pindrop under phone data; right?

16:21:57 7    A.    I see that, yes.

16:21:58 8    Q.    And so TRUSTID was distinguishing Next Caller and

16:22:05 9    Pindrop from itself; correct?

16:22:11 10   A.    It's distinguishing all of the players including Nice

16:22:16 11   and Nuance in terms of feature set, yes.

16:22:18 12   Q.    And it was categorizing Next Caller and Pindrop as

16:22:23 13   being in the same category; correct?

16:22:25 14   A.    Yeah, it's not clear if we're in that category or not

16:22:29 15   by looking at this, but we do have Next Caller and Pindrop

16:22:32 16   there in the same category.

16:22:34 17   Q.    You're not phone data, are you?

16:22:36 18   A.    We are in a big way phone data.

16:22:39 19   Q.    You are?  But in a different way than Pindrop and

16:22:42 20   Next Caller; correct?

16:22:45 21   A.    We think so.  We think we do more with it.  Phone

16:22:48 22   data is the basis of everything we do.

16:22:52 23   Q.    But in a different way than Next Caller and Pindrop

16:22:55 24   do it; correct?

16:22:56 25   A.    We have been through this, if you recall.

16:22:59 1   Q.      And then on the right side, you have Nice and Nuance,

16:23:05 2   and they're listed as voice biometrics.  And Pindrop is also

16:23:11 3   listed as voice biometrics; right?

16:23:15 4   A.      I see that, yes.

16:23:16 5   Q.      And all of these companies are listed as being in the

16:23:19 6   massive competitive moat; correct?

16:23:21 7   A.      In the big moat, right, the only one you see would be

16:23:25 8   phone data, solely with Next Caller, Pindrop and Next

16:23:33 9   Caller.

16:23:33 10  Q.      Now, as we went through the section, you didn't see

16:23:39 11  any tables that had, like your slide 2 that had Next Caller

16:23:49 12  and TRUSTID as being the caller-ID authentication market;

16:23:56 13  correct?

16:23:56 14  A.      I didn't see any today, no.

16:23:59 15  Q.      You haven't seen any ever in any of TRUSTID's

16:24:03 16  marketing documents, have you?

16:24:06 17  A.      I thought I showed them earlier, but I could be

16:24:09 18  mistaken.

16:24:09 19  Q.      Well, you showed one that you created for litigation;

16:24:14 20  correct?

16:24:14 21  A.      I guess that's what I showed today.

16:24:17 22  Q.      But in going through TRUSTID's documents, you've

16:24:21 23  never seen before the one you put up today any chart that

16:24:26 24  TRUSTID created where it categorized caller-ID

16:24:32 25  authentication market with just TRUSTID and Next Caller;

Cox- cross

16:24:36 1  correct?

16:24:37 2  A.    I can't say that's true.

16:24:39 3  Q.    You can't think of one, can you?

16:24:41 4  A.    I can't.  I don't know that to be the case.

16:24:43 5  Q.    But you can't think of one, can you?

16:24:45 6  A.    I actually can't think of a document where we

16:24:48 7  segmented it that way at all.  But again, show me something,

16:24:53 8  I'm happy to look at it.

16:24:55 9  Q.    Caller-ID authentication market is not a term that

16:24:58 10 TRUSTID uses when it's discussing the market, is it?

16:25:02 11 A.    I guess that would make sense.  I guess that's why

16:25:05 12 I'm having a hard time saying there is any document like

16:25:08 13 that.

16:25:09 14 Q.    Right.  Caller-ID authentication market is not a term

16:25:12 15 that TRUSTID uses except in this courtroom; correct?

16:25:16 16 A.    No, we have used it before, but we think it's the

16:25:20 17 simplest and easiest way to explain the solution.

16:25:24 18 Q.    Now, it's not a term that you use when you're

16:25:30 19 creating marketing documents; correct?

16:25:32 20 A.    We try to pocket words that our prospect and

16:25:37 21 customers will understand.  They're concerned about

16:25:41 22 authentication and they have their terminology and we try to

16:25:44 23 speak to them in those terms.

16:25:45 24 Q.    And when they're concerned about authentication,

16:25:48 25 they're concerned about TRUSTID and Next Caller and Payfone

16:25:52 1    and Pindrop and Nuance and Nice, and other companies;

16:25:56 2    correct?

16:25:56 3    A.      In authentication broadly?

16:25:58 4    Q.      Yes.

16:25:59 5    A.      I believe that's correct, yes.

16:26:00 6    Q.      And some of them have homemade solutions; correct?

16:26:04 7    A.      For authentication?

16:26:08 8    Q.      For authentication.

16:26:09 9    A.      I think probably everyone one uses knowledge-based

16:26:12 10   authentication, so yes, that would be correct.

16:26:14 11   Q.      And some of them don't use any authentication at all;

16:26:18 12   correct?

16:26:18 13   A.      Definitely banks and health care providers and such

16:26:22 14   need to, but there are contact centers that you're implying

16:26:26 15   that don't do authentication.

16:26:27 16   Q.      I'm asking, I'm not implying.

16:26:30 17   A.      I'm sorry.  Give me the question again.

16:26:32 18   Q.      Are there contact centers that don't do call

16:26:35 19   authentication?

16:26:35 20   A.      Yes.

16:26:36 21         THE COURT:  Mr. Blumenfeld, it's 4:30 and the

16:26:39 22   jurors haven't had a break this afternoon, so how about if

16:26:42 23   we stop here and we take up in the morning.

16:26:42 24         MR. BLUMENFELD:  That would be great, Your

16:26:47 25   Honor.  Thank you.

16:26:48 1          THE COURT:  Normally we take a break in the

16:26:50 2 afternoon.  I apologize.  We started a little bit late today

16:26:53 3 so we kept going, but tomorrow we will take a break in the

16:26:57 4 morning and in the afternoon as well.

16:26:59 5          All right.  With that, I will excuse you for the

16:27:01 6 evening.  I ask you to drive safely, and I will see you here

16:27:06 7 tomorrow at 9:00 a.m.

16:27:10 8          COURTROOM DEPUTY:  All rise.

16:27:12 9          (Jury leaving the courtroom at 4:27 p.m.)

16:27:42 10          THE COURT:  All right.  Mr. Cox, you may step

16:27:44 11 down.

16:27:44 12          Anything we need to discuss tonight?

16:27:48 13          MR. SPECHT:  No, Your Honor.

16:27:49 14          MS. COLUMBIA:  No, Your Honor.

16:27:50 15          THE COURT:  All right.  Thank you.  See you in

16:27:51 16 the morning.

17          (Court recessed at 4:27 p.m.)

18

19          I hereby certify the foregoing is a true and
accurate transcript from my stenographic notes in the proceeding.

20

21                     /s/ Dale C. Hawkins
                       Official Court Reporter
22                      U.S. District Court

23

24

25