08:33:21 1                IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF DELAWARE

3

4    TRUSTID, INC.,              ) VOLUME 3
                                 )
5              Plaintiff,        )
                                 ) C.A. No. 18-172(MN)
6    v.                          )
                                 )
7    NEXT CALLER, INC.,          )
                                 )
8              Defendant.        )

9

10                  Wednesday, July 14, 2021
                    8:45 a.m.
11                  Jury Trial

12

13                  844 King Street
                    Wilmington, Delaware

14

15   BEFORE:  THE HONORABLE MARYELLEN NOREIKA
                 United States District Court Judge
16

17

     APPEARANCES:
18

19              YOUNG CONAWAY STARGATT & TAYLOR
                BY:  ADAM POFF, ESQ.
20
                -and-
21
                STERNE KESSLER GOLDSTEIN & FOX
22              BY:  JONATHAN TUMINARO, PhD., ESQ.
                BY:  MICHAEL D. SPECHT, ESQ.
23              BY:  DEIRDRE WELLS, ESQ.
                BY:  DANIEL BLOCK, ESQ.
24              BY:  BYRON PICKARD, ESQ.

25                      Counsel for the Plaintiff

1

**APPEARANCES CONTINUED:**

2

3          **MORRIS NICHOLS ARSHT & TUNNELL LLP**
           **BY:  JACK B. BLUMENFELD, ESQ.**
4          **BY:  MEGAN E. DELLINGER, ESQ.**

5          **-and-**

6          **McDERMOTT WILL & EMERY**
           **BY:  SARAH CHAPIN COLUMBIA, ESQ.**
7          **BY:  IAN B. BROOKS, ESQ.**

8

                        **Counsel for the Defendant**
9

10                  **_ _ _ _ _ _ _ _ _**

11

08:44:00  12          **THE COURT:  Good morning.  Please be seated.**

08:46:58  13          **Okay.  So I saw the e-mails, and I'm okay with**

08:47:03  14  **the agreed upon proposal on the closing the courtroom, but**

08:47:08  15  **let's just minimize it, try to put it all together.  It**

08:47:12  16  **caught my attention like on direct and cross, that's fine,**

08:47:15  17  **but since it takes up time, let's minimize it.**

08:47:18  18          **Okay.  Then we have these tables.  So what's the**

08:47:24  19  **objection?**

08:47:29  20          **MS. DELLINGER:  Good morning, Your Honor.  Megan**

08:47:30  21  **Dellinger from Morris Nichols for the defendant.  Our**

08:47:34  22  **objection is that these tables are demonstratives.  They're**

08:47:38  23  **not evidence.  They're presenting Mr. Holzen's opinion as**

08:47:42  24  **though they were equivalent to record evidence.  And they**

08:47:47  25  **don't qualify under FRE 1006 as summary to prove the content**

08:47:54 1   because these calculations are not proving the content of

08:47:57 2   the voluminous writings.  There is nothing in the underlying

08:48:01 3   source data that talks about lost profits or reasonable

08:48:05 4   royalties.  These are transformative converting the

08:48:09 5   underlying facts into an opinion and then elevating it to

08:48:14 6   equivalent to record evidence.

08:48:16 7          THE COURT:  Okay.  How are these a summary?  It

08:48:23 8   says that it's lost profits as opposed to -- like I could

08:48:27 9   see if you said it's their revenue and we're summarizing

08:48:31 10  that in a table, but how is this a summary of the underlying

08:48:34 11  document?

08:48:34 12         MR. TUMINARO:  Because an element of our -- of

08:48:38 13  damages, the fourth factor for Panduit is the calculation of

08:48:42 14  damages.  The 15th factor for reasonable royalty is the

08:48:46 15  calculation of damages.  It's our burden to show that.  And

08:48:49 16  the calculation of damages is based --

08:48:51 17         THE COURT:  Nobody is suggesting you can't show

08:48:53 18  the jury this.  They're just -- it's a question of does it

08:48:57 19  come into evidence.

08:48:58 20         MR. TUMINARO:  That's correct, Your Honor.  And

08:49:00 21  we could not reasonably put in all of the hundreds of pages

08:49:04 22  of spreadsheets that result in the calculation.  And the

08:49:07 23  jury couldn't reasonably review all of those spreadsheets to

08:49:11 24  understand that calculation.  Since it's our burden, we

08:49:15 25  would like to put in evidence about what the calculation is.

08:49:17 1    That calculation is based on the underlying documents.  It's

08:49:20 2    not the ultimate opinion.  The ultimate opinion is what

08:49:24 3    Mr. Holzen will say on the stand, but --

08:49:27 4              THE COURT:  Is the ultimate opinion going to be

08:49:29 5    that there is 23,900 -- I can't even read it, $872,943?

08:49:37 6              MR. TUMINARO:  That's going to be the conclusion

08:49:39 7    on Factor 4 of the Panduit factors, but there are other

08:49:43 8    factors to consider and he needs to go through all of those

08:49:46 9    factors and we need to meet --

08:49:48 10             THE COURT:  I'm not understanding what evidence

08:49:50 11   is this summarizing as opposed to his opinion?

08:49:57 12             MR. TUMINARO:  It is summarizing the hundreds of

08:50:00 13   pages of spreadsheets that have the financial information.

08:50:05 14   And as U.S. v. Lynch, a Third Circuit case has said, it's

08:50:11 15   735 F appendix 780, Third Circuit, 2018, it's necessarily a

08:50:19 16   summary or a selective collection of documents.

08:50:23 17             Next Caller's counsel has had these calculations

08:50:25 18   since July 8th.  They could cross-examine Mr. Holzen on

08:50:29 19   these calculations.  But we should be -- if we can't put in

08:50:33 20   this evidence --

08:50:34 21             THE COURT:  You can put it in, no one is saying

08:50:37 22   you can't put in the evidence.  The evidence would be

08:50:41 23   Mr. Holzen, it's on the screen and Mr. Holzen says, yeah, so

08:50:45 24   for Capital One it's 2,967,522.

08:50:50 25             MR. TUMINARO:  We could not reasonably put in

any documentary evidence to support what Mr. Holzen says on the stand. It would just be Mr. Holzen's statement. Without these calculations, which are based on underlying documents, we have no way to put in evidentiary documentary evidence to support --

THE COURT: Okay. I'm going to say you can use it as a demonstrative and he can testify about the numbers because these are his opinions on lost profits rather than just simply facts on the underlying documents that are cited here. These are his opinions.

But I'll also listen to the evidence and let you know if I hear it differently.

MR. TUMINARO: So we're entitled to ask you to reconsider at the time the evidence comes in?

THE COURT: You may.

MR. TUMINARO: Thank you, Your Honor.

THE COURT: Anything else?

MR. TUMINARO: Nothing from us, Your Honor.

THE COURT: All right.

MS. DELLINGER: Your Honor, just one quick thing. It was in the e-mail this morning with respect to some testimony that Mr. Roncoroni gave yesterday. We would like to request limited redaction to some of the information.

THE COURT: You can put it in writing. I'm not

08:52:07 1    going to do it here.  And it's going to be very limited and

08:52:11 2    should have been objected to when it happened.

08:52:14 3                MS. DELLINGER:  Thank you, Your Honor.

08:52:15 4                THE COURT:  So I'll consider it.

08:52:16 5                Anything else?  Okay.  We're a few minutes

08:52:25 6    early, so let's just -- we'll start at 9 o'clock.

08:52:34 7                (A brief recess was taken.)

09:00:24 8                THE COURT:  All right.  Let's bring in the jury.

09:06:28 9                (Jury entering the courtroom at 9:06 a.m.)

09:06:54 10                THE COURT:  All right, everyone.  Good morning.

09:07:00 11   Let's pick up where we left off.

09:07:03 12                Mr. Bress.

09:07:12 13                MR. BLOCK:  Good morning, everyone.  My name is

09:07:15 14   Daniel Block.

09:07:16 15                THE COURT:  Hold on.  Good morning, Mr. Bress.

09:07:19 16   I'll just remind you you're still under oath.

09:07:24 17                THE WITNESS:  Thank you, Your Honor.

09:07:25 18                MR. BLOCK:  Good morning.  My name is Daniel

09:07:28 19   Block, attorney for TRUSTID.

09:07:30 20   BY MR. BLOCK:

09:07:30 21   Q.    Just maybe a quick recap of yesterday, Mr. Bress.  We

09:07:34 22   talked about the three patents?

09:07:35 23   A.    That's right.

09:07:36 24   Q.    And we talked a little bit about your infringement

09:07:38 25   analysis and what you did?

09:07:39 1    A.      That's right.

09:07:40 2    Q.      If we could bring back up the slide.  All right.  And

09:07:45 3    so we were talking about element 32.1 before we left off.

09:07:49 4    Could you very briefly just summarize your opinions for that

09:07:53 5    element?

09:07:54 6    A.      Right.  Here we are doing an element-by-element

09:07:57 7    analysis against VeriCall.  And this element 32.1, first it

09:08:02 8    starts off with a system for performing a forensic analysis

09:08:05 9    on calling party number information.  That's what VeriCall

09:08:08 10   does.  That's what VeriCall does.  Next it's associated with

09:08:12 11   an incoming call from a telephonic device.  What that means

09:08:15 12   is the telephonic device is yours or my phone calling the

09:08:20 13   call center and the incoming call is to the agent as I have

09:08:24 14   shown before.

09:08:24 15         Next it says before the incoming call is

09:08:26 16   answered.  What that means is there is a forensic analysis

09:08:30 17   that VeriCall does the processing before that call, that

09:08:33 18   incoming call to the agent is answered, that's the call.

09:08:38 19   The map to the claim is the incoming call to the agent.

09:08:42 20         Now we can get back to where we were.

09:08:44 21   Q.      All right.  Let's move on to the next element, 32.2.

09:08:48 22   Mr. Bress, in your opinion, does the Next Caller VeriCall

09:08:52 23   product infringe element 32.2 of claim 32 of the '532

09:08:56 24   Patent?

09:08:56 25   A.      My analysis shows that it does.

09:09:01 1    Q.      How is it that the VeriCall product infringes element

09:09:07 2    32.2?

09:09:07 3    A.      If you could bring up my demonstrative.  We saw this

09:09:11 4    before.  This is the VeriCall call system architecture.

09:09:13 5    Q.      What in this system architecture is the interface?

09:09:17 6    A.      We see in the lower part of the diagram the call

09:09:20 7    center.  We have seen it in other diagrams, that's where the

09:09:23 8    information comes in, say to the bank, the call center, for

09:09:26 9    example, and the signaling data from the call information

09:09:30 10   that SIP invite information if we remember what that was is

09:09:34 11   sent from the call center to VeriCall.  And the first piece

09:09:38 12   of software that hits is called the API gateway, application

09:09:43 13   programing interface, that's the interface.

09:09:45 14   Q.      So the interface is the API gateway?

09:09:49 15   A.      The interface of the claims is the API gateway.

09:09:51 16   Q.      And the calling party number in the diagram is what?

09:09:55 17   A.      That's the information that comes in the call center

09:09:58 18   signaling.  We talked about caller-ID or ANI, that

09:10:01 19   information in the signaling of the call and sent to

09:10:04 20   VeriCall and received at the API, the application programing

09:10:08 21   interface.

09:10:08 22   Q.      That's this diagram.  How is it that you know that

09:10:11 23   Next Caller's customers actually use this interface?

09:10:12 24   A.      Certainly the only way to use it, this is what

09:10:16 25   VeriCall is, this is their document describing how to use

09:10:19 1    it.  But for further evidence, if you can go to my next

09:10:23 2    demonstrative, we talked quite a bit before about the

09:10:27 3    testimony from each of Next Caller's customers, Dish, BBVA,

09:10:31 4    Capital One, and Comcast.  And each one of their corporate

09:10:34 5    representatives was asked to describe what they sent to

09:10:38 6    VeriCall and they confirmed that what they're sending is the

09:10:42 7    ANI which is the thing similar to caller-ID, Dish, BBVA,

09:10:46 8    Capital One, and Comcast, they all confirm that that's what

09:10:50 9    they're doing.

09:10:51 10   Q.      So what is the calling party number?

09:10:53 11   A.      Excuse me?

09:10:54 12   Q.      What is the calling party number information again,

09:10:57 13   Mr. Bress?

09:10:58 14   A.      The calling party number is the caller-ID or ANI

09:11:01 15   information.

09:11:01 16   Q.      So your opinion, Mr. Bress, does Next Caller infringe

09:11:06 17   element 32.2 of claim 32 of the '532 Patent?

09:11:10 18   A.      Yes, my analysis shows that it does.

09:11:11 19   Q.      All right.  Moving along.  Let's go to the next

09:11:14 20   element, 32.3.  In your opinion, Mr. Bress, does Next Caller

09:11:17 21   infringe element 32.3 of claim 32 of the '532 Patent?

09:11:21 22   A.      Yes, my analysis shows that element 32.3 is infringed

09:11:28 23   by VeriCall.

09:11:28 24   Q.      Let's start with the memory, it requires a memory.

09:11:32 25   Back to this diagram again.  Can you explain to the jury

09:11:35 1    what in this diagram is the memory?

09:11:37 2    A.    Sure.   There is two places where there is memory.   We

09:11:41 3    already talked about VeriCall is software and software has

09:11:43 4    code.   And the code is stored in memory.   So if we look at

09:11:46 5    the VeriCall analysis engine, that's where the code of the

09:11:50 6    software, the software system running on computers, so it's

09:11:54 7    necessarily there is memory.   In addition we talked about

09:11:57 8    the machine learning that has the models that are used to

09:12:02 9    compare incoming data.   That also is memory.   That's shown

09:12:06 10   as the element.   It's a like a cylinder, the element S3 on

09:12:10 11   the diagram.

09:12:11 12   Q.    That's the memory, but the claim goes on to say that

09:12:14 13   the memory needs to store a plurality of expected call

09:12:18 14   patterns.

09:12:18 15          Let's start with that word "plurality," do you

09:12:21 16   know what that means?

09:12:21 17   A.    Plurality means more than one.

09:12:25 18   Q.    All right.   Two or more.   If we could, it goes on to

09:12:31 19   say that the memory has to store these plurality of expected

09:12:34 20   call patterns.   What in VeriCall are the expected call

09:12:38 21   patterns?

09:12:39 22   A.    I think if you go to my next demonstrative.   There

09:12:42 23   are two places, two ways that VeriCall has expected call

09:12:46 24   patterns.   If you look at the software, if you review the

09:12:52 25   source code, it has rules.   And what rules mean is it takes

09:12:55 1   that incoming data from the call signal and it compares it

09:12:58 2   against what is expected and those are the expected call

09:13:01 3   patterns.  For example, if one of the pieces of data that

09:13:04 4   comes in on a call, it describes the type of line that the

09:13:09 5   call that's coming in came from.  And in the rules it would

09:13:13 6   have the whole set of patterns to match against that, for

09:13:16 7   example, the type of line could be a landline, could be a

09:13:20 8   cell line, could be a line from a prison, could be a line

09:13:22 9   from a hotel, all of those -- you know, voiceover IP line,

09:13:28 10  all of those are expected call patterns that are matched to

09:13:31 11  the incoming, one incoming line it came from.  So that's the

09:13:34 12  one way that there is expected call patterns in VeriCall.

09:13:38 13  Q.    What about the other way?

09:13:39 14  A.    So the other way is, we talked quite a bit or I have

09:13:45 15  talked quite a bit about the machine learning models that

09:13:48 16  are in VeriCall.  And the way that works is the models are

09:13:52 17  seated, they're basically tuned with data that comes in from

09:13:55 18  thousands of calls that have previously been made and the

09:13:59 19  information from those calls is put into these models, for

09:14:02 20  example, there can be a carrier type, a line type, say a

09:14:08 21  trunk type, these are all information that's about a call.

09:14:11 22  And they would be put in a pattern that would represent say,

09:14:16 23  for example, a valid call.

09:14:17 24           When that information comes in from the line on

09:14:20 25  the call we're analyzing, the system is analyzing, it's

09:14:23 1    compared to those patterns and if -- if it compares

09:14:29 2    favorably, it would be considered valid, but if not it would

09:14:33 3    be invalid.  That's the other place that VeriCall has

09:14:36 4    expected call patterns.

09:14:37 5    Q.    Let's dig into this a little more.  In terms of the

09:14:40 6    rules, how is it they know the rules are the expected call

09:14:44 7    patterns on the claim?

09:14:45 8    A.    If could go to my next demonstrative.  Mr. Williams

09:14:48 9    was the former vice-president of engineering at Next Caller

09:14:51 10   and he had his deposition taken.  He is a corporate

09:14:54 11   representative from Next Caller and he was explaining about

09:14:56 12   how the rules operate.  And the example he was giving is

09:14:59 13   something called an ANI II rule.  An ANI II rule is what I

09:15:04 14   just mentioned before is about the line type.  So what type

09:15:07 15   of line was used to make this incoming call and then in the

09:15:10 16   code they have all the different line types, the expected

09:15:13 17   call patterns to match up against.  That's an example of an

09:15:18 18   expected call pattern.

09:15:19 19   Q.    You heard this testimony yesterday from Mr. Williams?

09:15:21 20   A.    That's right, we did.

09:15:22 21   Q.    All right.  That's the rules.

09:15:24 22          Let's move on to the second as packet of machine

09:15:27 23   learning.  How is it that you know that is expected call

09:15:30 24   patterns?

09:15:31 25   A.    Again, from Mr. Williams -- from one source code, but

09:15:36 1 here we're seeing the testimony from Mr. Williams and we

09:15:39 2 heard it yesterday, he was describing exactly how the

09:15:42 3 machine learning works.  It takes in this call data, creates

09:15:46 4 this pattern of expected data that we would expect from a

09:15:50 5 good call, for example, and then compares with what's coming

09:15:52 6 in.  And the example he gave was called the carrier DN model

09:15:57 7 which in that model has the switch, the trunk and the line

09:16:00 8 type.

09:16:00 9 Q.    You mentioned your review of the source code.  Did

09:16:04 10 that also confirm your opinion with respect to this element?

09:16:06 11 A.    Yes, it's consistent with what Mr. Williams testified

09:16:09 12 to.

09:16:10 13 Q.    All right.  Mr. Bress, in your opinion, does VeriCall

09:16:12 14 infringe element 32.3?

09:16:14 15 A.    Yes, my analysis shows it does.

09:16:19 16 Q.    All right.  Keep moving on.  Next, element 32.4.  In

09:16:23 17 your opinion, Mr. Bress, does VeriCall directly infringe

09:16:26 18 element 32.4 of claim 32 of the '532 Patent?

09:16:29 19 A.    My analysis shows it does.

09:16:32 20 Q.    Why is it that VeriCall infringes this element?

09:16:35 21 A.    We've already said software product, it runs on

09:16:38 22 computers and computers necessarily have processors.

09:16:41 23 Q.    What computers does VeriCall run on?

09:16:42 24 A.    If you can, I think I have a demonstrative for this.

09:16:47 25 Q.    Before we get there, Mr. Bress, what computers does

09:16:50 1    it run on?

09:16:51 2    A.    So it runs on the computers that they are hosted at

09:16:55 3    the AWS.

09:16:56 4    Q.    What is AWS?

09:16:58 5    A.    AWS is the Amazon hosted site where basically it

09:17:04 6    provides processors to software that runs what they would

09:17:07 7    say, sometimes referred to as in the cloud.

09:17:10 8    Q.    Does Next Caller pay for the access to the Amazon

09:17:16 9    servers?

09:17:16 10    A.    Absolutely, they pay for it.  Their software runs on

09:17:20 11    it and the software controls the whole system.

09:17:22 12    Q.    Does Next Caller configure Amazon web servers to run

09:17:26 13    the VeriCall product?

09:17:29 14    A.    All of the softwares run product and all of the

09:17:31 15    softwares is VeriCall.  In fact, when the call comes in,

09:17:34 16    this API call, actually the way it turns, it spins up a

09:17:39 17    processor, it's not even running until that call comes in,

09:17:42 18    it spins up the code it runs it and then returns a score.

09:17:45 19    Q.    Just to confirm, Mr. Bress, does Next Caller

09:17:48 20    configure the Amazon web services to run the VeriCall

09:17:51 21    software?

09:17:52 22    A.    Yes.

09:17:52 23    Q.    And does Next Caller have a contract with Amazon to

09:17:52 24    do that?

09:17:52 25    A.    I understand they do.

09:18:01 1    Q.      And when Next Caller sells access to their system,

09:18:05 2    they're selling access to their system running on Amazon?

09:18:08 3    A.      That's right.

09:18:09 4    Q.      All right.  You mentioned a demonstrative.  What are

09:18:14 5    you trying to show here?

09:18:15 6    A.      Well, again, so this is the VeriCall system

09:18:19 7    architecture.  It's running on the Amazon servers that we

09:18:23 8    had discussed.  So the processor required by the claims are

09:18:27 9    those processors.

09:18:28 10   Q.      So your opinion, Mr. Bress, does the Next Caller

09:18:32 11   infringe directly element 32.4 of claim 32 of the '532

09:18:37 12   Patent?

09:18:37 13   A.      Yes, my analysis shows it does.

09:18:40 14   Q.      All right.  Moving to the next element, 32.5.  Does

09:18:47 15   Next Caller directly infringe element 32.5?

09:18:50 16   A.      My analysis shows it does.

09:18:52 17   Q.      All right.  It says gather operational status

09:18:55 18   information associated with the calling party number

09:18:57 19   information.  Maybe we start with that first part.  What is

09:19:02 20   operational status information mean?

09:19:04 21   A.      Well, that's another one of those cases where the

09:19:07 22   Court has a court ordered definition.  So it's called a

09:19:10 23   claim construction, ordered by the Court that when

09:19:12 24   interpreting these claim terms that when I see the --

09:19:16 25   anybody doing an analysis sees the operational status

09:19:19 1    information term, that it's to be interpreted as

09:19:23 2    characteristics about the functional state.

09:19:28 3    Q.      How is it that the VeriCall product gathered

09:19:33 4    characteristics about the functional state?

09:19:36 5    A.      If you could go to my next demonstrative, please.

09:19:38 6            So there is two ways that operational status

09:19:42 7    information, characteristics about the functional state is

09:19:45 8    gathered by VeriCall.  The first is, I have already

09:19:49 9    mentioned several times about this SIP invite message.

09:19:52 10   Remember what that is?  When you place a phone call all the

09:19:55 11   information about the call you're making travels through the

09:19:58 12   network and is received at the call center and then that

09:20:01 13   information is transmitted to VeriCall to do its analysis.

09:20:06 14   That information when it's extracted from that SIP invite

09:20:09 15   and put into data structures of the software, that is

09:20:13 16   operational status information.  That information, because

09:20:17 17   it's part of the call, is necessary characteristics about

09:20:19 18   the functional state associated with that calling party

09:20:22 19   number.

09:20:23 20   Q.      And you have two ways, what's the second way?

09:20:28 21   A.      The second way is that within the processing of

09:20:32 22   VeriCall once it's got this information from the call

09:20:36 23   signaling it's received, it has the caller-ID or the ANI, it

09:20:41 24   does a check, what they call a database, the way it's

09:20:45 25   described in the industry into an external database with

09:20:49 1    this caller-ID ANI to extract information, receive

09:20:53 2    information from that database that provides characteristics

09:20:56 3    about the functional state of that number that was sent to

09:20:59 4    the database.

09:20:59 5    Q.    Let's dig into that a little bit.  Can you explain to

09:21:03 6    the jury what this demonstrative is showing?

09:21:05 7    A.    Sure.  I mentioned several times about the SIP invite

09:21:08 8    message.  This is a blown up view of what some of this looks

09:21:12 9    like.  This is the type of work I do in analyzing call

09:21:17 10   signaling and analyzing systems that do this.  This is very

09:21:20 11   familiar to me.  What I have highlighted is two pieces of

09:21:24 12   information that's carried in this signaling and one of

09:21:27 13   them, I'll say what it means, it's called ORG, the

09:21:31 14   originating switch.  And what that -- the information that's

09:21:35 15   carried in that signaling is informing which switch, which

09:21:39 16   telephone switch did this call come from.  So if I made a

09:21:42 17   phone call and it went to the switch connected to my phone,

09:21:46 18   that would be the originating switch, and that's in the

09:21:49 19   information.

09:21:49 20          And the second one I have highlighted is the

09:21:51 21   carrier ID.  So the carrier, for example, would be the

09:21:54 22   service provider that I say, you or I would have our

09:21:58 23   telephone service from, and they have an ID.  And that's

09:22:01 24   also carried in the call signaling.

09:22:02 25   Q.    All right.  That's the SIP invite and that's

09:22:07 1    operational status information.  I think you mentioned

09:22:10 2    something about a database DIP.  How is that data business

09:22:15 3    DIP status information?

09:22:16 4    A.    We can go to my next demonstrative.

09:22:18 5          This is, again, Mr. Williams, we heard his

09:22:21 6    testimony yesterday about this.  He described it that they

09:22:23 7    use the ANI, the caller-ID to perform a lookup into a

09:22:26 8    database called TNS.  From there they receive the line type

09:22:30 9    of the call.  Another example from the TNS database is

09:22:35 10   whether a number has been recently ported.  What does that

09:22:40 11   mean?  If you had your cell service with AT&T and then you

09:22:44 12   decided to switch to another carrier, say T-Mobile, but you

09:22:47 13   want to keep your number, that's called porting the number.

09:22:50 14   You get to keep your number because the phone companies can

09:22:53 15   port your number.  And that's information about that number,

09:22:56 16   that caller-ID that you have actually recently ported.

09:22:59 17   Q.    All right.  Getting back to the element here it says

09:23:02 18   the operational status information is associated with the

09:23:04 19   calling party number information.  Why is this operational

09:23:08 20   status information associated with the calling party number

09:23:11 21   information?

09:23:11 22   A.    For the TNS database, certainly the line type that

09:23:15 23   you are making from the phone is associated with your

09:23:18 24   calling party number which is your caller-ID,

09:23:21 25   characteristics of the functional state of that number.  And

09:23:24 1 likewise for what I just mentioned, whether your number was

09:23:28 2 just ported from one carrier to another, that's the

09:23:32 3 characteristic about the functional state of that number.

09:23:34 4 Q.    Mr. Bress, in your opinion, does Next Caller directly

09:23:37 5 infringe element 32.5 of claim 32 of the '532 Patent?

09:23:41 6 A.    My analysis shows it does.

09:23:44 7 Q.    All right.  The last one.  Element 32.6.  Mr. Bress,

09:23:51 8 in your opinion, does the Next Caller VeriCall product

09:23:55 9 directly infringe element 32.6?

09:23:57 10 A.    Yes.

09:23:59 11 Q.    Okay.  Let's start with, it says that it has to

09:24:02 12 assign a source origin confidence metric.  Can you explain

09:24:07 13 to the jury what source origin confidence metric means?

09:24:10 14 A.    We haven't seen that term yet.  And that's another

09:24:13 15 one of the Court's claim construction.  Again, the Court has

09:24:15 16 an order for a definition of this source, source origin

09:24:19 17 confident metric.  And the Court's order is more informative

09:24:23 18 to understand what this is, a number in a range that

09:24:28 19 represents the credibility of the calling party number or

09:24:31 20 the calling party billing number.  We talked about what

09:24:34 21 VeriCall does, it returns a score, a risk score, that's what

09:24:37 22 this is.

09:24:37 23 Q.    How is it that VeriCall assigns a source origin

09:24:41 24 confident metric using the operational status information in

09:24:44 25 the expected call pattern?

09:24:45 1    A.       If you can go to my next demonstrative, please, I

09:24:49 2    have shown this before.  This is Next Caller's document.  I

09:24:52 3    refer to it as the API document.  It's a document they

09:24:55 4    provide to their customers to inform them of how to send

09:24:58 5    data to VeriCall to get the analysis.  And why are customers

09:25:02 6    doing this?  Why are they sending their call information to

09:25:06 7    VeriCall?  They want the risk score.  They want to know

09:25:08 8    what's the risk, what's the credibility of this caller-ID

09:25:11 9    information that they sent.  And that's what Next Caller's

09:25:14 10   document is showing is what they get in return is a

09:25:18 11   numerical score from 0 to 100 indicating how much risks is

09:25:22 12   associated with the caller with caller-ID.

09:25:24 13   Q.       Why is VeriCall, is that risk score assigned using

09:25:28 14   operational status information in an expected call pattern?

09:25:31 15   A.       I have already gone through that.  The system gathers

09:25:34 16   an operational status information from that SIP invite, does

09:25:37 17   it from the external databases, that's about the call and

09:25:40 18   then the expected call pattern is the code that executes the

09:25:44 19   rules to compare it to, it's compared to the models, the

09:25:47 20   expected call pattern in machine learning, all of that is

09:25:51 21   put into an algorithm that then generates the risk score and

09:25:55 22   it's sent back and that's the whole point of the system.

09:25:58 23   Q.       All right.  This is their API document.  How is it

09:26:01 24   that you know that Next Caller's customers actually get this

09:26:02 25   score?

09:26:04 1    A.      Of course the API document defines how the system

09:26:07 2    works, but for more information, for more evidence you can

09:26:11 3    go to my next demonstrative.

09:26:14 4              Again, what we heard yesterday from the

09:26:16 5    testimony from Next Caller's customers, the corporate

09:26:19 6    representative, Dish, BBVA, Comcast and Capital One, each

09:26:24 7    one confirms that's why they're using VeriCall, that's what

09:26:27 8    they get back, what they get out of it is they get the

09:26:30 9    score.

09:26:32 10   Q.      Okay.  So your opinion, Mr. Bress, does the Next

09:26:35 11   Caller VeriCall product directly infringe element 32.6 of

09:26:38 12   claim 32 of the '532 Patent?

09:26:40 13   A.      Yes, my analysis shows it does.

09:26:45 14   Q.      Okay.  So we have all of them checked.  In your

09:26:48 15   opinion, Mr. Bress, does Next Caller directly infringe claim

09:26:51 16   32 of the '532 Patent?

09:26:52 17   A.      Right.  So we just finished the analysis.  Remember

09:26:56 18   element-by-element analysis comparing against the accused

09:26:59 19   product which is VeriCall, went through it and demonstrated

09:27:02 20   that each and every element is infringed by VeriCall, each

09:27:06 21   and every element is infringed, that means that VeriCall is

09:27:08 22   infringing the claim.

09:27:12 23   Q.      Okay.  Were you here -- I think we talked yesterday

09:27:15 24   that you listened to the opening by Next Caller's counsel?

09:27:18 25   A.      Yes, I did.

09:27:19 1  Q.      Do you understand whether or not Next Caller disputes

09:27:22 2  any of your analysis with respect to claim 32?

09:27:24 3  A.      I understand they do.

09:27:26 4  Q.      What is it that Next Caller disputes as you

09:27:29 5  understand it?

09:27:29 6  A.      We heard a lot about this.  We're in the third day,

09:27:33 7  right, about the answering a call.  The dispute is over --

09:27:38 8  quite a bit of dispute in this case in general is about the

09:27:42 9  timing of answering a call relative to when VeriCall is

09:27:44 10 called.  That's it in a nutshell.

09:27:48 11 Q.      What is it that you understand Next Caller is

09:27:50 12 contending?

09:27:50 13 A.      So what I understand is that Next Caller is saying

09:27:53 14 that because an IVR answers a call, answers a call coming

09:28:00 15 in, that therefore they don't infringe.

09:28:03 16 Q.      Why is that?

09:28:05 17 A.      Well, they're saying that the IVR is answering the

09:28:10 18 call before the VeriCall call has been made.

09:28:14 19 Q.      Do you agree with that?

09:28:15 20 A.      No.  No, I don't.

09:28:17 21 Q.      Why not?

09:28:18 22 A.      I have got several reasons.

09:28:20 23 Q.      Okay.  What is this demonstrative showing?

09:28:23 24 A.      This is showing my several reasons.  I have got four

09:28:26 25 reasons of why the -- before the call -- calling it before

09:28:30 1    the call is answered dispute.  And I can walk through what

09:28:33 2    my reasons are.

09:28:34 3    Q.    Okay.  Let's go with that first reason.  Can you

09:28:37 4    explain to the jury what you mean by that?

09:28:39 5    A.    I think we have all been inundated by this.  I'll

09:28:43 6    show it again as quickly as possible, that Next Caller

09:28:45 7    advertises their system as being a pre-answer solution.  And

09:28:49 8    they clearly, I don't think anybody is denying that it's

09:28:53 9    before the agent answers the call.  So we can go to the next

09:28:56 10   demonstrative.  Each one, this is all Next Caller describing

09:29:00 11   this, representing VeriCall to their customers, and they're

09:29:05 12   saying it can be used ahead of the call before it is

09:29:08 13   answered.

09:29:08 14   Q.    That's JTX-102?

09:29:13 15   A.    That's right.

09:29:13 16   Q.    What does this one show?

09:29:16 17   A.    PTX-109, this is Next Caller, BBVA, again, before the

09:29:21 18   call is answered.

09:29:24 19         JTX-027, these are evidence numbers, that the

09:29:28 20   calls are flagged pre-answer.

09:29:34 21         PTX-270, API response, that means during first

09:29:41 22   ring, that means before it's answered.

09:29:42 23   Q.    Why is it before it's answered?

09:29:45 24   A.    The process is the incoming call, it rings, and then

09:29:48 25   you answer.

09:29:49 1  Q.    Let's get back to the reasons here again.  Reason

09:29:52 2  number two, can you explain to the jury what you mean there?

09:29:56 3  A.    Sure.  You can go to my next demonstrative.

09:30:00 4        What this means is that VeriCall really is

09:30:03 5  designed, it's an API call, you can send the information to

09:30:08 6  it any time and get the score back any time.  Really it's

09:30:11 7  not designed around any timing of a call.  And Mr. Williams,

09:30:14 8  former vice-president of engineering at Next Caller,

09:30:16 9  confirms that during his deposition testimony.  He was

09:30:19 10 talking about when it can be called, he said it can be

09:30:22 11 pre-answer analysis, really during his deposition he

09:30:25 12 confirmed that it can be called at any time.  It has the

09:30:29 13 capability to be called at any time.

09:30:32 14 Q.    Your next reason here, can you explain to the jury

09:30:35 15 what you mean here in reason number three on this

09:30:37 16 demonstrative?

09:30:38 17 A.    Sure.  If you can go to the next demonstrative.

09:30:41 18 Again, we have Dish's network diagram.  This is a call -- we

09:30:46 19 call it a call flow diagram slowing all the elements of

09:30:50 20 Dish's network and how they integrate with VeriCall.  The

09:30:53 21 steps, the call processing steps are numbered.  And this

09:30:56 22 confirms that in the case of Dish's network, actually, that

09:31:02 23 the IVR actually answers a call after the VeriCall analysis

09:31:08 24 is done.  Exactly what the claims require.

09:31:12 25 Q.    All right.  How is it -- so how is it that it

Bress - direct

09:31:16 1   confirmed that the analysis is done before the IVR answers

09:31:19 2   the call?

09:31:20 3   A.      Well, just as we stepped through before, I showed

09:31:25 4   yesterday how the person, you start a call, step 1 with the

09:31:29 5   phone, the VeriCall analysis is done, and then an incoming

09:31:33 6   call comes to the agent, but now the argument or dispute is

09:31:38 7   somehow the IVR is an issue.  In this case for Dish, the

09:31:43 8   IVR, an incoming call to the IVR occurs after the call to

09:31:49 9   VeriCall is made.  The information is sent from the call

09:31:54 10  center to VeriCall.

09:31:55 11  Q.      I want to walk the jury through how this diagram

09:31:59 12  shows that.  What is happening here in step 8?

09:32:03 13  A.      Let me step back real quick.  Step 1 is where you

09:32:07 14  make the call from your phone and go to the call center.

09:32:10 15  Step 7 is when the call center sends the information to

09:32:14 16  VeriCall.  We're jumping to step 8.  This is where VeriCall

09:32:17 17  returns the score.

09:32:18 18  Q.      In step 8, has VeriCall completed its forensic

09:32:21 19  analysis?

09:32:21 20  A.      That's right, it sent the score back to the call

09:32:24 21  center.

09:32:24 22  Q.      What system are you going to hear Welcome to Dish,

09:32:27 23  that talking to the machine?

09:32:28 24  A.      That's the IVR, interactive voice response system.

09:32:31 25  Q.      When is that?

09:32:33 1    A.    That's over on step 13 and 14.

09:32:36 2    Q.    I don't know what happened there.  That's a new one.

09:32:46 3          All right.  Let's get back to step 13 and 14,

09:32:50 4    Mr. Bress.  Can you explain to the jury again what step 13

09:32:55 5    and 14 is showing?

09:32:56 6    A.    Sure.  So we talked about step 8 is where VeriCall

09:33:00 7    has returned the score back to the call center.  They're

09:33:04 8    steps of the call processing, the call manager that I

09:33:07 9    mentioned, the box that it's coming through, eventually we

09:33:11 10   get to step 13 and 14 which is where the IVR would then

09:33:14 11   answer the call and give the greeting, for example.

09:33:16 12   Q.    So Next Caller's contention is that they perform

09:33:19 13   their analysis always after the IVR answers the call.  Would

09:33:22 14   you agree with that?

09:33:23 15   A.    Well, certainly not.  That's what this diagram is

09:33:26 16   showing for Dish, that's not the case.  For Dish the

09:33:29 17   analysis is done before the IVR would answer a call.

09:33:32 18   Q.    So in the Dish implementation, the forensic analysis

09:33:36 19   occurs even before the IVR answers the call?

09:33:39 20   A.    Right.  Again, from my analysis, it doesn't really

09:33:42 21   matter because the call I'm pointing to for the claims is

09:33:45 22   the incoming call to the agent.  But to be exactly -- put it

09:33:50 23   all out on the table this is exactly what happens with the

09:33:52 24   IVR.

09:33:54 25   Q.    All right.  Do you understand whether or not Next

09:33:57 1    Caller, Dr. Brody disputes where you say the IVR answers the

09:34:01 2    call here?

09:34:02 3    A.    Yes.  I understand Dr. Brody does have -- he said

09:34:09 4    something in his report about a CVP call server answering

09:34:14 5    the call before the VeriCall.

09:34:16 6    Q.    What do you understand Dr. Brody to have said?

09:34:19 7    A.    He is saying that before -- basically before the call

09:34:23 8    to VeriCall is made, the analysis is done by VeriCall, that

09:34:27 9    a CVP call server is answering the call.

09:34:31 10   Q.    Do you agree with that?

09:34:33 11   A.    No.

09:34:34 12   Q.    Why not?

09:34:34 13   A.    Well, the diagram shows it.

09:34:36 14   Q.    How does the diagram show that?

09:34:38 15   A.    First of all, Mr. Telman who is the corporate rep for

09:34:42 16   Dish, during the deposition walked through this diagram and

09:34:45 17   never mentioned anything about a CVP call server answering a

09:34:49 18   call.  It's in the diagram.

09:34:50 19         Secondly, this is a call flow diagram that I'm

09:34:52 20   familiar with and understand what it means to go through

09:34:52 21   these steps and understand what all those lines mean.

09:34:58 22   Q.    What do you mean by all those lines?

09:35:00 23   A.    So if you remember yesterday I talked about the

09:35:02 24   legend and the legend is over there on the bottom right.

09:35:07 25   And we can see that when there is signaling, this isn't a

Bress - direct

09:35:11 1   call yet, these are signals that go between all of the

09:35:14 2   servers and elements in the network, those are shown as

09:35:17 3   dashed lines.  And there is different types of signaling,

09:35:21 4   signaling, HTTP traffic, ICM signaling, those are all

09:35:26 5   signals.  What is the point of all this?  The point is to

09:35:30 6   set up voice call.  And when you have voice, what's shown on

09:35:32 7   a call flow diagram are the solid lines, and that's what RTP

09:35:37 8   stream means.  That's the way that the voice is carried in a

09:35:40 9   voiceover IP call, it's called the RTP stream.  Hopefully

09:35:45 10  the diagram is clear enough to see where there is dashed

09:35:49 11  lines and where there is solid lines.

09:35:51 12  Q.      Are there any solid lines going into the CVP server?

09:35:55 13  A.      No, there is only signaling going to the CVP server,

09:35:59 14  there is no dashed lines.  If the contention is that the CVP

09:36:01 15  call server is answering a call, when a call is answered

09:36:06 16  necessarily for it to be a call, then there is voice

09:36:09 17  communication, RTP stream, solid line.  There is no RTP

09:36:14 18  stream, there is no solid lines going to the CVP call

09:36:17 19  server.  So this is necessarily wrong to say that it's

09:36:20 20  answering a call.

09:36:20 21  Q.      So again, Mr. Bress, the CVP call server answers

09:36:25 22  calls?

09:36:25 23  A.      No, it cannot.

09:36:26 24  Q.      Why is that?

09:36:27 25  A.      As you can see in the diagram, there is no voice

09:36:30 1    connection to the CVP call server, so there was no call

09:36:36 2    answered.

09:36:36 3    Q.      Let's go to that last reason.  Next Caller ignores

09:36:40 4    the claim language.  What do you mean by that?

09:36:42 5    A.      This is probably the most important one.  You heard a

09:36:45 6    lot of dispute, a lot about call answered and all that.

09:36:48 7    This is really the understanding of probably why there is a

09:36:51 8    misunderstanding.  Let's not miss this.

09:36:53 9           If you go to the next slide.  I talked about the

09:36:56 10   Court's claim construction, the importance of using that,

09:36:59 11   making sure the definitions that are provided by the Court

09:37:03 12   are used when doing an infringement analysis.  And it's

09:37:06 13   especially important here for this part of this claim 32

09:37:09 14   because this is the heart of the claim, it's the heart of

09:37:11 15   the dispute.  And so the Court's claim construction for call

09:37:16 16   is any connection.  And you got to really look at the

09:37:20 17   language here to understand -- remember back on Monday, we

09:37:23 18   had the distinguished gentleman who runs the Patent Office

09:37:27 19   who is describing the claims of a patent to define the

09:37:32 20   boundaries of the invention.  You couldn't see that better,

09:37:35 21   it doesn't come to life better than the words right here,

09:37:38 22   where the claim requires that performing a forensic analysis

09:37:41 23   on calling party number information associated with an

09:37:44 24   incoming call, which means any connection.

09:37:46 25           And I showed this earlier where for infringement

09:37:50 1    analysis you just need to find that the product practices

09:37:54 2    it.  It can do other things, but if it's practicing the

09:37:58 3    claims, it infringes.  I showed, hopefully very clearly,

09:38:02 4    that in these systems, there is an incoming call to an

09:38:06 5    agent, it's a -- it's definitely associated with the calling

09:38:10 6    party number, it's a call from the caller.  And then later,

09:38:13 7    after the forensic analysis has been done after the -- that

09:38:18 8    call, the call is answered, that's where the confusion comes

09:38:21 9    in because it says an incoming call, and then the call is

09:38:25 10   answered, it has to be pointing to the same call.

09:38:28 11          And I think it's very simple, it's very

09:38:30 12   straightforward.  I'm not sure why there is so much

09:38:33 13   confusion on this, but this is the heart of the dispute.

09:38:36 14   And it's very straightforward.  An incoming call to an agent

09:38:39 15   is answered after the VeriCall, the VeriCall analysis is

09:38:42 16   done.

09:38:43 17   Q.    You mentioned the word "incoming" quite a bit.  How

09:38:46 18   does that support your analysis?

09:38:47 19   A.    I think sometimes when we talk about the claim

09:38:51 20   language has been ignored or misunderstood, it's an incoming

09:38:55 21   call, so I think we'll see later in this week that some

09:38:58 22   would like to equate it with an outgoing call, and they're

09:39:02 23   related, for sure, but the claim language is very clear,

09:39:05 24   that's why I brought up the gentleman that runs the Patent

09:39:10 25   Office describing the boundaries of a claim.

09:39:13 1          The claim --

09:39:13 2                MS. COLUMBIA:  Your Honor, I object.

09:39:15 3                THE COURT:  Hold on.

09:39:16 4                MS. COLUMBIA:  I object to this witness

09:39:18 5     parroting Judge Fogel in the patent video.

09:39:22 6                THE COURT:  He's not an expert in patents.  He

09:39:25 7     doesn't need to do this.  It's sustained.

09:39:29 8                MR. BLOCK:  All right, Mr. Bress, we'll move on.

09:39:33 9     BY MR. BLOCK:

09:39:33 10    Q.    Let's move on to the next claim, claim 38.

09:39:36 11    A.    Okay.

09:39:37 12    Q.    Is claim 38 an asserted claim?

09:39:42 13    A.    Yes, it is.

09:39:43 14    Q.    And are you sure about that, Mr. Bress?

09:39:49 15    A.    No, thank you, actually it's not.  The claims are

09:39:51 16    asserted from the '532 Patent, claim 32, claim 48, and claim

09:39:55 17    50.  The reason that I need to step through it is that this

09:39:59 18    is what is called a dependent claim.  So a dependent claim

09:40:03 19    is just like here, it will say the system of claim 38 and

09:40:07 20    then an additional limitation.  And the reason we know it's

09:40:10 21    not asserted, I am going to analyze it here is that the next

09:40:14 22    claim we'll look at, claim 48 depends on claim 38, so 48

09:40:17 23    depends on 38 depends on 32.  That's the way claims are

09:40:22 24    written.

09:40:22 25    Q.    All right.  So does Next Caller directly infringe

09:40:26 1   claim 32?

09:40:27 2   A.     Yes.  So claim 38, it requires everything of claim

09:40:32 3   32.  I have just shown that that's infringed by VeriCall and

09:40:35 4   then requires an additional element wherein the calling

09:40:38 5   party information that's in claim 32, includes calling party

09:40:43 6   number.

09:40:43 7   Q.     How is it that Next Caller infringes claim 38?

09:40:46 8   A.     Well, that's what we have been talking all along, the

09:40:50 9   calling party number information is calling, part of it is

09:40:53 10  calling party number and that's what I'm showing here in

09:40:55 11  this demonstrative is that the ANI, the caller-ID that's

09:41:00 12  required in this NextCaller API that's calling.

09:41:05 13  Q.     In your opinion, Mr. Bress, does Next Caller directly

09:41:08 14  infringe claim 38?

09:41:10 15  A.     Yes, it does.

09:41:14 16  Q.     Let's move on to the next claim, claim 48, you

09:41:18 17  mentioned earlier.  Does Next Caller directly infringe claim

09:41:21 18  48?

09:41:21 19  A.     Yes, claim 48 is another dependent claim and just

09:41:24 20  showed that claim 38 is infringed, so claim 48, it depends

09:41:30 21  on claim 38.  And then in addition the source origin

09:41:34 22  confident metric, that number arranged, the risk score, the

09:41:38 23  requirement is that it indicates validity, there is a static

09:41:44 24  of predetermined indicators.

09:41:47 25  Q.     Can you explain to the jury what a validity indicator

09:41:50 1    is?

09:41:50 2    A.    Sure.    What comes back, we already talked about the

09:41:53 3    risk source, the source origin confident metric, that's a

09:41:57 4    number of confident range, the zero to 100.    It can be

09:42:01 5    indicated other ways, that's why it's saying a validity

09:42:04 6    indicator, static set, what that means is if you -- for

09:42:09 7    example, if you categorize the numbers from zero to a

09:42:12 8    hundred to say 0 to 49 would be okay, low risk, and 50 to 80

09:42:18 9    would be medium risk and above 80 would be high risk.

09:42:22 10            You can go to my next demonstrative.    I believe

09:42:24 11   I have it.    This is the information exactly how Next Caller

09:42:27 12   described it in their API document, they provide information

09:42:32 13   of what the risk score indicates.    So indications of a

09:42:35 14   static set, that's what the green, yellow and red

09:42:40 15   categorized by the numbers of the risk score, that's what

09:42:43 16   this number is.

09:42:44 17   Q.    In your opinion, Mr. Bress, does Next Caller directly

09:42:47 18   infringe claim 48 of the '532 Patent?

09:42:49 19   A.    Yes, it does.

09:42:52 20   Q.    Let's move on to the next claim, claim 50.    Does Next

09:42:52 21   Caller directly infringe claim 50 of the '532 Patent?

09:43:01 22   A.    Yes, my analysis shows it does.

09:43:04 23   Q.    Can you explain to the jury what claim 50 requires?

09:43:07 24   A.    Again, this is another dependent claim.    Claim 50

09:43:11 25   requires everything of claim 38.    We already showed that's

09:43:13 1  infringed.  And it also required that the processor is

09:43:16 2  configured to adjust the source origin confident metric

09:43:20 3  based on personal risk factors.  These are the words that

09:43:24 4  are important.  Personal risk factors of an entity

09:43:26 5  associated with the calling party number.  So just the

09:43:29 6  source origin confident metric based on the personal risk

09:43:33 7  factors of an entity.

09:43:34 8  Q.      What do personal risk factors of an entity mean?

09:43:40 9  A.      If you can go to my next demonstrative, I can show an

09:43:42 10  example.

09:43:42 11          What I mentioned yesterday was to interpret

09:43:45 12  claims, one of the first places that I would go to, that

09:43:48 13  anyone should go to is the specification of the patent

09:43:51 14  explaining what the invention is.  And the patent in this

09:43:54 15  case has some very good information about what's meant by a

09:43:58 16  personal risk factor.  It's describing in the patent that

09:44:02 17  the source origin confident metric can be adjusted based on

09:44:07 18  the fact that a telephone call could be coming in from a

09:44:10 19  voice telephone.  A VoIP telephone would be a personal risk

09:44:14 20  factor indicating a higher risk that the caller-ID is not

09:44:17 21  valid, that's an example in the patent.

09:44:20 22  Q.      How is it that VeriCall is s configured to adjust the

09:44:24 23  source origin confident metric based on personal risk

09:44:27 24  factors of an entity?

09:44:29 25  A.      If you can go to my next demonstrative, please.

09:44:32 1    Again, back to Mr. Williams' testimony, former

09:44:35 2    vice-president of engineering.  In his deposition he was

09:44:38 3    describing just that, there is a -- we talked about

09:44:41 4    caller-ID spoofing.  And there is actually services out

09:44:45 5    there, you can go on the internet right now and go to Bluff

09:44:49 6    My Call and plug in the phone number you want to call and

09:44:51 7    put in whatever number you want to show up on the caller-ID,

09:44:55 8    that's a spoof call.  It's available for anybody.  It's part

09:44:58 9    of the problem this invention is out there to solve.

09:45:01 10            The personal risk factor is the entity, the

09:45:05 11   personal risk factor is Bluff My Call, it's that service,

09:45:09 12   and it's associated with the calling party number because

09:45:11 13   that's what you do, you put the calling party number in.

09:45:14 14   And it's personal because the person doing it went into the

09:45:17 15   Bluff My Call website and made this call happen.

09:45:21 16   Q.    All right.  Mr. Bress, does Next Caller's VeriCall

09:45:24 17   product directly infringe claim 50 of the '532 Patent?

09:45:27 18   A.    My analysis shows it does.

09:45:30 19   Q.    I think we're at the end here of all the claims of

09:45:32 20   the '532 Patent.

09:45:33 21   A.    All right.

09:45:34 22   Q.    Mr. Bress, in your opinion, does Next Caller's

09:45:37 23   VeriCall product directly infringe claims 32, 48 and 50 of

09:45:40 24   the '532 Patent?

09:45:41 25   A.    Yes, my analysis shows that all three claims are

09:45:44 1    infringed.

09:45:47 2    Q.      Let's move on to the next patent.  '985 Patent.

09:45:54 3    Mr. Bress, just to remind the jury, what are the asserted

09:45:57 4    claims of the '985 Patent?

09:45:59 5    A.      The asserted claims of the '985 Patent are claim 1,

09:46:03 6    claim 4 and claim 10.

09:46:04 7    Q.      And does the Next Caller VeriCall product directly

09:46:07 8    infringe claims 1, 4 and 10?

09:46:10 9    A.      My analysis shows that VeriCall does infringe on all

09:46:12 10   three claims.

09:46:13 11   Q.      Okay.  Why don't we get back to your two-step

09:46:17 12   process.  And the first step where we can walk the jury

09:46:20 13   through what the claim means and then we'll get to that

09:46:22 14   second step about the element-by-element analysis.

09:46:26 15           Why don't we start with that first part of the

09:46:28 16   element, a method of determining a source origin confident

09:46:32 17   metric of calling party number or billing number.  Where on

09:46:35 18   this diagram does that method run?

09:46:38 19   A.      That would be the electronic system.

09:46:41 20   Q.      In the case of VeriCall, that would be the VeriCall

09:46:42 21   --

09:46:42 22   A.      VeriCall would be the electronic system.

09:46:46 23   Q.      It goes on to say that it has to be associated with

09:46:49 24   an incoming call.  What is the incoming call?

09:46:52 25   A.      Again, this is the incoming call through the call

09:46:55 1    center agent.

09:46:56 2    Q.    All right.  This is a new one.  It says it has to be

09:46:58 3    to a call party telephonic device.  Can you explain to the

09:47:02 4    jury what that means?

09:47:03 5    A.    Sure.  So I think you heard this already, SBC or

09:47:08 6    session border controller, every call center will have a

09:47:12 7    session border controller as the first element, the network

09:47:15 8    element between the telephone network and the call center

09:47:17 9    network.

09:47:18 10   Q.    Okay.  So again, what's the call party telephonic

09:47:22 11   device?

09:47:22 12   A.    The call party telephonic device in the claim would

09:47:26 13   be the SBC, session boarder controller.

09:47:29 14   Q.    It goes on to say -- so what was that showing right

09:47:34 15   there, Mr. Bress, that SIP invite traveling?

09:47:36 16   A.    Again, what happens here you're on your phone, you

09:47:39 17   put in the 800 number of the call center, you call and that

09:47:42 18   SIP invite message with your caller-ID is transmitted

09:47:45 19   through the network and received at the call center.

09:47:47 20   Q.    Okay.  And it goes on to say from a call, a calling

09:47:51 21   party telephonic device?

09:47:52 22   A.    Right, that's the calling party.

09:47:54 23   Q.    That's the calling party here.  All right.  So what

09:47:56 24   happens next here in this next step?

09:47:59 25   A.    So this is the part called the receiving step.  Here

Bress - direct

09:48:05 1  the electronic system is receiving that information.  This

09:48:08 2  is VeriCall basically receiving the information in the API.

09:48:11 3  Q.      When you say the information, what do you mean?

09:48:14 4  A.      The call signaling information in the SIP invite.

09:48:17 5  Q.      Okay.  It goes on to say, though, that it has to

09:48:20 6  receive a calling party number or billing number.  What's

09:48:24 7  that?

09:48:24 8  A.      So in the calling signaling all of this information

09:48:26 9  that's in the SIP invite, one of the things that's included

09:48:29 10  is the calling party number, we also refer to as caller-ID

09:48:34 11  or ANI.

09:48:36 12  Q.      All right.  Let's move on to the next element here.

09:48:40 13  So there is a couple of aspects to this element.  Can you

09:48:45 14  just explain to the jury what this next element requires?

09:48:48 15  A.      Sure.  So this element is basically requiring that

09:48:51 16  there is -- again, this operational status information

09:48:56 17  that's being gathered.  And there is some timing requirement

09:49:01 18  in this claim about when that information is to be gathered

09:49:04 19  to meet the elements of the claim.

09:49:06 20  Q.      What are those timing requirements?

09:49:08 21  A.      Those are the first two, first after the calling

09:49:12 22  party number has been received and then the operational

09:49:14 23  status information has been received and this has to happen

09:49:17 24  after the call --

09:49:21 25  Q.      Sorry.

09:49:22 1    A.    After the incoming call is answered.

09:49:24 2    Q.    You mean before?

09:49:25 3    A.    I'm sorry, before.  The operational status

09:49:29 4    information is received after the calling party number

09:49:33 5    information and before the incoming call is answered.

09:49:36 6    Q.    What happens in this last step, the determining step?

09:49:38 7    A.    That step is, for example, in VeriCall that's when

09:49:41 8    the score is generated to determine the source origin

09:49:46 9    confident metric, this is very similar to claim 32 of the

09:49:49 10   '532 with just a couple of differences.

09:49:51 11   Q.    What would happen after that?

09:49:52 12   A.    The score, the metric is sent back to the call

09:49:55 13   center, determines if it's valid, sends that information to

09:50:00 14   the call center agent, and then the agent would answer the

09:50:04 15   incoming call.

09:50:05 16   Q.    All right.  Let's get into that element-by-element

09:50:08 17   analysis.  Start with the first element, element 1.1.

09:50:12 18          In your opinion, Mr. Bress, does the VeriCall

09:50:15 19   product by Next Caller directly infringe element 1.1 of

09:50:16 20   claim 1 of the '985 Patent?

09:50:21 21   A.    Yes, my analysis shows that it does.

09:50:24 22   Q.    All right.  How is it that the VeriCall product

09:50:26 23   infringes element 1.1?

09:50:28 24   A.    If you could put up my next demonstrative.

09:50:31 25          So the information here is that a method for

09:50:36 1  storing a source origin confident metric.  You were shown

09:50:40 2  this before.  This is the Next Caller document, the API

09:50:45 3  document, it defines how the call center in the NextCaller

09:50:49 4  customers must send data in the API.  It shows after the

09:50:53 5  processing has been done, what's the purpose of it is to get

09:50:56 6  the risk score and that's the method of determining a source

09:51:00 7  origin confident metrics.

09:51:01 8  Q.    You left a little blank there for the two.  How is it

09:51:07 9  that the VeriCall system that's a method of determining a

09:51:10 10 source origin confident metrics associated with an incoming

09:51:14 11 call to a party telephonic device?

09:51:16 12 A.    As I said, everything else so far was the same as the

09:51:19 13 analysis in the claim 32 of the '532 Patent, but this is one

09:51:22 14 of the additional requirement in claim 1 of the '985.

09:51:25 15       If you go to my next demonstrative.  I showed

09:51:28 16 this before, the Dish diagram.  This network architecture

09:51:33 17 diagram there is that element I highlighted in yellow called

09:51:36 18 the Acme 4600.  And that's a brand name for a session board

09:51:41 19 control or an SBC.  As I said in this claim analysis just a

09:51:45 20 moment ago that the SBC is the call party telephonic device,

09:51:48 21 it's the -- it's in the call center so the call center

09:51:52 22 telephonic device.

09:51:55 23 Q.    This is Dish Network, so why is it that you know that

09:51:59 24 all of Next Caller's other customers have that SBC?

09:52:02 25 A.    That's the way call centers -- every call center will

Bress - direct

09:52:05 1    have an SBC, a session boarder control element between a

09:52:09 2    telephone network, a public network and their internal

09:52:13 3    network.

09:52:14 4    Q.      In your opinion, Mr. Bress, does Next Caller directly

09:52:17 5    infringe element 1.1 of claim 1 of the '985 patent?

09:52:22 6    A.      Yes, my analysis shows that it does.

09:52:23 7    Q.      Moving on to the next element.  Element 1.2, does

09:52:27 8    Next Caller infringe element 1.2 of claim 1 of the '985

09:52:32 9    patent?

09:52:32 10   A.      My analysis shows that it does.

09:52:34 11   Q.      How is it that the Next Caller VeriCall system

09:52:36 12   receives by an electric system of the calling party

09:52:39 13   telephonic device of the calling party number or billing

09:52:42 14   number?

09:52:42 15   A.      If you can show my next demonstrative, please.  This

09:52:45 16   is again the testimony that we heard yesterday from Next

09:52:48 17   Caller's customers and when describing what they do, how

09:52:51 18   they integrate VeriCall into their platform, that's exactly

09:52:55 19   what each one of them confirms that when they pass the call

09:52:59 20   signaling information in the API, one of the pieces of

09:53:02 21   information they're passing is this ANI, or caller-ID, same

09:53:02 22   thing we said before for claim 32 of the '532 Patent.

09:53:10 23   Q.      This element says the receiving has to be by an

09:53:14 24   electronic system.  What's the electronic system?

09:53:17 25   A.      The electronic system is VeriCall.

09:53:20 1    Q.    And it goes on to say that the electronic system

09:53:23 2    receives the calling party number from the called party

09:53:26 3    telephonic device.  Again, can you remind the jury what the

09:53:31 4    called party telephonic device is?

09:53:33 5    A.    I talked about this session border control, the SBC,

09:53:37 6    that's the call -- all parties will first get the SBC and

09:53:43 7    they'll go over the network elements, but they'll pass

09:53:46 8    through the session border controller.  That information

09:53:48 9    necessarily goes from the session border controller to other

09:53:52 10   elements and then eventually to VeriCall.

09:53:54 11   Q.    Why is it that VeriCall received the calling party

09:53:57 12   number from the calling party telephonic device?

09:53:59 13   A.    Because they're communications with call signaling.

09:54:02 14   Q.    In your opinion, Mr. Bress, does Next Caller infringe

09:54:05 15   element 1.2, directly infringe element 1.2 of claim 1 of the

09:54:10 16   '985 Patent?

09:54:10 17   A.    My analysis shows that it does.

09:54:13 18   Q.    All right.  Moving on to the next element, we'll

09:54:17 19   break it down this time, Mr. Bress, because of all the

09:54:20 20   timing elements.

09:54:21 21   A.    I appreciate that.

09:54:22 22   Q.    Let's start with the gathering element.  Can you

09:54:31 23   explain to the jury how VeriCall gathers by the electronic

09:54:37 24   system operational status information?

09:54:38 25   A.    If you go to my next demonstrative.

09:54:41 1          This is exactly what I described for the '532

09:54:43 2     Patent, claim 32.  I already mentioned what operational

09:54:47 3     status information is, the information in the SIP invite.

09:54:50 4     It's also information that's retrieved from external

09:54:53 5     databases.  For all the reasons I said in claim 32, it's the

09:54:57 6     same here.

09:54:57 7     Q.     Okay.  And we talked about the timing elements.  Why

09:55:00 8     don't we go to the next one, the before the incoming call is

09:55:03 9     answered, how is it that you know that VeriCall gathers by

09:55:07 10    the electronic system the operational status information

09:55:11 11    before the incoming call is answered?

09:55:14 12    A.     If you put up my next demonstrative, I already went

09:55:17 13    through this in great detail for claim 32, but this is all

09:55:21 14    the analysis, VeriCall is happening before the incoming call

09:55:25 15    to the agent is answered.  So it's the same here.

09:55:28 16    Q.     And the next timing element here, that the gathering

09:55:31 17    has to happen after receiving the calling party number or

09:55:35 18    billing number, how is it that VeriCall gathers the

09:55:37 19    operational status information after receiving the calling

09:55:41 20    party number or billing number?

09:55:42 21    A.     You can put up my next demonstrative.  Again, this is

09:55:45 22    that SIP invite information with all that interesting

09:55:48 23    information that comes with a call signal.  And I have

09:55:52 24    highlighted what is called the from header, it's described

09:55:55 25    as headers.  The headers are nothing really but the

09:55:58 1   description of the different lines that you see here.  So

09:56:00 2   one is called the from header.  The from header is the

09:56:05 3   header, the calling party number that's carried in the

09:56:07 4   header.  The phone number of yours or my phone that's

09:56:11 5   carried to the call center, caller-ID, ANI.

09:56:14 6   Q.      Why does it say the operational status information is

09:56:18 7   gathered after the calling number is received?

09:56:21 8   A.      This is one way, the information in the invite, the

09:56:24 9   from field is usually in the first or second header in the

09:56:27 10  SIP invite and all the information follows it, so it's

09:56:30 11  received after.

09:56:31 12  Q.      Okay.  You mentioned earlier that there is a second

09:56:34 13  way that VeriCall gathers operational status information,

09:56:38 14  the database searches that you mentioned.  How is it that

09:56:41 15  the database searches occur after the receiving calling

09:56:47 16  party number or billing number?

09:56:48 17  A.      Right.  Just before I get to that as far as this

09:56:51 18  step, the after, this is the actual SIP invite that's sent

09:56:54 19  in the API so the information comes afterward.  When I

09:56:58 20  reviewed the source code, the actual extraction of this

09:57:01 21  data, the operational status information happens after it's

09:57:04 22  received.  So that's another reason it's received after.

09:57:07 23          To answer the question you just asked me, if you

09:57:09 24  could go to my next demonstrative.  The other way that

09:57:12 25  operational status information is received is through what I

09:57:15 1    call the database DIP access to an external database.  In

09:57:20 2    this case the database that VeriCall uses is called TNS.

09:57:25 3    And one of the pieces that they receive is the line type

09:57:28 4    that's associated with that ANI or that caller-ID and that's

09:57:32 5    also operational status information and that happens after

09:57:36 6    the TPI with the caller-ID was received.

09:57:38 7    Q.     All right.  So in your opinion, Mr. Bress, does Next

09:57:42 8    Caller infringe element 1.3 of claim 1 of the '985 patent?

09:57:46 9    A.     My analysis shows that it does.

09:57:47 10   Q.     Moving on to the last element.  Determining.

09:57:51 11   Mr. Bress, in your opinion does Next Caller directly

09:57:54 12   infringe element 1.4, claim 1 of the '985 patent?

09:57:58 13   A.     My analysis shows it does.

09:58:00 14   Q.     All right.  How is it that Next Caller infringes

09:58:03 15   element 1.4?

09:58:04 16   A.     If you can pull up my next demonstrative.  Back to

09:58:07 17   the API document.  This element 1.4 is the determining

09:58:13 18   source, determining the source origin confident metric, and

09:58:16 19   that's again, remember the claim construction, source origin

09:58:19 20   confident metric is a number range giving credibility of the

09:58:24 21   caller-ID information.  That's what VeriCall returns, a risk

09:58:28 22   score, a numerical score of 0 to 100 associated with the

09:58:34 23   caller-ID information.

09:58:35 24   Q.     In your opinion, Mr. Bress, does Next Caller infringe

09:58:38 25   directly element 1.4 of the claim 1 of the '985 patent?

09:58:42  1    A.       Yes, my analysis shows it does.

09:58:44  2    Q.       We have four checked boxes.  In your opinion does

09:58:47  3    VeriCall directly infringe claim 1 of the '985 Patent?

09:58:51  4    A.       My element-by-element analysis shows that each

09:58:57  5    element is infringed by VeriCall and, therefore, if each

09:59:00  6    element is infringed, that claim is infringed by VeriCall.

09:59:04  7    Q.       Let's move on to claim 4 of the '985 Patent.  Does

09:59:08  8    Next Caller directly infringe claim 4?

09:59:09  9    A.       Yes, claim 4, yes, they do.

09:59:12 10    Q.       You have the format highlighted there.  Can you

09:59:15 11    explain to the jury what format is or more broadly what

09:59:18 12    claim 4 is requiring?

09:59:19 13    A.       Claim 4 is another dependent claim.  Claim 4 requires

09:59:23 14    that everything in claim 1 is infringed.  And I just showed

09:59:25 15    that it is.  And then it further requires that the format of

09:59:28 16    the calling party number that's received is checked for, is

09:59:34 17    valid.

09:59:34 18    Q.       Why does Next Caller directly infringing claim 4?

09:59:38 19    A.       If you can go to the next demonstrative.

09:59:41 20    Q.       Before we get there, Mr. Bress --

09:59:42 21    A.       Yes, actually as I mentioned before, I developed test

09:59:46 22    systems and many of them are using calling party number

09:59:52 23    information as the basis of routing calls and the analysis.

09:59:56 24    And the very first thing that software does in testing an

10:00:00 25    analysis system is check the format, check the appendage

10:00:04 1  number, verify that characters are received are actually

10:00:07 2  numerals, that's verified validity of the calling party

10:00:10 3  number, for example.

10:00:11 4  Q.      Why do you know that Next Caller checked the format?

10:00:15 5  A.      So what -- what I mentioned already that I verified

10:00:18 6  the source code and I found the source code format is being

10:00:22 7  checked, it's being validated.

10:00:24 8  Q.      So in your opinion, Mr. Bress, Next Caller directly

10:00:26 9  infringed claim 4?

10:00:28 10  A.      Yes, my analysis shows that it is.

10:00:29 11  Q.      Move on to the next claim, claim 8.  Does Next Caller

10:00:35 12  directly infringe claim 8 of the '985 Patent?

10:00:38 13  A.      Yes.  And again, I'll mention that claim 8 is

10:00:41 14  actually not one of the asserted claims, but when we get to

10:00:45 15  claim 10, the dependent claims, another one of those

10:00:48 16  changes, dependent claim depends on claim 8 and claim 8

10:00:53 17  depends on claim 1.  I have to analyze claim 8 here.  But

10:00:57 18  claim 8 requires everything in claim 1.  I have already

10:01:00 19  shown that's infringed.  And then in addition the personal

10:01:02 20  risk factor associated with the calling party number.

10:01:02 21          You can go to my next demonstrative.

10:01:07 22  Q.      Before we do get to the next demonstrative,

10:01:09 23  Mr. Bress, I think we talked about this earlier, but can you

10:01:12 24  remind the jury again what a personal risk factor of an

10:01:15 25  entity is?

10:01:16 1    A.    Right, the personal risk factor, I gave an example

10:01:19 2    from the patent where an example was the calling coming in

10:01:23 3    was shown from a VoIP telephone, that VoIP telephone is

10:01:29 4    shown from a calling party number, it's personal because

10:01:32 5    it's a person's phone.

10:01:34 6    Q.    How is it that Next Caller directly infringes claim

10:01:37 7    8?

10:01:37 8    A.    If you go to my next demonstrative.  I have already

10:01:40 9    shown, so for claim 50 of the '532 Patent, the claim

10:01:44 10   language is essentially the claim, add just the source

10:01:47 11   origin confident metric based on the personal risk factors

10:01:50 12   of an entity, same language in claim 8, so it infringes for

10:01:54 13   the same reason as claim 50.

10:01:56 14   Q.    Let's move on to claim 10.

10:01:59 15         Actually before we get there, in your opinion,

10:02:00 16   Mr. Bress, does Next Caller directly infringe claim 8 of the

10:02:04 17   '985 Patent?

10:02:04 18   A.    Yes, my analysis shows it does.

10:02:07 19   Q.    Okay.  Moving to the claim 10, I think you mentioned

10:02:10 20   that earlier.  Can you explain to the jury what claim 10

10:02:12 21   requires?

10:02:12 22   A.    Sure.  So claim 10 is a dependent claim.  It requires

10:02:20 23   everything in claim 8, which we just talked about that.  I

10:02:24 24   have already shown claim 8 is infringed.  Claim 10 requires

10:02:27 25   further that the system must retrieve -- the method must

10:02:31 1    retrieve a consortium information.

10:02:34 2    Q.      And what is consortium information?

10:02:37 3    A.      Again, we have the Court's claim construction so the

10:02:41 4    Court ordered definition, in my demonstrative this is

10:02:44 5    showing the Court who had ordered that consortium

10:02:49 6    information shall be defined as aggregated data from

10:02:52 7    multiple external sources.

10:02:53 8    Q.      How is it that VeriCall product retrieves aggregated

10:02:58 9    data from multiple external sources?

10:03:00 10   A.      You can pull my next demonstrative.  We talked about

10:03:05 11   this multiple times, it's part of VeriCall's process is to

10:03:08 12   do this database, to look up in the external database called

10:03:14 13   TNS to get information associated with the calling party

10:03:17 14   number that's in the call, and that TNS is an example of

10:03:22 15   consortium information, aggregated data.

10:03:26 16   Q.      Can you turn to tab PTX-612 in your binder.

10:03:31 17   A.      612?

10:03:32 18   Q.      Yeah, 612.

10:03:37 19   A.      Okay.

10:03:39 20   Q.      Do you recognize this document?

10:03:41 21   A.      Yes, I do.

10:03:42 22   Q.      What is this document?

10:03:46 23   A.      So this is a copy of the web page from the TNS which

10:03:46 24   is the database service that I downloaded to confirm my

10:03:52 25   understanding of what TNS is.

10:03:56 1   Q.    Did you rely on this document in your opinions in

10:03:58 2   this case?

10:03:58 3   A.    I used it to confirm what I knew that TNS is

10:04:02 4   aggregated data from carriers.

10:04:05 5            MR. BLOCK:  Your Honor, we move to admit

10:04:08 6   PTX-612.

10:04:08 7            MS. COLUMBIA:  No objection, Your Honor.

10:04:09 8            THE COURT:  It's admitted.

10:04:09 9   BY MR. BLOCK:

10:04:11 10  Q.    Mr. Bress, you said you used this to confirm your

10:04:13 11  opinion.  What did this confirm for you?

10:04:15 12  A.    What we're looking at is the external data pace to

10:04:18 13  meet the claim element of aggregated data.  And certainly it

10:04:22 14  is.

10:04:23 15  Q.    And how is it that this document shows that TNS is

10:04:27 16  aggregated data?

10:04:28 17  A.    If you can go to my next demonstrative.  I have

10:04:33 18  highlighted this and some of the information that's on the

10:04:35 19  web page.  It makes it clear where TNS gets it data from so

10:04:40 20  it's of use.  It gets it from carriers, multiple carriers

10:04:44 21  bring their data, sell their data to TNS and TNS uses it to

10:04:49 22  be able to inform the users like VeriCall things like if the

10:04:52 23  number is imported, they would need to get that information

10:04:54 24  from both carriers, it's aggregate data from all the

10:05:00 25  carriers.

10:05:01 1    Q.    In your opinion, Mr. Bress, does Next Caller

10:05:04 2    VeriCall's product directly infringe claim 10 of the '985

10:05:07 3    Patent?

10:05:07 4    A.    My analysis shows it does.

10:05:09 5    Q.    I think that's the last claim of the '985 Patent.

10:05:12 6    So, Mr. Bress, in your opinion, does Next Caller directly

10:05:15 7    infringe claims 1, 4, and 10 of the '985 Patent?

10:05:19 8    A.    My analysis shows all three claims are infringed.

10:05:24 9    Q.    We're on the last patent, '913 Patent.  For the jury,

10:05:31 10   does Next Caller directly -- I'm sorry, does Next Caller

10:05:34 11   infringe claims 1, 14 and 15 of the '913 Patent?

10:05:39 12   A.    Yes, my analysis shows they do.

10:05:41 13   Q.    How is it that they infringe?

10:05:42 14   A.    So this is the case where it's an indirect

10:05:46 15   infringement.

10:05:47 16   Q.    Okay.  Let's talk a little bit about indirect

10:05:51 17   infringement.  Could you summarize your understanding of

10:05:54 18   indirect infringement?

10:05:56 19   A.    Sure.  So how is VeriCall configured?  You got a call

10:06:02 20   center with their operations, they integrate VeriCall into

10:06:07 21   those operations to send the call signaling data in the API

10:06:12 22   and then they can return a risk score.  For indirect

10:06:16 23   infringement, somebody has to be directly infringing.  In

10:06:19 24   this case it's Next Caller's customers at their call

10:06:22 25   centers.  Some of the operations are done, of the claims are

10:06:25 1    done at their call center and then they make the call to

10:06:28 2    VeriCall and all those acts together are the infringing

10:06:32 3    acts, but because Next Caller provides VeriCall, they're

10:06:37 4    indirectly infringing because they have induced their

10:06:39 5    customer and they have contributed to their customer

10:06:42 6    infringing.

10:06:44 7    Q.      Are there different types of indirect infringement?

10:06:48 8    A.      Yes.

10:06:48 9    Q.      And what are those types?

10:06:50 10   A.      So those types are what I have just said, there is

10:06:53 11   either induced indirect infringement and/or contributory

10:06:57 12   indirect infringement.

10:06:59 13   Q.      And based on your understanding of inducement, do you

10:07:03 14   believe Next Caller is liable for indirect infringement of

10:07:05 15   the '913 Patent?

10:07:07 16   A.      The three asserted claims, my analysis shows that

10:07:10 17   they are infringing.

10:07:11 18   Q.      And do you believe that Next Caller is liable for

10:07:14 19   contributory infringement of claims 1, 14, and 15 of the

10:07:15 20   '913 Patent?

10:07:15 21   A.      Yes.

10:07:20 22   Q.      Okay.  Let's get into what that means, what it means

10:07:24 23   to induce.  We'll start with inducement.  Can you explain to

10:07:24 24   the jury what the elements are to show inducement?

10:07:32 25   A.      Sure.  If could go to my next demonstrative.  Here

I'm showing the three elements that are required to show liability for inducement of infringement.

Q.    Let's start with that first element, what does that mean?

A.    So the first one is that the acts carried out by Next Caller's customers must directly infringe, and that's what I mentioned before that the customers are the ones that are directly infringing, and that's why it becomes indirect infringement for the next reasons we'll see.

Q.    In your opinion, does Next Caller's VeriCall product, do the customers directly infringe the asserted claims of the '913 --

A.    Yes, we'll see that in a moment.

Q.    Let's move on to the next element.  Can you explain to the jury what that element means?

A.    Yes, this element is requiring the indirect -- for inducement of infringement, Next Caller had to take action during the time of the '913 Patent that was intended to cause and lead to the infringing acts by the customers.

Q.    Okay.  And how is it that Next Caller took action during the time the '913 Patent was enforce that was intended to cause --

A.    If you can go to my next demonstrative, please.

Q.    Can you explain how this supports your opinion that Next Caller meets this element of inducement?

10:08:56 1    A.    Sure.  This is the testimony again from Mr. Williams,

10:09:00 2    the former vice-president of Next Caller.  You heard his

10:09:03 3    testimony yesterday.  In his testimony he was explaining how

10:09:08 4    Next Caller works with their customers and they provide

10:09:10 5    guidance.  He confirmed that they provide guidance multiple

10:09:16 6    times.  They work with their customers.  They provide the

10:09:19 7    API documents, they solve problems.  That's how Next Caller

10:09:23 8    helps their customers integrate VeriCall into the platform.

10:09:27 9    Q.    All right.  Let's move on to that next element of

10:09:30 10   inducement.  Next Caller had to be aware of the '913 Patent

10:09:34 11   and known that the acts, if taken, would likely constitute

10:09:38 12   infringement of the patent.  Can you explain to the jury

10:09:40 13   what this means?

10:09:41 14   A.    Sure.  This means that for there to be induced

10:09:44 15   infringement that Next Caller had to know that the '913

10:09:48 16   Patent existed, and that by creating VeriCall, integrating

10:09:53 17   with their customers' platforms that that would be

10:09:55 18   infringement.

10:09:56 19   Q.    Why is it that you believe Next Caller was aware of

10:09:59 20   the '913 Patent?

10:10:02 21   A.    From my understanding, there was a complaint, the

10:10:03 22   whole case starts with a complaint.  And TRUSTID who owns

10:10:06 23   the patent sent the complaint to Next Caller outlining the

10:10:11 24   patents that they believe were infringed, including the

10:10:15 25   '913, and the reasons that they believe that Next Caller's

10:10:19 1 VeriCall product was infringing, so that was included in the

10:10:21 2 complaint.

10:10:22 3 Q.     So just for confirmation, why is it that Next Caller

10:10:26 4 would have known that the acts likely constituted

10:10:29 5 infringement?

10:10:29 6 A.     They received a complaint with that information.

10:10:33 7 Q.     Okay.  Let's move on to contributory infringement,

10:10:36 8 and the next elements of the claim.  Can you explain to the

10:10:44 9 jury what the first element of contributory infringement is?

10:10:46 10 A.     Sure.  This is Next Caller had to know of the '913

10:10:50 11 Patent.

10:10:51 12 Q.     And why do you believe Next Caller knew of the '913

10:10:56 13 Patent?

10:10:56 14 A.     I described that information would have been conveyed

10:10:58 15 in the complaint.

10:10:59 16 Q.     And then this next element, can you explain to the

10:11:03 17 jury what this next element means?

10:11:05 18 A.     Yes, this for contributory infringement shows Next

10:11:08 19 Caller had to supply a material component of the claimed

10:11:11 20 invention to a customer, certainly they did, that's what the

10:11:14 21 VeriCall, the main part of this whole system.

10:11:16 22 Q.     And this next element, can you explain to the jury

10:11:21 23 what it means that a component was especially made for use?

10:11:24 24 A.     So Next Caller had to know that the component, in

10:11:27 25 this case, VeriCall, was especially made for the manner that

10:11:32 1    infringes the patent, as we'll see here in a minute, when

10:11:35 2    VeriCall is integrated with their customer's platform,

10:11:38 3    that's exactly what it does.

10:11:41 4    Q.    All right.  This next one.  The component is not a

10:11:45 5    staple or commodity article.  Can you explain to the jury

10:11:50 6    what it means it's not the staple or commodity article?

10:11:54 7    A.    A staple or commodity article would be something

10:11:57 8    that's used for many other things like a paperclip or

10:11:59 9    actually a staple.  In this example VeriCall is one

10:12:03 10   particular use so it's definitely not a staple or commodity.

10:12:09 11   Q.    The last one, one of Next Caller's customers had to

10:12:12 12   actually use the component in a manner that infringes.  Can

10:12:15 13   you explain to the jury what that is?

10:12:16 14   A.    Yes.  I mentioned before for indirect infringement,

10:12:19 15   for contributory indirect infringement, somebody had to be

10:12:23 16   directly infringing.  In this case I'll show Next Caller's

10:12:27 17   customers actually did infringe with their systems working

10:12:31 18   with VeriCall.

10:12:32 19   Q.    Okay.  We talked quite a bit about the two-step

10:12:35 20   process you used to determine infringement in this case.

10:12:38 21   Does that process still apply when we're talking about

10:12:41 22   indirect infringement?

10:12:42 23   A.    Yes, it's the same process.

10:12:44 24   Q.    Like we did before, why don't you start with that

10:12:46 25   first step, you can walk the jury through what the claims in

10:12:51 1  the term mean.  Let's start with the first one, computer

10:12:53 2  implemented method, what does that mean?

10:12:56 3  A.    I would like to introduce, this is my demonstrative

10:13:00 4  that's showing the same type of network, the calling part,

10:13:03 5  the network, and then the elements of the claim, claim 15 of

10:13:07 6  the '913 shown on the right.  The first element is a

10:13:11 7  computer-implemented method.  I think we all understand that

10:13:14 8  the -- that VeriCall, or in this case they're talking about

10:13:18 9  the claims, that the discrepancies, that is the terminology

10:13:23 10  used in this claim is a computer-implemented method.

10:13:26 11  Q.    Let's start with this step right here.  It says that

10:13:30 12  you receive from a calling party by discrepancy detector,

10:13:34 13  and then we highlighted a call request having a call

10:13:38 14  telephone number, wherein the call request includes calling

10:13:41 15  party information.  Can you explain to the jury what that

10:13:44 16  means?

10:13:44 17  A.    There is a new phraseology that we haven't seen,

10:13:47 18  calling party information should be familiar.  That's

10:13:51 19  caller-ID or ANI.  But the new term in here is called

10:13:54 20  telephone number.  And sometimes I'll say call in telephone

10:13:59 21  number.  That comes from my old Bell days.  The term can be

10:14:02 22  used to differentiate between call, call in, or calling, so

10:14:09 23  a call in telephone number is -- it's a number you call, and

10:14:12 24  that information is also in the call signal.

10:14:16 25  Q.    Okay.  And then what happens with this call

10:14:20 1    signaling?

10:14:20 2    A.    So that call signaling, that SIP invite message, the

10:14:24 3    call in phone number, the calling phone number, transmitted,

10:14:29 4    routed through the network at the call center telecom

10:14:34 5    network.

10:14:34 6    Q.    Okay.  It skipped ahead a little bit here.

10:14:45 7    A.    I wish it could go that fast.

10:14:56 8    Q.    We'll just re-sync back up here.  All right.

10:15:01 9    A.    There we go.

10:15:03 10   Q.    Okay.  So we have accessing a monitored called party

10:15:07 11   number database.  Can you explain to the jury what that

10:15:10 12   means?

10:15:10 13   A.    There is a lot of words here, but this isn't that

10:15:13 14   complicated.  I said that in the call signaling information

10:15:16 15   that the called telephone, whatever you call, the 800 number

10:15:19 16   you call, get to the bank, it gets to the call center, what

10:15:23 17   the claim requires is there is a database that is accessed

10:15:26 18   to compare that called number, that 800 number to determine

10:15:31 19   whether the calling party number, the same processor we have

10:15:34 20   been talking about is going to be checked.  Not all calls

10:15:38 21   will be checked that come into the call center, only the

10:15:41 22   ones that are in the database.

10:15:42 23   Q.    Okay.  And where would that monitored called party

10:15:47 24   number database be?

10:15:48 25   A.    That would be at the call center.

10:15:50 1    Q.       Okay.  And then what happens?

10:15:52 2    A.       Well, here we see that happening, called number

10:15:55 3    compared against the database.  In this example, yes, the

10:15:59 4    determination is that the discrepancy detector, the

10:16:05 5    authentication system will be accessed with the calling

10:16:10 6    party number information.

10:16:11 7    Q.       Next we have receiving from a calling party by a

10:16:14 8    discrepancy detector a call request.

10:16:18 9             What is the discrepancy detector?

10:16:20 10   A.       A discrepancy detector is very similar to the other

10:16:24 11   claims, it's using different words.  It's a system that's

10:16:27 12   going to check the calling party number information.

10:16:32 13   Q.       What happens after the discrepancy detector receives

10:16:36 14   that SIP invite information?

10:16:38 15   A.       Once it receives the SIP invite information it will

10:16:41 16   do the processing, that's where it determines the

10:16:44 17   discrepancies.  This lines up with doing its analysis and

10:16:48 18   producing the risk score.

10:16:50 19   Q.       And then what happens?

10:16:52 20   A.       So there is all the processing going on.  And the

10:16:57 21   question is, is there a discrepancy?  And then there is this

10:17:01 22   other requirement.

10:17:02 23   Q.       What is this requirement ancillary to an originating

10:17:05 24   service provider network element mean?

10:17:07 25   A.       What this requires is this discrepancy detector, this

10:17:13 1    system that's -- this method, the method of operating is

10:17:18 2    what is called ancillary to the network. It's not in the

10:17:22 3    network, it's ancillary to.

10:17:24 4    Q.    Okay. And lastly, what's this last element mean?

10:17:27 5    A.    So once that determination has been made that the

10:17:31 6    call center, this call, the information for this call will

10:17:34 7    be analyzed will be sent to the discrepancy detector, they

10:17:37 8    know the discrepancy detector does what it's been doing in

10:17:40 9    all the other claims is it determines the discrepancy which

10:17:43 10    is what it is calculating the risk for and in this case it

10:17:48 11    will return it back to the call center.

10:17:49 12    Q.    Let's get into that -- we're showing it do that.

10:17:54 13    What is this showing here, Mr. Bress?

10:17:56 14    A.    This is -- I don't believe this is actually required.

10:17:58 15    The claims require the discrepancy detector make a

10:18:00 16    determination, but this is what happens in the system. It

10:18:03 17    sends the information back to the call center. The

10:18:05 18    information is conveyed to the call center agent.

10:18:11 19    Q.    Let's get into the element-by-element analysis.

10:18:15 20    Element 15.1, was Next Caller indirectly infringing element

10:18:20 21    15.1?

10:18:21 22    A.    What we just did is looked through the claims, make

10:18:24 23    sure we understand what the claims mean. Now we're going to

10:18:26 24    the real infringement analysis, the element-by-element

10:18:29 25    analysis of the claim against the accused product which is

10:18:32 1   VeriCall.

10:18:32 2   Q.    All right.  And you mentioned that the direct

10:18:34 3   infringers of this claim are Next Caller's customers?

10:18:37 4   A.    That's right.

10:18:37 5   Q.    Why are Next Caller's customers executing a

10:18:40 6   computer-implemented method?

10:18:42 7   A.    So as we said, the whole point of it is for the

10:18:45 8   customers to integrate it, bring VeriCall into their

10:18:49 9   platform.  When they make that call, that API call, they

10:18:53 10  send the information to VeriCall for the score, that's the

10:18:55 11  computer-implemented method that they're dealing with.

10:18:58 12  Q.    In your opinion, Mr. Bress, does Next Caller

10:19:01 13  indirectly infringe element 15.1?

10:19:04 14  A.    That's correct.

10:19:04 15  Q.    Let's move on to element 15.2.  In your opinion,

10:19:08 16  Mr. Bress, does Next Caller indirectly infringe element

10:19:11 17  15.2?

10:19:12 18  A.    My analysis shows they do.

10:19:14 19  Q.    All right.  Let's move to your next demonstrative

10:19:17 20  here.  Can you explain to the jury what you're showing here?

10:19:19 21  A.    There is a lot of words there in element 15.2, and it

10:19:26 22  is more easier to understand what's going on by breaking it

10:19:30 23  into three different parts.

10:19:31 24  Q.    Let's start with the first part, receiving from a

10:19:34 25  calling party by a discrepancy detector, a call request

having a called telephone number, wherein the call request

includes calling party information.  How is it that Next

Caller indirectly infringes this aspect of element 15.2?

A.      If you can go to my next demonstrative.  There is the

SIP invite information.  Remember the SIP invite information

travels from the caller to the network to the telecom

network of the call center, and then that same information

is sent to VeriCall.  And in that information is the SIP

headers.  And so another one of the SIP headers we didn't

look at yet, but we are now is highlighted is the to header.

And to, not surprisingly is the number it was sent to, and

that would be the 800 number that was dialed to reach the

call center.

Q.      What's the called telephone number in your opinion?

A.      It's what's in the to header of the SIP invite

header.

Q.      And this element also includes the calling party

information.  What's that?

A.      That's what we have been talking about all along,

that's the caller-ID or ANI information that the incoming

call was from.

Q.      Again, getting back to Next Caller's customers, how

is it that they're indirectly infringing this aspect of

claim 15.2?

A.      This information is sent to VeriCall.

10:20:51 1   Q.      By who?

10:20:52 2   A.      By the call center.

10:20:53 3   Q.      By Next Caller's customers?

10:20:55 4   A.      The call center, Next Caller's customers.

10:20:58 5   Q.      Let's move on to the second part of element 15.2

10:21:02 6   wherein the discrepancy detector determines the

10:21:04 7   discrepancies in calling party information.  How is it that

10:21:07 8   Next Caller indirectly infringes this part?

10:21:10 9   A.      That's what we have seen all along what VeriCall

10:21:13 10  does, receives this information, it verifies whether the

10:21:17 11  caller-ID ANI information is credible, and then returns a

10:21:21 12  risk score.  And that's what the determining discrepancy

10:21:27 13  mean.

10:21:27 14  Q.      Turning into your next demonstrative, what's this

10:21:30 15  show?

10:21:30 16  A.      Same thing we saw before.  This is Next Caller's API

10:21:34 17  document showing how they integrate VeriCall into the

10:21:37 18  platform.  They show what they get in return and what you

10:21:40 19  get in return is the risk score, that's the numerical score

10:21:44 20  from 0 to 100.

10:21:45 21  Q.      Why is that a discrepancy?

10:21:48 22  A.      It's showing how much risk there is in the caller-ID

10:21:51 23  ANI being spoofed, the same as --

10:21:52 24  Q.      Since Next Caller customers are the direct infringer,

10:21:55 25  how is it that Next Caller customers are directly infringing

Bress - direct

10:22:01 1   this part?

10:22:02 2   A.      Because they are sending the API request to the

10:22:05 3   request for this information which is called the API request

10:22:09 4   to VeriCall and sending the score back.

10:22:12 5   Q.      Let's move on to this third element, ancillary to an

10:22:15 6   originating service provider network element that provides a

10:22:18 7   telephone line for the calling party placing the call

10:22:21 8   request.  A bit of a mouthful.  Can you explain for the jury

10:22:25 9   what that means?

10:22:26 10  A.      If you go to my next demonstrative, this is again

10:22:29 11  back to the Dish diagram to explain how this all fits in.

10:22:35 12  And this is showing everything we have before, the same

10:22:39 13  telephone network at the top, the call center, call

10:22:43 14  platform, call control platform, VeriCall and the IPM and

10:22:49 15  the agent.

10:22:50 16  Q.      Why don't we start with the originating service

10:22:53 17  provider element, what is that?

10:22:55 18  A.      The originating service provider, that means when you

10:22:58 19  and I are on the phone and we connect to the service

10:23:02 20  providers, that's the originating service provider, that's

10:23:02 21  what that originating means, that's where the call

10:23:02 22  originates from.

10:23:02 23  Q.      Can you point this out on the diagram?

10:23:10 24  A.      That's PSTN.  PSTN stands for Public Switch Telephone

10:23:17 25  Network, that's all the networks together all around the

10:23:20 1    country and all.

10:23:21 2    Q.    So all of the Next Caller customers have a PSTN?

10:23:25 3    A.    Yes.  That's the only way to make a phone call.

10:23:29 4    Q.    This is ancillary, says the discrepancy detector has

10:23:33 5    to be ancillary to the originating service provider network

10:23:37 6    element.  What does ancillary mean?

10:23:39 7    A.    If you can go to my next demonstrative.  This is

10:23:42 8    another court order, claim construction, ancillary to has

10:23:46 9    been defined by the Court to be coupled as an adjunct to.

10:23:55 10   Q.    Can you explain to the jury what it means to be

10:23:57 11   coupled as an adjunct to?

10:24:00 12   A.    It's sort of a telecom term.  I have learned that

10:24:05 13   through my career, adjuncts are used in the configuration of

10:24:08 14   networks.  But to confirm that, one of the sources that I

10:24:11 15   mentioned before, you go to external information, so I used

10:24:16 16   a dictionary to confirm the understanding of adjunct.

10:24:20 17   Q.    Mr. Bress, can you turn to PTX-697 in your binder.

10:24:24 18   A.    Okay.

10:24:28 19   Q.    Do you recognize this document?

10:24:29 20   A.    Yes.  This is the dictionary that I used to look up

10:24:32 21   the term adjunct.

10:24:35 22   Q.    Did you rely on this document in forming your

10:24:37 23   opinions in this case?

10:24:38 24   A.    Yes, I did.

10:24:39 25                 MR. BLOCK:  Your Honor, move to admit PTX-697.

10:24:43 1          MS. COLUMBIA:  Objection, Your Honor.  This is a

10:24:46 2    further construction of the claim construction.

10:24:50 3          MR. BLOCK:  Your Honor, Mr. Bress talked about

10:24:52 4    this in his reply report.

10:24:54 5          THE COURT:  Was this disclosed that you were

10:24:57 6    going to use this?

10:24:58 7          MS. COLUMBIA:  Yes, we oriented.

10:25:00 8          THE COURT:  Why wasn't that raised in the e-mail

10:25:02 9    this morning pursuant to the way we're supposed to do things

10:25:06 10   so we can deal with it before the jury came in?

10:25:08 11         MS. COLUMBIA:  My apologies, Your Honor.  I'll

10:25:10 12   withdraw the objection.  I just don't see why we need to --

10:25:14 13   I'll withdraw the objection.

10:25:16 14         THE COURT:  Okay.  We're going to put a

10:25:19 15   dictionary up on the screen?

10:25:21 16         MR. BLOCK:  Just to explain what adjunct means

10:25:24 17   to confirm Mr. Bress' opinion.

10:25:26 18         MS. COLUMBIA:  My apologies for not raising it

10:25:29 19   this morning, Your Honor, but it's really improper.

10:25:32 20         MR. BLOCK:  Your Honor, we did talk about this

10:25:33 21   in the meet and confer.

10:25:36 22         THE COURT:  It's almost time for our morning

10:25:38 23   break.  So we don't have to fight in front of you guys, you

10:25:42 24   guys can take your break.  And let's come back in about

10:25:45 25   twenty minutes.  10:45.

Bress - direct

10:25:50  1              (Jury leaving the courtroom at 10:25 a.m.)

10:26:14  2              THE COURT:  All right.  So show me -- you can

10:26:18  3   step down.

10:26:19  4              THE WITNESS:  Thank you, Your Honor.

10:26:21  5              THE COURT:  Can you just put it up on the

10:26:27  6   screen?

10:26:27  7              MR. BLOCK:  Sure.  Keep going.  One more.

10:26:33  8   That's what we're talking about.

10:26:39  9              THE COURT:  Is this a term that wasn't -- I

10:26:45 10   don't know, Judge Stark did the constructions.  I don't

10:26:48 11   remember.  Was this not construed so he just has the plain

10:26:52 12   and ordinary meaning, is that where we are on here?

10:26:55 13              MR. BLOCK:  We construed the term ancillary as

10:26:58 14   coupled as an adjunct to.  The question is what does coupled

10:27:03 15   as an adjunct mean.  Mr. Bress was explaining what adjunct

10:27:07 16   means.

10:27:07 17              THE COURT:  Isn't that a construction of a

10:27:09 18   construction?

10:27:09 19              MR. BLOCK:  It's just confirming what Mr. Bress'

10:27:11 20   opinions are here to explain why what he said is supported.

10:27:11 21              THE COURT:  Okay.

10:27:11 22              MS. COLUMBIA:  Your Honor, I think two things.

10:27:11 23   First, I apologize for doing this.

10:27:21 24              THE COURT:  It's okay.

10:27:21 25              MS. COLUMBIA:  I think it's a function of the

10:27:26 1  overnightness of this all.  Second, I think Mr. Bress just

10:27:29 2  testified that it's a term of art in telecom right before he

10:27:33 3  turned to the Webster's Dictionary.

10:27:36 4          Third, this is an agreed construction that the

10:27:39 5  parties agreed to.  And I think Your Honor added the claim

10:27:42 6  construction recently a week or so ago, it doesn't need

10:27:46 7  further construction.  What I understood Mr. Bress was going

10:27:50 8  to do is explain as a person of skill his understanding of

10:27:55 9  this and why this term is met.  Introducing the idea that

10:28:01 10 Daniel Webster has endorsed, it seems inappropriate.

10:28:05 11         MR. BLOCK:  Your Honor, we did have a meet and

10:28:07 12 confer about this, and my understanding is Next Caller

10:28:10 13 withdrew their objection.  It's a question of fact whether

10:28:13 14 or not the VeriCall system is coupled as an adjunct to.

10:28:16 15 This explains in Mr. Bress's opinion why that is.  And

10:28:19 16 again, it was in his report.  This is in his opinion.

10:28:23 17         THE COURT:  I'm just looking at the transcript,

10:28:25 18 and he did testify that it sort of is a telecom term.  So

10:28:31 19 then if that's the case, why can't he say and as a person of

10:28:36 20 skill in the art, it fits.  What I'm missing is how he's

10:28:41 21 testifying it's a telecom term and then we're bringing in

10:28:44 22 Webster's Dictionary.

10:28:46 23         MR. BLOCK:  I think he'll explain this comports

10:28:49 24 with his understanding of what the term means.

10:28:52 25         MS. COLUMBIA:  Who cares?

10:28:53 1          THE COURT:  I don't think you need this slide.

10:28:55 2   I think he can testify as to what it means to him.  I don't

10:28:58 3   think this is such a difficult word that you need to flash

10:29:02 4   the dictionary up on the screen.  And I do feel like it's

10:29:06 5   getting awfully close, if not crossing over the line of

10:29:13 6   claim construction in front of the jury.  He can testify

10:29:15 7   what it means to him, but I will sustain the objection on

10:29:19 8   this slide.

10:29:20 9          Are there other things that you have objected to

10:29:23 10  that we should talk about even if they weren't in the things

10:29:29 11  while the jury is not here so we don't have to deal with

10:29:32 12  them?

10:29:32 13         MS. COLUMBIA:  I don't believe so, Your Honor.

10:29:33 14         THE COURT:  The other thing I wanted to ask you

10:29:35 15  all while you were here is in looking through the

10:29:40 16  instructions again, there is a bunch of stuff about Doctrine

10:29:44 17  of Equivalents.  Is that an issue in this case?

10:29:47 18         MR. BLOCK:  It's not an issue, Your Honor.

10:29:49 19         THE COURT:  All right.  It would have been nice

10:29:51 20  if you guys actually read these things before we had to do

10:29:54 21  your cleanup.  Doctrine of Equivalents.  What about the

10:29:58 22  capable of instruction?

10:29:59 23         MR. BLOCK:  That is an issue, Your Honor.

10:30:02 24         THE COURT:  Okay.  And just so -- when I saw

10:30:07 25  this slide up there, is the inducement and contributory

10:30:12 1    infringement, is that only post-suit that's being asserted?

10:30:16 2                MR. BLOCK:  That's right, Your Honor, with --

10:30:19 3    that's right.

10:30:20 4                THE COURT:  Okay.

10:30:20 5                MS. COLUMBIA:  Your Honor, just in fairness, the

10:30:24 6    '913 Patent didn't issue until very relatively soon before

10:30:27 7    the suit was filed.

10:30:29 8                THE COURT:  I got it.  So it's not like --

10:30:32 9                MR. BLOCK:  That's what I was about to say.

10:30:34 10               THE COURT:  Thank you for that clarification.

10:30:36 11               All right.  See you in fifteen minutes.

10:30:38 12               (A brief recess was taken.)

10:48:41 13               THE COURT:  Bring the jury in.

10:48:43 14               (Jury entering the courtroom at 10:48 a.m.)

10:49:05 15               THE COURT:  All right.  Thank you.

10:49:08 16               Proceed.

10:49:08 17   BY MR. BLOCK:

10:49:11 18   Q.      Welcome back, Mr. Bress.

10:49:15 19   A.      Thank you.

10:49:15 20   Q.      Before the break we were talking about coupled as in

10:49:19 21   adjunct to, you mentioned that had a meaning to you as a

10:49:22 22   telecom term.  Can you explain to the jury what that means?

10:49:26 23   A.      Sure.  In the telecom network there is many different

10:49:30 24   elements, different parts, different switches, different

10:49:32 25   things that function.  And when something is said to be

10:49:37 1    adjunct to that, it's operating with it, so it's connected,

10:49:42 2    but it's necessarily outside of the network.  So the meaning

10:49:46 3    is when it's adjunct to, it's usually taken out of the

10:49:50 4    network to operate out of the network, but still connected,

10:49:54 5    still communicating with the network but outside of the

10:49:57 6    network.

10:49:57 7    Q.      Where is the VeriCall system coupled as an adjunct

10:50:02 8    system to?

10:50:05 9    A.      Looking at the diagram that's how it works in here.

10:50:11 10   As an example, we see the public switch telephone network

10:50:14 11   and that's the originating service provider network element,

10:50:21 12   PSTN, and VeriCall is coupled through a series of receivers,

10:50:25 13   SPC and other servers to that.  But it's not inside the

10:50:30 14   PSTN.

10:50:32 15   Q.      So again, to summarize for the jury, why is VeriCall

10:50:36 16   coupled as an adjunct to the originating service provider

10:50:40 17   network element?

10:50:41 18   A.      It's outside of the network, but it receives

10:50:43 19   signaling from the network.

10:50:45 20   Q.      All right.  So I think we have gone through all the

10:50:47 21   parts of element 15.2.  In your opinion, does Next Caller

10:50:55 22   indirectly infringe element 15.2?

10:50:57 23   A.      Yes, my analysis shows that Next Caller is infringing

10:51:00 24   element 15.2.

10:51:01 25   Q.      Let's move on to the next element.  The accessing a

10:51:05  1   monitored call party number database element, how is it that

10:51:09  2   the Next Caller indirectly infringes element 15.2?

10:51:13  3   A.      If you could bring up my next demonstrative.

10:51:17  4           I mentioned this is part of the claim, how

10:51:22  5   VeriCall works, the telecom network how they work at the

10:51:26  6   call center.  They receive the 800 number and then they need

10:51:30  7   to determine how to route that call, what to do with the

10:51:32  8   call, that's how call routers work.  It checks the database

10:51:36  9   and in that routing information, whether the call

10:51:39 10   information for this call will be routed to that SIP invite

10:51:43 11   message will be routed to in the claim terms, in the

10:51:48 12   discrepancy detector whether it would be routed to VeriCall,

10:51:50 13   that's what that claim element means.

10:51:52 14           And this is -- and so that's basically,

10:51:55 15   essentially what each of the corporate representatives from

10:51:58 16   each of Next Caller's customers, Dish, BBVA, Capital One,

10:52:02 17   and Comcast are confirming that that's how their call

10:52:06 18   centers operate.

10:52:06 19   Q.      So each of Next Caller's customers check the database

10:52:09 20   to determine whether or not the call is going to ultimately

10:52:13 21   get run through VeriCall?

10:52:14 22   A.      That's right.

10:52:15 23   Q.      Okay.  So in your opinion, Mr. Bress, does Next

10:52:17 24   Caller indirectly infringe element 15.3?

10:52:20 25   A.      That's what my analysis shows, yes.

10:52:22 1   Q.    Let's move on to the last element.  Almost there.  In

10:52:28 2   your opinion does Next Caller indirectly infringe element

10:52:32 3   15.4?

10:52:32 4   A.    Yes, my analysis shows it does, they do.

10:52:35 5   Q.    How is it that VeriCall infringes element 15.4?

10:52:39 6   A.    If you could pull up my next demonstrative.

10:52:42 7        So this requires, this element requires that the

10:52:47 8   discrepancy factor determines a discrepancy.  We have

10:52:53 9   already shown this for claim 32 in the '532 patent that

10:52:56 10  VeriCall executes rules to compare incoming data to the

10:53:00 11  expected call patterns that -- it also does the same thing,

10:53:07 12  it compares that incoming call data in the machine learning

10:53:10 13  models, so it does it in those two ways.  When it's doing

10:53:14 14  this, it's looking for a discrepancy.  It's looking for the

10:53:17 15  credibility of the caller-ID and the ANI information.  So

10:53:20 16  that lines up with the claim element.

10:53:21 17  Q.    In your opinion, does Next Caller indirectly infringe

10:53:24 18  element 15.4?

10:53:27 19  A.    Yes, that's what my analysis shows.

10:53:29 20  Q.    We have all the elements checked.  Does Next Caller

10:53:32 21  indirectly infringe claim 15?

10:53:34 22  A.    Yes.

10:53:35 23  Q.    Since they're liable for both inducement and

10:53:37 24  contributory?

10:53:38 25  A.    That's correct.

10:53:39 1    Q.    Let's move on to claim 1.  Your next demonstrative

10:53:43 2    here, can you explain to the jury what this is showing?

10:53:46 3    A.    This is very helpful.  Claim 1 is very similar to

10:53:50 4    claim 15.  Most of the language is the same with a couple of

10:53:53 5    differences.  So since it is exactly the same, here in my

10:53:58 6    demonstrative I will slide the checkmarks over and show that

10:54:01 7    because the claim elements in claim 15 were infringed, the

10:54:05 8    same ones that are the same in claim 1 are also infringed,

10:54:09 9    it's the same claim elements.

10:54:10 10   Q.    Wait a minute, though.  On claim 15 here there is

10:54:13 11   some extra language that's not in claim 1, but you still

10:54:16 12   checked the box.  Can you explain to the jury why you did

10:54:19 13   that?

10:54:19 14   A.    Sure.  That's the accessing part.  In claim 15, in

10:54:22 15   that part there was more required, that accessing where the

10:54:28 16   telephone number including only telephone numbers, that part

10:54:31 17   was in claim 15, that part isn't required in claim 1.  For

10:54:35 18   showing infringement of the claim element you can take

10:54:37 19   things away and still infringe, but as you'll see in a

10:54:41 20   minute you can't add things.  That also needs to be proven.

10:54:44 21   It also infringes.  The accessing step in claim 1 is

10:54:47 22   infringed because it's the same as shown in claim 15.

10:54:50 23   Q.    Let's move to the extra step.  In your opinion does

10:54:52 24   Next Caller indirectly infringe this last step of claim 1

10:54:56 25   when a discrepancy exists between the calling party

Bress - direct

10:55:01 1   information contained within the call request and stored

10:55:04 2   calling party information, causing call processing of a call

10:55:08 3   requested in the call request to be suspended.

10:55:11 4          That was a mouthful.

10:55:12 5   A.      That is a mouthful.  My analysis shows that claim

10:55:15 6   element is infringed.

10:55:17 7   Q.      Let's walk through that.  And before we get there,

10:55:24 8   another document that we will take a look at here.  If you

10:55:28 9   can turn to JTX-58 in your binder.

10:55:33 10  A.      JTX-50?

10:55:34 11  Q.      58.

10:55:38 12  A.      Here it is.  Okay.

10:55:41 13  Q.      Do you recognize this document?

10:55:43 14  A.      I do.

10:55:43 15  Q.      What is this document?

10:55:43 16  A.      This one is called an RFP response, produced -- it's

10:55:48 17  a Next Caller document.

10:55:50 18  Q.      Did you rely on this document in forming your

10:55:51 19  opinions?

10:55:52 20  A.      Yes, I did.

10:55:52 21          MR. BLOCK:  Your Honor, move to admit JTX-58.

10:55:55 22          MS. COLUMBIA:  No objection.

10:55:56 23          THE COURT:  Admitted.

10:55:57 24          (JTX Exhibit No. 58 was admitted into evidence.)

10:55:57 25  BY MR. BLOCK:

10:55:58 1    Q.    You said the word RFP response.  What does RFP stand

10:56:03 2    for?

10:56:03 3    A.    RFP stands for request for proposal.

10:56:06 4    Q.    How does your document support your opinion with

10:56:10 5    respect to that suspending step?

10:56:11 6    A.    This is how VeriCall works, they would be providing

10:56:14 7    this document to a potential customer to inform them of what

10:56:18 8    VeriCall does.

10:56:19 9    Q.    Okay.

10:56:21 10    A.    If you go to my next demonstrative, please.

10:56:24 11            So in here I have highlighted information that

10:56:26 12    Next Caller in their response was describing.  And what does

10:56:31 13    the claim element require?  It requires that based on this

10:56:34 14    discrepancy, the determination, that the call processing and

10:56:38 15    the call requested is suspended based on the discrepancy.

10:56:43 16    What is Next Caller describing?  They are describing that

10:56:47 17    for a score of 0 to 49 that I have highlighted, that means a

10:56:52 18    call can be trusted.  It's a low risk score.  For a score of

10:56:56 19    50 to 99, that's saying it would be a standard verification,

10:57:00 20    that would mean that you haven't been -- the caller-ID has

10:57:04 21    not been cleared completely so they need to ask a couple of

10:57:08 22    questions, maybe they just need to ask you your birth date

10:57:11 23    or your Social Security number.  It goes on to say if it's a

10:57:14 24    score of 100, which is the highest risk, they're going to

10:57:16 25    ask you all the questions they have got.

10:57:21 1    Q.      Has the testimony supported your opinion?

10:57:24 2    A.      Comcast explains that's exactly what they do if it

10:57:28 3    comes up that the caller-ID is not verified, that they ask

10:57:33 4    the additional questions to verify the caller.

10:57:36 5    Q.      Is that how it works for all of Next Caller's

10:57:39 6    customers?

10:57:39 7    A.      Yes.   That's what -- that's how the system works.

10:57:42 8    Q.      So in your opinion, Mr. Bress, does Next Caller

10:57:45 9    indirectly infringe element 1.5?

10:57:48 10   A.      That's what my analysis shows.

10:57:49 11   Q.      I think we have just one more short claim and then we

10:57:51 12   can move on.   So just again, we have all the check boxes

10:57:58 13   here, is Next Caller indirectly infringes claim 1 of the

10:58:02 14   '913 Patent?

10:58:02 15   A.      Again, an element-by-element analysis reminds us that

10:58:07 16   VeriCall working with a telecom platform, the functionality

10:58:12 17   to the claims and show that it is infringing all of them, so

10:58:15 18   that means that all of claim 1 is infringed.   And it's

10:58:19 19   inducement of infringement, so indirect infringement,

10:58:22 20   inducement and contributory.

10:58:25 21   Q.      Okay.   Last claim, claim 14.   In your opinion,

10:58:30 22   Mr. Bress, NextCaller indirectly infringed claim 14?

10:58:33 23   A.      Yes.

10:58:34 24   Q.      And how is it that Next Caller indirectly infringes

10:58:37 25   claim 14?

10:58:38 1    A.      Claim 14 is another of the dependent claims, so it

10:58:41 2    requires everything in claim 1.   I just showed how that's

10:58:44 3    infringed by Next Caller.   And then it adds that the

10:58:48 4    detecting a discrepancy within the call request is not

10:58:51 5    detectable by the calling party.

10:58:54 6    Q.      And again, how is it that Next Caller infringes this?

10:58:58 7    A.      If you could go to my next demonstrative.

10:59:01 8            That's really what the system is all about.

10:59:04 9    VeriCall is designed so that it can be done quickly so that

10:59:07 10   the customer does not have any additional delay or doesn't

10:59:10 11   hear anything happening on the line.   And that's what's

10:59:13 12   confirmed here in this document, the RFP response that I

10:59:18 13   brought up before.   And Next Caller is explaining that

10:59:21 14   VeriCall provides a subsecond response time which provides a

10:59:24 15   risk assessment.   That means that there -- the caller would

10:59:28 16   not perceive a delay, wouldn't perceive, it wouldn't be

10:59:32 17   detectable to the customer.

10:59:33 18   Q.      How do you know that's what it means?

10:59:35 19   A.      If you could go to the next demonstrative I have.

10:59:37 20   This is from testimony from Capital One, what we heard

10:59:41 21   yesterday.   And what Mr. Burgess, corporate representative

10:59:46 22   from Capital One, was explaining, I don't have it

10:59:50 23   highlighted, but the customer is none the wiser when the

10:59:54 24   analysis is done.   And that means they didn't detect it.

10:59:57 25   Q.      So in your opinion, Mr. Bress, does Next Caller.

11:00:01 1          Indirectly infringe claim 14?

11:00:03 2   A.    Yes, my analysis shows that claim 14 is infringed.

11:00:08 3   Q.    Okay.  So that is the last claim of the '913 Patent.

11:00:12 4   In your opinion, Mr. Bress, does Next Caller indirectly

11:00:15 5   infringe claim, 1, 14 and 15?

11:00:17 6   A.    Yes, my analysis shows that all three claims are

11:00:20 7   indirectly infringed.

11:00:21 8   Q.    Under both inducement and contributory infringement?

11:00:24 9   A.    That's right.

11:00:26 10          MR. BLOCK:  All right.  Thank you for your time,

11:00:27 11   Mr. Bress.  I have no further questions at the moment.

11:00:31 12          THE COURT:  Thank you.

11:00:32 13          Cross-examine.

11:00:45 14              CROSS-EXAMINATION

11:01:33 15          MS. COLUMBIA:  May I approach?

11:01:38 16          THE COURT:  You may.

11:01:48 17   BY MS. COLUMBIA:

11:02:04 18   Q.    Good morning, Mr. Bress.

11:02:06 19   A.    Good morning.  It's still morning, right?

11:02:08 20   Q.    It's still morning.  Hard to believe, isn't it?

11:02:11 21   Feels like it's been a full day already.

11:02:14 22   A.    That's right.

11:02:14 23   Q.    Mr. Bress, my name is Sarah Columbia.  We met

11:02:18 24   yesterday in the hallway.

11:02:21 25   A.    Nice to meet you again.

11:02:23 1    Q.      Thank you.  Nice to see you.

11:02:25 2            A couple of quick things about this '913 Patent

11:02:30 3    that you finished up on this morning.  Okay?

11:02:33 4    A.      Right.

11:02:34 5    Q.      Your opinions are that that -- the claims of that

11:02:37 6    patent are infringed indirectly; correct?

11:02:40 7    A.      That's correct.

11:02:40 8    Q.      And I think you explained to the jury that to

11:02:43 9    infringe indirectly, there has to be proof that the

11:02:48 10   customers infringe directly; correct?

11:02:51 11   A.      That's correct.

11:02:51 12   Q.      And the customers are at least Comcast, Capital One,

11:02:57 13   BBVA, and Dish?

11:02:59 14   A.      That's right.

11:03:00 15   Q.      Has TRUSTID sued any of Comcast, Capital One, BBVA,

11:03:08 16   or Dish for patent infringement?

11:03:10 17   A.      I'm not aware of that.

11:03:12 18   Q.      Well, you're aware that they have not; correct, sir?

11:03:15 19   A.      I'm just not aware of anyone else who they sued, so I

11:03:21 20   am not aware one way or the other.

11:03:22 21   Q.      You're aware, are you not, sir, that TRUSTID has not

11:03:27 22   sued Comcast, Capital One, BBVA, or Dish, or any other

11:03:32 23   VeriCall customer for direct infringement, aren't you, sir?

11:03:36 24   A.      I haven't heard that.  I haven't heard that they

11:03:38 25   have, so I can't say for sure that they haven't, but I

11:03:43 1    haven't heard that they have, so that's true.

11:03:49 2    Q.      Let's go back to I think basically where you started

11:03:53 3    yesterday, sir, which was with the '532 and the '985

11:03:59 4    Patents.  Are you with me?

11:04:00 5    A.      Yeah, that's right.

11:04:02 6    Q.      And we're going to go through in a lot of detail your

11:04:06 7    opinions, but I think you told us the construction of the

11:04:11 8    claim language in both of those patents that requires that

11:04:14 9    the incoming call, that the analysis be performed after the

11:04:20 10   incoming call has been answered; correct?

11:04:24 11   A.      Right.  Well, there is many elements of the claim as

11:04:28 12   you know.  I line this up against VeriCall, but from

11:04:31 13   everything I have heard so far this week it seems to be the

11:04:34 14   point that everybody is pointing to about the timing of the

11:04:37 15   incoming call being answered relative to VeriCall, so that's

11:04:40 16   why I brought it up and made a point of it.

11:04:43 17   Q.      And Mr. Bress, as the Judge has reminded us, we're

11:04:47 18   all on a time limit here, so if I could ask you to answer my

11:04:51 19   question, I'm sure your counsel will ask you to elaborate if

11:04:54 20   you would like.

11:04:55 21           My question was, each claim of the '985 and '532

11:05:02 22   Patent includes a claim limitation that the incoming call --

11:05:07 23   that the analysis be performed before the incoming -- sorry,

11:05:11 24   let me start over.

11:05:15 25           Each claim of the '532 and the '985 Patent

11:05:20  1   requires that the accused system performs analysis after the

11:05:28  2   incoming call has been answered; correct?

11:05:31  3   A.      Well, no.  Almost.  The claim language requires that

11:05:36  4   an incoming call is identified, that's the very important

11:05:40  5   part as I mentioned before, an incoming call and then the

11:05:44  6   incoming call is the analysis happens after.

11:05:48  7   Q.      Okay.  Let's take --

11:05:49  8   A.      That's important, an incoming call and then the --

11:05:53  9   Q.      Let's take a look at the language.  Mr. Rosenberg,

11:05:57 10   could you put up the '532 Patent, please.

11:06:02 11           And you recognize that, don't you, Mr. Bress?

11:06:06 12   A.      It's a little hard to see.  I'm familiar with it.

11:06:10 13   Q.      We'll blow it up for you.  That's the '532 Patent,

11:06:14 14   sir?

11:06:14 15   A.      Right.

11:06:14 16   Q.      And if we could go, Mr. Rosenberg, to the claims in

11:06:19 17   the '532 Patent, and in particular claim 32, please.

11:06:25 18           Do you have that, sir?

11:06:33 19   A.      Yes, I see it.

11:06:40 20   Q.      Now, you'll agree with me that the words in the claim

11:06:44 21   say that it must be a system for performing forensic

11:06:50 22   analysis on a calling party number information associated

11:06:54 23   with an incoming call from a telephonic device before the

11:07:01 24   incoming call is answered?

11:07:01 25   A.      That's correct, that's what the claim says.

11:07:07  1    Q.    And the Court's claim construction is very important

11:07:09  2    to your opinions; correct?

11:07:11  3    A.    It is.

11:07:11  4    Q.    And you'll agree that the Court's claim construction

11:07:15  5    of "is answered" has slightly different variations, but it

11:07:21  6    basically is actually or virtually off hook?

11:07:25  7    A.    Actually or virtually going off hook or goes off

11:07:30  8    hook.

11:07:30  9    Q.    That's the Court's official claim construction;

11:07:33  10   correct?

11:07:33  11   A.    For answered, right.

11:07:34  12   Q.    The Court's official claim construction does not add

11:07:38  13   the words, "by the agent," does it?

11:07:42  14   A.    No.

11:07:43  15   Q.    So when you repeatedly testified this morning that

11:07:47  16   the claim requires that the incoming call is answered by the

11:07:52  17   agent, that was not part of the Court's claim construction;

11:07:56  18   correct?

11:07:57  19   A.    For answered?

11:07:58  20   Q.    Sir, look at the words on the page.  You know the

11:08:04  21   Court's claim construction.  The words "by the agent" are

11:08:09  22   not in the Court's claim construction or in the claim;

11:08:12  23   correct?

11:08:12  24   A.    No.  An incoming call, an incoming call I pointed to

11:08:16  25   for my infringement analysis was an incoming call to the

11:08:20 1    agent, so that's part of the claim as well.

11:08:22 2    Q.    Let me try it again.  Look at the words, please, just

11:08:27 3    like the jury can look at the words.  And we know a part of

11:08:33 4    this claim has been construed as "is answered", correct?

11:08:37 5    A.    Correct.

11:08:37 6    Q.    And the Court construed that to mean is actually or

11:08:44 7    virtually off hook or is going virtually, actually or

11:08:48 8    virtually off hook; correct?

11:08:50 9    A.    Actually or virtually going off hook.

11:08:52 10   Q.    Same difference.

11:08:54 11   A.    That's the correction.

11:08:55 12   Q.    And the Court -- neither the claims nor the Court's

11:08:59 13   claim construction adds the phrase "by the agent," isn't

11:09:03 14   that true, sir?

11:09:04 15   A.    That's correct.

11:09:15 16   Q.    Now, the incoming call, I think you told the jury

11:09:24 17   yesterday, that's you or me or members of the jury, that's

11:09:28 18   the call they're making to their bank; correct?

11:09:31 19   A.    No, that's not right.

11:09:32 20   Q.    It's the call from you or me or the members of the

11:09:36 21   jury to their bank; correct?

11:09:38 22   A.    Not correct.

11:09:40 23   Q.    Who is making the incoming call?

11:09:42 24   A.    The incoming call is -- that I used for my

11:09:47 25   infringement analysis is coming to the agent.

11:09:51 1   Q.      I didn't ask you that, sir.  I said where is it

11:09:54 2   coming from?

11:09:54 3   A.      Where is the call coming from?

11:09:56 4   Q.      Yes.

11:09:57 5   A.      So it's a connection from the caller to the agent.

11:10:01 6   Q.      Where is the immediate call that is answered by the

11:10:05 7   agent coming from?

11:10:07 8   A.      I said, I said that it's the connection, in the claim

11:10:14 9   construction that I used for my infringement analysis is

11:10:17 10  from the caller an incoming call to the agent.

11:10:20 11  Q.      Are you having trouble answering my questions, sir?

11:10:23 12  Because there are actually multiple stops that that call

11:10:26 13  that I make to my bank makes along the way before it gets to

11:10:30 14  the agent.

11:10:31 15  A.      I didn't -- I didn't think I was having any trouble

11:10:34 16  answering your question.  The claim just requires an

11:10:37 17  incoming call and the one I used for my analysis is the

11:10:40 18  incoming call to the agent.

11:10:42 19  Q.      And does that call that's answered by the agent, is

11:10:46 20  that what you're calling an incoming call, is that coming

11:10:51 21  from me when I call my bank?

11:10:52 22  A.      Right.  It's the connection between the caller and

11:10:56 23  the agent, any connection.

11:10:57 24  Q.      And I'm a caller; correct?

11:11:01 25  A.      In your --

11:11:02 1    Q.      In my hypothetical --

11:11:04 2    A.      In your example --

11:11:06 3    Q.      In my hypothetical --

11:11:08 4            THE COURT:  Let's not talk over each other

11:11:10 5    because my court reporter needs to get it down clearly, so

11:11:13 6    everyone wait for the other one to finish.

11:11:17 7    Q.      Let's just say I'm the caller and I place a call to

11:11:20 8    my bank.  Is that call the incoming call?

11:11:24 9    A.      You just described the outgoing call.

11:11:27 10   Q.      Okay.  Does that outgoing call become the incoming

11:11:30 11   call when it's answered by the agent?

11:11:32 12   A.      No, there is an outgoing call and the incoming call.

11:11:35 13   The incoming call in this claim, as I said, I used the one

11:11:40 14   to the agent.

11:11:42 15   Q.      Okay.  Now, we know that the Court has construed "is

11:12:01 16   answered" to be actually or virtually going off hook;

11:12:06 17   correct?

11:12:07 18   A.      You got it right that time.

11:12:09 19   Q.      Thank you.  And you would agree with me, sir, that

11:12:12 20   off hook is somewhat synonymous with in use?

11:12:17 21   A.      Not in this case, no.  It could be, it could be in

11:12:22 22   some circumstances for sure, but in this case, when it's in

11:12:26 23   reference to answer, off hook is clearly defined as what it

11:12:32 24   means.

11:12:32 25   Q.      Okay.  You would agree with me, would you not, that

11:12:35 1  you know if something has actually or virtually gone off

11:12:39 2  hook when the line is in use; correct?

11:12:41 3  A.     There are -- yes, that's one way, that's one way to

11:12:46 4  describe it for sure.

11:12:47 5  Q.     That's a true statement, is it not, sir, that you

11:12:50 6  know if something has actually or virtually gone off hook

11:12:54 7  when the line is in use?

11:12:55 8  A.     So in use, that's a term I have used many times in

11:13:00 9  describing telephone calls.  So the line will go in use when

11:13:03 10  you pick it up to make an outgoing call, described as an

11:13:08 11  originating call.  It will also go into use after you have

11:13:12 12  gone off hook to answer the call, then you would be in use.

11:13:15 13  Q.     Okay.  Sir, if you would turn in your deposition, it

11:13:19 14  should be in your binder there, December 13th, 2019, please.

11:13:38 15  A.     Okay.

11:13:40 16  Q.     That's what we do.  Your deposition was taken in this

11:13:45 17  case; correct?

11:13:46 18  A.     Right.  On Friday the 13th, December.

11:13:50 19  Q.     I didn't catch that.  And you were under oath?

11:13:52 20  A.     That's right.

11:13:52 21  Q.     And so you told the truth at your deposition;

11:13:52 22  correct?

11:13:52 23  A.     Absolutely.

11:13:52 24  Q.     If you would turn to page 55, please, sir.

11:14:10 25  A.     Okay.

11:14:11 1  Q.     And beginning at line 2, you were asked the following

11:14:19 2  question and gave the following answer:

11:14:22 3          "QUESTION:  How do you know if something has

11:14:24 4  actually or virtually gone off hook?

11:14:26 5          "ANSWER:  You didn't seem to like this answer,

11:14:29 6  but it's the right answer.  When the line is in use."

11:14:33 7          Do you see that, sir?

11:14:34 8  A.     No, I don't.  Which page are you looking at?

11:14:37 9  Q.     It should be page 55.

11:14:41 10 A.     What line number?

11:14:52 11         MR. BLOCK:  Objection, Your Honor.  Improper

11:14:54 12 impeachment.

11:15:03 13 Q.     My apologies, Mr. Bress.  It's line 18 to 21.

11:15:09 14         MR. BLOCK:  Objection, Your Honor.  Improper

11:15:12 15 impeachment.  Mr. Bress answered the question.  He already

11:15:15 16 explained that what a --

11:15:19 17         THE COURT:  Overruled.

11:15:21 18 BY MS. COLUMBIA:

11:15:21 19 Q.     Let me try it again, Mr. Bress.  And I apologize, I

11:15:26 20 had the wrong line in my document.  Line 18.  Do you see

11:15:29 21 that you were asked:

11:15:30 22         "QUESTION:  How do you know if something has

11:15:33 23 actually or virtually gone off hook?

11:15:35 24         "ANSWER:  You didn't seem to like this answer,

11:15:38 25 but it's the right answer, when the line is in use."

11:15:41 1          Do you see that, sir?

11:15:42 2    A.    Yes.

11:15:42 3    Q.    That was your testimony under oath in December 2019?

11:15:45 4    A.    In that deposition I was asked the same question

11:15:49 5    multiple times and I repeated my same answer.

11:15:51 6    Q.    And the answer is that you know if something has

11:15:54 7    actually or virtually gone off hook when the line is in use,

11:15:58 8    right, sir, that's your answer --

11:16:00 9    A.    That's what I said in my testimony, that's right.

11:16:03 10   Q.    Mr. Bress, as the Judge noted, we have a court

11:16:07 11   reporter.  I need to ask my question and you answer the

11:16:10 12   question.  I will do my best to try not to interrupt you if

11:16:14 13   you would try not to interrupt me.

11:16:16 14   A.    I will do my best as well.

11:16:18 15   Q.    Just so we get that straight, your truthful answer in

11:16:21 16   your deposition was you know if something is actually or

11:16:24 17   virtually gone off hook when the line is in use.  Correct?

11:16:28 18   That was your testimony on that day, and that was truthful

11:16:32 19   testimony; correct?

11:16:33 20   A.    That's correct.

11:16:34 21   Q.    Thank you.

11:16:36 22          And you would agree with me, would you not, sir,

11:16:40 23   that if a caller places a call to a call center and starts

11:16:42 24   to receive an automated message or an automated greeting,

11:16:50 25   that that user's line would necessarily have gone off hook

11:17:00 1 before it could receive the greeting, correct?

11:17:02 2 A.     On the outgoing call.  The caller's line on the

11:17:08 3 outgoing call to create a call, they would be off hook in

11:17:12 4 use.  After they went off hook, then they would be in use.

11:17:16 5 Q.     So the caller's phone is off hook because it's

11:17:20 6 hearing the greeting, correct?  You know it's off hook

11:17:23 7 because it's hearing the greeting?

11:17:24 8 A.     That was from the originating call, outgoing

11:17:27 9 originating call.

11:17:28 10 Q.     Outgoing originating call?

11:17:30 11 A.     Correct.

11:17:30 12 Q.     So let's use me as the hypothetical caller.  I call

11:17:35 13 my bank, we have a commonality of experience that probably

11:17:41 14 the first thing I'm going to get is some sort of automated

11:17:45 15 greeting.  Would you agree with that?

11:17:46 16 A.     Yes, I do.

11:17:47 17 Q.     Welcome to XYZ Bank?

11:17:49 18 A.     The IVR.

11:17:50 19 Q.     And that's the IVR.  Usually that's the IVR; correct?

11:17:54 20 A.     That's correct.

11:17:55 21 Q.     And in order for me to hear that greeting, my phone

11:18:00 22 must be of hook; correct?

11:18:01 23 A.     Yes, the originating outgoing call you will.

11:18:04 24 Q.     And in order for me to hear that greeting, the IVR's

11:18:06 25 phone, if you will, must be off hook as well?

11:18:12 1    A.     The IVR is not a phone, it's a system.  And in the

11:18:16 2    Court's construction it could be virtually off hook.

11:18:19 3    Q.     At that moment when I start to hear the greeting, at

11:18:23 4    least by then that call has been answered by the IVR;

11:18:27 5    correct?

11:18:27 6    A.     So there is an incoming call to the IVR, and it was

11:18:31 7    virtually off hook, answered by virtually going off hook,

11:18:36 8    yeah, that's correct.

11:18:37 9    Q.     So I just want to make sure I got it right.  I call

11:18:41 10    my bank, I start to hear the greeting, that must mean that

11:18:49 11    my call has gone virtually off hook at the IVR at the bank;

11:18:54 12    correct?

11:18:54 13    A.     Well, no.  So you said my call.  So you got an

11:18:59 14    originating outgoing call and then there is an incoming call

11:19:02 15    to the IVR.  And when the ringing alert comes in from the

11:19:08 16    incoming call, it will then go off hook and be virtually off

11:19:13 17    hook to answer the call.

11:19:15 18    Q.     Okay.  So I think I understand why we're having

11:19:18 19    trouble.  You're calling my call the outgoing call; correct?

11:19:22 20    A.     When you're using your phone and you're placing an

11:19:25 21    outgoing call, it's the originating outgoing call.

11:19:29 22    Q.     My call is the originating outgoing call in my

11:19:34 23    example.  Okay?  My call is received at the IVR at the bank.

11:19:38 24    Are we together?

11:19:38 25    A.     It's the incoming call to the bank.

11:19:41 1  Q.    At that point from the bank's perspective, it's an

11:19:44 2  incoming call; correct?

11:19:45 3  A.    That's correct.

11:19:46 4  Q.    Still the same call; right?

11:19:51 5  A.    No.

11:19:52 6  Q.    Okay.  Let's move on.  That incoming call that's

11:19:55 7  being received by the bank as a result of my making a call

11:20:01 8  goes virtually off hook in order to play me the message;

11:20:06 9  correct?

11:20:06 10  A.    Incoming call, alerting, virtually of hook to answer,

11:20:11 11  yes, that's right.

11:20:12 12  Q.    So we can agree that the first place the incoming

11:20:17 13  call is received by the bank, usually the IVR; correct?

11:20:26 14  A.    Yes.  As we said, it would be an outgoing call and

11:20:29 15  then an incoming call at the IVR, incoming call to the IVR.

11:20:33 16  Q.    Let's focus on it now from the bank's perspective.

11:20:37 17  I'll take myself out of the equation.  Now I'm the bank, and

11:20:41 18  I have an IVR, an interactive voice thing.

11:20:44 19  A.    Response system.

11:20:45 20  Q.    Response system.  Okay.  I'm the bank and I have an

11:20:49 21  IVR.  I have a call incoming.  Okay?  We together?

11:20:52 22  A.    Yes.

11:20:54 23  Q.    That call is going to come incoming to the IVR as the

11:21:01 24  initial stop; correct?

11:21:02 25  A.    The incoming call to the IVR, I understand that.

11:21:05 1  Q.      And when it comes to the IVR, the call is taken

11:21:09 2  virtually off hook in order for the IVR to send back or send

11:21:16 3  instructions back so that whoever calls starts to hear the

11:21:21 4  greeting; correct?

11:21:23 5  A.      The IVR answers by going virtually off hook, that's

11:21:27 6  how I would describe it.

11:21:29 7  Q.      Okay.  And certainly you know that, I mean, you

11:21:37 8  didn't mean to suggest to this jury that the IVR doesn't

11:21:40 9  answer the incoming call, did you?

11:21:44 10  A.      Well, again, the incoming call I used for my

11:21:47 11  infringement analysis was the incoming call to the agent,

11:21:50 12  and the IVR certainly can't answer the incoming call to the

11:21:54 13  agent.

11:21:55 14  Q.      The incoming call that we just talked about for quite

11:21:59 15  a while, the incoming call to the bank --

11:22:02 16  A.      No, to the IVR.

11:22:04 17  Q.      -- is answered by the IVR; correct?

11:22:06 18  A.      The incoming call to the IVR is answered by the IVR,

11:22:10 19  that's definitely correct.

11:22:12 20  Q.      That was known at the time this patent was applied

11:22:14 21  for; correct?

11:22:14 22  A.      What do you mean by known?

11:22:18 23  Q.      Let's take a look at the patent if we could, the '532

11:22:22 24  Patent.  Mr. Rosenberg, if you don't mind.

11:22:27 25          That's the '532 that we put up earlier,

11:22:30 1    Mr. Bress.  And if could go to column 2, please,

11:22:35 2    Mr. Rosenberg.  And if you could highlight in the patent,

11:22:40 3    Mr. Rosenberg -- sorry, it's very small.

11:22:48 4    A.    It is.  Blurry.

11:22:51 5    Q.    Yeah.  Just blow up that top half of column 2,

11:22:56 6    Mr. Rosenberg.

11:22:57 7    A.    That's better.

11:22:58 8    Q.    My eyes will -- if you could highlight,

11:23:02 9    Mr. Rosenberg, where it starts, "In addition most businesses

11:23:06 10   have developed sophisticated inbound," et cetera, and then

11:23:11 11   we'll read that together.  It's in the second paragraph

11:23:14 12   there.  Maybe just blow up that second paragraph.  There you

11:23:23 13   go.

11:23:24 14         So the patent tells us, Mr. Bress, that most

11:23:27 15   businesses by this time had developed sophisticated inbound

11:23:32 16   telephone answering systems known as IVR, that answer calls

11:23:37 17   and are programmed with rules-based decision parameters

11:23:41 18   grounded on the ANI; correct?

11:23:43 19   A.    That's right.

11:23:44 20   Q.    So certainly at least by the time this patent was

11:23:46 21   filed, which was back I believe before 2012, it was

11:23:55 22   well-known businesses had developed sophisticated telephone

11:23:59 23   answering systems called IVRs that answer the call at the

11:24:03 24   bank; correct?

11:24:06 25   A.    I mean, IVRs go back way before this patent.

11:24:10 1    Answering incoming calls with IVR, there is nothing novel

11:24:14 2    about that, 1960s, maybe the 70s, certainly a long time ago.

11:24:19 3    Q.      When they answer the call, the incoming call is

11:24:21 4    answered by the IVR, that incoming call goes virtually off

11:24:29 5    hook; correct?

11:24:30 6    A.      An incoming call to the IVR would be answered by

11:24:32 7    virtual -- generally for IVR, virtually going off hook.

11:24:49 8    Q.      In the customer system for Comcast, the customer

11:24:59 9    implementation for Comcast, you agree with me that the

11:25:09 10   VeriCall system is used after the IVR has answered the call;

11:25:12 11   correct?

11:25:13 12   A.      Right.  So there is an incoming call to the IVR, and

11:25:17 13   the IVR from Comcast, the IVR would -- virtually or actually

11:25:26 14   -- virtually go off hook about the same time, but probably

11:25:29 15   right after that, the VeriCall would be called, that's

11:25:33 16   correct.

11:25:33 17   Q.      I think that was a yes.  Let me try it again.  I'm

11:25:37 18   going to use one customer, Comcast.  You have studied their

11:25:41 19   documents and testimony; correct?

11:25:42 20   A.      That's correct.

11:25:42 21   Q.      So you know where VeriCall is implemented in the

11:25:46 22   Comcast system; correct?

11:25:46 23   A.      In their call flow, correct.

11:25:50 24   Q.      In their call flow.  There are diagrams similar to

11:25:55 25   that Dish diagram you have reviewed for Comcast; correct?

11:25:57 1    A.    I think I have seen the diagram, that's correct.

11:25:59 2    Q.    Let me try my question again.

11:26:02 3    A.    Okay.

11:26:03 4    Q.    You know that in the Comcast call flow, in the

11:26:06 5    Comcast system, VeriCall is used by Comcast after an

11:26:13 6    incoming call is answered by the IVR?

11:26:17 7    A.    That's correct.

11:26:19 8    Q.    And you know that in the Capital One system, the

11:26:28 9    VeriCall system is used by Capital One after an incoming

11:26:35 10    call has been answered by the IVR; correct?

11:26:38 11    A.    After an incoming call, yes, that's correct.

11:26:41 12    Q.    And you know that in the BBVA system, VeriCall's

11:26:48 13    system is used after the -- after an incoming call has been

11:26:54 14    answered by the IVR; correct?

11:26:56 15    A.    That's correct.

11:27:13 16    Q.    And let's take a look, if we could, at the Dish

11:27:20 17    system.  In the Dish system I think you told the jury that

11:27:27 18    the VeriCall system was not used after the call went to the

11:27:35 19    IVR.  Do you recall that testimony earlier today?

11:27:37 20    A.    That's right.

11:27:38 21    Q.    But in the Dish system, the VeriCall system is used

11:27:42 22    after an incoming call has been answered by the bank's

11:27:47 23    computer system; correct?

11:27:50 24    A.    Can you say that again?

11:27:52 25    Q.    Sure.

11:27:52 1          In the Dish system, you're very familiar with

11:27:57 2   the Dish flow --

11:27:58 3   A.      I love that diagram.

11:27:59 4   Q.      We're going to spend a little time with it today.

11:28:02 5   I'm sure the jury is pretty fascinated with it by this

11:28:05 6   point.

11:28:06 7   A.      I think it's pretty cool.

11:28:07 8   Q.      In the Dish call flow, I think you told this jury

11:28:11 9   earlier today that VeriCall is used before that call reaches

11:28:18 10  the IVR.  Do you recall that testimony earlier today?

11:28:21 11  A.      I believe my testimony was that before any incoming

11:28:23 12  call to the IVR is answered, that VeriCall would have been

11:28:27 13  called, that's right.

11:28:29 14  Q.      But you know, do you not, sir, that in that same Dish

11:28:33 15  system, VeriCall is used after the banks -- the call

11:28:40 16  center's computer system has answered the call.  Isn't that

11:28:43 17  true?

11:28:44 18  A.      That's not what I said, that's incorrect.

11:28:46 19  Q.      I didn't mean to say it was your testimony this

11:28:50 20  morning.  I want to ask the question.  Isn't it true that in

11:28:54 21  the Dish system that you have described in detail, VeriCall

11:29:00 22  is used after the bank's computer system has taken the call

11:29:04 23  virtually off hook?

11:29:08 24  A.      I think the answer is no if I'm getting your timing

11:29:12 25  right.

11:29:12 1   Q.      Okay.

11:29:13 2   A.      Are you saying that it's gone off hook and then

11:29:16 3   VeriCall, is that what you're saying?

11:29:20 4   Q.      Yes.

11:29:20 5   A.      That's not correct.

11:29:21 6           MS. COLUMBIA:  Your Honor, I don't know if this

11:29:22 7   is complicated, but I would like to use the Elmo.

11:29:33 8           THE COURT:  You might just need to switch.  That

11:29:36 9   will work.  I think you need to switch --

11:29:46 10          MS. COLUMBIA:  Is that the Court that switches?

11:29:48 11          THE COURT:  If it is, you're out of luck.

11:29:51 12          MS. COLUMBIA:  It's Mr. Brooks that switches, I

11:29:53 13  would hope.

11:29:55 14  A.      Can we pull up my demonstrative?  I have got it in

11:29:57 15  electronic form.

11:29:59 16  Q.      We may, sir, if I don't get this oriented.  It should

11:30:04 17  work.

11:30:04 18  A.      I haven't seen one of those in a while.  They're

11:30:07 19  cool.

11:30:07 20  Q.      Old school is sometimes fun.

11:30:09 21  A.      That's great stuff.

11:30:10 22  Q.      I don't have an overhead projector, but this is as

11:30:14 23  close as I can get.

11:30:16 24          What I did, Mr. Bress, and just double-check me,

11:30:20 25  but the one that you were using had I think the witness from

11:30:26 1   Dish's hand markings on it and so forth, and other parts of

11:30:30 2   your demonstrative.  So this is just a higher resolution of

11:30:35 3   the document without those things.  Can you confirm that

11:30:38 4   this is the Dish diagram that you testified at length about

11:30:42 5   this morning?

11:30:42 6   A.    I wouldn't agree it's a higher resolution, but I

11:30:45 7   think it's the same diagram.

11:30:51 8   Q.    Let's see if we can make this work.  You told the

11:30:57 9   jury that it was important to distinguish between the dash

11:31:01 10  lines because they're signals and the RTP stream.  Do you

11:31:05 11  remember that?

11:31:05 12  A.    Yes.

11:31:05 13  Q.    And that's because the RTP stream is the voice, I

11:31:10 14  don't remember exactly what words you used?

11:31:11 15  A.    Yeah, the way we can describe it is the signaling

11:31:15 16  path, the voice path.

11:31:16 17  Q.    So the darker blue one that's not dashed is the voice

11:31:21 18  path; is that fair?

11:31:22 19  A.    I think it's hard to see the colors there, so maybe

11:31:25 20  if we stick with the solid line and the dashed line so that

11:31:28 21  everyone can see it, that helps.

11:31:31 22  Q.    That one that I highlighted in the legend is the

11:31:36 23  voice path; correct?

11:31:37 24  A.    The solid line, it is voice.

11:31:40 25  Q.    Is that also sometimes called like the media path, or

11:31:45 1  the media connection?

11:31:46 2  A.    Yes, that's correct.

11:31:48 3  Q.    Okay.  It doesn't require there to actually be

11:31:53 4  talking or voices; correct?

11:31:56 5  A.    When there is a media path or an RTP stream the

11:32:01 6  ability to transmit audio from each side of the connection

11:32:05 7  is there, whether you know each side is silent, that's not

11:32:11 8  helpful.

11:32:11 9  Q.    It's still there whether the audio is playing or not

11:32:15 10 playing?

11:32:15 11 A.    When you put an analyzer on the line and see the RTP

11:32:20 12 stream, it's there.

11:32:21 13 Q.    Let's follow that RTP stream if we could.

11:32:24 14 A.    Sure.

11:32:25 15 Q.    Am I correct that it starts here with the step 1?

11:32:30 16 A.    That's right.

11:32:32 17 Q.    Okay.  And then I see a dark line here that goes to

11:32:35 18 the PSTN.  That's the public network?

11:32:40 19 A.    That's right.  I'll just note that in these diagrams

11:32:42 20 when there is a solid line it can be both RPT stream and

11:32:48 21 signaling.  It's hard to show a dashed line through a solid

11:32:51 22 line, but that's how diagrams work.

11:32:53 23 Q.    There could be signals transmitted at the same time?

11:32:57 24 A.    Signaling.

11:32:57 25 Q.    Or signaling?

Bress - cross

11:32:58 1    A.        Signaling input.

11:33:00 2    Q.        Fair enough.

11:33:01 3              In step 2, we come down here; is that correct?

11:33:08 4    A.        That's right, that's where it's translating the 800

11:33:11 5    number.

11:33:12 6    Q.        Okay.  And then maybe it goes to AT&T, maybe it goes

11:33:17 7    to Verizon, but eventually it comes here to this thing

11:33:21 8    called Acme 4600; correct?

11:33:24 9    A.        Right, that's the SBC, session border controller.

11:33:29 10   Q.        Session border controller.  And that's Step 3;

11:33:33 11   correct, sir?

11:33:33 12   A.        That's right.

11:33:35 13   Q.        And then from the session border controller, this

11:33:39 14   Acme 4600 thing, one of the lines comes down here.  Do you

11:33:44 15   see that?

11:33:44 16   A.        I do.

11:33:45 17   Q.        And what's that -- that's step 5; correct?

11:33:51 18   A.        I'll really need you to blow this up, because I can't

11:33:57 19   -- if you can read it to me.

11:33:58 20   Q.        I think it's step 4, CVP sends call to --

11:34:02 21   A.        What does it say?

11:34:02 22             THE COURT:  Can you make that bigger?

11:34:09 23             MS. COLUMBIA:  That's a good question, Your

11:34:12 24   Honor.  Mr. Brooks.

11:34:22 25             THE WITNESS:  I can read it now.

11:34:24 1    Q.    Thank you.

11:34:26 2    A.    Thank you, Mr. Brooks.

11:34:30 3          MR. BROOKS:  You're welcome.

11:34:32 4    BY MS. COLUMBIA:

11:34:32 5    Q.    So step 4 is that the Acme 4600 box sends the call,

11:34:41 6    the media stream to this thing called VXML Gateway, have I

11:34:47 7    got that right so far?

11:34:48 8    A.    That's what is step 4, CVP send call to VXML Gateway.

11:34:57 9    Q.    When it reaches the VXML Gateway, that VXML Gateway

11:35:03 10   answers or virtually goes off hook, the call; correct?

11:35:06 11   A.    I have seen no evidence of that in this case at all.

11:35:11 12   What I have seen is Dr. Brody stated that he says that the

11:35:17 13   CVP call server answers the call, that's why I said in my

11:35:21 14   testimony before that it can't because there is no voice

11:35:24 15   path to the CVP call server.

11:35:27 16   Q.    Well, we'll hear from Dr. Brody hopefully later

11:35:33 17   today.

11:35:33 18   A.    I hope so.

11:35:34 19   Q.    But you will agree with me that the voice stream goes

11:35:41 20   down here to the VXML Gateway before the call is routed to

11:35:50 21   the VeriCall system; correct?

11:35:51 22   A.    No.

11:35:53 23   Q.    Well, that is step 4, we just established that, sir;

11:35:57 24   is that correct?

11:35:58 25   A.    Step 4 is the CVP sends call to VXML Gateway, but the

11:36:04 1    call gets passed around a lot in signaling, that's what we

11:36:08 2    see here, only signaling in the CVP server, we don't see any

11:36:12 3    voice coming to the CVP server.  To answer the call it would

11:36:17 4    have to have a voice path, that's answering a call is, it

11:36:22 5    would have to have a voice path.

11:36:24 6    Q.    My question is, sir, when the voice stream is sent to

11:36:28 7    the VXML Gateway in step 4, isn't it true that in connection

11:36:36 8    with that voice stream arriving at that gateway, the call is

11:36:42 9    taken virtually off hook which means it's been answered?

11:36:46 10   A.    I have seen no evidence of that anywhere in this

11:36:49 11   case.

11:36:49 12   Q.    I guess we'll wait for Dr. Brody on that.

11:36:52 13               Now, if we could put up --

11:36:58 14               MS. COLUMBIA:  Your Honor, could I mark this as

11:37:01 15   a demonstrative?

11:37:02 16               THE COURT:  You may.

11:37:03 17               MS. COLUMBIA:  I will mark it as Defendant's

11:37:06 18   Demonstrative A since there are a lot of numbers.

11:37:39 19               THE WITNESS:  Mr. Brooks to the rescue.

11:37:42 20   Q.    He'll probably offer to teach me which is not going

11:37:42 21   to be helpful.

11:37:42 22               You said that this Acme 4600 thing is a session

11:37:52 23   border controller?

11:37:52 24   A.    Yes, the Acme 4600 is a brand name for a session

11:37:56 25   border controller.

11:37:58 1    Q.     That's not a VeriCall product?

11:38:00 2    A.     No.

11:38:00 3    Q.     In fact, none of these components are VeriCall

11:38:05 4    products except for whatever software is in that little

11:38:08 5    cloud thing on the left?

11:38:11 6    A.     Right, that's VeriCall.  The rest of this would be

11:38:12 7    the call center, Next Caller's customer's call center.

11:38:16 8    Q.     Right.  This one happens to be Dish's call center?

11:38:20 9    A.     This is Dish.

11:38:21 10   Q.     And Dish call flow call center that we see all of

11:38:24 11   these little components, those are provided by multiple

11:38:28 12   different vendors that Dish does business with; correct?

11:38:32 13   A.     Yeah.  The call is sometimes called a server farm in

11:38:37 14   the middle.  My understanding this is all Cisco, Cisco

11:38:42 15   server management system.  And Cisco is a company that

11:38:47 16   builds a lot of computer software and hardware.

11:38:51 17   Q.     The Acme 4600 thing is the session border control;

11:38:55 18   correct?

11:38:56 19   A.     Session border controller, correct.

11:38:58 20   Q.     That's kind of like the track cop when an incoming

11:39:02 21   call comes into a call center?

11:39:02 22   A.     It does many things, call access control, CAC,

11:39:08 23   security, SIP proximity, it can do anything.

11:39:12 24   Q.     And it can also answer an incoming call, can't it?

11:39:15 25   A.     SBC can probably be configured to answer a call.  I

11:39:21 1   don't think in this case that I have seen any evidence that

11:39:23 2   they are, but I'm not sure.

11:39:25 3   Q.      But certainly in general SBCs are capable of being

11:39:30 4   configured to answer an incoming call; correct?

11:39:33 5   A.      It's possible.  In this case I haven't seen that

11:39:37 6   that's how they're configured to operate.

11:40:01 7   Q.      I think we're done with that for a while.  I don't

11:40:03 8   think -- I probably don't know how to put it back together

11:40:06 9   properly.

11:40:07 10             Now --

11:40:13 11  A.      That light is really bright.

11:40:16 12  Q.      Is it coming your way?

11:40:18 13  A.      Yeah, it's really bright.

11:40:21 14  Q.      Sorry.

11:40:23 15  A.      There we go.

11:40:46 16  Q.      Now, I think I understand, we just established that

11:40:51 17  an incoming call to the IVR is answered by the IVR; correct?

11:40:55 18  A.      An incoming call to the IVR would virtually go off

11:41:00 19  hook, yeah, that's right.

11:41:01 20  Q.      At the IVR?

11:41:02 21  A.      Yes.

11:41:02 22  Q.      I don't want to go back over -- no, no.  Can you

11:41:10 23  agree with me, sir, that an incoming call -- let's assume

11:41:12 24  we're a bank, I know this is used in other applications, but

11:41:12 25  assume we're a bank, an incoming call to a bank's call

11:41:20 1 center is first going to be taken virtually off hook at the

11:41:26 2 IVR.

11:41:27 3 A.       That's generally the call flow.

11:41:30 4 Q.       And not every call that comes in to a bank is going

11:41:37 5 to be routed to an agent; correct?

11:41:41 6 A.       I believe that's correct.

11:41:43 7 Q.       Some percentage of those calls, those incoming calls

11:41:49 8 will not be routed to an agent; correct?

11:41:53 9 A.       That's right.

11:41:54 10 Q.       And in those instances, there would be no transfer of

11:41:58 11 that incoming call to an agent in that system; correct?

11:42:04 12 A.       You're saying there is a scenario where there is an

11:42:07 13 incoming call on the IVR, it answers, and then there is no

11:42:10 14 incoming call to an agent?  Is that right?

11:42:15 15 Q.       I'm talking about the incoming call to the bank is

11:42:18 16 answered by the IVR.

11:42:20 17 A.       So incoming call to the IVR?

11:42:22 18 Q.       Right.

11:42:22 19 A.       Right.

11:42:23 20 Q.       That call, that incoming call would never be routed

11:42:26 21 -- might never be routed to the agent; correct?

11:42:28 22 A.       If it stayed, if the call IVR containment stayed in

11:42:32 23 the IVR, that's right.

11:42:34 24 Q.       But if that incoming call after being processed in

11:42:35 25 the IVR, if there was a determination that it should be

11:42:42  1   transferred to an agent, that incoming call would be

11:42:45  2   transferred to a human being who would eventually interact

11:42:51  3   with the customer; correct?

11:42:53  4   A.      Yeah, then there would be an incoming call to the

11:42:56  5   agent, correct.

11:43:00  6   Q.      Would that be a second call?

11:43:05  7   A.      Well, let's go back to the Court's claim

11:43:07  8   construction, and the Court's claim construction --

11:43:09  9   Q.      Excuse me --

11:43:10 10   A.      You said call and the Court's claim construction for

11:43:13 11   call is any connection.  So we could say would that be any

11:43:16 12   connection.

11:43:16 13   Q.      Let me just ask you this, sir.  Does your opinion

11:43:19 14   that the incoming call you're talking about is a call to the

11:43:26 15   agent require that there be a second call after that

11:43:32 16   incoming call to the IVR?

11:43:34 17   A.      My analysis didn't need that at all.  The claim

11:43:39 18   construction for call is any connection.  And I showed that

11:43:43 19   there is any connection between the caller to the agent and

11:43:47 20   that's an incoming call and then the agent answers the call

11:43:51 21   before that VeriCall is invoked.  That's what I did for my

11:43:55 22   infringement analysis.

11:43:56 23   Q.      Okay.  So the incoming -- there is an incoming call

11:44:01 24   to the bank that's answered by the IVR?

11:44:05 25   A.      An incoming call to the IVR.

11:44:08 1    Q.       The IVR, it doesn't sit at the bank, but it's part of

11:44:12 2    the bank's call center; correct?

11:44:14 3    A.       Right.    There is a call center and the IVR, an agent,

11:44:18 4    right.

11:44:19 5    Q.       Right.    IVR, agents and all these other component we

11:44:23 6    talked about.    So an incoming call comes into the bank's

11:44:27 7    call center system and it's answered by the IVR; correct?

11:44:30 8    A.       An incoming call to the IVR answered by the IVR,

11:44:35 9    that's right.

11:44:35 10   Q.       And that incoming call gets processed in the IVR;

11:44:39 11   correct?

11:44:40 12   A.       There would be processing in the IVR, that's right.

11:44:43 13   Q.       One element of that might be if it's a TRUSTID

11:44:47 14   customer, they might pass information, VeriCall, and there

11:44:52 15   might be lots of other components in the IVR that determine

11:44:55 16   how that call will be routed; correct?

11:44:57 17   A.       I lost you there on the TRUSTID customer.

11:45:00 18   Q.       Let's leave TRUSTID out of this.    Once that call is

11:45:04 19   in the IVR, sir, there is going to be different processing

11:45:11 20   that decides how that incoming call will then be routed

11:45:14 21   within the bank's call center; correct?

11:45:16 22   A.       The incoming call to the IVR, that's what VeriCall is

11:45:21 23   all about, yes, providing that risk score.

11:45:23 24   Q.       We heard from VeriCall's customers, they also get

11:45:26 25   other inputs from other systems within their call centers,

11:45:33 1  correct, you heard that testimony yesterday, didn't you?

11:45:35 2  A.   I did.  It wasn't part of my analysis for the

11:45:39 3  infringement.

11:45:40 4  Q.   Anyway, an incoming call comes into the IVR,

11:45:44 5  processing is done by systems in the IVR in order to

11:45:48 6  determine where that incoming call will be routed; correct?

11:45:54 7  A.   Part of my analysis was not to analyze the internal

11:45:59 8  processes of the IVR because my -- totally my infringement

11:46:04 9  analysis was on the incoming call to the agent.  So you're

11:46:07 10  asking me what happens inside the IVR.  What you're saying

11:46:11 11  sounds about right, but I just didn't do that analysis in

11:46:13 12  this case.

11:46:14 13  Q.   In all of your experience, do you know that one of

11:46:16 14  the things that happens in the IVR for these large call

11:46:19 15  centers is that there is processing to make decisions about

11:46:22 16  how that incoming call will be routed?

11:46:25 17  A.   Like I said, what you said makes sense, I just want

11:46:29 18  to say I didn't do that analysis for this case.

11:46:31 19  Q.   But you agree with me, that's part of what the IVR

11:46:35 20  does, it decides where my call is going to go and how I'm

11:46:38 21  going to be routed and whether I'm going to go to an agent

11:46:42 22  or whether I'm going to go to more computerized servicing;

11:46:46 23  correct?

11:46:47 24  A.   It may.  I didn't do that analysis, but what you're

11:46:49 25  saying sounds right.

11:46:50 1  Q.    After that IVR does its analysis it might be

11:46:53 2  determined that I don't need to talk to an agent; correct?

11:46:57 3  A.    Well, what happens, people get frustrated from having

11:47:02 4  to answer a lot of questions and hang up, if that's what you

11:47:05 5  mean.  I think we have all experienced that.

11:47:10 6  Q.    Try to follow my question.

11:47:11 7  A.    Okay.

11:47:12 8  Q.    Okay.  I have made my call to the bank, the incoming

11:47:16 9  call coming into the bank has been answered by the IVR.

11:47:20 10 It's possible, is it not, that that incoming call that

11:47:25 11 originated with me over here, it might be determined, maybe

11:47:30 12 because I'm low risk or maybe because of the nature of what

11:47:35 13 I need, that I can -- my problem can be addressed within the

11:47:40 14 IVR; correct?

11:47:42 15 A.    To summarize, there are were a lot of words.  An

11:47:45 16 incoming call to the IVR, it's processed in the IVR and that

11:47:49 17 call stays in the IVR, nothing else happens?

11:47:51 18 Q.    Right.  That's the scenario in these call centers;

11:47:55 19 correct?

11:47:56 20 A.    Sure.

11:47:56 21 Q.    And in that scenario, maybe -- we have used his

11:48:02 22 example, maybe all I want is my bank balance, for example,

11:48:05 23 and the IVR system determines that I can safely get my bank

11:48:11 24 balance by pushing some buttons or using a voicemail.

11:48:15 25 A.    Sure, we have quite a bit of testimony in this case

11:48:19 1    that the IVR containment is a goal.

11:48:23 2    Q.    In other circumstances after my call is processed in

11:48:26 3    the IVR, after it's answered in the IVR and processed, there

11:48:29 4    might be a determination that I should talk to an agent;

11:48:32 5    correct?

11:48:34 6    A.    If you want to talk to an agent, right, I'm usually

11:48:40 7    on the phone hitting the zero button until an agent comes

11:48:44 8    in, that's usually how you talk to an agent.

11:48:46 9    Q.    From the bank's perspective, it's not about whether I

11:48:49 10   want to talk to an agent, it's about whether the bank

11:48:53 11   determines that my call ought to be routed to an agent;

11:48:56 12   correct?

11:48:56 13   A.    I think either is valid.  You get an incoming call

11:49:00 14   that comes to an agent so they can authenticate you, and

11:49:03 15   also the caller is calling because they want to talk to an

11:49:07 16   agent, that's why they're calling.

11:49:08 17   Q.    In any event, after it is in the IVR, there would be

11:49:11 18   a determination that that incoming call that originated with

11:49:15 19   me will be transferred to an agent; correct?

11:49:22 20   A.    There would be an incoming call to the call IVR,

11:49:25 21   processing, and later incoming call to the agent, right.

11:49:28 22   Q.    Everything you said after later, you're calling that

11:49:32 23   a new incoming call?

11:49:34 24   A.    There is an incoming call to the IVR and an incoming

11:49:37 25   call to the agent.  They're not the same incoming call.

Q.      They're not the same incoming call?

A.      No, they're not.

Q.      Where is the incoming call to the agent incoming from?

A.      That doesn't make any sense.  It's an incoming call to the IVR, or did you say agent, incoming call to the agent?

Q.      To the agent.  So I think common sense is that if you have an incoming call, it's coming from somewhere, where is the incoming call to the agent coming from?

A.      So you're saying -- the Court's claim construction is super important.  Any connection between the caller and the agent, that's the call.

Q.      It was your testimony that the incoming call for the purposes of your opinion is coming from the caller?

A.      The incoming connection is between the caller and the agent, any connection, connection is defined by the end points.

Q.      Let me try my question again.

        Is it your testimony that the incoming call as that phrase is used in the claims is the call from the caller, calling party?

A.      It is the caller to the agent.  It's the connection, sure.

Q.      So the incoming call -- but in your testimony, there

11:50:51 1  are two incoming calls, do I understand that correctly?

11:50:54 2  A.    Right.   There is an incoming call -- the scenario you

11:50:58 3  just talked about, there is an incoming call to the IVR, and

11:51:01 4  then later an incoming call to an agent.

11:51:04 5  Q.    So the caller, there is an incoming call from the

11:51:10 6  caller on the IVR; is that correct?

11:51:12 7  A.    There is an incoming call at the IVR, outgoing call

11:51:15 8  from the caller, and then an incoming call to the IVR.

11:51:19 9  Q.    And then it's your testimony that there is an

11:51:21 10  outgoing call from the caller that becomes an incoming call

11:51:24 11  to the agent; is that correct?

11:51:27 12  A.    After the IVR's incoming call, what we expect is an

11:51:30 13  incoming call to the agent, correct.

11:51:35 14  Q.    And are those separate calls?

11:51:37 15  A.    The Court's claim construction, any connection,

11:51:40 16  connection defined by the endpoints, caller to the agent,

11:51:43 17  that's the connection, that's the analysis I did, I used the

11:51:47 18  Court's claim construction, very important.

11:51:51 19  Q.    How many calls does the caller make?

11:51:57 20  A.    I'm not sure I can answer that.

11:52:02 21  Q.    Maybe this was just common sense.  When you call your

11:52:02 22  bank to get your balance, how many times do you dial the

11:52:02 23  bank's 800 number?

11:52:02 24  A.    So originating outgoing call, that would be one.

11:52:12 25  Q.    We can agree there is one originating outgoing call

11:52:16 1   in the scenario you and I have been talking about; correct?

11:52:18 2   A.    Correct.

11:52:20 3   Q.    But your opinion is based on the assumption that that

11:52:26 4   one originating outgoing call is really two incoming calls,

11:52:33 5   the incoming call that's answered by the IVR and the

11:52:37 6   incoming call that's answered by the agent.  Did I

11:52:41 7   understand that correctly?

11:52:42 8   A.    You said it's an assumption.  We just talked about

11:52:45 9   this a lot.  There is an incoming call to the IVR, incoming

11:52:48 10  call to the agent.  I guess I'm not allowed to say it's

11:52:51 11  fact, but it's certainly my opinion, I think it's a fact.

11:52:55 12  But my opinion is a fact, how about that.

11:52:58 13  Q.    Just to be clear because there was a lot of words

11:53:02 14  other than just answering my question.  I want the jury to

11:53:06 15  understand your opinion which I know you believe is not only

11:53:11 16  your opinion, but fact, so I want to make sure I have it

11:53:14 17  right, sir.  There is one outgoing call, outgoing

11:53:17 18  originating call, that's me dialing my bank.  Are we

11:53:21 19  together so far?

11:53:22 20  A.    Yes.

11:53:22 21  Q.    Then there is an incoming call to the bank's IVR.

11:53:27 22  Are we together so far?

11:53:28 23  A.    Yes.

11:53:29 24  Q.    And the bank 's IVR answers that call as in has it go

11:53:32 25  virtually off hook; correct?

11:53:38 1   A.     The IVR answers the incoming call by virtually going

11:53:42 2   off hook, correct.

11:53:44 3   Q.     And then there is another incoming call that's

11:53:47 4   answered by the agent.  Is that your testimony?

11:53:50 5   A.     An incoming call that would be usually virtually

11:53:54 6   answered by virtually going off hook by the agent, right.

11:53:58 7   Q.     So your opinion depends on there essentially being

11:54:01 8   two incoming calls; correct?

11:54:03 9   A.     Incoming call to the IVR, incoming call to the agent,

11:54:07 10   correct.

11:54:09 11   Q.     And you mentioned IVR containment a moment ago.  In

11:54:13 12   your work in this case, you have not been asked to evaluate

11:54:19 13   IVR containment; correct?

11:54:21 14   A.     That's right, I was not.

11:54:59 15   Q.     If we could take a look, Mr. Rosenberg, at I think

11:55:25 16   it's Mr. Bress' demonstrative, slide 2.13.  That one.

11:55:36 17          Do you recall that one, sir?

11:55:37 18   A.     Oh, yes.  VeriCall's architecture.

11:55:41 19   Q.     And this is a diagram that you used to explain to the

11:55:46 20   jury how VeriCall worked, and your opinions on infringement?

11:55:50 21   A.     Multiple times, that's correct.

11:55:51 22   Q.     And this was on the portion of your testimony that

11:55:57 23   related to the '532 and the '985 Patents; correct?

11:56:02 24   A.     Yeah, that's correct.

11:56:02 25   Q.     And those are the two patents where your opinion is

11:56:08 1    that VeriCall directly infringes those claims; correct?

11:56:11 2    A.      Direct infringement of the '532 and '985, that's

11:56:15 3    right.

11:56:15 4    Q.      And you understand -- you sort of taught the jury

11:56:19 5    about indirect infringement, but you understand it to be

11:56:23 6    found to directly infringe, VeriCall would have to meet

11:56:29 7    every element of the claim?

11:56:33 8    A.      You're right.

11:56:34 9    Q.      Okay.  And as we walk through this diagram, sir, you

11:56:40 10   pointed to the various components in this diagram.  What was

11:56:47 11   S3 again?

11:56:48 12   A.      That's memory.  Memory is usually shown as like a

11:56:52 13   disk memory, a cylinder, that's memory.

11:56:56 14   Q.      And who owns S3?

11:56:59 15   A.      All of this is hosted on Amazon AWS.

11:57:04 16   Q.      So S3, the memory is owned by Amazon?

11:57:08 17   A.      Yes.

11:57:09 18   Q.      And what are these little circle things that say

11:57:13 19   train and docker?

11:57:15 20   A.      That's generally representing the software.

11:57:18 21   Q.      Is that something called SageMaker?

11:57:20 22   A.      That's right, that's the system that is used to

11:57:25 23   implement.

11:57:27 24   Q.      And SageMaker is an Amazon product?

11:57:31 25   A.      It's a service I believe is a better way to describe

11:57:36 1    it, a service that runs on their -- as part of their web

11:57:40 2    services.

11:57:40 3    Q.      So it's an Amazon service, this component --

11:57:45 4    A.      I'm not really sure whether they call it a product or

11:57:48 5    service, but it's one or the other or both, I don't know.

11:57:51 6    Q.      Either way, it's Amazon; correct?

11:57:53 7    A.      Yes.

11:57:53 8    Q.      And then there is Authenticator second S3, is that

11:57:57 9    more Amazon memory?

11:57:58 10   A.      That's right.

11:57:58 11   Q.      And then there is this interference endpoint that

11:58:02 12   also says dockers.  Is that Amazon SageMaker?

11:58:08 13   A.      That's right.

11:58:09 14   Q.      So other than the VeriCall analysis engine, is it

11:58:16 15   fair to say that all of these components are owned by

11:58:22 16   somebody other than Next Caller?

11:58:25 17   A.      Well, the reason VeriCall -- Next Caller put this

11:58:28 18   document together was to show that VeriCall software is

11:58:31 19   operating on Amazon's processors and controlling every bit

11:58:34 20   of it including the machine learning with the data from the

11:58:37 21   model and all of the code and the memory, it's all VeriCall

11:58:41 22   software running on Amazon AWS processors.

11:58:46 23   Q.      Sir, if you could answer my question.  Other than the

11:58:49 24   VeriCall analysis engine shown on the far left there, isn't

11:58:51 25   it true that all of the components in this diagram are owned

11:58:58  1  by -- are not owned by Next Caller?

11:59:01  2  A.    That's not true.

11:59:02  3  Q.    Which other component is owned by Next Caller?

11:59:05  4  A.    The S3 gateway, all the software that's depicted

11:59:12  5  here, not depicted exactly, some.  I said what's depicted

11:59:22  6  here is the software called software, that's what the

11:59:25  7  analysis engine and train is the data.

11:59:30  8  Q.    Let me try again, sir.  If you could answer my

11:59:33  9  question, I would appreciate it.  I'm sure your counsel will

11:59:34 10  have a chance to ask you, and we're all on the clock.

11:59:39 11  A.    Yes, ma'am.

11:59:40 12  Q.    This diagram which you used to explain the system to

11:59:42 13  the jury, isn't it true that the only components that are

11:59:47 14  owned by Next Caller are the VeriCall analysis engine and

11:59:52 15  the API gateway?

11:59:56 16  A.    That's not true.

11:59:58 17  Q.    Your testimony is that's not true?

12:00:01 18  A.    That's not true.

12:00:07 19  Q.    Okay.  Now, if we could take a look, Mr. Rosenberg,

12:00:28 20  at Mr. Bress's schematic.  I think it's at 2.9.  2.90.

12:00:42 21        Do you have that, sir?

12:00:45 22  A.    Yeah, I see it on the screen.

12:00:47 23  Q.    And this has to do with claim 1 of the '985 Patent.

12:00:52 24  Do you see that?

12:00:52 25  A.    That's right.  This is my demonstrative; right?

12:00:55 1    Q.    Yes.

12:00:56 2    A.    Okay.

12:00:57 3    Q.    Yes.

12:01:02 4          So you recognize that's your demonstrative?

12:01:04 5    A.    I do.

12:01:04 6    Q.    And this is the demonstrative that you used to tell

12:01:07 7    the jury that the system, to read at the top, gathers

12:01:17 8    operational status information after receiving the calling

12:01:20 9    party number.  Do you see that?

12:01:22 10   A.    I want to make sure we're on the line here.  I

12:01:25 11   believe that's what we're highlighting on element 1.3 that I

12:01:29 12   was using this demonstrative to show the processing of 1.3.

12:01:34 13   Was that your question, relating to 1.3?

12:01:37 14   Q.    I'm just reading what the heading said, sir.  This is

12:01:40 15   the slide, VeriCall gathers operational status information

12:01:45 16   after receiving the calling party number.

12:01:46 17   A.    Okay.  1.3.

12:01:49 18   Q.    I'm summarizing, but basically what you told the jury

12:01:52 19   was that the calling party number at the top is the -- is

12:02:01 20   received and then after that VeriCall gathers operational

12:02:07 21   status information.  Did I understand your testimony

12:02:09 22   correctly?

12:02:10 23   A.    I gave three reasons why.

12:02:14 24   Q.    But this one -- did you not tell the jury, sir, that

12:02:18 25   one of your reasons was that this schematic shows that

12:02:24 1    VeriCall receives the telephone number and then after that

12:02:28 2    gathers the operational status information, was that not

12:02:32 3    your testimony this morning?

12:02:33 4    A.      In the invite and SIP headers and from header, right.

12:02:37 5    Q.      If we take one question at a time, sir, that would be

12:02:40 6    super.

12:02:40 7            Did you not tell this jury this morning,

12:02:43 8    probably less than an hour ago, that what they could see

12:02:47 9    from this diagram was that VeriCall receives the calling

12:02:51 10   party number, and then after receiving the calling party

12:02:55 11   number gathers operational status information, was that your

12:02:59 12   testimony this morning?

12:03:00 13   A.      Absolutely.

12:03:01 14   Q.      Absolutely?

12:03:01 15   A.      Yes.

12:03:02 16   Q.      Is it not true, sir, that everything on this page is

12:03:05 17   part of a SIP header?

12:03:09 18   A.      These are examples.  This isn't a whole SIP invite,

12:03:13 19   but headers and SIP invite as an example.

12:03:15 20   Q.      It's what's called in your business an SIP invite?

12:03:18 21   A.      SIP invite.

12:03:20 22   Q.      And this intellectual property invite arrives in one

12:03:23 23   piece at the same time; correct?

12:03:25 24   A.      That's not correct.

12:03:27 25   Q.      That's not correct?

12:03:27 1    A.      No.

12:03:31 2    Q.      Is this SIP invite more than one file?

12:03:34 3    A.      When it's transmitted, it's transmitted as a data

12:03:40 4    stream, and the data stream is received in this order.

12:03:46 5    Q.      Okay.  So it's your testimony that the system does

12:03:49 6    not receive the SIP invite as one file?

12:03:54 7    A.      It's not really -- never referred to as a file.

12:03:58 8    Q.      Okay.

12:03:58 9    A.      Let me go back.  So it's received in the API, that

12:04:02 10   would be more like a file, okay, that's fair.

12:04:05 11   Q.      And the entire SIP invite would be one file; correct?

12:04:09 12   A.      We'll call it a file, that's fine, yes.

12:04:12 13   Q.      So the SIP invite is received at the API as a file;

12:04:16 14   correct?

12:04:17 15   A.      Right.  And it's processed in this order.

12:04:19 16   Q.      But all this information is in one file that's

12:04:23 17   transferred to the API; correct?

12:04:25 18   A.      Right.  Yes, received in this order.

12:04:48 19   Q.      Now, I think in your testimony yesterday going back

12:04:52 20   to the Dish document, if we could put up -- just a second,

12:05:04 21   Your Honor.  Make sure I get the right -- 2.26 from

12:05:55 22   Mr. Bress' demonstratives.

12:05:56 23           Do you recall this, Mr. Bress?

12:05:59 24   A.      Yes, I do.

12:06:00 25   Q.      And we saw this several times, maybe not the stuff on

12:06:05 1  the right, but the picture on the left.

12:06:06 2  A.    Okay.

12:06:08 3  Q.    You agree, several --

12:06:10 4  A.    I didn't count how many times I put it up.  Yes, this

12:06:14 5  is from my demonstratives.

12:06:17 6  Q.    Okay.  And you would agree with me, would you not,

12:06:20 7  that the -- in this Dish diagram, the caller is step 1?

12:06:28 8  A.    Right.  The outgoing call from the caller.

12:06:31 9  Q.    Is step 1?

12:06:32 10 A.    Step 1.  It is step 1 for sure.

12:06:37 11 Q.    And the step of sending that caller's call to the

12:06:42 12 agent is step 19; correct?

12:06:45 13 A.    That's not correct.  So the incoming call to the

12:06:51 14 agent is step 19.

12:06:53 15 Q.    Okay.  That gets back to the -- I'll call the

12:06:58 16 conversation we had about the two calls; right?

12:07:02 17 A.    I'm not sure it was a conversation, but it seems like

12:07:05 18 that's what we had, so that's right.

12:07:07 19 Q.    But in any event, the step at which the agent

12:07:12 20 receives the call is step 19; correct?

12:07:12 21 A.    So again, I got to be careful with the claim

12:07:22 22 language.  The call is any connection.  We're talking about

12:07:26 23 claims.  The claims are right on the slide.  Any connection,

12:07:29 24 and it's an incoming call, so any call, incoming, any

12:07:52 25 connection.

12:07:59 1    Q.       Let's make it simple, Mr. Bress.   Step 1 is the

12:08:02 2    outgoing call from the caller?

12:08:04 3    A.       The customer dials the Dish toll free number.

12:08:07 4    Q.       That's somebody in their kitchen dialing the 800

12:08:11 5    number; correct?

12:08:13 6    A.       That sounds correct.

12:08:14 7    Q.       And step 19 is sending the call to the agent phone;

12:08:23 8    correct?

12:08:24 9    A.       Right.   That represents the incoming call to the

12:08:29 10   agent's phone, right.

12:08:30 11   Q.       So step 19 is -- just answer my question, if you

12:08:38 12   could.   Step 19 says the words on the page say Acme 4500

12:08:43 13   send the call to the agent's phone.   Did I read that

12:08:47 14   correctly?

12:08:47 15   A.       You read it correctly.

12:08:49 16   Q.       So in between step 1 and step 19, which are the only

12:08:53 17   steps shown in your schematic that we just looked at, there

12:08:57 18   are seventeen additional steps; correct?

12:08:59 19   A.       You said they are the only steps shown in my --

12:09:02 20   Q.       In the schematic we just had on the screen.

12:09:02 21   A.       I'm not sure which schematic you're referring to.

12:09:02 22   Q.       I think the jury will remember.

12:09:10 23   A.       I don't remember which.

12:09:11 24   Q.       That's okay.   You'll agree with me there are nineteen

12:09:14 25   steps on this Dish schematic; right?

12:09:17 1    A.      1 through 19.

12:09:18 2    Q.      And you'll agree with me that nineteen minus two is

12:09:22 3    seventeen?

12:09:22 4    A.      That's right.

12:09:22 5    Q.      So can you then agree with me that there are

12:09:26 6    seventeen steps that have to take place between me in my

12:09:33 7    kitchen calling my bank and the Acme 4500 if we read it

12:09:40 8    correctly sends the call to the agent's phone?

12:09:43 9    A.      Absolutely.

12:10:12 10   Q.      Mr. Bress, I want to take a look at some of the

12:10:15 11   documents you were shown on direct.  If we could take a

12:10:28 12   look, sir, at -- if we could put on the screen JTX-58.  Do

12:10:39 13   you have that, sir?

12:10:40 14   A.      Yes.  Again, these are my demonstratives, right.

12:10:44 15   Q.      No, sir, to be fair, this is the actual exhibit,

12:10:47 16   JTX-58, that you looked at with your counsel on direct.

12:10:50 17   A.      Right.  I turned it into a demonstrative I believe.

12:10:53 18   That's okay, it's the same thing.

12:10:54 19   Q.      You recognize it, don't you?

12:10:56 20   A.      Yes.

12:10:56 21   Q.      And this morning with your counsel, you focused on

12:11:02 22   that bottom box, the vendor response box to suggest that

12:11:11 23   Next Caller and VeriCall were inducing their customers to

12:11:16 24   suspend the call as a result of the risk score.  Do you

12:11:22 25   recall that?

12:11:23 1   A.     Yes.

12:11:24 2   Q.     And if we could look just above that, Rob, at the box

12:11:30 3   that's E52. We didn't see this on questioning from your

12:11:38 4   counsel, Mr. Bress. Let me know if I'm reading it

12:11:43 5   correctly. VeriCall is a passive service and does not take

12:11:47 6   direct action on a call. Instead, VeriCall's risk score can

12:11:51 7   be used within IVR and routing logic to determine how and if

12:11:56 8   a call is handled within the contact center.

12:12:00 9         Did I read that correctly, sir?

12:12:02 10   A.     Yes, you did.

12:12:29 11   Q.     Now, in forming your opinions, Mr. Bress, you showed

12:12:35 12   the jury some Next Caller documents about Next Caller's

12:12:40 13   statements about pre-answer. Do you recall that?

12:12:43 14   A.     I went through a lot of documents and I presented

12:12:47 15   some, sure.

12:12:48 16   Q.     And you presented, it was the same demonstrative

12:12:50 17   basically as the jury has seen in opening with the Next

12:12:54 18   Caller documents lined up to different customers saying that

12:12:58 19   they answer -- that they perform their analysis before the

12:13:02 20   call is answered. Do you recall that?

12:13:02 21   A.     I think we all referred to that as marketing. I'm

12:13:02 22   not sure -- the marketing, right.

12:13:02 23   Q.     Fair enough.

12:13:10 24         And that's all consistent with your opinion,

12:13:12 25   that is their statements that -- sorry, Next Caller's

12:13:18 1    statements that VeriCall performs its analysis before the

12:13:22 2    agent answers the call is completely consistent with your

12:13:27 3    opinion; correct?

12:13:28 4    A.    Next Caller is saying that their pre-answer solution

12:13:32 5    is for before answer, answering a call, that's absolutely

12:13:37 6    consistent with my infringement analysis.

12:13:38 7    Q.    And you were here yesterday for Mr. Roncoroni's

12:13:41 8    testimony?

12:13:43 9    A.    I think I heard some of it.

12:13:46 10   Q.    Okay.  Well, were you here when he testified that the

12:13:50 11   statements in the marketing materials of pre-answer are

12:13:55 12   intended to convey before the call is answered by the agent?

12:14:00 13   A.    Honestly, I don't remember that.  It sounds about

12:14:03 14   right, but I don't actually remember it.

12:14:05 15   Q.    Did you also take into account in your analysis

12:14:08 16   TRUSTID's documents?

12:14:13 17   A.    Some TRUSTID information, for other reasons.

12:14:18 18   Q.    If you could turn in that, I think it's the big book

12:14:22 19   I gave you when I first came up there, there should be an

12:14:25 20   exhibit called DTX-63.

12:14:28 21   A.    You said PTX-63?

12:14:30 22   Q.    DTX, as in defendant.

12:14:40 23   A.    DTX.  DTX-69?

12:14:46 24   Q.    63.

12:14:47 25   A.    63, I'm sorry.  Yes.  There we go.  Okay.

12:14:54 1  Q.     I'm not sure this is in evidence, Your Honor, so if

12:14:58 2  you could take that down for a moment.  My apologies.  I'm

12:15:04 3  told it is in evidence.

12:15:05 4          So this is a document that's in evidence,

12:15:11 5  Mr. Bress, DTX-63.  And you recognize this to be a TRUSTID

12:15:15 6  document?

12:15:16 7  A.     That's what it shows on its face.  I may have looked

12:15:19 8  at this document, I don't really recall.  I'm sure I didn't

12:15:22 9  use it for my infringement analysis.

12:15:24 10  Q.     You are sure you did not use it for your infringement

12:15:28 11  analysis?

12:15:28 12  A.     I don't think so.  I don't see why I would have.

12:15:31 13  Q.     Do you know whether it was available to you in

12:15:33 14  conducting your infringement analysis?

12:15:35 15  A.     I looked at so many documents that I would have to go

12:15:37 16  back and look at the list of documents that I have

12:15:40 17  considered.  I can't say for sure right now.

12:15:43 18  Q.     Did you consider at all in forming your opinion how

12:15:48 19  the TRUSTID Authenticator works?

12:15:51 20  A.     My infringement opinions?

12:15:52 21  Q.     Yes.

12:15:54 22  A.     No.

12:15:54 23  Q.     So that you didn't take into account at all the

12:15:58 24  embodiment of the patents, that is the Authenticator?

12:16:02 25  A.     Other than my understanding that that's where the

12:16:08 1    patents came from was the Authenticator, was Mr. Cox

12:16:12 2    developed Authenticator and filed his patent, that's the

12:16:15 3    connection, the only connection really that was relevant for

12:16:18 4    my infringement analysis.  Although that's just knowledge,

12:16:23 5    during my infringement analysis it wasn't relevant.

12:16:26 6    Q.    And then in your invalidity analysis which we'll talk

12:16:30 7    more about on another day, I suppose, you did go map each

12:16:36 8    and every element of the claims in the patent to TRUSTID's

12:16:41 9    Authenticator product; correct?

12:16:43 10   A.    That's correct, in my validity response document I

12:16:47 11   provided that information in the appendix.

12:16:50 12   Q.    And there is a big old appendix that does kind of

12:16:53 13   what you did for the jury today with VeriCall, but instead

12:16:57 14   it maps it to Authenticator; correct?

12:17:01 15            MR. BLOCK:  Objection, Your Honor.  This is

12:17:03 16   outside the scope of Mr. Bress' direct.  Is this an

12:17:05 17   infringement analysis of VeriCall?  She's talking about

12:17:09 18   TRUSTID Authenticator.

12:17:11 19            MS. COLUMBIA:  Your Honor, I believe he was

12:17:12 20   asked on direct about his mapping of the patents to the

12:17:12 21   Authenticator product.

12:17:20 22            MR. BLOCK:  It was simply does it practice the

12:17:23 23   patents, that is it.

12:17:24 24            MS. COLUMBIA:  That's what I'm doing.

12:17:25 25            THE COURT:  It sounds like it's within the

12:17:27 1    scope, so overruled.

12:17:28 2    BY MS. COLUMBIA:

12:17:28 3    Q.    Maybe that's more efficient.  You agree that the

12:17:31 4    Authenticator practices the patent?

12:17:34 5    A.    Yes.

12:17:34 6    Q.    The patent claims that are at issue here?

12:17:36 7    A.    That's correct.

12:17:36 8    Q.    And you did indeed -- we'll talk about this more,

12:17:40 9    maybe tomorrow, but you did indeed go through the sort of

12:17:44 10   detailed analysis that you showed this jury here to go

12:17:51 11   element by element to make sure that the TRUSTID

12:17:54 12   Authenticator product performs each and every element of the

12:17:58 13   claims; correct?

12:17:59 14   A.    I did map the element of the claims to the operation

12:18:03 15   of the Authenticator, that's correct.

12:18:04 16   Q.    And there is no question in your mind that the

12:18:06 17   Authenticator performs or meets every element of these

12:18:11 18   claims that you have walked through today for the jury?

12:18:13 19   A.    That's what my analysis showed, that's right.

12:18:15 20   Q.    And then if we could keep that document up,

12:18:21 21   Mr. Rosenberg, and go to the last page, page 12.  Can you

12:18:28 22   put the page up.

12:18:32 23        And you see that is a conceptual integration

12:18:42 24   architecture for the Authenticator product?

12:18:46 25   A.    Conceptual integration architecture, okay.

12:18:50 1    Q.    And on the right it has a description of the

12:18:54 2    pre-answer state for TRUSTID's Authenticator product.  Do

12:18:58 3    you see that?

12:18:59 4    A.    Yes.

12:19:01 5    Q.    Yes?

12:19:02 6    A.    Yes.

12:19:03 7    Q.    Okay.  And if we could just walk through that, sir.

12:19:07 8    In the TRUSTID product, the first thing that happens is the

12:19:13 9    carrier passes an inbound ANI to a telephony platform.  Is

12:19:18 10   that similar to what we have been talking about an incoming

12:19:21 11   call to the IVR?

12:19:23 12   A.    That's reasonable.

12:19:25 13   Q.    Okay.  And then the next thing that happens in

12:19:28 14   TRUSTID's Authenticator system is that send an ANI request

12:19:39 15   to TRUSTID's Authenticator.  And then it says do not send

12:19:43 16   200 OK response to carrier, (caller hears ringing).  Do you

12:19:52 17   see that?

12:19:52 18   A.    I have to read this, because I don't remember this

12:19:56 19   document in detail.  But yeah, that's what it says.

12:19:59 20   Q.    And that means in the TRUSTID system, the call center

12:20:08 21   is instructed not to send a 200 OK response to the carrier,

12:20:17 22   but rather to have the caller hear ringing at that step 2.

12:20:22 23   Correct?

12:20:24 24   A.    I really can't say for sure.  I haven't had a chance

12:20:28 25   to analyze this and whether this is the IVR, it talks about

12:20:32 1    the ANI to the telephony platform.  It may be saying that,

12:20:38 2    but again, this wasn't anything to do with my infringement

12:20:41 3    analysis so I'm a little caught off guard here because I

12:20:45 4    didn't analyze this for infringement.

12:20:48 5    Q.    Okay.  Well, the 200 OK, that's the message that you

12:20:53 6    would send to answer, to let the other side know that the

12:20:59 7    call has been taken off hook; correct?

12:21:01 8    A.    Yeah, we talked about virtual off hook, that's

12:21:04 9    generally the message that's used to try to set that call

12:21:07 10   up.

12:21:08 11   Q.    As part of being virtually off hook, the system would

12:21:12 12   send a 200 OK message?

12:21:15 13   A.    It's a SIP message, 200 OK.

12:21:19 14   Q.    At least from what's written here in TRUSTID's own

12:21:21 15   documentation, the second step says, "Send out ANI request

12:21:28 16   to TRUSTID.  Do not send 200 OK response to carrier (caller

12:21:35 17   hears ringing)."

12:21:37 18         Do you see that?

12:21:37 19   A.    I do.

12:21:38 20   Q.    And then the next step says "TRUSTID completes

12:21:41 21   real-time forensic process."

12:21:45 22         Do you see that?

12:21:45 23   A.    Yes.

12:21:47 24   Q.    And the next step says "TRUSTID sends authenticate

12:21:51 25   ANI response to telephony platform."

12:21:56 1          Do you see that?

12:21:57 2     A.      Yes.

12:21:58 3     Q.      And then it's only after TRUSTID has sent the

12:22:04 4     authenticate ANI response that the telephony system answers

12:22:10 5     the call; correct?

12:22:12 6     A.      Correct.

12:22:27 7              MS. COLUMBIA:  Your Honor, may I have a moment

12:22:28 8     to consult with Mr. Brooks?

12:22:31 9              THE COURT:  You may.

12:22:58 10             MS. COLUMBIA:  I have nothing further, Your

12:23:00 11    Honor.  Thank you, Mr. Bress.

12:23:01 12             THE WITNESS:  Thank you, ma'am.

12:23:03 13             THE COURT:  Okay.

12:23:14 14             THE WITNESS:  Would you like this binder back?

12:23:16 15             MS. COLUMBIA:  Not right this minute.  You might

12:23:19 16    need it.

12:23:19 17             THE WITNESS:  I should keep it.

12:23:20 18             THE COURT:  Just leave it there.  Go ahead.

12:23:24 19             MR. BLOCK:  Good afternoon, Mr. Bress.

12:23:28 20             THE WITNESS:  Good afternoon.

12:23:29 21              REDIRECT EXAMINATION

12:23:29 22    BY MR. BLOCK:

12:23:29 23    Q.      Just a few things to talk about.

12:23:32 24              Do you recall when counsel for Next Caller was

12:23:35 25    asking you questions about Comcast's IVR?

12:23:40 1    A.    Yes.

12:23:40 2    Q.    And counsel asked you whether VeriCall performs its

12:23:44 3    analysis after Comcast's IVR answers an incoming call?

12:23:51 4    A.    That's sounds about right.

12:23:53 5    Q.    I think you said yes.

12:23:54 6    A.    Yes.

12:24:00 7    Q.    If it's true that Comcast performs the VeriCall

12:24:03 8    analysis after the IVR answers the call, how does it still

12:24:08 9    meet the claims?

12:24:08 10    A.    So, again, my analysis, my infringement analysis is

12:24:12 11    on the incoming call to the agent, and everything I have

12:24:18 12    shown, I don't think anybody disagrees that the VeriCall

12:24:22 13    analysis occurs before an incoming call to the agent is

12:24:26 14    answered.

12:24:29 15    Q.    Now, counsel was asking you questions about the call,

12:24:33 16    and your answers I think had the words "an incoming call" in

12:24:37 17    it.  Is there a reason why you made that distinction?

12:24:40 18    A.    Absolutely.

12:24:41 19    Q.    What's that reason?

12:24:42 20    A.    Two things.  One, I wanted to make sure I pointed out

12:24:46 21    that the word call, the term call has been a claim

12:24:51 22    construction order from the Court to be interpreted

12:24:55 23    essentially as any connection.  And the other reason, I

12:24:59 24    think it's very important to go back to the claim language

12:25:02 25    and recognize that there is the claim requires an incoming

12:25:07 1    call, and then before -- and then the analysis happens

12:25:12 2    before the call is answered.  So the call is used twice

12:25:17 3    there.  So an incoming call, which one, for my infringement

12:25:21 4    analysis, an incoming call to the agent, I don't think

12:25:25 5    anybody, there is no dispute that there is incoming calls to

12:25:29 6    the agents.

12:25:29 7    Q.    Can you remind the jury again why the call to the

12:25:33 8    agent or an incoming call to an agent qualifies as an

12:25:38 9    incoming call for the claims?

12:25:40 10   A.    Sure.  That's what I just said, the claim

12:25:44 11   construction is that any connection, and I showed in my

12:25:48 12   diagram that we put up multiple times showing that the

12:25:51 13   connection between the caller and the agent qualifies as any

12:25:56 14   connection.  And that was my infringement analysis.

12:26:00 15   Q.    And counsel for Next Caller was asking questions

12:26:02 16   about one outgoing call and two incoming calls.  Does it

12:26:06 17   make sense to you with your telecom background that there

12:26:09 18   could be one outgoing call and multiple incoming calls?

12:26:12 19   A.    Absolutely, that's how these systems work.

12:26:14 20   Q.    Now, Mr. Passey, can you pull up PDX-220.  I think we

12:26:22 21   have seen this diagram quite a few times already.  I promise

12:26:30 22   I'll keep it brief.

12:26:32 23        There was some discussion about the blue line

12:26:36 24   between the Acme 4600, the solid blue line between the Acme

12:26:42 25   4600 and the VXML Gateway.  Mr. Passey, can you highlight

1 that. It's on the left-hand side there. Not that one. All

2 right. Well, I mean, everybody can see at this point.

3 If I recall your testimony, you said that

4 despite that blue line going into VXML, the solid line going

5 in VXML Gateway, the VXML Gateway doesn't answer calls. Can

6 you explain to the jury why that is?

7 A. I don't believe that was my testimony. My testimony

8 was that the CVP call server does not answer calls. This

9 was in response to Dr. Brody, Dr. Brody in his report saying

10 the CVP call server answers the call and what I pointed out

11 was for the call to be answered, you need to have a voice

12 path, you need that RTV stream, there is no RTV stream

13 coming into the call server. The CVP can't answer calls.

14 Q. I'm talking about VXML Gateway, there is a solid blue

15 line there. Why isn't the VXML Gateway answering calls?

16 A. I'm not sure I understand the question.

17 Q. There is a solid blue line coming from the Acme 4600

18 to the VXML Gateway. Do you see that?

19 A. Yes.

20 Q. What is that line for?

21 A. So if you look at step 18, it describes it is for

22 call recording. And from my understanding of this document

23 which makes sense to me how these systems work, when you

24 talk to an agent, often you'll hear before that it says this

25 call is recorded, I don't know what they say, this call is

12:28:26  1    recorded for a certain reason, and that would be for

12:28:29  2    recording, I believe that's for recording.

12:28:31  3    Q.    All right.  So then getting back to my question about

12:28:33  4    the VXML Gateway, why is it that the VXML, that solid blue

12:28:40  5    line coming into the VXML Gateway doesn't indicate that the

12:28:45  6    VXML Gateway answers calls?

12:28:49  7    A.    It just made from my understanding, it's for

12:28:53  8    recording.

12:28:53  9    Q.    Okay.  Mr. Passey, if we could pull up JTX-002, the

12:29:00 10    '985 Patent, and if we could zoom in on claim 1.  Sorry, if

12:29:31 11    we could go to -- I'm sorry, is it JTX-003?  It should be

12:29:38 12    the '985 Patent.  Sorry.  003, the '985 Patent.  And then

12:29:47 13    claim 1.  Claim 1.

12:30:24 14          Okay.  I want to focus in on the limitation here

12:30:30 15    that's before the incoming call is answered.  Mr. Passey, if

12:30:33 16    you could highlight right after about line 10, that whole

12:30:37 17    after receiving element.  All right.

12:30:45 18          In this element, what is required to occur

12:30:49 19    before the incoming call is answered?

12:30:52 20    A.    Gathering by the electronic system associated with

12:30:56 21    the calling party telephonic device operational status

12:31:00 22    information associated with the calling party number or

12:31:02 23    billing number.

12:31:04 24    Q.    So is that all of the so-called forensic analysis?

12:31:08 25    A.    It says determining by the electronic system.

12:31:13 1    Q.      Is the determining step required to occur before the

12:31:17 2    incoming call is answered?

12:31:19 3    A.      No, that's a separate element.

12:31:23 4    Q.      Getting back to my question, is the entirety of the

12:31:26 5    analysis in this claim required to occur before the incoming

12:31:29 6    call is answered?

12:31:30 7    A.      No, only the gathering part.

12:31:33 8    Q.      Okay.  If we could move to PDX 2.13.  We're back to

12:31:53 9    this picture again.  There was some questions about Amazon,

12:31:58 10   I think, from Next Caller's counsel with this picture up

12:32:01 11   there.  Let's start with, you mentioned when Next Caller's

12:32:06 12   counsel asked you a question that not all of the stuff in

12:32:09 13   this diagram was owned by Amazon.  Can you point out the

12:32:12 14   stuff that's not owned by Amazon?

12:32:14 15   A.      Sure.  The API gateway, VeriCall, which is the call

12:32:21 16   center, and the software, very importantly it's the software

12:32:25 17   that's making all of this work, that controls all this

12:32:30 18   system is the software, that's the software in the analysis

12:32:33 19   engine, and the data, and the data that's part of the,

12:32:37 20   what's shown as the train, that's for training the models,

12:32:40 21   so all of that is Next Caller software.  And without it,

12:32:45 22   this system does nothing.

12:32:47 23   Q.      What about that line that says model artifacts, is

12:32:50 24   that owned by Next Caller or Amazon?

12:32:52 25   A.      That's Next Caller, so that's the Next Caller

provides the data that creates the models.

Q.    Does Next Caller pay for the use of Amazon's
hardware?

A.    Oh, yes.

Q.    So in effect Next Caller is renting Amazon's
hardware?

A.    Yes.

Q.    Do they sell access to the VeriCall system as it's
running on Amazon web services?

A.    That's my understanding of their arrangement with
their customers.

Q.    And when they sell access to their system, that would
include the use of Amazon's processors and memory?

A.    They're software running on the processors, that's
right.

Q.    Mr. Passey, if we could pull up PDX 2.90.

      Do you recall when Next Caller's counsel was
asking you some questions about the diagram on this
demonstrative, Mr. Bress?

A.    Yes.

Q.    Now, I think there were some questions about whether
this SIP invite was received at the same time by VeriCall?

A.    That's right.

Q.    Is the from field in this SIP invite received at the
same time as the rest of the fields in this SIP invite by

12:34:14 1    the VeriCall system?

12:34:16 2    A.    As I said, this one is referred to as a file, but

12:34:21 3    data comes streaming through and this is how a SIP invite is

12:34:25 4    received is that the headers come in, the headers come in.

12:34:28 5    Q.    What do you mean that data comes in as a stream?

12:34:31 6    A.    A data stream, so you get an analyzer.  I have done

12:34:36 7    this, connect an analyzer and see the data coming in on a

12:34:41 8    line, you see the data coming in on a data stream basically

12:34:45 9    character by character.

12:34:46 10   Q.    Mr. Passey, if we could go to JTX-004, claim 1, the

12:34:55 11   '913 Patent.  And then claim 1.  If you can highlight the

12:35:11 12   last step, the one when a discrepancy exist.  Perfect.  I

12:35:18 13   want to focus on that word "causing."

12:35:24 14          Does the use of the word causing actually

12:35:29 15   require VeriCall to suspend the call itself?

12:35:34 16   A.    No, it would just be the discrepancy exist, it causes

12:35:39 17   the call processing of the call request to be suspended.

12:35:48 18   Q.    One last document, DTX-63.

12:36:01 19          Sorry, I speak quickly.  Do you remember when

12:36:12 20   counsel for Next Caller was asking you some questions about

12:36:22 21   this document?

12:36:22 22   A.    Yes.

12:36:23 23   Q.    And I think you said that you did not review this

12:36:27 24   document for your infringement analysis?

12:36:29 25   A.    That's right.

12:36:29 1    Q.      Why not?

12:36:31 2    A.      Because the infringement analysis is the claims of

12:36:33 3    the patent.  And the accused product and accused product in

12:36:38 4    this case is VeriCall.

12:36:39 5    Q.      So again, for the jury, why didn't you review

12:36:43 6    TRUSTID's product when you were determining infringement in

12:36:45 7    this case?

12:36:46 8    A.      TRUSTID owns the patents.  I don't think they would

12:36:49 9    infringe on themselves so I wouldn't -- elements of the

12:36:54 10   claims versus TRUSTID's -- I mean Next Caller's VeriCall

12:36:58 11   product.

12:36:58 12   Q.      I think we might have gone over this already, but is

12:37:01 13   it possible for two products that operate differently to

12:37:04 14   still practice the same claims of the patent?

12:37:07 15   A.      Absolutely.

12:37:10 16           MR. BLOCK:  No further questions, Mr. Bress.

12:37:12 17           THE WITNESS:  Thank you.

12:37:13 18           THE COURT:  Thank you, Mr. Bress.  You are

12:37:15 19   excused.

12:37:16 20           And we're going to take our lunch break now.

12:37:19 21   We'll take forty-five minutes, come back at 1:20.

12:37:22 22           (Jury leaving the courtroom at 12:37 p.m.)

12:37:50 23           THE COURT:  You can step down.  Anything that we

12:37:54 24   need to discuss?  All right.

12:37:56 25           MS. COLUMBIA:  Your Honor, may I mention one

12:37:59 1 thing, because it's troubling me.  Could I ask that

12:38:04 2 Mr. Bress be excused before I do?

12:38:06 3    THE COURT:  You may.

12:38:25 4    MS. COLUMBIA:  So I think it became clear on

12:38:31 5 cross-examination that we have the two call theory going on.

12:38:37 6 I don't know procedurally how you would like me to raise

12:38:40 7 that.  I'm not asking you to decide it here on the bench at

12:38:43 8 the end of that, but I am going to need to raise both the

12:38:53 9 lateness issue and the other prejudicial issues because I

12:38:56 10 think that's really what that testimony --

12:38:58 11    THE COURT:  I think there was a lot of two call

12:39:01 12 stuff that was testified to, but the only person I heard

12:39:04 13 mention it was you, so that actually got my attention when I

12:39:08 14 was listening to your cross-examination.  You can tell me

12:39:11 15 why what he said originally was the two call, but I

12:39:16 16 didn't -- when I was listening to it, he replied to what you

12:39:23 17 were asking.

12:39:23 18    MS. COLUMBIA:  Well, what happened on direct was

12:39:26 19 he used his words very carefully and talked about the

12:39:30 20 incoming call to the agent, and it wasn't until cross that

12:39:34 21 it became clear that his opinion is based on that being a

12:39:37 22 second call.

12:39:39 23    MR. BLOCK:  Your Honor, the question was

12:39:41 24 literally asked, "Are you saying there are two calls?"

12:39:45 25 Mr. Bress never said that before that point.  That's what

12:39:47 1　caused the two call theory to be disclosed.  Mr. Bress on

12:39:51 2　his direct never mentioned two calls, repeatedly only

12:39:55 3　pointed to the calls to the agent which are in his report.

12:39:58 4　　　　　　THE COURT:  You can file something.  You're

12:40:00 5　going to have to show me where in his direct he -- he did

12:40:05 6　something that was different from what I allowed.  And you

12:40:09 7　can point out to me why that's not the case and why it was

12:40:12 8　only raised on cross.  If it was just raised on cross, I

12:40:16 9　think you might be out of luck, but if it was raised in

12:40:19 10　direct, I will consider it.  You can submit something.

12:40:22 11　　　　　　MS. COLUMBIA:  I understand.  And we'll review

12:40:24 12　the transcript.  I understand, and we'll only file something

12:40:27 13　if we think it's meritorious.

12:40:30 14　　　　　　THE COURT:  Okay.

12:40:31 15　　　　　　MS. COLUMBIA:  Thank you.

13:24:57 16　　　　　　(A luncheon recess was taken.)

13:24:57 17　　　　　　THE COURT:  Okay.  Bring in the jury.

13:25:07 18　　　　　　(Jury entering the courtroom at 1:25 p.m.)

13:25:15 19　　　　　　THE COURT:  Welcome back everyone.  Be seated,

13:25:30 20　please.

13:25:30 21　　　　　　What's next?

13:25:32 22　　　　　　MR. PICKARD:  Your Honor, Byron Pickard on

13:25:36 23　behalf of TRUSTID.  We call Stephen Holzen.

13:25:42 24　　　　　　THE COURT:  Okay.

13:25:55 25　　　　　　COURT CLERK:  Please raise your right hand.

1   Please state and spell your full name for the record.

2           THE WITNESS:  Stephen Holzen.  S-T-E-P-H-E-N,

3   H-O-L-Z-E-N.

4           STEPHEN HOLZEN, having been duly sworn was

5   examined and testified as follows:

6           THE COURT:  Good afternoon.

7           THE WITNESS:  Good afternoon.

8           THE COURT:  Mr. Pickard.

9                   DIRECT EXAMINATION

10  BY MR. PICKARD:

11  Q.      Good afternoon.  Could you please state your name for

12  the jury?

13  A.      Stephen Andrew Holzen.

14  Q.      Why are you here today, Mr. Holzen?

15  A.      I'm here today to share my opinions about the damages

16  that TRUSTID has suffered due to Next Caller's patent

17  infringement.

18  Q.      Could you briefly explain to the jury what you mean

19  by damages?

20  A.      Sure.  Damages, the amount of money that TRUSTID has

21  lost due to Next Caller's patent infringement.

22  Q.      Mr. Holzen, have you prepared a presentation, visual

23  presentation to assist with, or accompany your testimony

24  today?

25  A.      Yes, I have.

13:26:59 1        MR. PICKARD:  Your Honor, we have a set of

13:27:01 2   demonstratives.  I understand there is no objection to them.

13:27:03 3   May we publish them to the jury?

13:27:05 4        THE COURT:  Sure.

13:27:06 5   BY MR. PICARD:

13:27:06 6   Q.    Mr. Holzen, let's start with your background if we

13:27:09 7   can.  Do you have a college degree?

13:27:11 8   A.    Yes, I do.  I graduated from Penn State University in

13:27:16 9   2000 with a mechanical engineering degree.

13:27:19 10  Q.    Okay.  And do you have any graduate degrees?

13:27:22 11  A.    Yes, I do.  I graduated from American University in

13:27:25 12  2007 with a masters in business administration.

13:27:29 13  Q.    And can you tell the jury what the master of business

13:27:32 14  administration degree is?

13:27:34 15  A.    Sure.  That's a graduate level business degree with a

13:27:37 16  focus on the core business criteria, curriculum like

13:27:42 17  statistic, accounting, finance and whatnot.

13:27:45 18  Q.    Did you have a particular concentration as part of

13:27:48 19  your business school program?

13:27:49 20  A.    I did.  My concentration was in finance.

13:27:52 21  Q.    What year did you graduate?

13:27:52 22  A.    I graduated in 2007.

13:27:53 23  Q.    Did you graduate with any distinctions?

13:27:52 24  A.    I graduated with high honors.  I graduated at the top

13:28:02 25  of my class.

13:28:03 1    Q.    Let's talk about what you have been doing

13:28:06 2    professionally since graduating from your business school

13:28:08 3    program.  What have you done since graduation?

13:28:11 4    A.    I have been working as a financial consultant,

13:28:14 5    working on projects where there is patent licensing, patent

13:28:18 6    valuation, and patent damages.

13:28:19 7    Q.    All right.  And where do you currently work?

13:28:21 8    A.    I work for a company called Stout Risius Ross.

13:28:26 9    Q.    What's your position there?

13:28:27 10    A.    I'm a managing director, which is another word for

13:28:31 11    partner.

13:28:32 12    Q.    What are your job duties in that role?

13:28:35 13    A.    I work with clients to help them improve questions

13:28:39 14    about patent valuation.  I help them with patent licensing

13:28:42 15    issues and the calculation of patent damages due to

13:28:45 16    infringement.

13:28:45 17    Q.    Can you explain what a patent license is, sir?

13:28:49 18    A.    Sure.  A patent license is a contract that grants one

13:28:53 19    company the right to use another company's patents.

13:28:58 20    Q.    And roughly how many patent licensing transactions

13:29:01 21    have you been involved with?

13:29:03 22    A.    I have been -- I have licensed over a hundred

13:29:08 23    patents.  I have licensed for the Department of Energy, for

13:29:11 24    corporate clients, and for NASA.

13:29:12 25    Q.    Do you have any certifications that are germane to

13:29:17 1  your opinions in this case?

13:29:19 2  A.    I do.  I am a certified valuation professional and a

13:29:23 3  certified licensing professional.

13:29:25 4  Q.    You mentioned that you do damage analysis in your

13:29:27 5  current role at Stout.  Does that mean you served as an

13:29:31 6  expert in litigation in the past?

13:29:33 7  A.    Yes.

13:29:33 8  Q.    How many times have you been retained to do that,

13:29:37 9  sir?

13:29:37 10  A.    I have been retained more than thirty times.

13:29:39 11  Q.    And have you testified in trial before?

13:29:41 12  A.    Yes, I have.  This is my second trial testimony.

13:29:45 13  Q.    Have you ever taught on the subject of patent damages

13:29:49 14  or damages in general?

13:29:51 15  A.    I have.  I taught a class at the Smith School of

13:29:56 16  Business at the University of Maryland.

13:29:58 17  Q.    And have you published in the area of patent damages?

13:30:01 18  A.    I have, yes.  I have published nine articles as well

13:30:05 19  as a book on patent damages.

13:30:08 20  Q.    Okay.  Now, TRUSTID has hired your firm in order to

13:30:12 21  on -- for you to provide your opinions today.  Is that

13:30:14 22  right?

13:30:14 23  A.    Yes, that's right.

13:30:15 24  Q.    Can you tell the jury how much your firm is being

13:30:18 25  compensated for your work?

13:30:19 1    A.      $475 an hour.

13:30:21 2    Q.      Are your opinions in any way dependent on the

13:30:24 3    compensation received?

13:30:26 4    A.      No, my opinions are completely independent.

13:30:28 5            MR. PICKARD:  Your Honor, we tender Mr. Holzen

13:30:31 6    as an expert in accounting, finance, and damages analysis

13:30:33 7    including patent infringement damages.

13:30:35 8            MS. COLUMBIA:  No objection.

13:30:36 9            THE COURT:  All right.  He will be so

13:30:38 10   recognized.

13:30:40 11   BY MR. PICKARD:

13:30:40 12   Q.      Mr. Holzen, can you give the jury an overview of the

13:30:43 13   opinions that you will provide today?

13:30:44 14   A.      So today we will be talking about lost profits and

13:30:48 15   reasonable royalties, two forms of damages.

13:30:51 16   Q.      And what amounts for those two types of damages have

13:30:56 17   you concluded are appropriate in the case?

13:30:59 18   A.      For the lost profits my conclusion is the damages

13:31:02 19   amount is $23.9 million.  And for reasonable royalties it's

13:31:07 20   nine-and-a-half million dollars.

13:31:08 21   Q.      All right.  Now, as between those two damage awards,

13:31:11 22   do you have an opinion as to which is most appropriate here?

13:31:15 23   A.      It's my opinion that the most appropriate award in

13:31:17 24   this case is lost profits of $23.9 million.

13:31:22 25   Q.      Okay.  Let's start with the assumptions you made in

13:31:26 1   doing your analysis.  Can you tell the jury what those were?

13:31:30 2   A.     I made three assumptions.  The first is that I had to

13:31:34 3   assume that TRUSTID's patents are valid.  Second, I had to

13:31:38 4   assume that Next Caller infringes TRUSTID's patents.  And

13:31:40 5   third, I assumed the damages period in this case runs from

13:31:46 6   January 2018 through the present.

13:31:49 7   Q.     All right.  And what materials have you considered in

13:31:51 8   forming your opinion?

13:31:52 9   A.     Sure.  So the purpose of this slide is to provide an

13:31:55 10  overview of the information that I considered.  Generally

13:31:59 11  speaking I reviewed a number of produced documents by both

13:32:03 12  parties, court records and other legal documents.  And

13:32:07 13  interviews with -- interviewing Mr. Cox and interviews with

13:32:12 14  Mr. Bress as well as opposing Next Caller's damages expert

13:32:16 15  report, and some of my own publicly available research.

13:32:22 16  Q.     Let's turn to your lost profits opinion.  Can you

13:32:24 17  explain to the jury what the concept of a lost profits

13:32:27 18  damage is?

13:32:28 19  A.     Sure.  So the slide will help me with this.  So the

13:32:32 20  purpose of this slide is to show that TRUSTID earns revenue

13:32:36 21  from its customers and it converts that revenue into profit.

13:32:42 22  And the purpose of this slide is to illustrate the impact

13:32:46 23  that Next Caller has had on TRUSTID's profits, what -- what

13:32:51 24  I'm showing in the slide is that the revenue amounts for

13:32:52 25  TRUSTID's customers is now smaller, and likewise the amount

13:33:02 1    that is turning into profits is also smaller.

13:33:05 2    Q.      What are you trying to determine by way of your lost

13:33:08 3    profits opinion here?

13:33:09 4    A.      The amount of money that TRUSTID lost due to Next

13:33:12 5    Caller's patent infringement.

13:33:13 6    Q.      What methods did you apply in carrying out your

13:33:16 7    analysis?

13:33:17 8    A.      I used a four factor test.

13:33:24 9    Q.      All right.  Can you explain to the jury what the four

13:33:27 10   factor test is?

13:33:28 11   A.      The purpose of this slide is to give you an overview

13:33:30 12   of the four factors that we consider while I'm doing a lost

13:33:34 13   profits calculation.  The first three relate to TRUSTID's

13:33:37 14   business, the fact that they qualify to receive lost profit

13:33:42 15   and then the fourth is the calculation itself.

13:33:45 16   Q.      All right.  Let's get some context to that.  In your

13:33:51 17   analysis, considering what business TRUSTID would have won

13:33:56 18   in the absence of Next Caller's infringement, what customers

13:33:58 19   of Next Caller were you analyzing?

13:34:00 20   A.      I was focused on Next Caller's customers including

13:34:02 21   Capital One, BBVA, Dish, Comcast, and a handful of other

13:34:02 22   customers that were held in confidence.

13:34:10 23   Q.      Can you tell the jury roughly when Next Caller won

13:34:14 24   each of these customers?

13:34:16 25   A.      Sure.  So Capital One, it won Capital One in the

13:34:21 1  spring of 2017.  BBVA was in August of 2017, I think is when

13:34:29 2  the revenue started.  Dish was in the summer of 2018.  And

13:34:33 3  Comcast, Next Caller started getting revenue from Comcast in

13:34:39 4  January of 2018.

13:34:41 5  Q.      Next Caller has other customers.  Can you give the

13:34:43 6  jury a rough sense of how much the VeriCall revenue was

13:34:48 7  represented by these four that we see on the slide?

13:34:50 8  A.      Sure.  The large majority of Next Caller's customers

13:34:53 9  is from these four -- excuse me, from their customers is

13:34:57 10 these four, it's more than 90 percent.

13:34:59 11 Q.      So let's turn to the factors.  Can you explain what

13:35:02 12 the demand for the patented products required you to

13:35:06 13 consider?

13:35:07 14 A.      This is a consideration of whether there is demand in

13:35:12 15 the industry for TRUSTID's patented invention.

13:35:15 16 Q.      What did you determine?

13:35:17 17 A.      I determined that there is strong evidence of demand.

13:35:20 18 Q.      What was that determination based on?

13:35:22 19 A.      That was based on a review of -- a review records of

13:35:27 20 TRUSTID's and Next Caller's financial records.

13:35:29 21 Q.      Let's start with your review of the TRUSTID records.

13:35:33 22 Can you tell the jury what we see here?

13:35:33 23 A.      Sure.  The purpose of this slide is to illustrate the

13:35:38 24 amount of money that TRUSTID earned by year in the sale of

13:35:41 25 its patent practicing the product Authenticator.  And what

13:35:45 1   it shows is that in 2014 up to 2020, there has been an

13:35:51 2   increasing trend in revenue, and it's leveled -- it stayed

13:35:57 3   above 15, $16 million after 2019.

13:36:01 4   Q.     What did that indicate to you?

13:36:02 5   A.     That there is strong evidence of demand for TRUSTID's

13:36:05 6   patented invention.

13:36:06 7   Q.     Did you also consider Next Caller's revenue trend?

13:36:10 8   A.     I did.

13:36:12 9   Q.     All right. And can you explain to the jury what you

13:36:14 10   determined with respect to that?

13:36:15 11   A.     Sure.

13:36:15 12         So the purpose of this slide is to present an

13:36:18 13   illustration of the VeriCall revenue by year. What it shows

13:36:23 14   from 2016 to 2020, Next Caller's revenue from VeriCall

13:36:28 15   product had increased each year.

13:36:35 16   Q.     Mr. Holzen, if you could please turn in your binder

13:36:39 17   to exhibit PTX-856?

13:36:43 18   A.     I'm sorry, I missed the number.

13:36:45 19   Q.     Sure. It's PTX-856. Do you recognize that exhibit?

13:36:55 20   A.     I do.

13:36:55 21   Q.     Can you please explain what it is?

13:36:58 22   A.     This is a summary of Next Caller's revenue that I

13:37:01 23   did. It is based on underlying source records that were

13:37:04 24   produced by Next Caller including interrogatory responses.

13:37:08 25         MR. PICARD: Your Honor, we move to admit

13:37:10 1   PTX-856.

13:37:12 2               MS. COLUMBIA:  Your Honor, I don't think I'm

13:37:13 3   going to have an objection, but I don't have it in the

13:37:15 4   binder I was given.  Perhaps if I could get 856.

13:37:47 5               MS. COLUMBIA:  No objection, Your Honor.

13:37:48 6               THE COURT:  It's admitted.

13:37:50 7               (PTX Exhibit No. 856 was admitted into

13:37:51 8   evidence.)

13:37:51 9               MR. PICKARD:  Can we publish this to jury?

13:37:54 10  BY MR PICKARD:

13:37:54 11  Q.     Mr. Holzen, can you summarize what's summarize here

13:37:58 12  in PTX-856?

13:38:00 13  A.     This shows Next Caller's revenue by customer from

13:38:03 14  2017 through July 12th, 2021.  During the entire time frame

13:38:08 15  Next Caller's total revenue was $16.5 million.

13:38:12 16  Q.     If we can take that down, please.  Let's turn to the

13:38:18 17  second factor in your analysis, absence of commercially

13:38:27 18  acceptable, non-infringing alternatives.  Can you explain to

13:38:31 19  the jury what you considered in applying this factor?

13:38:34 20  A.     Sure.  This is a factor that ask us to consider

13:38:37 21  whether there is any substitute products that offer the same

13:38:42 22  technologies as do TRUSTID's patents.

13:38:42 23  Q.     What did you conclude with the presence of acceptable

13:38:47 24  alternatives?

13:38:48 25  A.     There are no non-infringing acceptable alternatives.

13:38:52 1    Q.      Did you determine who uses the patented technologies

13:38:57 2    in your analysis?

13:38:57 3    A.      Yes, I did.

13:38:59 4    Q.      What was your conclusion there?

13:39:01 5    A.      That there is two companies, TRUSTID and Next Caller.

13:39:05 6    Q.      All right.  Now, the jury has heard some evidence

13:39:08 7    about other solutions in the broader fraud detection market

13:39:14 8    and prevention, have you reviewed those in determining in

13:39:18 9    they were acceptable alternatives?

13:39:20 10   A.      Yes, I have.

13:39:20 11   Q.      What have you determined?

13:39:22 12   A.      I have determined that the other solutions are not

13:39:24 13   commercially acceptable and non-infringing alternatives.

13:39:27 14   Q.      Can you tell the jury at a high level what the other

13:39:30 15   solutions were that you considered?

13:39:31 16   A.      These include, and they're illustrated in the slide,

13:39:38 17   knowledge-based authentication, biometrics and black list.

13:39:42 18   Q.      Let start with your analysis of knowledge-based

13:39:45 19   authentication.  Can you remind the jury what that solution

13:39:47 20   entails?

13:39:49 21   A.      This is where you place a phone call to a call center

13:39:52 22   and you confirm you are who you say you are by asking either

13:39:55 23   your mother's maiden name or your Social Security number.

13:39:59 24   Q.      Why did you conclude that knowledge-based

13:40:02 25   authentication is not an acceptable alternative to the

13:40:04 1  patented technology?

13:40:05 2  A.      As we can see on this slide, because KBA is a

13:40:10 3  complimentary product to the patent.  It's not used as a

13:40:14 4  substitute but rather they're used together.  Also with KBA,

13:40:18 5  KBA ends up being very expensive because you're paying for

13:40:22 6  labor to answer the phone, so it ends up being 4.42 cents

13:40:27 7  per call which is eleven times more expensive than the

13:40:32 8  patented products.

13:40:33 9  Q.      Let's turn to biometrics.  Can you quickly remind the

13:40:37 10  jury what biometrics are?

13:40:38 11  A.      Biometrics is a way of authenticating somebody by the

13:40:43 12  sound of their voice.

13:40:44 13  Q.      Why in your view aren't the biometrics solution an

13:40:49 14  acceptable alternative to the patented technology?

13:40:51 15  A.      Biometrics does not analyze a hundred percent of the

13:40:54 16  phone calls and that's because it requires customers to

13:40:57 17  share their voice with the bank and not all customers are

13:41:01 18  willing to do that.

13:41:01 19  Q.      How does that compare to the patented products?

13:41:02 20  A.      As compared to the patented products, the patented

13:41:06 21  invention is the first line of defense at the call center,

13:41:10 22  and it processes 100 percent of the phone calls.

13:41:11 23  Q.      And the rest of your reason, sir?

13:41:14 24  A.      Sure.  Biometrics also has the drawback that it can

13:41:18 25  be tricked because of measuring the sound of your voice, so

13:41:21 1    if somebody has a voice recording of you, they can use that

13:41:24 2    voice recording to bypass the biometric authentication.

13:41:30 3    Another drawback with biometric is that it cost $0.15 per

13:41:34 4    call.  This is roughly five to seven times more expensive

13:41:38 5    than caller based authentication which is an economic

13:41:41 6    indicator that biometrics is in a separate market segment

13:41:46 7    from the patented products.

13:41:47 8    Q.    How does the installation or setup charges for

13:41:51 9    installing a biometric solution compare to the patented

13:41:54 10   products?

13:41:54 11   A.    Biometrics are very expensive to install because they

13:41:58 12   require customer premise equipment, very different than with

13:42:02 13   the patented products which can be installed with no

13:42:05 14   customer premise equipment, the phone calls can just be

13:42:09 15   routed.

13:42:10 16   Q.    Let's turn to the black list solution.  What is that?

13:42:16 17   A.    Black list is a process of blocking suspicion phone

13:42:21 18   calls.  And black list is in a different market segment

13:42:26 19   because it can be easily defeated by spoofing.  So if a

13:42:29 20   fraudster simply changes their phone number they can bypass

13:42:33 21   the black list and gain access to a call center.

13:42:38 22   Q.    There was another solution you analyzed in forming

13:42:40 23   your opinions as well; is that right?

13:42:42 24   A.    That's right.

13:42:42 25   Q.    What was that?

13:42:42 1    A.      It was the option of inaction, or taking no security

13:42:47 2    to protect your customer's personal information.

13:42:51 3    Q.      What did you conclude with the option of inaction?

13:42:54 4    A.      For the companies that have decided they need to

13:42:58 5    purchase an authentication solution, the option of inaction

13:43:01 6    is really no option at all.

13:43:03 7    Q.      So you concluded that in essence that TRUSTID just

13:43:09 8    competes with Next Caller; is that right?

13:43:11 9    A.      Yes.

13:43:11 10   Q.      Now, you have on another occasion provided an opinion

13:43:15 11   that TRUSTID also competed with Pindrop; is that right?

13:43:17 12   A.      That's correct.

13:43:18 13   Q.      Is your opinion here inconsistent with that one where

13:43:22 14   you said that TRUSTID competes with Pindrop?

13:43:24 15   A.      No, it's not.

13:43:26 16   Q.      The period you analyzed for the presence of

13:43:29 17   acceptable alternatives, what was that period in this case?

13:43:32 18   A.      It was 2017 to 2019.

13:43:35 19   Q.      And this other opinion, what period did it read to?

13:43:38 20   A.      That was an opinion written in May of 2019.

13:43:42 21   Q.      Have you seen any evidence in your review of the

13:43:45 22   record in this case that supports your conclusion that Next

13:43:48 23   Caller and TRUSTID solely compete with one another?

13:43:51 24   A.      Yes, I have.

13:43:52 25   Q.      And is it okay if we put an example of that up for

13:43:56 1    the jury?

13:43:56 2    A.    Sure.

13:43:57 3    Q.    This has already been admitted into evidence.  Can

13:44:00 4    you tell the jury what we have here?

13:44:02 5    A.    Sure.  So this is a Next Caller document.  We can see

13:44:06 6    that this document, the author of this document says that

13:44:10 7    Next Caller's "100 percent competing with TRUSTID and not

13:44:16 8    Pindrop."

13:44:17 9    Q.    Can you remind the jury who Mr. Kirchick is?

13:44:20 10   A.    Mr. Kirchick is an executive who used to work for

13:44:24 11   Next Caller.

13:44:24 12   Q.    Why did this document support your conclusion that

13:44:27 13   the only two competitors are TRUSTID and Next Caller?

13:44:30 14   A.    Because Next Caller confirmed via internal e-mail

13:44:37 15   that it's competing with TRUSTID but it's not competing with

13:44:39 16   Pindrop.

13:44:40 17   Q.    Let's turn to the next factor, capacity to meet

13:44:43 18   demand.  What did you consider in analyzing this factor?

13:44:46 19   A.    This factor asked me to consider whether TRUSTID had

13:44:42 20   the ability to sell its products to Next Caller's customers.

13:44:52 21   Q.    And what did you conclude in your analysis of this

13:44:52 22   factor?

13:44:52 23   A.    I concluded that TRUSTID had the capacity to make

13:44:56 24   that sale.

13:45:00 25   Q.    All right.  Can you explain to the jury what you

13:45:02 1    considered in making that conclusion?

13:45:04 2    A.    Sure.  So there is two forms of capacity, one is

13:45:07 3    technical capacity and the other is marketing capacity.

13:45:09 4    Under technical capacity, I concluded that TRUSTID had

13:45:13 5    technical capacity because it's selling software and it can

13:45:17 6    be installed in sixty to ninety days.  In the marketing

13:45:20 7    capacity side I determined that they did have marketing

13:45:23 8    capacity because they worked with resellers who delivered

13:45:28 9    their product indirectly through resellers or directly into

13:45:32 10   a number of different industry customers including banking,

13:45:36 11   insurance, retail, and automotive.

13:45:41 12   Q.    All right.  And the last factor is calculate the

13:45:44 13   profits.  Can you explain to the jury what this step of your

13:45:47 14   analysis involved?

13:45:48 15   A.    Sure.  So this is just the last step of the four

13:45:51 16   factor test, the calculation itself.

13:45:54 17   Q.    What did you do to calculate the profits here?

13:45:56 18   A.    So the purpose of this slide is to show the equation.

13:46:00 19   The equation that we used to calculate lost profits is Next

13:46:04 20   Caller's invoiced calls times TRUSTID's profit per call and

13:46:08 21   that equals TRUSTID's lost profits.

13:46:12 22   Q.    What did you determine was the number of invoiced

13:46:12 23   calls to use in your analysis?

13:46:12 24   A.    It's 1.93 billion phone calls.

13:46:18 25   Q.    What did you base that on?

13:46:20 1    A.    That was based on review of an analysis, calculation

13:46:24 2    of Next Caller's invoiced phone calls.

13:46:27 3    Q.    And if you could turn to PTX-851 in your binder,

13:46:33 4    please.

13:46:36 5            MS. COLUMBIA:  851.

13:46:37 6            MR. PICKARD:  Yes.

13:46:41 7    Q.    Do you recognize this document, Mr. Holzen?

13:46:43 8    A.    Yes, I do.

13:46:44 9    Q.    Could you describe what it is, please?

13:46:46 10   A.    Sure.  This is a summary of my calculations for

13:46:53 11   number of phone calls that Next Caller processed from 2018

13:46:57 12   to 2021.

13:46:58 13   Q.    What did you base that summary on?

13:47:00 14   A.    I based the summary on Next Caller invoices and I

13:47:06 15   prepared the summary myself.

13:47:09 16            MR. PICKARD:  I move to admit PTX-851, Your

13:47:11 17   Honor.

13:47:11 18            MS. COLUMBIA:  No objection.

13:47:12 19            THE COURT:  It's admitted.

13:47:14 20            (PTX Exhibit No. 851 was admitted into

13:47:15 21   evidence.)

13:47:15 22   BY MR. PICKARD:

13:47:18 23   Q.    All right.  And if we could, could you explain to us

13:47:22 24   what's shown in your summary, PTX-851 -- I guess I'll start,

13:47:26 25   what are the two scenarios?

13:47:27 1    A.      The difference between scenario one and scenario two

13:47:31 2    is the start date.  And the scenario one started on

13:47:34 3    January 9th and scenario two we start on January 30th of the

13:47:38 4    same year.

13:47:39 5    Q.      Why are there two different start dates in your

13:47:41 6    analysis?

13:47:42 7    A.      Scenario one is starting on the date that TRUSTID

13:47:45 8    informed Next Caller that they were infringing TRUSTID's

13:47:48 9    patents.  And scenario two starts on the date that TRUSTID

13:47:53 10   filed the complaint that resulted in this litigation.

13:47:57 11   Q.      And if the jury wanted to understand how much call

13:48:01 12   volume was attributable to any given customer in any

13:48:05 13   particular year, would this document allow them to do that?

13:48:07 14   A.      Yes, it would.

13:48:08 15   Q.      If we could return to the slide, Mr. Passey.  Thank

13:48:11 16   you.

13:48:13 17           All right.  Profits per call.  What did you

13:48:20 18   determine was the profit per call here?

13:48:22 19   A.      1.23 cents per phone call.

13:48:27 20   Q.      Let's step through how you made that determination.

13:48:31 21   First of all, how did you measure profits, what was the

13:48:36 22   method you applied?

13:48:37 23   A.      Sure.  So the purpose of this slide is just to

13:48:40 24   illustrate the process we used to calculate profits.  In

13:48:44 25   accounting you calculate profits by starting with revenue,

13:48:47 1  subtracting costs and ended up with profits.

13:48:51 2          MR. PICKARD:  Your Honor, I understand that you

13:48:54 3  will allow us to close the courtroom to have maybe five

13:48:58 4  minutes of testimony that is sensitive and proprietary

13:49:01 5  information.  I would like to do that now.

13:49:03 6          THE COURT:  Okay.  Members of the jury when

13:49:05 7  court proceedings are open proceedings, they're open to the

13:49:07 8  public.  When you guys aren't under a duty, you can come in

13:49:11 9  any day you want to and sit here and watch one.  But there

13:49:14 10 are times when we talk about things that are very sensitive,

13:49:17 11 like in financial matters.  So what we're going to do is

13:49:20 12 what we call close the courtroom.  All it means is that

13:49:23 13 anyone who isn't allowed to see information under the

13:49:26 14 protective order is going to be asked to leave the

13:49:29 15 courtroom.  You all can stay put.  I'll ask anyone who is

13:49:32 16 not entitled to see the information under the protective

13:49:35 17 order to leave.

13:49:35 18          Is there anyone here who fits that description?

13:49:39 19          MS. COLUMBIA:  Your Honor, I assume our

13:49:41 20 corporate rep can stay?

13:49:42 21          MR. PICKARD:  That's fine.

13:49:44 22          THE COURT:  Okay.  All right.  So then -- I

13:49:49 23 think actually -- usually the marshal is here and locks the

13:49:52 24 door, but we'll just consider it closed and I'll ask that

13:49:55 25 the Zoom proceedings be halted.  Can someone tell me if

13:50:00  1    that's been done?

13:50:06  2            So just so you know when I say the Zoom

13:50:08  3    proceedings, because we're limiting the number of people who

13:50:11  4    can come in here, the witnesses and the attorneys who are on

13:50:16  5    there, they are on camera for folks to watch from outside

13:50:20  6    the courtroom.  But you are not on camera and I am not on

13:50:24  7    camera.  Okay.

13:50:26  8            MR. PICKARD:  Thank you.

13:50:30  9            (Transcript sealed.)

         10

         11

         12

         13

         14

         15

         16

         17

         18

         19

         20

         21

         22

         23

         24

         25

Holzen - direct -  sealed

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

13:56:10   9          (Transcript unsealed.)

13:56:13  10          THE COURT:  Go ahead.

13:56:15  11   BY MR. PICKARD:

13:56:17  12   Q.    Mr. Holzen, if you could in your binder take a look

13:56:20  13   at PTX-854, please.  Do you recognize that document?

13:56:29  14   A.    I do.

13:56:29  15   Q.    What is this document?

13:56:31  16   A.    This document is a summary of my calculations of

13:56:35  17   TRUSTID's lost profits.

13:56:36  18   Q.    All right.  And how does it break out to your lost

13:56:41  19   profit calculation?

13:56:42  20   A.    It breaks it out by customer by year.

13:56:45  21   Q.    And what did you review in preparing that summary?

13:56:49  22   A.    When I prepared this summary I reviewed a number of

13:56:55  23   sources that were produced by Next Caller and by TRUSTID,

13:57:00  24   including having to perform a series of calculations to

13:57:04  25   arrive at these numbers.

13:57:06 1    Q.      And does PTX-854 accurately summarize the contents of

13:57:11 2    the underlying documents and the calculations that you

13:57:13 3    performed?

13:57:14 4    A.      It does.

13:57:15 5            MR. PICKARD:  Your Honor, we move to admit

13:57:18 6    PTX-854.

13:57:19 7            MS. COLUMBIA:  Objection, Your Honor.  That's

13:57:20 8    one of the documents that we sent this morning.

13:57:26 9            THE COURT:  The objection is sustained.

13:57:28 10   BY MR. PICKARD:

13:57:29 11   Q.      Mr. Passey, if you could put slide 65 up, please.

13:57:36 12           Mr. Holzen, can you tell the jury what we see on

13:57:40 13   this slide 65?

13:57:41 14   A.      Sure.  So this is a summary of TRUSTID's lost profits

13:57:45 15   per year from 2018 to 2021 broken out by customer.

13:57:52 16   Q.      Okay.  And why would it be useful to the jury to see

13:57:55 17   the lost profits award broken out on a customer-by-customer

13:58:00 18   basis?

13:58:00 19   A.      Because if the jury decides that lost profits should

13:58:04 20   be awarded for one of the customers, for example, Capital

13:58:08 21   One, the jury may award $12.75 million for Capital One, and

13:58:14 22   the reasonable royalties for the other customers.

13:58:20 23   Q.      Now let's turn to your reasonable royalty analysis.

13:58:22 24   If we could go back to the slide deck.  Can you explain to

13:58:32 25   the jury what a reasonable royalty is?

13:58:35 1   A.      Sure.  So in damages the lowest amount of damages in

13:58:40 2   patent law, the lowest amount of damages for infringement is

13:58:44 3   referred to as a reasonable royalty.  That's the language

13:58:47 4   provided by the patent damages law.

13:58:51 5   Q.      What is a royalty?

13:58:52 6   A.      Sure.  I prepared this slide to talk through what a

13:58:54 7   royalty is.  On the top of the slide, a royal -- an

13:58:58 8   analogous situation to a royalty would be like paying rent.

13:59:03 9   So in the top of the slide, we can see a tenant would

13:59:07 10  approach a landlord, ask permission to live in the house,

13:59:10 11  they would sign a lease agreement and the tenant would pay

13:59:13 12  the landlord a monthly rent.

13:59:15 13  Q.      How does that relate to a patent royalty?

13:59:18 14  A.      Patent royalties work very similar.  So for a patent

13:59:24 15  license, the licensee or Next Caller would approach TRUSTID

13:59:27 16  and request permission to use TRUSTID's patents.  The two

13:59:31 17  parties would sign what's called a license agreement or a

13:59:33 18  contract, and then Next Caller would pay TRUSTID a royalty

13:59:38 19  or a fee for the right to use TRUSTID's patents.

13:59:41 20  Q.      If the jury decides your opinions about lost profits

13:59:44 21  are correct, do they need to also decide reasonable royalty?

13:59:48 22  A.      No, they don't.

13:59:51 23  Q.      Given that there wasn't a patent license agreement

13:59:54 24  between Next Caller and TRUSTID, how did you determine what

13:59:56 25  a reasonable royalty was in this case?

13:59:59 1    A.      Sure.  So I used a framework that's commonly -- is
14:00:04 2    known as the hypothetical negotiation.
14:00:07 3    Q.      All right.  Can you explain to the jury what a
14:00:10 4    hypothetical negotiation is?
14:00:11 5    A.      It's called hypothetical because it didn't happen in
14:00:14 6    real life.  But this is where you imagine a situation where
14:00:18 7    TRUSTID sits down with Next Caller to negotiate the terms of
14:00:23 8    the patent license.
14:00:24 9    Q.      And what assumptions did you make in performing your
14:00:28 10   reasonable royalty analysis?
14:00:29 11   A.      So there are a number of assumptions.  First, that
14:00:34 12   the parties would assume that TRUSTID's patents are valid
14:00:36 13   and they would be infringed by Next Caller in the absence of
14:00:39 14   a license agreement.  Both parties would have perfect
14:00:43 15   information, they would lay their cards on the table, they
14:00:48 16   would have an understanding of each other's business records
14:00:51 17   and business strategy.  And that both parties -- neither
14:00:54 18   party would be allowed to leave and that means they would
14:00:56 19   have to be a licensee/licensor.
14:00:59 20   Q.      And your last assumption there, can you explain that
14:01:02 21   to the jury?
14:01:02 22   A.      Sure.  The last assumption is important for this case
14:01:06 23   because it frames the bargaining positions of the
14:01:10 24   negotiation.
14:01:10 25   Q.      Why is that?

14:01:11 1    A.      Well, because the negotiation is assumed to have

14:01:14 2    taken place on the eve of infringement, or the day before

14:01:20 3    the Next Caller product comes on the market.

14:01:22 4    Q.      What role did that play in your analysis?  What was

14:01:25 5    the dynamic on the eve of first infringement?

14:01:28 6    A.      So on the eve of first infringement, TRUSTID would

14:01:31 7    have recognized and would have already spent $15 million

14:01:36 8    developing its own patented product, bringing its own

14:01:39 9    product to market, educating the market.  Next Caller would

14:01:43 10   be showing up at the table asking for permission to use

14:01:46 11   TRUSTID's patents.  What that means is that Next Caller

14:01:50 12   would be asking permission to compete with TRUSTID, and for

14:01:54 13   that reason TRUSTID would not be willing to give away its

14:01:58 14   patents for a small -- an unreasonable royalty.

14:02:02 15   Q.      All right.  So quickly, when did this hypothetical

14:02:08 16   negotiation occur in this case?

14:02:10 17   A.      There would have to be two hypothetical negotiations

14:02:13 18   in this case.  The first one would be in 2015 for the '985

14:02:17 19   and the '532 Patent.  The second negotiation would be in

14:02:24 20   2018 for the '913 Patent.

14:02:27 21   Q.      Could you explain why there are two different

14:02:29 22   hypothetical negotiation dates?

14:02:31 23   A.      Sure.  So Next Caller first infringed the '985 and

14:02:35 24   the '532 in 2015, and the U.S. Patent Office granted the

14:02:41 25   '913 Patent in 2018.

14:02:42 1    Q.      All right.  Can you explain what the key issues were

14:02:45 2    that you needed to address in carrying out your analysis?

14:02:48 3    A.      So there is three key questions that ask about

14:02:52 4    setting up a license agreement.  The first is the structure

14:02:55 5    and the form of the payment.  The second is the royalty

14:02:58 6    base.  And the third is to address what royalty rate should

14:03:02 7    be.

14:03:02 8    Q.      What did you determine the structure of the royalty

14:03:05 9    would take?

14:03:06 10   A.      I determined that the structure of the royalty would

14:03:08 11   be on a per call basis, for each of Next Caller's infringing

14:03:14 12   phone callers.

14:03:16 13   Q.      What did you determine with respect to the base?

14:03:17 14   A.      It's a similar number to the lost profits

14:03:20 15   calculation.  It's 1.93 billion phone calls.

14:03:23 16   Q.      And the royalty rate, what did you determine the

14:03:26 17   correct royalty rate was?

14:03:27 18   A.      0.49 cents per call.

14:03:30 19   Q.      Let's go through how you determined that the royalty

14:03:34 20   rate was 0.49 cents.  Can you tell the jury what methods you

14:03:38 21   applied?

14:03:38 22   A.      Sure.  So the law provides us with fifteen factors

14:03:42 23   that are known as the Georgia-Pacific factors, so these are

14:03:46 24   the factors that I went through to figure out the parties'

14:03:50 25   bargaining positions.

14:03:51 1  Q.      Why are they called the Georgia-Pacific factors?

14:03:56 2  A.      In 1970's there was a famous case that involved the

14:04:00 3  company, Georgia-Pacific.  In that case it articulated these

14:04:04 4  fifteen factors.  And since that day patent damages experts

14:04:07 5  like myself will use fifteen Georgia-Pacific factors to

14:04:12 6  frame a hypothetical negotiation.

14:04:13 7  Q.      Did you consider all fifteen factors in your

14:04:16 8  analysis?

14:04:16 9  A.      I considered them all, yes.

14:04:19 10 Q.      All right.  Were the factors all of equal weight in

14:04:24 11 your analysis?

14:04:25 12 A.      No, they were not all equal weight.

14:04:30 13 Q.      We'll go through the ones.  Were there any that were

14:04:35 14 inapplicable?

14:04:36 15 A.      Yes.

14:04:38 16 Q.      Could we start at the opening of the negotiation.

14:04:42 17 Would there have been an opening bid in your hypothetical

14:04:45 18 negotiation?

14:04:45 19 A.      TRUSTID would have had the opening bid of 1.23 cents

14:04:50 20 per call.

14:04:50 21 Q.      Why would that be the appropriate starting bid for

14:04:54 22 TRUSTID?

14:04:54 23 A.      That's the amount of incremental profit that TRUSTID

14:04:58 24 had spent to earn in this sale of its own product, that's

14:05:00 25 the same number we talked about as the lost profits

14:05:04 1    calculation.

14:05:04 2    Q.      Would Next Caller have had an opening bid?

14:05:06 3    A.      Next Caller would have been interesting in licensing

14:05:10 4    for the lowest amount possible, for example, one percent of

14:05:13 5    1 penny.

14:05:14 6    Q.      What role in your analysis did these opening bids

14:05:18 7    play?

14:05:18 8    A.      This sets what I call the reference range, it

14:05:22 9    bookends the parties, the range of royalty rates that the

14:05:26 10   parties would negotiate between.

14:05:30 11   Q.      So let's start with factor 8 from the Georgia-Pacific

14:05:35 12   factors.  What role did that play in your analysis?

14:05:39 13   A.      That was the -- factor 8 is TRUSTID's established

14:05:44 14   profitability.  That was the opening offer that TRUSTID

14:05:47 15   would have made.

14:05:48 16   Q.      That 1.23 cents, does that come from one of your

14:05:52 17   calculations in your lost profits analysis?

14:05:54 18   A.      It comes from the lost profits analysis.

14:05:56 19   Q.      Earlier you mentioned that the dynamic between Next

14:05:59 20   Caller and TRUSTID on the eve of infringement was important

14:06:02 21   in your analysis.  Did that reveal itself in your analysis

14:06:06 22   of the Georgia-Pacific factors?

14:06:09 23   A.      Yes, it did.  There are three factors that relate to

14:06:12 24   competition, factors 4, 5, and 11.

14:06:15 25   Q.      Can you explain how factor 4 related to this, the

14:06:21 1   competition notion that you just introduced?

14:06:24 2   A.       Factor 4 is TRUSTID's established licensing policy

14:06:28 3   and it was TRUSTID's policy not to license to a direct

14:06:31 4   competitor, however, TRUSTID was willing to license, to

14:06:35 5   grant limited license to resellers as a way to expand its

14:06:40 6   reach into the market.

14:06:41 7   Q.       Does TRUSTID compete with these resellers?

14:06:44 8   A.       No, TRUSTID does not.  They work together.

14:06:46 9   Q.       What effect did factor 4 have in your determination

14:06:50 10  as to the royalty rate?

14:06:52 11  A.       Factor 4 suggested a higher royalty rate within the

14:06:56 12  reference range.

14:06:57 13  Q.       How about factor 5, what did you consider in

14:06:59 14  analyzing that factor?

14:07:00 15  A.       Factor 5 asked me to consider the commercial

14:07:04 16  relationship between TRUSTID and Next Caller.

14:07:05 17  Q.       What did you determine there?

14:07:07 18  A.       That they would be related as competitors.

14:07:10 19  Q.       And what influence did that have in setting the

14:07:12 20  royalty rate?

14:07:14 21  A.       This factor suggested a higher royalty rate within

14:07:17 22  the range and that's because Next Caller -- TRUSTID would be

14:07:20 23  losing money every time Next Caller sells a product using

14:07:24 24  the patented technology.

14:07:25 25  Q.       Now factor 11, what did you consider in your analysis

14:07:29  1    of that factor?

14:07:30  2    A.       Factor 11 relates to the extent to which Next Caller

14:07:34  3    made use of TRUSTID's patents.

14:07:36  4    Q.       And what did you determine as to the extent to which

14:07:40  5    Next Caller would make use of the patents?

14:07:42  6    A.       Well, both parties would recognize that Next Caller

14:07:45  7    intended to use TRUSTID's patents to process close to 2

14:07:50  8    billion phone calls, 1.93 billion phone calls which is

14:07:56  9    extensive use.  And the total company-wide revenue that Next

14:08:00 10    Caller would earn from the sale of the patents would amount

14:08:04 11    to more than 70 percent.

14:08:06 12    Q.       What influence would that have on your analysis?

14:08:09 13    A.       It suggested a higher royalty rate within the range.

14:08:15 14    Q.       Now we have called these factors out together.  Why

14:08:17 15    do you group these in your analysis, Mr. Holzen?

14:08:21 16    A.       These ones relate to -- the factors that relate to

14:08:24 17    licensing.

14:08:27 18    Q.       Can you explain what the duration of the patent

14:08:30 19    requires you to analyze?

14:08:31 20    A.       Sure.  So factor 7 ask us to consider the length of

14:08:35 21    time that the hypothetical license would extend.

14:08:40 22    Q.       How does the duration of the patent relate to the

14:08:44 23    period of the license agreement?

14:08:45 24    A.       The license agreement assumes it extends to the

14:08:50 25    patent expiration, in this case, both sets of patents had

14:08:54 1    fourteen years of life remaining.

14:08:56 2    Q.      What effect did that fact have on your setting of the

14:08:59 3    royalty rate?

14:09:00 4    A.      It suggested a higher royalty rate.

14:09:03 5    Q.      Why is that?

14:09:03 6    A.      That's because it's a long time, and Next Caller

14:09:08 7    would be interested at the time of the hypothetical

14:09:12 8    negotiation to come into the market immediately.  So they

14:09:16 9    would be willing to pay a premium in order to not have to

14:09:20 10   wait until the patent expired to come and compete with

14:09:23 11   TRUSTID.

14:09:24 12   Q.      All right.  Factors 9 and 10, what did you consider

14:09:27 13   in analyzing those?

14:09:29 14   A.      So factors 9 and 10 were the advantages and benefits

14:09:33 15   of the patents.

14:09:34 16   Q.      All right.  And what did you determine there?

14:09:37 17   A.      These factors are very similar to the -- whether

14:09:41 18   there exist non-infringing commercially acceptable

14:09:45 19   substitute products that we considered in the four factor

14:09:48 20   test.

14:09:48 21   Q.      Okay.  And I gather then your conclusion was the same

14:09:52 22   for this factor?

14:09:56 23   A.      Yes, that's correct.  There are no non-infringing

14:10:00 24   commercially acceptable substitute products.

14:10:02 25   Q.      What influence would that have had in the setting of

14:10:06 1   the royalty rate?

14:10:07 2   A.      It suggested a higher royalty rate.

14:10:09 3   Q.      Why is that?

14:10:10 4   A.      It's because Next Caller would not have any other

14:10:13 5   alternatives to turn to to sell customers a product that

14:10:16 6   offered the same technical and economic benefit.

14:10:20 7   Q.      So far we talked about factors that would drive the

14:10:23 8   royalty rate up.  Did any of the factors you analyzed drive

14:10:27 9   the rate down?

14:10:28 10  A.      Yes, three factors drove the rate down, factors 3 and

14:10:33 11  13.

14:10:33 12  Q.      Let's start with factor 3.  What did you consider

14:10:36 13  there?

14:10:36 14  A.      Factor 3 is related to the nature of the license as

14:10:39 15  to whether it's exclusive or nonexclusive.

14:10:42 16  Q.      What did you conclude on this factor?

14:10:44 17  A.      Well, it would be nonexclusive because an exclusive

14:10:49 18  license would mean that only one company can use the

14:10:51 19  patented invention, so because two companies would be using

14:10:55 20  the patented invention, it's necessarily not exclusive.

14:10:58 21  Q.      What effect did that have on the rate?

14:11:01 22  A.      It suggested a lower royalty rate within the range.

14:11:04 23  Q.      Factor 13, what did you analyze in weighing factor

14:11:08 24  13?

14:11:08 25  A.      Factor 13 relates to the portion of the profit that

should be credited to the patents as compared to other

non-patented elements.

Q.     All right.  And what did you determine for factor 13?

A.     Well, TRUSTID would recognize that Next Caller is

running its own business and taking on its own risk of

running that business, and so TRUSTID would be willing to

share a portion of its expense for that reason.

Q.     Did you have any evidence to would lead you to rely

on that portion that TRUSTID would share?

A.     I did.

Q.     What did your review of the retail agreement show

you?

A.     There were two key terms within the resale agreement.

The first was a minimum cost of on average $0.04 per call,

but also as part of the relationship that TRUSTID had with

its resellers, TRUSTID was willing to split its profits from

those relationships 60/40, with 40 percent staying with

TRUSTID.

Q.     All right.  Let's turn to factor 15.  What's factor

15?

A.     Factor 15 ask me to weigh all of the factors together

to assess what a reasonable royalty would be.

Q.     Can you tell the jury what you concluded in applying

factor 15?

A.     Sure.  Shown at the bottom right-hand side, a royalty

14:12:35 1 per call of 0.49 cents.

14:12:37 2 Q.     And if we apply that 0.49 cents royalty to our

14:12:43 3 earlier equation, what did you conclude with respect to the

14:12:46 4 royalty award in this case?

14:12:48 5 A.     That the reasonable royalty award damages would be

14:12:51 6 nine-and-a-half million dollars.

14:12:55 7 Q.     If we could go to slide 64, Mr. Passey.

14:13:08 8         Mr. Holzen, can you tell the jury what's shown

14:13:10 9 here in this slide?

14:13:12 10 A.     Sure.  This is TRUSTID's reasonable royalty by year

14:13:17 11 from 2018 to 2021, also broken out by customer.

14:13:22 12 Q.     All right.  And this follows the same format where we

14:13:29 13 had customer-by-customer basis for lost profits; correct?

14:13:32 14 A.     Yes.

14:13:32 15 Q.     The jury won't have this document when they do their

14:13:36 16 deliberations.  And you suggested that they could look to

14:13:39 17 these numbers in selecting a lost profit award for one

14:13:45 18 customer and a reasonable royalty award for another.  How

14:13:47 19 would they do that with this information?

14:13:51 20 A.     For example, if Capital One had lost profits, then

14:13:54 21 the other customers were a reasonable royalty, then BBVA,

14:14:01 22 Dish, Comcast and others, you can mix and match the

14:14:05 23 allowance.  You could total up the lost profits for Capital

14:14:08 24 One and add the reasonable royalty amount for the other

14:14:11 25 customers.

14:14:12 1          MR. PICKARD:  We pass the witness.

14:14:34 2          MS. COLUMBIA:  Your Honor, may I approach with

14:14:35 3  the cross binder?

14:14:37 4          THE COURT:  You may.

14:15:18 5              CROSS-EXAMINATION

14:15:18 6  BY MS COLUMBIA:

14:15:19 7  Q.      Good afternoon, Mr. Holzen.

14:15:20 8  A.      Good afternoon.

14:15:21 9  Q.      Nice to see you again.

14:15:22 10  A.      Likewise.

14:15:23 11  Q.      Just before we get started, your lost profits damages

14:15:31 12  number, the amount you're asking this jury to award to Next

14:15:34 13  Caller is roughly $23 million?

14:15:36 14  A.      $23.9 million.

14:15:39 15  Q.      So almost 24?

14:15:41 16  A.      Almost 24.

14:15:41 17  Q.      What's Next Caller's total revenue on VeriCall for

14:15:44 18  the same time period?

14:15:47 19  A.      I believe it was about $15 million.

14:15:49 20  Q.      We can agree that you're asking this jury to award

14:15:52 21  lost profits damages of 60 or 70 percent above the total

14:16:00 22  revenue Next Caller has ever earned on the accused products;

14:16:00 23  correct?

14:16:07 24  A.      Yes.

14:16:08 25  Q.      And your reasonable royalty number is 9.5, roughly?

14:16:13 1    A.    Yes.

14:16:14 2    Q.    Million dollars?

14:16:15 3    A.    9.5 million.

14:16:18 4    Q.    And you would agree that that's almost 60 percent of

14:16:24 5    Next Caller's revenue?

14:16:25 6    A.    Yes.

14:16:26 7    Q.    And that would certainly leave Next Caller with no

14:16:30 8    profit; correct?

14:16:32 9    A.    Correct.

14:16:42 10   Q.    Were you here for Mr. Bress' testimony?

14:16:46 11   A.    I viewed some of it via Zoom.

14:16:50 12   Q.    Okay.  And you heard Mr. Bress express his opinion

14:16:54 13   which was that the infringement is tied to the incoming

14:16:58 14   calls to the agent.  Did you catch that?

14:17:02 15   A.    I caught some of that, but I wasn't following his

14:17:06 16   entire testimony.

14:17:07 17   Q.    And in forming your expert opinions, in preparing

14:17:12 18   your reports in this case, you did not use the term

14:17:17 19   pre-answer to mean before the agent answers the phone;

14:17:22 20   correct?

14:17:22 21   A.    I meant when I used the word pre-answer, I meant

14:17:27 22   before the call was answered.

14:17:28 23   Q.    Specifically you did not mean pre-answer to mean

14:17:34 24   before an agent answers the phone; correct?

14:17:37 25   A.    I meant it to mean just pick up the phone just before

14:17:42 1   the phone call was answered.

14:17:44 2   Q.    Sir, would you take a look at your deposition. It

14:17:47 3   should be in your binder there, from December 10th, 2019.

14:18:03 4   A.    Which tab should I turn to?

14:18:06 5   Q.    Give me just a moment. It should be in your binder

14:18:16 6   as the December 10th, 2019, deposition. Do you have that

14:18:41 7   sir?

14:18:42 8   A.    I'm not looking at the right binder. Okay. I have

14:18:58 9   the right binder. Can you remind me of the date?

14:19:01 10   Q.    Yes, of course. December 10th, 2019.

14:19:05 11   A.    Okay. I'm there.

14:19:07 12   Q.    And you gave a deposition on that day under oath;

14:19:10 13   correct?

14:19:10 14   A.    I did, yes.

14:19:11 15   Q.    And if you would turn to page 49, please. Are you

14:19:24 16   there, sir?

14:19:25 17   A.    I am.

14:19:26 18   Q.    And starting at line 23, you were asked:

14:19:30 19        "QUESTION: As you used the term pre-answer in

14:19:33 20   the context of your expert reports, do you understand

14:19:36 21   pre-answer to mean before an agent answers the phone?

14:19:40 22        "ANSWER: No."

14:19:42 23        Do you see that, sir, and is that testimony

14:19:42 24   truthful as of the date that you gave it?

14:19:42 25   A.    Yes, it is.

14:19:50 1    Q.    And we can tell that because you are basing your

14:19:54 2    damages numbers on all processed calls; correct?

14:20:01 3    A.    All processed and invoiced calls.

14:20:04 4    Q.    All processed and invoiced calls.  So every single

14:20:08 5    call that Next Caller processed and invoiced is included in

14:20:12 6    your calculations; correct?

14:20:14 7    A.    Yes, that's correct.

14:20:15 8    Q.    And you heard from the testimony this morning that

14:20:19 9    not every call is answered by an agent; correct?

14:20:26 10   A.    That's possible, yes.

14:20:27 11   Q.    Did you hear that testimony this morning, sir?

14:20:30 12   A.    I don't think I heard it today.

14:20:32 13   Q.    Okay.  Were you in court yesterday or watching on

14:20:36 14   Zoom yesterday?

14:20:37 15   A.    Yes, I was.

14:20:38 16   Q.    Did you hear some testimony about IVR containment?

14:20:42 17   A.    Yes, I did.

14:20:43 18   Q.    And you learned if you didn't know already, that's

14:20:45 19   when the call gets resolved in the IVR and never goes to an

14:20:50 20   agent?

14:20:50 21   A.    Yes.

14:20:51 22   Q.    And some percentage of calls are resolved in the IVR,

14:20:57 23   that's what IVR containment is; correct?

14:20:59 24   A.    Yes.

14:21:00 25   Q.    Those calls would never go to an agent; correct?

14:21:04 1    A.      Yes.

14:21:05 2    Q.      So those calls would never be answered by an agent

14:21:09 3    and meet Dr. Bress' opinion of what causes the infringement;

14:21:14 4    correct?

14:21:16 5              MR. PICKARD:  Your Honor, scope.  He's not here

14:21:18 6    to testify about infringement theories.

14:21:22 7              THE COURT:  Ms. Columbia, do you want to

14:21:25 8    respond?

14:21:25 9              MS. COLUMBIA:  I'll ask another question, Your

14:21:27 10   Honor.

14:21:27 11   BY MS. COLUMBIA:

14:21:28 12   Q.      In any event, your numbers include every single call

14:21:32 13   including those that, in fact, were never answered by an

14:21:36 14   agent; correct?

14:21:36 15   A.      Yes, correct.

14:21:47 16   Q.      Now, I want -- your opinions on lost profits assume,

14:21:56 17   or are based upon your opinion that this is a, what we call

14:22:01 18   a two-player market; correct?

14:22:04 19   A.      Yes.

14:22:06 20   Q.      And a two-player market, it means you determined in

14:22:11 21   your analysis that the only competitor for TRUSTID's

14:22:15 22   Authenticator system during this time period was VeriCall;

14:22:22 23   correct?

14:22:23 24   A.      The only non-infringing alternative, commercially

14:22:27 25   acceptable solution, yes.

14:22:29 1    Q.      Is that different than saying the only competitor?

14:22:32 2    A.      Yes, it is.

14:22:34 3    Q.      Okay.  So that's a lot of words, though.  Can you say

14:22:38 4    them again and I'll try to use them properly so we don't get

14:22:42 5    in a spat?

14:22:43 6    A.      Commercially acceptable non-infringing alternative.

14:22:49 7    Q.      Okay.  So your opinion is based on your determination

14:22:52 8    that the only commercially available non-infringing

14:22:56 9    alternative was VeriCall; correct -- sorry, TRUSTID would be

14:23:04 10   the non-infringing -- let me start over.  You got me messed

14:23:08 11   up with the words.

14:23:08 12           Your opinion is based on your determination that

14:23:10 13   there were no commercially acceptable non-infringing

14:23:16 14   alternatives to TRUSTID's Authenticator; correct?

14:23:22 15   A.      That offered the same technical and economic

14:23:26 16   benefits, yes.

14:23:26 17   Q.      And that opinion is slightly different than the

14:23:30 18   opinion you have given before in this case in your reports;

14:23:34 19   correct?

14:23:34 20   A.      I believe I gave that same opinion before.

14:23:38 21   Q.      Have you in the past opined that the basis for your

14:23:42 22   opinion is that there is something called a pre-answer niche

14:23:47 23   market?

14:23:47 24   A.      Pre-answer authentication market segment, yes.

14:23:55 25   Q.      And you have expressed the opinion in your reports in

14:23:56 1  this case that that pre-answer authentication niche market

14:24:00 2  was kind of a submarket of the overall authentication

14:24:06 3  market; correct?

14:24:08 4  A.    Yes, that's correct.   The pre-answer authentication

14:24:15 5  niche is a submarket to the broader fraud prevention

14:24:20 6  detection market.

14:24:21 7  Q.    Okay.   Because you'll agree with me the

14:24:25 8  authentication market is -- the call authentication market

14:24:28 9  is substantial; correct?

14:24:30 10  A.    It's a large market for sure.

14:24:33 11  Q.    Approximately -- the addressable market is

14:24:37 12  approximately $1 billion?

14:24:39 13  A.    The addressable market, which is a potential of

14:24:44 14  revenue opportunity is $1 billion.

14:24:47 15  Q.    And we can see that if we look at JTX-52, which you

14:24:54 16  have in your binder, sir, but I believe it's already in

14:24:57 17  evidence.   I can put it up on the screen for you.   Do you

14:25:28 18  have that, sir?

14:25:28 19  A.    I do.

14:25:30 20  Q.    Mr. Rosenberg -- first, this is a management

14:25:33 21  presentation by TRUSTID; correct?

14:25:40 22  A.    Yes, it is.

14:25:41 23  Q.    And it's dated fall 2018?

14:25:45 24  A.    Yes.

14:25:46 25  Q.    And if we could turn, Mr. Rosenberg, to page 14.

14:25:54 1    Blow that up.

14:25:58 2                This confirms what your testimony is, which is

14:26:01 3    that the addressable market for call authentication in the

14:26:06 4    U.S. is $1 billion plus; correct?

14:26:11 5    A.      Yes.  This is an opportunity highlight which shows

14:26:14 6    that the potential market size for call authentication is

14:26:19 7    $1 billion plus.

14:26:21 8    Q.      And of that $1 billion, what's TRUSTID's annual

14:26:30 9    revenue?

14:26:31 10   A.      TRUSTID's annual revenue is just north of $16

14:26:35 11   million.

14:26:35 12   Q.      Less than two percent of that 1 billion?

14:26:38 13   A.      They have penetrated two percent of the total

14:26:41 14   addressable market opportunity.

14:26:43 15   Q.      That would be 980-some-odd million dollars or more

14:26:48 16   that companies are spending on other technologies to solve

14:26:53 17   their call authentication needs?

14:26:54 18   A.      Yes.  That leaves them lots of opportunity for

14:26:59 19   long-term growth.

14:27:00 20   Q.      But for right now, companies are spending

14:27:04 21   approximately 98 percent of their dollars that they have to

14:27:07 22   spend for call authentication on other solutions; correct?

14:27:14 23   A.      Yes, that -- as a startup company, TRUSTID is growing

14:27:20 24   its business.

14:27:21 25   Q.      Is that a yes, sir?

14:27:22 1    A.    Yes.

14:27:24 2    Q.    And again, if I add in the revenue on VeriCall which

14:27:29 3    I think you told me was 16 million, that's over five years,

14:27:35 4    even if I add in annual revenue of VeriCall, would it even

14:27:39 5    get over two percent?

14:27:40 6    A.    Of what?

14:27:42 7    Q.    Of 1 billion?

14:27:43 8    A.    It would be around two percent for the total

14:27:46 9    addressable market opportunity.

14:27:48 10   Q.    So if we take your niche market, your pre-answer

14:27:53 11   authentication niche market, that accounts for about two

14:28:00 12   percent of the need for call authentication in the U.S.;

14:28:03 13   correct?

14:28:05 14   A.    I don't see it quite that way.  I would say that this

14:28:09 15   is a market opportunity growth.  So this is a two percent

14:28:17 16   penetration rate within the total addressable market.

14:28:20 17   Q.    While the other 980 million companies are spending on

14:28:25 18   other solutions to call authentication; correct?

14:28:27 19   A.    Other authentication methods, yes.

14:28:30 20   Q.    To solve their authentication needs; correct?

14:28:33 21   A.    Yes.

14:28:37 22   Q.    And of that 980 million, by far the biggest chunk is

14:28:42 23   what we call knowledge-based authentication; correct?

14:28:46 24   A.    Yes.

14:28:49 25   Q.    Now, within this niche market, niche, that word just

14:28:54 1   means like submarket, right, or specialized market?

14:28:57 2   A.    I would refer to it as a market segment.

14:29:02 3   Q.    Okay.  You testified today for the jury that the only

14:29:09 4   players in that market are TRUSTID and Next Caller.  Did I

14:29:12 5   hear that correctly?

14:29:13 6   A.    They are the only two companies that define in this

14:29:20 7   market as commercially acceptable, but TRUSTID would be the

14:29:22 8   only commercially acceptable non-infringing alternative in

14:29:26 9   that market.

14:29:29 10  Q.    It's your testimony here today that Pindrop would not

14:29:32 11  be in that market?

14:29:34 12  A.    Correct.

14:29:36 13  Q.    So if I were to ask you how many other competitors

14:29:42 14  TRUSTID has in the pre-answer caller authentication market

14:29:46 15  niche beyond Next Caller, your answer would be none?

14:29:53 16  A.    No.

14:29:56 17  Q.    No, your answer would not be none?

14:29:58 18  A.    I think your question -- maybe if you could maybe

14:30:01 19  repeat the question.

14:30:02 20  Q.    Sure.

14:30:02 21        How many other competitors besides Next Caller

14:30:02 22  does TRUSTID have in the pre-answer caller authentication

14:30:12 23  market niche?

14:30:17 24  A.    The two companies, the two other companies I'm aware

14:30:21 25  of are Pindrop and Payfone.

14:30:23 1    Q.      Okay.  So in that pre-answer caller authentication

14:30:28 2    market niche, your testimony now is that there are four

14:30:31 3    competitors; correct?

14:30:33 4    A.      Yes.

14:30:34 5    Q.      So in a four competitor market --

14:30:38 6    A.      Excuse me, I think I misspoke.  There is only three

14:30:42 7    competitors that I am aware of in the pre-answer

14:30:45 8    authentication niche, it's Next Caller, TRUSTID, and

14:30:48 9    Payfone.

14:30:48 10   Q.      And Payfone?

14:30:49 11   A.      Yes.

14:30:51 12   Q.      Okay.  So is it your testimony today that Pindrop is

14:30:54 13   not in the pre-answer caller authentication market niche as

14:31:00 14   you defined it in your report?

14:31:02 15   A.      Pindrop is a biometrics company.

14:31:06 16   Q.      Was that --

14:31:07 17   A.      They're outside of the market niche.

14:31:09 18   Q.      Could you open your binder to your August 8th, 2019,

14:31:14 19   deposition, please, sir?  Do you have that, sir?

14:31:36 20   A.      Yes.

14:31:36 21   Q.      If you would turn to page 8.  Do you have that, sir?

14:31:52 22   A.      Yes, I do.

14:31:52 23   Q.      And if we go to line 14, this is a deposition you

14:31:52 24   gave under oath in a different proceeding; correct?

14:32:02 25   A.      Yes.

14:32:04 1    Q.      And you were under an oath that day; correct?

14:32:08 2    A.      Yes.

14:32:09 3    Q.      And you were asked the following question:

14:32:12 4            "QUESTION:  Do you know how many other

14:32:13 5    competitors TRUSTID had in the pre-answer caller

14:32:16 6    authentication market niche beyond Next Caller and Pindrop?

14:32:23 7            "ANSWER:  Well, as I say in paragraph 29, the

14:32:26 8    two primary competitors are Next Caller and Pindrop.  Those

14:32:31 9    two companies are the primary competitors I am aware of."

14:32:36 10           Were you asked that question, did you give that

14:32:38 11   answer in your deposition under oath, sir?

14:32:41 12   A.      Yes, I did.

14:32:55 13   Q.      Now, if indeed, Mr. Holzen, there were three or four

14:33:11 14   competitors in this pre-answer authentication niche, you

14:33:20 15   would have to take that in account in your lost profits

14:33:22 16   analysis; correct?

14:33:23 17   A.      Yes, that's the four factor test that we had talked

14:33:27 18   about, that I spoke about during the direct examination.

14:33:30 19   Q.      And you did not take that into account, you assumed a

14:33:33 20   two-player market; correct?

14:33:36 21   A.      No, I took it into account.

14:33:38 22   Q.      If there were three -- if this jury believes there

14:33:42 23   were three or four competitors or maybe more for the

14:33:46 24   opportunities that are captured in your damages analysis,

14:33:52 25   they would not be able to apply your lost profits analysis

14:33:58 1    to their conclusion; correct?

14:34:01 2    A.      The framework that I spoke about today involves what

14:34:07 3    -- involves the question as to whether or not those

14:34:09 4    competitors are offering a non-infringing commercially

14:34:12 5    acceptable solution.

14:34:14 6    Q.      Is Pindrop infringing TRUSTID's patent?

14:34:18 7    A.      Pindrop?

14:34:20 8    Q.      Yes.

14:34:22 9    A.      I don't think I have seen that other than the fact

14:34:26 10   that Pindrop owns Next Caller.

14:34:27 11   Q.      But Pindrop has its own services and had its own

14:34:31 12   services in 2019 when you gave your testimony under oath

14:34:34 13   that Pindrop was part of the pre-market -- pre-answer

14:34:41 14   authentication market niche; correct?

14:34:42 15   A.      My understanding is that Pindrop is a biometrics

14:34:46 16   company.

14:34:47 17   Q.      Sir, that was not my question.  In 2019 when you gave

14:34:52 18   your testimony under oath that Pindrop was part of the

14:34:56 19   pre-answer caller authentication market niche, Pindrop did

14:35:03 20   not own Next Caller and marketed separate and independent

14:35:10 21   products; correct?

14:35:11 22   A.      Correct.

14:35:13 23   Q.      And there is no evidence that you have seen in this

14:35:16 24   case that those products infringed TRUSTID's patent, is

14:35:20 25   there?

14:35:23 1    A.        Correct.

14:35:24 2    Q.        And, in fact, you're aware as you sit here today, are

14:35:28 3    you not, that Pindrop has products that are not strictly

14:35:33 4    biometric products?

14:35:41 5    A.        I am aware of Pindrop biometrics product.

14:35:45 6    Q.        Are you aware that Pindrop also has technology that

14:35:49 7    uses other forms of technology for pre-answer

14:35:52 8    authentication?

14:35:53 9    A.        Not that I have seen through my research.

14:35:55 10   Q.        So you didn't take that into account in your

14:36:02 11   analysis?

14:36:02 12   A.        I have researched Pindrop's products and I didn't see

14:36:08 13   the essential products on the market.

14:36:11 14   Q.        We talked a lot about Capital One in this case.  I'm

14:36:14 15   sure you heard some of that testimony?

14:36:16 16   A.        Yes.

14:36:16 17   Q.        Can you agree with me that at least with respect to

14:36:20 18   the Capital One opportunity, there were at least three other

14:36:23 19   competitors besides TRUSTID?

14:36:29 20   A.        That sounds right.  I remember two other competitors

14:36:31 21   for sure.

14:36:32 22   Q.        Why don't we look at DTX-044, please, Mr. Rosenberg.

14:37:19 23   Let's put that down, Mr. Rosenberg.  I'll come back to it.

14:37:24 24           Now, in any event, Mr. Holzen, in order to apply

14:37:37 25   your lost profits analysis and calculations, the jury would

14:37:42 1    have to agree with you that there were only -- there --

14:37:46 2    sorry, I'm going to do it right this time, that there were

14:37:50 3    no non-infringing alternatives for TRUSTID's product;

14:37:55 4    correct?

14:37:55 5    A.       And it would have to be commercially acceptable.

14:37:58 6    Q.       Commercially acceptable.  And the reason that you

14:38:01 7    need that to be true is because your analysis assumes that

14:38:06 8    every single call Next Caller processed would have been

14:38:13 9    processed by TRUSTID and TRUSTID would have gotten that

14:38:19 10   revenue; correct?

14:38:20 11   A.       Yes, for Capital One, yes.

14:38:22 12   Q.       For any of Next Caller's customers; correct?

14:38:26 13   A.       Well, that was a long question.  Would you mind

14:38:30 14   repeating the whole question?

14:38:32 15   Q.       I just want to make sure the jury understands that

14:38:34 16   the reason this two-player market is so important is because

14:38:41 17   your numbers -- your numbers assume that for each call Next

14:38:56 18   Caller actually sold in the but for world where Next Caller

14:39:03 19   was not in the market, TRUSTID would have made that sale.

14:39:07 20   Isn't that how it works?

14:39:08 21   A.       It's not based on assumption, it's based on a

14:39:11 22   four-factor framework analysis.

14:39:13 23   Q.       I think that was a yes, but let's try it again.

14:39:16 24            In order to apply your numbers, I have to agree

14:39:20 25   with you based on your four-factor analysis that in a world

14:39:26 1    where Next Caller wasn't available, TRUSTID would have made

14:39:31 2    those sales and would have earned revenue on each and every

14:39:35 3    call; correct?

14:39:36 4    A.      Each and every invoiced and processed call.

14:39:40 5    Q.      That would include for customers like BBVA who we

14:39:44 6    heard yesterday on the video had never heard of TRUSTID;

14:39:47 7    correct?

14:39:47 8    A.      Yes.

14:39:48 9    Q.      So to get to your numbers, the jury would have to

14:39:53 10   believe that if Next Caller weren't in the picture, BBVA who

14:39:57 11   had never heard of TRUSTID would have bought TRUSTID's

14:40:01 12   Authenticator and would have used TRUSTID for all its calls?

14:40:04 13   A.      BBVA had e-mailed TRUSTID and they exchanged e-mails

14:40:09 14   with each other.

14:40:11 15   Q.      Were you here for the testimony of the BBVA witness

14:40:15 16   yesterday?

14:40:15 17   A.      I heard it.

14:40:16 18   Q.      Did you hear him say he never heard of them?

14:40:20 19   A.      Yes, I heard his testimony.

14:40:23 20   Q.      And you're aware, are you not, Mr. Holzen, that for

14:40:28 21   at least some of these customers, they were more interested

14:40:32 22   in what are called red calls, meaning antifraud calls, than

14:40:38 23   green calls; correct?

14:40:40 24   A.      I understand that customers have discussed red calls

14:40:45 25   with Next Caller, yes.

Q.   Okay.  And so the customers who purchased from Next Caller you know were interested in either only red calls or some combination of red and green; correct?

A.   I don't know if that's -- I don't know if I can agree with that, either one way or the other.

Q.   Okay.  Take a look in your binder, sir, at the testimony that's dated -- dated in March 2021.  Do you have that, sir?

A.   Would that be the last tab in my binder?

Q.   Probably.

A.   Yes, I have it.

Q.   Okay.  And just before I get to the actual testimony, one of the things you testified about this morning was capacity; correct?

A.   Yes.

Q.   And you told this jury that TRUSTID had the capacity to make all the sales, process all the calls that Next Caller made; correct?

A.   Correct.

Q.   Okay.  Now, turn, if you would, sir, to page 278.  Do you have it?

A.   Yes.

Q.   And read to yourself, if you would, lines 1 through 7.

A.   (Witness complies.)

14:44:02 1    Q.      **Have you read lines 1 through 7, sir?**

14:44:04 2    A.      **Yes.**

14:44:05 3    Q.      **Does that refresh your recollection that at the time**

14:44:10 4    **the contracts were entered with the four customers you**

14:44:13 5    **talked about, TRUSTID did not have the capacity on its own**

14:44:16 6    **to detect red calls?**

14:44:20 7    A.      **Yes, that's what I saw.**

14:44:24 8    Q.      **You agree with me now that TRUSTID did not at the**

14:44:28 9    **time those contracts were entered have the capacity to**

14:44:31 10   **detect red calls?**

14:44:33 11   A.      **Yes, is what I said.**

14:44:40 12   Q.      **And as a reminder, the red calls are the fraud or**

14:44:44 13   **spoofed calls; right?**

14:44:47 14   A.      **The red calls are the spoofed calls, yes.**

14:44:57 15   Q.      **Now, I wanted to ask you another question about your**

14:45:01 16   **lost profits, Mr. Holzen.  If I understood your schedules**

14:45:05 17   **correctly, you calculated lost profits through about now,**

14:45:11 18   **through the first half of 2021; is that correct?**

14:45:15 19   A.      **Yes.**

14:45:16 20   Q.      **But if I looked at the schedules correctly, you only**

14:45:21 21   **looked at costs, TRUSTID's costs through 2018; is that**

14:45:28 22   **correct?**

14:45:28 23   A.      **Used TRUSTID 2018 costs, it was a benchmark to**

14:45:34 24   **perform my lost profits calculation.**

14:45:36 25   Q.      **So you didn't do any analysis to determine whether**

14:45:40 1    TRUSTID's costs had increased or decreased over that

14:45:45 2    three-year period from 2018 to 2021?

14:45:49 3    A.      I did an analysis which showed that TRUSTID's costs

14:45:52 4    increased in part because they were having to compete with

14:45:56 5    Next Caller.

14:45:57 6    Q.      Okay.  But you didn't -- instead of using that

14:46:00 7    analysis, you used the costs as of 2018, three years ago;

14:46:05 8    correct?

14:46:06 9    A.      Yes.  Which is appropriate because the costs

14:46:09 10   increased over time due to competition with Next Caller and

14:46:12 11   the framework that we used to calculate lost profits is but

14:46:16 12   for framework in a world in which Next Caller was not.

14:46:21 13   Q.      I think that was a yes, sir.  As you probably heard,

14:46:24 14   we're on a clock, and I think you answered the question yes.

14:46:27 15   And I'm sure your attorney will have plenty of opportunity

14:46:30 16   to ask you to explain further if he chooses to.

14:46:34 17           Now, I think this is the last thing, Mr. Holzen.

14:46:39 18   I want to talk a little bit about the pricing that you used.

14:46:44 19           MS. COLUMBIA:  And, Your Honor, I suspect -- I

14:46:47 20   don't know what the answers are going to be, but I suspect

14:46:51 21   this may be the section of the cross that could be sensitive

14:46:55 22   for TRUSTID and require sealing.

14:46:58 23           THE COURT:  All right.  So why don't we do this,

14:47:00 24   we'll seal the courtroom and I'll ask that Zoom be turned

14:47:05 25   off.  But if it turns out that from his answers there is no

14:47:12 1    **nonconfidential information, I'll expect the parties to tell**

14:47:16 2    **me and then we can unseal that portion of the transcript.**

14:47:21 3    **MS. COLUMBIA:  Thank you, Your Honor.**

14:47:23 4    **THE COURT:  Is Zoom off?  Can we get a status**

14:48:17 5    **update here?  Time is ticking.**

14:48:25 6    **MR. PASSEY:  Yeah, one moment.**

14:48:27 7    **THE COURT:  Go ahead, Ms. Columbia.**

14:48:31 8    **MS. COLUMBIA:  Thank you, Your Honor.**

9    **(Transcript is sealed.)**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Holzen - cross - sealed

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

14:52:32 21          **(Transcript is unsealed.)**

14:52:35 22          **THE COURT:  Thank you.**

14:52:36 23  **BY MR. PICKARD:**

14:52:36 24  Q.    **Mr. Holzen, my colleague asked you about the**

14:52:39 25  **difference between red and green call capabilities for**

14:52:43  1    TRUSTID.  Do you remember that?

14:52:45  2    A.      Yes.

14:52:45  3    Q.      Do you recall that's a technical issue related to the

14:52:49  4    TRUSTID Authenticator system?

14:52:51  5    A.      Yes.

14:52:51  6    Q.      Are you qualified or have you formed any opinions

14:52:54  7    about how the Authenticator system works at a fundamental

14:52:57  8    level?

14:52:57  9    A.      I have not.

14:52:58 10    Q.      Mr. Passey, if we could put slide 12 back up, please.

14:53:05 11    I would like to -- can you remind the jury of the relevant

14:53:11 12    time period that you considered for your assessment of the

14:53:15 13    availability of commercially acceptable non-infringing

14:53:18 14    alternatives?

14:53:19 15    A.      Sure.  We start in early 2017 and run through

14:53:26 16    January 2019 for these four customers.

14:53:30 17    Q.      All right.  And why does that time frame, why is that

14:53:33 18    relevant in setting the time window in your assessment of

14:53:38 19    acceptable alternatives?

14:53:39 20    A.      So these four customers would be looking for

14:53:42 21    alternatives to purchase in a world in which Next Caller did

14:53:47 22    not infringe.  And in that window of time, the only

14:53:51 23    commercially available non-infringing alternative would have

14:53:55 24    been TRUSTID.

14:53:56 25    Q.      All right.  And there was some testimony about your

14:54:01 1   opinion concerning Pindrop and whether it competed with

14:54:04 2   TRUSTID.  Do you remember that?

14:54:04 3   A.    I do.

14:54:05 4   Q.    Can you tell the jury what Pindrop product that was

14:54:08 5   that you were talking about when you said that TRUSTID

14:54:10 6   competed with Pindrop?

14:54:11 7   A.    I was referring to the Pindrop Express.

14:54:15 8   Q.    And was Pindrop Express available to your knowledge

14:54:18 9   in the relevant window when you assessed the availability of

14:54:21 10  commercially acceptable non-infringing alternatives?

14:54:25 11  A.    No, it was not.

14:54:26 12  Q.    And are you aware that Mr. Roncoroni has testified in

14:54:34 13  this case that Capital One was in head-to-head competition

14:54:38 14  between TRUSTID and Next Caller?

14:54:40 15  A.    Yes.

14:54:41 16  Q.    And what does that suggest to you about whether

14:54:44 17  TRUSTID would have won the business in the absence of Next

14:54:47 18  Caller?

14:54:47 19  A.    That suggest that it was a two-player market,

14:54:51 20  especially for Capital One where there was only -- there is

14:54:54 21  two parties competing for that business.

14:54:59 22  Q.    All right.  Mr. Passey, if we could put up slide 55,

14:55:03 23  please.

14:55:03 24        I'm sorry, 65.  I misspoke.  Mr. Holzen, can you

14:55:12 25  please remind the jury what we see here?

A.      Sure.  So this is a summary of TRUSTID's lost profits from 2018 to 2021 and it's broken out by customer.

Q.      This is important because the jury won't have this information in printed form when they make their deliberations.  Can you explain what you concluded as to the lost profits that are attributable to the Capital One business for the jury?

A.      Sure.  So the Capital One, the TRUSTID lost profits for Capital One amount to $12.56 million, and that number goes from 2018 to 2021.

Q.      Mr. Passey, if you could put up slide 64, please. Can you remind the jury what we're viewing here, Mr. Holzen?

A.      This is TRUSTID's reasonable royalty damages.  It's running from 2018 to 2021.

Q.      If the jury were to conclude that Capital One, for example, that TRUSTID would be entitled to a lost profit award, but the other customers should be a reasonable royalty, what should the jury do?

A.      The jury should award $12.6 million in lost profit damages for Capital One, and then four-and-a-half million dollars on damages for the rest of the customers.

                MR. PICKARD:  I have no further questions.

                THE COURT:  All right.  Thank you.

                Let's take our afternoon break.  Let's say fifteen minutes, come back at between 3:10 and 3:15.

14:56:57 1                    (Jury leaving the courtroom at 2:56 p.m.)

14:57:18 2                    THE COURT:  All right.  You guys can sit down

14:57:21 3   just for a second.

14:57:27 4                    What's next?

14:57:29 5                    MR. TUMINARO:  We will rest our case, Your

14:57:31 6   Honor.

14:57:31 7                    THE COURT:  When they rest, what's next?

14:57:35 8                    MS. COLUMBIA:  I'm sorry, Your Honor.

14:57:37 9                    THE COURT:  That's okay.

14:57:38 10                   MS. COLUMBIA:  I apologize.

14:57:40 11                   THE COURT:  They're closing their case.

14:57:42 12                   MS. COLUMBIA:  If they're closing their case, I

14:57:43 13  guess we're starting our case, and I also have a Rule 50

14:57:47 14  whenever the Court wants to hear it.

14:57:49 15                   THE COURT:  When the jury comes back, he's going

14:57:53 16  to close his case.  Who is next?

14:57:55 17                   MS. COLUMBIA:  Who is next?  In light of the

14:57:57 18  testimony, we are not going to call Mr. Espinosa.  Our next

14:58:01 19  witness will be Dr. Brody who is our technical expert.

14:58:05 20                   THE COURT:  How long do you think Dr. Brody is

14:58:07 21  going to be on direct?

14:58:09 22                   MS. COLUMBIA:  A long time.

14:58:10 23                   THE COURT:  Because he's your infringement and

14:58:12 24  validity?

14:58:12 25                   MS. COLUMBIA:  He's infringement and invalidity,

14:58:15 1  and it's --

14:58:17 2              THE COURT:  That's fine.  What I want to do,

14:58:19 3  though, is let's finish -- see if you can find a time to

14:58:23 4  stop around 4:15 because I have a call at 4:30.  But I did

14:58:27 5  want to ask a few more questions so that you guys are

14:58:29 6  prepared to answer my questions on the jury instructions.

14:58:32 7  So we'll stop at 4:15, and then you can also make your

14:58:40 8  motion.

14:58:41 9              MS. COLUMBIA:  Okay.  Thank you.

14:58:44 10             (A brief recess was taken.)

15:15:42 11             THE COURT:  All right.  Bring in the jury.

15:15:45 12             (Jury entering the courtroom at 3:15 p.m.)

15:16:04 13             THE COURT:  All right.  Good afternoon.  You

15:16:08 14 guys can be seated.

15:16:10 15             Mr. Tuminaro.

15:16:11 16             MR. TUMINARO:  Your Honor, Plaintiff rest.

15:16:15 17             THE COURT:  Okay.  Thank you.

15:16:17 18             MR. BROOKS:  Your Honor, we call Dr. Brody as

15:16:21 19 our first witness.

15:16:22 20             THE COURT:  Okay.

15:16:41 21             COURT CLERK:  Please raise your right hand.

15:16:50 22 Please state and spell your full name for the record.

15:16:54 23             THE WITNESS:  It's Arthur Brody.  A-R-T-H-U-R,

15:16:58 24 B-R-O-D-Y.

15:16:58 25             ARTHUR BRODY, having been duly affirmed, was

15:17:00 1  examined and testified as follows:

15:17:05 2          THE COURT:  All right.  Good afternoon.

15:17:13 3          THE WITNESS:  Good afternoon, Your Honor.

15:17:15 4          THE COURT:  Mr. Brooks.

15:17:17 5          MR. BROOKS:  Good afternoon, Your Honor.  Good

15:17:19 6  afternoon, ladies and gentlemen of the jury.  My name is Ian

15:17:22 7  Brooks.  I'm an attorney for Next Caller.

15:17:23 8              DIRECT EXAMINATION

15:17:23 9  BY MR. BROOKS:

15:17:24 10 Q.      Dr. Brody, could you please state your full name?

15:17:26 11 A.      Yes.  It's Arthur Ted Brody.

15:17:28 12 Q.      What is your role in this case?

15:17:29 13 A.      My role is to provide opinions on infringement and on

15:17:34 14 validity.

15:17:35 15 Q.      Could you please summarize for the jury the ultimate

15:17:38 16 opinions that you have reached in this case?

15:17:39 17 A.      Yes.  The asserted claims of the '532 and '985

15:17:45 18 Patents are not infringed by Next Caller.  And the asserted

15:17:49 19 claims of the '913 Patent are not infringed by Next Caller.

15:17:52 20 Also, the asserted claims of the '532 Patent and the '913

15:18:00 21 Patent are invalid.

15:18:04 22 Q.      Could you briefly tell the jury about yourself?

15:18:07 23 A.      Yes.  I was born and raised in Brooklyn, New York.  I

15:18:12 24 have three children and three grandkids -- excuse me, two

15:18:17 25 grandkids, one on the way.  I also live in New Jersey and in

15:18:23 1    my spare time I run, I bike, and I cycle.

15:18:27 2    Q.      What is your educational background?

15:18:29 3    A.      I have a bachelor of science in physics from the City

15:18:34 4    College of New York, and a Ph.D. in experimental particle

15:18:38 5    physics from Stoney Brook University.

15:18:41 6    Q.      A Ph.D. in experimental particle physics.  Dr. Brody,

15:18:47 7    how does that relate to telecommunication?

15:18:49 8    A.      When you run an experiment you have to design

15:18:51 9    hardware to take the data and then you write software to

15:18:55 10   take the data from hardware and analyze the data, and that

15:18:59 11   made me marketable to tech companies at that time.

15:19:01 12   Q.      Could you please tell the jury about your experience

15:19:03 13   in telecommunications?

15:19:05 14   A.      Yes.  After serving three years in the post doc in

15:19:09 15   physics, I joined Bell Laboratories.  That was in 1981 as a

15:19:14 16   member of technical staff.  I then became manager of

15:19:18 17   technical staff in 1984.  I left to go to a smaller company

15:19:23 18   that was a telecom equipment provider in 1985.  And I ended

15:19:28 19   up there as a vice-president of marketing and sales.

15:19:33 20   Subsequent to that, in 1988, I started my consulting

15:19:37 21   practice.

15:19:38 22   Q.      You mentioned Bell Laboratories.  Could you please

15:19:40 23   tell the jury what Bell Laboratories is?

15:19:42 24   A.      Yes.  Bell Laboratories was one of the preeminent

15:19:46 25   research facilities at that time.  Bellcore, as you heard

15:19:50 1    Mr. Bress worked at, was spun out of Bell Laboratories.

15:19:54 2    Q.      Do you have any experience with call centers?

15:19:57 3    A.      Yes, I do.  I started at Bell Laboratories working on

15:20:02 4    systems in call centers.  Then as a consultant I consulted

15:20:07 5    to Lucent Technologies which was an equipment provider, a

15:20:11 6    very large one on one of their systems called Dispatch

15:20:17 7    System.  You know how you call up a cable company, they say

15:20:20 8    they'll have someone over between 1 and 5 o'clock, that's

15:20:24 9    what the dispatch manager does, figures out when someone

15:20:27 10   would be available and when they can be at your place.

15:20:31 11           Then I also provided consulting to Oracle

15:20:35 12   Corporation.  They were thinking of converting the call

15:20:39 13   center space with telecom service providers.  And I also

15:20:43 14   reengineered the call center and the underlying conference

15:20:48 15   calling bridges for a company that was involved in massive

15:20:51 16   conference calling with hundreds of lines.  They would be

15:20:55 17   used by people like stock brokers who would be listening

15:20:58 18   from people providing their earnings analysis.

15:21:01 19   Q.      Dr. Brody, you're here as a technical expert.  Can

15:21:02 20   you please tell the jury your experience as a technical

15:21:02 21   expert?

15:21:02 22   A.      Yes.  I have forty years in telecommunications and

15:21:12 23   nineteen years as a technical expert involved with various

15:21:12 24   patent cases.  These patent cases have involved my providing

15:21:12 25   opinions on infringement, non-infringement, validity,

Brody - direct

15:21:23 1    invalidity, and licensing issues and other issues at that

15:21:28 2    time.

15:21:28 3    Q.      Those experiences, did they relate to communications

15:21:32 4    as well, telecommunications?

15:21:33 5    A.      Excuse me?

15:21:34 6    Q.      Those experiences where you worked as a technical

15:21:39 7    expert, did those relate to telecommunications as well?

15:21:41 8    A.      Yes, it was all telecommunications, networks and call

15:21:45 9    center analysis.

15:21:46 10   Q.      Do you have experience with helping people get

15:21:48 11   patents?

15:21:48 12   A.      Yes, I do.  I help people determine when to file for

15:21:53 13   intellectual property protection such as a patent.  And I

15:21:57 14   have also written some, helped with some patent applications

15:22:04 15   for various parties.

15:22:05 16   Q.      Do you have experience helping companies value their

15:22:08 17   patents?

15:22:08 18   A.      Yes, some very large companies that you have heard of

15:22:12 19   like GTE, I read through their patent portfolios and tried

15:22:17 20   to identify those patents that would have commercial value.

15:22:20 21   Q.      Dr Brody, does your compensation at all depend upon

15:22:23 22   the opinions you render or on the outcome of this case?

15:22:28 23   A.      No, my opinions, if I get paid or not, I get paid the

15:22:32 24   same no matter what the outcome of this case is, no matter

15:22:35 25   if an award is made or even if there is no award.

15:22:39 1          MR. BROOKS:  Your Honor, at this time we proffer

15:22:41 2     Dr. Brody as an expert in telecommunications and call center

15:22:45 3     technology.

15:22:46 4          MR. TUMINARO:  No objection.

15:22:47 5          THE COURT:  He will be recognized as such.

15:22:49 6     BY MR. BROOKS:

15:22:50 7     Q.     Dr. Brody have you prepared demonstratives to assist

15:22:52 8     the jury in following your testimony?

15:22:54 9     A.     Yes, I have prepared some slides.

15:22:57 10         MR. BROOKS:  Your Honor, may I publish the

15:22:59 11    demonstratives?

15:23:00 12         THE COURT:  You may.

15:23:07 13    BY MR. BROOKS:

15:23:08 14    Q.     Dr. Brody, could you please remind the jury of your

15:23:11 15    opinions in this case?

15:23:12 16    A.     Yes.  Next Caller does not infringe TRUSTID's patents

15:23:16 17    in this case, the '532, the '985, and the '913 Patents.

15:23:25 18    Also, TRUSTID's '532 and '913 asserted claims are invalid.

15:23:30 19    It shouldn't have been issued by the Patent Office.

15:23:33 20    Q.     Please tell the jury how you formed your opinions?

15:23:36 21    A.     I formed my opinions by reviewing documents and

15:23:40 22    testimony provided by the parties in this case, and third

15:23:44 23    parties.  I have also relied on my forty years of experience

15:23:46 24    in telecommunications.

15:23:50 25    Q.     Let's start with number one, your opinions regarding

15:23:53 1    infringement.  What is required for the jury to find patent

15:23:56 2    infringement?

15:23:57 3    A.    Well, as Mr. Bress described, every individual claim

15:24:01 4    element has to be met by the infringing system.  It's an all

15:24:05 5    or nothing proposition.  If just one element is missing,

15:24:08 6    there is no infringement.

15:24:11 7    Q.    When you say if one element is missing, what do you

15:24:15 8    mean?

15:24:15 9    A.    Well, for reference -- well, the accused system would

15:24:21 10   have to actually be performing that particular element.  If

15:24:25 11   it's not performing that element, then there is no

15:24:28 12   infringement.

15:24:30 13   Q.    If we could advance to the next demonstrative, the

15:24:33 14   next slide.

15:24:33 15         Dr. Brody, could you please summarize for the

15:24:37 16   jury the reasons why Next Caller does not infringe TRUSTID's

15:24:40 17   patent?

15:24:41 18   A.    Yes.  VeriCall is not used before the incoming call

15:24:46 19   goes actually or virtually off hook.  This is a big

15:24:49 20   difference between Mr. Bress and myself.  That's for both

15:24:54 21   the '532 and '985 Patents.

15:24:57 22         For the '913 Patent, VeriCall is not ancillary,

15:25:02 23   and I'm sorry for this, but this is claim language to the

15:25:02 24   originating service provider network element that provides

15:25:02 25   the caller's telephone network.  I also have a few other

15:25:14 1    opinions that I'll also be touching on.

15:25:16 2    Q.    Dr. Brody, I would like to start with the '532 and

15:25:21 3    '985 Patents.  You said that Next Caller does not infringe

15:25:22 4    because VeriCall is not used before the incoming call

15:25:26 5    actually or virtually goes off hook.

15:25:28 6             If we could advance to slide 5.  Dr. Brody,

15:25:33 7    using this slide, could you please walk the jury through

15:25:36 8    starting at the top your reasoning for why Next Caller does

15:25:40 9    not infringe the '532 and '985 Patents.

15:25:43 10   A.    Well, as it says on the very top, the patent requires

15:25:47 11   that the analysis is done before the incoming call is

15:25:50 12   answered or goes actually or virtually off hook.  And how do

15:25:55 13   we know that?  Because the Court has construed the claim,

15:25:59 14   that's the legal term, which basically is answered means

15:26:03 15   actually or virtually goes off hook.

15:26:05 16            Now, what I have done in the white horizontal

15:26:10 17   region is I have just shown a caller calling a call center,

15:26:14 18   that's at step 1.  So say a customer calls Capital One,

15:26:19 19   usually the first thing that happens is you hit the call

15:26:23 20   center and some computer equipment answers the call.  And as

15:26:27 21   it says here, you may hear "Thank you for calling Capital

15:26:30 22   One.  Your call may be monitored or recorded."  You may get

15:26:34 23   a menu of things, press 1 for sales.  Press 2 for service.

15:26:41 24   Now, that is step 2.  VeriCall as we'll discuss later isn't

15:26:47 25   called until after that call advances, answers the incoming

15:26:53 1  call and then maybe the call goes to the agent.  It depends

15:26:57 2  how the call is processed, that's step 3.

15:27:00 3          Below that in the orange region we're showing

15:27:03 4  this is where TRUSTID's '532 and '985 Patents apply.  It's

15:27:08 5  before the incoming call goes off hook at the computer.

15:27:13 6  That's the incoming call.  Once the call is in the call

15:27:17 7  center, that's after 2, it's no longer incoming, it's just

15:27:22 8  being transferred around the call center.  That's where

15:27:24 9  VeriCall is used, it's after that incoming call has gone off

15:27:29 10  hook.

15:27:30 11         So therefore, there can be no infringement

15:27:34 12  because the call is already answered by the IVR which is a

15:27:38 13  term, interactive voice response unit.  Once that computer

15:27:44 14  answers that call at 2 and then VeriCall is called, and then

15:27:48 15  that's when the analysis is done after the call goes

15:27:50 16  actually or virtually off hook.

15:27:52 17  Q.     Thank you, Dr. Brody.  I would like to break that

15:27:55 18  down a bit.  Just so we're clear, what is the thing depicted

15:27:59 19  above the number 2 there?

15:28:00 20  A.     Above number 2 is computer equipment that would be in

15:28:04 21  the call center.

15:28:05 22  Q.     And we heard the term IVR, interactive voice

15:28:08 23  response.  Would that be an example of one of those

15:28:12 24  computers?

15:28:12 25  A.     Yes.  IVR is a term.  You also hear VRU, which stands

15:28:17 1   for voice response unit.  You also hear the term CVP, which

15:28:21 2   stands for customer voice portal.  That's a specific system

15:28:25 3   of IVR.

15:28:27 4   Q.    Now, we have the term here actually or virtually goes

15:28:32 5   off hook.  Can you please tell the jury what is actually or

15:28:35 6   virtually going off hook?

15:28:37 7   A.    Sure.  All the telephones have a handset, a handset

15:28:44 8   that hangs on the wall, or go in a cradle.  Going off hook

15:28:49 9   means actually lifting off the handset.  Now if you look at

15:28:53 10  your cell phone, does your cell phone have a handset?  No.

15:28:56 11  What happens to answer the call, you press the green button,

15:29:00 12  that is the equivalents of going virtually going off hook.

15:29:04 13  Q.    We heard the term incoming call earlier with

15:29:07 14  Mr. Bress.  What is an incoming call as would be understood

15:29:12 15  looking at the claim?

15:29:13 16  A.    Yes, the patent teaches that the incoming call is the

15:29:16 17  call that's coming into the call center from the

15:29:20 18  telecommunication service provider, so that would be coming

15:29:24 19  into step number 2, having been sent from the caller at

15:29:28 20  number one.

15:29:32 21  Q.    So just so that we're clear, when incoming call comes

15:29:34 22  into Next Caller's customer's call center, what takes the

15:29:36 23  incoming call off hook?

15:29:38 24  A.    The computer, the IVR, or the CVP.

15:29:42 25  Q.    And is there anything that would indicate to the

15:29:46 1  caller on their telephone that the call center has taken

15:29:50 2  that incoming call off hook?

15:29:52 3  A.    Yes.  If you would call from your cell phone, when

15:29:56 4  someone answers your call you see the timer start running on

15:29:59 5  the call and you could look after your call and see my call

15:30:02 6  is five minutes and thirty-two seconds.

15:30:05 7  Q.    Can you tell the jury the significance of the

15:30:07 8  incoming call going off hook by a computer?

15:30:10 9  A.    Yes.  Since it's going off hook by the computer, the

15:30:15 10 call is already answered, it's no longer incoming, it's in

15:30:20 11 the call center so there cannot be infringement because the

15:30:23 12 call has already been answered before any of the analysis is

15:30:30 13 done by the accused system, in this case VeriCall.

15:30:33 14 Q.    Now, using your diagram, I would like you to help

15:30:36 15 clarify something for all of us.  We heard testimony that

15:30:39 16 VeriCall is before the agent answers the phone.  Why is

15:30:42 17 there no infringement if VeriCall is used before the agent

15:30:46 18 answers the phone?

15:30:47 19 A.    Well, as we are going to see when we look at the Dish

15:30:50 20 document again, which I'm sure you're bored with, there are

15:30:54 21 nineteen steps to get over to the -- to the actual agent.

15:30:58 22 There is analysis done all the way after the first call is

15:31:02 23 answered, which is by the CVP in the Dish document, so as

15:31:07 24 the call is transferred around inside the call center, it's

15:31:10 25 just being sent from place to place, it's no longer

15:31:14 1    incoming.

15:31:15 2    Q.      Just so I'm clear, does it matter that the call is

15:31:18 3    answered by an agent if a computer has already taken the

15:31:22 4    incoming call off hook?

15:31:23 5    A.      Yes, the computer has taken the incoming call off

15:31:27 6    hook.  Even if the agent at some other time answers the

15:31:31 7    call, they're not answering the incoming call because the

15:31:35 8    incoming call they are getting is from somewhere else in the

15:31:38 9    call center.

15:31:38 10   Q.      Let's take a look at the claim language.  If we could

15:31:42 11   advance.  Thank you.  What is highlighted here in both

15:31:46 12   patent claims of the '532 and '985 Patent?

15:31:50 13   A.      Well, this is the language we have been discussing.

15:31:52 14   It's before the incoming call is answered.  And it appears

15:31:56 15   both in claim 32 of the '532 Patent and claim 1 of the '985

15:32:02 16   Patent.  So there is the term.

15:32:05 17   Q.      So looking at claim 32 of the '532 Patent on the left

15:32:09 18   here, what needs to occur before the incoming call is

15:32:13 19   answered?

15:32:14 20   A.      Well, in claim 32 the system must perform the

15:32:19 21   forensic analysis before the incoming call is answered.

15:32:22 22   Q.      Is VeriCall used to perform an analysis before the

15:32:27 23   incoming call is answered?

15:32:28 24   A.      No, it is not.

15:32:29 25   Q.      Now, looking at claim 1 of the '985 Patent on the

15:32:33 1    right here, what is needed to occur, or what needs to occur

15:32:37 2    according to the claim before the incoming call is answered?

15:32:40 3    A.    Well, this is where there is gathering by the

15:32:42 4    electronic system associated with the calling party

15:32:47 5    telephone.  The operational status information.  So that

15:32:53 6    activity must be done before the call is answered.

15:32:57 7    Q.    Does Next Caller's VeriCall do that?

15:32:59 8    A.    No, it does not.

15:33:02 9    Q.    What, if anything, do the patents say about why

15:33:06 10   certain things need to occur before the incoming call is

15:33:09 11   answered?

15:33:09 12   A.    Well, if you read the patent specification, that's

15:33:13 13   all the words that come from the claim, it describes what

15:33:16 14   you have to do is in order to determine, for instance, this

15:33:21 15   operational status information, you call the calling party,

15:33:25 16   call their telephone.  Now, if they are off hook, obviously

15:33:29 17   what's going to happen is you're going to get a busy signal.

15:33:32 18   If not, you're going to hear ringing.  The problem is that

15:33:36 19   there are sometimes when you can be off hook and the calling

15:33:39 20   party will hear a ringing.  If you have call waiting on your

15:33:42 21   phone and you're on another call, you will be on the call

15:33:47 22   and you will hear a signal, the party that's calling you

15:33:50 23   hears ringing and thinks -- hears ringing and gets the wrong

15:33:55 24   information, it thinks that no one is on that call.

15:33:55 25   Therefore to be in a predictable state, the patent describes

15:34:03 1    that you call the calling number and then analyze what

15:34:11 2    signal you hear.  It has to be in a predictable state.

15:34:16 3    Q.    If I understand properly, by doing these things

15:34:19 4    before the incoming call is answered while the phone is

15:34:23 5    ringing, the line is in a more predictable state?

15:34:26 6    A.    That's correct, because if you have answered the

15:34:28 7    call, now things like call waiting can start taking place.

15:34:32 8    Q.    And you considered TRUSTID's Authenticator product in

15:34:37 9    your analysis?

15:34:38 10   A.    Yes, I have.  And we've heard Dr. Bress, Mr. Bress

15:34:42 11   say that it does practice the asserted claims.

15:34:46 12   Q.    When does TRUSTID do its analysis in its

15:34:49 13   Authenticator product?

15:34:50 14   A.    It does its analysis before the incoming call is

15:34:53 15   answered while the phone is in that predictable state, the

15:34:58 16   call in phone, the call has not been answered.

15:35:01 17   Q.    If we could please turn to PTX-483 in your binder.

15:35:08 18   A.    Excuse me, which one?

15:35:10 19   Q.    483.

15:35:12 20   A.    Yes.  Yes, I have it.

15:35:28 21   Q.    What is PTX-483?

15:35:30 22   A.    This is a document from TRUSTID describing I believe

15:35:33 23   authentication process in the Authenticator.

15:35:40 24   Q.    Is this a document you considered in forming your

15:35:42 25   opinion?

15:35:43 1    A.      Yes, I did.

15:35:44 2                MR. BROOKS:  Move to admit, Your Honor.

15:35:47 3                MR. TUMINARO:  No objection, Your Honor.

15:35:48 4                THE COURT:  All right.  Admitted.

15:35:49 5                (PTX Exhibit No. 483 was admitted into

15:35:50 6    evidence.)

15:35:50 7    BY MR. BROOKS:

15:35:51 8    Q.      If we could move to slide number 7, please.

15:35:56 9                Dr. Brody, if we look at page 40 of PTX-483,

15:36:02 10   what does PTX-483 indicate about how TRUSTID's product

15:36:06 11   works?

15:36:06 12   A.      It says first on the top, the call has to be in a

15:36:10 13   pre-answer state.  Here they're using it for any answer.  So

15:36:13 14   the carrier passes the information inbound and number two,

15:36:18 15   it says you send the information to TRUSTID.  Do not send

15:36:25 16   the 200 OK response to the carrier.  The 200 OK response is

15:36:32 17   what is sent in response to a SIP invite when you answer the

15:36:35 18   call.  Therefore, the caller is hearing ringing because the

15:36:38 19   200 OK has not been sent.

15:36:42 20               Number five, after TRUSTID completes its

15:36:46 21   realtime forensic after Step 3 and does its authentication

15:36:50 22   in number four it sends it to the telephony platform.  It

15:36:54 23   says answer the call, send the 200 OK response.

15:36:59 24   Q.      What does the 200 OK indicate?

15:37:01 25   A.      Again, the 200 OK response is one of those SIP

15:37:05 1    messages, when you get an invite, messages going back and

15:37:09 2    forth and when you answer the call, so when you go off hook,

15:37:12 3    if you're the called party, you go actually or virtually off

15:37:16 4    hook, the 200 OK is sent.

15:37:23 5    Q.    You took us to step 5 where it says answer call.  Is

15:37:27 6    the call at the agent in step 5 for TRUSTID's product?

15:37:33 7    A.    Excuse me?

15:37:34 8    Q.    Is the call at TRUSTID's -- excuse me, looking at

15:37:39 9    step 5 where it says answer call, when that call is analyzed

15:37:44 10   by TRUSTID, it is answered there at step 5, where is the

15:37:51 11   call, is it at the agent?

15:37:53 12   A.    No, it's not at the agent yet.  It's being answered

15:37:57 13   by the call center.  We're going to get to the agent.

15:38:00 14   Q.    Where, if anywhere, does this indicate that a call

15:38:04 15   goes to an agent?

15:38:05 16   A.    No where.

15:38:06 17   Q.    How about step 7?

15:38:08 18   A.    Well, looking at the pre-answer state.  In the

15:38:12 19   post-answer state, then the call can go to the IVR for the

15:38:17 20   handling strategy and then in the IVR may do something with

15:38:23 21   it or then may route it to an agent.

15:38:26 22   Q.    Dr. Brody, after step 5, this would be an example of

15:38:33 23   a computer -- I guess step 5 would be the example of a

15:38:39 24   computer answering at the call center that we have been

15:38:42 25   talking about?

Brody - direct

15:38:42 1  A.     Right.  This would be the answer at the call center

15:38:46 2  if it were -- if it was first answering the call.  In this

15:38:51 3  case TRUSTID is doing the analysis before the answer.

15:38:55 4  Q.     So if the analysis is done while the phone is ringing

15:39:02 5  in the example of how TRUSTID describes it product and in

15:39:07 6  the patents, what does that mean for the caller's experience

15:39:11 7  calling the call center?

15:39:12 8  A.     The caller may experience some longer ringing.

15:39:16 9  Q.     Does Next Caller VeriCall require the call to be in a

15:39:20 10 ringing state?

15:39:20 11 A.     No, it does not.

15:39:22 12 Q.     Do any Next Caller customers use VeriCall while the

15:39:26 13 call is in a ringing state?

15:39:27 14 A.     No.  As I will be showing you, each of the VeriCall

15:39:32 15 customers discussed in this case uses VeriCall after their

15:39:36 16 equipment is in the call center, their IVR, the CVP answers

15:39:41 17 the call.

15:39:42 18 Q.     Mr. Rosenberg, you can take that down.

15:39:45 19        What do you base your understanding on that each

15:39:48 20 customer of Next Caller uses VeriCall after the incoming

15:39:52 21 call actually or virtually goes off hook?

15:39:55 22 A.     Well, we have heard testimony and I think it was

15:39:58 23 Monday or yesterday to that effect.

15:40:02 24 Q.     In addition to testimony, testimony from who?

15:40:02 25 A.     That would be from Next Caller's customers.  And they

Brody - direct

15:40:09 1  know best when they have actually determined when they want

15:40:12 2  to use VeriCall.

15:40:14 3  Q.      Beyond the testimony that we've heard, have you

15:40:16 4  considered anything else?

15:40:17 5  A.      Well, there is customer documents.  And there is Next

15:40:21 6  Caller documents.  And there is even a TRUSTID document that

15:40:24 7  says that VeriCall is used after the call is answered.

15:40:32 8  Q.      What about Next Caller source code, did you review

15:40:32 9  that?

15:40:35 10 A.      No, I didn't.  The VeriCall source code does not know

15:40:38 11 when it gets called and it does not know who calls it in a

15:40:42 12 sense, so reading the code would not tell you anything about

15:40:45 13 when the customer uses VeriCall.

15:40:47 14 Q.      Who decides when to use VeriCall?

15:40:49 15 A.      That would be the customer.

15:40:54 16 Q.      So if one wanted to determine using source code when

15:40:58 17 the Next Caller's customer used VeriCall, whose source code

15:41:02 18 would you have to look at?

15:41:04 19 A.      I would review the customer's source code because

15:41:06 20 then you would review the source code of the system and see

15:41:10 21 who has the opposite end of the API.  The API is like a

15:41:15 22 string, there is two ends and one end would be the source

15:41:17 23 code, that would be for the customer.  And when they were

15:41:22 24 setting up to send a message.

15:41:25 25 Q.      You said you considered Next Caller's customers'

15:41:27 1    testimony in forming your opinion.  Why is that important

15:41:30 2    information to consider?

15:41:31 3    A.    Again, Next Caller's customer knows, they know when

15:41:36 4    they have implemented VeriCall and when they use it.

15:41:40 5    Q.    If we could put up slide 8, Mr. Rosenberg.  Let's

15:41:45 6    talk about each of the four customers that we've heard

15:41:48 7    about.  What was important about the testimony from Capital

15:41:51 8    One?

15:41:51 9    A.    Well, Capital One said they answer the call in the

15:41:55 10   IVR and subsequently they use VeriCall.

15:42:00 11   Q.    And Comcast, what was important about the testimony

15:42:03 12   from Comcast?

15:42:04 13   A.    You heard basically the same thing from Comcast, they

15:42:07 14   stated that they answered the call in the IVR and then they

15:42:13 15   used VeriCall.

15:42:15 16   Q.    We also have BBVA.  What was important about the

15:42:18 17   testimony from BBVA?

15:42:19 18   A.    BBVA used the Cisco call customer voice at CVP which

15:42:28 19   is in IVR to answer the call, and then subsequently they

15:42:33 20   called -- I should say used VeriCall, so VeriCall was being

15:42:33 21   used after the call was answered.

15:42:41 22   Q.    And then finally we have Dish.  What was important

15:42:44 23   about the testimony from Dish?

15:42:46 24   A.    Well, Dish said the same thing that BBVA said.  They

15:42:51 25   answered the call in the CVP and subsequently used VeriCall.

15:42:56 1   Q.      Now, regarding the Dish implementation, we saw a lot

15:43:00 2   about that from Mr. Bress, and he told the jury that

15:43:03 3   VeriCall was used before the IVR.  How is it that you are

15:43:08 4   positive that VeriCall is used after the incoming call was

15:43:12 5   answered?

15:43:12 6   A.      Well, first I looked at what the diagram that Bress

15:43:17 7   used said at each step and I have knowledge of the equipment

15:43:21 8   that was used at each step.  Second, I had a conversation

15:43:25 9   with a Mr. Ezell who did the implementation at Dish.

15:43:33 10  Q.      Who is Mr. Ezell?

15:43:35 11  A.      He is the founder of a company called CTI Logic which

15:43:40 12  CTI stands for Computer Telephony Integration.

15:43:45 13  Q.      What does CTI specialize in?

15:43:47 14  A.      They specialize in Cisco equipment and have used it.

15:43:50 15  Q.      Why did you speak to Mr. Ezell?

15:43:53 16  A.      There was a lot going on in that diagram and I

15:43:56 17  thought that there could be call answer and I wanted to

15:43:59 18  confirm my suspicion.

15:44:00 19  Q.      In speaking with Mr. Ezell, were you able to confirm

15:44:04 20  your understanding of Dish's implementation of VeriCall?

15:44:07 21  A.      Yes, Mr. Ezell confirmed that call was answered at

15:44:11 22  CVP.

15:44:18 23  Q.      If we could turn to slide 9.  We have here JTX-24

15:44:22 24  which was discussed by Mr. Young at Comcast.  Did you

15:44:25 25  consider this document?

15:44:26 1    A.      Yes, I did.

15:44:27 2    Q.      How did this document inform your opinion?

15:44:30 3    A.      Well, it shows that the IVR is the thing that calls,

15:44:34 4    in this case Next Caller, so the calls in the IVR have

15:44:39 5    already been answered at Comcast, so VeriCall is used after

15:44:42 6    the incoming call goes off hook.

15:44:45 7    Q.      If we could turn to the next slide, DTX-5.  DTX-5 at

15:44:52 8    page 26, this was a document discussed by Mr. Burgess at

15:44:57 9    Capital One.  Did you consider this document?

15:44:59 10   A.      Yes, I did.

15:44:59 11   Q.      How did this document inform your opinion?

15:45:02 12   A.      Well, in this document, the [24]7, that's a name of a

15:45:08 13   company and they provide the IVR application for Capital

15:45:13 14   One.  So what happens is in Capital One, customer hears a

15:45:18 15   greeting while Next Caller returns the risk score.  What's

15:45:23 16   important about that is the RTP stream that Mr. Bress was

15:45:27 17   talking about has already been set up.  So the call has

15:45:31 18   already been answered.  And it's been answered in the IVR.

15:45:35 19   Q.      If we could turn to JTX-38, which is on the next

15:45:40 20   slide.  This was discussed by Mr. Legate at BBVA.  Did you

15:45:46 21   consider JTX-38 in forming your opinion?

15:45:46 22   A.      Yes, I have the yellow highlighting and the green

15:45:55 23   highlighting in the original.  So the first thing I have

15:45:56 24   highlighted is the VRU, which is another name for an IVR

15:46:00 25   answers the call.  And that comes from the first step in the

15:46:03 1   call flow on the left.  I know it's hard to see, but that's

15:46:08 2   the writing next to the first step in the call flow on the

15:46:12 3   left.

15:46:12 4           Then in the second step, it says then get the

15:46:15 5   risk score from Next Caller.  So clearly the VRU has

15:46:20 6   answered the call in this call flow, BBVA, and in their VRU

15:46:26 7   is the CVP and then they get the risk score from Next

15:46:29 8   Caller.  So again, VeriCall is used after the incoming call

15:46:33 9   has been answered.

15:46:34 10  Q.      Now let's talk about Dish.  Could we please have up

15:46:40 11  JTX-30.  If could go to the next page.  There we go.

15:46:51 12          Dr. Brody, were you here when Mr. Bress

15:46:56 13  testified?

15:46:56 14  A.      Yes, I was.

15:46:57 15  Q.      Do you recall Mr. Bress showing the jury this

15:47:00 16  document?

15:47:00 17  A.      Yes.

15:47:01 18  Q.      Mr. Bress said this document shows that Dish uses

15:47:05 19  VeriCall before the incoming call was answered.  Do you

15:47:08 20  agree?

15:47:09 21  A.      Well, he's pointing to a second IVR that converges,

15:47:16 22  the convergence IVR which is actually steps 13 and 14.  It's

15:47:21 23  way after the call has been answered originally.

15:47:26 24  Q.      And so did you hear Dr. Bress' testimony where he

15:47:31 25  started at 1 in this diagram at the top left corner?

15:47:35 1    A.      Yes, I did.

15:47:36 2    Q.      And do you recall the next step that he went to was

15:47:42 3    step 7?

15:47:42 4    A.      Right.  He skipped a few steps in between, 2

15:47:46 5    through 6.

15:47:47 6    Q.      What is significant about the steps that Mr. Bress

15:47:51 7    skipped in his presentation to the jury?

15:47:53 8    A.      Well, in SIP you get some routing instructions that

15:47:59 9    the network uses.  That's not very germane here.  But in

15:48:04 10   step 3 it says the Acme query.  If we could blow that up.

15:48:09 11   Acme queries the CUSP for the CVP call server.  That's

15:48:18 12   jargon.  And that jargon, the CUSP is a SIP proxy, that's

15:48:27 13   where you get the address from so you know where to route it

15:48:29 14   when you get the address, because these are internet

15:48:32 15   addresses for those packets.

15:48:34 16           The first thing that happens in the SBC in the

15:48:37 17   Acme 4600 has to ask, that's the little signaling thing

15:48:41 18   that's going on between it, signaling pathway, you ask how

15:48:46 19   do I route the call to the CVP call server.

15:48:50 20   Q.      And Mr. Rosenberg, if we could blow up just above the

15:48:55 21   Acme SBC and down to VeriCall.  Thank you.  That's helpful.

15:49:02 22           So looking here, Mr. Bress argued that Next

15:49:10 23   Caller ignores the Court's claim construction of call which

15:49:12 24   is any connection.  Do you agree?

15:49:15 25   A.      No, I do not.  As a matter of fact he only uses the

15:49:20 1    first two words which I think is any connection.  There are

15:49:23 2    several more words that follow-up.

15:49:24 3    Q.     What is the call or connection that is required in

15:49:27 4    the claim?

15:49:28 5    A.     Well, what happens is there are two connections

15:49:33 6    actually required from the Acme 4600.  It turns out that

15:49:39 7    when you're doing a voiceover IP with SIP, you get two

15:49:43 8    different streams of packets.  One stream of packets are

15:49:47 9    signaling packets that as Mr. Bress pointed out was a dash

15:49:51 10   line.  So you're going from the Acme 4600 through the CUSP

15:49:55 11   to the CVP call server.  The solid lines are the audio

15:50:00 12   packets.  Those are your voice packets, our touch tones that

15:50:03 13   would be sent, in this case to the VXML Gateway.  VXML

15:50:09 14   Gateway be something that can actually take audio packets

15:50:13 15   in.  That's important because of step 4.  And step 4 says

15:50:17 16   CVP sends the call to the VXML Gateway.  So the CVP call

15:50:24 17   server answers the call so that the RTP stream can be set up

15:50:29 18   through the VXML Gateway.

15:50:32 19   Q.     What is the RTP stream that you're referring to?

15:50:35 20   A.     Again, that stands for real-time protocol and it

15:50:38 21   actually contains your digitized voice in packets being sent

15:50:42 22   through the network, separate from the signaling packets

15:50:42 23   that are sent.

15:50:50 24   Q.     In this diagram, is that the vertical line coming

15:50:52 25   down from the Acme 4600 to the VXML Gateway?

15:50:57 1    A.      Yes, that's the vertical line going directly from the

15:51:00 2    4600 to the VXML Gateway.

15:51:04 3    Q.      Now, when Mr. Bress was on the stand, he testified

15:51:08 4    that that vertical blue line related to step 18 just above

15:51:13 5    the Acme 4500.  Do you agree with that?

15:51:16 6    A.      No, I don't.

15:51:17 7    Q.      Why not?

15:51:19 8    A.      Because for step 18 when the Acme 4600 sends the call

15:51:24 9    to the Acme 4500, that's when the call will be sent to the

15:51:29 10   agent in step 19.  The reason there is two SBC's involved is

15:51:35 11   sometimes, many times, call agents are off site.  They

15:51:39 12   aren't in the same place as the computers are.  So you have

15:51:42 13   to have two SBCs to make sure that they're each guarding

15:51:47 14   what they call their domain, but they're responsible for

15:51:51 15   securing them.

15:51:52 16   Q.      Is there a different blue line of voice path that

15:51:56 17   takes the call from the Acme 4600 to the Acme 4500?

15:52:01 18   A.      Yes.  There is that diagonal line, that short

15:52:06 19   diagonal blue line that goes from the Acme 4600 to the 4500.

15:52:12 20   Q.      And so just so we're clear, that step 4, the CVP call

15:52:12 21   server answers the call?

15:52:22 22   A.      Yes.  Step 4 and then step 5.

15:52:25 23   Q.      And that -- and step 5, that establishes that voice

15:52:29 24   path to the VXML Gateway?

15:52:32 25   A.      That is correct.

15:52:33 1   Q.    So at this point, Dish has answered that incoming

15:52:37 2 call?

15:52:37 3   A.    Yes, Dish has already answered the call. And the

15:52:41 4 other steps that occur are after the call answered. As a

15:52:45 5 matter of fact all the steps from step 5 to 19, fourteen

15:52:49 6 steps, all occur after that incoming call was answered by

15:52:54 7 the call server which sends 200 OK. That's why it has a SIP

15:53:01 8 line, it sends the signaling answer message.

15:53:04 9   Q.    Thank you, Mr. Rosenberg. You can take that down.

15:53:08 10        Dr. Brody, do you understand that Mr. Bress

15:53:11 11 basis his opinions on Next Caller's marketing document?

15:53:14 12   A.    Yes, I do.

15:53:16 13   Q.    Did you consider the Next Caller documents that are

15:53:18 14 relied upon by Mr. Bress?

15:53:20 15   A.    Yes, I did.

15:53:21 16   Q.    How have those documents impacted your opinions?

15:53:24 17   A.    Well, it did not change my opinion that Next Caller

15:53:28 18 does not infringe the asserted claims.

15:53:34 19   Q.    Let's take a look at those documents. Specifically I

15:53:39 20 I'll just refer you to Mr. Bress' slides, starting with PDX

15:53:42 21 2.56. Do you recall seeing this slide when Mr. Bress did

15:53:52 22 his presentation?

15:53:52 23   A.    Yes, I do.

15:53:54 24   Q.    And could you explain to the jury what is meant by

15:54:02 25 this excerpt, it can be used ahead of the call before it is

15:54:05 1    answered?

15:54:06 2    A.    Yes.  I believe as Mr. Kirchick said in his testimony

15:54:10 3    you listened to and he said that about a dozen times, he

15:54:14 4    claimed that it means that it is before the agent gets to the

15:54:20 5    agent, that's what is happening is the call to the agent.

15:54:25 6    So the call is being transferred to the agent already.

15:54:31 7    Q.    Does that change whether or not VeriCall has been

15:54:36 8    used after the incoming call has gone off hook?

15:54:42 9    A.    So, VeriCall is -- the first answer is done at CVP or

15:54:49 10   the IVR, in this case for Capital One it would be the IVR.

15:54:53 11   The call is passed around the call center.  It ultimately

15:54:57 12   gets to the agent.  It's no longer an incoming call, the

15:55:01 13   incoming call is the call that's handled by the call center

15:55:04 14   equipment when it receives it from the telecommunications

15:55:08 15   service provider, it doesn't go back out.

15:55:11 16   Q.    If we could also look at slide 57.  So here this

15:55:17 17   marketing material to BBVA says this is a real-time solution

15:55:22 18   which can be used to make decisions in the IVR before the

15:55:25 19   call is answered.  What do you understand that to mean?

15:55:29 20   A.    Right.  The decision is being made by the IVR after

15:55:34 21   it answered the call, the incoming call.  And now the IVR is

15:55:38 22   determining what to do with the call, and maybe it does send

15:55:41 23   it and route it to an agent.  So this is what pre-answered

15:55:45 24   means here, it's a marketing document.  He was a

15:55:48 25   vice-president of marketing and sales and you try to speak

15:55:51 1    the language that your customers would understand, so

15:55:54 2    pre-answer for the customers means before the call is

15:55:56 3    answered by the call agent.

15:56:00 4    Q.    If we could look at slide 58.  This is another

15:56:05 5    example of calls are flagged pre-answer to enable strategic

15:56:10 6    routing.  What's your understanding of this statement?

15:56:12 7    A.    This is a perfect example of their flagged

15:56:16 8    pre-answer, that's again pre-answered to the agent.  Why is

15:56:20 9    it pre-answered to the agent?  Because you're going to do

15:56:25 10    strategic routing.  The IVR, in this case the CVP and the

15:56:30 11    IVR, is doing its analysis before deciding how to route the

15:56:32 12    call to the next location within the call center.

15:56:38 13    Q.    If I could just, Mr. Rosenberg, turn back to

15:56:43 14    Dr. Brody's slides, slide 6.

15:56:48 15         Dr. Brody, we have up here the claim language

15:56:50 16    again.  If you could just direct your attention to the

15:56:53 17    screen.  Does the term pre-answer appear in any patent

15:56:56 18    claim?

15:56:57 19    A.    No, the term pre-answer does not appear in either of

15:57:01 20    the claim 32 of the '532 Patent or claim 1 of the '985

15:57:02 21    Patent.

15:57:02 22    Q.    Does the term pre-answer have a single meaning?

15:57:11 23    A.    No, it's very context dependent as shown here, that

15:57:15 24    Next Caller documents speaking to the customer, it is before

15:57:20 25    the agent answers the call.

15:57:21 1    Q.    Does pre-answer mean the same thing as before the

15:57:25 2    incoming call is answered as used in the patent?

15:57:29 3    A.    No.  The patent is very clear on that, the incoming

15:57:32 4    call is coming from the telecommunications service provider

15:57:35 5    and that's where it's answered, and talked about it can be

15:57:38 6    answered by the IVR.

15:57:40 7    Q.    And then we have one more marketing document in

15:57:44 8    Mr. Bress' presentation at slide 59.  Can we have that up,

15:57:49 9    Mr. Rosenberg.

15:57:55 10          Here, Dr. Brody, the marketing materials says

15:57:59 11   200-millisecond API response delivers analysis in the IVR

15:58:03 12   during the first ring.  What do you understand that document

15:58:07 13   to mean?

15:58:09 14   A.    Next Caller is so fast, 200-milliseconds is a fifth

15:58:13 15   of a second.  What's happening here is it's delivering the

15:58:16 16   analysis, it's already sent the 200 OK, but because of

15:58:20 17   physics, it takes time for 200 OK to get across the network,

15:58:24 18   so the call is still on its first ring.  Einstein said

15:58:30 19   nothing travels faster than the speed of light.  Plus you

15:58:34 20   have all the processing on the way, all the switches and

15:58:37 21   routers that get involved with that call spend time doing

15:58:40 22   it, so it takes a while for that 200 OK to get across the

15:58:42 23   network.

15:58:44 24   Q.    Dr. Brody, you said you considered other Next Caller

15:58:48 25   documents as well?

Brody - direct

15:58:49 1    A.    Excuse me?

15:58:51 2    Q.    You considered other Next Caller documents as well?

15:58:54 3    A.    Yes, I did.

15:58:54 4    Q.    If you could please turn to DTX-72 in your binder.

15:59:08 5    A.    I'm there.

15:59:10 6    Q.    What is DTX-72?

15:59:12 7    A.    It's a document about Next Caller that was prepared.

15:59:18 8    Q.    Is this a document you considered in forming your

15:59:20 9    opinion?

15:59:20 10    A.    Yes, I did.

15:59:23 11          MR. BROOKS:  Your Honor, I move to admit DTX-72.

15:59:27 12          MR. TUMINARO:  No objection.

15:59:28 13          THE COURT:  It's admitted.

15:59:29 14          (DTX Exhibit No. 72 was admitted into evidence.)

15:59:31 15    BY MR. BROOKS:

15:59:32 16    Q.    DTX-72 at page 4 has a statement, "VeriCall assigns a

15:59:38 17    risk score to every call in the IVR."

15:59:43 18          Did you consider this document in forming your

15:59:45 19    opinions and the statement here?

15:59:46 20    A.    Yes, I did.

15:59:47 21    Q.    How does this inform your opinion?

15:59:49 22    A.    Well, essentially Next Caller is saying it knows from

15:59:55 23    its customers the IVR answers the call and it's doing --

15:59:55 24    it's being used once the call has already been answered.

16:00:04 25    Q.    If we could please turn to the next slide which we

16:00:08 1   have, JTX-58.  And this is a document that is already

16:00:13 2   admitted.  This is a Next Caller document sent to a

16:00:17 3   prospective customer?

16:00:18 4   A.     Yes, this is either from a request for a proposal or

16:00:21 5   a request for information.  It's part of a formal process

16:00:24 6   for getting information from vendors that customers will

16:00:27 7   send out.

16:00:28 8   Q.     How did JTX-58 inform your opinion as to the way

16:00:32 9   VeriCall is used?

16:00:33 10  A.     Again, it says that the risk score is being returned

16:00:36 11  in parallel with the greeting after the call is answered in

16:00:40 12  the IVR.  So the call has already been answered.  It's the

16:00:44 13  only way the IVR can send the greeting because it needs that

16:00:47 14  voice band, that RTP stream set up.

16:00:51 15  Q.     And Dr. Brody, if we go to the next slide, we have

16:00:57 16  JTX-40 which I think you alluded to earlier.  Did you

16:01:01 17  observe Mr. Cox's testimony regarding JTX-40?

16:01:03 18  A.     Yes, I did.

16:01:04 19  Q.     Could you please remind the jury what company

16:01:07 20  prepared this document?

16:01:07 21  A.     TRUSTID prepared this document in 2018.

16:01:11 22  Q.     What is significant, if anything, about the fact that

16:01:14 23  this document was prepared in 2018?

16:01:16 24  A.     Well, it's my understanding that in January of 2018

16:01:20 25  is when this litigation was started.  Therefore, either at

16:01:24 1  the time they were starting the litigation or after the

16:01:26 2  litigation, they wrote this document.

16:01:30 3  Q.     Now, how has this TRUSTID document informed your

16:01:33 4  opinion regarding Next Caller's VeriCall?

16:01:37 5  A.     It confirmed everything that I learned from all the

16:01:40 6  documents and testimony that I have used.

16:01:43 7  Q.     And what specifically in here has helped to inform

16:01:46 8  your understanding?

16:01:47 9  A.     Well, first off, TRUSTID is saying comparing Next

16:01:54 10  Caller to TRUSTID, which practices their patent, is

16:01:58 11  comparing apples and oranges, they're two different things.

16:02:01 12  But the more important statement is Next Caller's processing

16:02:06 13  occurs after a call is answered.  That is underlined in red.

16:02:12 14  TRUSTID themselves said that.

16:02:15 15  Q.     Thank you, Dr. Brody.

16:02:17 16         What did you conclude based upon the testimony

16:02:20 17  and the documents that you have reviewed regarding whether

16:02:23 18  VeriCall infringes?

16:02:24 19  A.     Excuse me?  I'm having trouble hearing you.

16:02:26 20  Q.     I'm sorry.

16:02:27 21         What have you concluded based upon your review

16:02:30 22  of the testimony and documents that you have reviewed?

16:02:32 23  A.     I have concluded that VeriCall in all cases is used

16:02:37 24  by the customer after the incoming call has been answered.

16:02:40 25  Q.     Please tell the jury the significance of that fact?

16:02:43  1    A.       Since the claims require that analysis and guiding

16:02:51  2    operational -- I call you will OSI -- must take place before

16:02:57  3    the incoming call was answered, there can be no infringement

16:03:01  4    because those occur after the incoming call is answered.

16:03:06  5    Q.       Dr. Brody, you said you had additional basis for no

16:03:10  6    infringement on the '532 and '985 Patents.  If we can go to

16:03:14  7    slide 16, could you please tell the jury what additional

16:03:17  8    basis you had for non-infringement of the '532 Patent?

16:03:20  9    A.       Yes.  I have highlighted a few terms, I should say

16:03:25 10    bolded a few terms here, that claim 32 requires a system for

16:03:29 11    doing all these things.  First off, VeriCall doesn't know

16:03:34 12    anything about when it's being used.  It could be used after

16:03:38 13    the call by all the customers.  Looking at its code won't

16:03:41 14    help you, so it's not a claim system.  It does not answer

16:03:47 15    calls.  We already heard that memory and processors belong

16:03:50 16    to Amazon.  VeriCall is only software, so VeriCall is not --

16:03:54 17    is not the accused system that meets this.

16:04:00 18             SageMaker, which is a machine learning tool,

16:04:03 19    that wasn't even written by VeriCall.  It runs on Amazon

16:04:07 20    equipment and it's all Amazon code.  Next Caller knows

16:04:12 21    nothing about that code.

16:04:14 22    Q.       If we could take a look at the next slide which has

16:04:18 23    the Dish diagram again that Mr. Bress has relied heavily on.

16:04:22 24    Could you put in perspective for the jury on this diagram

16:04:26 25    what aspects are Next Caller and then not?

Brody - direct

16:04:30 1    A.     So what is Next Caller being accused, what is being

16:04:35 2   accused?  It's VeriCall that is being accused.  VeriCall is

16:04:39 3   a portion of the software it uses riding on somebody else's

16:04:44 4   processors, using somebody else's memory, and also using

16:04:50 5   somebody else's software.  Everything else in the red box or

16:04:55 6   I should say sort of red box, is other things including the

16:05:00 7   networks that the incoming call comes in on and all the

16:05:03 8   processing done in the call center, so VeriCall is a very

16:05:08 9   small piece of what's going on.

16:05:10 10   Q.     If we advance to the next slide on the '985 Patent,

16:05:14 11   what additional basis have you identified for

16:05:16 12   non-infringement?

16:05:17 13   A.     Well, for claim 1 of the '985 Patent, you have to

16:05:22 14   have receiving by an electronic system associated with the

16:05:26 15   called party telephonic device, the called party number or

16:05:32 16   billing number.  Basically VeriCall is not an electronic

16:05:35 17   system associated with the called party telephonic device as

16:05:40 18   is bolded in the claim language.

16:05:42 19   Q.     Now, Mr. Bress identified the session border

16:05:45 20   controller as the called party telephonic device.  What is

16:05:50 21   the session border controller?

16:05:51 22   A.     As Mr. Bress explained, that is a piece of equipment

16:05:54 23   that's the first piece of equipment where the incoming call

16:05:58 24   comes into the call center and it's used to provide security

16:06:00 25   and other types of processing.

16:06:03 1    Q.      Was that one of the Acme devices that we've seen on

16:06:08 2    the Dish diagram?

16:06:09 3    A.      Yes, once you enter the call.  The call center, the

16:06:13 4    Acme 4600, that is an SBC.

16:06:19 5    Q.      Who owns the SBC or session border controller?

16:06:23 6    A.      It was probably bought and owned by in this case

16:06:27 7    Dish.

16:06:28 8    Q.      Does Next Caller provide session border controllers

16:06:32 9    to its customers?

16:06:34 10   A.      No, it does not.

16:06:35 11   Q.      If we could turn to the next slide, I would like you

16:06:37 12   to assist the jury in understanding exactly why VeriCall is

16:06:41 13   not associated with the customer's telephonic device like an

16:06:46 14   SBC?

16:06:47 15   A.      Many of us during the pandemic would call -- not

16:06:53 16   call, address Amazon through a PC to order things because

16:06:57 17   that would be a way to get things delivered safely.  Now

16:07:01 18   Amazon -- when you call Amazon and do things with your PC,

16:07:07 19   you wouldn't say that Amazon is an electronic system

16:07:12 20   associated with your personal computer, it just doesn't make

16:07:15 21   any sense.  Amazon is this large giant system out there.

16:07:19 22   Similarly the call center computers which are at the bottom

16:07:24 23   on the left, the Capital One computer in this example,

16:07:28 24   contacts VeriCall which relies on Amazon.  Just because

16:07:32 25   Capital One's system computer contacted VeriCall to use it

16:07:38 1  does not mean that VeriCall is associated with the call

16:07:43 2  center computer which is the telephonic device receiving the

16:07:47 3  call, just like Amazon is not associated with your personal

16:07:52 4  computer.

16:07:53 5  Q.    So what is significant about the fact that using

16:07:57 6  VeriCall by one of Next Caller's customers is similar to

16:08:02 7  going to Amazon.com to buy socks?

16:08:05 8  A.    Again, going to Amazon.com, you would not say that

16:08:08 9  Amazon.com, that entire system worth billions and billions

16:08:13 10 and billions of dollars is associated with your PC, which is

16:08:17 11 an electronic system.

16:08:18 12 Q.    If we could turn to slide 20, please.

16:08:23 13       Dr. Brody we have here a slide that has the

16:08:25 14 claim language and some red X's.  Could you please tell the

16:08:31 15 jury what is indicated by these red X's?

16:08:34 16 A.    Remember Mr. Bress claimed that every one of those

16:08:36 17 boxes on the left had a green checkmark.  I disagree.  At

16:08:40 18 least three of them have red X's which means those are claim

16:08:46 19 elements that are not met.  In fact, it's an all or nothing

16:08:50 20 proposition.  Even if just one showed up, there would be no

16:08:54 21 infringement by Next Caller's VeriCall.  In this case, there

16:08:58 22 are three claim elements that are not met.

16:09:01 23 Q.    If we could turn to the next slide.  You have claim 1

16:09:05 24 of the '985 Patent.  Could you please tell the jury what is

16:09:05 25 indicated by these X's?

16:09:10 1    A.    Well, these are the two claim elements that are not

16:09:14 2    met in my opinion.  Again, it's an all or nothing

16:09:18 3    proposition.  It would have to be all green checkmarks

16:09:21 4    there, but I have found two claim elements where the

16:09:25 5    VeriCall system does not read on the claims and does not

16:09:30 6    practice the claim elements.  So, therefore, there is no

16:09:34 7    infringement of claim 1 of the '985 Patent.

16:09:39 8    Q.    So Dr. Brody, we talked about claim 1 of the '985

16:09:42 9    Patent and claim 32 of the '532 Patent.  What about the

16:09:45 10   dependent claims, would those be met?

16:09:48 11   A.    No.  I don't have to go any further.  If you

16:09:51 12   remember, a dependent claim includes what comes from a

16:09:56 13   dependent -- the independent claim.  The independent claim

16:10:00 14   is not met by the system.  The dependent claim, which must

16:10:05 15   include that as well, is not met.  I don't have to go any

16:10:08 16   further, the independent claims are not met.

16:10:10 17   Q.    So Dr. Brody, given that the independent claims are

16:10:13 18   not met for the '532 and '985 Patents, what is your opinion

16:10:18 19   regarding whether Next Caller infringes?

16:10:21 20   A.    Next Caller's VeriCall system does not infringe the

16:10:24 21   asserted claims of the '532 and '985 Patents.

16:10:28 22            THE COURT:  I think this is a good place for us

16:10:32 23   to stop for the day.  It's been a long day.  Let's let you

16:10:36 24   out a little bit early today and we will pick up tomorrow

16:10:39 25   morning.  Everyone, safe travels.

16:10:42 1           **(Jury leaving the courtroom at 4:10 p.m.)**

16:11:09 2           **THE COURT:  All right.  You may step down.**

16:11:13 3  **Okay.  You guys can all sit down.**

16:11:16 4           **Ms. Columbia, if you want to make a motion, feel**

16:11:22 5  **free.**

16:11:26 6           **MS. COLUMBIA:  Yes, Your Honor.  Sarah Columbia**

16:11:29 7  **for defendant, Next Caller.**

16:11:31 8           **At the close of plaintiff's case, Next Caller**

16:11:33 9  **moves under Rule 50 for judgment as a matter of law as a**

16:11:37 10  **preliminary matter, counts 2, 3, 5, 6 and 7, there has been**

16:11:44 11  **no evidence presented.  And I believe plaintiff's counsel**

16:11:46 12  **has represented to the Court that they are not pursuing**

16:11:49 13  **those claims.  Those are the indirect infringement claims**

16:11:52 14  **for the '532 and the '985, and the direct infringement**

16:11:58 15  **claims for the '913 Patent.**

16:12:01 16           **With respect to Counts 1 and 4 for direct**

16:12:03 17  **infringement of the '895 and '532 Patents respectively,**

16:12:09 18  **plaintiff has not introduced evidence from which a jury can**

16:12:13 19  **reasonably find infringement, in particular has not**

16:12:17 20  **introduced evidence from which a jury could find the**

16:12:21 21  **required elements of all of those claims that the system or**

16:12:24 22  **method performance analysis before the incoming call is**

16:12:27 23  **answered as that claim term requires.**

16:12:31 24           **Next, with respect to Counts 8 and 9, which are**

16:12:36 25  **for indirect infringement of the '913 Patent, plaintiff has**

failed to introduce evidence from which a jury could

reasonably find indirect infringement, at least because

there is insufficient evidence that any customer actually

infringes.  And with respect to inducement, no evidence that

Next Caller took action to induce infringement.

Corollary of those claims is willful

infringement.  And at the close of the evidence, plaintiff

had failed to introduce the evidence required for willful

infringement including an absence of evidence of knowledge

of the patents-in-suit, much less awareness of the relevance

of the patents or failure to exercise due care.

With respect to Counts 10 and 11 which are the

false advertising claims under the Lanham Act and the

Delaware Uniform Trade Practices Act, the only evidence

submitted was on the statement ten percent IVR containment.

And plaintiff's have failed to introduce evidence from which

a reasonable jury could find that statement, ten percent IVR

containment, in its various iterations to meet the

requirements for false advertising under either the Lanham

Act or the Delaware Uniform Trade Practices Act.  In

particular, the first element of both is that the statement

be false or misleading.  Plaintiffs have introduced no

evidence that the statements themselves are false or

misleading and presumably are relying upon the line of cases

that talk about per se falsities based on completely

16:14:21 1    unsubstantiated claims, but there is no evidence in this

16:14:25 2    case that these claims are completely unsubstantiated which

16:14:29 3    under the --

16:14:30 4         THE COURT:  Is there any evidence or semblance

16:14:33 5    of support for them?

16:14:37 6         MS. COLUMBIA:  Yes.

16:14:38 7         THE COURT:  Can you --

16:14:39 8         MS. COLUMBIA:  Mr. Roncoroni's testimony --

16:14:42 9         THE COURT:  Can you tell me what he said that

16:14:44 10   you're relying on?

16:14:47 11        MS. COLUMBIA:  Yes.  It's been a long day, Your

16:14:50 12   Honor.  Mr. Roncoroni testified yesterday in court under

16:14:53 13   oath to the various steps that they took within the company

16:14:56 14   to look at outside research and the feedback they had from

16:15:02 15   customers.  I believe he testified that they had feedback

16:15:05 16   from a prospective customers, Barclay Bank had reported

16:15:11 17   25 percent IVR containment increase and from Dish Network

16:15:14 18   which reported something like three percent and if they

16:15:19 19   combined that with industry standard research and feedback

16:15:22 20   that they had available to them in order to arrive at and be

16:15:27 21   comfortable that the ten percent IVR containment was

16:15:31 22   substantiated.

16:15:32 23        THE COURT:  Okay.

16:15:34 24        MS. COLUMBIA:  Absent falsity, plaintiffs would

16:15:38 25   have to prove the other elements of the Lanham Act, the

16:15:42 1    Delaware Uniform Trade Practices statutes, and they have

16:15:49 2    introduced no evidence from which a jury could reasonably

16:15:52 3    conclude that the ten percent IVR statement actually

16:15:56 4    deceived anyone or had a tendency to deceive, no evidence

16:16:00 5    that it was likely to influence purchasing and no evidence

16:16:03 6    that it was likely to injure the plaintiffs.

16:16:06 7            Corollary to the false advertising claims, Your

16:16:10 8    Honor, is the claim for punitive damages which are tied to

16:16:13 9    the false advertising claim and which would require not only

16:16:16 10   that the false advertising element be met by that, that

16:16:20 11   those claims are met and that be a finding that it was

16:16:24 12   willful false advertising in the form of I don't care or

16:16:28 13   evil attitude or proof that someone should have known that

16:16:33 14   the conduct was of the nature prohibited.  Plaintiffs have

16:16:37 15   introduced no evidence to support a false advertising claim

16:16:40 16   much less a willful and false advertising claim.

16:16:42 17           THE COURT:  Okay.

16:16:43 18           MS. COLUMBIA:  Thank you, Your Honor.

16:16:44 19           THE COURT:  Thank you.  I'm going to reserve on

16:16:49 20   this, but if you have to make a few statements for the

16:16:52 21   record, that's fine.  I guess I would like to know, you

16:16:57 22   don't disagree on the issue of direct and indirect

16:17:02 23   infringements, right, that you have dropped indirect

16:17:02 24   infringement for two of the patents and direct infringement

16:17:02 25   for one?

16:17:09 1          MR. TUMINARO:  We don't disagree to '532 and

16:17:14 2     '985, and we are not doing indirect, and '913 we're not

16:17:17 3     doing direct.

16:17:17 4          THE COURT:  Is the willfulness claim really only

16:17:20 5     post-suit willfulness?

16:17:22 6          MR. TUMINARO:  No, Your Honor, it is not.

16:17:23 7          THE COURT:  Because you think it starts when

16:17:25 8     they said they have a patented invention?

16:17:28 9          MR. TUMINARO:  Yes, in 2016, we had three

16:17:31 10    patents at that time.  The '532 and the '985 were two of the

16:17:34 11    three patents at the time.  They said our tool was patented.

16:17:37 12    They had knowledge of our patent.

16:17:39 13         THE COURT:  Okay.  And then what about the false

16:17:42 14    advertising, are you proceeding on the two statements or

16:17:46 15    just the ten percent IVR containment?

16:17:49 16         MR. TUMINARO:  We are proceeding on two

16:17:52 17    attempts, on ten percent IVR containment, it's completely

16:17:55 18    unsubstantiating and the evidence that they pointed to,

16:17:59 19    three percent for Dish was way lower.  And for Barclays,

16:18:00 20    Mr. Roncoroni testified they never became a customer.

16:18:06 21         For pre-answer, they can't have it both ways.  I

16:18:10 22    guess, Your Honor, either it is pre-answer and they infringe

16:18:14 23    or it's not pre-answer and they have a false advertising

16:18:16 24    problem.

16:18:16 25         THE COURT:  Okay.  And I did want to ask about

16:18:23 1  the Delaware Deceptive Practices Act.  This is actually a

16:18:27 2  question that I had in the jury instructions because when

16:18:30 3  you look through the jury instructions, 4.1 says TRUSTID

16:18:34 4  says under federal law they falsely advertised, just federal

16:18:40 5  law refers to the Lanham Act.  Nothing about Delaware law in

16:18:44 6  there at all talking about false advertising.

16:18:47 7       And then we get to number 5, instruction number

16:18:51 8  5, or Section 5 that says if you decide under Delaware law

16:18:55 9  that they falsely advertised, then you have to decide

16:18:58 10  whether they're entitled to punitive damages under Delaware

16:19:01 11  law.  And since the Lanham Act doesn't allow for punitive

16:19:05 12  damages, though it allows for enhanced damages, I don't know

16:19:08 13  if you're still asserting it.  There is no question -- there

16:19:12 14  is no jury instructions on the Delaware Uniform Trade

16:19:17 15  Practices Act, there is nothing that says it's the same,

16:19:19 16  it's false advertising and there is no question on the

16:19:22 17  verdict sheet.  So I need a little help there.

16:19:25 18       MR. TUMINARO:  Your Honor, we'll fix that.  I

16:19:27 19  need to confer with my team.  I don't know as I stand here

16:19:30 20  right now all the answers to those questions that you have.

16:19:33 21  We'll confer and get you an answer tomorrow.

16:19:36 22       THE COURT:  Okay.  Anything else you want to say

16:19:39 23  is fine.  Go ahead.

16:19:41 24       MR. TUMINARO:  No, Your Honor, we oppose the

16:19:42 25  motion.

16:19:44 1          THE COURT:  All right.  So I am going to reserve

16:19:49 2     on that.  We're going to give you when we leave today a

16:19:54 3     version of the jury instructions.  I want you to read them

16:19:59 4     carefully.  We tried to clean all the stuff that was in

16:20:03 5     there that shouldn't have been and that doesn't relate to

16:20:06 6     anything in the case.  But I need you to read it just to

16:20:09 7     make sure there is no more of that stuff that's irrelevant

16:20:12 8     and also to make sure I didn't take out anything that

16:20:14 9     actually was relevant.

16:20:15 10         The couple of sections -- so read it all, but

16:20:20 11    the couple of sections I particularly want to note are 3.6

16:20:25 12    and 3.7, that's inducement and contributory.  And you will

16:20:29 13    see in there I left a part where it had TRUSTID's proposed

16:20:36 14    language.  That's not because I decided that I want to

16:20:39 15    include it, it's that I want to hear on that one because I

16:20:42 16    didn't know what to do with that one.  So you'll see I left

16:20:45 17    it in there.  It's not because I have decided one way or the

16:20:48 18    other, but I need you to be prepared to explain why I should

16:20:52 19    do one thing or the other.

16:20:54 20         Section 3.8 on willfulness, I believe that the

16:20:59 21    instruction you included was the instruction that the

16:21:02 22    Federal Circuit said was wrong in the *Eko* case.  So we tried

16:21:07 23    to fix it consistent with *Eko*, but the state of willfulness

16:21:12 24    is a little bit up in the air.  So you need to read that

16:21:16 25    carefully and give me some help.

3.10, 101, so I tried to make the 101 instruction consistent with the verdict sheet about that it's only well-known and conventional. But 101 as I understand it is claim by claim, and on the verdict sheet, it's just about a patent. So I don't know what we're doing with that. Did people agree that there is a particular claim that's representative? I don't know what the jury is deciding on that because it's just a patent and we're not pointing them to a claim, yet the instruction seems to talk about a claim.

MR. TUMINARO: I guess from our side, Your Honor, it's not even clear that we get to step 2 of *Alice*.

THE COURT: We're going to get to step 2 of *Alice* because I'm not deciding step 1 before the jury decides on Friday, I get it, but we're going to do things a little bit backwards here. And if the jury comes out in a particular way on step 2, I might not even have to decide step 1. But I need you to look at that instruction because there is not a lot of them out there, none that the Federal Circuit has blessed. And I need you to look at the verdict sheet because I don't understand what we're doing.

Section 4.1, I think I just pointed that out, what you gave me only refers to the federal law, not the state law.

And then in punitive damages we skipped to

16:22:54 1  talking about Delaware law without giving the jury any

16:22:59 2  understanding of what that is.  And I think you all took

16:23:03 3  some of that from the Gavrieli jury instructions, but in

16:23:11 4  Gavrieli, if you take a look, what they did was they also

16:23:14 5  had an instruction that said everyone agrees that the

16:23:17 6  elements are the same under the state law and the federal

16:23:20 7  law and I believe that there was a separate question for the

16:23:22 8  state and separate question for the federal law.  So I

16:23:28 9  appreciate you trying to look at what I had done before, but

16:23:31 10  it's not complete.

16:23:32 11         And so it's just a little bit confusing and

16:23:38 12  there is a lot of issues here and I don't want to confuse

16:23:40 13  the jury.  If you all can look at everything, but at least

16:23:43 14  on those things, it would be helpful.

16:23:46 15         Anything else that we need to talk about?

16:23:50 16         MR. TUMINARO:  No.

16:23:50 17         MS. COLUMBIA:  No.

16:23:54 18         Your Honor, I always do that.  Just scheduling,

16:23:59 19  it feels like we're going to finish sometime tomorrow, maybe

16:24:00 20  by lunchtime.  So I'm assuming we're thinking charge

16:24:08 21  conference tomorrow, closings Friday morning?

16:24:11 22         THE COURT:  Yes.  If you're asking whether you

16:24:14 23  need to prepare your closings tonight, you do not.

16:24:16 24         MS. COLUMBIA:  Thank you.

16:24:17 25         THE COURT:  Okay.

16:24:18  1          (Court recessed at 4:24 p.m.)

          2

          3          I hereby certify the foregoing is a true and
             accurate transcript from my stenographic notes in the proceeding.
          4

          5                          /s/ Dale C. Hawkins
                                     Official Court Reporter
          6                          U.S. District Court

          7

          8

          9

         10

         11

         12

         13

         14

         15

         16

         17

         18

         19

         20

         21

         22

         23

         24

         25