08:30:29 1       IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF DELAWARE

3

4   TRUSTID, INC.,              )  VOLUME 2
                               )
5            Plaintiff,        )
                               )  C.A. No. 18-172(MN)
6   v.                         )
                               )
7   NEXT CALLER, INC.,         )
                               )
8            Defendant.        )

9

10              Tuesday, July 13, 2021
                9:04 a.m.
11              Jury Trial

12
                844 King Street
13              Wilmington, Delaware

14

15   BEFORE:   THE HONORABLE MARYELLEN NOREIKA
              United States District Court Judge
16

17
     APPEARANCES:
18

19              YOUNG CONAWAY STARGATT & TAYLOR
                BY:  ADAM POFF, ESQ.
20
                -and-
21
                STERNE KESSLER GOLDSTEIN & FOX
22              BY:  JONATHAN TUMINARO, PhD., ESQ.
                BY:  MICHAEL D. SPECHT, ESQ.
23              BY:  DEIRDRE WELLS, ESQ.
                BY:  DANIEL BLOCK, ESQ.
24

25                   Counsel for the Plaintiff

1    APPEARANCES CONTINUED:

2
          MORRIS NICHOLS ARSHT & TUNNELL LLP
3         BY:  JACK B. BLUMENFELD, ESQ.

4         -and-

5         McDERMOTT WILL & EMERY
          BY:  SARAH CHAPIN COLUMBIA, ESQ.
6         BY:  IAN B. BROOKS, ESQ.

7                    Counsel for the Defendant

8

9              — — — — — — — — —

09:04:46 10            THE COURT:  Good morning, everyone.  Any issues?

09:04:46 11            MR. TUMINARO:  The only thing that we were going

09:04:46 12   to raise is just tomorrow we might seal the courtroom.

09:04:46 13   We're talking with the -- seek to seal the courtroom for

09:04:46 14   Mr. Holzen's testimony.  It will be about five to

09:04:46 15   ten minutes.  We're working with the other side about that

09:04:46 16   issue.

09:04:46 17            THE COURT:  Okay.  Sounds good.  Thanks for the

09:04:46 18   heads up.  With respect to I guess you guys got the memo, in

09:04:46 19   my courtroom, if you are vaccinated you may take off your

09:04:46 20   masks if you choose, but you do not have to.  And I'm going

09:04:46 21   to tell the jury the same thing.

09:04:47 22            All right.  Let's bring in the jury.

09:05:17 23            (Jury entering the courtroom at 9:05 a.m.)

09:05:17 24            THE COURT:  Good morning, everyone.  Have a

09:05:17 25   seat.

09:05:17 1     All right, Mr. Cox, come back to the stand.

09:05:21 2 I'll just remind you, sir, that you're still under oath.

09:05:37 3 Good morning.

09:05:38 4          THE WITNESS:  Good morning.

09:05:40 5          MR. BLUMENFELD:  Good morning, members of the

09:05:42 6 jury.

09:05:43 7 BY MR. BLUMENFELD:

09:05:44 8 Q.     Good morning, Mr. Cox.  How are you today?

09:05:46 9 A.     I'm good.  Thank you.

09:05:47 10 Q.     Do you still have your two notebooks from yesterday?

09:05:50 11 A.     I do.

09:05:51 12 Q.     Good.  Thank you.  I'm just going to ask you a few

09:05:55 13 topics today.  And to re-orient things, yesterday I asked

09:06:01 14 you some questions and so did your counsel about Capital

09:06:04 15 One.  Do you remember that?

09:06:05 16 A.     I do.

09:06:06 17 Q.     Can you look at DTX-43 in your cross-examination

09:06:11 18 binder.

09:06:24 19 A.     JTX-43?

09:06:26 20 Q.     DTX.  Sorry if I said JTX, I misspoke.

09:06:35 21 A.     Yes, I got it.

09:06:37 22 Q.     This is an e-mail chain dated August 25th, 2016; is

09:06:42 23 that right?

09:06:42 24 A.     Yeah, I see that.

09:06:44 25 Q.     And you're on the e-mail chain; right?

09:06:47 1    A.        Yeah, I'm on the CC line, yes.

09:06:50 2                MR. BLUMENFELD:  Your Honor, we move DTX-43 into

09:06:53 3    evidence.

09:06:54 4                MR. SPECHT:  No objections, Your Honor.

09:06:55 5                THE COURT:  All right.  It's admitted.

09:06:57 6                (DTX Exhibit No. 43 was admitted into evidence.)

09:06:58 7    BY MR. BLUMENFELD:

09:06:58 8    Q.        Mr. Rosenberg, could you put that up for us.  Thank

09:07:01 9    you.

09:07:01 10               Now, I want to start with the bottom half, there

09:07:06 11   is an e-mail at the bottom half from Mr. O'Leary, 10:23 a.m.

09:07:14 12   Do you see that?

09:07:14 13   A.        I do.

09:07:14 14   Q.        And that had to do with a call he said he had with

09:07:19 15   Tara Hilton; right?

09:07:23 16   A.        Yes.

09:07:24 17   Q.        And Tara Hilton was the contact at Capital One; is

09:07:27 18   that right?

09:07:27 19   A.        She was one of the contacts at Capital One.

09:07:30 20   Q.        And in the second paragraph, Mr. O'Leary -- by the

09:07:38 21   way, what was Mr. O'Leary's position at TRUSTID?

09:07:42 22   A.        Chris O'Leary was the vice-president of marketing and

09:07:44 23   sales.  He worked for Mr. Godfrey.

09:07:47 24   Q.        In the second paragraph he referred to the price

09:07:50 25   negotiation and then in the third line he said, "I indicated

09:07:54 1    they are comparing apples and oranges and they need to get

09:07:57 2    their operations (authentication, contact center, customer

09:08:02 3    satisfaction teams) involved."

09:08:04 4            Do you see that?

09:08:04 5    A.      I do.

09:08:05 6    Q.      And then there i a response, I would like to go up

09:08:07 7    on the top e-mail, the response from Mr. Godfrey.  Did you

09:08:12 8    say Mr. Godfrey was his boss?

09:08:14 9    A.      Yes.

09:08:15 10   Q.      And what Mr. Godfrey said was in the first paragraph,

09:08:21 11   "I just ran into Next Caller at BAC."

09:08:24 12           And that's Bank of America; right?

09:08:26 13   A.      That's correct.

09:08:27 14   Q.      "Which I imagine could easily be half our price as it

09:08:32 15   is simply a data play and therefore repeatedly breakable.

09:08:38 16   I'm optimistic I have won this issue at BAC, but I may not

09:08:43 17   be out of the woods just yet as it could rear its head

09:08:47 18   again."

09:08:48 19           And then he finished by saying, "You are spot

09:08:51 20   on.  They are comparing apples/oranges."

09:08:55 21           Do you see that?

09:08:56 22   A.      I do.

09:08:56 23   Q.      What he was saying there is their comparing TRUSTID's

09:09:00 24   solution and Next Caller's solution was comparing apples and

09:09:03 25   oranges; right?

09:09:05 1    A.      Based on our imperfect understanding of the Next

09:09:09 2    Caller product.

09:09:09 3    Q.      And you agreed with that at that time at least;

09:09:12 4    right?

09:09:12 5    A.      I did, again, based on the imperfect understanding of

09:09:18 6    where Next Caller's product was at.

09:09:20 7    Q.      Could you turn to DTX-50.  And do you have that in

09:09:32 8    front of you?

09:09:32 9    A.      I do, yes.

09:09:33 10   Q.      DTX-50 is an e-mail chain dated May 29th, 2018, so a

09:09:42 11   couple of years later; right?

09:09:43 12   A.      Correct.

09:09:46 13   Q.      And you are on this e-mail chain also; right?

09:09:50 14   A.      I am on the e-mail chain.  Some of it is from me and

09:09:54 15   some from others, yes.

09:09:55 16   Q.      This is a discussion of TRUSTID's marketing

09:10:00 17   materials; is that right?

09:10:01 18   A.      Let me look at it here.  I actually don't know.  Yes,

09:10:16 19   seems to be, it's not completely clear to me, there is so

09:10:20 20   many titles and signatures, but that seems to be the case.

09:10:24 21            MR. BLUMENFELD:  Your Honor, we move DTX-50 into

09:10:27 22   evidence.

09:10:27 23            MR. SPECHT:  No objection, Your Honor.

09:10:28 24            THE COURT:  It's admitted.

09:10:29 25            (DTX Exhibit No. 50 was admitted into evidence.)

09:10:30 1  **BY MR. BLUMENFELD:**

09:10:31 2  Q.    **Mr. Rosenberg.  Thank you.**

09:10:32 3          **So I want to start with the e-mail, 9:26 a.m.**

09:10:39 4  **from Mr. Godfrey in the middle of the first page.  Thank**

09:10:45 5  **you.  And Mr. Godfrey said there are some typos in the**

09:10:51 6  **marketing materials.  Also, this version refers to Pindrop**

09:10:56 7  **as not being authentication.  I think most of the market**

09:11:00 8  **thinks of PD, that's Pindrop, yes?**

09:11:04 9  A.    **I would say in this case it would be clear it's**

09:11:08 10 **Pindrop to me at this case.**

09:11:11 11 Q.    **As AUTH at this point, AUTH, but you understand that**

09:11:16 12 **to be authentication; right?**

09:11:17 13 A.    **Yes.**

09:11:17 14 Q.    **And you responded to that a few minutes later,**

09:11:20 15 **correct, at the top of the page?**

09:11:22 16 A.    **Yes.**

09:11:23 17 Q.    **And what you said "Pindrop is as much authentication**

09:11:28 18 **as is Next Caller."**

09:11:31 19          **And in 2018, you believed that Pindrop was as**

09:11:37 20 **much authentication as Next Caller; correct?**

09:11:42 21 A.    **Yes.**

09:11:42 22 Q.    **And you believe that today, don't you?**

09:12:51 23 A.    **Pindrop, no, I don't.**

09:12:51 24 Q.    **But you believed that when you said it in 2018?**

09:12:51 25 A.    **Yes.**

09:12:51 1  Q.      And then you went on to say auditing, it says

09:12:51 2  singling, is that supposed to be signaling?

09:12:51 3  A.      It should be signaling.

09:12:51 4  Q.      "Auditing signaling data is not authentication."

09:12:51 5          And what you were saying there was that neither

09:12:51 6  -- in your view, neither Next Caller or Pindrop were

09:12:51 7  authentication like TRUSTID is; right?

09:12:51 8  A.      At that point in time, that was my opinion and

09:12:51 9  understanding.

09:12:51 10 Q.      And what you were saying was that Next Caller and

09:12:51 11 Pindrop were both very different from TRUSTID; right?

09:12:51 12 A.      I think very different is wrong, but different,

09:12:51 13 absolutely different.

09:12:51 14 Q.      Can we just see one more document here.  Can we turn

09:12:51 15 to DTX-63.

09:13:53 16 A.      Okay.

09:13:53 17 Q.      And yesterday you showed us some marketing brochure

09:13:53 18 from TRUSTID.  Do you remember that?

09:13:53 19 A.      I do.

09:13:52 20 Q.      And is this another marketing brochure from TRUSTID?

09:13:52 21 A.      DTX-63, this appears to be a sales presentation.

09:13:52 22 Q.      Okay.  A sales presentation as opposed to a marketing

09:13:52 23 brochure?

09:13:52 24 A.      Right.

09:13:52 25 Q.      And it has Mr. O'Leary's name on the cover; right?

09:13:53 1    A.      It does, yes.

09:13:53 2    Q.      And then on the second page it has your name as the

09:13:53 3    CEO of the company; right?

09:13:53 4    A.      Yes.

09:13:53 5            MR. BLUMENFELD:  Can we move DTX-63 into

09:13:53 6    evidence, also.

09:13:53 7            MR. SPECHT:  No objection, Your Honor.

09:13:53 8            THE COURT:  It's admitted.

09:13:53 9            (DTX Exhibit No. 63 was admitted into evidence.)

09:13:55 10           MR. BLUMENFELD:  Mr. Rosenberg, could you put

09:13:55 11   that up.  Thank you.

09:13:55 12   BY MR. BLUMENFELD:

09:13:55 13   Q.      That's a standard picture you put in your marketing

09:13:55 14   sales brochures; right?

09:13:55 15   A.      At that time period, yeah.

09:13:55 16   Q.      Can you turn, Mr. Rosenberg and Mr. Cox, to page 4.

09:14:37 17   And this was Mr. Cox, 2018; is that correct?

09:14:37 18   A.      Yes.

09:14:37 19   Q.      So it looks like June 20th, 2018.

09:14:37 20   A.      I don't see the June part.  Right.  Was that on the

09:14:37 21   front page?

09:14:37 22   Q.      No, I think it's right down at the bottom, but in any

09:14:37 23   event, it's sometime in 2018.

09:14:37 24   A.      Okay.

09:15:35 25   Q.      And this is -- in this sales brochure it's a product

09:15:39 1  comparison of the market landscape.  Do you see that?

09:15:39 2  A.      I do.

09:15:39 3  Q.      And the things that are being compared here are two

09:15:39 4  TRUSTID products, right, Authenticator and Identifier, those

09:15:39 5  are two separate products; right?

09:15:39 6  A.      They're two separate products.

09:15:39 7  Q.      They can be used together, but they're separate

09:15:39 8  products?

09:15:39 9  A.      They can be used together, yes.

09:15:39 10 Q.      That's on the left side, and then on the right side

09:15:39 11 there is NextCaller and Pindrop listed; right?

09:15:39 12 A.      Yes.

09:15:39 13 Q.      And your Authenticator product is listed as being

09:15:39 14 network forensics.  Do you see that?

09:15:39 15 A.      I do.

09:15:39 16 Q.      And on the right side, the NextCaller and Pindrop

09:15:39 17 products are listed as call, what does it say, call header

09:15:39 18 based?

09:15:39 19 A.      I see that.

09:15:39 20 Q.      And so those are being categorized as other

09:15:39 21 competitive products, but different than Authenticator;

09:15:40 22 correct?

09:15:40 23 A.      Yeah, based on my understanding at that time.

09:16:38 24 Q.      Now, you understand, Mr. Cox, that Dish is a Next

09:16:38 25 Caller customer?

09:16:38 1   A.      I learned that.

09:16:38 2   Q.      And if Dish decided not to work with Next Caller,

09:16:38 3   they might choose a different vendor; right?

09:16:38 4   A.      They could, yes.

09:16:38 5   Q.      Or they could choose not to buy any product in the

09:16:38 6   authentication space; right?

09:16:38 7   A.      They could, yes.

09:16:38 8   Q.      And you don't know what they would do if they stopped

09:16:38 9   using Next Caller?

09:16:38 10  A.      Unless they told me.  I wouldn't know unless they

09:16:38 11  told me.

09:16:38 12  Q.      You don't know as you sit here; right?

09:16:38 13  A.      I can't be certain.

09:16:38 14  Q.      And same for Comcast, right, if they stopped using

09:16:38 15  Next Caller, you don't know what they would do?

09:16:38 16  A.      Again, unless they told me, I wouldn't know.

09:16:38 17  Q.      And BBVA is the same, if they stopped using Next

09:16:38 18  Caller, you don't know what they would do?

09:16:38 19  A.      Correct.

09:16:41 20  Q.      Yesterday you were you shown your patents, I think

09:16:41 21  they were JTX-2, 3 and 4?

09:18:57 22  A.      I remember the patents.  I don't remember the JTX

09:18:57 23  number.

09:18:57 24  Q.      Now, I wanted to just confirm a few things.  So what

09:18:57 25  you invented and didn't invent.  You didn't invent

09:18:57 1    caller-ID; right?

09:18:57 2    A.      I did not invent caller-ID.

09:18:57 3    Q.      That was well-known before your patents; right?

09:18:57 4    A.      Call-ID had been around for quite some time.

09:18:57 5    Q.      And yesterday there was a short mention of SIP or

09:18:57 6    session, I think it's initiation protocol.  Is that what it

09:18:57 7    stands for?

09:18:57 8    A.      Session initiation protocol.  It's protocol in

09:18:57 9    telephony.

09:18:57 10   Q.      You didn't invent that either?

09:18:57 11   A.      I did not.

09:18:57 12   Q.      That was well-known before your time?

09:18:57 13   A.      Yes.

09:18:57 14   Q.      And you didn't invent the IVR; correct?

09:18:57 15   A.      I did not invent the integrated interactive voice

09:18:57 16   response.

09:18:57 17   Q.      That was well-known before your patents; right?

09:18:57 18   A.      Yes.

09:18:57 19   Q.      And the IVR is a computer that answers telephone

09:18:57 20   calls; right?

09:18:57 21   A.      Not always.

09:18:57 22   Q.      Not always, but that's one thing it can do?

09:18:57 23   A.      It can, yes.

09:18:57 24   Q.      And for your customers, the IVR is supplied by

09:18:57 25   others, not by TRUSTID; right?

A.      TRUSTID does not supply IVR, correct.

Q.      And it doesn't design IVR?

A.      We do not design IVR, correct.

Q.      And there was a mention yesterday of APIs,
Application Programing Interface.  Is that what that stands
for?

A.      Correct.

Q.      And that's a piece of software that connects two
computers; is that right?

A.      It's more of a system than a piece of software, a
system that would typically connect two computers and let
them talk back and forth, yes.

Q.      And you didn't invent the API either; right?

A.      We have invented API, but not the API.

Q.      API's were known before your patent; right?

A.      Yes.

Q.      Could you turn in your book to JTX-2, that's the '532
Patent.  And if you look at column 6 at the very top, that
top paragraph.  Just the top paragraph, Mr. Rosenberg.  If
you can shorten that up.

        Do you have that in front of you or you can look
at the screen?

A.      It's easier to see on the screen.

Q.      It refers to Figure 2 being a block diagram of a
telephone network forensic system service unit suitably

09:19:38 1    configured to implement preferred methods of determining

09:19:41 2    credibility of calling party number information performed in

09:19:45 3    accordance with the hybrid process block and method step

09:19:50 4    flow diagram of Figure 1.  Do you see that?

09:19:52 5    A.      I do see that.

09:19:53 6    Q.      And Mr. Rosenberg, can you put up Figure 2.  It's

09:19:59 7    page 4 of the patent.

09:20:04 8            Now, this is the telephone network forensic

09:20:09 9    system service unit that we just looked at in column 6;

09:20:14 10   right?

09:20:14 11   A.      I actually don't see -- Figure 2, there it is, yes.

09:20:17 12   Q.      And you didn't design this, did you?

09:20:20 13   A.      That is our network diagram.

09:20:23 14   Q.      But you didn't design this system; right?

09:20:26 15   A.      TRUSTID designed the system.

09:20:29 16   Q.      Did you design any component of the system?

09:20:39 17   A.      Yes.

09:20:40 18   Q.      And did you design the servers that are listed there?

09:20:44 19   A.      Are you talking about did we design hardware?

09:20:48 20   Q.      Yes.

09:20:54 21   A.      I probably have to spend more time looking at it.  We

09:20:58 22   have designed hardware.  I don't know if it's included

09:21:01 23   there.  I don't see it at a quick look.

09:21:04 24   Q.      And TRUSTID has never built a system, has it?

09:21:12 25   A.      I would say we have.  You know, it could be something

09:21:15 1    about it that's maybe different or improved, but...

09:21:19 2    Q.        You built a hardware system?

09:21:21 3    A.        Oh, a hardware system?  Well, hardware, software, I

09:21:26 4    guess you would be putting special cards in there, there are

09:21:30 5    devices you can plug into a computer, so we didn't design

09:21:34 6    microchips if that's what you're saying.

09:21:36 7    Q.        You didn't design the servers and the gateways and

09:21:38 8    the buses, that's not what TRUSTID does; right?

09:21:42 9    A.        Many servers and gateways are dumb.  Until you tell

09:21:46 10   them what to do, I don't mean that in a derogatory term,

09:21:50 11   it's just a term of art.  It's a system in a program that

09:21:53 12   tells it what to do.

09:21:54 13   Q.        And those systems are made by other people?

09:21:57 14   A.        Right.

09:21:57 15   Q.        The servers and the processors, the buses, the

09:22:00 16   gateways, those are made by other people, not by you?

09:22:03 17   A.        Yeah, the hardware, I would think all if not most of

09:22:09 18   it is absolutely built and designed by hardware

09:22:12 19   manufacturers, sure.

09:22:14 20   Q.        By manufacturers other than TRUSTID; right?

09:22:16 21   A.        Yes.

09:22:17 22   Q.        And can we go to the '913 Patent, that's JTX-4 in

09:22:21 23   your book, Mr. Cox.  And I'm going to ask you to turn to

09:22:27 24   column 9.

09:22:29 25   A.        JTX, I'm sorry, one more time?

09:22:33 1  Q.      JTX-4, column 9.  And Mr. Rosenberg, if you could put

09:22:40 2  up the part, the portion starting at line 15 of column 9.

09:22:50 3  Thank you.  That's fine.  Can you pull up the line above

09:22:54 4  that that says -- thank you.

09:22:57 5          This is your '913 Patent; right?

09:23:07 6  A.      '913 Patent, yes.

09:23:10 7  Q.      And this refers to a computer system implementation;

09:23:13 8  right?

09:23:15 9  A.      Yes.

09:23:16 10 Q.      And if you go down, you see it says, starting at

09:23:21 11 line 20, computer 400 at the end of the line there, includes

09:23:26 12 one or more processors also called central processing units,

09:23:31 13 or CPUs, such as processor 410.  Processor 410 is connected

09:23:37 14 to communication bus 420.  Computer 400 also includes a main

09:23:42 15 or primary memory 430, preferably random access memory.  Do

09:23:48 16 you see that?

09:23:48 17 A.      I do.

09:23:49 18 Q.      Those are all components that are made by people

09:23:53 19 other than TRUSTID; right?

09:23:55 20 A.      Yes, correct.

09:23:57 21 Q.      You didn't design or build the processors or the

09:24:02 22 communication bus or the memory; right?

09:24:05 23 A.      That would be correct.

09:24:06 24 Q.      And TRUSTID doesn't make or sell this computer

09:24:12 25 implementation; correct?

09:24:15 1    A.      We utilize it.  We don't manufacture it.

09:24:19 2    Q.      Or sell it?

09:24:20 3    A.      Well, by utilizing it, I don't know -- we don't sell

09:24:24 4    the hardware.

09:24:26 5              MR. BLUMENFELD:  Thank you.  I don't have any

09:24:27 6    further questions, Mr. Cox.

09:24:30 7              THE COURT:  Redirect.

09:24:37 8                    REDIRECT EXAMINATION

09:24:41 9    BY MR. SPECHT:

09:24:44 10   Q.      Good morning, Mr. Cox.  Good morning, members of the

09:24:47 11   jury.

09:24:48 12              I'm going to start with the testimony you just

09:24:51 13   went through this morning with Next Caller's counsel

09:24:55 14   beginning first with the discussion of hardware.  What is

09:25:00 15   hardware?

09:25:01 16   A.      Hardware are physical components in typically

09:25:06 17   computing systems or telephone systems, chips, microchips,

09:25:09 18   memory, circuit boards, power supplies.

09:25:12 19   Q.      And what is the difference between hardware and

09:25:15 20   software?

09:25:15 21   A.      Hardware is a platform that stores and executes

09:25:20 22   software.

09:25:21 23   Q.      And I believe that you had testified that TRUSTID had

09:25:25 24   previously designed hardware; is that correct?

09:25:28 25   A.      We have.

09:25:29 1   Q.      Has TRUSTID also designed software?

09:25:32 2   A.      Yes, we have.

09:25:34 3   Q.      And is software fundamentally important to the

09:25:38 4   inventions here?

09:25:39 5   A.      Yes, it's fundamentally important to the invention

09:25:42 6   here.  Everything runs on software.

09:25:44 7   Q.      And is software fundamentally important to the

09:25:48 8   TRUSTID Authenticator product?

09:25:50 9   A.      Yes.

09:25:50 10  Q.      And would it be your understanding that software is

09:25:54 11  fundamentally important to the VeriCall product?

09:25:57 12  A.      Yes.

09:25:58 13  Q.      Thank you.  Could we bring up DTX-43.

09:26:19 14          Mr. Blumenfeld, Next Caller's counsel, asked you

09:26:22 15  a few questions about this e-mail.  First of all,

09:26:25 16  Mr. Passey, could you highlight at the very top the from and

09:26:28 17  sent and the date information.

09:26:33 18          Mr. Cox, what is the date of this e-mail?

09:26:35 19  A.      August 25th, 2016.

09:26:40 20  Q.      In August 2016, what was your understanding of the

09:26:42 21  product that Next Caller was offering at that time?

09:26:52 22  A.      Our understanding, which as I said several times is

09:26:57 23  limited, was that it was looking at data, pre-answer data

09:27:01 24  solely to make a determination about fraud for banks and

09:27:06 25  their customers.

Q.     And is it your understanding that at that time, Next
Caller was not offering the VeriCall solution?

A.     I don't know that I even heard the name VeriCall in
2016.  There is a chance I had, but it's really possible
that I didn't.

Q.     Mr. Passey, can you reduce that and then highlight in
the first or the second paragraph there the apples to
oranges.  You were right the first time.

       And Next Caller's counsel focused on your
statement here.  You are spot on that they are comparing
apples and oranges, do you recall that?

A.     I see that, yes.

Q.     And so is it your understanding that the apple here
would be Authenticator?

A.     It could be.

Q.     And the orange, is it your understanding that that
would be some other product other than VeriCall?

A.     It would be the opposite product, yes.

Q.     Because, in fact, at this time I believe you just
testified you didn't believe VeriCall was offering -- or
that Next Caller was offering VeriCall; correct?

A.     Correct.

Q.     You can put that down, Mr. Passey.

       Next Caller's counsel also asked you a series of
questions about whether TRUSTID's products and Next Caller's

09:28:44 1  VeriCall product are different.  Do you recall that?

09:28:46 2  A.    I remember several questions, no one jumped out

09:28:51 3  specifically.

09:28:51 4  Q.    Is it your understanding that TRUSTID and Next Caller

09:28:54 5  offer the exact same product?

09:28:56 6  A.    The exact same product, no, it's not the exact same

09:29:01 7  product, but again, that's based on imperfect information.

09:29:05 8  As I said, I never actually read their source code to be

09:29:08 9  certain about that, but it's my best summation it's not

09:29:11 10  exactly the same.

09:29:12 11  Q.    Would it be your understanding that TRUSTID's

09:29:16 12  Authenticator product has additional features that are not

09:29:19 13  at issue in this case?

09:29:20 14  A.    Yeah, that is my understanding.

09:29:22 15        MR. BLUMENFELD:  Objection, Your Honor.

09:29:23 16        THE COURT:  Hold on.  I saw you go to stand up.

09:29:25 17  Go ahead.

09:29:26 18        MR. BLUMENFELD:  Objection.  Leading.

09:29:28 19        THE COURT:  Sustained.  You're getting very

09:29:30 20  leading here, so Mr. Cox can answer the questions without

09:29:33 21  you leading him.

09:29:33 22        MR. SPECHT:  Fair enough.

09:29:35 23  BY MR. SPECHT:

09:29:36 24  Q.    Does TRUSTID have additional patents beyond those

09:29:38 25  three that are in suit here?

09:29:40 1    A.      We do.  We have eight in total.

09:29:42 2    Q.      Do TRUSTID's patents cover additional features?

09:29:45 3    A.      They do.

09:29:50 4    Q.      Now I would like to turn to some of the testimony

09:29:54 5    that you gave yesterday during the cross-examination.  There

09:29:59 6    were a lot of questions regarding the market.  Do you recall

09:30:02 7    that?

09:30:02 8    A.      I do.

09:30:03 9    Q.      Mr. Passey, could you put up Mr. Cox's slide, the

09:30:09 10   caller-ID authentication market slide.  Thank you.

09:30:13 11           I want to focus on caller-ID authentication

09:30:17 12   market, the caller-ID authentication market.  Do companies

09:30:21 13   that offer caller-ID authentication services measure the

09:30:24 14   credibility of caller-ID information?

09:30:27 15   A.      Yes.

09:30:28 16   Q.      Is that a unique characteristic of companies in the

09:30:32 17   caller-ID authentication market?

09:30:34 18   A.      Yes.

09:30:35 19   Q.      And do companies that offer caller-ID authentication

09:30:38 20   services provide their services in a way that is invisible

09:30:42 21   to spoofers?

09:30:42 22           MR. BLUMENFELD:  Objection.  Leading.

09:30:47 23           THE COURT:  Sustained.

09:30:49 24   Q.      Mr. Cox, can you identify characteristics of both

09:30:52 25   companies that compete in the caller-ID authentication

09:30:54 1    market?

09:30:54 2    A.    Sure.  It would be using data that is pre-answer by

09:31:00 3    the very nature, caller-ID comes in a specific invite

09:31:05 4    message.  It would require audio for that, it would require

09:31:09 5    the yes question.  It wouldn't require the voice biometrics

09:31:13 6    and it would be making a determination of the measurement of

09:31:17 7    the quality and trustworthiness of that caller-ID based on

09:31:21 8    that data.

09:31:22 9    Q.    If a call center wants to purchase a caller-ID

09:31:27 10   authentication solution, what companies can offer them such

09:31:30 11   a solution?

09:31:31 12   A.    Those two, now of course Pindrop because Pindrop is

09:31:36 13   owned by Next Caller, so us -- I don't know how they're

09:31:40 14   marketing their products, TRUSTID and Pindrop, unless Next

09:31:43 15   Caller is a separate company, which I don't know.

09:31:47 16   Q.    Thank you.

09:31:47 17         You also were asked a number of questions about

09:31:50 18   the broader market during your cross-examination.  What was

09:31:53 19   the distinction you were drawing between a broad competitor

09:31:57 20   in the call authentication market versus a direct competitor

09:32:01 21   in the caller-ID authentication market?

09:32:04 22   A.    Yeah.  I think I talked about that a lot yesterday,

09:32:07 23   but broadly speaking asking questions would be

09:32:10 24   authentication.  Voice biometrics would be authentication.

09:32:12 25   We don't do that.  We can't offer that to a bank or if

09:32:17 1  wanted that, they wouldn't buy that from us.  They might buy

09:32:21 2  it from a partner.  They are different as a broad sense.

09:32:25 3  They are competitive because a bank could choose just to

09:32:28 4  have voice bio and we don't get an opportunity to sell our

09:32:31 5  solution.  But direct competitors is when a bank says we

09:32:36 6  want to know the trustworthiness of caller-ID, that would be

09:32:40 7  directly competing because there is only two companies that

09:32:43 8  can solve that problem.

09:32:46 9  Q.    I would like to turn -- yesterday there were a series

09:32:48 10 of questions asked regarding Capital One during your

09:32:51 11 cross-examination.  Do you remember that?

09:32:52 12 A.    I do.

09:32:53 13 Q.    In particular, Next Caller's counsel asked a

09:33:01 14 question, and they never came back to you and said we want

09:33:03 15 to switch from Next Caller to TRUSTID; right?

09:33:06 16 A.    Yes.

09:33:06 17 Q.    And your answer was, about six times?

09:33:10 18 A.    Correct.

09:33:10 19 Q.    Can you expand upon what you meant by about six

09:33:15 20 times?

09:33:15 21 A.    Yeah.  We've had two partners of ours come to us

09:33:18 22 saying Capital One has reached out to them to buy our

09:33:23 23 solution through them.  We had meetings with Capital One

09:33:25 24 about that.  I personally have had two meetings with Capital

09:33:25 25 One where they have reached out to us, not us reaching out

09:33:32 1  to them, new folks coming in.  Some of the folks who had

09:33:37 2  left Capital One had bought our services at other banks.  I

09:33:40 3  think they had relationships.  There were introductions

09:33:43 4  made.  We have not done a proof of concept with them since,

09:33:47 5  but we have had several conversations, probably more than

09:33:50 6  six actually with Capital One about replacing Next Caller,

09:33:53 7  but we have not yet.

09:33:54 8  Q.    And once a call center installs a caller-ID

09:34:00 9  authentication system into their call center, are there any

09:34:05 10 difficulties in removing it from the center?

09:34:07 11 A.    Yes.  It's a lot of work.  There are regulatory

09:34:11 12 issues, IT issues, resource issues, training and, you know,

09:34:14 13 there is a lot of work and risk and time involved.  It's

09:34:18 14 very expensive to put things in and to take them out.

09:34:21 15 Q.    Thank you.

09:34:21 16        Yesterday, Mr. Cox, there were a number of

09:34:27 17 questions about a battle card.  Do you recall those?

09:34:30 18 A.    I do.

09:34:33 19 Q.    Mr. Passey, could you bring up JTX-040.  Can you

09:34:42 20 highlight the last bullet -- bring that whole section up.

09:34:42 21 And then we're going to focus in on the Next Caller is

09:34:55 22 faster portion of that.

09:34:56 23        Before I get there, yesterday Next Caller's

09:35:00 24 counsel asked you, "And you prepared one in 2018; correct?"

09:35:05 25        And your response had been, "I couldn't tell

09:35:08 1  you, especially with the date.  I'm sorry."

09:35:11 2         And Next Caller's counsel indicated, "You're not

09:35:14 3  good at dates, I forgot about that."

09:35:17 4         Let's assume for a moment that Next Caller's

09:35:21 5  counsel's date for this document is correct and that date is

09:35:24 6  2018.  If the date is 2018, would this document have been

09:35:29 7  prepared after the lawsuit was filed, this present lawsuit?

09:35:32 8  A.    Yes.  So we filed the lawsuit in the beginning of

09:35:36 9  2018, so it would most likely be after.

09:35:41 10  Q.    And if we could highlight the first sentence there

09:35:45 11  under Next Caller is faster.  What is this analysis based

09:35:58 12  on?

09:35:58 13  A.    Next Caller's claim to prospective buyers of the

09:36:05 14  product.

09:36:05 15  Q.    When you say claim, what do you mean by that?

09:36:08 16  A.    Well, they said they were faster.  That was a common

09:36:11 17  theme we heard, that they are faster than us.  They can get

09:36:14 18  the response back faster than we can.  And I think there was

09:36:17 19  some confusion about that, the way they would portray it as

09:36:20 20  if we were wasting customer time and they were not, and that

09:36:22 21  is not the case.

09:36:24 22  Q.    Have you reviewed Next Caller's software source code

09:36:26 23  for its VeriCall products?

09:36:30 24  A.    I have not.

09:36:31 25  Q.    Without reviewing Next Caller's source code software,

09:36:34 1    would you be able to confirm or deny this statement?

09:36:37 2    A.    No.

09:36:44 3            MR. SPECHT:  I have no further questions, Your

09:36:45 4    Honor.

09:36:45 5            THE COURT:  All right.  Thank you.  Mr. Cox, you

09:36:47 6    are excused.

09:36:48 7            What's next?

09:36:50 8            MR. TUMINARO:  Mr. Roncoroni.

09:36:55 9            THE COURT:  Okay.

09:36:56 10           MR. TUMINARO:  It's just going to take a second,

09:37:00 11   Your Honor.

09:37:01 12           THE COURT:  All right.  You're on the clock,

09:37:03 13   take a second if you want.

09:37:05 14           Mr. Roncoroni, come on up.  Hold on, we just

09:37:23 15   need to swear you in.

09:37:34 16           COURTROOM DEPUTY:  Do you solemnly swear that

09:37:35 17   the testimony you will give to the Court and jury in the

09:37:38 18   case now pending before it will be the truth, the whole

09:37:40 19   truth and nothing but the truth so help you God.

09:37:42 20           THE WITNESS:  I do.

09:37:42 21           COURT CLERK:  State and spell your name for the

09:37:42 22   record.

09:37:42 23           THE WITNESS:  Ian Roncoroni.  I-A-N,

09:37:52 24   R-O-N-C-O-R-O-N-I.

09:37:52 25           THE COURT:  Thank you.  Take a seat.

09:37:58  1          You're supposed to give him his binders before

09:38:01  2    he went up, so let's do that.  Let's try and remember that

09:38:04  3    next time.  Just try.  Do your best.

09:38:26  4          Good morning.

09:38:28  5                    DIRECT EXAMINATION

09:38:29  6    BY MR. TUMINARO:

09:38:29  7    Q.     Good morning, sir.

09:38:30  8    A.     Good morning.

09:38:31  9    Q.     Would you please state your name for the record?

09:38:33 10    A.     Ian Roncoroni.

09:38:35 11    Q.     Can you hear me?

09:38:36 12    A.     I can.  If you could speak closer to the microphone

09:38:40 13    it would be easier.  If not, I can use the headset, that's

09:38:43 14    fine.

09:38:43 15    Q.     I'll try my best.

09:38:44 16          Just for some background, you're the CEO of Next

09:38:48 17    Caller; is that right?

09:38:48 18    A.     Yes, that's correct.

09:38:49 19    Q.     And you are a co-founder of Next Caller; true?

09:38:54 20    A.     Yes, I am co-founder of Next Caller.

09:38:57 21    Q.     Fair to say that Next Caller is a software company?

09:39:02 22    A.     Yes, that's fair to say.

09:39:02 23    Q.     And that software is used for telecommunications?

09:39:07 24    A.     Could you be more specific with what you mean by

09:39:10 25    telecommunications?

Roncoroni - direct

09:39:11 1  Q.      The software is used to help the telephone system,

09:39:14 2  fair?

09:39:14 3  A.      No, that's not true.

09:39:16 4  Q.      The software is used to help the call centers and the

09:39:20 5  answering telephone calls; fair?

09:39:22 6  A.      Yes, we help call centers.

09:39:24 7  Q.      Okay.  But you don't have a degree in computer

09:39:28 8  science; is that right?

09:39:29 9  A.      No, I do not.

09:39:30 10  Q.      You don't have any formal training in computer

09:39:33 11  science; is that right?

09:39:34 12  A.      I do not.

09:39:35 13  Q.      You don't have a degree in telecommunications; is

09:39:40 14  that right?

09:39:40 15  A.      No, I do not.

09:39:41 16  Q.      And you don't even have any formal training in

09:39:45 17  telecommunications; is that right?

09:39:47 18  A.      I have nine years on the job at Next Caller as my

09:39:51 19  training.

09:39:52 20  Q.      But before Next Caller you had no formal training in

09:39:55 21  telecommunications; is that right?

09:39:56 22  A.      That's correct.

09:39:57 23  Q.      But you do have a degree in philosophy; is that true?

09:40:01 24  A.      Yes, it is.

09:40:02 25  Q.      And you got a degree in philosophy from Princeton?

09:40:06 1    A.    Yes, that's correct.

09:40:06 2    Q.    In 2006?

09:40:08 3    A.    Yes, that's correct.

09:40:09 4    Q.    And after you graduated from Princeton, your first

09:40:14 5    job was in real estate development; is that right?

09:40:16 6    A.    Yes, that's correct.

09:40:17 7    Q.    And then for about three or four years after that, I

09:40:21 8    think you were a stockbroker; is that right?

09:40:23 9    A.    I wasn't a stockbroker, but close enough.

09:40:26 10   Q.    Natural gas derivatives broker; is that right?

09:40:30 11   A.    Yes, that's correct.

09:40:32 12   Q.    So despite having no formal training in computer

09:40:38 13   science and no formal training in telecommunications, you

09:40:41 14   then started Next Caller in 2012; is that right?

09:40:44 15   A.    Yes, that's correct.

09:40:47 16   Q.    Next Caller's first product to market was something

09:40:53 17   called Advanced Caller-ID; is that right?

09:40:56 18   A.    Yes, that's the first product we brought to market.

09:40:59 19   Q.    And what that product did was basically linked

09:41:02 20   personal information to a telephone number; is that right?

09:41:04 21   A.    Yes, that's generally correct.

09:41:06 22   Q.    And that product had negative margins; is that true?

09:41:11 23   A.    No, that's not true.

09:41:12 24   Q.    It had no margins; right?

09:41:15 25   A.    No, that's not true.

09:41:24 1    Q.      So it's your testimony here on the stand that the

09:41:32 2    Advanced Caller-ID product had margins?

09:41:37 3    A.      Yes.  If a margin is described as the sum of the

09:41:44 4    profits were more than the costs of the goods sold going

09:41:46 5    into it, yes.

09:41:47 6    Q.      You no longer offer Advanced Caller-ID; is that true?

09:41:51 7    A.      No, we do not.

09:41:53 8    Q.      So that after Advanced Caller-ID -- well, you also

09:41:59 9    have a product called VeriCall; true?

09:42:02 10   A.      Yes, that's correct.

09:42:03 11   Q.      And you understand that's the product that's being

09:42:05 12   accused of infringement in this case; right?

09:42:08 13   A.      Yes, that is correct.

09:42:10 14   Q.      And you don't have any patents for the VeriCall

09:42:13 15   product; is that true?

09:42:14 16   A.      No, we do not.

09:42:15 17   Q.      And is it true that Matt Williams was the person who

09:42:24 18   led the charge of the design of VeriCall?

09:42:27 19   A.      Could you rephrase what you mean by led the design?

09:42:31 20   Q.      Well, he led the charge of the design of VeriCall;

09:42:35 21   right?

09:42:35 22   A.      I guess that's generally true.

09:42:38 23   Q.      And just so the jury understands, Matt Williams was

09:42:42 24   the head of engineering at Next Caller.  Is that true?

09:42:45 25   A.      Could you put a time frame on that?

09:42:49 1    Q.    Well, before August 2nd, 2019, Mr. Williams was the

09:42:57 2    head of engineering at Next Caller?

09:43:00 3    A.    Yes, that's correct.

09:43:04 4    Q.    Okay.  Mr. Williams led the charge of the design of

09:43:09 5    VeriCall; right?  We just talked about that.

09:43:14 6    A.    Yes.

09:43:15 7    Q.    Okay.  And I believe that VeriCall was first offered

09:43:19 8    to Capital One in March 2016; is that right?

09:43:26 9    A.    It sounds generally correct.  If you could show me a

09:43:30 10   document to refresh my memory on the exact date that it was

09:43:34 11   first offered.  I know that our conversations started before

09:43:38 12   that for our Advanced Caller-ID product.

09:43:47 13   Q.    Well, if you turn in your binder, you have a binder

09:43:51 14   there from -- and there is a tab.  It's the cross binder,

09:43:58 15   Volume I of II, it's the largest binder you have in front of

09:44:01 16   you there, the last tab of the largest binder.  The last

09:44:10 17   tab.

09:44:12 18   A.    I don't know if that's -- could you repeat the tab

09:44:16 19   that you're looking for?

09:44:17 20   Q.    The last tab.  It's labeled 2021, March 24th,

09:44:24 21   Roncoroni.  Do you see that?

09:44:27 22   A.    Yes.  Okay.

09:44:28 23   Q.    If you turn to page 93.

09:44:36 24   A.    Okay.

09:44:37 25   Q.    And if you read lines 5 through 20 of page 93, does

09:44:45 1  that refresh your recollection that you -- Next Caller

09:44:51 2  offered VeriCall to Capital One in March 2016?

09:45:08 3  A.      No, that's not exactly correct.

09:45:11 4  Q.      Does it refresh your memory that VeriCall -- that

09:45:18 5  Capital One first -- the first paying customer for VeriCall

09:45:21 6  was Capital One in 2017?

09:45:24 7  A.      Yes, that is correct.

09:45:25 8  Q.      And for about a year before that, Capital One was

09:45:28 9  using VeriCall for free?

09:45:30 10  A.      No, that's not entirely correct.

09:45:32 11  Q.      Well, if I would refer you to lines 15 through 17 of

09:45:39 12  page 93, does that refresh your memory?

09:45:42 13  A.      Yes.  It wasn't one year consistently.  It wasn't one

09:45:48 14  total year of free service.

09:45:49 15  Q.      So about a year, Capital One used VeriCall for free.

09:45:53 16  Is that fair?

09:45:54 17  A.      No, that's not fair.  There was about a one-year

09:45:58 18  period of which certain periods were free periods.

09:46:02 19  Q.      Thank you for that clarification.  I appreciate that.

09:46:05 20          So Capital One first started to use the VeriCall

09:46:11 21  product around March 2016; fair?

09:46:15 22  A.      I don't remember the exact date that they first did

09:46:18 23  their POC, but that sounds generally correct.

09:46:22 24  Q.      Okay.  So sometime since Mr. Williams led the charge

09:46:27 25  for the design of VeriCall, sometime after he started in

09:46:31 1  March 2016 is when the VeriCall product was designed; right?

09:46:35 2  A.    Yes, that's correct.

09:46:36 3  Q.    Okay.  And Mr. Williams started at Next Caller in

09:46:40 4  January 2016; right?

09:46:42 5  A.    No, that's not correct.

09:46:44 6  Q.    Let's turn to your tab -- maybe this will refresh

09:46:49 7  your memory on this issue.  If you could turn to the Tab 2.

09:46:58 8  A.    Is it in the same binder?

09:47:01 9  Q.    Same binder.  The second tab, 2019, August 2nd,

09:47:10 10 Williams.  And if you would turn to page 24.

09:47:23 11 A.    Okay.  I'm there.

09:47:24 12 Q.    And if you could look at lines 12 to 13.  Does that

09:47:29 13 refresh --

09:47:31 14       MS. COLUMBIA:  Your Honor, I object.  This is a

09:47:33 15 different witness' testimony.

09:47:37 16       THE COURT:  He's just asking if it refreshes his

09:47:41 17 recollection.  He hasn't even asked a question and you're

09:47:46 18 objecting.  But I get it, this is not his deposition.  He's

09:47:49 19 not impeaching him with it, he's just trying to refresh his

09:47:52 20 recollection as to when Mr. Williams was there.  If it

09:47:52 21 doesn't help, it doesn't help.

09:47:52 22 BY MR. TUMINARO:

09:47:52 23 Q.    Could you look at page 24, lines 12 through 13?

09:48:02 24 A.    Yes, I can see that.

09:48:02 25 Q.    Does that refresh your recollection that Mr. Williams

09:48:06 1    started at Next Caller in January 2016?

09:48:09 2    A.    No, it does not.

09:48:16 3         THE COURT:  You asked if it refreshed his

09:48:18 4    recollection, he said it didn't refresh his recollection.

09:48:25 5         MR. TUMINARO:  Can I read the word, Your Honor?

09:48:27 6         THE COURT:  No.  You can ask him what he

09:48:29 7    understands the guy did and you can play deposition

09:48:32 8    testimony later if you need to, but no, you don't get

09:48:37 9    deposition testimony in through reading it through another

09:48:39 10   witness.

09:48:40 11        MR. TUMINARO:  I'll move on.  Thank you.

09:48:43 12   BY MR. TUMINARO:

09:48:44 13   Q.    All right.  So Capital One, they did begin paying for

09:48:51 14   VeriCall in March 2017, we talked about that; right?

09:48:54 15   A.    Yes, that's correct.

09:48:54 16   Q.    And Capital One is in Virginia; right?

09:48:57 17   A.    At least one of their offices are in Virginia.

09:49:01 18   Q.    And Next Caller is in New York?

09:49:02 19   A.    Yes, our headquarters is in New York.

09:49:05 20   Q.    So you sold your product across state lines; right,

09:49:08 21   it went from New York to Virginia?

09:49:10 22   A.    Yes, that's true.

09:49:12 23   Q.    Okay.  Before Capital One actually started paying for

09:49:42 24   VeriCall, you knew that you were competing head to head for

09:49:50 25   Capital One -- you were competing with TRUSTID head to head

09:49:54 1    for Capital One because you learned that from Mr. Kirchick,

09:49:59 2    your head of sales; right?

09:50:00 3    A.      Yes, that's true.

09:50:02 4    Q.      And you offered -- Next Caller offered a lower price

09:50:10 5    than TRUSTID; right?

09:50:14 6    A.      Yes, we offered a lower price to Capital One than

09:50:17 7    TRUSTID.

09:50:17 8    Q.      And Mr. Kirchick would often determine or negotiate

09:50:23 9    price with customers; right?

09:50:26 10   A.      Yes, he would.

09:50:27 11   Q.      Okay.  And Mr. Kirchick had a strategy of

09:50:32 12   undercutting TRUSTID on price; is that fair?

09:50:35 13   A.      Could you explain what you mean by a strategy of

09:50:39 14   undercutting.

09:50:41 15   Q.      Well, Mr. Kirchick would want to go lower in price

09:50:45 16   than TRUSTID in order to win business; right?

09:50:50 17   A.      Yes.  One of our strategies to win business is to

09:50:54 18   offer a better price.

09:50:56 19   Q.      If you would turn to PTX-411 in your binder, it's the

09:51:02 20   smaller binder.  I think it says on the front, adverse

09:51:02 21   direct.  Do you see that?

09:51:02 22   A.      Yes.  What was the number again?

09:51:12 23   Q.      PTX-411.

09:51:12 24   A.      Okay.  I see it.

09:51:12 25   Q.      And PTX-411 is a Slack communication from

09:51:24 1  Mr. Kirchick, your head of sales; right?

09:51:26 2  A.    Yes, that's correct.

09:51:28 3          MR. TUMINARO:  Your Honor, I move to admit

09:51:31 4  PTX-411.

09:51:31 5          MS. COLUMBIA:  No objection, Your Honor.

09:51:32 6          THE COURT:  It's admitted.

09:51:34 7          (PTX Exhibit No. 411 was admitted into

09:51:35 8  evidence.)

09:51:35 9  BY MR. TUMINARO:

09:51:36 10 Q.    And if you would turn to the second page.  And could

09:51:39 11 you do a callout on that language there?

09:51:42 12          So we have here Mr. Kirchick, he's the head of

09:51:45 13 sales for Next Caller, and he's communicating internally

09:51:49 14 with your team; is that true?

09:51:52 15 A.    He's communicating with one person on the team, yes.

09:51:57 16 Q.    And what Mr. Kirchick says is in the callout on the

09:52:02 17 screen, UBS is Verizon.  Do you see that?

09:52:04 18 A.    Yes, I do.

09:52:06 19 Q.    UBS, that's a large bank; is that right?

09:52:09 20 A.    Yes, they are.

09:52:10 21 Q.    And it says UBS 12 million calls a year, uses

09:52:14 22 TRUSTID.  Do you see that?

09:52:15 23 A.    Yes, I do.

09:52:17 24 Q.    So what he wanted -- TRUSTID was -- well, take that

09:52:21 25 back.

09:52:22 1    UBS was a customer of TRUSTID at this time

09:52:24 2  according to Mr. Kirchick; right?

09:52:27 3  A.    He doesn't say a customer, he says uses TRUSTID.  I

09:52:30 4  can't be sure exactly what he means by that.

09:52:33 5  Q.    He says TRUSTID; right?

09:52:34 6  A.    He does say they use TRUSTID, yes.

09:52:37 7  Q.    What he goes on to say is you can say 1.5 cents or so

09:52:42 8  because I'm going to go low AF to steal the business.  Do

09:52:46 9  you see that?

09:52:46 10  A.    Yes, I see that.

09:52:47 11  Q.    Does that mean low as F word to steal the business?

09:52:50 12  A.    I believe it means low as free to steal the business.

09:52:54 13  Q.    So he was going to give it away for free in order to

09:52:58 14  steal business from TRUSTID?

09:52:59 15  A.    Again, I can't -- I didn't write this message, I

09:53:03 16  can't testify as to what exactly he meant, but we have

09:53:06 17  offered a lot of free service to clients so we can

09:53:10 18  demonstrate our value.

09:53:11 19  Q.    And Mr. Kirchick was the one who was often

09:53:12 20  negotiating prices with customers; right?

09:53:17 21  A.    Yes, that's correct.

09:53:20 22  Q.    You can take that down, Mr. Passey.

09:53:25 23    So let's talk about the competition that TRUSTID

09:53:40 24  has with Next Caller.  Did your team have internal

09:53:42 25  communications about who your competitors are?

09:53:52 1    A.    Yes, we would have.

09:53:53 2    Q.    And we already talked about Mr. Williams, he was the

09:53:58 3    head of engineering, so he would understand how products

09:54:01 4    worked; fair?

09:54:02 5    A.    He would understand how our products worked, yes.

09:54:05 6    Q.    So let's turn to PTX-404 in your binder.

09:54:16 7    A.    Okay.

09:54:17 8    Q.    This is a Slack communication between Mr. Williams

09:54:20 9    and Mr. Kirchick; is that right?

09:54:26 10   A.    Yes, it is.

09:54:28 11            MR. TUMINARO:  Your Honor, move to admit

09:54:31 12   PTX-411.

09:54:32 13            MS. COLUMBIA:  No objection, Your Honor.

09:54:33 14            THE COURT:  It's admitted.

09:54:34 15            (PTX Exhibit No. 411 was admitted into

09:54:35 16   evidence.)

09:54:35 17            MR. TUMINARO:  Can you publish the first page,

09:54:38 18   404 -- sorry, Your Honor, I misspoke.  It's 404.

09:54:42 19            MS. COLUMBIA:  No objection, Your Honor.

09:54:44 20            THE COURT:  It's also admitted.  Did we admit

09:54:47 21   411 or not?

09:54:48 22            MR. TUMINARO:  Not yet, Your Honor, I think

09:54:50 23   we're going to get to that one.

09:54:51 24            THE COURT:  Didn't you already put 411 on the

09:54:54 25   board?  Shouldn't you have admitted that before you did it?

09:54:58 1    MR. TUMINARO:  Apologize, we did already admit

09:55:01 2    it, I misspoke, 411.

09:55:03 3    THE COURT:  Okay.

09:55:04 4    MR. TUMINARO:  It is admitted as I understand

09:55:06 5    it.  Now we're moving to admit 404.  I apologize, Your

09:55:10 6    Honor.

09:55:10 7    THE COURT:  All right.

09:55:11 8    MS. COLUMBIA:  So the two are -- pardon me, Your

09:55:13 9    Honor, the two are 404 and 411, and I have no objection.

09:55:17 10   THE COURT:  Which one did you say you didn't

09:55:19 11   object to?

09:55:20 12   MS. COLUMBIA:  I don't object to either one.  I

09:55:22 13   don't know if there is a third in the mix.

09:55:24 14   MR. TUMINARO:  We'll get there.

09:55:25 15   THE COURT:  411 and 404 are admitted.

09:55:28 16   (PTX Exhibit No. 404 was admitted into

09:55:29 17   evidence.)

09:55:29 18   BY MR. TUMINARO:

09:55:31 19   Q.    Mr. Passey, can you do a callout on the bottom

09:55:33 20   portion.

09:55:33 21          This is a communication between when it says

09:55:33 22   Matthew, that's Mr. Williams, the head of engineering at

09:55:33 23   Next Caller; right?

09:55:40 24   A.    Yes, that's correct.

09:55:41 25   Q.    And what Mr. Williams tells Mr. Kirchick, the head of

09:55:45 1    sales, by the way, I'm getting more and more of a feeling

09:55:50 2    we're not really competing with Pindrop.  Did I read that

09:55:53 3    correctly?

09:55:54 4    A.    Yes, you read that correctly.

09:55:56 5    Q.    If you could turn to the third page, Mr. Passey, and

09:56:01 6    toward the bottom of the page, can you do a fourth -- or

09:56:04 7    third from the top -- from the bottom, third from the

09:56:08 8    bottom, can you do a callout on that.  The whole bottom, I'm

09:56:14 9    sorry, Mr. Passey, the third from the bottom all the way to

09:56:17 10   the end.

09:56:18 11          And what Mr. Williams says to Mr. Kirchick here

09:56:22 12   is he says "TRUSTID on the other hand is a real competitor."

09:56:28 13          Right?

09:56:28 14   A.    Yes, he does say that.

09:56:30 15   Q.    And at this very bottom, he says "and maybe our only

09:56:35 16   real competitor."

09:56:38 17          Right?

09:56:38 18   A.    Yes, he said that.

09:56:42 19   Q.    All right.  So we can take that down, Mr. Passey.

09:56:47 20   Let's turn to PTX-296.  This is an e-mail from -- an e-mail

09:57:04 21   communication between Mr. Kirchick and another employee

09:57:07 22   within Next Caller; is that right?

09:57:10 23   A.    Yes, that's correct.

09:57:11 24          MR. TUMINARO:  Your Honor, move to admit

09:57:14 25   PTX-296.

09:57:14 1          MS. COLUMBIA:  No objection.

09:57:15 2          THE COURT:  It's admitted.

09:57:17 3          (PTX Exhibit No. 296 was admitted into

09:57:18 4   evidence.)

09:57:18 5   BY MR. TUMINARO:

09:57:19 6   Q.     Just to orient ourselves to this e-mail, see we have

09:57:23 7   e-mail between Mr. Kirchick and Mr. Prugar; is that right?

09:57:26 8   A.     Yes, that's correct.

09:57:27 9   Q.     Mr. Prugar is the chief operating officer at Next

09:57:34 10  Caller?

09:57:34 11  A.     No, he is not.

09:57:35 12  Q.     What is his title?

09:57:37 13  A.     Could you put a time on that?

09:57:40 14  Q.     He was in charge of operations; fair?

09:57:42 15  A.     At some point in time.

09:57:44 16  Q.     Okay.  So Mr. Kirchick, the head of sales, is talking

09:57:48 17  to the head of operations.  Fair?

09:57:50 18  A.     No, I believe in 2017, Tim was a member of the sales

09:57:54 19  team.

09:57:54 20  Q.     So two salespeople talking to each other?

09:57:57 21  A.     I believe so, yes.

09:57:58 22  Q.     So at the very top -- you can take down that callout.

09:58:02 23  At the very top it says -- of the e-mail, if you could

09:58:06 24  remove that callout.  The very top of the e-mail it says

09:58:10 25  thoughts in red.  Mr. Kirchick is responding to Mr. Prugar

09:58:14 1   and Mr. Kirchick's thoughts are in red; is that right?

09:58:17 2   A.      Yes, that's correct.

09:58:18 3   Q.      So could we do a callout on the bottom red portion of

09:58:22 4   the e-mail, Mr. Passey.

09:58:28 5           And if we look at the third line, it really --

09:58:32 6   well, look at the very first line, it says, Mr. Kirchick is

09:58:36 7   saying, "Not to sound smug or anything, but this is

09:58:39 8   something I've known and discussed with Matthew for quite

09:58:43 9   some time."

09:58:44 10          Fair to say that Mr. Kirchick is referring to

09:58:47 11  Matt Williams at Next Caller?

09:58:50 12  A.      Yes, that is fair.

09:58:51 13  Q.      Okay.  And what Mr. Kirchick goes on to say in the

09:58:55 14  third line there is, "100 percent we are competing with

09:58:59 15  TRUSTID and not at all with Pindrop."

09:59:03 16          Is that what your head of sales thought in

09:59:06 17  August 2017?

09:59:07 18  A.      I can't attest to what he thought in 2017.

09:59:12 19  Q.      Is that what he wrote in his e-mail?

09:59:14 20  A.      He did write those word in his e-mail, yes.

09:59:16 21  Q.      There is a part about five lines down that says

09:59:19 22  functionality that starts on the right, "functionality

09:59:22 23  wise," it goes on to say, "TRUSTID is doing a lot more than

09:59:24 24  we are to authenticate a call."

09:59:26 25          Do you see that?

09:59:29 1   A.      Yes, I do see that.

09:59:30 2   Q.      So Mr. Kirchick at least wrote in his e-mail that he

09:59:34 3   thought TRUSTID was doing more than Next Caller to

09:59:37 4   authenticate a call; right?

09:59:38 5   A.      Yes, that's what he's saying in the e-mail.  But the

09:59:41 6   context of the e-mail is even in the next sentence him

09:59:46 7   admitting that he's not an engineer so he doesn't actually

09:59:50 8   know.

09:59:50 9   Q.      But he's the one out there selling the VeriCall

09:59:54 10  product, he was the one out there selling the VeriCall

09:59:57 11  product to potential customers; right?

09:59:59 12  A.      Yes, he was.

09:59:59 13  Q.      And he understood at least as of 2017 that TRUSTID

10:00:04 14  was potentially doing more to authenticate a call than Next

10:00:08 15  Caller?

10:00:08 16  A.      Again, not to repeat myself, but I can't testify as

10:00:11 17  to what he understood.

10:00:13 18  Q.      But you're not denying the words on the screen;

10:00:16 19  right?

10:00:16 20  A.      I am not denying the words on the screen.

10:00:26 21  Q.      Now, is it fair to say that sometimes Next Caller

10:00:32 22  would use its VeriCall product -- well, let's step back,

10:00:36 23  sorry.

10:00:37 24          VeriCall, it can determine whether a caller-ID

10:00:41 25  is credible or not.  Fair?

10:00:43 1    A.      Could you define credible, please?

10:00:46 2    Q.      Well, VeriCall will produce a score to determine

10:00:50 3    whether the caller-ID is the caller-ID that's associated

10:00:54 4    with the device; right?

10:00:56 5    A.      Yeah, generally that's a fair assessment.

10:00:59 6    Q.      And you're aware of something called voice

10:01:02 7    biometrics?

10:01:04 8    A.      Yes, I am.

10:01:05 9    Q.      Voice biometrics will listen to a voice as it's being

10:01:09 10   spoken to kind of verify who that speaker is; right?

10:01:12 11   A.      Yes, that's one of the cases.

10:01:17 12   Q.      And fair to say that there are times where VeriCall's

10:01:22 13   product would be used or layered on top of or used in

10:01:26 14   conjunction with a voice biometric product; right?

10:01:30 15   A.      Yes, that is fair.

10:01:32 16   Q.      Can we turn to PTX-418 in your binder, sir?

10:01:37 17   A.      Could you repeat the number?

10:01:39 18   Q.      PTX-418.

10:01:40 19   A.      418.

10:02:01 20   Q.      This is a Slack communication between Mr. Kirchick

10:02:05 21   and you; correct?

10:02:06 22   A.      Yes, correct.

10:02:08 23           MR. TUMINARO:  Your Honor, move to admit

10:02:10 24   PTX-418.

10:02:11 25           MS. COLUMBIA:  Your Honor, I renew the objection

10:02:13 1  we discussed yesterday morning.  You overruled it.

10:02:16 2          THE COURT:  Okay.  And it's overruled and

10:02:20 3  admitted.

10:02:21 4          (PTX Exhibit No. 418 was admitted into

10:02:22 5  evidence.)

10:02:22 6  BY MR. TUMINARO:

10:02:23 7  Q.      Could you pull up 418.  Again, can you do a callout

10:02:31 8  on the bottom portion of this Slack communication.

10:02:36 9          So just so we're clear, orient ourselves, this

10:02:40 10 is a communication between Mr. Kirchick, who is the head of

10:02:44 11 sales, and you; right?

10:02:46 12 A.      Yes, that's correct.

10:02:47 13 Q.      And if we could go to page 13 of this communication.

10:03:01 14 And if you could do a callout on all the texts there,

10:03:06 15 Mr. Passey.

10:03:07 16         So Mr. Kirchick explains, he said, "I explained

10:03:11 17 to them we are partnering with Nuance."  I'll pause there

10:03:14 18 for a second.

10:03:15 19         Nuance is a voice biometrics company; is that

10:03:20 20 true?

10:03:21 21 A.      Among other things, yes.

10:03:22 22 Q.      They provide voice biometrics?

10:03:25 23 A.      They do have a voice biometrics solution.

10:03:28 24 Q.      What Mr. Kirchick said to you, he was explaining to

10:03:31 25 you is, "I explained to them we are partnering with Nuance

10:03:35 1  to offer spoof and biometrics together."

10:03:38 2              Did I read that correctly?

10:03:40 3  A.      Yes, you read that correctly.

10:03:42 4  Q.      What he's explaining is this voice biometrics could

10:03:46 5  be layered on top of spoof protection, used as a

10:03:48 6  complementary product; fair?

10:03:51 7  A.      He doesn't say that.

10:03:53 8  Q.      Is that what the intent of the communication is?

10:03:56 9  A.      I can't testify as to Jeff's intent.

10:03:59 10  Q.      Does he say spoofing offered with voice biometrics?

10:04:02 11  A.      That's not exactly what he's saying there.

10:04:04 12  Q.      "I explained to them we are partnering with Nuance to

10:04:08 13  offer spoof and biometrics together."  Is it your testimony

10:04:12 14  that's not using spoof, your VeriCall spoof detection and

10:04:17 15  Nuance voice biometrics together?

10:04:20 16  A.      It could be.  He's saying those word, yes, but again,

10:04:24 17  I can't say what he intended by the comment.

10:04:28 18  Q.      But you agree that VeriCall can be used with voice

10:04:32 19  biometrics tool as complimentary.  Fair?

10:04:38 20  A.      It can be used as complimentary, but it can also be

10:04:42 21  used in replace of.

10:04:44 22  Q.      Let's move on to another topic here.  You have heard

10:04:51 23  of something called IVR containment; right?

10:05:00 24  A.      Yes, I have.

10:05:00 25  Q.      And can you explain to the jury -- well, IVR

10:05:05 1    containment is when a customer can get their needs met in

10:05:13 2    the IVR, they don't have to go to an agent.  Is that fair?

10:05:19 3    A.      Yes.

10:05:19 4    Q.      Is it fair to say IVR containment is an important

10:05:24 5    metric for customers?

10:05:25 6    A.      Not necessarily, but it could be.

10:05:27 7    Q.      It could be.  Customers want to increase IVR

10:05:30 8    containment; right?

10:05:31 9    A.      Some customers do.

10:05:33 10   Q.      It would save them money?

10:05:35 11   A.      For some customers, yes.

10:05:45 12   Q.      And Next Caller was monitoring what TRUSTID said

10:05:50 13   about its own IVR containment; right?

10:05:53 14   A.      Could you explain what you mean by monitoring?

10:05:57 15   Q.      Well, if TRUSTID put out marketing about what its IVR

10:06:02 16   containment was doing, Next Caller knew about it; right?

10:06:07 17   A.      Not necessarily.

10:06:09 18   Q.      Can we go to PTX-287 in your binder.

10:06:19 19   A.      Okay.  I'm there.

10:06:21 20   Q.      This is an e-mail between Mr. Kirchick, your head of

10:06:25 21   sales, and other people within Next Caller?

10:06:26 22   A.      Yes, that's correct.

10:06:28 23            MR. TUMINARO:  Your Honor, move to admit

10:06:30 24   PTX-287.

10:06:32 25            MS. COLUMBIA:  No objection.

10:06:32 1          THE COURT:  It's admitted.

10:06:34 2              (PTX Exhibit No. 287 was admitted into

10:06:35 3     evidence.)

10:06:35 4     BY MR. TUMINARO:

10:06:35 5     Q.     Can you just do a callout on the top portion,

10:06:38 6     including the to and from line and the first e-mail,

10:06:42 7     Mr. Passey.  That's good.  Thank you.

10:06:47 8              So here we have a communication between

10:06:50 9     Mr. Kirchick, your head of sales, Mr. Prugar, who was also

10:06:55 10    in sales at the time; is that right?

10:06:56 11    A.     Yes, I believe so.

10:06:57 12    Q.     Mr. Williams, who is the head of engineering; is that

10:07:00 13    right?

10:07:00 14    A.     Yes, that's correct.

10:07:01 15    Q.     And Mr. Cash.  What does Mr. Cash do?

10:07:04 16    A.     At that time he was also on the sales team.

10:07:07 17    Q.     Okay.  So we have Mr. Kirchick saying, "One late

10:07:12 18    addition.  TRUSTID says IVR containment goes up 5 to

10:07:16 19    10 percent with their solution."

10:07:18 20             Do you see that?

10:07:18 21    A.     Yes, I see that.

10:07:20 22    Q.     So fair to say that Next Caller was monitoring what

10:07:24 23    TRUSTID's advertisement was?

10:07:24 24    A.     Again, it sounds like Jeff is aware, but I don't know

10:07:29 25    if that constitutes monitoring.

Roncoroni - direct

10:07:32 1    Q.    He goes on to say, "Given what TRUSTID advertised for

10:07:37 2    its product, Mr. Kirchick goes on to say, so I would like to

10:07:41 3    jack that stat or make up a number like eight percent."

10:07:47 4         Do you see that?

10:07:48 5    A.    I do see those words, yes.

10:07:51 6    Q.    So does this document appear to suggest that

10:07:56 7    Mr. Kirchick wanted to make up a number to compete with

10:07:59 8    TRUSTID?

10:08:00 9    A.    No, it does not.

10:08:01 10   Q.    You're aware that TRUSTID brought a lawsuit and is

10:08:12 11   alleging that Next Caller falsely advertised a ten percent

10:08:19 12   number; right?

10:08:19 13   A.    Yes, I am aware.

10:08:21 14   Q.    Before we get there, let's look at that.   Can you

10:08:24 15   turn to PTX-82.

10:08:32 16   A.    Okay.

10:08:35 17   Q.    This is Next Caller marketing collateral?

10:08:42 18   A.    Yes, that's correct.

10:08:43 19         MR. TUMINARO:  Your Honor, move to admit PTX-82.

10:08:46 20         MS. COLUMBIA:  No objection.

10:08:46 21         THE COURT:  Admitted.

10:08:47 22         (PTX Exhibit No. 82 was admitted into evidence.)

10:08:48 23   BY MR. TUMINARO:

10:08:48 24   Q.    Mr. Passey would it be possible to publish PTX-82 on

10:08:52 25   one side and PTX-287 on the other.   And could we do a

10:09:06 1    callout just to remind everyone, do a callout of the top on

10:09:11 2    the right portion of PTX-287, a callout of Mr. Kirchick's

10:09:15 3    e-mail, and then can you do a callout of the advertisement

10:09:22 4    of Next Caller of the ten percent more IVR containment.

10:09:31 5        So Next Caller did advertise that it has -- that

10:09:38 6    it increases IVR containment by more than ten percent, by

10:09:42 7    ten percent; right?

10:09:43 8    A.    Yes, that's correct.

10:09:45 9    Q.    Okay.  And Mr. Kirchick had advocated to jack a stat

10:09:50 10   or make up a number like eight percent; right?

10:09:53 11   A.    No, he did not advocate for that.

10:09:56 12   Q.    What he said is he wanted to jack that stat or make

10:09:59 13   up a number like eight percent?

10:10:00 14   A.    No, he didn't use those words, either.

10:10:03 15   Q.    "I'd like to jack that stat or make up a number like

10:10:07 16   eight percent."

10:10:08 17   A.    He did say, "I would like to."

10:10:12 18   Q.    And the number that the marketing department put on

10:10:15 19   it, the number is ten percent?

10:10:17 20   A.    Yes, that's what's on the marketing material.

10:10:20 21   Q.    And you know that TRUSTID had advertised that its IVR

10:10:23 22   containment was ten percent; right?

10:10:25 23   A.    Could you put a time bound on that.

10:10:30 24   Q.    Put a time bound in what way?  You know as you sit

10:10:34 25   here today that TRUSTID advertised that its IVR containment

10:10:37 1    provided ten percent increase in IVR containment, you know

10:10:41 2    that?

10:10:42 3    A.      Yes, I do today.

10:10:43 4    Q.      And you know that TRUSTID brought a lawsuit against

10:10:47 5    you, or Next Caller, I apologize, brought a lawsuit against

10:10:52 6    Next Caller for false advertising, one of the reasons being

10:10:56 7    this claim of ten percent more IVR containment.  You

10:11:01 8    understand that; right?

10:11:02 9    A.      Yes, I understand that.

10:11:03 10   Q.      And you recall that that lawsuit was brought roughly

10:11:08 11   in April 2018.  Are you aware of that?

10:11:12 12   A.      Generally, yes.

10:11:14 13   Q.      Okay.  So after you received that complaint to start

10:11:20 14   that lawsuit, I imagine that was a big deal for Next Caller;

10:11:24 15   fair?

10:11:24 16   A.      Yes, it was.

10:11:25 17   Q.      So I imagine that you wanted to investigate the

10:11:30 18   claims that were being made by TRUSTID against Next Caller;

10:11:35 19   right?

10:11:36 20   A.      Yes, that's correct.

10:11:37 21   Q.      And, in fact, if you turn to PTX-84 in your binder,

10:11:42 22   this is an e-mail from you to Mr. Espinosa.  Do you see

10:11:51 23   that?

10:11:52 24   A.      I see the e-mail, but it's not an e-mail from me.

10:11:56 25   Q.      Well, it's an e-mail chain including you, an e-mail

10:12:03 1   string including you, Mr. Espinosa and Mr. Shaw; right?

10:12:07 2   A.      Yes, that's right.

10:12:08 3             MR. TUMINARO:  Your Honor, move to admit

10:12:11 4   PTX-084.

10:12:11 5             MS. COLUMBIA:  No objection.

10:12:12 6             THE COURT:  It's admitted.

10:12:13 7             (PTX Exhibit No. 084 was admitted into

10:12:14 8   evidence.)

10:12:14 9   BY MR. TUMINARO:

10:12:15 10  Q.      Mr. Passey, if you could do a callout on the first

10:12:18 11  e-mail after the beginning that starts at Friday, April 20th

10:12:26 12  from Mr. Roncoroni.

10:12:27 13             This is your e-mail, true, the one from Friday,

10:12:30 14  April 20th, 2018?

10:12:32 15  A.      Yes, that's correct.

10:12:33 16  Q.      And in the first line what you say is, "We would like

10:12:37 17  to put together information around how we derive the stats

10:12:41 18  we use on our website."

10:12:44 19             Do you see that?

10:12:44 20  A.      Yes, I do see that.

10:12:46 21  Q.      "Specifically around 30 seconds saved, $0.50 per

10:12:50 22  call, and ten percent lift in IVR containment."

10:12:54 23             Do you see that?

10:12:54 24  A.      Yes, I do see that.

10:12:57 25  Q.      This is in April, April 20th of 2018, only about a

10:13:01 1  week after you were served with that complaint; right?

10:13:06 2  A.    Which complaint are you talking about?

10:13:08 3  Q.    The first amended complaint that added the cause of

10:13:12 4  action for false advertising.

10:13:14 5  A.    Yes, I am.

10:13:16 6  Q.    Okay.  But it's true that almost a year-and-a-half

10:13:23 7  later in September 2019, you still didn't know whether or

10:13:31 8  not the VeriCall product increases IVR containment by ten

10:13:36 9  percent; right?

10:13:37 10  A.    No, that's not true.  I was asking for them to

10:13:42 11  provide to me the information we had because I know that the

10:13:47 12  previous e-mail you showed me about six hours before Jeff

10:13:51 13  wrote that e-mail, we got a report from marketing card

10:13:55 14  saying in our testing we increased IVR containment by

10:14:00 15  25 percent.

10:14:00 16  Q.    Just to be clear, it's your testimony as you sit here

10:14:03 17  on the stand today that in September 2019, a year-and-a-half

10:14:09 18  after you wrote this e-mail, that you knew -- it's your

10:14:17 19  testimony that you did know whether or not the VeriCall

10:14:20 20  product increases IVR containment by ten percent?

10:14:23 21  A.    Could you put a time range on that?

10:14:26 22  Q.    Yes.  As I asked in my original question, a year --

10:14:32 23  almost a year-and-a-half after this e-mail in

10:14:37 24  September 2019, you still didn't know whether or not the

10:14:41 25  VeriCall product increases IVR containment by ten percent.

10:14:46 1    Is that a true statement?

10:14:48 2    A.    I don't remember exactly what I knew at that specific

10:14:51 3    point in time.  I'm not sure.

10:14:53 4    Q.    In fact, you didn't know one way or the other whether

10:14:57 5    the VeriCall product increased IVR containment by ten

10:15:01 6    percent.  Isn't that a true statement?

10:15:02 7    A.    Again, given that time frame, I'm not exactly sure

10:15:06 8    what I knew at that time.

10:15:07 9    Q.    Why don't you turn in your binder --

10:15:10 10          MR. TUMINARO:  Well, Your Honor, may I play the

10:15:13 11    deposition testimony to impeach?

10:15:17 12          THE COURT:  Why don't we start with letting him

10:15:21 13    read the deposition.  Let's read the deposition testimony.

10:15:25 14          MR. TUMINARO:  Okay.

10:15:26 15    BY MR. TUMINARO:

10:15:27 16    Q.    Could you go to page 195 of the September 5th, 2019,

10:15:32 17    transcript.

10:15:37 18    A.    You said 195?

10:15:40 19    Q.    195.

10:15:40 20          THE COURT:  I'm sorry, which transcript so I can

10:15:42 21    follow?

10:15:42 22          MR. TUMINARO:  September 5th, 2019.

10:15:47 23          THE COURT:  And what page?

10:15:47 24          MR. TUMINARO:  Page 195, lines 20, and it

10:15:52 25    continues to 196, line 1.

10:15:57 1          MS. COLUMBIA:  Your Honor, if I could just have

10:15:59 2   a moment.  I found it.  Never mind.  I'm sorry,

10:16:04 3   Mr. Tuminaro, could you just tell me the page again.

10:16:06 4          MR. TUMINARO:  195.

10:16:09 5          MS. COLUMBIA:  Thank you.

10:16:10 6          MR. TUMINARO:  Line 20.

10:16:12 7          MS. COLUMBIA:  Thank you.

10:16:12 8   BY MR. TUMINARO:

10:16:18 9   Q.     Shall I repeat my question?

10:16:24 10  A.     Sure.

10:16:28 11  Q.     So you still didn't know almost a year-and-a-half

10:16:31 12  after your e-mail in September 2019, you still didn't know

10:16:38 13  whether or not the VeriCall product increases IVR

10:16:42 14  containment by ten percent; right?

10:16:45 15  A.     Could you point to a specific line to me that you're

10:16:50 16  referencing in the deposition?

10:16:53 17         MR. TUMINARO:  Your Honor --

10:16:54 18         THE COURT:  Look, he said he didn't remember.

10:16:58 19  Okay?

10:17:00 20         MR. TUMINARO:  May I play the video?

10:17:02 21         THE COURT:  No.  That's not -- no, you can point

10:17:04 22  him to the testimony.  He said he didn't remember.  Maybe

10:17:07 23  this will help him remember.

10:17:10 24         MR. TUMINARO:  Page 195, line 20, going on to

10:17:12 25  page 196, line 1.

10:17:20 1    A.      (Witness reviewing.)

10:17:23 2            Yes, it looks like I'm saying I don't know at

10:17:23 3    that time.

10:17:26 4    Q.      So does that refresh your memory that almost a

10:17:29 5    year-and-a-half after you had been sued by false

10:17:34 6    advertising, you still didn't know whether or not the

10:17:38 7    VeriCall product increased IVR containment by ten percent?

10:17:42 8    A.      Yes, that's what I said.

10:17:52 9    Q.      Let's move on to another topic here.  You had four

10:17:59 10   customers for VeriCall before the lawsuit was filed; right?

10:18:03 11   A.      Yes, that's correct.

10:18:04 12   Q.      They're Capital One, BBVA, Dish, and Comcast; right?

10:18:10 13   A.      Yes, that's correct.

10:18:11 14   Q.      And before this lawsuit, you told Capital One that

10:18:17 15   the VeriCall product worked before the call was answered;

10:18:22 16   right?

10:18:22 17   A.      Yes, we told them before the agent answered the call.

10:18:28 18   Q.      And you told BBVA that the VeriCall product works

10:18:37 19   before the call is answered; right?

10:18:38 20   A.      Yes, we told them before the agent answers the call.

10:18:44 21   Q.      Let's just turn to JTX-13.

10:19:02 22   A.      I don't think I have JTX-13.

10:19:07 23   Q.      It should be in the first tab in the small binder.

10:19:11 24   Not that binder, the other binder that you have in front of

10:19:14 25   you, I believe.

10:19:16  1    A.       Yes.  Sorry.  Got it.

10:19:23  2    Q.       JTX-13 is the appendix G that Next Caller provided to

10:19:30  3    BBVA in response -- when you were trying to sell the

10:19:35  4    VeriCall product to BBVA; is that fair?

10:19:41  5    A.       Yes, that's fair.

10:19:46  6              MR. TUMINARO:  Your Honor, move to admit JTX-13.

10:19:49  7              MS. COLUMBIA:  No objection.

10:19:50  8              THE COURT:  It's admitted.

10:19:51  9              (JTX Exhibit No. 13 was admitted into evidence.)

10:19:53 10    BY MR. TUMINARO:

10:19:55 11    Q.       Mr. Passey, if you would just pull up page 5.  And do

10:19:59 12    a callout on the top portion where it says number one,

10:20:03 13    real-time identification.

10:20:08 14              So this is what Next Caller said to BBVA about

10:20:13 15    how the VeriCall product works; right?

10:20:15 16    A.       Yes, that's correct.

10:20:16 17    Q.       And it says, "Our real-time offering allows our tool

10:20:21 18    to be used in the IVR for decision making."

10:20:24 19              Right?

10:20:25 20    A.       Yes, that's correct.

10:20:26 21    Q.       And you told BBVA that while it's in the IVR, that is

10:20:30 22    before the call was answered; right?

10:20:33 23    A.       Yes, that is before the call was answered by the

10:20:36 24    agent.

10:20:38 25    Q.       And let's go, if we could go to JTX-102.  Actually,

10:20:47 1 I'm going to skip that given the time.

10:20:50 2         Let's go to JTX-27.  JTX-27 is an e-mail from

10:21:05 3 Mr. Kirchick to an individual at Dish, is that right, Mark

10:21:13 4 Gallick?

10:21:13 5 A.     I don't know exactly where Mark Gallick worked, but

10:21:17 6 it could be Dish.

10:21:18 7 Q.     If you look at the bottom portion there, it has a

10:21:21 8 Dish Bates number on the lower right-hand corner.

10:21:23 9 A.     Okay.  I have no reason to believe it isn't, I just

10:21:27 10 don't know Mark personally.

10:21:29 11         MR. TUMINARO:  Your Honor, move to admit JTX-27.

10:21:33 12         MS. COLUMBIA:  No objection.

10:21:33 13         THE COURT:  Admitted.

10:21:34 14         (JTX Exhibit No. 27 was admitted into evidence.)

10:21:34 15 BY MR. TUMINARO:

10:21:36 16 Q.     If we could publish that and go to the second page,

10:21:40 17 Mr. Passey.  On the bottom page if we can do a callout on

10:21:44 18 the pre-answer analysis.

10:21:46 19         Next Caller told Dish that the VeriCall product

10:21:42 20 offered pre-answer analysis; right?

10:21:52 21 A.     Yes, that's correct.  And the context here is that

10:21:58 22 strategic routing is what the IVR does to make an

10:22:00 23 intelligent decision as to what to do with the call, so

10:22:02 24 we're saying before the agent answers the call we help the

10:22:07 25 IVR make that determination.

10:22:10 1    Q.      If could go to PTX-271 in your binder.

10:22:22 2            Before we get there, is it fair to say that Next

10:22:29 3    Caller told Comcast that the VeriCall product works before

10:22:33 4    the call is answered?

10:22:34 5    A.      Yes, we told them that the product works before the

10:22:37 6    agent answers the call.

10:22:39 7    Q.      Okay.  And can we go to -- those were statements that

10:22:42 8    Next Caller made before this litigation; right?

10:22:45 9    A.      Yes, they were.

10:23:05 10   Q.      Can we go to actually PTX-282.

10:23:18 11           PTX-282, this is an e-mail from Mr. Kirchick,

10:23:22 12   it's an e-mail chain from Mr. Kirchick to an individual

10:23:26 13   within BBVA; right?

10:23:27 14   A.      Yes, that's correct.

10:23:28 15           MR. TUMINARO:  Your Honor, move to admit

10:23:30 16   PTX-282.

10:23:31 17           MS. COLUMBIA:  No objection.

10:23:32 18           THE COURT:  It's admitted.

10:23:34 19           (PTX Exhibit No. 282 was admitted into

10:23:35 20   evidence.)

10:23:35 21   BY MR. TUMINARO:

10:23:35 22   Q.      Mr. Passey, can you pull this e-mail up?

10:23:38 23           So here we have a communication between

10:23:41 24   Mr. Kirchick and Carolina Aramayo from BBVA; right?

10:23:48 25   A.      Yes, that's correct.

Roncoroni - direct

10:23:49 1    Q.    And the bottom e-mail is from -- on the first page is

10:23:53 2    from the employee from BBVA; right?

10:23:58 3    A.    Yes, that's correct.

10:23:59 4    Q.    And if we could do a callout on what she had said in

10:24:04 5    the top of the second page of her e-mail where it starts

10:24:08 6    with "Your technology's ability."  What she writes is, "Your

10:24:18 7    technology's ability to give real time results, pre-IVR, in

10:24:22 8    the IVR, and pre-agent is a key distinction from Pindrop's

10:24:29 9    technology."

10:24:30 10            Do you see that?

10:24:30 11    A.    Yes, I see that.

10:24:31 12    Q.    So she understood, a customer of yours, that the Next

10:24:36 13    Caller VeriCall product could be used pre-IVR; right?

10:24:40 14    A.    I can't testify as to what she knew or believed.  I

10:24:44 15    can only testify as to what I see on the page.

10:24:47 16    Q.    And what she wrote on the page is that the VeriCall

10:24:50 17    product was pre-IVR; right?

10:24:53 18    A.    She doesn't say that actually.

10:24:56 19    Q.    Do you understand that when she's talking about your

10:25:00 20    technology's ability, she's talking about VeriCall?

10:25:02 21    A.    Yes, I believe she is talking about VeriCall.

10:25:05 22    Q.    When she's talking about VeriCall, she's talking

10:25:08 23    about the results can be given pre-IVR?

10:25:12 24    A.    That is what she is saying, yes.

10:25:14 25    Q.    And in the IVR?

10:25:16 1   A.      She also says that, yes.

10:25:18 2   Q.      And before the agent?

10:25:19 3   A.      Yes, she also says that.

10:25:21 4   Q.      And that's a true statement, VeriCall can provide

10:25:27 5   results pre-IVR, in IVR, and pre-agent; right?

10:25:31 6   A.      We can only provide results after the call, after the

10:25:35 7   call has been answered by the contact center.

10:25:37 8   Q.      You mean by the IVR?

10:25:39 9   A.      It could be the IVR.

10:25:40 10  Q.      So then why does she believe that you could provide

10:25:46 11  the results before the IVR?

10:25:48 12  A.      I don't know why she believes that.

10:25:51 13  Q.      Your product can't do that, that's what you're

10:25:55 14  saying?

10:25:55 15  A.      I'm saying our product can only work after the

10:25:59 16  incoming call has been answered by the contact center.

10:26:02 17  Q.      Would you tell a customer or a potential customer

10:26:04 18  about a functionality that your product can't perform?

10:26:08 19  A.      No, we would not.

10:26:12 20  Q.      If we could turn to PTX-283.  This is an e-mail from

10:26:28 21  Mr. Kirchick to individuals at Verizon; is that right?

10:26:34 22  A.      Yes, that's a correct.

10:26:36 23          MR. TUMINARO:  Your Honor, move to admit

10:26:36 24  PTX-283.

10:26:36 25          MS. COLUMBIA:  No objection.

10:26:39 1          THE COURT:  It's admitted.

10:26:41 2              (PTX Exhibit No. 283 was admitted into

10:26:42 3   evidence.)

10:26:42 4   BY MR. TUMINARO:

10:26:44 5   Q.     Mr. Passey, can you do a callout on Mr. Kirchick's

10:26:48 6   e-mail, in particular the key highlight points that

10:26:52 7   Mr. Kirchick is writing to Verizon.

10:26:56 8              And the way Mr. Kirchick describes the VeriCall

10:27:01 9   tool is he says that VeriCall is an API, is a phone

10:27:06 10  authentication and fraud prevention tool.  Right?

10:27:09 11  A.     Yes, he says that.

10:27:10 12  Q.     And he goes on to say in the third bullet, "Less than

10:27:15 13  200 milliseconds response time allows for pre-IVR analysis

10:27:20 14  to occur."

10:27:21 15             Do you see that?

10:27:22 16  A.     Yes, I see that.

10:27:24 17  Q.     Is that a true statement?

10:27:25 18  A.     What he means is that the context here is very

10:27:28 19  important.  What he's saying is that it takes us

10:27:32 20  200 milliseconds to do what our algorithm does, and that's

10:27:37 21  pre-IVR making decisions as to how to route the call.  So

10:27:40 22  the tool cannot work before the incoming call has been

10:27:44 23  answered, and we do that within 200-millisecond of that.

10:27:46 24  Q.     Mr. Kirchick didn't provide that explanation in this

10:27:52 25  e-mail to this potential customer; right?

A.     Like Mr. Cox testified yesterday, we often talk to
our customers in the language that we use with us and the
language they understand, so again, I didn't draft this
e-mail but my understanding is that he's speaking in the
language that Verizon understands.

Q.     So the language that Verizon understands is they
thought pre-IVR is before IVR; right?

A.     I don't know what Verizon understands.

Q.     That's what Mr. Kirchick told to Verizon that
VeriCall allows for pre-IVR analysis to occur, and he didn't
provide any qualifications about what that means?

A.     The IVR analysis is how the IVR makes the decision as
to what to do with the call.

Q.     Mr. Kirchick didn't provide that context when he was
talking to Verizon; right?

A.     I don't know what he provided outside of this e-mail.

Q.     And in his written words he says allows for pre-IVR
analysis to occur?

A.     He's also thanking them above that for the time
today, so it's very likely that he told them that over the
phone.

Q.     You're not disputing that the words "pre-IVR analysis
to occur" are on the page; right?

A.     No, I'm not.  Pre-IVR analysis means before the IVR
has had a chance to make the determination as to what to do

10:29:07 1    with the call.

10:29:09 2    Q.    Can we turn to PTX-349.  PTX-349 is a Next Caller

10:29:27 3    investor presentation.  Is that right?

10:29:31 4    A.    Yes, it is.

10:29:32 5                MR. TUMINARO:  Your Honor, move to admit

10:29:35 6    PTX-349.

10:29:35 7                MS. COLUMBIA:  No objection.

10:29:36 8                THE COURT:  It's admitted.

10:29:38 9                (PTX Exhibit No. 349 was admitted into

10:29:39 10   evidence.)

10:29:39 11   BY MR. TUMINARO:

10:29:45 12   Q.    If you would turn to page 8 of this presentation,

10:29:48 13   Mr. Passey.

10:29:48 14               And you could follow along, Mr. Roncoroni, in

10:29:51 15   your binder.  On page 8, this Next Caller presentation is

10:29:58 16   talking about the Capital One Use Case, how Capital One uses

10:30:02 17   VeriCall; right?

10:30:06 18   A.    Yes, that's what this is talking about.

10:30:09 19   Q.    And the first line says "Capital One Use Case.

10:30:14 20   Identify the risk level of a call before it is answered by

10:30:17 21   the IVR or an agent."

10:30:20 22               Right?

10:30:21 23   A.    Yes, that's what it says.

10:30:23 24   Q.    In fact the next line says, "Isolate high risk calls

10:30:29 25   pre-IVR."

10:30:31 1    A.       Yes, it says that.

10:30:34 2    Q.       So is that what Next Caller told its investors that

10:30:39 3    the Capital One Use Case allowed for pre-IVR isolation of

10:30:44 4    high risk calls?

10:30:46 5    A.       No.  Like I said in the last exhibit, the context

10:30:50 6    here is really important.  And a lot of the value from our

10:30:55 7    service comes from allowing companies, our customers to use

10:31:00 8    the data to make decisions in the IVR.  What we are

10:31:03 9    referring to here is before the IVR has made that

10:31:05 10   determination, because then it can route them away from

10:31:09 11   agents or to a specific location.

10:31:12 12   Q.       You're not disputing that you have an investor

10:31:15 13   presentation that uses the words when describing VeriCall

10:31:19 14   product, "Isolate high risk calls pre-IVR."  Right?

10:31:24 15   A.       I am not disputing the words on the page, but none of

10:31:28 16   our customers use our solution before the incoming call has

10:31:31 17   been answered by the contact center.

10:31:32 18   Q.       If none of your customers use it that way, why would

10:31:36 19   you be telling your investors that that's how it can be

10:31:39 20   used?

10:31:40 21   A.       Like I said a minute ago, we are referring to before

10:31:42 22   the IVR has a chance to make decisions.

10:31:55 23   Q.       Let's go to JTX-14.  JTX-14 is a memo that Next

10:32:17 24   Caller provided to Capital One; is that right?

10:32:18 25   A.       Yes, that's correct.

10:32:20  1          MR. TUMINARO:  Your Honor, move to admit JTX-14.

10:32:22  2          MS. COLUMBIA:  No objection.

10:32:23  3          THE COURT:  It's admitted.

10:32:24  4          (JTX Exhibit No. 14 was admitted into evidence.)

10:32:25  5  BY MR. TUMINARO:

10:32:27  6  Q.      So this is an FAQ, Frequently Asked Questions about

10:32:30  7  the TRUSTID Next Caller litigation; is that right?

10:32:33  8  A.      Yes, that's correct.

10:32:34  9  Q.      So you were sending a communication to one of your

10:32:37 10  customers, Capital One, about this litigation; right?

10:32:40 11  A.      Yes, we were.

10:32:41 12  Q.      Okay.  And just -- you did tell Capital One before

10:32:45 13  this litigation that Next Caller provides its analysis

10:32:49 14  before the call was answered; right?

10:32:51 15  A.      Yes, we told them it was before the agent answers the

10:32:54 16  call.

10:32:54 17  Q.      Could we do a callout on the first bullet in the

10:32:58 18  middle of the page.

10:33:03 19          And what you're explaining to Capital One is

10:33:06 20  you're saying that you don't infringe these patents because

10:33:14 21  Next Caller's solution performs the relevant analysis after

10:33:17 22  the call is answered; is that right?

10:33:20 23  A.      Yes, that's what we said here.  But like I said in

10:33:24 24  the last slide, and I agree with the testimony of Mr. Cox,

10:33:28 25  that we always craft our language to the audience that we're

10:33:33 1   speaking to.  And in this case we are speaking to lawyers.

10:33:36 2   And in this scenario here, we are differentiating ourselves

10:33:42 3   from what TRUSTID's technology does which is everything

10:33:45 4   before the call center answers the call and what we do which

10:33:49 5   is after the call center answers the call.

10:33:51 6   Q.      In this case, though, you're telling the same

10:33:54 7   customer, Capital One, two different things; right?  Before

10:33:57 8   the litigation you said we're before the call is answered,

10:34:01 9   and after the litigation you're saying after the call is

10:34:04 10  answered; right?

10:34:04 11  A.      No, that's not what I'm saying.  I'm saying when we

10:34:08 12  talk to business people in business terms, we use pre-answer

10:34:12 13  to mean before the agent answers the call.  When we're

10:34:14 14  talking to lawyers who are looking at the specific language

10:34:17 15  of patents, we use the language in the patents, and the

10:34:21 16  TRUSTID patent has language for before the incoming call is

10:34:24 17  answered by the call center.

10:34:25 18  Q.      So when it's important for business reasons to make a

10:34:28 19  sale, you use the before the call is answered language.  Is

10:34:33 20  that your testimony?

10:34:35 21  A.      Not exactly, no.

10:34:36 22  Q.      But when it's important for litigation reasons, you

10:34:39 23  use the after the call is answered.  Is that your testimony?

10:34:42 24  A.      No, it's not.

10:34:51 25  Q.      After the litigation was filed, you talked to

10:34:54 1   Pindrop, Next Caller talked to Pindrop and you in particular

10:34:59 2   talked to Pindrop about a potential acquisition; is that

10:35:04 3   right?

10:35:04 4   A.    Yes, that's correct.

10:35:09 5   Q.    If we go to PTX-340.

10:35:32 6         PTX-340 is an e-mail from you to the CEO of

10:35:37 7   Pindrop; is that right?

10:35:38 8   A.    Yes, that's correct.

10:35:40 9         MR. TUMINARO:  Your Honor, move to admit

10:35:44 10   PTX-340.

10:35:44 11         MS. COLUMBIA:  No objection.

10:35:45 12         THE COURT:  It's admitted.

10:35:47 13         (PTX Exhibit No. 340 was admitted into

10:35:48 14   evidence.)

10:35:48 15   BY MR. TUMINARO:

10:35:49 16   Q.    This e-mail was drafted or written on June 5th, 2018,

10:35:54 17   after the lawsuit was filed; right?

10:35:56 18   A.    Yes, that's correct.

10:35:57 19   Q.    And the second line of the e-mail you're talking

10:36:00 20   about that said, "Putting this together was really valuable

10:36:08 21   and makes a deeper partnership a no brainer, at least for

10:36:12 22   me."

10:36:12 23         Do you see that?

10:36:12 24   A.    Yes, I do.

10:36:14 25   Q.    What you're talking about with the CEO of Pindrop is

10:36:18 1    a potential acquisition of Next Caller by Pindrop; correct?

10:36:22 2    A.    Yes, that's correct.

10:36:22 3    Q.    And the e-mail refers to an attachment.  Do you see

10:36:24 4    that?

10:36:27 5    A.    Yes.

10:36:27 6    Q.    Could we go to PTX-341 in your binder.  This is the

10:36:38 7    attachment to your e-mail to the CEO of Pindrop?

10:36:41 8    A.    Yes, that's correct.

10:36:43 9          MR. TUMINARO:  Your Honor, move to admit

10:36:47 10   PTX-341.

10:36:47 11         MS. COLUMBIA:  No objection.

10:36:48 12         THE COURT:  It's admitted.

10:36:49 13         (PTX Exhibit No. 341 was admitted into

10:36:49 14   evidence.)

10:36:49 15   BY MR. TUMINARO:

10:36:51 16   Q.    Mr. Passey, could you do a callout of the second

10:36:54 17   bullet after the number one.

10:36:55 18         So in this communication, you're answering

10:36:58 19   questions that the CEO of Pindrop had about your product;

10:37:02 20   right?

10:37:02 21   A.    Yes, that's correct.

10:37:02 22   Q.    And what you told him is -- and this is after the

10:37:02 23   lawsuit is filed; right?

10:37:06 24   A.    Yes, this is.

10:37:06 25   Q.    And what you told him is, "Our tool works in the

10:37:12 1    absence of voice, before the call is answered."

10:37:17 2            Right?

10:37:18 3    A.      Yes, I'm saying before the agent answers the call to

10:37:21 4    differentiate from one of their products which is the voice

10:37:24 5    biometrics.

10:37:26 6    Q.      When you're looking to become acquired by Pindrop,

10:37:29 7    you told Pindrop that your analysis was before the call was

10:37:32 8    answered; right?

10:37:32 9    A.      Yes, consistent with what we have told all of our

10:37:36 10   customers, before the agent answers the call.

10:37:39 11   Q.      And that communication with the CEO of Pindrop was

10:37:48 12   successful, right, because they ultimately made an offer?

10:37:52 13   A.      No, this conversation with the CEO was not

10:37:55 14   successful.

10:37:55 15   Q.      Did Pindrop ultimately make an offer to acquire Next

10:37:59 16   Caller?

10:37:59 17   A.      They did make an offer.

10:38:01 18   Q.      Can you turn to PTX-344 in your binder.

10:38:15 19   Mr. Roncoroni, PTX-344 is an e-mail stream that includes you

10:38:20 20   and several other individuals and the subject is Pindrop

10:38:22 21   LOI.  Do you see that?

10:38:22 22   A.      Yes, I do.

10:38:27 23            MR. TUMINARO:  Your Honor, move to admit

10:38:30 24   PTX-344.

10:38:30 25            MS. COLUMBIA:  No objection.

10:38:31 1    THE COURT:  It's admitted.

10:38:32 2    (PTX Exhibit No. 344 was admitted into

10:38:34 3  evidence.)

10:38:34 4  BY MR. TUMINARO:

10:38:35 5  Q.    Mr. Passey, if you could pull up the second page --

10:38:37 6  well, just to orient ourselves, this is an e-mail string

10:38:41 7  between you and several -- those are investors in Next

10:38:44 8  Caller; is that right?

10:38:45 9  A.    Yes, that's correct, they were two of our investors.

10:38:49 10  Q.    You can take out that callout now, Mr. Passey.

10:38:52 11        And the bottom e-mail on the first page on the

10:38:54 12  left, that's from the CEO of Pindrop, right, just the

10:38:57 13  heading where it says forwarded message on the bottom?

10:39:01 14  A.    Yes, that's correct.

10:39:02 15  Q.    Could we do a callout on the CEO's e-mail which

10:39:07 16  appears on the second page of the e-mail.

10:39:13 17        So the CEO of Pindrop wrote to you and he said,

10:39:17 18  "It gives me great pleasure in providing you with a letter

10:39:20 19  of intent for Pindrop acquiring Next Caller."

10:39:24 20        Right?

10:39:24 21  A.    Yes, he says that.

10:39:26 22  Q.    So he was making an offer to acquire Next Caller;

10:39:30 23  right?

10:39:30 24  A.    Yes, he was.

10:39:31 25  Q.    And under the third bullet there, there is a portion

10:39:34 1   that says this offer would be worth approximately ▮

10:39:38 2   ▮ It's in the text right there. He was telling you

10:39:44 3   that the offer would have been worth approximately ▮

10:39:48 4   ▮ ; right?

10:39:49 5   A.   Not at that time, no.

10:39:51 6   Q.   Well, what he says, this offer would be worth

10:39:54 7   approximately ▮ ?

10:39:56 8   A.   Those are the words he said, but he's not talking

10:40:00 9   about that time, he's talking about a hypothetical example

10:40:04 10   where Pindrop exited at a $1.7 billion valuation, not at

10:40:11 11   that time.

10:40:11 12   Q.   You can take back the callouts, and let's look at

10:40:15 13   your response, what you tell your investors about this

10:40:18 14   communication. If you could blow up the top e-mail,

10:40:21 15   Mr. Passey. Callout there.

10:40:24 16   So what you say in the first bullet to your

10:40:28 17   investors about this offer, what you say is, "I countered

10:40:32 18   that the price was too low to even bring to our board."

10:40:37 19   Is that what you said?

10:40:39 20   A.   Yes, I did say that.

10:40:41 21   Q.   Okay. And you also talk a little bit about what was

10:40:44 22   in that offer; is that right?

10:40:45 23   A.   Yes, I do.

10:40:46 24   Q.   The third bullet of the e-mail that you wrote said,

10:40:51 25   "His legal team wants to hit TRUSTID with the fury of a

10:40:56 1    thousand suns."

10:40:57 2                    Do you see that?

10:40:57 3    A.      Yes, I do.

10:40:59 4    Q.      It goes on to say, "In addition to defense, plans

10:41:03 5    extra counterclaims and estimating over $9 million in legal

10:41:07 6    fees to put them out of business, which they are factoring

10:41:11 7    into the deal."

10:41:13 8                    Do you see that?

10:41:13 9    A.      Yes, I do see that.

10:41:14 10   Q.      Does that mean that Pindrop wanted to pay its

10:41:19 11   attorneys almost $9 million to sue TRUSTID out of existence?

10:41:23 12   A.      No, that's not what he's saying.  He's negotiating

10:41:27 13   with me and explaining to me why the value of our deal was

10:41:31 14   lower than we had wanted.

10:41:33 15   Q.      And part of the value of that deal was $9 million to

10:41:37 16   go to attorneys; right?

10:41:39 17   A.      What he's referring to here is the $9 million they

10:41:43 18   estimated it would cost us to defend ourselves in this

10:41:47 19   litigation.

10:41:47 20   Q.      He also talked about counterclaims, right, extra

10:41:50 21   counterclaims?

10:41:51 22   A.      He does talk about extra counterclaims, but Pindrop

10:41:54 23   as far as I know has never filed counterclaims.

10:41:57 24   Q.      But what a counterclaim would be is that Pindrop

10:42:00 25   would then sue TRUSTID; is that right?

10:42:02 1    A.    I don't know what counterclaims they would file.

10:42:05 2    Q.    You don't know one way or the other?

10:42:07 3    A.    No, I don't.

10:42:08 4    Q.    But it was $9 million to attorneys; right?

10:42:11 5    A.    Yes, to defend ourselves in this lawsuit.

10:42:15 6    Q.    And extra counterclaims?

10:42:17 7    A.    Again, he doesn't say specifically, and I don't know

10:42:22 8    what claims they plan, if any.

10:42:25 9    Q.    Okay.  If you could pull that down.

10:42:28 10            All right.  Going back to IVR containment.  You

10:42:34 11   had advertised the ten percent IVR containment on your

10:42:37 12   website; is that right?

10:42:38 13   A.    Yes, that's correct.

10:42:39 14   Q.    And you sent Capital One collateral marketing

10:42:44 15   material about IVR containment; is that right?

10:42:46 16   A.    Yes, we probably did.

10:42:47 17   Q.    And you sent Comcast collateral material about

10:42:53 18   increased ten percent IVR containment?

10:42:55 19   A.    I'm not sure if he sent it to Comcast, but if you

10:43:00 20   show me a document, I'm happy to refresh my memory.

10:43:02 21            THE COURT:  Mr. Tuminaro, let's take our morning

10:43:05 22   break before we get into another document.  We're going to

10:43:05 23   take our morning break.  Let's take about fifteen minutes,

10:43:12 24   stretch our legs.

10:43:12 25            (Jury leaving the courtroom at 10:43 a.m.)

10:43:34 1          THE COURT:  All right.  Fifteen minutes.

10:43:45 2          (A brief recess was taken.)

11:01:58 3          THE COURT:  All right.  Let's bring in the jury.

11:03:16 4          (Jury entering the courtroom at 11:03 a.m.)

11:03:25 5          THE COURT:  And you guys can sit down as soon as

11:03:35 6    you come in.  You don't have to wait for us.

11:03:38 7          All right.  Let us continue.

11:03:39 8    BY MR. TUMINARO:

11:03:47 9    Q.     Welcome back, Mr. Roncoroni.  Just to reorient

11:03:50 10   ourselves, before the break we were talking about Comcast.

11:03:54 11   Do you remember that?

11:03:54 12   A.     Yes, I do.

11:03:55 13   Q.     And in particular we were talking about

11:04:00 14   advertisements that Next Caller made to Comcast about ten

11:04:04 15   percent increased IVR containment?

11:04:07 16   A.     Yes, that's correct.

11:04:08 17   Q.     And if you would turn in your binder to PTX-270.

11:04:20 18   This is an e-mail from Mr. Kirchick to individuals at

11:04:24 19   Comcast.  Is that right?

11:04:27 20   A.     Yes, it is.

11:04:29 21          MR. TUMINARO:  Your Honor, move to admit

11:04:31 22   PTX-270.

11:04:32 23          MS. COLUMBIA:  No objection, Your Honor.

11:04:34 24          THE COURT:  Thank you.

11:04:35 25          (PTX Exhibit No. 270 was admitted into

11:04:35 1 evidence.)

11:04:35 2 BY MR. TUMINARO:

11:04:36 3 Q.    Mr. Passey, could you put up this e-mail.  And just

11:04:39 4 do a callout of the beginning portion, the to/from

11:04:47 5 attachments.  Again, this is Mr. Kirchick, Next Caller's

11:04:52 6 head of sales providing information to Mike Young at

11:04:56 7 Comcast.  Right?

11:04:57 8 A.    Yes, that's correct.

11:04:58 9 Q.    And there is an attachment, Next Caller Verification

11:05:02 10 Services, PowerPoint, and there is a VeriCall service

11:05:07 11 brochure.  Do you see that?

11:05:09 12 A.    Yes, I do.

11:05:11 13 Q.    If you would turn for me to PTX-271 in your binder.

11:05:16 14 This is one of the attachments to Mr. Kirchick's e-mails; is

11:05:19 15 that right?

11:05:19 16 A.    Yes.

11:05:21 17           MR. TUMINARO:  Your Honor, move to admit

11:05:24 18 PTX-271.

11:05:25 19           MS. COLUMBIA:  No objection, Your Honor.

11:05:26 20           THE COURT:  All right.  It's admitted.

11:05:26 21           (PTX Exhibit No. 271 was admitted into

11:05:26 22 evidence.)

11:05:26 23 BY MR. TUMINARO:

11:05:30 24 Q.    So here we have a Next Caller presentation to

11:05:32 25 Comcast.  Right?

11:05:34  1   A.      Yes, that's correct.

11:05:35  2   Q.      And if you would turn with me to page 6 of this

11:05:41  3   presentation.  Mr. Passey, if you could bring it up on the

11:05:45  4   screen.  If you could do a callout on call verification

11:05:48  5   there.

11:05:49  6           So what Next Caller said to Comcast about the

11:05:54  7   VeriCall product in the second bullet, approximately ten

11:05:58  8   percent improvement in IVR containment rate.  Right?

11:06:02  9   A.      Yes, that's correct, approximately ten percent.

11:06:05 10   Q.      Okay.  And, in fact, when -- you can take that down,

11:06:16 11   Mr. Passey.

11:06:21 12           When Next Caller actually tested the VeriCall

11:06:26 13   product in the customer implementation, that customer got

11:06:33 14   something well below ten percent, right, increased IVR

11:06:37 15   containment?

11:06:37 16   A.      We did testing with multiple customers.  Could you

11:06:40 17   tell me which one you're talking about?

11:06:42 18   Q.      How about with Dish?

11:06:44 19   A.      Yes, that's correct.

11:06:45 20   Q.      So with Dish, Next Caller's VeriCall product resulted

11:06:51 21   in only a three percent increase in IVR containment rate.

11:06:55 22   Isn't that right?

11:06:56 23   A.      Yes, that's correct.

11:07:02 24   Q.      So again, you had communications with Capital One

11:07:07 25   about the VeriCall product; right?

11:07:09 1    A.    Yes, we did.

11:07:10 2    Q.    If you would turn with me to JTX-102 in your binder.

11:07:26 3    JTX-102 is information that Next Caller provided to Capital

11:07:28 4    One about the VeriCall product.  Fair?

11:07:30 5    A.    Yes, that's correct.

11:07:31 6         MR. TUMINARO:  Your Honor, move to admit

11:07:32 7    JTX-102.

11:07:33 8         MS. COLUMBIA:  No objection, Your Honor.

11:07:34 9         THE COURT:  Thank you.  It's admitted.

11:07:37 10         (JTX Exhibit No. 102 was admitted into

11:07:38 11    evidence.)

11:07:38 12    BY MR. TUMINARO:

11:07:39 13    Q.    Mr. Passey, first of all let's do a callout on the

11:07:42 14    second bullet.  I'm sorry, the second numbered thing, IVR

11:07:49 15    containment, IVR/real-time agent notification.

11:07:52 16         And what you told Capital One is that because

11:07:56 17    our solution is real-time, it could be used ahead of the

11:08:01 18    call, before it is answered; right?

11:08:03 19    A.    Yes, that's what I said.

11:08:04 20    Q.    And you can pull down this callout and do a callout

11:08:08 21    of the second to last bullet of this presentation.  It says,

11:08:14 22    "We maintained."  That one.

11:08:16 23         So what you told Capital One is that Next Caller

11:08:20 24    maintains its technology as a secret; right?

11:08:24 25    A.    Yes.

11:08:28 1 Q.    And you told Capital One that your competitor's

11:08:32 2 system could be gamed and all you have to do is Google their

11:08:36 3 patents to game their system.  Is that right?

11:08:38 4 A.    That's what's up there, yes.

11:08:40 5 Q.    So you understood as a company, Next Caller, how to

11:08:44 6 Google your competitor's patents; right?

11:08:47 7 A.    Yes, we did.

11:08:48 8 Q.    And Next Caller monitored TRUSTID's patents; right?

11:08:53 9 A.    Could you define what you mean by monitor?

11:08:57 10 Q.    Well, if TRUSTID were to have a patent issued, Next

11:09:01 11 Caller would know about it that very same day; right?

11:09:03 12 A.    It's possible that we could, but not necessarily.

11:09:06 13 Q.    And if it did issue, Next Caller would have

11:09:12 14 communications about TRUSTID's patents; fair?

11:09:15 15 A.    If we were aware of the patent, then we could, yes.

11:09:19 16 Q.    And you were aware, in fact, that TRUSTID had

11:09:24 17 patents; right?

11:09:27 18 A.    Yes, I was.

11:09:29 19 Q.    If you would turn with me to PTX-125.  This is an

11:09:37 20 e-mail from you to several other leaders within Next Caller;

11:09:42 21 right?

11:09:42 22 A.    Yes, that's correct.

11:09:45 23         MR. TUMINARO:  Your Honor, move to admit

11:09:46 24 PTX-125.

11:09:50 25         MS. COLUMBIA:  No objection, Your Honor.

11:09:51 1          THE COURT:  All right.  It's admitted.

11:09:53 2          (PTX Exhibit No. 125 was admitted into

11:09:54 3   evidence.)

11:09:54 4   BY MR. TUMINARO:

11:09:56 5   Q.    Mr. Passey, would you do a callout on the to/from and

11:09:59 6   subject of this e-mail.

11:10:00 7          Just to orient ourselves again, this is an

11:10:03 8   e-mail from you to Gianni Martire; right?

11:10:08 9   A.    Yes, that's correct.

11:10:09 10  Q.    He's one of the co-founders of Next Caller?

11:10:11 11  A.    Yes, he was.

11:10:12 12  Q.    And he was a chief product officer?

11:10:15 13  A.    Yes, he was.

11:10:15 14  Q.    And the cc is Mr. Espinosa.  Do you see that?

11:10:21 15  A.    Yep.

11:10:22 16  Q.    He's the head of marketing at Next Caller?

11:10:24 17  A.    Yes, that's correct.

11:10:25 18  Q.    And the other cc is Mr. Kirchick.  Do you see that?

11:10:28 19  A.    Yes, I do.

11:10:29 20  Q.    It's the head of sales at Next Caller?

11:10:31 21  A.    He was at that time.

11:10:33 22  Q.    So fair to say that these are the leaders of the Next

11:10:33 23  Caller company?

11:10:37 24  A.    These are some of the leaders of Next Caller.

11:10:39 25  Q.    They were part of something called the Steering

Roncoroni - direct

11:10:42 1    Committee; is that right?

11:10:43 2    A.      Yes, that's correct.

11:10:45 3    Q.      Okay.  You can pull up -- put that down.

11:10:48 4            What you said to your -- these members of the

11:10:56 5    Steering Committee, if you could do a callout -- right

11:10:59 6    there.  That's good, Mr. Passey.

11:11:02 7            You're talking about TRUSTID here.  And you

11:11:05 8    said, "Their tool is patented."  Do you see that in the

11:11:07 9    second bullet?

11:11:08 10   A.      Yes, I do.

11:11:08 11   Q.      So you are talking about TRUSTID's tool being

11:11:12 12   patented; right?

11:11:12 13   A.      Yes, I am.

11:11:13 14   Q.      And you went on to say, "Even if we infringe one

11:11:17 15   percent, we could be liable for that."

11:11:19 16           Correct?

11:11:21 17   A.      Yes, I said that.

11:11:22 18   Q.      So you knew that TRUSTID had patents and you knew

11:11:25 19   that you could be liable for patent infringement; right?

11:11:27 20   A.      No.

11:11:28 21   Q.      You knew that you could be liable for infringing

11:11:32 22   TRUSTID's patents; right?

11:11:33 23   A.      No, that's not what I said.

11:11:33 24   Q.      You knew about TRUSTID's patents; right?

11:11:37 25   A.      Yes.

11:11:38 1    Q.      Okay.  And in the last bullet, what you said there

11:11:44 2    is, "We don't have to play nice in the sand box."

11:11:47 3            Right?

11:11:48 4    A.      Yes.  I'm referencing the first bullet where I did

11:11:52 5    not want to have a partnership with them.

11:11:54 6    Q.      And you even went on to say, and these are your

11:11:57 7    words, "We could put 'fuck you TRUSTID' on our website and

11:12:01 8    it won't mean dick."

11:12:03 9            Right?

11:12:03 10   A.      Yes, I said that.

11:12:05 11           MR. TUMINARO:  I have no more questions, Your

11:12:07 12   Honor.  Pass the witness.

11:12:08 13           THE COURT:  All right.  Cross, or whatever this

11:12:12 14   is.

11:12:26 15           MS. COLUMBIA:  Your Honor, may I approach the

11:12:30 16   witness with one more notebook?

11:12:32 17           THE COURT:  You may.

11:12:55 18                    CROSS-EXAMINATION

11:12:55 19   BY MS. COLUMBIA:

11:13:10 20   Q.      Good morning, Mr. Roncoroni.

11:13:11 21   A.      Good morning.

11:13:12 22   Q.      Before we get into really introducing you, let's take

11:13:16 23   a look at PTX-125, the document we finished on.

11:13:21 24   A.      Okay.

11:13:26 25   Q.      And Mr. Rosenberg, if you could put that up.

11:13:29 1          Do you have that, sir?

11:13:31 2     A.    Yes, I do.

11:13:32 3     Q.    And Mr. Rosenberg, if you could blow up the to/from,

11:13:38 4     and down through that first e-mail.

11:13:42 5          What was the context for this e-mail?

11:13:45 6     A.    The context of this e-mail was Rich Greene who at the

11:13:49 7     time was the CTO of TRUSTID had reached out to us, filled

11:13:54 8     out a lead form on our website effectively putting in his

11:13:58 9     e-mail address and saying that he wanted to get more

11:14:01 10    information from us.

11:14:02 11    Q.    And what was your response?

11:14:05 12    A.    My response was that I didn't want to partner with

11:14:08 13    them.  I thought that their products and positioning in the

11:14:13 14    marketplace was such that we didn't want to partner with

11:14:16 15    them.  And I was making that clear to my team that I did not

11:14:20 16    want to.

11:14:20 17    Q.    And were you concerned that any suggestion that you

11:14:23 18    might get information from them would be dangerous?

11:14:26 19    A.    Yes, that's correct.

11:14:27 20    Q.    Why?

11:14:28 21    A.    Well, as Mr. Cox testified yesterday, patents are

11:14:37 22    public information, they're available to everyone, so it was

11:14:41 23    our strategy from the very beginning to keep our technology

11:14:44 24    a trade secret instead of patenting it and publishing it to

11:14:42 25    the world.

Roncoroni - cross

11:14:49 1    Q.      Does anything in this e-mail suggest that you had any

11:14:52 2    reason to think that VeriCall was infringing any TRUSTID

11:14:55 3    patent?

11:14:55 4    A.      No, there is not.

11:14:58 5    Q.      Now, we didn't get much chance to get introduced to

11:15:01 6    you this morning by TRUSTID's counsel, Mr. Roncoroni.  I

11:15:05 7    think we learned that you're the CEO of Next Caller; is that

11:15:09 8    right?  Yes?

11:15:12 9    A.      Yes, that's correct.

11:15:13 10   Q.      You seem like kind of a young guy to be a CEO.  How

11:15:17 11   did that come about?

11:15:18 12   A.      I have been an entrepreneur since I was a kid.

11:15:22 13   Q.      Have you started businesses before Next Caller?

11:15:24 14   A.      I have.  In high school I had a pond building

11:15:29 15   landscaping business.  In college I started an online sales

11:15:33 16   platform for collectable cards.

11:15:36 17   Q.      What jobs did you hold before you formed and founded

11:15:41 18   Next Caller?

11:15:42 19   A.      My first job out of college was as a real estate

11:15:47 20   development analyst.  After that I got a job as a natural

11:15:51 21   gas and crude oil derivatives brokerage.  And from

11:15:56 22   brokerage, I started Next Caller.

11:15:58 23   Q.      When did you form Next Caller?

11:16:02 24   A.      I started in 2012.

11:16:02 25   Q.      And what was the impetus or the idea that led you to

11:16:11 1 form Next Caller?

11:16:12 2 A.    It was one of those really classic ah-ha moments.  My

11:16:18 3 name is Roncoroni, and that often sounds like two names, Ron

11:16:23 4 Coroni, so whenever I'm articulating that over the phone,

11:16:26 5 it's often confusing.  And one day I had a problem with a

11:16:29 6 rental car company and the agents kept bouncing me around.

11:16:33 7 They couldn't find my reservation.  And ultimately I learned

11:16:37 8 this was because of the confusion of my last name.  And it

11:16:40 9 was about a forty-five-minute experience and I was really

11:16:43 10 frustrated and so I thought to myself why is this.  There

11:16:47 11 has got to be a better way.  This is my phone, I got my

11:16:52 12 driver's license and credit card, I have had it for ten

11:16:55 13 years.  How do they not know who I am?

11:16:57 14        So I did some research in the contact center

11:17:00 15 space and I learned there were a lot of problems with

11:17:03 16 authentication and the cost associated with the call

11:17:06 17 centers.

11:17:06 18 Q.    A lot of us have been frustrated with our call center

11:17:10 19 experience.  What motivated you to start a business?

11:17:12 20 A.    Well, having that entrepreneurial spirit I guess you

11:17:21 21 could say, I at the time was living with a roommate who had

11:17:24 22 previously had technology companies and he had talked about

11:17:27 23 his startups in the past.  And I thought this seems like it

11:17:31 24 could be a pretty interesting startup that we could build

11:17:34 25 together.  He was in the mood to start a business, too, so

11:17:37 1  we did.

11:17:39 2  Q.      Did you keep your day job?

11:17:41 3  A.      Yes, I did.

11:17:43 4  Q.      And what was that first year or two like?

11:17:47 5  A.      Well, I kept my day job as a natural gas broker for a

11:17:52 6  little under a year.  And I used that day job to save up

11:17:57 7  money to start the business.  My co-founder and I each

11:18:01 8  invested $30,000 that we had saved to get the business off

11:18:05 9  the ground.  And in that first year it was the same as a lot

11:18:10 10 of small businesses, we didn't really know what we were

11:18:13 11 doing.  We had to talk to a lot of people.  We had to learn

11:18:16 12 the things that we didn't know.  Lots of bumps along the

11:18:20 13 way.

11:18:20 14         And then after about the first year is when we

11:18:23 15 started to get a little bit of traction from external

11:18:27 16 parties and eventually hired our first two employees.

11:18:33 17 Q.      Was there third-party recognition of your traction as

11:18:41 18 you called it after that first year?

11:18:43 19 A.      After the first year we got accepted in a program

11:18:47 20 called Y Combinator which is a really exclusive program,

11:18:52 21 sort of like Shark Tank where you present your idea and

11:18:56 22 company to investors in the hopes of raising money.  And

11:19:02 23 they only accept around two percent of applicants.  So when

11:19:02 24 we got this recognition we felt wow, maybe this is -- maybe

11:19:06 25 this is more than just an idea.  Other people are starting

11:19:11 1  to believe in what we are doing.  Now it's time to quit my

11:19:14 2  day job and focus on this a hundred percent.

11:19:17 3  Q.      I think Mr. Tuminaro in his questioning made it clear

11:19:20 4  that you're not the engineer; correct?

11:19:22 5  A.      No, I'm not the engineer.

11:19:23 6  Q.      Did you find an engineer who could help you to

11:19:27 7  develop the business?

11:19:27 8  A.      Yes, I did.  My co-founder who was my roommate at the

11:19:32 9  time was not an engineer directly, but he was a product

11:19:35 10 person who had experience working with engineers, so it was

11:19:37 11 his responsibility in the business to go out and hire the

11:19:41 12 other engineers.

11:19:42 13 Q.      We have heard in this courtroom a lot about VeriCall.

11:19:44 14 Was that where the business began?

11:19:46 15 A.      No, it was not.

11:19:47 16 Q.      Where did you start?

11:19:49 17 A.      The very first idea we had or I had was sort of a VIP

11:19:54 18 service for consumers like us who are frustrated waiting on

11:19:59 19 hold, getting their names and addresses messed up.  So the

11:20:02 20 very first service we envisioned was a VIP program where

11:20:07 21 consumers could volunteer their personal information to the

11:20:12 22 company, we could skip the whole line treatment, better

11:20:15 23 agents, rebates, coupons, things like that.

11:20:18 24 Q.      At some point did you change the business model?

11:20:21 25 A.      We did.  After about one year of talking to customers

11:20:25 1    and engineers, figuring out how we could build this, we

11:20:29 2    learned that one, we probably couldn't build it with the

11:20:32 3    little resources we had, and two, that customers didn't

11:20:34 4    really want to buy it.

11:20:36 5    Q.      And what direction did Next Caller go from there?

11:20:40 6    A.      From there we developed a product called Advanced

11:20:44 7    Caller-ID.  And it was effectively a database that linked

11:20:48 8    personal information like name, address, e-mail, to phone

11:20:52 9    numbers, so the idea was to solve that original pain point

11:20:57 10   of caller identification and to do it without us having to

11:21:01 11   speak our names and articulate spelling and without the

11:21:04 12   business having to ask us those questions.

11:21:09 13   Q.      Was Advanced Caller-ID a successful product?

11:21:12 14   A.      It was a relatively successful product.  We ran it

11:21:16 15   for a few years.  We did have a lot of household names as

11:21:19 16   customers, The Gap, Uber, Lending Tree.  But we struggled to

11:21:24 17   make a profit.  You know, we had a staff of probably around

11:21:29 18   twenty people at that time, so we weren't profiting enough

11:21:32 19   in the service to pay for all of the employees.

11:21:36 20   Q.      So what did you do next?

11:21:38 21   A.      After that we made the hard decision to pivot.  We

11:21:42 22   couldn't afford to pay the bills that we were paying at the

11:21:45 23   time, so we decided to investigate a different direction,

11:21:49 24   but still focusing on that same problem of authentication.

11:21:52 25   And one of the prospects that we had been talking to for our

first product, Advanced Caller-ID, was Capital One.  And in

talking with them, we learned that even if we gave them all

of the best caller-ID information, always accurate, they

still had to make sure that they were talking to the person

they thought they were talking to.  So that pain point, you

want the spelling of your name and address, it was how do I

know I'm interacting with the person that I think I'm

interacting with.

At that time around 2014, about two years later,

Matthew Williams was working with us as a consultant at that

time and he had brought this concept of call spoofing to us

and, you know, we started to look into it.

Q.    Now, the jury heard a back and forth about Matthew

Williams and when he started with the company earlier.  When

did Matthew Williams first start doing work for Next Caller?

A.    He first started in 2014.

Q.    That was as a consultant?

A.    That's correct.

Q.    So what was the vision for VeriCall?

A.    The vision of VeriCall was to detect call spoofing.

As we've heard a little bit in this trial, call spoofing is

the act of manipulating your number to be a number other

than what it should be.  And this is a very common way for

identity thieves to hack into our accounts through call

centers.

11:23:19 1   Q.      And I can understand why I wouldn't want that to

11:23:23 2   happen to my identity.  Why is it also important for big

11:23:26 3   customers like banks and financial institutions?

11:23:28 4   A.      Yeah.  Not only is it really frustrating for us to

11:23:32 5   have that happen, but when we as consumers suffer these

11:23:36 6   losses, the banks generally cover them for us.  If somebody

11:23:40 7   breaks into our account over the phone and it's not us and

11:23:44 8   they steal $5,000, the bank covers that loss.  So it's

11:23:47 9   important for them not only to offer good customer service,

11:23:51 10  but to save themselves from paying for those fraud losses.

11:23:55 11  Q.      We've also heard a lot about authentication for call

11:24:00 12  centers and banks and financial institutions.  What is that,

11:24:03 13  and is that different from this spoof detecting?

11:24:07 14  A.      Authentication is kind of like the opposite.  So if

11:24:12 15  detecting spoof is identifying the call, caller-ID has been

11:24:17 16  manipulated or changed, authenticating a call is saying that

11:24:20 17  the caller-ID has not been changed.

11:24:24 18  Q.      Does VeriCall do both?

11:24:27 19  A.      Yes, VeriCall does both.

11:24:28 20  Q.      At a high level, the jury has been hearing about

11:24:31 21  these services.  What is VeriCall?

11:24:34 22  A.      VeriCall is a cloud-based software system.  We're

11:24:39 23  hosted on an internet server called AWS which is owned and

11:24:41 24  run by Amazon.  And we ingest data from the calling network

11:24:45 25  after the call has been answered by the call center, and we

have a proprietary algorithm that processes that information

to determine a risk score.  And we then send that risk score

back to the call center so that the IVR can then make a

determination as to what to do with that caller.  Do they

want to allow them to self serve and check their balance

without talking to an agent, or if they detect something

that's potentially risky, maybe they send them right to an

agent before they give them any information.

Q.     In simple terms, we're going to hear from experts

later in the trial, you testified a couple of times in

response to Mr. Tuminaro sort of where and when Next

Caller's customers use VeriCall.  Could you just explain

that timeline for the jury?

A.     Do you mean the timeline of the actual contact center

integration?

Q.     The timeline of the incoming call.

A.     Yes.  So the caller which would be you and/or me,

places a call into a 1-800 number.  The contact center

receives that call and the call goes off hook.  Once the

call goes off hook, the IVR, or other similar system, sends

us the data that our algorithm uses to process and we send

that back.  Once the IVR has that information, the IVR based

on whatever rules of business the customer chooses to make,

they can do one of any number of things with that caller.

They can ask them more security questions if it's

11:26:26 1  suspicious.  They can ask them fewer questions if it's not

11:26:29 2  suspicious.  And ultimately determine if that reaches an

11:26:34 3  agent or not an agent.

11:26:37 4  Q.    Let's talk about the timeline for Next Caller's

11:26:39 5  development of VeriCall.  When did you start?

11:26:43 6  A.    The first conversations about VeriCall started in

11:26:46 7  2014 with Matthew Williams.

11:26:50 8  Q.    And tell us a little bit about Matthew Williams.  Did

11:26:54 9  he have a software engineering background?

11:26:57 10  A.    Yes, he did.  Matthew had been a telecom engineer for

11:27:00 11  over twenty years.

11:27:04 12  Q.    And when you talked earlier about making this pivot

11:27:08 13  to VeriCall, what did you as the CEO need to do to support

11:27:14 14  that pivot?

11:27:15 15  A.    Yeah.  So the biggest role I played in supporting

11:27:18 16  this pivot was I guess twofold.  One, as CEO it was my job

11:27:24 17  to raise money and make sure that our team had the resources

11:27:28 18  it needed, whether it was money for software, for testing,

11:27:31 19  or money to hire employees to work our team.  And then my

11:27:35 20  second role was motivating, inspiring, helping them when

11:27:42 21  they needed help.

11:27:42 22  Q.    Mr. Williams led that team?

11:27:45 23  A.    Yes, he did.

11:27:46 24  Q.    And as part of that, did he become a permanent

11:27:51 25  employee?

11:27:51 1     A.      Yes, he was promoted to vice-president of

11:27:53 2 engineering.

11:27:56 3     Q.      And how big a team did Mr. Williams have?

11:27:59 4     A.      I'm sorry?

11:27:59 5     Q.      How big a team did Mr. Williams have?

11:28:02 6     A.      He built a team shortly thereafter of around eight to

11:28:06 7 ten engineers.

11:28:11 8     Q.      Approximately how long did Next Caller work on the

11:28:15 9 development of VeriCall?

11:28:17 10     A.      We developed VeriCall from 2014, and we're still

11:28:24 11 working on it today, but to a point where it became ready

11:28:29 12 for a customer, our first customer was in 2017.  So

11:28:33 13 approximately three years from the very beginning to being

11:28:36 14 used by a customer.

11:28:38 15     Q.      And roughly how much money has Next Caller invested

11:28:41 16 in the R & D, the development of VeriCall?

11:28:45 17     A.      We have spent over $5 million developing our tool.

11:28:49 18     Q.      As a startup did you just have that $5 million lying

11:28:52 19 around?

11:28:52 20     A.      No, we did not.

11:28:54 21     Q.      How did you fund that investment in VeriCall?

11:28:58 22     A.      We had to go to outside investors to raise capital.

11:29:03 23 In September of 2016, we raised approximately $5 million to

11:29:09 24 continue development.

11:29:14 25     Q.      Now, with all that work, did you apply for patents on

11:29:17 1  **VeriCall?**

11:29:18 2  A.      **No, we did not.**

11:29:19 3  Q.      **Why not?**

11:29:20 4  A.      **Like we talked about a moment ago, when you patent**

11:29:26 5  **technology, it becomes public information to anyone and**

11:29:31 6  **everyone, including potential identity thieves.  Like**

11:29:36 7  **Mr. Cox testified yesterday, that's one of the downsides.**

11:29:39 8  **And I agree.  We did not want any potential identity thieves**

11:29:44 9  **to know how we were providing security so we decided to keep**

11:29:48 10 **it a trade secret.**

11:29:49 11 Q.      **Mr. Tuminaro showed you a document where it said**

11:29:53 12 **something about Googling your competitor's patents.  Do you**

11:29:56 13 **recall that from a few moments ago?**

11:29:59 14 A.      **Yes, I do.**

11:29:59 15 Q.      **Who were you worried could Google patents?**

11:30:02 16 A.      **Anybody and everybody, but very specifically we**

11:30:04 17 **didn't want potential fraudsters or identity thieves to know**

11:30:09 18 **what we were doing.**

11:30:10 19 Q.      **Why would it be bad for potential fraudsters or**

11:30:14 20 **identity thieves to learn about how VeriCall works?**

11:30:19 21 A.      **If they know how the system works, it makes it easier**

11:30:22 22 **for them to figure out how to break into it.**

11:30:25 23 Q.      **Did you do anything at all to protect VeriCall?**

11:30:28 24 A.      **Yes, we did.**

11:30:29 25 Q.      **What was that?**

11:30:30 1    A.      We did get a trademark.

11:30:53 2    Q.      I think you said your first paying customer was 2017.

11:30:57 3    Who was that?

11:30:58 4    A.      That was Capital One.

11:30:59 5    Q.      When did Next Caller start working with Capital One?

11:31:04 6    A.      We first started working with Capital One in 2014.

11:31:09 7    Q.      So was that for VeriCall?

11:31:11 8    A.      No, it was not.  It was for our original Advanced

11:31:18 9    Caller-ID product.

11:31:19 10   Q.      How did that turn into conversation about VeriCall?

11:31:21 11   A.      Well, we were pitching this use case to them of

11:31:25 12   reducing their handle time and also offering a better

11:31:29 13   customer experience.  And they said well, this caller-ID

11:31:32 14   sounds interesting, but it doesn't really solve our problem.

11:31:36 15   What we need to do is know that we're talking to the person

11:31:39 16   we think we're talking to because we have to verify all of

11:31:43 17   that person's information anyway.

11:31:46 18   Q.      And did there come a time when you started talking to

11:31:50 19   Capital One specifically about VeriCall?

11:31:52 20   A.      Yes.

11:31:54 21   Q.      And when was that?

11:31:56 22   A.      I believe that was in 2015 for the first time.

11:32:01 23   Q.      If you could take a look in the new book I gave you

11:32:07 24   at DTX-78.

11:32:14 25   A.      It looks like the new book has just exhibit numbers.

11:32:18 1    Q.    I hope it's 78, then.

11:32:22 2    A.    It does not go up to 78.

11:32:26 3              MS. COLUMBIA:  Your Honor, may I just have a

11:32:28 4    second?

11:32:38 5              Your Honor, I apologize.  I think with all the

11:32:41 6    notebooks, I gave him the wrong book.  May I approach?

11:32:45 7              THE COURT:  Yes, you may.

11:32:46 8    BY MS. COLUMBIA:

11:32:47 9    Q.    I'll take that one back, Mr. Roncoroni, since you

11:32:50 10   seem to be getting a little buried.

11:32:55 11   A.    Did you say 78?

11:32:58 12   Q.    Yes.

11:33:07 13             Do you have that, sir?

11:33:08 14   A.    Yes, I do.

11:33:08 15   Q.    And do you recognize that document?

11:33:11 16   A.    Yes, I do.

11:33:12 17   Q.    Can you tell us what it is in general terms?

11:33:14 18   A.    Yes.  This is an e-mail from me to Jeff Kirchick, our

11:33:20 19   head of sales, and to Tara Hilton who was one of the

11:33:25 20   supplier managers for Capital One.

11:33:27 21             MS. COLUMBIA:  I move DTX-78 into evidence.

11:33:29 22             MR. TUMINARO:  No objection.

11:33:30 23             THE COURT:  It's admitted.

11:33:31 24             (DTX Exhibit No. 78 was admitted into evidence.)

11:33:33 25   BY MS. COLUMBIA:

11:33:35  1    Q.    Without reading the document, Mr. Roncoroni, what's

11:33:38  2    the significance of this e-mail from you to Tara Hilton at

11:33:43  3    Capital One?

11:33:43  4    A.    Well, the significance was at the highest level this

11:33:47  5    was our first big customer who reached out to us to try to

11:33:51  6    use our service, and it was very exciting for us.  This was

11:33:55  7    November of 2015.  And I'm answering some of the questions

11:33:59  8    that she had asked me before.  I'm talking about how our

11:34:03  9    system is hosted on Amazon.  It's a cloud-based solution.

11:34:09 10    And I'm also talking about the pilot and how we would

11:34:12 11    actually conduct the analysis and how they could look at our

11:34:16 12    results.

11:34:17 13    Q.    And Mr. Roncoroni, if you could turn in your book,

11:34:21 14    the same book to DTX-79, just the next document.

11:34:26 15    A.    Yes.

11:34:29 16    Q.    Do you recognize this document?

11:34:31 17    A.    Yes, I do.

11:34:33 18         MS. COLUMBIA:  I move admission of DTX-79, Your

11:34:36 19    Honor.

11:34:36 20         MR. TUMINARO:  No objection.

11:34:37 21         THE COURT:  It's admitted.

11:34:39 22         (DTX Exhibit No. 79 was admitted into evidence.)

11:34:40 23    BY MS. COLUMBIA:

11:34:42 24    Q.    And the second page is kind of first on this,

11:34:47 25    Mr. Roncoroni.  If we could look at the second page first.

11:34:55 1          Mr. Roncoroni, again, without reading the entire

11:34:58 2    document, can you explain to the jury the significance of

11:35:00 3    this e-mail from you to Capital One on January 22nd, 2016?

11:35:09 4    A.    Sure.  So what I am doing here is I am writing to the

11:35:15 5    buyers, the decision makers at Capital One and I'm putting

11:35:19 6    together a proposal for a pilot, which is basically a free

11:35:24 7    trial for the service, because as we've talked about before,

11:35:27 8    these are really sophisticated customers who need to try

11:35:32 9    something sometimes multiple times over millions and

11:35:36 10   millions of transactions before they feel comfortable

11:35:39 11   purchasing it.

11:35:39 12   Q.    Did Next Caller ultimately run a pilot for Capital

11:35:45 13   One in early 2016?

11:35:46 14   A.    Yes, we did.

11:35:48 15   Q.    And approximately how many calls did Capital One run

11:35:52 16   through that pilot?

11:35:53 17   A.    I think the first pilot had somewhere between 5 and

11:35:58 18   10 million calls.

11:35:59 19   Q.    And did you charge Capital One for that pilot?

11:36:02 20   A.    No, we did not.

11:36:02 21   Q.    And how did that first pilot go?

11:36:08 22   A.    Well, the pilot went well enough that they wanted to

11:36:12 23   continue further testing, but they were not ready to

11:36:14 24   purchase after the first pilot was complete.

11:36:22 25   Q.    And did you ultimately do a second pilot for Capital

11:36:27 1   One, or with Capital One?

11:36:28 2   A.      Yes, we did run a second pilot with Capital One.

11:36:31 3   Q.      And when was that?

11:36:33 4   A.      That was shortly after.  I believe that was the very

11:36:37 5   end of 2016 or early 2017.

11:36:41 6   Q.      And do you know whether in that second pilot Capital

11:36:46 7   One was also considering other alternatives, maybe using

11:36:50 8   something other than Next Caller's service?

11:36:52 9   A.      Yes, we were made aware of two things.  The first

11:36:55 10  thing we knew that they had built their own tool internally,

11:37:00 11  so we were competing one against the tool that they had

11:37:03 12  built and had been using for some period of time before that

11:37:06 13  and we were made aware at that time that they were also

11:37:09 14  piloting the TRUSTID technology.

11:37:13 15  Q.      And ultimately did Capital One select VeriCall?

11:37:18 16  A.      Yes, they did.

11:37:22 17  Q.      In this period of time from this e-mail in

11:37:27 18  February 2016 -- let me first ask you.  When did you first

11:37:32 19  receive your first dollar in revenue from Capital One for

11:37:35 20  VeriCall?

11:37:36 21  A.      They became a paying customer in April of 2017.

11:37:42 22  Q.      So more than a year after, almost a year-and-a-half

11:37:46 23  after that first e-mail from Tara Hilton?

11:37:49 24  A.      Yes, that's correct.

11:37:50 25  Q.      Over that time, did Capital One help Next Caller in

11:37:56 1  its development of VeriCall?

11:37:59 2  A.     Yes, they did.

11:38:00 3  Q.     Can you explain that?

11:38:01 4  A.     Yeah.  They helped us in two really big ways.  The

11:38:05 5  first way like I talked about a couple times before, we

11:38:09 6  believe that the best way to learn the tools to build and

11:38:13 7  what to do in the marketplace is to talk to your users.  You

11:38:17 8  may have assumptions in your own company, but it's good to

11:38:21 9  verify them with the customers who may actually be using it.

11:38:25 10  So they helped us build a tool that they knew they would

11:38:28 11  want, and we felt that was a really good way to do it

11:38:32 12  because if they wanted it, other companies would want it as

11:38:35 13  well.

11:38:35 14         They also helped let us know where we were

11:38:39 15  succeeding, so when we were providing these pilots, they

11:38:42 16  could tell us, yes, you've authenticated these calls and

11:38:47 17  they were proving to be authentic, so we could use this

11:38:51 18  process called machine learning to actually train the

11:38:54 19  algorithm to get better and better over time.

11:38:57 20  Q.     And you heard in the opening statement a statement

11:39:01 21  that you allowed Capital One to use your service for free

11:39:02 22  for a year.  Is that true?

11:39:02 23  A.     That's not true.

11:39:02 24  Q.     Can you explain?

11:39:02 25  A.     Yes.  So the way the pilot works is it is what's

11:39:15 1    called either proof of concept or a trial.  This would be

11:39:19 2    similar to getting ninety days to sleep on a mattress before

11:39:26 3    you have to buy it.  So we allowed them to use it because we

11:39:30 4    have full confidence in the tool that we're giving them and

11:39:34 5    because our costs of goods sold, which is an acronym COGS,

11:39:39 6    the actual amount of money it takes us to provide our

11:39:43 7    solution because of its unique methodology ███████████

11:39:46 8    ████████████████, so we could afford to give it to them for

11:39:51 9    this free testing period because we were confident that they

11:39:55 10   would buy it afterward.

11:39:56 11   Q.      And you mentioned the costs of goods sold and that

11:40:00 12   VeriCall has a low cost of goods sold.  Can you explain to

11:40:03 13   the jury why that is?

11:40:05 14   A.      Yeah.  So our method as I mentioned is a proprietary

11:40:09 15   algorithm.  So we own this end to end.  We don't have to buy

11:40:15 16   anything from anybody else.  We don't have to leverage

11:40:18 17   expensive external data sources or anything like that.  So

11:40:22 18   ████████████████████████████████████████████████████████

11:40:27 19   ████████████████████████████.  So we use that as a

11:40:31 20   negotiating tool with our customers.  ████████████████████

11:40:36 21   ██████████████████████████████████████████████████

11:40:40 22   ██████████████████████████████████.

11:40:43 23   Q.      How did signing Capital One help Next Caller with

11:40:46 24   additional business?

11:40:50 25   A.      It helped us build credibility in the marketplace.

11:40:53 1   Prior to Capital One, nobody was using the VeriCall tool, so

11:40:59 2   it made selling harder.  After closing Capital One, one of

11:41:04 3   the ten largest banks in U.S., other customers could look at

11:41:10 4   that reference and say well, if it's good enough for Capital

11:41:13 5   One, it's worth looking into this.  So Capital One agreed to

11:41:17 6   be a reference customer for us so when we had a potential

11:41:22 7   prospect like Comcast, our buyers and users at Capital One

11:41:25 8   would do reference calls and tell them about the good

11:41:29 9   experience they had using the tool and working with our

11:41:32 10  team.

11:41:33 11  Q.      Let's talk briefly about some of those early

11:41:36 12  customers.  One of them was BBVA?

11:41:39 13  A.      Yes, that's correct.

11:41:40 14  Q.      What is BBVA?

11:41:42 15  A.      BBVA is a bank, presence in Europe as well as the

11:41:47 16  southern United States, also known as BBVA Compass.

11:41:51 17  Q.      And when did you first begin talking to BBVA about

11:41:56 18  VeriCall?

11:41:57 19  A.      The first BBVA conversations were happening in 2015.

11:42:01 20  Q.      And did BBVA eventually become a customer of

11:42:05 21  VeriCall?

11:42:05 22  A.      Yes, they did.

11:42:06 23  Q.      When was that?

11:42:08 24  A.      They became a customer in 2017, after Capital One.

11:42:12 25  Q.      Did BBVA run the pilots or tests that you talked

11:42:19 1  about?

11:42:19 2  A.     Yes, they did.

11:42:20 3  Q.     And they did that before they decided to buy?

11:42:23 4  A.     Yes, they did that before they decided to buy.

11:42:26 5  Q.     Another customer we heard about was Dish Network?

11:42:29 6  A.     Yes, that's correct.

11:42:30 7  Q.     When did you first start talking with Dish Network?

11:42:33 8  A.     We first started talking to them similar to Capital

11:42:37 9  One back when we had our Advanced Caller-ID product, so

11:42:42 10 2014, 2015.

11:42:43 11 Q.     How about with respect to VeriCall?

11:42:45 12 A.     The first VeriCall conversations happened I believe

11:42:47 13 in 2015.

11:42:49 14 Q.     Did they eventually become a customer?

11:42:51 15 A.     Yes, they did.

11:42:52 16 Q.     And when was that?

11:42:54 17 A.     They became a customer in early 2018.  So after about

11:42:59 18 two years of testing.

11:43:02 19 Q.     I was going to ask, did you do the same sort of a

11:43:05 20 pilots and testing with Dish Network?

11:43:07 21 A.     Yes, we did.  We pilot tested millions of calls in

11:43:14 22 their call center.

11:43:14 23 Q.     Comcast, I suspect we all know what Comcast is.  When

11:43:18 24 did you first start talking to Comcast about VeriCall?

11:43:21 25 A.     Around the same time as Dish Network, the 2015 time

11:43:25 1   period.

11:43:25 2   Q.    When did you sign them on as a customer?

11:43:28 3   A.    They became a customer in 2018.

11:43:30 4   Q.    Did they run pilots and proof of concepts before

11:43:34 5   deciding to buy?

11:43:35 6   A.    Yes, they also tested millions of calls in our

11:43:39 7   environment before signing to buy.

11:43:41 8   Q.    Before we move on, who are the people inside these

11:43:45 9   banks and, you know, cable companies that are making the

11:43:50 10  decisions to purchase or not to purchase VeriCall?

11:43:54 11  A.    So the teams to make these decisions are generally

11:43:58 12  people who are in charge of managing the IVR, that's the

11:44:02 13  thing we have been talking about, effectively a computer

11:44:06 14  system that answers the phone for the call center.  And they

11:44:10 15  have sometimes specialized individuals who work with

11:44:13 16  customer experience like how do you make the IVR better for

11:44:16 17  consumers.  And then sometimes they have people who work

11:44:19 18  with IVRs and vendors to enhance security, enhance

11:44:25 19  efficiency, thing like that.

11:44:27 20  Q.    So they are specialized in this call center IVR

11:44:30 21  space?

11:44:30 22  A.    Yes, that's correct.  Their job exist entirely in the

11:44:35 23  IVR.

11:44:35 24  Q.    Not physically in the IVR?

11:44:37 25  A.    Not physically, no.

11:44:38  1    Q.      Is the IVR a physical thing?

11:44:40  2    A.      The IVR can be a physical thing.  It can use a

11:44:46  3    hardware system like we talked about.  But they can also be

11:44:49  4    cloud-based systems as well.

11:44:52  5    Q.      Now, talking about those customers, do you know,

11:46:32  6    Mr. Roncoroni, who makes the decision of sort of where and

11:46:32  7    when in the call process to use VeriCall?

11:46:32  8    A.      The customer makes all of the decisions about where

11:46:32  9    and when to use VeriCall.

11:46:32 10    Q.      And for your customers -- first of all, we talked

11:46:32 11    about four.  You have others; correct?

11:46:32 12    A.      Yes, we do.

11:46:32 13    Q.      So what is the total, approximately?

11:46:32 14    A.      We have about ten or eleven customers today.

11:46:32 15    Q.      And for those customers, where have those customers

11:46:32 16    determined to use VeriCall in their call processing for

11:46:32 17    their call centers?

11:46:32 18    A.      Every one of our customers uses our tool after the

11:46:32 19    incoming call has been answered by the call center.

11:46:32 20    Q.      When you say after the incoming call has been

11:46:32 21    answered by the call center, what do you mean by that?

11:46:32 22    A.      I mean that once the call is received by the call

11:46:32 23    center, it goes off hook and that's the time period where

11:46:32 24    the IVR is making decisions about what to do.  This is where

11:46:32 25    we as consumers interact with it.  Sometimes we might speak

11:46:33 1    our account number.  Sometimes we might enter a one-time

11:46:33 2    pass code or the last four digits of our Social Security

11:46:33 3    number.  And then the IVR might say do you want to talk to a

11:46:33 4    representative or do you want to check your balance and

11:46:33 5    based on what you enter, the IVR then decides to send you to

11:46:33 6    an agent or not send you to an agent at all.

11:46:34 7    Q.    And for the customers of VeriCall, those that use

11:46:37 8    VeriCall, I think you just said this, but they use VeriCall

11:46:41 9    after that incoming call has been answered by the call

11:46:44 10   center?

11:46:44 11   A.    Yes, every one of our customers uses VeriCall after

11:46:48 12   the incoming call has been answered by the call center.

11:46:58 13   Q.    And is that -- I think you -- so all that stuff that

11:47:02 14   you just described, that happens before I get transferred to

11:47:06 15   an agent?

11:47:07 16   A.    Yes, that's correct.  As we talked about a minute

11:47:10 17   ago, much of the value in our solution is helping that IVR

11:47:15 18   make decisions as to what to do to it, what to do to that

11:47:20 19   call and how to handle the customer, yes, it happens before

11:47:22 20   the agent interaction.

11:47:24 21   Q.    And indeed for your customers, are there calls that

11:47:28 22   never get to an agent?

11:47:30 23   A.    Yes, there are some calls that never reach an agent.

11:47:33 24   If it's what they would call a low risk transaction, like we

11:47:35 25   keep using the example the bank balance, if you're not

11:47:42 1   trying to change information or transfer money, you just

11:47:45 2   want to see how much money is in the account, they may

11:47:48 3   determine that is a low risk enough request that they'll let

11:47:52 4   you handle yourself in the IVR, but ultimately the business

11:47:57 5   determines everything they want to do.  They determine the

11:48:00 6   risk level of the call and whether or not they want to allow

11:48:03 7   that call to be contained in IVR or if they want to send it

11:48:09 8   to an agent.

11:48:10 9   Q.      You mentioned earlier a risk score.  What is that?

11:48:13 10  A.      So the risk score is the actual output of our system.

11:48:16 11  So we never tell the business what to do with a call.  We

11:48:20 12  just tell them based on our methodology and our algorithm

11:48:24 13  how risky that score is.  And our product provides a score

11:48:29 14  between, a numerical score between zero and 100.  Depending

11:48:35 15  on their risk tolerance, depending on what the caller wants

11:48:39 16  to do, they can make a choice, this is scored a zero, that

11:48:45 17  means low risk and they only want to check their balance.

11:48:48 18  They don't need to talk to an agent.  But if the score is

11:48:51 19  high, say a hundred, they may decide to do one of any number

11:48:55 20  of things.  They could immediately route that person to a

11:48:59 21  dedicated fraud representative.  They could decide to ask

11:49:02 22  them additional security questions.  We're all used to

11:49:05 23  getting one or two, but maybe they want to ask five or six

11:49:08 24  to make sure the person is who they really say they are.

11:49:14 25  Q.      Does Next Caller face competition when it goes to

11:49:20 1    sell VeriCall?

11:49:21 2    A.      Yes, we face a lot of competition.

11:49:24 3    Q.      Who do you compete with?

11:49:25 4    A.      Well, we compete with a lot of companies.  Like

11:49:28 5    Mr. Cox testified yesterday, sometimes when you're filling

11:49:31 6    out one of these RFP's, which stands for Request for

11:49:36 7    Proposal, that's sort of like the offer that the business

11:49:39 8    puts out to say we want to buy a solution to solve this

11:49:42 9    problem.  It can be up to twenty different companies who are

11:49:45 10   bidding for that same business.  Some of the companies, a

11:49:49 11   name that we've heard of today, companies like TRUSTID,

11:49:53 12   Neustar, Pindrop, we've had also heard about Payfone, we are

11:49:59 13   -- we're also competing with companies like Human Box,

11:50:05 14   Secure Logics, we're competing with a lot of the

11:50:07 15   knowledge-based authentication companies like the credit

11:50:10 16   bureaus, so they're really over a dozen, dozens of

11:50:14 17   competitors.

11:50:14 18   Q.      And you testified when you were talking about Capital

11:50:17 19   One, you also compete with just internally built systems?

11:50:20 20   A.      Yes, that's correct, sometimes they build their own

11:50:24 21   intelligent routing engines.  They doesn't always have

11:50:28 22   names.  I don't know what they would be called, but a lot of

11:50:32 23   companies build their own systems.

11:50:33 24   Q.      And you mentioned Payfone.  And I think Mr. Cox said

11:50:37 25   yesterday that Payfone was a partner of Next Caller.  Is

11:50:40 1   that true?

11:50:40 2   A.     No, that is not true.  We are not partners with

11:50:43 3   Payfone.

11:50:43 4   Q.     You also mentioned Pindrop.  Next Caller is today a

11:50:47 5   Pindrop company; correct?

11:50:49 6   A.     That's correct.

11:50:50 7   Q.     Are you -- is Next Caller still a separate operating

11:50:55 8   company?

11:50:55 9   A.     Yes, we are a separate operating company from

11:50:59 10   Pindrop.

11:50:59 11   Q.     And so you mentioned the other competitors.  Do you

11:51:04 12   still compete with Pindrop today?

11:51:05 13   A.     Yes, we still compete with them today.  Next Caller

11:51:09 14   offers its own products to the market.  And in a lot of

11:51:12 15   these RFP's, Pindrop is offering its products that compete

11:51:18 16   with us still.

11:51:27 17   Q.     Now, when you compete in this marketplace with all

11:51:31 18   these -- I don't know if you said TRUSTID in there.  I

11:51:33 19   assume TRUSTID is one of your competitors?

11:51:36 20   A.     Yes, they are.

11:51:37 21   Q.     And when you compete with all these competitors, what

11:51:42 22   do you emphasize?

11:51:42 23   A.     Could you be more specific with your question?

11:51:47 24   Q.     Sure.  When you compete, is price one of the things

11:51:50 25   you stress?

A.      Yes, price is generally one of the most important

factors for the customers to consider.

Q.      And why based on what you know about your competitors

is Next Caller able to offer lower pricing than several of

the competitors?

A.      My understanding about the way other competitors

provide their solutions is either with funky expensive

hardware that makes things expensive.  Sometimes they need

to purchase data in realtime to help provide their solution,

but that's not something that we have to do.  We own the

algorithm.  We developed this over the course of years.  We

ingest data that already exist in calling the network, so we

don't have to go to external sources to get anything, which

is to fill in the gaps for the rest of the answer to that

question, the way that we can respond in 200 milliseconds is

also an advantage for us because it makes the calling

experience for the consumer easier if you don't have to sit

on the phone quite as long.

Q.      Now, we've heard a little bit about IVR containment.

Is that one of the metrics customers use to think about the

performance of these authentication competitors?

A.      Yes, it is.

Q.      And if you can just remind the jury, what is IVR

containment?

A.      IVR containment is the percentage of callers who can

11:53:33 1  handle themselves in that computer system without ever

11:53:36 2  having to talk to an agent.

11:53:38 3  Q.      And on questioning from Mr. Tuminaro, you said that

11:53:42 4  some customers care about IVR containment.  Are there some

11:53:46 5  customers who care about it less?

11:53:48 6  A.      Yes.

11:53:49 7  Q.      Why is that?

11:53:50 8  A.      Well, there are some customers like Dish Network, for

11:53:54 9  example, who don't care about containment.  They pride

11:53:57 10 themselves on winning JD Power & Associates awards for

11:54:02 11 customer service, and all they care about -- not all they

11:54:05 12 care about, one of the big things they care about is giving

11:54:08 13 that wonderful white glove customer service so they don't

11:54:12 14 get upset and leave for a competitor, meaning a competing

11:54:18 15 cable company.

11:54:20 16 Q.      With IVR containment, is it purely a function of

11:54:26 17 VeriCall's performance, the measure of IVR containment?

11:54:30 18 A.      No, it is not.  It's actually entirely up to the

11:54:34 19 business to decide what they want to do.  Depending on where

11:54:40 20 they're actually using VeriCall, on what toll-free numbers

11:54:44 21 they're using it on, they decide what their risk tolerance

11:54:47 22 is for passing along a certain caller.  And at one point,

11:54:52 23 they could be containing five percent of calls.  They could

11:54:57 24 decide the next day they want to include a broader range of

11:55:01 25 risk scores into that containment.  So even within a

11:55:05 1   specific business, that number could change because we don't

11:55:08 2   tell them what calls to contain, we give them the

11:55:12 3   information on the risk profile.  They decide, hey, maybe

11:55:17 4   after six months of using the tool, they have more

11:55:20 5   confidence, maybe they want to increase the number of

11:55:24 6   callers who are allowed to serve themselves, but that's

11:55:27 7   entirely up to them.

11:55:29 8   Q.    I think on questioning from Mr. Tuminaro he showed

11:55:32 9   the jury several marketing materials where VeriCall shows

11:55:38 10  that it can attain ten percent improved IVR containment.  Do

11:55:43 11  you recall that?

11:55:43 12  A.    Yes, I do.

11:55:45 13  Q.    How did Next Caller get comfortable given what you

11:55:50 14  just testified to with representing that VeriCall could

11:55:56 15  attain ten percent increase IVR containment?

11:56:00 16  A.    Yes, we did a number of things.  First as I mentioned

11:56:03 17  when we started the business, we did as much research as we

11:56:06 18  could.  There are a lot of annually published books and

11:56:10 19  papers about call center metrics, and it sounds kind of

11:56:12 20  boring, it's even boring for me, but hundreds of pages

11:56:20 21  documents where businesses have interviewed and surveyed

11:56:24 22  thousands of different call centers to ask them every type

11:56:27 23  of question, size of your call center, what the average

11:56:31 24  agent talk time, what percentage of callers have to talk to

11:56:35 25  an agent, things like that.

1      The first thing we did was look at this industry

2  research and figure out based on the performance of our tool

3  what is a reasonable containment that a business could

4  achieve.  That was where we started our investigation.  And

5  then we also looked at the actual data that was provided to

6  us by our customers.

7  Q.      And any customers in particular?

8  A.      Yes.  We had two customers who reported to us the IVR

9  containment rate after using our tool.

10 Q.      And which customers were they?

11 A.      Dish Network as we talked about was a three percent

12 containment based on the way they were using the tool.  And

13 the other customer was Barclaycard which was a Barclays

14 Bank.  They saw a 25 percent containment based on the way

15 they anticipated using the tool.

16 Q.      And ultimately did Next Caller become comfortable

17 with that ten percent IVR containment representation?

18 A.      Yes, we did.

19 Q.      To your knowledge has any customer ever made a

20 decision to buy VeriCall based on that representation of ten

21 percent IVR containment?

22 A.      No.  No customer has made the decision to buy looking

23 at any of our materials.  Every customer has engaged in

24 lengthy proof of concepts where they're processing millions

25 of calls before making a decision to buy.

11:58:28 1    Q.      Now, Mr. Roncoroni, you were asked about some general

11:58:37 2    statements about knowing that TRUSTID had patents.  Do you

11:58:39 3    recall that?

11:58:39 4    A.      Yes, I do.

11:58:41 5    Q.      And at some point did you become aware that TRUSTID

11:58:44 6    had these particular patents that are being asserted here in

11:58:47 7    this courtroom?

11:58:48 8    A.      Yes, I did become aware.

11:58:50 9    Q.      How did you become aware of that?

11:58:51 10   A.      I became aware of that when I received a cease and

11:58:55 11   desist letter from TRUSTID.

11:58:58 12   Q.      What did you do when you received that cease and

11:59:01 13   desist letter?

11:59:02 14   A.      After receiving the cease and desist, took it very

11:59:05 15   seriously.  Immediately went out and contacted multiple

11:59:11 16   legal teams, investigated with our engineers and evaluated

11:59:18 17   how our tool was performing and then we became comfortable

11:59:23 18   within the company that we were not infringing.  We then

11:59:28 19   drafted a letter back to TRUSTID and we told them all of the

11:59:31 20   reasons why our technology was not infringing.

11:59:35 21           THE COURT:  Mr. Tuminaro, you were standing?

11:59:37 22           MR. TUMINARO:  I will wait for the next

11:59:39 23   question, Your Honor.

11:59:42 24   Q.      And sometime thereafter did TRUSTID file the lawsuit

11:59:45 25   that we're here for today?

A.      Yes, they filed the lawsuit just two or three weeks

after receiving our letter.

                MR. TUMINARO:  Objection, Your Honor.  Move to

strike the testimony given your order.

                THE COURT:  The testimony he just gave saying

you guys sued them, I think we all know that, don't we?

                MR. TUMINARO:  The testimony I heard was

something different, Your Honor.

                THE COURT:  I don't know what she asked -- you

stood while he was answering a question.  You said I'm going

to wait for the next question.  She asked a question about

when TRUSTID sued and now I don't have a clue what you're

asking to strike.

                MR. TUMINARO:  The last portion of his response.

                THE COURT:  He said yes, they filed the lawsuit

just two or three weeks after receiving our letter.  That's

what you want to strike?

                MR. TUMINARO:  Yes.

                THE COURT:  Overruled.

BY MS. COLUMBIA:

Q.      Mr. Roncoroni, I want to follow-up on some topics

that were covered in Mr. Tuminaro's questioning, if I could.

Could you turn to -- this will now be in Mr. Tuminaro's

binder.  Sorry about that.  Let me know when you got it.

And go to JTX-14.  Do you have that?

12:01:23 1    A.      Yes, I do.

12:01:24 2    Q.      Okay.  And this is admitted.  Thanks Mr. Rosenberg.

12:01:30 3            First, it says at the top Next Caller, of

12:01:33 4    course, and then FAQ's on the TRUSTID, Inc. v. Next Caller

12:01:39 5    litigation.  Do you see that?

12:01:40 6    A.      Yes, I do.

12:01:41 7    Q.      Is this a document that Next Caller prepared?

12:01:43 8    A.      Yes, it is.

12:01:44 9    Q.      And it's for Capital One?

12:01:45 10   A.      Yes, this is for Capital One.

12:01:47 11   Q.      And presumably it's some time after this lawsuit was

12:01:51 12   filed?

12:01:51 13   A.      Yes, that's correct.

12:01:52 14   Q.      So some time after January 2018?

12:01:55 15   A.      Yes, that's correct.

12:01:56 16   Q.      Capital One was an ongoing customer at that time?

12:02:00 17   A.      Capital One was a customer at that time, yes.

12:02:03 18   Q.      Why did Next Caller need to prepare a document for

12:02:07 19   Capital One responsive to frequently asked questions about

12:02:12 20   this litigation?

12:02:14 21   A.      Yeah, as the title of the document suggest, we were

12:02:18 22   getting questions all the time from prospects and existing

12:02:22 23   customers about the litigation.  The customers made us aware

12:02:26 24   that the TRUSTID teams had been talking about the lawsuit,

12:02:31 25   and we needed to address those questions head on.

12:02:41 1   Q.      And Capital One continued to do business with you;

12:02:44 2   correct?

12:02:45 3   A.      Yes, they did.

12:02:46 4   Q.      Are there other customers who have declined to do

12:02:50 5   business with you because of this lawsuit?

12:02:52 6   A.      Yes, there are a number of customers who have refused

12:02:55 7   to do business with us specifically because of this lawsuit.

12:03:07 8   Q.      Switching subjects a little bit, Mr. Roncoroni.  You

12:03:11 9   were asked by Mr. Tuminaro several questions with several

12:03:15 10  documents using different terminology for pre-answer,

12:03:20 11  pre-IVR, et cetera.  Do you recall that?

12:03:22 12  A.      Yes, I do.

12:03:24 13  Q.      And turn, if you would, in Mr. Tuminaro's book to

12:03:32 14  PTX-283.  Do you have that, sir?

12:03:44 15  A.      I do.

12:03:44 16  Q.      And if we could blow up the top, please,

12:03:55 17  Mr. Rosenberg.

12:03:55 18          So this is December 27th, from Mr. Kirchick to

12:04:02 19  Verizon.  Do you see that, Mr. Roncoroni?

12:04:04 20  A.      Yes, I do.

12:04:05 21  Q.      And Mr. Tuminaro pointed you to the third bullet.

12:04:09 22  Could you just read that for the jury?

12:04:11 23  A.      Yes.  "Less than 200-millisecond response time allows

12:04:16 24  for pre-IVR analysis to occur."

12:04:19 25  Q.      And could you explain again to the jury what that

means?

A.    Yes.  So the term here is pre-IVR analysis.  And pre-IVR analysis is a decision that the IVR makes before routing a call.  Our tool has the most value if it's used within the IVR before it ever goes to an agent.  So what we're talking about here is within 200 milliseconds of the call being answered by the contact center, we have already provided our analysis.  So before the consumer on the other end of the phone even hears a greeting, once the call has terminated, once the call has been answered by the call center, we have already provided our analysis.

Q.    So that 200 milliseconds is occurring after the incoming call has been answered?

A.    Yes, the 200 milliseconds is after the incoming call has been answered by the call center.

Q.    Then Mr. Tuminaro showed you other documents where it referred to pre-answer.  Has Next Caller ever had an implementation where VeriCall was used before the incoming call was answered by the call center?

A.    No, we have never implemented our solution before the incoming call has been answered, and none of our customers use it that way today.

Q.    And I think there was a suggestion that somehow you changed your language after this lawsuit.  Is there any truth to that?

12:05:56 1   A.      No, there is not.

12:06:17 2   Q.      If you could turn to another document Mr. Tuminaro

12:06:20 3   asked you to look at, PTX-341 in his binder.

12:06:33 4   A.      I'm there.

12:06:35 5   Q.      And just as a reminder, Mr. Roncoroni, this was the

12:06:40 6   attachment that we looked at earlier today of an e-mail from

12:06:42 7   you to the CEO of Pindrop.  Do you recall that?

12:06:46 8   A.      Yes, that's correct.

12:06:49 9   Q.      And when you tell the CEO of Pindrop that on the

12:06:55 10  second page, in the second bullet about VeriCall doing its

12:07:02 11  analysis within 200 milliseconds of a call reaching the IVR,

12:07:07 12  could you explain that?

12:07:08 13  A.      Yeah.  So this is a similar language where we're

12:07:12 14  saying that the call is reach -- has reached the IVR,

12:07:17 15  meaning the call has already been answered by the contact

12:07:19 16  center which is the point that we can start our analysis.

12:07:23 17  Q.      And then farther down we didn't look at this with

12:07:26 18  Mr. Tuminaro, there is a section called COGS.  Do you see

12:07:29 19  that?

12:07:31 20  A.      Which line is it?

12:07:33 21  Q.      I think Mr. Rosenberg is going to find it for us.

12:07:37 22  It's on the first page, Mr. Rosenberg.  COGS.

12:07:42 23  A.      Yes, I see it.

12:07:46 24  Q.      And we talked about this a little bit a few minutes

12:07:49 25  ago.  This is the cost of goods sold?

12:07:51 1    A.      Yes, that's correct.

12:07:52 2    Q.      What were you emphasizing for the CEO of Pindrop

12:07:56 3    about VeriCall's cost of goods sold?

12:07:59 4    A.      Yes.  So what we're talking about here is how

12:08:02 5    inexpensive it is for us to do what we do.  Maybe to make an

12:08:06 6    analogy since it's an acronym people might not know.  The

12:08:10 7    cost of goods if you're selling pickles, for example, it

12:08:13 8    might cost you a dollar to make a jar of pickles, but you

12:08:18 9    might sell it for 1.50 at the store.  But you still have

12:08:22 10   other costs to your business, warehouse, shipping, employees

12:08:27 11   to make them, things like that.  So what we're talking about

12:08:31 12   here is the actual costs of all of the material that goes

12:08:34 13   into one API response or one analysis, ███████████████

12:08:39 14   ████████████████████████████████████████████████████████

12:08:45 15   ████████████████████████████, which is why we're able to sell

12:08:49 16   it for such a low price and compete in the marketplace.

12:09:01 17   Q.      And if we could turn to another document you were

12:09:04 18   asked about by Mr. Tuminaro, PTX-344 in Mr. Tuminaro's book.

12:09:11 19   A.      Yep.

12:09:14 20   Q.      And this is an e-mail from you to your investors, but

12:09:20 21   sort of reporting on a conversation with the CEO of Pindrop?

12:09:24 22   A.      Yes, that's correct.

12:09:25 23   Q.      Before we get much farther, these documents are all

12:09:29 24   dated in 2018; correct?

12:09:30 25   A.      Yes, that's correct.

Roncoroni - cross

12:09:32 1    Q.      Did Pindrop acquire Next Caller in 2018?

12:09:35 2    A.      No, they did not.

12:09:36 3    Q.      That deal never happened?

12:09:38 4    A.      That deal never happened, no.

12:09:41 5    Q.      And we know that today Next Caller is a Pindrop

12:09:47 6    company.  When did Next Caller become a Pindrop company?

12:09:51 7    A.      We officially became acquired in March of 2021, so

12:09:55 8    this year.

12:09:57 9    Q.      So did any of the events that are talked about in

12:09:59 10   this e-mail ever happen?

12:10:04 11   A.      No, nothing came to fruition.  In fact, there was

12:10:07 12   another conversation with Pindrop even between these two and

12:10:11 13   then other parties who attempted to acquire us as well.

12:10:27 14   Q.      Mr. Roncoroni, I would like to talk a little bit --

12:10:30 15   we talk about the founding of Next Caller and some of your

12:10:34 16   early struggles.  I think you testified earlier that Next

12:10:41 17   Caller's investment in VeriCall is over $5 million; correct?

12:10:44 18   A.      Yes, that's correct.

12:10:46 19   Q.      And when did you first start earning revenue from

12:10:48 20   VeriCall?

12:10:49 21   A.      We first started earning revenue from VeriCall in

12:10:52 22   2017.

12:10:54 23   Q.      So your first full year of revenue from VeriCall was?

12:11:00 24   A.      2018 was our first full year of revenue.

12:11:02 25   Q.      What were your revenues in 2018?

12:11:05 1   A.         **Approximately $1.5 million.**

12:11:08 2   Q.         **And how about 2019 and 2020 for VeriCall?**

12:11:12 3   A.         **2019 was about 4.5 million, and 2020 was about**

12:11:17 4   **6.5 million.**

12:11:20 5   Q.         **And what, if any, profit has Next Caller made between**

12:11:26 6   **2017 and 2020 from its sales of VeriCall?**

12:11:29 7   A.         **We have never made a profit.**

12:11:32 8   Q.         **What's prevented you from making a profit on**

12:11:35 9   **VeriCall?**

12:11:36 10   A.         **Primarily the costs associated with lawsuits.**

12:11:43 11   Q.         **And that's mostly legal fees?**

12:11:45 12   A.         **Yes, that's correct, legal fees.**

12:11:47 13   Q.         **Do you know as CEO of Next Caller whether you would**

12:11:51 14   **be profitable today were it not for those legal fees?**

12:11:54 15   A.         **Yes, if it weren't for the legal fees associated with**

12:11:58 16   **our litigations we would have been profitable as early as**

12:12:02 17   **2019.**

12:12:03 18   Q.         **And instead of profits has Next Caller suffered**

12:12:08 19   **losses?**

12:12:08 20   A.         **Yes, we have.**

12:12:09 21   Q.         **And what have those losses been in 2018, '19 and '20?**

12:12:12 22   A.         **Between 2 and $3 million per year.**

12:12:12 23   Q.         **And other than just financial, the profitability, has**

12:12:25 24   **the fact of this lawsuit hurt Next Caller's ability to grow?**

12:12:30 25   A.         **Yes, it has.  There are a number of prospective**

12:12:34 1    customers out here who have decided that they're not ready

12:12:37 2    to work with us because of the lawsuit, and until it's

12:12:41 3    resolved.

12:12:43 4    Q.    So it sounds pretty bleak.  How have you stayed in

12:12:47 5    business?

12:12:48 6    A.    Well, we have stayed in business by raising money

12:12:51 7    from outside investors.  We've also taken loans from banks

12:12:54 8    to keep the lights on.

12:12:56 9    Q.    And at some point after two false starts, were you

12:13:01 10   acquired by Pindrop?

12:13:02 11   A.    Yes, on the third attempt we were acquired by

12:13:05 12   Pindrop.

12:13:07 13   Q.    And how is that going?

12:13:09 14   A.    It's going really well so far.

12:13:12 15   Q.    Now, you're a separate operating company from

12:13:17 16   Pindrop; correct?

12:13:18 17   A.    Yes, we are.  We're a separate operating company.

12:13:21 18   Q.    I may have already asked you this.  If I did, I

12:13:24 19   apologize.  Are you still competing with Pindrop in the

12:13:27 20   marketplace?

12:13:27 21   A.    Yes, we are still competing with Pindrop in the

12:13:30 22   marketplace.

12:13:31 23   Q.    Are you competing with them -- we heard that they

12:13:34 24   have a biometric, voice biometric product.  Is that the only

12:13:35 25   product you compete with?

12:13:40 1    A.      No, we compete with two other products that Pindrop

12:13:43 2    offers, one is known as Express and the other is known as

12:13:47 3    Passport.

12:13:48 4            MS. COLUMBIA:  Your Honor, may I just have a

12:13:50 5    moment to consult?

12:13:51 6            THE COURT:  You may.

12:13:55 7            MS. COLUMBIA:  I have nothing further on direct,

12:13:58 8    Your Honor.

12:13:59 9            THE COURT:  All right.  Redirect.

12:14:11 10                REDIRECT EXAMINATION

12:14:20 11   BY MR. TUMINARO:

12:14:41 12   Q.      Mr. Roncoroni, you mentioned during Ms. Columbia's

12:14:46 13   questioning that you said you anticipated Barclays would

12:14:53 14   have a 20 percent increase in IVR containment; is that

12:14:56 15   right?

12:14:56 16   A.      No, that's not my testimony.

12:14:58 17   Q.      Well, was a 20 percent IVR containment rate of

12:15:02 18   20 percent ever achieved by Barclays?

12:15:05 19   A.      I didn't say that.

12:15:07 20   Q.      My question is, was a 20 percent IVR containment rate

12:15:10 21   ever achieved by Barclays?

12:15:14 22   A.      Barclays never became a customer of ours.

12:15:16 23   Q.      You mentioned Payfone was not a partner?

12:15:22 24   A.      No, I did not say that either.

12:15:25 25   Q.      Well, you did access information from Payfone; is

12:15:31 1  that right?

12:15:31 2  A.      Could you be more specific with what you mean by

12:15:36 3  accessing information from Payfone?

12:15:38 4  Q.      You would buy information from Payfone to use in your

12:15:42 5  system?

12:15:42 6  A.      Which system are you talking about?

12:15:45 7  Q.      VeriCall.

12:15:45 8  A.      No, we did not.

12:15:46 9  Q.      Did you buy data from Payfone?

12:15:49 10 A.      We have purchased data from Payfone, yes.

12:15:52 11 Q.      And, in fact, Payfone gave you a million-and-a-half

12:15:56 12 dollars in advance payments for those services; right?

12:15:58 13 A.      No, that's not correct.

12:16:04 14 Q.      Payfone did give you a million-and-a-half dollars;

12:16:07 15 right?

12:16:07 16 A.      They did not give us the money, no.

12:16:10 17 Q.      You received one-and-a-half million dollars from

12:16:14 18 Payfone; right?

12:16:14 19 A.      We received one-and-a-half million dollars from

12:16:17 20 Payfone as a prepayment of services.

12:16:20 21 Q.      Okay.  Now, you mentioned in questioning with

12:16:22 22 Ms. Columbia that you didn't learn about these particular

12:16:32 23 patents until the lawsuit.  Is that right?

12:16:37 24 A.      I did say I learned about them when the lawsuit was

12:16:41 25 filed.  I may have had general awareness of them before, but

12:16:48 1    not the specific patents and how they were being used.

12:16:52 2    Q.      Well, you knew that TRUSTID had patents before this

12:16:56 3    lawsuit was filed; right?

12:16:58 4    A.      Yes.

12:16:58 5    Q.      Even as early as 2016; right?

12:17:01 6    A.      I did know that TRUSTID had patents, yes.

12:17:03 7    Q.      And the day that the patent -- TRUSTID's patent

12:17:06 8    issued, your team was aware of that; true?

12:17:10 9                THE COURT:  Can you be more specific?

12:17:12 10               MS. COLUMBIA:  Objection, Your Honor.

12:17:13 11               THE COURT:  Can you be more specific what

12:17:14 12   patent?  We're talking about three in this case.

12:17:18 13   Q.      Well, you were aware of the patents at issue in this

12:17:20 14   case by 2016, or at least the '532 and the '985 Patent, you

12:17:27 15   were aware of those patents by 2016; right?

12:17:29 16   A.      I don't recall.

12:17:31 17   Q.      You don't recall.  But you knew the patents that

12:17:34 18   TRUSTID's technology, its tool was patented; right?

12:17:38 19   A.      I did know that TRUSTID had patents, yes.  But I

12:17:42 20   don't recall the dates when I became familiar with their

12:17:42 21   patents.

12:17:42 22   Q.      Could we just put back up PTX-125.  It was admitted.

12:17:52 23   Can you just callout the e-mail, the date of your e-mail is

12:18:00 24   July 2016.  Is that right?

12:18:00 25   A.      Yes, that's correct.

12:18:07 1    Q.    And in the second bullet of your e-mail, you say --

12:18:13 2    can we callout the second bullet of Mr. Roncoroni's e-mail.

12:18:19 3            "Their tool is patented."

12:18:22 4            Do you see that?

12:18:22 5    A.    Yes, I see that.

12:18:24 6    Q.    So you knew by 2016 that TRUSTID's tool was patented;

12:18:29 7    right?

12:18:29 8    A.    Yes, I knew they had patents.

12:18:32 9    Q.    Okay.  And the '532 Patent that's at issue in this

12:18:35 10   case issued before 2016; right?

12:18:37 11   A.    I don't know.  Like I said before, I don't remember

12:18:40 12   which patents I became aware of and when.  But I do know

12:18:45 13   that at this point in time that they do have patents.

12:18:47 14   Q.    You could have been aware of the '532 Patent as of

12:18:51 15   the 2016 date, you just don't remember on the stand right

12:18:55 16   now?

12:18:56 17           MS. COLUMBIA:  Objection.

12:18:56 18           THE COURT:  Sustained.  Why don't you rephrase.

12:19:02 19   Q.    Do you know whether you were aware of these specific

12:19:05 20   patents?  You just don't know one way or the other, is that

12:19:08 21   your testimony?

12:19:08 22   A.    Could you ask a more direct question?

12:19:11 23   Q.    You knew their tool was patented in 2016; right?

12:19:14 24   A.    Yes, I knew they had patents.

12:19:17 25   Q.    Is it your testimony -- and the '532 Patent issued

12:19:20 1    before 2016; right?

12:19:22 2    A.      I don't know when I became aware of that patent, no.

12:19:25 3    Q.      My question was the '532 Patent issued before 2016;

12:19:30 4    right?

12:19:30 5    A.      I don't know offhand when that patent was issued, no.

12:19:33 6    Q.      Can we put up JTX-2.  Can you go to the second page,

12:19:44 7    and blow up the callout on the top right corner.  This is

12:19:50 8    the issue date of the five -- this is the '532 Patent.  Do

12:19:54 9    you see that?

12:19:54 10   A.      Yes, I see that.

12:19:56 11   Q.      It says the issue date is August 7, 2012?

12:19:59 12   A.      Yes, I see that, too.

12:20:01 13   Q.      That's before your e-mail in 2016; right?

12:20:03 14   A.      Yes, it is.

12:20:04 15   Q.      Can we pull up the '985 Patent, JTX-3.  Go to the

12:20:15 16   second page, please, Mr. Passey.

12:20:17 17           Again, the callout on the top right corner, this

12:20:19 18   is the '985 Patent; correct?

12:20:21 19   A.      Yes, it is.

12:20:22 20   Q.      And the issue date is April 7, 2015?

12:20:26 21   A.      Yes, it is.

12:20:27 22   Q.      Before your 2016 e-mail where you said that TRUSTID's

12:20:31 23   tool was patented; correct?

12:20:32 24   A.      Yes.  But Mr. Cox testified yesterday that he had

12:20:37 25   something like thirty-five patents.  It's hard for me to

12:20:40 1    know, impossible for me to know which ones are being used,

12:20:44 2    which ones we're aware of.

12:20:45 3    Q.      Fair to say your team was also monitoring TRUSTID's

12:20:49 4    patents; correct?

12:20:49 5    A.      Could you define what you mean by monitoring their

12:20:53 6    patents?

12:20:56 7    Q.      You looked at their patents, you had your team look

12:20:59 8    at TRUSTID's patents?

12:21:00 9    A.      No, I don't think I ever had my team look at their

12:21:03 10   patents.

12:21:09 11   Q.      Do you know whether members of your team were looking

12:21:11 12   at TRUSTID's patents?

12:21:14 13   A.      I do know that members of my team were aware of

12:21:17 14   TRUSTID's patents, yes.

12:21:18 15   Q.      And trying to learn from TRUSTID's patents?

12:21:20 16   A.      I do not know that anybody on my team has ever read

12:21:25 17   one of TRUSTID's patents.

12:21:27 18   Q.      Did you ever advocate for anyone on your team to look

12:21:32 19   at TRUSTID's patents?

12:21:34 20   A.      No, I don't think I did.

12:21:40 21   Q.      Can I direct your attention to PTX-398 in your

12:21:42 22   binder, not show it, just to refresh your recollection.

12:21:52 23   A.      Yes, I see the exhibit.

12:22:01 24   Q.      If you read that, does that refresh your recollection

12:22:02 25   about whether you ever instructed anyone on your team to

12:22:08 1 look more closely at TRUSTID's patents?

12:22:11 2 A.    No, there is no instruction in this document of me

12:22:14 3 telling anybody to do anything.

12:22:21 4 Q.    You certainly were aware of TRUSTID's patents by

12:22:26 5 2016; right?

12:22:27 6 A.    I was aware by 2016 that TRUSTID had patents, yes.

12:22:31 7 Q.    And you saw that the '985 and the '532 patents are

12:22:37 8 the two patents at issue in this case; right?

12:22:39 9 A.    Yes.

12:22:39 10 Q.    And those two patents issued before your 2016 e-mail;

12:22:43 11 correct?

12:22:43 12 A.    Which 2016 e-mail?

12:22:45 13 Q.    The PTX-125 that we just talked about.

12:22:49 14 A.    Okay.

12:22:50 15 Q.    Is that correct?

12:22:51 16 A.    Yes, those dates are before that e-mail, but there is

12:22:54 17 no reference as to which patents we were aware of.

12:23:01 18              MR. TUMINARO:  One moment, Your Honor.

12:23:12 19              Nothing further, Your Honor.

12:23:14 20              THE COURT:  Thank you.

12:23:15 21              MS. COLUMBIA:  Nothing further, Your Honor.

12:23:17 22              THE COURT:  All right.  Thank you.

12:23:18 23              Mr. Roncoroni, you're excused.

12:23:20 24              Why don't we take our lunch break now, about

12:23:25 25 forty-five minutes.  Come back around 1:10.

12:23:29  1          (Jury leaving the courtroom at 12:23 p.m.)

12:23:55  2        THE COURT:  Just one quick question before we go

12:24:03  3  to lunch.  I was looking at the verdict sheet and for the

12:24:07  4  validity defenses, I was going to -- and for infringement I

12:24:13  5  guess, I was going to conform it to my rulings on it -- you

12:24:18  6  can step down -- on the rulings on the motions in limine,

12:24:21  7  but I did have a question about what prior art defenses are

12:24:25  8  still there because the question just says did they prove

12:24:28  9  it's invalid over the prior art.  And I want to make sure I

12:24:32 10  know what I'm getting into in post-trial briefing by that.

12:24:36 11  So I don't know what -- how many, what the -- I don't know

12:24:40 12  if there is anticipation and obviousness that that's

12:24:44 13  supposed to cover.  I don't know if it's a hundred

12:24:47 14  obviousness contentions.

12:24:50 15        MR. BROOKS:  Your Honor, there would still be

12:24:51 16  anticipation and obviousness with respect to the '913.

12:24:55 17        THE COURT:  Why didn't you break that out in the

12:24:57 18  verdict sheet so that we actually know what jury is

12:25:04 19  deciding?

12:25:04 20        MS. COLUMBIA:  Are you asking by prior art

12:25:05 21  reference, Your Honor?

12:25:06 22        THE COURT:  No, I'm asking, you don't need to

12:25:09 23  say anticipation, have you proven by clear and convincing

12:25:12 24  evidence that it's invalid over the prior art.  Don't we

12:25:12 25  usually ask something more specific or in the post-trial

12:25:19 1  briefing do I have to go through and say if they say yes, I

12:25:24 2  have to figure out which one they want or if they say no, I

12:25:27 3  have to go through and say there was substantial evidence to

12:25:30 4  support it for every single defense.  Do you see my issue

12:25:33 5  there?

12:25:34 6          MS. COLUMBIA:  Could I suggest, Your Honor, we

12:25:36 7  take a look at that with that concern in mind and --

12:25:40 8          THE COURT:  Let me know what you propose so that

12:25:42 9  I can get you a sheet.  I don't think the way it's written

12:25:45 10 there is -- I mean, that's like saying did they prove

12:25:50 11 infringement, but we don't list any claims.

12:25:52 12         MS. COLUMBIA:  Understood.

12:25:53 13         THE COURT:  All right.  Let's take a break.

12:25:55 14 I'll see you at 1:10.

12:25:57 15         (A luncheon recess was taken.)

13:04:49 16         THE COURT:  Bring in the jury.

13:13:26 17         (Jury entering the courtroom at 1:13 p.m.)

13:13:39 18         THE COURT:  Okay.  Thank you.  Please be seated.

13:13:47 19 What's next?

13:13:49 20         MS. WELLS:  Next we're going to call

13:13:51 21 Mr. Kirchick by video deposition.

13:13:52 22         THE COURT:  Okay.

13:13:54 23         MS. WELLS:  For the video deposition, we have

13:13:56 24 worked with Next Caller's counsel and we have one video for

13:13:59 25 each witness, both sides' designations will be played and

13:14:03 1  parallel the plan was put up the exhibits that the witness

13:14:06 2  is discussing, do you have a preference on if we move those

13:14:09 3  exhibits in before the video begins or after?

13:14:11 4          THE COURT:  You can do it at the end.   Thanks.

13:14:14 5          MS. WELLS:  Okay.

13:14:15 6          THE COURT:  And if you just give us an idea so

13:14:19 7  the jury knows what to expect how long each deposition is

13:14:23 8  going to be when you introduce it.

13:14:26 9          MS. WELLS:  Absolutely.

13:14:28 10         Good afternoon.  I'm Deirdre Wells.  I'm here on

13:14:30 11 behalf of the plaintiff, TRUSTID.  First we will see a video

13:14:33 12 deposition from Mr. Kirchick who was the head of sales at

13:14:36 13 Next Caller at the time of the deposition.  This video is

13:14:39 14 approximately twenty minutes in length.

13:14:42 15         (Videotape deposition of Jeffrey Kirchick:)

13:14:49 16 Q.     So Capital One was Next Caller's first customer for

13:14:54 17 VeriCall; is that right?

13:14:55 18 A.     Yes.

13:15:02 19 Q.     But when Capital One first became a customer of

13:15:05 20 VeriCall, they weren't a paying customer; fair?

13:15:08 21 A.     They -- they did -- they did a pilot, so, yeah, I

13:15:12 22 guess that's fair.

13:15:18 23 Q.     Did they pay you for the pilot?

13:15:21 24 A.     No.

13:15:22 25 Q.     But you suggested payment for that pilot; right?

13:15:27 1  A.     Yes.

13:15:29 2  Q.     Have you heard the term "green-light" in the context

13:15:33 3  of VeriCall?

13:15:34 4  A.     Yes.

13:15:34 5  Q.     What does that mean?

13:15:35 6  A.     It means that we are asserting that a call is coming

13:15:39 7  from the physical device that owns the number.

13:15:42 8  Q.     You've heard of the term "red-lighting"?

13:15:46 9  A.     Yes.

13:15:46 10  Q.     What does that mean?

13:15:47 11  A.     Red lighting general -- well, in the context of our

13:15:52 12  product, or --

13:15:53 13  Q.     Yes.

13:15:55 14  A.     Red-lighting means that the call is definitively not

13:16:01 15  coming from the physical device that owns the number.

13:16:03 16  Q.     So in number two, under "ANI spoof detection," it

13:16:08 17  says that "the tool could be used to give a green-light to

13:16:14 18  authenticated customers as well as a red-light to suspicious

13:16:18 19  callers."

13:16:19 20         Do you see that?

13:16:20 21  A.     Yes.

13:16:21 22  Q.     VeriCall green lights a call by providing a risk

13:16:25 23  score or determining a risk score; is that fair?

13:16:30 24  A.     Yes.

13:16:31 25  Q.     You've been handed what has been marked as Exhibit 3

13:16:37 1   for identification purposes.  This is a string of e-mails.

13:16:40 2   It starts in the lower right-hand corner.  There's a Bates

13:16:43 3   number that's NXTCLRO 115736, and it ends in Bates number

13:16:51 4   740.  Do you see that?

13:16:55 5   A.      Yep.

13:16:56 6   Q.      And the top e-mail is an e-mail from Jeff Kirchick to

13:17:02 7   Ryan Cash.

13:17:04 8           Do you see that?

13:17:05 9   A.      Yes.

13:17:06 10  Q.      Would that Jeff Kirchick be you?

13:17:10 11  A.      Yes.

13:17:10 12  Q.      Next Caller tries to make its marketing truthful and

13:17:14 13  accurate?

13:17:14 14  A.      Yes.

13:17:15 15  Q.      And the top line reads -- this is what you wrote,

13:17:22 16  "One late addition - TRUSTID says IVR containment goes up 5

13:17:27 17  to 10 percent with their solution, so I'd like to jack that

13:17:30 18  stat up or make up a number like eight percent."

13:17:35 19          Do you see that?

13:17:36 20  A.      Yes.

13:17:36 21  Q.      What do you mean, "make up a number"?

13:17:40 22  A.      So we use industry research for, you know, marketing

13:17:43 23  purposes.  So we frequently used sources that are doing

13:17:46 24  industry research, people like Gartner, people like Pindrop,

13:17:52 25  people like TRUSTID, who have done analysis.  And we've

13:18:02 1  leveraged that information because it is out there for

13:18:06 2  public consumption, to help understand what value we can

13:18:11 3  drive for our customers.

13:18:14 4  Q.     So you use that information from those public sources

13:18:18 5  and where other research was done to make up a number with

13:18:24 6  respect to your own product?

13:18:26 7  A.     No.

13:18:26 8  Q.     Your e-mail says you want to make up a number like

13:18:30 9  eight percent; right?

13:18:30 10  A.     Yes.

13:18:30 11  Q.     What do you mean by make up a number like eight

13:18:34 12  percent?

13:18:34 13  A.     So with all of these statistics, we had a reasonable

13:18:37 14  starting point for what we believe were the right answers.

13:18:41 15  Q.     You've been handed what's been marked as Exhibit 6

13:18:44 16  for identification purposes.  This is an e-mail from Ian J.

13:18:48 17  Roncoroni to Gianni Martire, on July 11, 2016.  And there

13:18:57 18  are two people that are cc'd, Sam Espinosa and Jeff

13:19:04 19  Kirchick.

13:19:05 20          Do you see that?

13:19:06 21  A.     Yes.

13:19:07 22  Q.     So this e-mail is an internal e-mail between the

13:19:11 23  employees of Next Caller about whether to enter into a deal

13:19:12 24  with TRUSTID.  Fair?

13:19:12 25  A.     Yes.

13:19:21 1    Q.    Do you see the second bullet in the e-mail at the top

13:19:27 2    from Mr. Roncoroni?  It says, "Their tool is patented."

13:19:33 3            Do you see that?

13:19:34 4    A.    Yes.

13:19:36 5    Q.    That confirms that, at that time, all of the

13:19:40 6    employees at Next Caller understood that TRUSTID's solution

13:19:43 7    was patent protected?

13:19:45 8    A.    It indicates to me that the people who are on this

13:19:50 9    e-mail exchange are aware.

13:19:53 10    Q.    And Mr. Roncoroni goes on to say, "even if we

13:19:58 11    infringe one percent, we could be liable for that."

13:20:01 12            Do you see that?

13:20:02 13    A.    Yes.

13:20:02 14    Q.    You've been handed what's been marked as Exhibit 11

13:20:06 15    for identification purposes.  This is an e-mail string

13:20:09 16    between Jeff Kirchick and Tara Hilton at Capital One around

13:20:16 17    March 2017.  Do you see that?

13:20:18 18    A.    Yes.

13:20:19 19    Q.    And attached to your e-mail, if we go to Bates ending

13:20:22 20    in 116, there's that document that you said was either

13:20:28 21    prepared by Mr. Martire or Mr. Roncoroni describing Next

13:20:32 22    Caller's spoof detection functionality; fair?

13:20:38 23    A.    Yes.

13:20:40 24    Q.    If you read bullet two, it says "IVR real-time agent

13:20:45 25    notification."

13:20:49 1               Do you see that?

13:20:51 2  A.    Yes.

13:20:53 3  Q.    First bullet reads, "because your solution is

13:20:57 4  real-time, it can be used ahead of the call, before it is

13:21:00 5  answered, to make intelligent routing decisions."

13:21:04 6                Do you see that?

13:21:05 7  A.    Yes.

13:21:05 8  Q.    So that means Next Caller's spoof detection analysis

13:21:09 9  occurs before the call is answered; right?

13:21:13 10  A.    I think you've conveniently left out the next

13:21:16 11  sentence, which says, "training agent is costly, so our tool

13:21:20 12  allows you to route high-risk callers to a small dedicated

13:21:26 13  team," which implies to me that the intention of the first

13:21:29 14  sentence is to say that the -- the solution is deployed

13:21:33 15  ahead of the call answer at the agent level.  That context

13:21:39 16  is pretty clear to me.

13:21:41 17  Q.    If you look back on Exhibit 11, ending in Bates 116,

13:21:46 18  on the second to last bullet, it said, "To game our

13:21:51 19  competitor's system, you only have to Google their patent

13:21:55 20  and you'll learn exactly how they work."

13:22:00 21  A.    Yes, because assuming that the patents are being used

13:22:04 22  as part of the technology, it would stand to reason that

13:22:08 23  understanding the patent could help you to understand --

13:22:12 24  like could help a criminal to understand how to overcome the

13:22:15 25  technology.

13:22:15 1   Q.      Would it tell them exactly how it works?

13:22:18 2   A.      It would tell them, I would guess, a pretty good idea

13:22:23 3   of how it works.

13:22:24 4   Q.      I'll start with Exhibit 20.  This is the executive

13:22:28 5   summary that was attached to Mr. Roncoroni's November 9,

13:22:31 6   2016 e-mail; right?

13:22:33 7   A.      Yep.

13:22:35 8   Q.      And you're submitting them to BBVA in order to try to

13:22:43 9   win the account?

13:22:47 10  A.      Yep.

13:22:47 11  Q.      The third paragraph, first sentence, "The Next Caller

13:22:52 12  solution is considered a first line of defense since our

13:23:00 13  analysis occurs before the phone call is answered."

13:23:03 14          Do you see that?

13:23:04 15  A.      Yep.

13:23:04 16  Q.      That's a true statement; right?

13:23:06 17  A.      I believe -- yeah, I mean, the way that it was

13:23:10 18  intended, it was a true statement.

13:23:11 19  Q.      How is it intended?

13:23:14 20  A.      The way it is intended is that our analysis occurs

13:23:17 21  before the phone call is answered by a customer service

13:23:22 22  agent.

13:23:22 23  Q.      So the analysis from Next Caller is always performed

13:23:27 24  before the agent picks up; fair?

13:23:31 25  A.      Yeah.  That was the intention, yes.

13:23:34 1    Q.    And that's still the intention and how it works

13:23:38 2    today?

13:23:38 3    A.    Yes.

13:23:39 4    Q.    And if you look, Exhibit 28 actually includes, at the

13:23:44 5    bottom of the page ending in Bates 144, an e-mail from

13:23:50 6    Theresa Jones to you that's dated December 1, 2016.

13:23:57 7         Do you see that?

13:23:58 8    A.    Yes.

13:24:00 9    Q.    All right.  So in particular, Ms. Jones asks you that

13:24:06 10   "please describe in detail what differentiates your product

13:24:12 11   from other anti-spoofing products in the market."

13:24:16 12        Do you see that?  That's the first line.

13:24:20 13   A.    Yes.

13:24:22 14   Q.    And Exhibit 29 is the attachment that you included in

13:24:26 15   your e-mail to Ms. Jones on December 7, 2016; is that right?

13:24:38 16   A.    Yes.

13:24:50 17   Q.    I'll read it for the record.  "Of the vendors in the

13:24:54 18   industry, to our knowledge, only Next Caller and one other

13:24:58 19   vendor use metadata analysis."

13:25:00 20        Do you see that?

13:25:01 21   A.    Yes.

13:25:02 22   Q.    What other vendor do you have in mind?

13:25:12 23        (Pause.)

13:25:40 24   A.    Sounds like TRUSTID.

13:25:42 25   Q.    You and TRUSTID played in a two-player market; is

13:25:48 1    that fair?

13:25:49 2    A.    No.

13:25:55 3    Q.    Well, only you and TRUSTID, to your knowledge, were

13:25:58 4    vendors that provided services based on metadata analysis,

13:26:06 5    that's right?

13:26:08 6    A.    Realistically, based on what we, I think, now know

13:26:16 7    about, you know, how TRUSTID works, I don't think that it

13:26:19 8    would -- I think people in our industry would say that

13:26:27 9    TRUSTID is not a metadata solution and that there are -- and

13:26:34 10   there's other companies that are squarely competitive with

13:26:36 11   both Next Caller and TRUSTID.

13:26:38 12   Q.    At the time that you wrote this e-mail in 2016, you

13:26:44 13   believed that you, Next Caller, and TRUSTID were the only

13:26:47 14   vendors in the metadata analysis niche market; right?

13:26:53 15   A.    I believe that TRUSTID used signaling metadata like

13:26:58 16   Next Caller for its analysis.  And in retrospect, I believe

13:27:03 17   that that was -- I was wrong for believing that.

13:27:06 18   Q.    If you go back up to the top of the page that ends in

13:27:10 19   Bates 148, the second sentence in number 3 says, "Next

13:27:12 20   Caller's proprietary algorithm detects anomalies and these

13:27:24 21   data patterns and uses a simple API to flag suspicious and

13:27:30 22   verified callers before the call is answered."

13:27:33 23         Do you see that?

13:27:34 24   A.    Yes.

13:27:35 25   Q.    Is that a true statement?

13:27:37 1  A.     As I've mentioned before, our definition in this is

13:27:41 2  saying that before the call is answered by an agent.  So if

13:27:45 3  you go down to section A, bullet .1 -- I'll provide you some

13:27:52 4  additional context, which you've omitted -- "providing you

13:27:58 5  with a response in less than 300 milliseconds, which can be

13:28:02 6  used to make decisions in the IVR before the call is

13:28:05 7  answered."

13:28:06 8      Again, it's clear that Next Caller is saying

13:28:09 9  decision happens in the IVR before the call is answered by

13:28:12 10  an agent.  It would be impossible for it to mean anything

13:28:16 11  else.  If we're saying that the IVR is before the answer and

13:28:23 12  you're saying that we're somehow asserting that pre-answer

13:28:27 13  means something in front of the IVR, certainly you can see

13:28:32 14  how those two statements are incongruous.  VeriCall as it

13:28:41 15  exist today provides a score.

13:28:43 16  Q.     A score.  A response.  And that response is before

13:28:45 17  the call is answered, according to what -- what you've

13:28:49 18  written there; right?

13:28:51 19  A.     Yes.  Again, and I've stated this multiple times

13:28:55 20  where this has been the case, but I'll do it again.  We go

13:28:55 21  on to say, "Can be used to make decisions in the IVR before

13:29:02 22  the call is answered."  So your definition of call answer is

13:29:08 23  clearly, as it is written in front of both of us, something

13:29:12 24  before the agent level, but past the IVR.

13:29:17 25  Q.     If you turn to the next page of Exhibit 29 that ends

in Bates 149, there's a paragraph 3.  It says, "our pricing

is more favorable."

Do you see that?

A.    Yes.

Q.    You're talking about your pricing being more

favorable than TRUSTID's; is that right?

A.    Yes.

Q.    Exhibit 34 is documentation that informs customers

and potential customers about how they can integrate

VeriCall into their telephone systems; fair?

A.    I guess that's fair, yeah.

Q.    And in the middle of the page on the first page of

Exhibit 34, do you see that it says, "The API may be invoked

before or after the call is answered."

A.    Yes.

Q.    So, again, Next Caller is informing customers and

potential customers that VeriCall can be invoked before the

call is answered?

A.    Like I've said throughout this interview, you know,

answer just means to the -- at the agent level.  So in that

context, yes.

Q.    Before you entered into a deal with TRUSTID, you knew

that their product was patented; right?

A.    I knew that Pat Cox held several patents and that

some of those might be used in the -- as part of their

1   product.

2   Q.      In Exhibit 6, which you have in front of you,

3   Mr. Roncoroni says, "their tool is patented."

4           Do you see that?

5   A.      Yep.

6   Q.      So at least as of July 2016, you knew and the other

7   employees at Next Caller knew that TRUSTID's tool was

8   patented; right?

9   A.      Yes, I mean, the people on this e-mail string.  I

10  can't speak for like everybody else in the company, but it

11  stands to reason that, you know, the people on this string

12  would understand that patents are used as part of the

13  product.

14  Q.      At no point did Next Caller ever make any changes to

15  VeriCall's functionality in order to get around TRUSTID's

16  patents?

17  A.      I'm not sure.

18  Q.      In order to properly route or write business rules,

19  you intended these customers to get the results from

20  VeriCall before the call was answered?

21  A.      I've probably said this about a dozen times now, but

22  you can make a routing decision in the IVR before the call

23  is answered by a call center agent.  And so that was the

24  intention of, you know, what I meant by writing those

25  business rules and where the API would be invoked.

Q.    In fact, you explicitly told Capital One that Next Caller's solution could be used ahead of the call, before it is answered to make intelligent routing decisions; right?

A.    Yeah, I think that supports everything I've been saying.

Q.    You supposedly told BBVA that Next Caller's solution provides a response that can be used to make decisions in the IVR before the call is answered; right?

A.    Yes.

Q.    Page 986, the first sentence of the third paragraph, "The Next Caller solution is considered a first line of defense since our analysis occurs before the phone call is answered."

       Right?

A.    Yeah.  I mean, it goes on at the end of that paragraph to say, you know, "to route suspicious calls to agents."  So, again, I believe it's used in the context that we can be the first line of defense because it's before the call reaches an agent.  And we talked about voice biometrics, which is actually mentioned in the paragraph above, which would happen at the agent level.  So in the context of where this falls in this entire document, I think it's pretty clear what that means.

Q.    The words that you used to describe VeriCall to BBVA is that "the analysis occurs before the phone call is

13:34:19 1    answered."

13:34:22 2                Right?

13:34:23 3    A.      Yes.

13:34:25 4    Q.      You also provided documentation to Dish and Key Bank,

13:34:30 5    which we looked at in Exhibits 31, 32, and 34, that

13:34:34 6    explained how VeriCall can be invoked before the call is

13:34:37 7    answered; right?

13:34:39 8    A.      Yeah.  Again, with the context -- and in our

13:34:48 9    estimation, call answer being at the agent level.

13:34:51 10   Q.      And Next Caller also provided instructions to its

13:34:54 11   customers on how to integrate VeriCall into their telephone

13:34:58 12   systems?

13:34:59 13   A.      Generally, as a best practice, we let them know what

13:35:02 14   -- what's possible.  We don't tell them really how to -- you

13:35:06 15   know, we don't force customers really to do anything.

13:35:09 16   Q.      So you're instructing potential customers that

13:35:13 17   VeriCall can be invoked before the call is answered; right?

13:35:16 18   A.      Yeah.  And again, with the answer meaning at the

13:35:20 19   agent level.

13:35:21 20              (End of videotape.)

13:35:27 21              THE COURT:  Ms. Wells, we need you to give us

13:35:30 22   the breakdown before you play the stuff.

13:35:42 23              MS. WELLS:  We have three copies of the pretrial

13:35:45 24   order, but would you like them --

13:35:45 25              THE COURT:  No, I don't want the copies, I just

13:35:51 1   want you to tell us how to breakdown the time.

13:35:54 2              MS. WELLS:  Oh, just the time?  Okay.  For

13:36:05 3   Mr. Kirchick who we just heard from, TRUSTID's breakdown is

13:36:09 4   13 minutes 52 seconds, and Next Caller's portion is

13:36:12 5   6 minutes 26 seconds.

13:36:15 6              THE COURT:  Thank you.

13:36:24 7              MS. WELLS:  We move to enter the following

13:36:27 8   exhibits discussed during Mr. Kirchick's deposition into

13:36:30 9   evidence:  PTX-287, PTX-232, PTX-233, JTX-13, JTX-102,

13:36:47 10  PTX-209, PTX-210, PTX-255, and PTX-258.

13:37:02 11             THE COURT:  Any objections?

13:37:05 12             MS. COLUMBIA:  No objection, Your Honor.

13:37:06 13             THE COURT:  Okay.  They're admitted.

13:37:08 14              (The above-listed exhibits were admitted into

13:37:09 15  evidence.)

13:37:09 16             MS. WELLS:  The next witness who will be played

13:37:11 17  via video is Mr. Matthew Williams who at the time of his

13:37:16 18  deposition was the head of engineering at Next Caller.  His

13:37:20 19  deposition is about seventeen-and-a-half minutes in total.

13:37:24 20  TRUSTID's portion is 11 minutes, 42 seconds; and Next

13:37:27 21  Caller's portion is 5 minutes, 44 seconds.

13:37:33 22             THE COURT:  Thank you.

13:37:34 23              (Videotape deposition of Matthew Williams:)

13:37:42 24  Q.    Can you please state your full name and address for

13:37:45 25  the record?

A.    Matthew Williams, 17633 Federal Road, Hiltons,
Virginia.

Q.    You understand you're here under oath?

A.    Yes.

Q.    How long did you work at Next Caller?

A.    From January 2016.

Q.    Is Next Caller's spoof detection and VeriCall the
same product?

A.    I believe so.

Q.    So VeriCall is, in fact, capable of performing
pre-answer analysis; right?

A.    Yes, if it has the signaling.

Q.    Has the VeriCall product always been capable of
performing pre-answer analysis?

A.    It has the capability.

Q.    Do any of Next Caller's customers use VeriCall to
perform pre-answer analysis?

A.    Not to the best of my knowledge.

Q.    So I'd like to go back to your statements earlier
about Next Caller's VeriCall product being capable of
performing analysis pre-answer.

        Can you walk me through a scenario as to how a
customer would potentially implement Next Caller's API
pre-answer?

A.    I -- Next Caller doesn't instruct or -- customers to

13:39:00 1    use any particular integration method.  I would be purely

13:39:07 2    speculating as to how they might do that.

13:39:12 3    Q.    Do all of Next Caller's customers call the VeriCall

13:39:16 4    API and receive a result from the VeriCall API prior to any

13:39:20 5    of their agents answering the phone call?

13:39:24 6    A.    I think so.

13:39:25 7    Q.    In other words, the intent of the VeriCall API is for

13:39:29 8    it to be used prior to the agent answering the phone?

13:39:32 9    A.    Correct.

13:39:34 10   Q.    ANI is one of the fields that Next Caller's customers

13:39:40 11   sends to the VeriCall API; correct?

13:39:42 12   A.    We have an input called ANI.

13:39:45 13   Q.    So here's some example, SIP headers that are being

13:39:51 14   sent here, is that right, page 6?

13:39:53 15   A.    That's right.

13:39:54 16   Q.    Okay.  See the from field?

13:39:56 17   A.    Yes.

13:39:56 18   Q.    Does that contain an ANI?

13:39:59 19   A.    That's one possible source for the ANI.

13:40:06 20   Q.    Okay.  Is that field sent first in the request that's

13:40:10 21   on page 6?

13:40:12 22   A.    It's the first header.

13:40:14 23   Q.    Okay.  To get a risk score, your clients send certain

13:40:16 24   data to the API; right?

13:40:20 25   A.    That's correct.

13:40:23 1   Q.     Okay. And are there requirements by Next Caller as

13:40:28 2   to what data needs to be sent to its API?

13:40:35 3   A.     Yes.

13:40:38 4   Q.     Mr. Williams, do you recognize Exhibit 4?

13:40:43 5   A.     I've seen this document.

13:40:44 6   Q.     So Next Caller uses the ANI to perform a lookup in a

13:40:49 7   database maintained by a company called TNS to retrieve the

13:40:54 8   line type of the call?

13:40:56 9   A.     That's correct.

13:40:59 10   Q.     How does Next Caller use the charge and billing

13:41:02 11   number as part of its overall strategy to determine whether

13:41:06 12   an ANI is spoofed?

13:41:08 13   A.     At least one form of spoof call carries a distinct

13:41:14 14   billing number.

13:41:16 15   Q.     What form would that be?

13:41:18 16   A.     It's associated with the specific provider of

13:41:24 17   spoofing.

13:41:29 18   Q.     And who would that be?

13:41:31 19   A.     Bluff My Call.

13:41:37 20   Q.     Bluff?

13:41:38 21   A.     Bluff My Call.

13:41:40 22   Q.     Well named, I guess. All right.

13:41:43 23         So Next Caller can use the charge and billing

13:41:46 24   number to determine whether, for example, the call might

13:41:51 25   have originated from a Bluff My Call device and, if so, it

13:41:59 1  determines the call is spoofed?

13:42:02 2  A.    That's correct.

13:42:03 3  Q.    So Next Caller uses the originating switch field in

13:42:07 4  the VeriCall API as part of determining whether an ANI is

13:42:13 5  spoofed?

13:42:14 6  A.    That's correct.

13:42:17 7  Q.    How does the VeriCall API use the originating switch

13:42:22 8  field to determine whether an ANI is spoofed?

13:42:25 9  A.    It's an input to our models.

13:42:28 10  Q.    Which models are you referring to?

13:42:30 11  A.    The machine learning models that VeriCall uses.

13:42:35 12  Q.    You had to train the model; right?

13:42:37 13  A.    Correct.

13:42:38 14  Q.    And you trained the model with actual call data;

13:42:43 15  right?

13:42:43 16  A.    That's correct.

13:42:44 17  Q.    So the carrier DN model was created using a bunch of

13:42:49 18  call data that Next Caller obtained; correct?

13:42:54 19  A.    Correct.

13:42:55 20  Q.    And so the model of the carrier DN stores that call

13:42:59 21  data in some fashion; right?

13:43:02 22  A.    Yes.

13:43:02 23  Q.    Okay.  And isn't the goal of the carrier DN model to

13:43:09 24  figure out how switch, trunk, OLI and carrier are correlated

13:43:12 25  to each other so that it can then take future inputs and

13:43:17 1   figure out how those are correlated?

13:43:22 2   A.    Yes.

13:43:22 3   Q.    I'm not a machine learning expert so that's my basic

13:43:28 4   knowledge.

13:43:28 5        So, in other words, the model's figure out how

13:43:32 6   all those field relate to each other in some mathematical

13:43:35 7   fashion; right?

13:43:36 8   A.    Yes.

13:43:37 9   Q.    And then you can later give, as an input to the

13:43:41 10   model, a new switch and trunk and OLI and then it will tell

13:43:45 11   you how likely it is that all of those are related; right?

13:43:50 12   A.    Yes.

13:43:50 13   Q.    And then the reason why it creates those correlations

13:43:54 14   is so that it can later take as inputs a switch, trunk, OLI

13:44:00 15   from an SIP message that the VeriCall API receives; right?

13:44:06 16   A.    It also takes carrier DN.

13:44:09 17   Q.    And carrier DN.  And then what it does is it compares

13:44:14 18   how those are -- it compares -- sorry, -- it determines what

13:44:18 19   the likelihood is that all of those are correctly related

13:44:21 20   based on comparing it against the correlations that it

13:44:24 21   previously created in the model, fair?

13:44:26 22   A.    Yes, that's correct.

13:44:27 23   Q.    The risky ANI II rule, that's what we discussed

13:44:31 24   earlier today, is that right?

13:44:32 25   A.    The risky ANI II rule maps ANI II's to risk scores.

13:44:40 1    Q.    Right.  You have a list of something that you're

13:44:42 2    comparing against OLI; right?

13:44:44 3    A.    Correct.

13:44:45 4    Q.    What is that last?

13:44:46 5    A.    It's a list of ANI II.

13:44:49 6    Q.    ANI II; right?

13:44:51 7    A.    Correct.

13:44:52 8    Q.    So the list of ANI II, so the Next Caller -- strike.

13:44:57 9    Next Caller maintains a list of ANI IIs, which

13:45:01 10    indicate the device type, and compares that against the

13:45:05 11    received OLI to determine whether a call is potentially

13:45:09 12    fraudulent?

13:45:09 13    A.    Yes.

13:45:10 14    Q.    Prior to the lawsuit that TRUSTID filed, have you

13:45:13 15    ever seen any of TRUSTID's patents?

13:45:15 16    A.    I've seen them, yes.

13:45:18 17    Q.    Why?  What was the context?

13:45:21 18    A.    They were brought to my attention by the former CEO

13:45:33 19    of Next Caller.

13:45:34 20    Q.    And the former CEO of Next Caller, what was his name?

13:45:40 21    A.    Gianni Martire.

13:45:42 22    Q.    What did he tell you about the patents?

13:45:44 23    A.    He mentioned that they are their patents.  I don't

13:45:47 24    remember the details of the conversation.

13:45:48 25    Q.    Did he tell you to look at them?

A.    He asked me to look at them, yes.

Q.    And you looked at them?

A.    I chose not to read them.

Q.    So why did you choose not to read them?

A.    Because I was developing a product and did not want to be influenced by other's works.

Q.    After the lawsuit was filed, did you read the patents?

A.    Yes.

Q.    Okay.  And the patents that were in the lawsuit; right?

A.    The ones mentioned, yes.

Q.    Okay.  Did Next Caller make any changes to the VeriCall product because of anything it read in those patents?

A.    Not that I recall.

Q.    So as I understand it, when the API is invoked by one of Next Caller's customers -- and "the API" being the VeriCall API -- the first thing that happens is the data that's sent as part of that request is parsed by a component known as a loader; is that right?

A.    Yes.

Q.    Okay.  And then after that, there's a component that runs called preprocessor; correct?

A.    Yes, that's correct.

Q.      And the preprocessor component is what's responsible for querying the TNS database that we talked about earlier; correct?

A.      Yes.

Q.      All right.  Loader runs first.  It extracts from the API requests all the data into a call data object; correct?

A.      Not all the data.

Q.      All the relevant data from the SIP message goes into the call data; correct?

A.      The data relevant to what?

Q.      That VeriCall is going to be using.

A.      Yes.

Q.      Then there's this phone data object.  And that's created through the preprocessor by searching those databases we discussed; correct?

A.      Yes.

Q.      Fundamentally, between versions one, versions two, and version three, of the VeriCall product, is the analysis that VeriCall performs the same between those versions to determine whether an ANI is spoofed?

A.      Fundamentally it's looking at the same type of data and producing the same type of output.

Q.      Going back to the customers.  So you mentioned Comcast.  Did you have any discussions with Comcast regarding their architecture of the VeriCall product?

A.       Yes.

Q.       And can you tell me what those discussions were?

A.       Regarding enabling additional parameters, for
example.

Q.       When you say "additional parameters," what does that
mean?

A.       Ensuring that parameters such as JIP and OLI, the
parameters that we operate on, are available.

Q.       So is that similar to the conversations you had with
Dish, that they needed to enable certain fields in their SIP
header?

A.       Similar, yes.

Q.       So, in other words, with both Dish and Comcast, you
helped them through the process of implementing the VeriCall
solution into their systems; right?

A.       We helped them get -- well, we had discussions with
them regarding enabling -- or passing to us additional
information.

Q.       And you provided them with guidance on how to do
that; right?

A.       With what?

Q.       You provided them with guidance on how to implement
VeriCall in their systems; right?

A.       To that extent, yes.

Q.       Okay.  Capital One -- did you provide guidance to

Capital One prior to them going live with your product as to how to implement VeriCall in their systems?

A.     Prior to going live, we may have.  It was a long time ago.

Q.     And after going live with Capital One, did you provide guidance to them on how to use VeriCall with their system?

A.     You're speaking to architectural design of their system?

Q.     I'm just asking you whether you provided guidance as to how they would implement the VeriCall system with their system?

A.     To my knowledge, no changes have been made since they went live.

Q.     So they've had no issues at all that you've had to get involved with, with Capital One?

A.     Other than a couple of occasions of system performance issues, but in terms of how they integrate with us, as best I recall, there's been no changes.

Q.     So you provided support to Capital One after they went live with the VeriCall product?

A.     Yes.

Q.     And that support might be, for example, tweaking the system performance?

A.     On our side.

13:50:53 1    Q.      BBVA.  Did you provide any guidance to BBVA prior to

13:50:57 2    them going live with your product as to how to implement

13:51:05 3    VeriCall in their system?

13:51:07 4    A.      We had some conversations, yes.

13:51:09 5    Q.      What did those conversations involve?

13:51:13 6    A.      I believe they're Cisco, also, and there was some

13:51:18 7    brainstorming about how to get the parameters to us.

13:51:21 8    Q.      So is it safe to assume that for all of Next Caller's

13:51:25 9    customers, you provided guidance prior to them going live as

13:51:28 10   to how to implement VeriCall in their systems?

13:51:32 11   A.      To the extent needed to get the parameters to our

13:51:36 12   API, yes.

13:51:36 13   Q.      So it is safe to assume that for all of Next Caller's

13:51:40 14   customers that you currently have, you provided guidance

13:51:42 15   prior to them going live as to how to implement VeriCall in

13:51:47 16   their systems; correct?

13:51:48 17   A.      We provided guidance on -- we worked with our

13:51:51 18   customers to ensure we were receiving the parameters needed.

13:52:05 19   Q.      Is it safe to assume that, for the VeriCall product,

13:52:09 20   Next Caller provides support after the customers go live?

13:52:14 21   A.      Yes.

13:52:14 22   Q.      Is the score call function a function where a

13:52:18 23   customer sends SIP invite information to the Next Caller API

13:52:24 24   and receives a score back immediately?

13:52:26 25   A.      That's correct.

Q.    There's another rule right after that, at line 31, in the Common.PY, called "recent port."  Do you see that?

A.    Yes.

Q.    What does that rule do?

A.    That applies a penalty to recently ported calls -- or numbers, I'm sorry.

Q.    And how do you determine whether a number has been recently ported?

A.    That information is returned from a third party.

Q.    Which third party?

A.    TNS.

Q.    And then after that, the next rule is a ruled called "charge number," at line 85.  Do you see that?

A.    Yes.

Q.    What does the charge number rule do?

A.    It applies a penalty for specific charge numbers.

Q.    And those charge numbers are defined in the corresponding JSON file?

A.    That's correct.

Q.    Can you give me an example of what it would do?  Is this the Bluff My Call thing?

A.    Online it gives that as an example.

Q.    I'd like you to turn to page 5 of this document, which is alternatively stamped with 26013.  Do you see the section called "our results"?

A.      Yes.

Q.      And it also says that VeriCall has up to ten percent more IVR containment; correct?

A.      Yes.

Q.      And the engineering team never verified whether VeriCall has up to ten percent more IVR containment; correct?

A.      I'm not aware of such a request.

Q.      I also take that to mean that no one ever asked the engineering team to verify whether VeriCall has up to ten percent more IVR containment; correct?

A.      I think I just said that, but that's correct.

Q.      Do you know at all how these numbers were determined as a result of VeriCall?

A.      I was not involved in the preparation of this document.

Q.      I understand you weren't involved in the preparation of this document, but I'm -- I just want to talk about these numbers because I will represent to you they're used in a lot of Next Caller's documentation.

        So just to be clear, you don't know at all how these numbers that are on page 5 of Exhibit 12 were verified; right?

A.      You would need to get that information from marketing.

13:55:05 1  Q.    So the marketing department at Next Caller would know

13:55:09 2  how, or if, the results listed on page 5 of Exhibit 12 were

13:55:14 3  verified; correct?

13:55:15 4  A.    Yes.

13:55:16 5              (End of videotape deposition.)

13:55:22 6              MS. WELLS:  We move the following exhibits into

13:55:26 7  evidence that were used with Mr. Matt Williams:  JTX-59,

13:55:33 8  JTX-67, and PTX-11.

13:55:37 9              THE COURT:  Any objection?

13:55:39 10             MS. COLUMBIA:  No objection, Your Honor.

13:55:40 11             THE COURT:  All right.  They're admitted.

13:55:42 12             (The above listed exhibits were admitted into

13:55:44 13 evidence.)

13:55:44 14             MS. WELLS:  We will now hear from Mr. Burgess

13:55:47 15 who testified on behalf of Capital One.  He is a manager in

13:55:51 16 Capital One's Enterprise Supplier Management Team.  His

13:55:55 17 total video is about 24 minutes.  The amount of time for

13:56:00 18 TRUSTID is 8 minutes, 26 seconds, and for Next Caller, it's

13:56:06 19 15 minutes, 36 seconds.

13:56:08 20             (Videotape deposition of Austin Gregory

13:56:12 21 Burgess:)

13:56:12 22 Q.    Would you please state your full name for the record?

13:56:19 23 A.    Sure.  Austin Gregory Burgess.

13:56:22 24 Q.    So what's your current role?

13:56:24 25 A.    Current role, I am a third-party manager within our

Enterprise Supplier Management Team.

Q.    Capital One began using Next Caller's services around 2016; is that right?

A.    I believe the pilot began in 2016, yes.

Q.    So the IVR -- Capital One's IVR is that hosted by a third party?

A.    Yes.

Q.    Which third party?

A.    [24]7.AI.

Q.    And before -- from the carrier Verizon, before the call gets to the IVR, does it go through something called an SBC, or a session boarder controller?

A.    Yes.  Yes.  So we identify all of our toll free numbers that we own, segment them by line of business.  We provide that information to our vendor, [24]7, who will then catalog all of those, inventory those, and make sure that any incoming calls coming in on one of those toll free numbers are routed appropriately.

Q.    So when you said we provided all of that information to our vendor, [24]7, when you refer to that information, was it DNIS?  Was it something in addition to the DNIS?  What was that information that you're referring to?

A.    The DNIS, or the toll free number, one in the same.

Q.    So I guess we talked about how -- what happens with the call when it comes in, the DNIS is used to route the

13:58:15 1    call to the various IVR experiences.  After the IVR

13:58:18 2    experience, if the caller wants to -- how does the -- what

13:58:22 3    does the call do then after the IVR?  What are the options?

13:58:27 4    A.       After the IVR, or in the IVR?

13:58:30 5    Q.       In the IVR?

13:58:31 6    A.       In the IVR, the caller is going to be given the

13:58:36 7    opportunity to service certain things on their account, get

13:58:41 8    certain information.  In order to do so, they'll need to

13:58:45 9    authenticate, identify themselves using certain criteria.

13:58:50 10   If they're successful in doing that, they'll be able to

13:58:53 11   perform certain functions within the IVR.  Those that

13:58:56 12   they're unable to perform, they'll then be given the option

13:59:00 13   to transfer out to an agent for that service.

13:59:03 14   Q.       Okay.  So if I'm understanding correctly, then, you

13:59:06 15   would get this score from Next Caller before you would make

13:59:08 16   a determination whether to do the two-piece authentication

13:59:12 17   or just one-piece authentication, is that fair?

13:59:16 18   A.       For those calls that are eligible for Next Caller

13:59:19 19   treatment, that's accurate.

13:59:21 20   Q.       Okay.  As I understand it, though ultimately Capital

13:59:27 21   One will get a score from Next Caller before an agent will

13:59:31 22   answer any call; right?

13:59:41 23   A.       Correct.

13:59:42 24   Q.       What information does Capital One provide to Next

13:59:52 25   Caller in order to get the score from Next Caller?

14:00:00 1    A.    The information that's passed to Next Caller is going

14:00:05 2    to be largely what is received in the SIP invite from the

14:00:12 3    carrier.

14:00:14 4    Q.    Are there any particular pieces of information from

14:00:20 5    that SIP invite that Capital One sends to Next Caller?

14:00:25 6    A.    We send everything we receive from the carrier.  We

14:00:29 7    do not parse it out.  So anything we get from the carrier is

14:00:34 8    packaged up by [24]7 and sent to Next Caller.

14:00:39 9    Q.    So one of the things in the SIP invite would be the

14:00:45 10   ANI, ANI, is that true?

14:00:48 11   A.    Correct, yes.

14:00:49 12   Q.    Yeah.  Did Next Caller provide any sort of assistance

14:00:54 13   in integrating VeriCall into Capital One's systems?

14:00:57 14   A.    I don't have direct knowledge as to the level of

14:00:59 15   integration assistance.  I can say that generally when we

14:01:02 16   work with a third-party technology vendor, there going to be

14:01:06 17   input from the partner as well as potentially other third

14:01:09 18   parties, and obviously Capital One engineers to figure out

14:01:12 19   the best way to integrate a solution.

14:01:14 20   Q.    What component in Capital One's system makes that

14:01:17 21   call to -- that API call?

14:01:20 22   A.    It's actually the [24]7 application that makes the

14:01:25 23   API call on our behalf.

14:01:28 24   Q.    This -- so that would be in the IVR, is that where,

14:01:32 25   or is it in the SBC?

14:01:34 1    A.    It would be in the IVR.

14:01:36 2    Q.    Was there any particular impetus or something that

14:01:40 3    happened that caused Capital One to try to want to rethink

14:01:43 4    their authentication solution?

14:01:46 5    A.    Yes.

14:01:50 6    Q.    What was that?

14:01:52 7    A.    I believe the basis, at least as far as bank was

14:01:57 8    concerned, was their increase in spoofed calls and

14:02:00 9    subsequent fraud associated with those types of interactions

14:02:07 10   that led us to look at solutions outside of things that

14:02:11 11   we've developed internally to --

14:02:18 12   Q.    Was there --

14:02:19 13   A.    -- perform that function.

14:02:21 14   Q.    Was there any particular feature or functionality

14:02:24 15   that you were looking for in those outside solutions?

14:02:26 16   A.    Yes.

14:02:27 17   Q.    What was that?

14:02:28 18   A.    We were looking for a service that closed the gap and

14:02:31 19   performed where our homegrown ANI spoofing technology had

14:02:37 20   begun to fail.

14:02:38 21   Q.    Did you want a solution that could provide

14:02:42 22   information before the call was ultimately answered by an

14:02:46 23   agent?

14:02:47 24   A.    Yes, that was the intent.

14:02:50 25   Q.    I'm going to hand you what has been marked as

Exhibit 3. This is an e-mail from Tara Hilton to a number of individuals inside of Capital One it appears, and it's an e-mail dated February 2016. Do you see that?

A.    I do.

Q.    And just for the record, it's Bates Capital 1000022 to 000023. Do you see that?

A.    I do.

Q.    Who is Tara Hilton?

A.    Tara Hilton is a third-party manager within the Enterprise Supplier Management Team.

Q.    Is she still at Capital One?

A.    Yes, she is.

Q.    And the e-mail that Ms. Hilton sent to the other individuals refers to a few vendors that Capital One was considering. Is that fair?

A.    It appears to be, yes.

Q.    So Capital One was considering TRUSTID, Next Caller, and Pindrop?

A.    Yes.

Q.    For Pindrop, listed number three, it says, "I haven't submitted an intake on this yet as I was waiting," and then it goes on. Do you see that?

A.    I do.

Q.    Do you know whether Capital One actually ever did any sort of intake or pilot within Pindrop?

14:04:22 1    A.        I do.

14:04:23 2    Q.        Did they?

14:04:24 3    A.        We did not.

14:04:25 4    Q.        You did not.

14:04:26 5              Do you know why you did not?

14:04:29 6    A.        As far as specific -- specific reasons behind Pindrop

14:04:35 7    was not pursued, I do not have that information.

14:04:40 8    Q.        Okay.  But you did go forward with a pilot on both

14:04:43 9    TRUSTID and Next Caller; is that true?

14:04:46 10   A.        That's correct.

14:04:47 11   Q.        Well, ultimately TRUSTID and Next Caller's solution

14:04:51 12   will provide a result before the agent answers the phone;

14:04:54 13   right?

14:04:55 14   A.        Correct, yes.

14:04:56 15   Q.        You've been handed what's been marked as Exhibit 4

14:05:00 16   for identification purposes.  This is a document with Bates

14:05:03 17   Capital 1000116 to Capital 1000117.  Do you see that?

14:05:11 18   A.        I do.

14:05:14 19   Q.        Do you have an understanding as to what this document

14:05:16 20   is?

14:05:19 21   A.        I do.

14:05:22 22   Q.        And what's your understanding?

14:05:26 23   A.        This appears to be an overview provided to Capital

14:05:30 24   One by Next Caller.  It basically outlines how an

14:05:32 25   integration may occur, what services their service provides

14:05:38 1    to us, et cetera.

14:05:43 2    Q.    Do you know whether this document that Next Caller

14:05:45 3    provided to Capital One was provided before there was any

14:05:49 4    pilot of Next Caller's product at Capital One?

14:05:52 5    A.    I would -- I would need to confirm that.  I don't

14:05:58 6    know for certain the date that this was provided.

14:06:02 7    Q.    How would you confirm that?

14:06:05 8    A.    I don't see a date on here, so I would need to

14:06:09 9    determine to which e-mail this was attached to back into.

14:06:14 10   Q.    And looking at Capital One's production, it was

14:06:21 11   difficult to tell which e-mail this was attached to.

14:06:25 12   A.    My -- my guess is that this would be pre-pilot since

14:06:30 13   it's a very general overview of how they would perform their

14:06:35 14   service.  But, again, that would be speculation.

14:06:38 15   Q.    Number two, it says "IVR/real time agent not

14:06:42 16   indication."  Do you see that?

14:06:43 17   A.    Yes.

14:06:43 18   Q.    The bullet right below that says, "Because our

14:06:47 19   solution is real-time, it can be used ahead of the call,

14:06:50 20   before it is answered, to make intelligent routing

14:06:54 21   decisions."

14:06:54 22         Do you see that?

14:06:55 23   A.    I do.

14:06:56 24   Q.    Was that an important capability for Capital One that

14:06:59 25   the result would be provided ahead of the call before it is

14:07:02 1   answered?

14:07:03 2   A.    I think -- I think the capability would be important

14:07:10 3   insofar as we would want to receive a read early on in the

14:07:15 4   interaction before we get to our authentication process

14:07:18 5   within the IVR.

14:07:19 6            I think the use of things -- phrases like

14:07:22 7   answered can be a little bit vague in these scenarios

14:07:25 8   because we don't know whether we're referring to an answer

14:07:28 9   by an agent, an answer by an IVR, so it's tough to determine

14:07:31 10  what the intent was here.

14:07:32 11  Q.    We talked earlier about SIP invite?

14:07:36 12  A.    Yep.

14:07:36 13  Q.    I would like to go back to that.  You mentioned --

14:07:39 14  what's your understanding of what the SIP invite does?

14:07:44 15  A.    The SIP invite from the carrier is basically what is

14:07:49 16  initiating a handshake, for lack of a better term, between

14:07:53 17  the carrier and our IVR.  And is basically telling our IVR

14:07:59 18  that you have an incoming call, here's all the information

14:08:03 19  we know about that call, would you like to take that call?

14:08:06 20  And then if that handshake is made, accepts all that header

14:08:09 21  information that is included in the invite.

14:08:12 22  Q.    So in the way that the Capital One system -- the

14:08:17 23  [24]7 IVR needs to receive that SIP invite before a call can

14:08:20 24  be answered?

14:08:22 25  A.    When you say answered, again, can we clarify what we

14:08:33 1    mean by answered, in this regard?  By the IVR or by an

14:08:37 2    agent?

14:08:38 3    Q.    Either in this case, I guess.

14:08:40 4    A.    I'd say the -- the -- I would say that your

14:08:43 5    characterization is correct.  If we don't receive SIP

14:08:50 6    information -- actually, I'm going to say I don't know

14:08:54 7    exactly how the IVR would treat that call in the -- if SIP

14:09:01 8    information wasn't received or was incomplete.  I don't know

14:09:10 9    if that means that a call was not answered, or if it's

14:09:14 10    answered and handled a certain way.  I can't speak to that.

14:09:19 11    Q.    Just to be clear, the [24]7 IVR needs to receive a

14:09:24 12    SIP invite before the IVR can answer that call --

14:09:28 13    A.    Sorry, yes.

14:09:29 14    Q.    -- is that true?

14:09:31 15    A.    Yes.  Yes.  Yes.

14:09:32 16    Q.    Capital One will -- the [24]7 IVR will send the SIP

14:09:37 17    invite to Next Caller before the call is answered?

14:09:41 18    A.    I believe we're talking milliseconds, so the call --

14:09:51 19    [24]7 has initiated the handshake and has in effect answered

14:09:52 20    the call.  We would be playing the IVR greeting to the

14:09:55 21    customer saying welcome to Capital One at the point that

14:10:02 22    [24]7 is initiating the API call to Next Caller.  So it's

14:10:08 23    all kind of happening all at the same time rapid fire.

14:10:12 24    Q.    When that greeting is being played, can a customer

14:10:17 25    talk to the IVR in a way that the IVR can actually like do

14:10:22 1  something with the talking by the customer?

14:10:26 2  A.    No, not at that point.  We're not accepting voice

14:10:30 3  commands prior or during that introductory period.  So we're

14:10:37 4  really not listening until later in the experience.

14:10:40 5  Q.    I think the term is called barging in?

14:10:43 6  A.    Correct.

14:10:44 7  Q.    Are you familiar with that?

14:10:45 8  A.    Yes.

14:10:45 9  Q.    So what does barging in mean?

14:10:47 10  A.    Barging in would be -- would be a -- you know, a

14:10:52 11  customer's ability to interrupt the IVR script that's

14:10:55 12  playing in their ear with a command or a key tone press or

14:10:58 13  something of that nature.

14:10:59 14  Q.    So while the IVR is playing its greeting, a customer

14:11:03 15  can't barge in with voice, for example, to cut off the

14:11:08 16  greeting; is that fair?

14:11:09 17  A.    Correct.

14:11:10 18  Q.    And while the greeting is playing, a customer cannot

14:11:13 19  barge in by pressing a number on the telephone to cut off

14:11:18 20  the greeting; is that right?

14:11:19 21  A.    Correct.

14:11:20 22  Q.    It's during the greeting when the interaction with

14:11:24 23  Next Caller is initiated and the result is returned; is that

14:11:27 24  true?

14:11:27 25  A.    Yes, that's the expectation, is by the time -- by the

14:11:31 1   time all the information is received, the customer is none

14:11:34 2   the wiser that we've done anything in the background and

14:11:37 3   they can move on with their experience.

14:11:39 4   Q.    I'm going to hand you what's been marked as Exhibit 5

14:11:43 5   for identification purposes.  This starts at Bates Capital

14:11:50 6   One 000067 and ends in Bates 000094.  Do you see that?

14:11:58 7   A.    I do, yes.

14:12:00 8   Q.    This is a presentation by Capital One titled "Next

14:12:06 9   Caller changes to ANI spoof detection treatment."

14:12:10 10           Do you see that?

14:12:11 11   A.    I do.

14:12:11 12   Q.    Is this a document that was created by Capital One in

14:12:15 13   the ordinary course of business?

14:12:16 14   A.    It is, yes.

14:12:17 15   Q.    So if you turn with me to Bates 83.

14:12:21 16   A.    Okay.  I'm there.

14:12:27 17   Q.    It's slide -- I guess it's 17.  I don't see a number.

14:12:32 18   Do you see there that it says at the top "key risks," top

14:12:50 19   left?

14:12:50 20   A.    I do.

14:12:51 21   Q.    And then it says, "Next Caller market position."

14:12:52 22           Do you see that --

14:12:52 23   A.    I do.

14:12:52 24   Q.    -- underneath that?

14:13:02 25           And the description says that Next Caller is a

14:13:03 1  startup that is using a black box model to determine a

14:13:06 2  spoofing risk; is that right?

14:13:07 3  A.      That is correct.

14:13:08 4  Q.      So is it fair to say that Capital One viewed using

14:13:11 5  Next Caller as a startup to be a potential risk?

14:13:14 6  A.      Based on this presentation, yes.

14:13:18 7  Q.      Okay.  And then on the right it says "mitigation,"

14:13:21 8  and number one it says, "testing against market leader

14:13:27 9  performed (TRUSTID)."

14:13:30 10         Do you see that?

14:13:30 11 A.      Yes.

14:13:30 12 Q.      So is it fair to say that one way that Capital One

14:13:34 13 mitigated the risk of using Next Caller as a startup was to

14:13:38 14 test against the market leader being TRUSTID?

14:13:42 15 A.      That would appear to be the case, yes.

14:13:46 16 Q.      Okay.  So on Bates 86 --

14:13:51 17 A.      Okay.

14:13:53 18 Q.      -- there's a first bullet there.  It says, "Next

14:14:02 19 Caller integrates as an API without our IVR."

14:14:06 20         Do you see that?

14:14:07 21 A.      I do.

14:14:07 22 Q.      What does it mean there when it says "without our

14:14:11 23 IVR"?

14:14:15 24 A.      I don't know if this may be a typo and they meant to

14:14:21 25 say within our IVR.  That would be speculation.  But based

14:14:25 1  on everything I know of the integration, it integrates as an

14:14:29 2  API within our AVR -- within our IVR, sorry.

14:14:33 3  Q.    So is it fair to say that the SIP invite that [24]7

14:14:39 4  sends to Next Caller was received before the IVR answered

14:14:42 5  the call?

14:14:43 6  A.    I would say that the SIP invite is generated before

14:14:47 7  the IVR answers the call.  I don't know how to answer your

14:14:51 8  question other than that.  I mean, the SIP header is created

14:14:57 9  -- generated by a carrier, it is received by [24]7, and the

14:15:01 10  call is initiated.  I imagine it's all within milliseconds

14:15:05 11  of the SIP header being received.

14:15:07 12  Q.    Yeah.  But [24]7 reached that SIP invite before

14:15:12 13  answering the call?

14:15:13 14  A.    Correct.

14:15:13 15  Q.    If you could please direct your attention to Burgess

14:15:16 16  Exhibit 5?

14:15:17 17  A.    Five?  Okay.

14:15:19 18  Q.    And specifically I'd like to direct your attention to

14:15:21 19  Bates page 68.

14:15:27 20  A.    Okay.

14:15:28 21  Q.    Under the overview section, do you see there is a

14:15:32 22  third bullet there?

14:15:32 23  A.    Yes.

14:15:33 24  Q.    The third bullet says, "The business undertook

14:15:37 25  several iterations of spoof detection vendor testing in

14:15:41 1    2016, culminating with a final test between two vendors

14:15:49 2    (Next Caller and TRUSTID) in January 2017 that is informing

14:15:58 3    the current recommendation with Next Caller."

14:16:01 4              Do you see that?

14:16:02 5    A.      I do see that, yes.

14:16:03 6    Q.      All right.  Is that bullet consistent with your

14:16:07 7    understanding as to the vendor testing between Next Caller

14:16:10 8    and TRUSTID?

14:16:11 9    A.      It is, yes.

14:16:12 10   Q.      So testing of the products was a consideration of

14:16:16 11   Capital One in determining which vendor to proceed with?

14:16:19 12   A.      It was in this case, yes.

14:16:21 13   Q.      Okay.  What did testing -- what was the result of the

14:16:24 14   testing between Next Caller and TRUSTID?

14:16:27 15   A.      Could you be more specific in what you're looking

14:16:30 16   for?

14:16:30 17   Q.      Did one product perform better than the other?

14:16:33 18   A.      Yes.

14:16:35 19   Q.      Which product performed better?

14:16:37 20   A.      The Next Caller product.

14:16:38 21   Q.      If I could direct your attention to page 75.

14:16:42 22   A.      Okay.  I'm there.

14:16:45 23   Q.      The bottom right-hand corner there, under details,

14:16:51 24   "tested two solutions:  TRUSTID and Next Caller."  Do you

14:16:55 25   see that?

14:16:56 1  A.     I do.

14:16:56 2  Q.     It says that, "TRUSTID results were at parity with

14:17:01 3  Next Caller's and costs were ten times, hence we have

14:17:05 4  excluded them from near term consideration."

14:17:08 5          Is it your understanding that the cost of

14:17:10 6  TRUSTID's product was ten times that of Next Caller?

14:17:13 7  A.     It is, yes.

14:17:14 8  Q.     Mr. Burgess, you've been handed what's been marked as

14:17:18 9  Burgess Exhibit 7, bearing Bates numbers, Capital_One_000001

14:17:27 10 to 119.  I would a like to direct your attention to Bates

14:17:30 11 number 40.

14:17:34 12 A.     Okay.

14:17:46 13 Q.     And Bates number 40 is an e-mail from Patrick Cox

14:17:51 14 dated April 10th, 2017, with a subject, "TRUSTID POC

14:17:58 15 results."

14:17:59 16          Do you recognize this e-mail?

14:18:03 17 A.     I do.

14:18:04 18 Q.     This e-mail was produced by Capital One in response

14:18:08 19 to the subpoena served in this proceeding?

14:18:12 20 A.     Is that a question?

14:18:14 21 Q.     Yes.

14:18:14 22 A.     Yes.

14:18:15 23 Q.     And this e-mail came from Capital One's files;

14:18:16 24 correct?

14:18:18 25 A.     It did, yes.

14:18:19 1   Q.      This e-mail is kept in the ordinary course of

14:18:22 2   business of Capital One?

14:18:23 3   A.      Correct, yes.

14:18:24 4   Q.      And to the best of your knowledge, this e-mail is an

14:18:27 5   accurate copy of the e-mail received by Capital One from

14:18:30 6   Patrick Cox dated April 10th, 2017, with the subject

14:18:36 7   "TRUSTID POC results"?

14:18:37 8   A.      I have no reason to believe otherwise, yes.

14:18:40 9   Q.      In the first sentence after the greeting in the

14:18:43 10  e-mail, Mr. Cox writes, "Thank you for taking the time on

14:18:48 11  Friday to provide TRUSTID with feedback from our recent POC

14:18:52 12  and for the insights into your decision."

14:18:56 13          Do you see that?

14:18:56 14  A.      I do.

14:18:57 15  Q.      Do you know what feedback Capital One provided to

14:18:59 16  Mr. Cox?

14:19:00 17  A.      I believe I do, yes.

14:19:01 18  Q.      What is your understanding or recollection of that

14:19:05 19  feedback?

14:19:05 20  A.      There were some specific spoofed calls that were

14:19:09 21  attempted by Capital One or third parties engaged by Capital

14:19:13 22  One to test both products, and the spoofed calls, the known

14:19:22 23  spoofed calls, did not -- were not detected properly by the

14:19:28 24  TRUSTID application or service.

14:19:31 25  Q.      Back on Exhibit 5, and that Bates 75, Mr. Brooks

14:19:40 1  directed your attention to the bottom right-hand corner --

14:19:53 2  A.      Yes.

14:19:54 3  Q.      -- which says, "TRUSTID results were at parity with

14:19:58 4  Next Caller."

14:19:59 5          Do you see that?

14:19:59 6  A.      Yes.

14:19:59 7  Q.      So that suggests that TRUSTID performed equally well

14:20:03 8  as Next Caller; true?

14:20:05 9  A.      Overall -- overall, call results were close, yes.

14:20:09 10 Q.      Okay.  And it appears to be that the reason that

14:20:13 11 Capital One was proposing Next Caller over TRUSTID was

14:20:17 12 price; is that right?

14:20:18 13 A.      It was a primary consideration, yes.

14:20:21 14 Q.      That was the primary consideration?

14:20:23 15 A.      Yes.

14:20:24 16          (End of videotape deposition.)

14:20:27 17          MS. WELLS:  We would like to move into evidence

14:20:33 18 DTX-003 and DTX-005 which were played with Mr. Burgess.

14:20:41 19          MS. COLUMBIA:  No objection, Your Honor.

14:20:42 20          THE COURT:  All right.  They're admitted.

14:20:42 21          (DTX Exhibit Nos. 003 and 005 were admitted into

14:20:45 22 evidence.)

14:20:45 23          MS. WELLS:  We will now hear from Mr. --

14:20:47 24          THE COURT:  How many more of these do we have

14:20:49 25 just so we know what we have because it's a lot.

MS. WELLS:  It is.  We have three more.

THE COURT:  All right.

MS. WELLS:  We will now hear from Mr. Legate who testified on behalf of BBVA.  He is a senior system programmer.  His entire video is approximately fifteen minutes.  TRUSTID's share is 6 minutes, 42 seconds. And Next Caller's share is 8 minutes, 33 seconds.

(Videotape deposition of Patrick Legate:)

Q.     Well, good morning.  Can you please state your full name for the record?

A.     Patrick Legate.

Q.     Good morning, Mr. Legate.  You understand you're here testifying under oath?

A.     Yes.

Q.     What's your current title?

A.     I think it's senior systems programmer.

Q.     So have you heard of a company called Next Caller?

A.     Yes.

Q.     Okay.  So I'd like to understand at least your understanding of BBVA's relationship with Next Caller. Okay?

A.     Next Caller is a service provider.  They analyze call information, the SIP header, and they evaluate that information and they return a score that is the -- that they generate designating fraud risk.

Q.    And at a high level, how is it that BBVA uses that score in their systems?

A.    Okay.  Within our system, that fraud risk score, we use it as a component for authentication to determine how authenticated, we'll say, a caller is when they're transferred to an agent.

Q.    Is it -- is that authentication score only used for transfer -- transferring to an agent or is it also used for some of the self-service options that you were talking about earlier?

A.    We do not use Next Caller or that fraud score for authenticating within our IVR environment.

Q.    So it's just merely passed to the agent, the fraud score, that is?

A.    We evaluate the fraud score from Next Caller, we evaluate what the caller entered, we evaluate our own data and we combine all that information only on those occasions where the call is transferred, and then we pass that information to the agent with a -- kind of a conglomerate -- big score that we've generated within our organization.

Q.    Just getting back to BBVA's relationship with Next Caller.  Next Caller is a vendor of BBVA?

A.    Yes.

Q.    As far as you're aware, does BBVA have any kind of formal vendor selection process that they use in cases like

14:23:47 1   this?

14:23:47 2   A.      Yes.  It's a big organization.  They do -- must have

14:23:52 3   -- we're a big organization.  We have formal processes for

14:23:55 4   acquisition and dealer relate -- or vendor relationships.

14:23:59 5   Q.      You mentioned earlier, and you can tell me if I got

14:24:04 6   this wrong, that you were only aware of Next Caller as being

14:24:08 7   able to provide this spoof determination technology at some

14:24:11 8   point recently; is that right?

14:24:13 9   A.      I'm not -- you mean Next Caller being the only

14:24:17 10  company?

14:24:17 11  Q.      Yeah.

14:24:18 12  A.      There are other companies that the company we -- that

14:24:21 13  I've heard over the years, one of -- but it's a different

14:24:27 14  technology.

14:24:28 15  Q.      What company would that be?

14:24:30 16  A.      Pindrop.  But as I understand the way their

14:24:34 17  technology works, that somehow listens in on the call.  It

14:24:41 18  doesn't -- it's not taking the SIP header -- or if it takes

14:24:46 19  the SIP header, that's only one component of their analysis.

14:24:50 20  Q.      Do you know whether BBVA has evaluated whether to use

14:24:54 21  Pindrop?

14:24:55 22  A.      I'm fairly certain that they've looked into it.

14:24:57 23  Q.      In BBVA's determination to use Next Caller, were they

14:25:02 24  comparing Next Caller against Pindrop, to the best of your

14:25:05 25  knowledge?

A.      As I recall, Pindrop was a vendor that was considered kind of in the same line as Next Caller, though their products seemed to be completely a different way of evaluating the calls.

Q.      Are you familiar with a company called TRUSTID?

A.      TRUSTID?  No.

Q.      What are the circumstances in which BBVA decides to run the Next Caller API?

A.      In broad terms, the company has, who knows, hundreds of 800 numbers.

Q.      Right.

A.      Not all of those 800 numbers feed into -- they may feed into our -- you referred to the ICM, which is the phone system, but not every call that goes to the phone system comes to our IVR, our CVP.  Only those -- and not every call that comes to our CVP gets Next Caller treatment.  And not even -- even within our -- so, for example, we have an IVR application, the main 800 number, and all of those calls would get a Next Caller score.  But if you called in our branch, they may come through our application, but they don't get treated.

Q.      So does BBVA have different IVR applications that are run depending on the phone number that's called?

A.      Yes.

Q.      Have you ever heard of a term called IVR containment?

14:26:39 1    A.    Yes.

14:26:39 2    Q.    What is IVR containment?

14:26:41 3    A.    IVR containment are what I refer to as success.  The

14:26:46 4    call stays within the IVR.  The customer makes a phone call.

14:26:50 5    They're able to self-service or they get frustrated and they

14:26:55 6    hang up within the IVR.  So I know that's -- that sounds

14:27:00 7    counterintuitive if they get frustrated.  Calls that are not

14:27:04 8    contained are those calls that go to agents.

14:27:06 9    Q.    And the reason why you said IVR containment is a

14:27:10 10   success, in more or less terms, is because transferring

14:27:13 11   calls to agents is expensive; right?

14:27:15 12   A.    Exactly.

14:27:16 13   Q.    So if you can keep callers in the IVR, that saves

14:27:20 14   money?

14:27:20 15   A.    Yes, that's the idea.

14:27:22 16   Q.    Is IVR containment an important metric for BBVA?

14:27:26 17   A.    Indeed it is.

14:27:27 18   Q.    Is that something that BBVA might evaluate when it's

14:27:31 19   looking at vendors what their IVR containment levels are?

14:27:36 20   A.    I'm sure we do, yes.

14:27:38 21   Q.    Has BBVA ever shared their IVR containment numbers,

14:27:42 22   to the best of your knowledge, with Next Caller?

14:27:48 23   A.    I'm sure that came up in conversation, yes.

14:27:52 24   Q.    Why do you think that came up in conversation?

14:27:54 25   A.    I'm fairly certain I've spoken to some of the folks

at Next Caller, and just throughout conversation, mentioned

containment.

Q.    Has the IVR containment for BBVA increased since it

implemented Next Caller?

A.    Next Caller has not been used in the VRU for

containment purposes at all.

Q.    If one vendor has better IVR containment metric than

the other, that might be something that BBVA would consider

when selecting a vendor; right?

A.    Absolutely.

Q.    The reason why BBVA uses Next Caller is to pass the

Next Caller authentication score as a component of a greater

score to the agent; right?

A.    Yes.

Q.    So at bottom, the Next Caller API has to be run prior

to the call being transferred to an agent; correct?

A.    Yes.

Q.    And from BBVA's perspective, that's really the only

thing that matters, that the Next Caller API gets called

before the agent answers, from a timing perspective?

A.    Yes.

Q.    Currently, how is it that the Next Caller API is

called within the BBVA IVR?

A.    Within the call flow?

Q.    Yes.

14:29:21 1   A.      The system -- of course, the phone system will

14:29:26 2   transfer -- essentially transfers the call to the CVP.

14:29:32 3   There's no ring back at that point, so the call goes

14:29:37 4   directly to CVP.  But once the CVP answers the call, we do a

14:29:43 5   process to retrieve the SIP header from the ICM, SIP header

14:29:55 6   data, and there may be a few other little steps involved.

14:29:59 7   And then we -- currently we'll make a Next Caller request

14:30:03 8   where we send that SIP header information to Next Caller and

14:30:07 9   get their response so that we have the Next Caller fraud

14:30:12 10  score.

14:30:14 11  Q.      From a user's perspective, when is it that the Next

14:30:20 12  Caller API is called?

14:30:24 13  A.      It's called -- okay.  So if I was a user and I had my

14:30:29 14  phone in front of me, you know how it shows ringing; as soon

14:30:33 15  as the phone answers, the seconds start ticking for the

14:30:41 16  duration of the call.  When that seconds comes up, in other

14:30:45 17  words, when the timer starts, that's when the Next Caller

14:30:48 18  function would be called.

14:30:49 19          And then -- and during that same period they

14:30:52 20  would hear the greeting from our IVR, "Thank you for calling

14:30:52 21  BBVA."

14:31:00 22  Q.      Yeah.  Let me try that again.  See the Next Caller

14:31:04 23  API is currently being called by the BBVA greeting is

14:31:07 24  called?

14:31:07 25  A.      Essentially.

14:31:08 1   Q.      If a user were to press touchtones during the BBVA

14:31:12 2   greeting, would that stop the Next Caller API from running?

14:31:15 3   A.      No.

14:31:16 4   Q.      Okay.  So you mentioned that there is various data

14:31:22 5   that BBVA passes to the Next Caller API; is that right?

14:31:25 6   A.      Yes.

14:31:26 7   Q.      You mentioned SIP header data; right?

14:31:29 8   A.      Yes.

14:31:29 9   Q.      If you could turn to the 20.

14:31:32 10  A.      Yes.

14:31:37 11  Q.      Is this the Next Caller API documentation that you

14:31:41 12  were referring to?

14:31:41 13  A.      Yes.

14:31:43 14  Q.      Okay.  So if we could turn to page 21.  There's a

14:31:47 15  field -- there's a number of fields that are listed there

14:31:57 16  under the request -- under the request attributes.

14:32:02 17          Do you see that?

14:32:03 18  A.      Yes.

14:32:05 19  Q.      Are these request attribute fields the fields we were

14:32:10 20  referring to earlier, the ANI, DNIS and the SIP headers?

14:32:16 21  A.      Yes.

14:32:17 22  Q.      So does this now refresh your recollection as to what

14:32:21 23  fields are being sent to Next Caller?

14:32:22 24  A.      Yes, it does.

14:32:25 25  Q.      Okay.  And one of those fields is called ANI;

14:32:30 1  correct?

14:32:30 2  A.      Yes.

14:32:31 3  Q.      Okay.  So let's go back to the beginning of the call.

14:32:34 4  So the call comes into the BBVA network, it gets answered by

14:32:38 5  the IVR; right?

14:32:40 6  A.      Yes.

14:32:41 7  Q.      And then the call -- the Next Caller API will get

14:32:47 8  run?

14:32:47 9  A.      Yes.

14:32:48 10  Q.      And then the call will get sent to an agent where the

14:32:51 11  agent then answers the call; correct?

14:32:53 12  A.      Yes.

14:32:55 13  Q.      And before the agent answers the call, the Next

14:32:59 14  Caller API is called?

14:33:00 15  A.      Yes.

14:33:01 16  Q.      And before the agent sentences the call, the BBVA

14:33:05 17  system receives a score from Next Caller; correct?

14:33:08 18  A.      Yes.

14:33:09 19  Q.      In terms of actually being able to set up the system

14:33:12 20  between BBVA and Next Caller, do you have any interaction

14:33:17 21  with anybody at Next Caller?

14:33:21 22  A.      I'm not sure how you mean.  Yes, I have to contact

14:33:27 23  them to make sure everything works.  We discuss the bit

14:33:31 24  about the mechanics of the -- their API and --

14:33:36 25  Q.      So it's fair to say that --

A.      Yes.  Ask more.

Q.      So it's fair to say that Next Caller provided support
and help to BBVA in being able to implement the Next Caller
API in BBVA's system?

A.      Yes.  In order to get the mechanics of the two
systems talking, they provided this documentation.  I was
able to work with them.  They provided a test environment,
credentials, a URL.  They provided the various pieces and
parts, and I was able to assemble their requests, all the
SIP headers, the DNIS, the ANI, within our system to make
that request from them and get a response.

Q.      You mentioned earlier there were call flows that you
sometimes create; is that right?

A.      Yes.

Q.      Are there any call flows that BBVA has that would
show when Next Caller gets called?

A.      Yes.

Q.      Those would be like Visio diagrams; right?

A.      Yes.

Q.      If we could mark this exhibit.

        I've handed you a document that's been marked as
Exhibit 2.  Do you recognize this document?

A.      Yes.

Q.      Did you create this document?

A.      Yes.

14:35:01 1    Q.      Is this a call flow?

14:35:03 2    A.      Yes.

14:35:07 3    Q.      Is this -- are there other documents that are more

14:35:10 4    formal that have like longer Visio diagrams in them that

14:35:15 5    this Visio diagram would be a part of?

14:35:17 6    A.      This is a summary to -- provided to management so

14:35:20 7    that they would understand the -- how callers are

14:35:23 8    authenticated when they go to agents.  The detailed call

14:35:29 9    flow -- if somebody said I would like to see your call flow,

14:35:34 10   it would be our entire application, and they provide tools

14:35:37 11   within the application to print out the giant application.

14:35:46 12   Q.      Get go back to the calculation of the score that's

14:35:50 13   sent to the agent, my understanding is that Next Caller

14:35:54 14   returns a number between 0 and 100.  Is that right?

14:35:58 15   A.      That is my understanding as well.  However, the

14:36:02 16   version we're using, we do not get that score from Next

14:36:05 17   Caller.  We're using the old version.

14:36:09 18   Q.      So that's what my real question is.  So what data

14:36:13 19   gets returned to Next Caller from you that you use?

14:36:16 20   A.      Okay.  The score we will receive, there is -- for

14:36:20 21   fraud risk, there's very high, high, medium, low, very low,

14:36:25 22   and unknown.

14:36:28 23   Q.      So Next Caller returns to BBVA very high, high,

14:36:30 24   medium, low, very low, and unknown; right?

14:36:35 25   A.      Yes.

14:36:44 1          (End of videotape deposition.)

14:36:49 2          MS. WELLS:  We would like to move JTX-037 and

14:36:56 3  JTX-038 into evidence.

14:36:59 4          MS. COLUMBIA:  No objection.

14:37:00 5          THE COURT:  All right.  Those are admitted.

14:37:02 6          (JTX Exhibit Nos. 037 and 038 were admitted into

14:37:03 7  evidence.)

14:37:03 8          THE COURT:  How long is the next one so we can

14:37:05 9  decide if we want to take a break or go forward?

14:37:08 10         MS. WELLS:  The next one is ten minutes and the

14:37:10 11  final one will be sixteen minutes.

14:37:12 12         THE COURT:  Do you want to take a break now or

14:37:14 13  do you want to listen to ten minutes and take a break?  I'm

14:37:20 14  getting the look here.  All right.  Ten minutes and then

14:37:23 15  we're taking our break.

14:37:25 16         MS. WELLS:  All right.  We will next hear from

14:37:27 17  Mr. Young who testified in his deposition on behalf of

14:37:31 18  Comcast.  He is the vice-president of Business Information

14:37:35 19  Systems at Comcast.  His total deposition like I said is ten

14:37:39 20  minutes.  Of that time, 3 minutes and 17 seconds are

14:37:41 21  designated for TRUSTID, and 6 minutes, 59 seconds go to Next

14:37:50 22  Caller.

14:37:52 23         (Deposition testimony of Robert Michael Young:)

14:37:52 24  Q.     Can you please state your full name for the record?

14:38:01 25  A.     Robert Michael Young.

14:38:02 1   Q.      Now you understand that you're here today under oath?

14:38:04 2   A.      I do.

14:38:05 3   Q.      What's your current role at Comcast?

14:38:07 4   A.      Vice-president of Business Information Systems.

14:38:09 5   Q.      Are you familiar with a company called Next Caller?

14:38:11 6   A.      I am.

14:38:11 7   Q.      And are you also familiar with a company called

14:38:14 8   TRUSTID?

14:38:14 9   A.      I've heard of them, yes, but --

14:38:17 10  Q.      How are you --

14:38:18 11  A.      I guess define familiar.

14:38:20 12  Q.      I guess first question is, have you heard of them?

14:38:23 13  A.      Okay.  Yeah, I've heard of them.

14:38:25 14  Q.      And what do you understand Next Caller -- the

14:38:28 15  services that Next Caller provides?

14:38:30 16  A.      There's identification services they provide as well

14:38:33 17  as authentication services that they provide.

14:38:35 18  Q.      And to the extent you know what TRUSTID provides,

14:38:38 19  what is it that they provide?

14:38:39 20  A.      I think they do authentication services as well.

14:38:41 21  Q.      Were you responsible for selecting Next Caller to

14:38:42 22  provide those services at first?

14:38:45 23  A.      Yes.

14:38:46 24  Q.      And I think you had mentioned at some point you also

14:38:52 25  looked at Next Caller for authentication services; is that

14:38:54 1    right?

14:38:54 2    A.    That is correct.

14:38:55 3    Q.    And did Comcast look at any other vendors beside Next

14:38:59 4    Caller for providing those authentication services?

14:39:01 5    A.    We did not.

14:39:02 6    Q.    Does Comcast use any other vendors for authentication

14:39:06 7    services?

14:39:06 8    A.    Not in my space.  I can't say that the company or

14:39:09 9    someone else isn't, but in my particular area, we're not

14:39:12 10   using any other third party.

14:39:13 11   Q.    Have you heard of a term called IVR containment?

14:39:16 12   A.    Yes.

14:39:17 13   Q.    And what is IVR containment?

14:39:18 14   A.    I'll give you my definition of IVR containment.  It's

14:39:22 15   a customer calls into the IVR system, we automate a phone

14:39:26 16   call, and they don't need agent assistance.

14:39:29 17   Q.    Is IVR containment something that Comcast wants to

14:39:32 18   increase or maximize in some fashion?

14:39:34 19   A.    Absolutely.

14:39:35 20   Q.    Why is that?

14:39:36 21   A.    Because it saves phone calls to agents that are more

14:39:39 22   expensive than an automated system.

14:39:40 23   Q.    If Comcast is looking at vendors, is that vendor's

14:39:42 24   possibility to increase IVR containment something that would

14:39:42 25   be factored in?

14:39:50 1    A.       It depends on the use case.  Are we talking about for

14:39:53 2    verification purposes here, so authentication purposes?

14:39:57 3    Q.       Sure.  Let's talk about authentication services

14:40:00 4    first.

14:40:00 5    A.       So in this particular use case, it was not --

14:40:03 6    Q.       Why is that?

14:40:05 7    A.       -- part of IVR containment.

14:40:06 8    Q.       Why --

14:40:07 9    A.       We were not looking through an IVR containment lens.

14:40:10 10   Q.       Why is that?

14:40:11 11   A.       Because we don't really use IVR authentication to

14:40:15 12   drive IVR containment.

14:40:16 13   Q.       Maybe we can talk about how Comcast uses Next Caller

14:40:20 14   currently in its system.  Maybe you could just give me a

14:40:24 15   high-level overview of that?

14:40:25 16   A.       We bundle it with other information.  So if a

14:40:28 17   customer calls the IVR and we choose to pass the traffic to

14:40:31 18   the Next Caller, which is a business decision, we would

14:40:34 19   leverage the Next Caller data along with other telemetry

14:40:38 20   data we have to decide if we want to fully authenticate a

14:40:41 21   caller when we deliver them to an agent.

14:40:42 22   Q.       So is Next Caller authentication only used for calls

14:40:46 23   that ultimately go to the agents?

14:40:49 24   A.       That's correct, right now at this time.

14:40:50 25   Q.       So it's not used for any self-service --

14:40:52 1  A.    That's right.

14:40:53 2  Q.    -- applications.

14:40:53 3        Are there any plans?

14:40:54 4  A.    Yes.

14:40:57 5  Q.    I'm sorry.  I might have been speaking too fast,

14:41:02 6  so...

14:41:03 7  A.    Yeah.

14:41:03 8  Q.    Are there any plans to use the authentication for

14:41:06 9  self-service?

14:41:07 10  A.   Not firm plans, not at this time.  I think it's

14:41:11 11  definitely something we want to look toward, but we don't

14:41:14 12  have any firm plans at this time.

14:41:15 13  Q.   Okay.  Does Comcast have a component known as a

14:41:19 14  "session border controller"?

14:41:20 15  A.   Yes, we do.

14:41:20 16  Q.   Is that where the calls go first?

14:41:20 17  A.   Yes, it is.

14:41:20 18  Q.   Okay.  So how is it that the system determines when a

14:41:30 19  call comes in from an 800 number which path to send it down?

14:41:30 20  A.   Usually, there's a DNIS number that's assigned to it.

14:41:34 21  DNIS number assigned to a telephone number that the SBC

14:41:39 22  would then make a decision on where to direct the phone

14:41:41 23  call.

14:41:41 24  Q.   And so there's some kind of table somewhere in

14:41:44 25  Comcast's system that says, "For this particular DNIS, do

14:41:48 1    **X --**

14:41:48 2    **A.      Yes.**

14:41:49 3    **Q.      -- for this other DNIS do Y?**

14:41:51 4    **A.      Yes.**

14:41:52 5    **Q.      So maybe could you walk me through the path of how a**

14:41:56 6    **call goes through that IVR and when Next Caller would get**

14:42:00 7    **executed.  Make sense?**

14:42:03 8    **A.      It does.**

14:42:06 9    **Q.      So a call comes into the IVR.  What happens next?**

14:42:09 10   **A.      We would look at the information that was passed in**

14:42:13 11   **from the network.**

14:42:14 12   **Q.      Okay.  So now the Comcast IVR has looked at that**

14:42:18 13   **information.  What happens next?**

14:42:19 14   **A.      We have a fairly complex business logic that**

14:42:23 15   **determines what we do next.**

14:42:25 16   **Q.      I think you had mentioned earlier that this business**

14:42:27 17   **logic also determines whether Next Caller would get**

14:42:31 18   **executed; is that right?**

14:42:32 19   **A.      That's true.**

14:42:32 20   **Q.      And when you say that Comcast passed data to Next**

14:42:36 21   **Caller, what type of data were you -- are you referring to?**

14:42:39 22   **A.      It's SIP data.  Again, I think much of it was**

14:42:42 23   **contained in some of that e-mail thread that you were just**

14:42:45 24   **referring to.**

14:42:45 25   **Q.      And so Comcast gives a bunch of SIP data to Next**

14:42:49 1  Caller, and then Next Caller runs it through its system, and

14:42:54 2  then told Comcast what its potential match rate would be; is

14:42:58 3  that right?

14:42:58 4  A.    Yes, that's accurate.

14:43:01 5  Q.    Okay.  So Comcast decides to move forward.  But at

14:43:04 6  that point, the system hadn't been implemented at any of

14:43:07 7  Comcast's IVR; correct?

14:43:11 8  A.    That's correct.

14:43:11 9  Q.    So was there a testing or proof of concept phase

14:43:16 10  after that?

14:43:16 11  A.    There was.

14:43:17 12  Q.    Okay.  And how did the testing work exactly?

14:43:21 13  A.    Can you restate the question?

14:43:27 14  Q.    So does -- does Comcast have like a separate test

14:43:32 15  environment that they can run these things in?

14:43:34 16  A.    We do.

14:43:35 17  Q.    And is that how Comcast tested the VeriCall solution?

14:43:39 18  A.    Yeah, so they -- we would sit down with the IVR

14:43:42 19  vendor.  They would understand from an integration

14:43:44 20  standpoint how it would -- was expected to work.  They would

14:43:47 21  build a call flow that would emulate that.  And we would put

14:43:50 22  it through a quality assurance and a user acceptance testing

14:43:54 23  environment before putting it into a production system.

14:43:57 24  Q.    Did Next Caller provide any help or assistance to

14:44:01 25  Comcast during that process when Comcast was trying to

14:44:03 1  integrate the --

14:44:03 2  A.      They did.

14:44:04 3  Q.      -- Next Caller solution?

14:44:06 4  A.      They did.

14:44:06 5  Q.      What kind of help or assistance did Next Caller

14:44:09 6  provide?

14:44:10 7  A.      I believe our teams met with their technical teams

14:44:13 8  and had conference calls and exchanged e-mails to -- to --

14:44:16 9  to work through the integration.

14:44:18 10  Q.      Does Next Caller provide any ongoing support to

14:44:21 11  Comcast in support of the VeriCall solution?

14:44:23 12  A.      I believe, yeah, absolutely they do.

14:44:26 13  Q.      Has -- does Comcast ever make use of that support?

14:44:29 14  A.      I'm not sure I understand the question, so...

14:44:33 15  Q.      Have you ever had to e-mail Next Caller because of a

14:44:36 16  problem?

14:44:37 17  A.      No, we have not.

14:44:38 18  Q.      So everything has been working smoothly?

14:44:40 19  A.      They have.  They've done a good job, yes.

14:44:42 20  Q.      So I think you had mentioned earlier that the reason

14:44:46 21  why Comcast uses Next Caller has to do with calls that are

14:44:51 22  sent to agents; is that right?

14:44:55 23  A.      That is right.  Correct.

14:44:57 24  Q.      What is it that Next Caller responds to once Next

14:45:01 25  Caller receives that data from Comcast?

14:45:03 1  A.      They respond with a color, which is kind of a score

14:45:07 2  assigned to a phone call.

14:45:09 3  Q.      Okay.  So is it fair to say that green means the call

14:45:12 4  is a safe call from Comcast's perspective?

14:45:16 5  A.      Yes.

14:45:16 6  Q.      And yellow is risky and red is riskiest?

14:45:21 7  A.      Yellow would mean they -- they could not score the

14:45:25 8  call to us, so they didn't provide any information at all.

14:45:29 9  Q.      I see.

14:45:30 10         So Next Caller returns these color codes to --

14:45:33 11 to Comcast.  What does Comcast do with those color codes

14:45:38 12 after it's received them?

14:45:40 13 A.      We bundle the color codes with other information to

14:45:44 14 make decisions.

14:45:44 15 Q.      Do Comcast agents alter their questions they ask

14:45:49 16 customers based on that flag?

14:45:50 17 A.      Yes.  They should.

14:45:51 18 Q.      How is it that they would alter their questions?

14:45:54 19 A.      If a customer wasn't fully verified, we would have to

14:45:58 20 ask them for additional information to verify them depending

14:46:01 21 on what they were asking for.  So it's -- it's specific to

14:46:04 22 the situation.

14:46:05 23 Q.      And so by having the Next Caller verification in

14:46:06 24 there, Comcast is able to save agent time?

14:46:11 25 A.      That's correct, yes.

Q.    When a call is transferred from the third party IVR to a Comcast agent, is that call transferred via voice over IP technology?

A.    Yes.

Q.    And so before the agent answers their phone, Comcast has sent data to Next Caller and received the risk score from Next Caller; correct?

A.    Yes.

Q.    Handed you a document marked Exhibit 6.  This is another one of those executive reviews?

A.    Yes.

Q.    Do you recognize this document?

A.    I do.

Q.    And this one's from October of 2018; right?

A.    That's correct, yes.

Q.    Underneath that, it talks about 60 to 65 percent can be scored passively through a phone printing solution.  Do you see that?

A.    I do.

Q.    Do you have an understanding what phone printing means?

A.    It's the next -- it's a service such as Next Caller that has the ability to look at SIP metadata and other metadata to make a decision on scoring.

Q.    Besides Next Caller, has Comcast ever considered any

14:47:27 1    other vendor for phone printing?

14:47:28 2    A.    No, not in my area.

14:47:30 3    Q.    Do you understand TRUSTID to provide phone printing?

14:47:34 4    A.    I don't know what -- what their authentication

14:47:37 5    service is to be honest, no, I don't, I don't know that.

14:47:40 6    Q.    Are you aware of any other vendors beside Next Caller

14:47:43 7    that provide phone printing?

14:47:45 8    A.    I had heard that Avaya was offering a phone printing

14:47:48 9    solution, but again, I don't know for sure.

14:47:50 10    Q.    So during the break, you asked which field within the

14:47:54 11    SIP header is ANI; is that right?

14:48:00 12    A.    I asked Dan Tepper to confirm next to the name in the

14:48:04 13    "from" header that we are passing ANI, yes.

14:48:08 14    Q.    Okay.  And so in the "from" header of a SIP invite,

14:48:14 15    is Comcast passing ANI next to the name?

14:48:17 16    A.    Yes, we are passing originating ANI.

14:48:20 17          (End of videotape deposition.)

14:48:24 18          THE COURT:  Okay.

14:48:25 19          MS. WELLS:  We would move to introduce JTX-24

14:48:29 20    into evidence.

14:48:30 21          MS. COLUMBIA:  No objection.

14:48:31 22          THE COURT:  All right.  It's admitted.

14:48:33 23          (JTX Exhibit No. 24 was admitted into evidence.)

14:48:33 24          THE COURT:  Let's take our fifteen-minute break.

14:48:37 25    And you guys come back around 3 o'clock.

14:48:47 1     **(Jury leaving the courtroom at 2:48 p.m.)**

14:49:08 2    **THE COURT:  All right.  We'll be in recess.**

14:50:19 3    **(A brief recess was taken.)**

15:09:45 4    **(Jury entering the courtroom at 3:09 p.m.)**

15:09:55 5    **THE COURT:  All right, everyone.  Let's all be**

15:10:07 6 **seated.**

15:10:09 7    **Ms. Wells.**

15:10:10 8    **MS. WELLS:  Thank you, Your Honor.  We are on**

15:10:13 9 **our last witness by video.  We will hear from Mr. Telman who**

15:10:18 10 **testified on behalf of Dish.  He is a business operations**

15:10:22 11 **manager with Dish.  His total video is just over 16 minutes.**

15:10:28 12 **Of that time, 7 minutes, 38 seconds is designated for**

15:10:33 13 **TRUSTID, and 8 minutes, 35 seconds is designated for Next**

15:10:38 14 **Caller.**

15:10:39 15    **(Videotape deposition of Jordan Telman:)**

15:10:45 16 **Q. Would you please state your full name for the record?**

15:10:48 17 **A. Jordan Telman.**

15:10:50 18 **Q. You understand that you're testifying under oath here**

15:10:53 19 **today?**

15:10:52 20 **A. Yes, I do.**

15:10:52 21 **Q. Is there any reason you can't do that?**

15:10:52 22 **A. No.**

15:10:52 23 **Q. Were there any particular features that Next Caller**

15:10:57 24 **offered that made Dish interested in Next Caller?**

15:11:01 25 **A. I can't speak to the original interests.  That dates**

15:11:07 1    back to 2015.  When I first received the information and the

15:11:10 2    request from Mark Gallick to see if there was a business

15:11:14 3    case for it, what interested me was the ability to

15:11:17 4    authenticate off of the metadata on the call.

15:11:25 5    Q.      Who would -- who made the recommendation to

15:11:28 6    Mr. Carlson to choose Next Caller?

15:11:29 7    A.      Mark Gallick made the recommendation to me.  And my

15:11:33 8    team put together the business proposal to take through our

15:11:36 9    PAR process for executive approval.

15:11:40 10   Q.      Is there anything that Mr. Gallick told you about

15:11:45 11   Next Caller that made him interested in Next Caller?

15:11:52 12   A.      It did not require voice recordings, was of

15:11:57 13   particular interest.

15:12:00 14   Q.      And other vendors required voice recordings?

15:12:04 15   A.      Yes, that's correct.

15:12:05 16   Q.      Like Pindrop?

15:12:06 17   A.      That would be another vendor, yes.

15:12:09 18   Q.      Were there any other features that Mr. Gallick

15:12:18 19   mentioned to you that made Next Caller interesting?

15:12:25 20   A.      When we did a sample with them of what would -- we

15:12:29 21   took historic calls, provided them to Next Caller, and got

15:12:33 22   Next Caller's score in return.  We did not see a single

15:12:37 23   likely fraud call in what was returned as green.  Or

15:12:41 24   healthy.

15:12:42 25   Q.      When you were making the recommendation to the

15:12:52 1 executive team for approval, were there any materials from

15:12:57 2 Next Caller that you relied on in making that presentation?

15:13:02 3 A.    We looked at their marketing materials.  I believe we

15:13:08 4 submitted in discovery the -- the actual presentation that

15:13:11 5 we put together for the executive.  I think the only thing

15:13:16 6 we used directly from there was a -- we modified an image to

15:13:21 7 kind of describe how it worked.  But the -- the majority of

15:13:25 8 the numbers that we used and quoted were based off of that

15:13:29 9 initial sample test that we did with them.

15:13:32 10 Q.    So he -- Mr. Gallick would have been the person who

15:13:35 11 would have evaluated Next Caller's material and made a

15:13:39 12 decision whether to move forward with the initial

15:13:45 13 investigation of Next Caller?  Is that fair?

15:13:51 14 A.    I can't say whether he would have evaluated any

15:13:54 15 marketing material.  Mark tends to be very focused on the

15:13:58 16 actual results and less focused on what companies tend to

15:14:02 17 say about themselves.  I think the sample would have been

15:14:07 18 the primary pieces that -- and their -- anything that was

15:14:13 19 more related to the -- the actual system architecture.

15:14:19 20 Q.    When you say the sample, what do you mean?

15:14:21 21 A.    We provided a series of calls to them and asked for

15:14:26 22 them to score those calls using their algorithm.

15:14:30 23 Q.    In the time frame between 2015 and 2017, do you know

15:14:35 24 whether Dish was considering other vendors besides Next

15:14:39 25 Caller?

15:14:39 1  A.      As I stated before, we -- we tend to evaluate all

15:14:44 2  technology in the space.  So my assumption would be that we

15:14:48 3  evaluated several different options.  Speaking with Mark

15:14:54 4  Gallick back in late 2017, early 2018, I do know that

15:14:59 5  Pindrop was also investigated.

15:15:02 6  Q.      So you don't know, as you sit here right now, why

15:15:06 7  Dish chose to go forward with Next Caller over TRUSTID, for

15:15:09 8  example, in the 2015 to 2017 time frame?

15:15:14 9  A.      What Mark communicated to me in late 2017 was that

15:15:20 10 Next Caller, from a technology standpoint, best met our

15:15:23 11 needs from an authentication perspective and a fraud

15:15:28 12 deterrent perspective without increasing -- without putting

15:15:36 13 us at risk of our PCI compliance through recording of calls.

15:15:44 14 Q.      Did Next Caller help Dish implement the VeriCall

15:15:48 15 system within Dish's network?

15:15:51 16 A.      We call out to their VeriCall system from our ICM on

15:15:55 17 the front side, in front of our IVR.  There was coordination

15:16:02 18 between Dish and Next Caller to make that implementation

15:16:06 19 possible.

15:16:06 20 Q.      So to make the implementation possible, Next Caller

15:16:10 21 provided information to Dish.  Is that fair?

15:16:16 22 A.      That's fair.

15:16:16 23 Q.      Is it fair to say that Next Caller instructed Dish on

15:16:22 24 how to integrate VeriCall into Dish's network?

15:16:26 25 A.      It was a dialogue.  And to be frank, Dish had to do

significant work and instruct Next Caller on how to
integrate into our environment as well.

Q.    And so that's my question.  Has -- has Dish renewed
this VeriCall service from Next Caller?

A.    Yes.  The -- we have -- the automatic renew clause
has been enacted.

Q.    Okay.  And if you look on the first page there,
there's a subparagraph 1.2, Support Services.  Do you see
that?

A.    Yes.

Q.    It says that, Next Caller will provide 24/7 phone and
e-mail support with respect to the hosted services.  Do you
see that?

A.    Yes, I do.

Q.    Okay.  And paragraph 1.3, it also says that Next
Caller will provide professional services required to
support the implementation of the VeriCall product to Dish.
Is that true?

A.    At no charge, yes.

Q.    And when it says "professional services," what does
that entail?

A.    It entails any modification that they have to do on
their side in order to integrate into our system or any
changes that we request as long as it's within the nature of
the agreement.

15:17:50 1    Q.    Okay.  Just so I understand that, Next Caller

15:17:53 2    instructed Dish on how to implement the VeriCall product

15:17:57 3    into Dish's network.  Is that fair?

15:17:59 4    A.    Next Caller instructed Dish on what information was

15:18:02 5    required for their service to run and what was needed to

15:18:06 6    pass to them.  Dish instructed Next Caller on how to modify

15:18:10 7    their systems to integrate with our ecosystem.

15:18:16 8    Q.    I guess, Next Caller helped Dish to implement the

15:18:19 9    VeriCall product into Dish's network?

15:18:22 10    A.    Yes.

15:18:24 11    Q.    You mentioned earlier modifications that Next Caller

15:18:27 12    made to support Dish; is that right?

15:18:29 13    A.    Yes.

15:18:29 14    Q.    What modifications did Next Caller make in order to

15:18:33 15    support Dish?

15:18:34 16    A.    I can't speak to the nature of the changes they made

15:18:37 17    on their side.  I can tell you that we have an abnormal

15:18:41 18    ecosystem where our ICM sits in front of and behind our IVR.

15:18:47 19    They were used to integrating directly into an IVR, and we

15:18:51 20    had them integrate into our ICM.

15:18:54 21    Q.    Just for completeness, ICM stands for what?

15:18:57 22    A.    Interactive call management.

15:18:59 23    Q.    What is the Acme 4600?

15:19:02 24    A.    It's a server.

15:19:02 25    Q.    What does it do?

A.      Normalizes the data across the carrier, since every call from the different carriers looks different.

Q.      Is this also called a session border controller?

A.      Yes.

Q.      And at a high level, what does that VXML gateway do in the implementation that -- before VeriCall was implemented?

A.      Sure.  So that cluster that we're looking at is -- what it's doing is, it's taking the call.  It's normalizing the data.  It's receiving that call.  And then it's bouncing it against call records to see if we're going to get into that last agent return scenario where we're going to bypass the IVR.  And so that -- really, that whole quadrant of the VXML, CUSP, CVP, and ICM is really determining what to do with that call when it comes in.  So it's evaluating the call data that we have against historic calls tied to that ANI.  It's also doing a little bit of data management of what data is still needed on the call and what isn't -- what can be dropped.

Q.      And the ICM is responsible for sending data to Next Caller?

A.      Yes.

Q.      And the ICM is what receives the score back from Next Caller; is that right?

A.      Yes, that's correct.

15:20:19 1  Q.    And that all happens before the call is sent to the

15:20:22 2  IVR?

15:20:22 3  A.    Yes.

15:20:23 4  Q.    So that Next Caller receives the data from Dish and

15:20:26 5  provides a score back to Dish before the IVR even answers

15:20:30 6  the call; is that right?

15:20:34 7  A.    Before the IVR receives the call, we do get a score

15:20:37 8  back from Next Caller, that's correct.

15:20:40 9  Q.    On Exhibit 6, page 2, which is Dish's implementation

15:20:44 10 of the VeriCall product, the Acme 4600, is that a telephonic

15:20:51 11 device?

15:20:51 12 A.    Yes.

15:20:53 13 Q.    Okay.  Yeah.  My question is just that, in that

15:20:56 14 scenario, Next Caller will produce a score to Dish before

15:21:00 15 the agent picks up the call; right?

15:21:05 16 A.    Yes.

15:21:06 17 Q.    Okay.  And when Dish implements the VeriCall product,

15:21:10 18 there are Dish's that -- with SIP headers that Dish receives

15:21:15 19 and sends to VeriCall.  Is that true?

15:21:20 20 A.    No.  The -- what we did was we didn't strip off some

15:21:24 21 of that information in the SIP header, and they identified

15:21:28 22 specifically which data elements we needed to persist.  So

15:21:31 23 that when we call their services, we pass the ANI along with

15:21:35 24 that header information, and then they provide the score

15:21:38 25 back.

15:21:38 1    Q.    Okay.  So Dish receives certain information with the

15:21:44 2  -- with the incoming call.  And then sends some of that

15:21:47 3  information to VeriCall's product, and then VeriCall returns

15:21:51 4  a score.  Is that right?

15:21:54 5    A.    Yes.  We modified the system to bring in the CVP,

15:22:04 6  VXML server which is what we're using to connect into

15:22:08 7  VeriCall.  And we also changed how and when we're stripping

15:22:11 8  out the SIP header information.

15:22:13 9    Q.    When is the SIP header information stripped out in

15:22:15 10  the VeriCall implementation?

15:22:17 11    A.    After we receive the VeriCall score and before it

15:22:20 12  goes to the IC -- or IVR.  Or before it goes to the agents

15:22:24 13  in a direct routing situation.

15:22:27 14    Q.    So with the VeriCall implementation, Dish receives a

15:22:32 15  confidence score from VeriCall before the call is routed to

15:22:36 16  IVR; is that right?

15:22:37 17    A.    Yes.  That's correct.

15:22:39 18    Q.    Well, I guess what I'm asking is, other than

15:22:41 19  receiving the confidence score, is there anything else that

15:22:45 20  Dish uses the VeriCall product for?

15:22:47 21    A.    No, the VeriCall product returns that score, which we

15:22:51 22  then action off of, and that score is what we care about.

15:22:56 23    Q.    Okay.  And then the ICM collects various pieces of

15:23:00 24  information related to that call; is that right?

15:23:02 25    A.    Yes.  Mostly, the information that it's looking at is

15:23:07 1  historical calls tied to that ANI at that point and the TFN

15:23:14 2  that is calling in on it.  So we have thousands of TFN that

15:23:18 3  are assigned to Dish, it's evaluating which campaign they're

15:23:22 4  calling in on, so things like a direct to act campaign is

15:23:26 5  handled differently than a Dish main campaign.

15:23:28 6  Q.    Just to be clear, the TFN stands for what?

15:23:31 7  A.    Toll free number.

15:23:33 8  Q.    Mr. Telman, you've been handed what's been marked as

15:23:36 9  Exhibit 7.  It has Bates numbers Dish 0001338 to 343.  Do

15:23:42 10 you recognize Exhibit 7?

15:23:46 11 A.    Yes.  This is a black and white version of a full

15:23:50 12 color presentation that I -- that I put together.

15:23:51 13 Q.    And this is a document that is maintained in the

15:23:56 14 normal course of business at Dish?

15:23:58 15 A.    Yes.

15:24:00 16 Q.    You said that you're the person that puts this

15:24:04 17 document together?

15:24:05 18 A.    Yes, I am.

15:24:05 19 Q.    What is the purpose of this document?

15:24:07 20 A.    This was to talk about the -- the use case of doing a

15:24:12 21 partnership with Next Caller to our executive team.

15:24:20 22 Q.    If you return to -- excuse me, if you turn to

15:24:24 23 page 342 of the document.

15:24:25 24 A.    Yes.

15:24:27 25 Q.    Do you see at the top, it says compared to other

15:24:31 1    procedures, Next Caller offers lowest cost quoted and

15:24:34 2    highest level of dependability, as evaluated by IT SEC?

15:24:40 3    A.     Yes.

15:24:40 4    Q.     What is IT SEC?

15:24:42 5    A.     IT security.

15:24:43 6    Q.     Is IT security a department within Dish?

15:24:46 7    A.     Yes, it is.

15:24:47 8    Q.     And so IT security, am I understanding correctly that

15:24:51 9    they did an evaluation of Next Caller?

15:24:53 10    A.     Yes.

15:24:57 11    Q.     And is that the discussion that we had earlier this

15:25:00 12    morning, the efforts that Mark Gallick went through?

15:25:05 13    A.     Yes, it is.

15:25:06 14    Q.     And it says here, "compared to other providers." Do

15:25:12 15    you recall what other providers are being referenced here?

15:25:17 16    A.     The only two names are the same that I mentioned

15:25:20 17    earlier this morning which were TRUSTID and Pindrop.

15:25:24 18    Q.     And it's your recollection that Next Caller had the

15:25:27 19    lowest cost of those providers?

15:25:29 20    A.     That's what was communicated to me by IT security.

15:25:32 21    Q.     Do you know whether Dish spoke to any references of

15:25:36 22    Next Caller before engaging Next Caller?

15:25:39 23    A.     We did.

15:25:40 24    Q.     What references did Dish speak with?

15:25:42 25    A.     I believe it was Capital One.

15:25:44 1    Q.      And it's your understanding that Capital One spoke

15:25:48 2    positively about Next Caller?

15:25:50 3    A.      Yes.

15:25:51 4    Q.      Did Dish's discussion with Capital One influence

15:25:54 5    Dish's decision to partner with Next Caller?

15:25:58 6    A.      Yes, it did.

15:25:59 7    Q.      How so?

15:26:00 8    A.      We rely not only on our evaluation of a company, but

15:26:05 9    also the communications that we have with other people in

15:26:09 10   the industry and their experiences.  It becomes one of the

15:26:13 11   -- one of the elements that we provide up for senior

15:26:20 12   executives when we request for money.

15:26:23 13   Q.      On Exhibit 6, in Dish's implementation of the

15:26:27 14   VeriCall product, would you draw a box around the IVR?

15:26:33 15   A.      (Complies.)

15:26:38 16   Q.      Would you label that as IVR?

15:26:41 17   A.      (Complies.)

15:26:44 18   Q.      Would you also draw a box around the ICM platform,

15:26:48 19   what you considered to be an ICM platform?

15:26:54 20   A.      (Complies.)

15:26:56 21   Q.      Would you label that as ICM platform?

15:27:02 22   A.      (Complies.)

15:27:08 23                (End of videotape deposition.)

15:27:11 24                MS. WELLS:  We move to enter JTX-30 and JTX-31

15:27:12 25   into evidence.

15:27:19 1      MS. COLUMBIA:  No objection.

15:27:20 2      THE COURT:  All right.  They're admitted.

15:27:22 3      MS. WELLS:  Thank you.  The next witness we

15:27:24 4 would like to call is Mr. Jim Bress.

15:27:26 5      THE COURT:  All right.

15:28:00 6      COURT CLERK:  Please state and spell your name

15:28:00 7 for the record.

15:28:00 8      THE WITNESS:  James Bress.  J-A-M-E-S,

15:28:00 9 B-R-E-S-S.

15:28:00 10      JAMES BRESS, having been duly sworn, was

15:28:00 11 examined and testified as follows:

15:28:06 12      MR. BLOCK:  Good morning.  My name is -- I lost

15:28:15 13 track of time.  Good afternoon.  My name is Daniel Block.

15:28:18 14 I'm another attorney for TRUSTID.

15:28:21 15                    DIRECT EXAMINATION

15:28:21 16 BY MR. BLOCK:

15:28:22 17 Q.      Can you please state your name for the record again?

15:28:24 18 A.      Good afternoon.  My name is James Bress.

15:28:27 19 Q.      Mr. Bress, can you tell the jury a little bit about

15:28:30 20 yourself?

15:28:32 21 A.      Sure.  My education I spent most of my youth and

15:28:35 22 graduated high school in New Jersey, then I went to the

15:28:38 23 University of North Carolina in Charlotte where I received a

15:28:41 24 bachelor degree in electrical engineering.  Then I went to

15:28:45 25 Cal Tech, California Institute of Technology where I

15:28:48 1   received a masters degree in electrical engineering.

15:28:50 2   Q.      Mr. Bress, did you prepare demonstratives for your

15:28:53 3   testimony today?

15:28:53 4   A.      Yes, I have.

15:28:54 5              MR. BLOCK:  Your Honor, may we publish this

15:28:56 6   demonstrative for the jury?

15:28:57 7              THE COURT:  You may.

15:28:57 8   BY MR. BLOCK:

15:29:06 9   Q.      Mr. Bress, can you tell the jury about your

15:29:09 10  professional experience?

15:29:10 11  A.      Sure.  I started my career at Bellcore, in Bell

15:29:15 12  Communications and Research.  Bellcore is responsible for

15:29:18 13  developing all the operation systems for the Bell Telephone

15:29:21 14  Companies, also for developing new services and doing

15:29:24 15  research and development.

15:29:24 16  Q.      What are the Bell Telephone Companies?

15:29:26 17  A.      So back in the 1980's, AT&T was broken up and broken

15:29:31 18  into several different Bell operating companies.  The local

15:29:35 19  telephone companies, Bellcore was responsible for

15:29:38 20  maintaining and developing the operation systems and the

15:29:41 21  network for all the phone networks.

15:29:42 22  Q.      What did you do while you were at Bellcore?

15:29:47 23  A.      I started out in the operation systems, development,

15:29:50 24  and so there I gained a deep understanding of how the

15:29:55 25  operation systems worked, how the networks are connected

15:29:56 1    together, essentially how phone calls get from one place to

15:29:59 2    the other.  And then the last part of my career there, the

15:30:03 3    last seven years I was in involved in developing new

15:30:07 4    services, most of those services were using the caller-ID

15:30:11 5    signal that we've heard about here in this case.

15:30:13 6    Q.       When you were at Bellcore, did you work with any Bell

15:30:17 7    communications networks?

15:30:19 8    A.       Absolutely.  That's what the phone network is.

15:30:21 9    Q.       How about telephone devices?

15:30:23 10   A.       Yes.

15:30:24 11   Q.       And you mentioned caller-ID technology.  Can you

15:30:28 12   point the jury to what your caller-ID experience was at

15:30:32 13   Bellcore?

15:30:32 14   A.       Sure.  So caller-ID actually was invented back in the

15:30:37 15   '70s, perhaps, and for being able to receive a number who is

15:30:41 16   calling, many new services that were developed.  For

15:30:44 17   example, one of the services I worked on was called

15:30:47 18   caller-ID with call waiting, and so when you had -- this was

15:30:51 19   an innovation at this time so when you were on the phone and

15:30:52 20   the call waiting signal came in, you were able to actually

15:30:52 21   see the caller-ID of who it was so you wouldn't be

15:30:52 22   interrupted.  And it was an innovation for avoiding

15:31:02 23   telemarketing calls when you were on another important call.

15:31:02 24   Q.       We'll get into this a little bit later.  What about a

15:31:10 25   technology called voiceover IP, did you work on that at

15:31:13 1    Bellcore?

15:31:13 2    A.        That was just starting.  I left Bellcore in 1995 and

15:31:17 3    some of the technologies and basically networking that

15:31:21 4    supported the development of voiceover IP was going there.

15:31:25 5    By 1995 it wasn't commercially available.

15:31:27 6    Q.        Are you still with Bellcore?

15:31:29 7    A.        No.  No, I'm not.

15:31:31 8    Q.        Where did you go after you left Bellcore?

15:31:34 9    A.        Right.  So I was at Bellcore for ten years, and at

15:31:38 10   that time I needed to -- I felt I needed to make a decision

15:31:40 11   whether I wanted to climb the corporate ladder or do

15:31:46 12   something different.  And I decided to do something, I

15:31:48 13   started my own company, AST Technology Labs.

15:31:52 14   Q.        What does AST Technology Labs do?

15:31:55 15   A.        AST is a test lab.  I started out the business

15:31:59 16   testing telecom equipment.  I have been the president, chief

15:32:03 17   technical officer since the beginning.  That's still my role

15:32:06 18   and we're still testing telecom equipment.

15:32:09 19   Q.        What type of telecom equipment do you test?

15:32:12 20   A.        Well, we started in 1995, so we were testing mainly

15:32:17 21   analog telephone equipment.  Since we have been in business

15:32:19 22   for twenty-five years, as a company we have moved with the

15:32:21 23   times and kept up with the technology.  And starting in

15:32:24 24   about the year 2000, 2002, when voiceover IP technology

15:32:27 25   started to be relevant and commercially relevant in the

15:32:33 1  industry, that's mainly the products and devices we have

15:32:36 2  been testing since about 2002, 2005.

15:32:39 3  Q.      How about caller-ID, do you do any work at AST with

15:32:43 4  caller-ID?

15:32:43 5  A.      Certainly.  And so caller-ID, the networking

15:32:47 6  caller-ID is very relevant.  In fact, it's relevant for the

15:32:50 7  older network, it's relevant for voiceover IP as I think

15:32:54 8  we've all heard about so far in this case.

15:32:58 9  Q.      So you see there is a logo there called TIA on our

15:33:03 10 demonstrative.  Can you explain to the jury what that is?

15:33:06 11 A.      TIA stands for Telecommunications Industry

15:33:10 12 Association.  It's a standard development organization.

15:33:12 13 Q.      What is your connection with TIA?

15:33:14 14 A.      I joined TIA soon after I started AST Technology

15:33:20 15 Labs.  I have been involved in the development of standards

15:33:22 16 for telecommunications equipment.  And what is a standard?

15:33:26 17 It usually has a measurement method and a performance

15:33:29 18 requirement and those measurement methods are what we do at

15:33:32 19 AST testing the various telecom equipment.  And to test that

15:33:36 20 telecom equipment, I have been involved, directly involved

15:33:39 21 in developing the test points at the labs that simulate

15:33:42 22 these signals to test all of the equipment, the performance

15:33:46 23 of the equipment that we're evaluating.

15:33:50 24 Q.      Does your work at TIA and AST involve understanding

15:33:52 25 signaling protocol?

15:33:56 1    A.       Absolutely.

15:33:58 2              MR. BLOCK:  Your Honor, we proffer Mr. Bress as

15:34:01 3    an expert in this case in the field of telecommunications

15:34:03 4    including telecommunications networks, telecommunications

15:34:06 5    devices, caller identification, telecommunication signaling

15:34:10 6    and protocol such as voiceover IP.

15:34:13 7              MS. COLUMBIA:  No objection, Your Honor.

15:34:14 8              THE COURT:  He will be so recognized.

15:34:16 9    BY MR. BLOCK:

15:34:18 10   Q.       Mr. Bress, what were you asked to do in this case?

15:34:22 11   A.       I was asked to review three TRUSTID patents to

15:34:28 12   analyze them for -- against VeriCall for infringement of

15:34:35 13   those patents.

15:34:35 14   Q.       What is VeriCall?

15:34:36 15   A.       VeriCall is Next Caller's caller-ID authentication

15:34:39 16   product.

15:34:40 17   Q.       Were you asked to do anything else in this case?

15:34:42 18   A.       Yes.  I was also asked to analyze the patents for

15:34:46 19   their validity.

15:34:47 20   Q.       Were you asked to look at any TRUSTID products?

15:34:50 21   A.       Yes, I was.

15:34:51 22   Q.       Which products was that, or product?

15:34:53 23   A.       TRUSTID's product called Authenticator.

15:35:02 24   Q.       Which -- and I just turned to your next demonstrative

15:35:02 25   here.  Were these the three patents that you're referring

15:35:10 1    to?

15:35:10 2    A.    Yes, they are.   This is the '532 Patent, the '985

15:35:15 3    Patent, and the '913 Patent.

15:35:17 4    Q.    I would like to focus on your infringement analysis

15:35:19 5    with respect to VeriCall.   What materials did you review to

15:35:22 6    form your opinions for that analysis?

15:35:24 7    A.    Right.   That's the evidence in this case.   There were

15:35:28 8    many, many documents produced by Next Caller and Next

15:35:32 9    Caller's customers you heard from, and so I reviewed all

15:35:35 10   those documents, and that was provided, a lot of information

15:35:39 11   about how VeriCall works and how it's integrated with the

15:35:44 12   call centers of Next Caller's customers.

15:35:46 13   Q.    Did you look at anything else?

15:35:48 14   A.    Yes.   We just -- we all just heard the testimony from

15:35:53 15   -- I think from all of Next Caller's customers, the

15:35:56 16   corporate representatives from Next Caller's customers,

15:35:59 17   corporate representatives from Next Caller, and so all of

15:36:02 18   that is documented, documents you can read, so I have read

15:36:08 19   through all of that documentation -- all of that deposition

15:36:11 20   testimony.

15:36:11 21   Q.    Besides the documents you mentioned and depositions,

15:36:14 22   was there anything else you looked at?

15:36:16 23   A.    Yes.   So VeriCall is a software, and so I had the

15:36:22 24   ability to review all of the source code of VeriCall.

15:36:27 25   Q.    What is source code?

15:36:30 1    A.      So since -- it's software.  To develop software

15:36:34 2    somebody has to create it, that means somebody types in the

15:36:37 3    software code that eventually becomes what it runs and what

15:36:40 4    VeriCall is, and so it's something you can read and by

15:36:43 5    reading it and going through it and understanding it, I'm

15:36:46 6    able to -- I was able to understand exactly how VeriCall

15:36:50 7    operates.

15:36:50 8    Q.      Was source code important to your analysis,

15:36:53 9    Mr. Bress?

15:36:53 10   A.      Absolutely.

15:36:54 11   Q.      Why?

15:36:55 12   A.      Well, if you can read source code and understand how

15:36:57 13   it works, you know how the system operates.

15:37:00 14   Q.      I want to focus on your analysis with respect to

15:37:03 15   TRUSTID's Authenticator product.  Do you have any opinions

15:37:08 16   as to whether that practices the patent in this case?

15:37:11 17   A.      Yes, through my knowledge I found it has.  And I

15:37:17 18   believe Mr. Roncoroni during his testimony today basically

15:37:21 19   stated that, that he understood that TRUSTID's Authenticator

15:37:25 20   product -- he said it practices these patents, so he

15:37:28 21   confirms what I found, too.

15:37:29 22   Q.      For the record, though, which patents do you believe

15:37:33 23   in your opinion does the TRUSTID Authenticator product

15:37:36 24   practice?

15:37:36 25   A.      The ones we have here, the '532, '985 and '913

15:37:41 1   Patents.

15:37:41 2   Q.     Now, does TRUSTID's product operate differently than

15:37:45 3   Next Caller's product?

15:37:46 4   A.     Yes.

15:37:47 5   Q.     So how is it that TRUSTID's product even though it

15:37:51 6   operates differently than Next Caller's product, both of

15:37:53 7   them can still practice the claims of the patent?

15:37:56 8   A.     Right.  So we're getting into some of the details, an

15:38:00 9   infringement analysis of claims of a patent.  And the claims

15:38:03 10  require certain things, certain elements to infringe.

15:38:08 11        Let's talk about infringement first.  To

15:38:10 12  infringe, for VeriCall to infringe a claim, it has to do --

15:38:14 13  we'll look at these in a moment here -- certain elements of

15:38:16 14  the claim.  So as long as it practices, it performs each one

15:38:21 15  of those elements in the claim, it then infringes that

15:38:24 16  claim.  But the product can do other things.  It can do many

15:38:27 17  other things, but for an infringement analysis, as long as

15:38:30 18  it does those, practices those elements in the claim, then

15:38:34 19  it infringes.

15:38:35 20  Q.     So in order to determine whether VeriCall's product

15:38:38 21  infringes the patents in this case, would you need to look

15:38:41 22  at TRUSTID's product?

15:38:42 23  A.     No.  No, not at all.

15:38:45 24  Q.     Were you -- did you watch the opening of Next

15:38:47 25  Caller's counsel?

15:38:49 1    A.      Yes.

15:38:50 2    Q.      Did you hear their comments about comparing TRUSTID's

15:38:54 3    products with Next Caller's product?

15:38:57 4    A.      I did hear about that, yes.

15:38:59 5    Q.      Did it matter in your opinions whether TRUSTID's

15:39:02 6    product or Next Caller's product operate differently?

15:39:05 7    A.      No.  Just as I said, for example, doing an

15:39:08 8    infringement analysis on VeriCall, look at the claims, see

15:39:12 9    if VeriCall is practicing each of the elements and then it

15:39:15 10   would infringe.  It can do many different other things, too,

15:39:19 11   the same way we talk about Authenticator, if it's practicing

15:39:23 12   each of the claims, it's practicing the patent as well.  It

15:39:26 13   won't infringe because it's the same company's patent,

15:39:29 14   that's what the patents are developed on, based on

15:39:31 15   Authenticator, but Authenticator does many other things as

15:39:34 16   well, so the overlap, that overlap is what is in the claims,

15:39:37 17   the elements of the claims.  Then there is infringement.

15:39:40 18   Q.      Let's get to the good part, why we're here today, to

15:39:44 19   talk about the technology.  Can you explain to the jury at a

15:39:46 20   high level what the technology of the three patents are

15:39:50 21   here?

15:39:50 22   A.      Sure.  I think you already heard some of this, so

15:39:52 23   I'll try to keep it brief.  The best way I think to

15:39:57 24   understand the purpose of a patent, what does a patent do,

15:39:59 25   is to first understand what problems are being solved.

15:40:02 1    Every patent is developed to solve a problem.

15:40:06 2    Q.      What's the problem that these three patents are

15:40:09 3    directed toward?

15:40:10 4    A.      Well, the patents are directed towards bringing back

15:40:12 5    the credibility of caller-ID.  And so that starts with where

15:40:16 6    did the problem start?  And so let me go back in time a

15:40:20 7    little bit, back to -- I guess they were the good old days,

15:40:24 8    the good old days of caller-ID authentication, authenticity,

15:40:29 9    this was the '70s, '80s, even into the '90s where the banks,

15:40:33 10   especially banks, financial institutions and any other

15:40:36 11   company that had a call center would receive call signaling

15:40:40 12   and in that call signaling is the caller-ID.  You heard the

15:40:43 13   two terms mixed together, caller-ID and ANI.  When you hear

15:40:49 14   ANI and caller-ID, you should just think of the caller-ID

15:40:53 15   signal, your phone number that's being received on the other

15:40:55 16   side.

15:40:56 17          When that information was received back in the

15:40:58 18   good old days, was received at the bank, they could

15:41:01 19   immediately rely on it.  It was guaranteed that that phone

15:41:02 20   number that that call signaling was from your phone, and

15:41:07 21   they could immediately put it into their system and when

15:41:10 22   they connected you to the agent, they could say hello

15:41:13 23   Mr. Bress, I have your account on the screen.  How can I

15:41:12 24   help you?  That was the good old days.

15:41:17 25   Q.      Since you mentioned the good old days, I suspect

15:41:20 1   something changed.   What changed?

15:41:22 2   A.      Well, I don't want to imply that voiceover IP started

15:41:26 3   any bad old days, because voiceover IP enabled a lot of

15:41:30 4   technology that we all enjoy, but it did bring about the

15:41:33 5   problem.   The problem of the authentication, the need for

15:41:37 6   authentication of the caller-ID and the problem was that the

15:41:40 7   voice, the internet technology, voiceover IP technology were

15:41:45 8   merging with the public telephone system technologies and it

15:41:49 9   became very easy for someone with a computer and a little

15:41:52 10  bit of knowledge to create a phone call that would go into

15:41:55 11  the network and say go to a bank's call center.   And when

15:41:59 12  that call signaling was received at that call center, it

15:42:02 13  would look like the phone number was coming from my phone

15:42:05 14  when, in fact, it was not.

15:42:08 15  Q.      Why is that a problem?

15:42:10 16  A.      It's a huge problem.   So go back to what I just said

15:42:13 17  how the banks were using that signaling, the signaling --

15:42:17 18  the signal comes in, they think -- the bank thinks it's

15:42:19 19  authentic, immediately I go to get access to my account and

15:42:24 20  I can transact business on my bank account.   In this case

15:42:27 21  now that caller-ID has been spoofed, I think you heard that

15:42:31 22  term already, it's been spoofed, now somebody else is

15:42:34 23  getting access to my bank account.

15:42:36 24  Q.      Did the banks have any solution to this problem?

15:42:40 25  A.      So the banks became aware of it when the fraud

15:42:43 1   started mounting up and the complaints started mounting up

15:42:46 2   of fraud so they attempted to -- they attempted to implement

15:42:51 3   some other solutions.  One of the solutions I think we have

15:42:54 4   heard about it is called KBA, or knowledge-based

15:42:58 5   authentication.  We're all familiar with that.  When you

15:43:01 6   call your cell phone provider, anywhere you get to a call

15:43:04 7   center, speak to an agent, they ask you questions, what's

15:43:07 8   your mother's maiden name?  What's your home phone number?

15:43:10 9   What's your birthday?  What's your PIN?  That's my favorite.

15:43:15 10  What's your PIN?  I never know my PIN so I never get to do

15:43:18 11  what I want to do, so it halts my call right there.  I think

15:43:21 12  we have all experienced that.

15:43:22 13  Q.      Was KBA an effective solution to the problem of call

15:43:27 14  spoofing?

15:43:27 15  A.      I think I pretty much said it wasn't very effective,

15:43:30 16  no, it wasn't effective for a couple of reasons.  One, we

15:43:33 17  can forget our PIN numbers.  The other is other people can

15:43:36 18  get that information.  They can find out our mother's maiden

15:43:39 19  name, your Social Security number and pretend to be you.  So

15:43:42 20  it's not very effective.  Another thing, it's expensive for

15:43:47 21  call centers.  It's expensive for them to have to add

15:43:50 22  agents' time to ask you questions.  And more importantly

15:43:54 23  it's expensive for us having to waste our time having to

15:43:57 24  answer these questions.

15:43:57 25  Q.      Were there any other solutions that banks had besides

15:44:00 1  the KBA or knowledge-based authentication?

15:44:03 2  A.      The other things that been tried are voice

15:44:05 3  biometrics.  I believe we have heard about that as well

15:44:08 4  where the way voice biometrics works is initially the bank

15:44:12 5  or the call center would need to get a recording of your

15:44:15 6  voice and so you would have that stored and then later you

15:44:19 7  call in and they talk to you, and they get some more of your

15:44:23 8  voice and they compare the two, it's called a voice print.

15:44:25 9  And they compare the voice prints in an attempt to

15:44:29 10 authenticate that it's actually you calling in.

15:44:31 11 Q.      Was a voice biometrics an effective solution to the

15:44:35 12 problem?

15:44:35 13 A.      No, it's not either.  Again, it suffers some of the

15:44:39 14 same problems.  It's expensive.  It takes time.  And there

15:44:43 15 are problems with the performance of it.  You can imagine

15:44:47 16 why some of the problems come about.  There is a very simple

15:44:50 17 example.  If the initial recording they got was made say

15:44:54 18 when you were in a quiet room because you're on the phone

15:44:57 19 making a recording, and then you call back in and they get

15:45:00 20 your voice and now you're in a noisy environment, say you're

15:45:02 21 on a train and they try to compare the voice prints, it's

15:45:02 22 going to fail.  So it wasn't reliable either.

15:45:10 23 Q.      We talked a little bit about the problem, perhaps

15:45:12 24 quite a bit about the problem.  Where did the patent fit in?

15:45:16 25 A.      I think that was the first thing you asked me and I

15:45:18 1    talked all about the problems, so coming full circle here.
15:45:21 2    So I'm going to step back for a second to remind us all that
15:45:25 3    what was working first was when we could rely, the banks
15:45:28 4    could rely on that caller-ID signal coming in.  And what the
15:45:32 5    patents do, the patents, the invention of the patents is to
15:45:35 6    bring back that credibility of that caller-ID signaling
15:45:40 7    that's in the telephone signaling that is received at the
15:45:43 8    call center.
15:45:44 9    Q.      And how is it that the patents do that?
15:45:46 10   A.      Well, how do the patents do it?  We'll get into that
15:45:51 11   here in a second.  But the patents describe a method where
15:45:54 12   the call signaling is sent to an authentication system and
15:45:58 13   that authentication system processes that call signaling
15:46:01 14   data and generates a risk score.  And you have seen that, an
15:46:04 15   authentication score.  And it's sent back to the call center
15:46:07 16   and the call center is able to then verify whether you are,
15:46:11 17   that you're caller-ID in the call coming in is valid or not
15:46:14 18   valid.  And that's the beauty of this system, once it's
15:46:19 19   considered to be valid and the call center knows that, no
15:46:22 20   more twenty questions by the agent, you go right to doing
15:46:25 21   your business.
15:46:25 22   Q.      You mentioned -- we'll go into that, try to go into
15:46:31 23   that.  Slight technological issue here.
15:46:36 24   A.      There you go.
15:46:36 25   Q.      Thank you.

15:46:40 1      And so can you explain to the jury what this

15:46:46 2 diagram is showing?

15:46:47 3 A.      Sure.  This is a -- you heard a lot of testimony, you

15:46:51 4 heard a lot about answering calls.  We just sat for an

15:46:57 5 hour-and-an-half hearing about answering calls and SIP

15:47:00 6 metadata, SIP headers, authentication scores, and what does

15:47:05 7 that all mean.  I'm going to try to not repeat too much of

15:47:09 8 that, but try to bring that to a live presentation of what

15:47:13 9 that all means.

15:47:14 10      Really the point of is how does that fit into

15:47:16 11 the claims of the patent and how does this fit into what is

15:47:19 12 called the accused product in this case called VeriCall.

15:47:22 13 Q.      Hopefully this may have fixed it.  Since we have

15:47:26 14 something appearing on the screen here --

15:47:28 15 A.      This is one of my demonstratives.

15:47:29 16 Q.      Since we have something that's appeared on the screen

15:47:32 17 here, something called SIP invite, can you explain that to

15:47:35 18 the jury?

15:47:35 19 A.      Let's go over quickly what's on this diagram.  A

15:47:39 20 calling party.  That would be you or I calling into the

15:47:41 21 bank.  We have a public telephone network, we have the call

15:47:44 22 center telecom network, that's connected to the telephone.

15:47:48 23 There is the call center agent that we want to talk about.

15:47:51 24 And the invention, the authentication system, that's what

15:47:55 25 the patents are shown down next to it.

15:47:55 1    Q.       What is that SIP invite?

15:47:56 2    A.       Right.   So you take your cell phone, dial the 800

15:48:00 3    number at the bank, you hit send and this is where we're

15:48:03 4    talking about this call signaling, SIP, this message is

15:48:07 5    called a SIP invite.   SIP stands for session initiation

15:48:12 6    protocol.   It's really just the rules that are behind the

15:48:15 7    scenes at the network of how the network communicates with

15:48:18 8    itself and communicates with the call center to send that

15:48:21 9    call signal information including your caller-ID to the --

15:48:24 10   to where the call is going.

15:48:26 11   Q.       And then what happens after that?

15:48:27 12   A.       So if we can click through it.   After you hit the

15:48:31 13   send button, that SIP invite is routed through the telephone

15:48:35 14   network and it's received at the call center.   And since the

15:48:38 15   call center is now implementing the invention, that SIP

15:48:42 16   invite will then -- SIP invite information, all of this call

15:48:47 17   signaling information, we'll look this up a little bit

15:48:50 18   later, goes down to the authentication system.   We can click

15:48:53 19   through.   There we go.

15:48:55 20            And the authentication system does it

15:48:57 21   processing.   And we'll get into the details, some of the

15:48:59 22   details of that later.   And it comes up with a score.   So it

15:49:02 23   receives that information, comes up with a score, call it a

15:49:06 24   metric.   There it is.   And the metric is then sent back to

15:49:12 25   the call center, the call center is able to verify whether

15:49:15  1   the caller-ID received is valid.  And then that information

15:49:19  2   is conveyed to the call center agent.  And then you would be

15:49:24  3   talking to the agent.  And that's what brought back the

15:49:27  4   credibility of that caller-ID information.

15:49:30  5          So in this scenario, whether -- say that was you

15:49:34  6   or I calling in and the system authenticated valid, no more

15:49:38  7   questions, you're going right on to do business with the

15:49:41  8   bank just like it was in the '70s, '80s and early '90s.

15:49:45  9   Q.     This is what happened if everything was good and your

15:49:48 10   number wasn't spoofed.  Can you explain to the jury what

15:49:51 11   happened when the number is spoofed?

15:49:54 12   A.     Sure.  If you can go to my next demonstrative.  This

15:49:56 13   is the reason for the system, because now we're over --

15:49:59 14   people with the computer can spoof the caller-ID and your

15:50:02 15   call signaling and make it look like it's you or I calling

15:50:06 16   into say the bank, but it's not, it's the bad guy there that

15:50:09 17   we can see there in my demonstrative.  So that phone has an

15:50:13 18   actual phone number, caller-ID associated with it.  But now

15:50:17 19   since he's a spoofer, he's just changed that SIP invite

15:50:20 20   information to look like it's coming from me, or you, with

15:50:24 21   our phone.

15:50:25 22          And then the same thing happens, click through

15:50:27 23   the SIP invite information is transferred through the

15:50:31 24   network, gets to the call center, it's sent to the

15:50:35 25   authentication system, authentication system does the same

15:50:37 1    thing, does the score, the score goes back to the call

15:50:41 2    center, and in this case since it wasn't valid and the

15:50:47 3    authentication system is doing what it's invented to do, it

15:50:50 4    comes up as spoofed, meaning that when the call center agent

15:50:54 5    receives that information that the call is spoofed then

15:50:57 6    they're going to have to ask more questions.

15:51:00 7    Q.      Thank you, Mr. Bress.  That was helpful.  Do you have

15:51:03 8    an understanding of what it means to infringe a patent?

15:51:05 9    A.      Yes, I do.

15:51:06 10   Q.      Can you explain that to the jury?

15:51:07 11   A.      Certainly.  So a patent has claims.  First, let me go

15:51:15 12   to what a patent is.  I think you heard some of this, but

15:51:18 13   quickly a patent has a specification.  It defines when

15:51:20 14   someone invents something by getting a patent, they're

15:51:23 15   telling the world, hey, this is what I did and this is how I

15:51:27 16   built it in great detail, sometimes a hundred pages.

15:51:31 17   Patents are twenty to a hundred pages, a lot of detail.  But

15:51:34 18   at the end of that is what's called the claims.  And this is

15:51:38 19   what the inventor is actually saying he or she has invented.

15:51:41 20   And there are multiple claims.  Each claim is its own

15:51:44 21   invention.  So for infringement, if a product is

15:51:48 22   practicing -- if a product is doing every part of that

15:51:51 23   claim, every element of that claim, then it infringes the

15:51:52 24   claim.

15:51:55 25   Q.      What if a product does more than the elements of the

15:51:59 1    claim, does it still infringe?

15:52:01 2    A.      No.   We talked about that before.   When we look at

15:52:04 3    some of the language that's in the claims, I think in all

15:52:08 4    the claims in this case that there is a keyword, that's

15:52:12 5    comprising.   And so we'll see that this word is in there and

15:52:15 6    it will say something like a system comprising, and then it

15:52:19 7    has a list of things, these elements that define what the

15:52:23 8    claim is.   And so when the word comprising is in there,

15:52:27 9    that's telling us that the claim only requires these things.

15:52:30 10   The product that you're comparing it to can do many other

15:52:34 11   things, but as long as it does just those things, then it

15:52:38 12   infringes the claims.

15:52:39 13   Q.      Would it matter if a product had improvements

15:52:42 14   relative to patent claim?

15:52:43 15   A.      No, you're comparing to the product -- the product

15:52:46 16   could have other improvements, it could have additional

15:52:49 17   functions, additional features, the infringement analysis

15:52:51 18   here is the claims, the elements of the claims, does this

15:52:54 19   product do those elements.   It doesn't matter if it does

15:52:56 20   other things.

15:52:56 21   Q.      We have a demonstrative, PDX-2.6 up here.   Can you

15:53:01 22   explain to the jury what this is showing?

15:53:02 23   A.      Sure.   This is a summary of the three patents that

15:53:05 24   are at issue here in this case.   And then what's under them

15:53:06 25   is what's called the asserted claims.   These are the claims

15:53:11 1    that are being infringed, or my analysis has shown they are

15:53:17 2    being infringed.  The '532 Patent, we have claim 32, claim

15:53:22 3    48, claim 50; the '985, there is claim 1, claim 4, claim 10

15:53:27 4    are being asserted; and the '913 Patent, claim 1, claim 14,

15:53:30 5    and claim 15 are being asserted.

15:53:33 6    Q.    We will get into these claims in a minute.  But can

15:53:36 7    you explain to the jury or walk the jury through the process

15:53:39 8    you took to determine infringement in this case for each of

15:53:42 9    these claims?

15:53:43 10   A.    Sure.  An infringement analysis is a two-step

15:53:47 11   process.  And the first step is to take each claim one at a

15:53:52 12   time, so we'll talk about just an infringement analysis for

15:53:55 13   one claim, and you take the claim and understand what every

15:53:59 14   word, what every term in the claim means.  The first step is

15:54:02 15   to understand what is this claim saying?  What is the

15:54:05 16   invention in this claim?

15:54:09 17   Q.    Okay.  And how is it that you determine the meaning

15:54:12 18   of those words?

15:54:14 19   A.    Right.  And so I mention the specification of the

15:54:17 20   patent.  The specification again is a description from the

15:54:21 21   inventor of what I invented, what he or she invented.  So in

15:54:26 22   that specification there is often very important information

15:54:28 23   about what the inventor meant by certain claim terms and

15:54:32 24   certain words.

15:54:35 25   Q.    Is there anything else you look at besides the

15:54:36 1 specification?

15:54:36 2 A.    Absolutely.  And so if you or I were to file a patent

15:54:40 3 application, we invented something, we filed it with the

15:54:43 4 Patent Office, that starts an extensive search at the Patent

15:54:47 5 Office.  Sometimes it takes two, three, maybe even more than

15:54:51 6 three years for the Patent Office to do its searching to

15:54:55 7 verify that you really have invented this.  There is

15:54:58 8 something called prior art, there is no prior art, nobody

15:55:01 9 has disclosed anywhere else in other patents, other

15:55:04 10 products, other documents, what you have invented.  So that

15:55:07 11 search goes on for quite a while.  And during that search,

15:55:11 12 what's called a patent examiner, a person at the Patent

15:55:14 13 Office, will be communicating back and forth with the

15:55:19 14 inventor asking questions saying, you know, what did you

15:55:22 15 mean by this, what did you mean by that?  We're not going to

15:55:25 16 allow this.  And the inventor and patent examiner go back

15:55:28 17 and forth.  This creates a paper trial and the paper trail

15:55:31 18 can be hundreds of pages, but it's very informative to read

15:55:35 19 it all because you can understand what the inventor thought

15:55:38 20 things were.  And more importantly when the patent applicant

15:55:41 21 tells the examiner this is what I meant, well then that's

15:55:44 22 very informative as to what the claims, the words in the

15:55:47 23 claims were intended to mean.

15:55:48 24 Q.    Does that paper trail have a name?

15:55:50 25 A.    Yes.  It's called the file history or the prosecution

15:55:55 1    history of the patent.

15:55:56 2    Q.    Besides the specification or the prosecution history,

15:55:59 3    is there anything else you look at to determine the meaning

15:56:01 4    of a claim?

15:56:02 5    A.    Absolutely, there is.  When you've gone through the

15:56:06 6    specification, you have gone through the patent history, the

15:56:09 7    prosecution history, and you're pretty much sure you know

15:56:14 8    what the terms are, sometimes you can go to what is called

15:56:17 9    an external information, and that would be say textbooks,

15:56:20 10   dictionaries, generally just to confirm what is understood

15:56:25 11   that the claim terms mean.

15:56:26 12   Q.    All right.  Besides the specification, the

15:56:28 13   prosecution history, the dictionary, anything else you look

15:56:31 14   at?

15:56:32 15   A.    Yes.  I think I have left the best for last.  This,

15:56:35 16   I'll be mentioning this when I talk about my analysis in a

15:56:39 17   bit.  In this case, there is -- we have Next Caller, we have

15:56:43 18   TRUSTID, and no surprise, there will be disagreements on

15:56:47 19   what claim terms mean.  And so both sides are asked to get

15:56:50 20   together and try to agree on the claim terms that they

15:56:54 21   disagree about.  And eventually the sides come up with an

15:56:57 22   agreed definition of certain claim terms.  But when that

15:57:01 23   part is done, often there are some claim terms that they

15:57:05 24   disagree on, they just don't agree at all.  So that

15:57:08 25   information is provided to the Court, provided to the Judge.

And the Judge is asked to agree to the agreements that have already been made by the two sides, but probably most importantly is the Court then makes a definition for the terms that are not agreed upon. And that's called a claim construction.

So it's very important when understanding, when analyzing a claim and understanding what the words mean is to make sure that when the claim, when a Court has a court ordered claim construction of a definition for each claim term, that that's used in the analysis.

Q. All right. So we spent quite a bit of time on step 1. You mentioned it is a two-step process. What's step 2?

A. Step 1 is very important, you got to understand the claim terms. Step 2, now we understand the claim terms, we understand what it means, now we're going to start analyzing against the product, in this case the accused product, in this case called VeriCall. VeriCall, the next step is to understand how does VeriCall works and then map that, map its operation to the claims to the element of the claims. And if it practices each of the elements of the claim, each and every element, then it infringes. If it doesn't practice even one element of the claim, then it doesn't infringe. But if it practices all elements, that's infringement.

15:58:26 1    Q.    All right.  Since you have outlined this two-step

15:58:29 2    process, why don't we start with step 1, pulling up another

15:58:33 3    one of your demonstratives.

15:58:34 4              MR. BLOCK:  Your Honor, if you'll indulge us, I

15:58:37 5    gave Mr. Bress a clicker.  Can he walk the jury through

15:58:40 6    this?  I think it will be quicker if he does that.

15:58:43 7              THE COURT:  Yes, within reason.

15:58:44 8              MR. BLOCK:  Within reason.

15:58:46 9              THE WITNESS:  I'll try to keep it brief, Your

15:58:48 10   Honor.

15:58:48 11             So what is on my demonstrative here is similar

15:58:52 12   diagram that I had already was the calling party, telephone

15:58:57 13   network, the call center, the authentication system, and the

15:59:00 14   call center agent.  And the point of this demonstrative is

15:59:05 15   to show you the claim language of one of the claims that's

15:59:08 16   at issue in this case, and that's the '532 Patent, claim 32.

15:59:12 17   And I have divided it into the elements of the claim so that

15:59:16 18   I can do an element-by-element analysis.  And this is

15:59:20 19   step 1.  This is going through the claim to understand what

15:59:22 20   do the claim terms mean.

15:59:30 21   Q.    All right.  If not, I guess I can walk you through

15:59:32 22   it.

15:59:33 23   A.    I'm too far away to click.

15:59:35 24   Q.    All right.  So Mr. Bress --

15:59:36 25   A.    Thank you for clicking for me.

15:59:39 1    THE COURT:  Just so you know, Mr. Bress, we

15:59:41 2  usually do this as question and answer so it's not just a

15:59:44 3  lecture.  If you can just break it up a little bit.

15:59:49 4    MR. BLOCK:  Absolutely, Your Honor.

15:59:50 5    THE COURT:  That's just not the way we do it.

15:59:52 6    THE WITNESS:  Thank you, Your Honor.

15:59:53 7  BY MR. BLOCK:

15:59:53 8  Q.    Mr. Bress, can you explain how the first element,

15:59:55 9  what that first element means?

15:59:57 10  A.    Right.  So the first element is a system for

15:59:59 11  performing a forensic analysis on calling party number

16:00:03 12  information.  I think we have all heard that.  There is a

16:00:06 13  system, it's the authentication system here in this diagram

16:00:10 14  that performs an analysis on the caller-ID, calling party

16:00:15 15  number information.

16:00:16 16  Q.    And next we have got highlighted incoming call from a

16:00:19 17  telephonic device.  What would that be?

16:00:22 18  A.    When you're calling in to say the bank when you want

16:00:25 19  to speak to the call center agent, so you have your

16:00:28 20  caller-ID, you'll have the connection through the call

16:00:30 21  center, and then you would be talking to the agent.  When

16:00:33 22  you look at the call center agent there is an incoming call

16:00:36 23  to the call center agent.

16:00:39 24  Q.    So we're going -- so what happened there?

16:00:41 25  A.    Here it's just like before, you call the 800, you

16:00:44 1    click the 800 number in your phone, you click send, the SIP

16:00:49 2    invite message is sent through the telephone network, routed

16:00:53 3    through the network, routed into the call center, say the

16:00:56 4    bank, and then this is where the invention comes in.

16:00:59 5    Q.    Okay.  So we have highlighted the before the incoming

16:01:04 6    call is answered.  Can you explain that, Mr. Bress?

16:01:06 7    A.    You have heard a lot about this, this issue, when the

16:01:09 8    call answers.  This is where -- this is what this means in

16:01:13 9    the claim.  This is why it's very relevant in this case.

16:01:15 10   The claim requires that this forensic analysis of this

16:01:19 11   calling party number, the caller-ID, occurs before that

16:01:22 12   incoming call to the agent is answered.

16:01:27 13   Q.    Okay.  Next we have the interface for receiving

16:01:29 14   calling party number information associated with the

16:01:32 15   incoming call.  Where would that be on this diagram?

16:01:36 16   A.    That would be at the authentication system.  So when

16:01:38 17   the information is sent from the call center to the

16:01:41 18   authentication system, the authentication system needs an

16:01:45 19   interface, we'll see later it's called the API, the

16:01:48 20   application programing interface.

16:01:50 21   Q.    How about the memory?

16:01:52 22   A.    Certainly it's a computer-based system,

16:01:55 23   software-based system that runs on computers, it necessarily

16:01:57 24   has a memory.

16:01:58 25   Q.    And where would those expected call patterns be?

16:02:01 1    A.    So the expected call patterns are what is going to be

16:02:04 2    analyzed.  It's going to be used to compare the incoming

16:02:07 3    data to -- that would be in that memory.

16:02:09 4    Q.    How about the one or more processors?

16:02:11 5    A.    Certainly it's a computer system running software,

16:02:13 6    it's got processors.

16:02:15 7    Q.    So next we have the step, gather operational status

16:02:18 8    information associated with the calling party number

16:02:21 9    information.  Can you explain to the jury how that works?

16:02:24 10   A.    Sure.  That's the SIP invite information.  So when

16:02:27 11   the call center now wants to authenticate the caller-ID

16:02:30 12   coming in that signaling, they send that SIP invite

16:02:33 13   information to the authentication system, it extracts this

16:02:38 14   operational status information from that SIP invite

16:02:41 15   information, it does its processing, and that's the next

16:02:44 16   step is doing the processing on it and on that received

16:02:48 17   information.

16:02:49 18   Q.    Okay.  And this next step, the assign a source origin

16:02:54 19   confidence metric?

16:02:55 20   A.    That's the next step, the scoring you heard about,

16:03:00 21   source origin confidence metric, it does the processing on

16:03:02 22   the incoming data, the operational status information,

16:03:06 23   compares it to the expected call pattern, assigns a score,

16:03:10 24   sends that information back to the call center.  In this

16:03:15 25   case it was valid.  That information would then be conveyed

16:03:18 1    to the call center.  And then the call center agent can

16:03:21 2    answer the call.  So we see here all that processing in the

16:03:26 3    system occurred before the call center agent answered the

16:03:29 4    call.

16:03:30 5    Q.    Okay.  We talked a little bit about the patents here.

16:03:34 6    Why don't we talk about Next Caller's VeriCall product.  Do

16:03:37 7    you have an understanding of how VeriCall works?

16:03:39 8    A.    Yes, I do.

16:03:42 9    Q.    Okay.  I would like to turn to your next

16:03:45 10   demonstrative.  Can you point out to the jury where the

16:03:48 11   VeriCall system would fit in on this diagram?

16:03:51 12   A.    Sure.  So there is the same diagram.  And now the

16:03:55 13   first part I just did was an analysis of the claim terms, so

16:03:59 14   we understand what the claim terms mean with regard to the

16:04:01 15   system.  And now I'm going to carry those claim terms, those

16:04:05 16   elements to VeriCall.  In this case VeriCall will be the

16:04:08 17   authentication system.

16:04:10 18   Q.    Okay.  Mr. Bress, can you turn to tab PTX-10 in your

16:04:17 19   binder?

16:04:20 20   A.    Okay.

16:04:22 21   Q.    Do you recognize this document?

16:04:22 22   A.    I do.

16:04:27 23   Q.    What is this document?

16:04:28 24   A.    This is a document produced by Next Caller.  It's one

16:04:32 25   of Next Caller's engineering documents.

16:04:37 1   Q.     Mr. Bress, did you rely on that document in your

16:04:40 2   analysis in this case?

16:04:41 3   A.     Yes, I did.

16:04:42 4           MR. BLOCK:  Your Honor, we move to admit PTX-10.

16:04:45 5           MS. COLUMBIA:  No objection.

16:04:46 6           THE COURT:  All right.  It's admitted.

16:04:47 7           (PTX Exhibit No. 10 was admitted into evidence.)

16:04:48 8   BY MR. BLOCK:

16:04:49 9   Q.     Mr. Bress, how does this document fit into your

16:04:52 10   analysis?

16:04:52 11   A.     Well, as we'll see here in a minute, this document

16:04:55 12   includes an architecture, high level architecture of the

16:04:59 13   VeriCall system.  And if we can go to my next demonstrative.

16:05:03 14   There it is.  So I already said we're analyzing the claims

16:05:07 15   against VeriCall.  VeriCall is an authentication system

16:05:10 16   running on computers.  And that's the architecture from Next

16:05:16 17   Caller that describes how VeriCall works.

16:05:18 18   Q.     Why did you place it down there in the bottom right

16:05:21 19   corner?

16:05:21 20   A.     Well, that's what the authentication system is, so

16:05:24 21   doing a claim analysis.  Now I'm showing that it's not

16:05:28 22   really one computer depicted in this diagram, it's really a

16:05:32 23   system.

16:05:32 24   Q.     Does that entire system on the right-hand side fit

16:05:35 25   inside the little authentication system?

16:05:36 1   A.      That's one way to think of it, yes.

16:05:38 2   Q.      Why don't we turn to that diagram.  Maybe we can walk

16:05:42 3   the jury through that a little bit.  In the bottom

16:05:45 4   right-hand corner there is something called call center.

16:05:47 5   Can you explain what that is?

16:05:49 6   A.      Sure.  That's the call center we already seen.  If

16:05:52 7   you're calling into the bank, you're going to get to their

16:05:55 8   system for handling phone calls.

16:05:56 9   Q.      There is a line coming out of that call signaling

16:05:59 10  data, what's that?

16:05:59 11  A.      We saw what that SIP invite message is received at

16:06:03 12  the call center.  That information is then sent to VeriCall.

16:06:06 13  Q.      Okay.  There is a box that is highlighted here called

16:06:11 14  API Gateway.  I'll ask you to explain what that is in a

16:06:15 15  minute, but can you just explain what the letters API mean?

16:06:18 16  A.      I mentioned this before.  When one system is

16:06:21 17  communicating data to another, you need rules, it needs to

16:06:25 18  be in a certain format and that's called an application

16:06:28 19  programing interface.

16:06:29 20  Q.      How does the API Gateway fit into the system?

16:06:32 21  A.      The first part of the system is going to -- that data

16:06:36 22  will be the API Gateway.  As the arrow shows it will pass

16:06:40 23  that information to the actual VeriCall analysis engine.

16:06:42 24  Q.      Okay.  At a high level what does the VeriCall

16:06:47 25  analysis engine do?

16:06:48 1    A.      The VeriCall analysis engine is responsible for

16:06:50 2    generating the score.

16:06:53 3    Q.      Okay.  And again, we're going to get into the details

16:06:56 4    a little bit later, but at a high level how does it generate

16:07:00 5    that score?

16:07:00 6    A.      So at a high level there is two things that are done.

16:07:04 7    VeriCall software has rules, and rules are essentially

16:07:08 8    comparing data that came in in that signaling information

16:07:11 9    from the phone network against a set of rules for things it

16:07:14 10   will identify whether that call is risky, the caller-ID is

16:07:19 11   risky or not, that's number one.  And number two, it uses

16:07:23 12   something called machine learning which we see here on the

16:07:25 13   right.

16:07:26 14   Q.      What's machine learning?

16:07:27 15   A.      Machine learning is based on a model.  And what is a

16:07:30 16   model?  Very simply it receives thousands -- it receives

16:07:36 17   data from thousands of telephone calls all on that signaling

16:07:39 18   information we have been talking about and puts certain

16:07:42 19   elements into these model.  For example, the things like the

16:07:45 20   line type that was used to call in, the carrier with the

16:07:48 21   call came in, all of that information is correlated for what

16:07:51 22   is a valid call.  And then when the signaling information

16:07:54 23   from my call or your call comes in, it's able to be compared

16:07:58 24   against those models, compared against those patterns in the

16:08:01 25   models to determine whether it makes sense or not,

16:08:04 1    indicating whether that caller-ID is valid or not.

16:08:06 2    Q.    I would like to turn back to infringement for a

16:08:09 3    moment.  And I think we talked about the two-step process

16:08:12 4    earlier.  But can you confirm what opinion that relates to

16:08:16 5    that you have rendered in this case?

16:08:18 6    A.    I don't think I understand your question.

16:08:20 7    Q.    Do the two steps relate to your infringement

16:08:23 8    analysis?

16:08:24 9    A.    Yes, the two steps is the infringement analysis,

16:08:27 10   that's right.

16:08:28 11   Q.    Okay.  Are there different ways you can show

16:08:30 12   infringement?

16:08:31 13   A.    Yes, there are.

16:08:31 14   Q.    And what would those ways be?

16:08:33 15   A.    Well, there is two ways, one is called direct

16:08:37 16   infringement and the other is called indirect infringement.

16:08:40 17   Q.    What does direct infringement mean?

16:08:43 18   A.    So when doing an analysis for direct infringement,

16:08:45 19   that's when we say we have one product, for example,

16:08:48 20   VeriCall, and when doing the analysis, the analysis is

16:08:52 21   comparing against the claims is VeriCall practicing each and

16:08:57 22   every element of the claims being analyzed.  That would be

16:09:02 23   direct infringement if it does infringe.

16:09:02 24   Q.    You mentioned indirect infringement.  What's that?

16:09:04 25   A.    Indirect infringement would be for, again, in this

16:09:07 1   case, we've got VeriCall, but we also have VeriCall's

16:09:12 2   customers' call centers.  And in the case where the claims

16:09:15 3   are practiced on something that is part of the call center

16:09:20 4   and when we call VeriCall, that's when -- that combines

16:09:24 5   together the call center and they will call VeriCall, it's

16:09:27 6   called indirect infringement.  It's an interesting concept

16:09:31 7   because the infringer -- the actual direct infringement is

16:09:37 8   actually happening by the customer, by the call center, but

16:09:40 9   because VeriCall, because Next Caller provided the VeriCall

16:09:43 10  product, they are what is called indirectly infringing.

16:09:48 11  Q.      What patents, if any, do you believe Next Caller

16:09:51 12  directly infringes?

16:09:52 13  A.      My analysis found that the '532 and the '985 Patents

16:09:57 14  are being directly infringed by VeriCall.

16:10:00 15  Q.      And which patent, if any, do you believe Next Caller

16:10:03 16  indirectly infringes?

16:10:05 17  A.      So my analysis has shown that the asserted claims of

16:10:08 18  the '913 Patent are indirectly infringed.

16:10:11 19  Q.      Okay.  You mentioned the element-by-element analysis

16:10:15 20  earlier.  Let's walk the jury through that.  And I have a

16:10:20 21  demonstrative here on the screen.  Can you just explain

16:10:22 22  briefly what this is showing?

16:10:23 23  A.      Sure.  This is my demonstrative.  Again, it's pretty

16:10:26 24  much the same thing as I showed before about claim 32 from

16:10:29 25  the '532 Patent.  Now, we're going to do the natural

16:10:33 1    infringement analysis.  This is what is required, this is

16:10:35 2    what I had to do to do my analysis element by element of the

16:10:39 3    claim to compare to VeriCall.  And so here I'm showing that

16:10:42 4    the claim is broken into separate elements and I have

16:10:45 5    numbered them, 32.1, 32.2, down to 32.6.

16:10:50 6    Q.     Let's go back to your binder for a second.  If you

16:10:53 7    could you can turn to JTX-60.

16:10:59 8    A.     You said JTX-60; is that right?

16:11:03 9    Q.     Yes, that's correct, Mr. Bress.

16:11:04 10   A.     Okay.

16:11:05 11   Q.     Do you recognize this document?

16:11:06 12   A.     Yes, I do.

16:11:07 13   Q.     And just what is this document at a very high level?

16:11:11 14   A.     This is a document from Next Caller.  And I have

16:11:14 15   referred to it as Next Caller's API document.

16:11:17 16   Q.     Did you rely on this document for your opinions in

16:11:20 17   this case?

16:11:20 18   A.     Yes, I did.

16:11:22 19          MR. BLOCK:  Your Honor, we move to admit JTX-60

16:11:24 20   and publish it.

16:11:25 21          MS. COLUMBIA:  No objection.

16:11:26 22          THE COURT:  All right.  It's admitted.

16:11:27 23          (JTX Exhibit No. 60 was admitted into evidence.)

16:11:28 24   BY MR. BLOCK:

16:11:28 25   Q.     Mr. Bress, how does this document fit into your

16:11:31 1  analysis?

16:11:31 2  A.     This document is from Next Caller and it is provided

16:11:34 3  to their customers to inform them, we talked about this data

16:11:38 4  going from the call center to VeriCall, and that's called

16:11:41 5  the API, the authentication program interface, it's giving

16:11:46 6  instructions on how to take that call data from the call

16:11:48 7  center and send it to the correct format to VeriCall so

16:11:51 8  VeriCall can then do its analysis.

16:11:53 9  Q.     Let's turn to your next demonstrative here.  Can you

16:11:57 10 explain to the jury what this is showing?

16:11:58 11 A.     Sure.  This is a -- this is the first page of the

16:12:02 12 overview.  And it's showing exactly what I just said that

16:12:04 13 they're relying on the caller-ID, also called the ANI, and

16:12:08 14 then what's highlighted next is that Next Caller analyzes

16:12:11 15 the call including the carrier metadata associated with the

16:12:14 16 call, for example, the SIP header.  SIP headers is the call

16:12:18 17 signaling data that I mentioned multiple times.

16:12:20 18 Q.     This is JTX-60?

16:12:22 19 A.     JTX-60, that is correct.

16:12:25 20 Q.     In the top right-hand corner you have highlighted

16:12:28 21 some text, a test for performing forensic analysis on

16:12:32 22 calling party number information?

16:12:35 23 A.     So now we are doing the element-by-element analysis,

16:12:40 24 comparing the problem, Next Caller is describing what

16:12:42 25 VeriCall does, it meets that part of the element of the

16:12:45 1  claim.

16:12:46 2  Q.      Can you just point to the specific sentence where it

16:12:49 3  would do that?

16:12:49 4  A.      The part that I have highlighted, the part analyzes

16:12:53 5  the call including carrier metadata associated with the

16:12:57 6  call.

16:12:57 7  Q.      It goes on to say it's performing its analysis on

16:13:00 8  calling party number information.  What in VeriCall is the

16:13:04 9  call party number for?

16:13:05 10  A.      On VeriCall the call party number information is the

16:13:11 11  API.

16:13:11 12  Q.      This is that API document.  How do we know that Next

16:13:15 13  Caller's customers actually use this system in that way?

16:13:17 14  A.      Really there is no other way to use it because that's

16:13:20 15  how VeriCall is defined by API.  But if you can pull up my

16:13:24 16  next demonstrative, we just sort of heard at length the

16:13:28 17  testimony from Next Caller's customers, the corporate

16:13:30 18  representatives during their deposition testimony from the

16:13:35 19  customers, and I have highlighted here a part of their

16:13:39 20  testimony where they were talking about how they integrate

16:13:41 21  their system with VeriCall and it explains that the SIP

16:13:45 22  header information is sent along with the ANI information,

16:13:49 23  and all four customers, Dish, BBVA, Capital One and Comcast

16:13:52 24  confirm that that's exactly what they did.

16:13:55 25  Q.      All right.  Now I think we're coming to the big one.

16:14:00 1    An incoming call from a telephonic device.  How is it that

16:14:04 2    the VeriCall system performs this analysis on this calling

16:14:08 3    party number information associated with an incoming call?

16:14:13 4    A.      Right.  So there is a claim element, an incoming call

16:14:17 5    from a telephonic device.  And where is that in the system?

16:14:21 6    If you can pull up my next demonstrative.  This is a diagram

16:14:24 7    that I think we saw before during the deposition testimony

16:14:28 8    from Dish, Mr. Telman, the corporate representative from

16:14:32 9    Dish was explaining how Dish is integrated within VeriCall

16:14:36 10   and this is their system architecture and it's called a call

16:14:41 11   flow.

16:14:41 12   Q.      This looks like a complicated document here.  Maybe

16:14:44 13   we can be break it down for the jury.  There is the drawings

16:14:48 14   that I think we saw Mr. Telman drawing.  Can you explain

16:14:52 15   what ICM platform is?

16:14:53 16   A.      Sure.  Mr. Telman was explaining that the ICM

16:14:57 17   platform is essentially the call manager.  The calls come in

16:15:00 18   to the call center, that's the system that works together to

16:15:02 19   manage how calls are passed around in the call center and

16:15:06 20   how, essentially how VeriCall is invoked.

16:15:09 21   Q.      And there is the other blue drawing in the top right

16:15:11 22   corner labeled IVR.

16:15:14 23   A.      What is IVR?  IVR is an interactive voice response

16:15:17 24   system.  That's the system we're all familiar with when we

16:15:22 25   call into your bank, your cell phone carrier, you're usually

greeted with a computer voice, that's why it's called

interactive voice response.

Q.      In the bottom left-hand corner there is a cloud

labeled Next Caller.  What is that?

A.      That's where VeriCall is.

Q.      Straight above it there is a little person with a

telephone.  What's that meant to represent?

A.      That's the call center agent.  That's the person when

you're calling in that you actually want to talk to.

Q.      You mean there, the top left corner there is the

little flip phone.  What's that supposed to mean?

A.      That's your phone when you're calling into the call

center.  That's when you're calling in, in the claim, that's

when there is an incoming call from a telephonic device.

Those are words that say from a telephone, that's using your

telephone to call into the bank.

Q.      And the bottom right-hand corner there is a legend.

Can you explain what that shows?

A.      Sure.

        As you said, this is a complicated document.

This is really to inform someone like myself, a telecom

engineer, of how the calls flow into the network of in this

case Dish.  So that legend is very informative because you

see a lot of lines here, and there is dash lines and there

is solid lines.  And the dash lines that represent

16:16:30 1  signaling, so these are signals that are passed back and

16:16:33 2  forth between the different elements of this network to

16:16:37 3  perform the operations of the call management.

16:16:39 4  Q.    What about that solid line at the bottom?

16:16:41 5  A.    The solid line is different.  So when -- what is the

16:16:45 6  purpose of all this signaling?  The purpose is to set up a

16:16:48 7  call.  What is the call?  The connection, the voice

16:16:50 8  connection.  So when you're communicating between you and

16:16:53 9  the agent, you need to communicate through voice.  So all

16:16:56 10 that happens with all these dash lines setting up the call,

16:16:59 11 but once the call is set up, you know it because you're in

16:17:02 12 the call center agent, you can hear their voice and they can

16:17:05 13 hear your voice, so the solid lines represent voice traffic,

16:17:09 14 voice connection.

16:17:10 15 Q.    Okay.  So where on this diagram would an incoming

16:17:14 16 call be?

16:17:16 17 A.    So the incoming call, if you can click to the next

16:17:22 18 part of my demonstrative.  There is the caller.  And there

16:17:25 19 is the agent.  And there is the incoming call, the call

16:17:29 20 coming into the agent.  How do you know it's an incoming

16:17:31 21 call?  We just saw it ringing.

16:17:34 22 Q.    All right.  But how is it that you know that that

16:17:37 23 counts as a call for the claims the way the claims use the

16:17:40 24 term call?

16:17:41 25 A.    Right.  So here we'll go into what was a very

16:17:46 1  important part about the interpretation of claims,

16:17:48 2  interpretation of claim language.  Remember I talked about

16:17:51 3  the Court's claim construction?  A court order on how to

16:17:55 4  define certain claim terms.  And the term call can be --

16:17:59 5  could mean many things, but the Court has defined it given

16:18:03 6  it a definition.  If you go to my next demonstrative.  This

16:18:06 7  is the Court's order when doing an infringement analysis on

16:18:09 8  the claim for the claim term "call."  And any connection

16:18:13 9  over a telecommunications or an information service network

16:18:18 10 and it gives examples of what that can be.  What that

16:18:21 11 essentially means is any connection, that's how to interpret

16:18:25 12 the word "call."

16:18:26 13 Q.    How does that help you determine that the call you

16:18:29 14 pointed to, the call to the agent is the incoming call as

16:18:32 15 that term is used in the claims?

16:18:35 16 A.    If we can go back to the diagram, again, what are we

16:18:39 17 doing here?  We're taking the claims and we're mapping it

16:18:42 18 against the application of the product, the operation of

16:18:45 19 VeriCall working with the call center network.  And so the

16:18:49 20 proper analysis is to say does the system have an incoming

16:18:52 21 call from a telephonic device and use the word call, is

16:18:57 22 there any connection?  Well, certainly there is a connection

16:19:00 23 between the caller and the agent.  And I have depicted it

16:19:02 24 here on my drawing.

16:19:05 25 Q.    Let's move on to the next aspect here.  Before the

16:19:07 1  incoming call is answered, let's sort of start in reverse

16:19:13 2  there.  How is it that you know that the call that you just

16:19:16 3  pointed to, the call to the agent counts as being answered

16:19:19 4  under the way that term is used in the claim?

16:19:21 5  A.      Right.  We have to go back to where we just were so

16:19:24 6  that the first part says an incoming call, and I just

16:19:28 7  pointed to the incoming call, incoming to the agent.  So

16:19:31 8  which call has to be -- for the forensic analysis it has to

16:19:37 9  happen before the incoming call was answered.  What is the

16:19:40 10 incoming call?  It's that call I just pointed to coming into

16:19:43 11 the agent.  It has to be the same one.

16:19:45 12 Q.      How do you know that call is answered?

16:19:47 13 A.      Answered.  Another one, another claim construction

16:19:50 14 from the Court.  So the Court has an order for defining how

16:19:53 15 to interpret, how anybody doing a claim -- a claim analysis,

16:19:57 16 an infringement analysis for this claim must interpret the

16:20:01 17 term answer.  So if you can pull up my next demonstrative.

16:20:05 18 There it is.  So the court order for the term, the claim

16:20:08 19 term "answered" is actually or virtually goes off hook.

16:20:12 20 Q.      What does actually going off hook mean, Mr. Bress?

16:20:15 21 A.      The reason that is defined that way is that the term

16:20:18 22 off hook goes back to I guess the beginning of the telephone

16:20:23 23 network.  And back maybe a long time ago, telephones used to

16:20:29 24 be hanging on the wall and you had a receiver and it hung in

16:20:32 25 the switch and it hung in a hook, and the receiver was hung

16:20:36 1    on the hook and when you took it off the hook that was a

16:20:40 2    switch that would close the switch and draw current back to

16:20:43 3    the signal office telephone switch and that's how the

16:20:46 4    central office telephone company knew you had answered your

16:20:50 5    call.  That's where that term off hook comes from, because

16:20:52 6    there is a hook, the receiver comes off and then it's

16:20:55 7    answered.

16:20:56 8    Q.    That's actually off hook.  What does it mean to go

16:20:59 9    virtually off hook?

16:21:00 10   A.    Right.  So the reason that the two phrases were made

16:21:04 11   so that there would be no disagreement on what answered

16:21:07 12   meant, everybody knows what off hook in an old network

16:21:11 13   meant, picking up the receiver, but in the newer networks

16:21:14 14   the voiceover IP, when you pick up the receiver you press

16:21:18 15   the button, you answer your phone, it's not drawing current

16:21:21 16   into the central office, it's sending a message much like

16:21:24 17   the messages that go back and forth when you're accessing a

16:21:27 18   website and that message would indicate to then answer that

16:21:31 19   call.

16:21:33 20   Q.    Are there any ways to go off hook besides actually or

16:21:35 21   virtually?

16:21:36 22   A.    No, I believe that covered it.

16:21:37 23   Q.    All right.  Let's go back to the diagram here.  So

16:21:40 24   which lady is the agent answering the phone here, actually or

16:21:42 25   virtually?

16:21:44 1    A.    Like I said, it doesn't actually matter.  The claim

16:21:48 2    only matters if the income call is answered.  It could be

16:21:51 3    done actually with an old phone, it could be done virtually

16:21:55 4    with a newer type phone that sends messages.  My

16:21:58 5    understanding is the call centers that are used by Next

16:22:01 6    Caller's customers use voiceover IP technology so it would

16:22:04 7    be virtually in this case, but it could be either.

16:22:07 8    Q.    Okay.  So we spent a lot of time on answered, but

16:22:11 9    there has been a whole lot of talk about before the call is

16:22:14 10   answered.

16:22:15 11   A.    Right.

16:22:16 12   Q.    Can you explain to the jury how this diagram helps

16:22:19 13   answer that at least in the Dish Network implementation that

16:22:23 14   the forensic analysis occurs before the incoming call is

16:22:26 15   answered?

16:22:26 16   A.    Right.  And I have heard quite a bit of dispute about

16:22:30 17   this, but I don't think anybody in this case, we heard it

16:22:34 18   all throughout the testimony, I don't think anybody disputes

16:22:36 19   that VeriCall analysis occurs before an agent answers the

16:22:40 20   call.  I don't think anybody is disputing that.  So in doing

16:22:42 21   my analysis I'm showing that there is an incoming call to

16:22:42 22   the agent and the claim requires go back to the very

16:22:49 23   beginning, it requires that there is a system for performing

16:22:51 24   a forensic analysis on the calling party number on that call

16:22:55 25   before that call is answered.

16:22:57 1    Q.    All right.  Where is it that the Next Caller caller

16:23:01 2    analysis begins in this diagram?

16:23:02 3    A.    So what I want to show here in this diagram is why is

16:23:06 4    that -- why is this happening before an incoming call to the

16:23:10 5    agent is answered.  And so what I have highlighted there is

16:23:13 6    step 1 which is you or I dialing into the bank, getting to

16:23:18 7    the call center.  In that box in the middle, the call will

16:23:22 8    be processed.  And then it gets to step 7.  And step 7 is

16:23:26 9    where the call management system, Mr. Telman labeled the ICM

16:23:30 10   Dish, takes that information from the call, packages into

16:23:33 11   that API and send it to VeriCall.

16:23:36 12   Q.    What happens at step 8?

16:23:38 13   A.    Step 8 is when VeriCall receives that information and

16:23:41 14   does the processing, and it comes up with its score and

16:23:45 15   sends it back to the call center.

16:23:49 16   Q.    Step 8, is that when Next Caller completes its

16:23:51 17   forensic analysis?

16:23:52 18   A.    That's right.  So the analysis has been completed and

16:23:55 19   the score has been sent back to the call center.

16:23:57 20   Q.    What step does the agent answer the telephone call in

16:24:00 21   this diagram?

16:24:02 22   A.    So there are other processing steps here, but the

16:24:03 23   very last step is step 19 and that's when the incoming call

16:24:07 24   to the agent occurs.

16:24:08 25   Q.    And how do you know that comes after the forensic

16:24:11 1    analysis is complete?

16:24:12 2    A.    Well, we have steps 1, 7 and 8, and then 9.  This is

16:24:17 3    a call flow document.  It's developed, it's made to show

16:24:21 4    what the steps in the call processing are, so they're

16:24:25 5    necessarily in chronological order.

16:24:27 6    Q.    That's Dish Networks, but how do we know that it

16:24:31 7    operates the same way for Next Caller's other callers?

16:24:33 8    A.    There is a lot of testimony that the networks are

16:24:36 9    fairly similar.  You can pull up my next demonstrative.  At

16:24:39 10   least we heard this earlier, we heard this for two hours

16:24:42 11   today listening to the testimony where only half of it was

16:24:46 12   about this, making this point, that nobody is disagreeing

16:24:51 13   that an agent, that this analysis is VeriCall's analysis on

16:24:55 14   caller-ID information occurs before the agent picks up the

16:24:59 15   call and Dish, BBVA, Capital One, Comcast, the corporate

16:25:04 16   representatives for each of those companies has confirmed

16:25:07 17   that that's exactly how their system operates.

16:25:09 18   Q.    In your opinion, Mr. Bress, does Next Caller directly

16:25:12 19   infringe element 32.1 of claim 32 of the '532 Patent?

16:25:17 20   A.    Yes, my analysis shows that element 32.1 is

16:25:21 21   infringed.

16:25:21 22            MR. BLOCK:  Your Honor, I know we are at 4:25.

16:25:24 23   This may be a great natural stopping point.

16:25:27 24            THE COURT:  Let's stop.

16:25:28 25            Members of the jury, we're going to stop for the

1     night and pick up tomorrow at 9 o'clock.  And I wish you all

2     safe travels on your way home.  And we'll see you in the

3     morning.

4               (Jury leaving the courtroom at 4:25 p.m.)

5               THE COURT:  All right.  Have a seat.  You can

6     step down, Mr. Bress.

7               THE WITNESS:  Thank you, Your Honor.

8               THE COURT:  All right.  Just a couple of

9     questions I had.  Where are we on the prior art and verdict

10     sheet?

11               MS. COLUMBIA:  Your Honor, I looked at it.  I

12     see the issue.  We would be amenable, if what you're asking

13     could we do a 102 and a 103, that's fine with us.

14               THE COURT:  Any objection?

15               MR. TUMINARO:  No objection, Your Honor.

16               MS. COLUMBIA:  I think there will be other

17     changes, Your Honor, in light of the testimony we just

18     heard.

19               THE COURT:  I was going to ask.  What's all this

20     direct and indirect infringement?  We have all claims for

21     indirect and all claims for direct, but what I just heard

22     was direct on two patents and indirect on one.  Is that

23     right?

24               MR. TUMINARO:  Yes, that's right, Your Honor.

25               THE COURT:  Can we make that change?

16:27:03 1           MR. BLOCK:  Yes, Your Honor.

16:27:03 2           THE COURT:  Because tomorrow I have a Markman

16:27:05 3  hearing after this, so you guys, we can't just wait until

16:27:09 4  Thursday or we're going to be here all night because of

16:27:12 5  this.  So we'll change the claims for direct and indirect,

16:27:19 6  remind me which ones are direct and which ones are indirect.

16:27:23 7           MR. BLOCK:  The directs are the '532 and '985

16:27:27 8  Patents.  Indirect '913.  All claims for each respectively.

16:27:31 9           And, Your Honor, one other question on the prior

16:27:34 10  art.  It would be helpful if we knew what we're dealing with

16:27:38 11  here in terms of the obviousness and anticipation, what

16:27:41 12  references, there are still a lot of references left.

16:27:44 13           THE COURT:  My guess is -- when are we going to

16:27:49 14  know that?

16:27:51 15           MS. COLUMBIA:  Your Honor, we had a whole

16:27:52 16  process before we were with you last week, we narrowed the

16:27:56 17  number of references, we narrowed them quite significantly

16:28:00 18  and our expert, Dr. Brody, will be testifying to those as

16:28:04 19  soon as we begin our case.

16:28:17 20           My colleague, Mr. Brooks, is pointing out

16:28:21 21  because it's possible we'll reach Dr. Brody, possibly we'll

16:28:22 22  reach Dr. Brody tomorrow.  I don't know that we will, but in

16:28:22 23  an abundance of caution, we'll send over the slides tonight

16:28:30 24  which should help them see the use of the references.

16:28:36 25           THE COURT:  There were six.  There were six

16:28:40 1   references in the obviousness instruction.  Is that what

16:28:43 2   we're thinking, six?

16:28:46 3                MS. COLUMBIA:  We may be down to five.  Would it

16:28:48 4   be helpful, Your Honor, if we sent the court an e-mail

16:28:52 5   tonight or at some point?

16:28:55 6                THE COURT:  When you figure out when he's going

16:28:57 7   to testify.

16:28:59 8                MR. BLOCK:  And we'll send a demonstrative

16:29:02 9   tonight for us.

16:29:02 10               THE COURT:  All right.  Okay.  The other thing

16:29:11 11  is in looking through the jury instructions which again

16:29:14 12  we're trying to deal with, it seems like there are at least

16:29:19 13  two terms in the claim construction that aren't in any

16:29:24 14  asserted claim.  So at least as we saw, it was the

16:29:31 15  correction of information from infomation, I don't see that

16:29:36 16  in any of the current claims.  And then the answer

16:29:39 17  condition.

16:29:40 18               MR. BLOCK:  I think that's right, Your Honor.

16:29:42 19               THE COURT:  I can remove that.

16:29:42 20               MS. COLUMBIA:  Yes, Your Honor.

16:30:02 21               THE COURT:  And then the thing that we're going

16:30:05 22  to need some help with when we go through the jury

16:30:11 23  instructions on Thursday is the -- is in the false

16:30:14 24  advertising.  I need some law, not just citations to other

16:30:21 25  jury instructions from other judges, or even my jury

16:30:25 1    instruction from the Gavrieli case, because we're trying to

16:30:29 2    figure out if we need to define -- I don't remember what the

16:30:37 3    term is at the moment.  Completely unsubstantiated.  Did I

16:30:45 4    get that one right?  Completely unsubstantiated.  And we're

16:30:49 5    having a hard time figuring out if we need to define it, and

16:30:53 6    it doesn't seem like -- I just don't know what support

16:30:57 7    anybody is giving me for that, for the two different

16:31:01 8    provisions that I have, or the proposals that I have.  So

16:31:05 9    we're going to need some support and help.  And what I gave

16:31:11 10   you in the revised version might still have stuff in there

16:31:18 11   that we need to work through.

16:31:20 12           The other question I had in looking through the

16:31:22 13   instructions is willful blindness.  Is that an issue?

16:31:26 14           MR. TUMINARO:  It may be an issue, Your Honor.

16:31:28 15   It depends on how the testimony comes out.  I'm just not

16:31:32 16   sure exactly at this point, but it still may be an issue.

16:31:36 17           THE COURT:  Okay.  We looked in the pretrial

16:31:39 18   order and it was like at most a passing reference, so we

16:31:44 19   weren't sure if that was in the case or not.  If you don't

16:31:42 20   know off the top of your head, that's fine.

16:31:51 21           MS. COLUMBIA:  I don't know, but I'm assuming

16:31:52 22   it's in the false advertising section, right.

16:31:52 23           THE COURT:  No, I think -- I thought it was in

16:31:57 24   the patent infringement, maybe for inducement, maybe for

16:32:00 25   indirect infringement.

16:32:02 1             MR. TUMINARO:  That's correct, for indirect

16:32:03 2  infringement.

16:32:04 3             THE COURT:  For both, it's in there twice,

16:32:07 4  inducement and contributory, look at those numbered things

16:32:11 5  toward the bottom of the instruction.

16:32:13 6             MS. COLUMBIA:  Okay.  Will do, Your Honor.

16:32:16 7             THE COURT:  Okay.  I think those were all my

16:32:19 8  questions.

16:32:20 9             Anything else we need to discuss?

16:32:22 10             MR. TUMINARO:  The one housekeeping issue, Your

16:32:24 11  Honor, about the closing the courtroom.  We were working

16:32:26 12  with the other side about trying to seal the court --

16:32:29 13  requesting permission to seal the courtroom for Mr. Holzen's

16:32:33 14  testimony.  It would relate to specific pricing information,

16:32:37 15  and cost information, it would be limited to about five or

16:32:41 16  ten minutes.  We're working with the other side.  I think we

16:32:44 17  may be able to reach an agreement.  That will be an issue

16:32:47 18  for tomorrow's testimony.

16:32:48 19             THE COURT:  Okay.

16:32:51 20             MS. COLUMBIA:  I think I have an e-mail that I'm

16:32:52 21  not allowed to read in court that tells me where we are on

16:32:52 22  that, Your Honor.

16:32:52 23             THE COURT:  Okay.

16:32:57 24             MS. COLUMBIA:  And I think there was some

16:33:00 25  financial information that my client revealed today that may

16:33:03 1    make it harder for me to agree, but I'm going to try.

16:33:07 2              THE COURT:  Okay.  Do your best.

16:33:10 3              MS. COLUMBIA:  Your Honor, can I ask one

16:33:12 4    question before you leave the bench?  I expect that the

16:33:15 5    plaintiffs will rest tomorrow.  And I just -- if you could

16:33:20 6    advised me on your preferred procedure for Rule 50 motion.

16:33:24 7              THE COURT:  You can just -- you don't have to

16:33:31 8    make a motion right at the end of their case, but you can

16:33:34 9    put it on the record, you know, when we have a break when

16:33:38 10   the jury is not here.

16:33:39 11             MS. COLUMBIA:  Okay.  Should I stand up and just

16:33:42 12   say the words "Rule 50" or should I wait until the break?

16:33:45 13             THE COURT:  You can wait until the break and I

16:33:47 14   will understand that you have preserved that by what you

16:33:49 15   just said.

16:33:49 16             MS. COLUMBIA:  Thank you, Your Honor.

16:33:51 17             THE COURT:  Anything else?

16:33:54 18             MS. COLUMBIA:  Sorry.

16:33:55 19             THE COURT:  That's okay.

16:33:55 20             MS. COLUMBIA:  Risky.  From what --

16:33:59 21             THE COURT:  I'm tired.

16:34:00 22             MS. COLUMBIA:  From what you said about your

16:34:02 23   schedule, I'm understanding that we're likely to have a

16:34:07 24   charge conference on Thursday?

16:34:08 25             THE COURT:  Thursday.

16:34:09 1          MS. COLUMBIA:  With closing on Friday likely?

16:34:12 2          THE COURT:  I guess it depends when we're going

16:34:14 3 to finish.  If you're going to finish tomorrow, then we

16:34:19 4 probably would have the charge conference Thursday morning

16:34:21 5 and close Thursday afternoon, but otherwise, yes.

16:34:24 6          MS. COLUMBIA:  Thank you, Your Honor.

16:34:25 7          THE COURT:  Okay.

8          (Court adjourned at 4:34 p.m.)

9

10          I hereby certify the foregoing is a true and
accurate transcript from my stenographic notes in the proceeding.

11

12                              /s/ Dale C. Hawkins
                                Official Court Reporter
13                              U.S. District Court

14

15

16

17

18

19

20

21

22

23

24

25